No. 22-1757

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MATTHEW GIBSON,
Plaintiff-Appellee
v.

LOUISE E. GOLDSTON, individual
Defendant-Appellant

and

COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision;
JEFF MCPEAKE, individually; BOBBY STUMP, individually, BRIAN WHITE,
Individually

Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

---

JOINT APPENDIX – VOLUME I OF II
(Pages 1 - 509)

---

<table>
<tr><td>

Jennifer E. Tully (WV Bar #9356)
John P. Fuller (WV Bar #9116)
Adam K. Strider (WV Bar #12483)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia  25337-3710
T: 304.345.4222
F: 304.343.3133
jtully@baileywyant.com
jfuller@baileywyant.com
astrider@baileywyant.com

*Counsel for Defendants-Appellants*

</td><td>

John H. Bryan (WV Bar #10259)
John H. Bryan, Attorney at Law
411 Main Street
P.O. Box 366
Union, WV 24983
T: 304.772.4999
F: 304.772.4998
jhb@johnbrvanlaw.com

*Counsel for Plaintiff-Appellee*

</td></tr>
</table>

# TABLE OF CONTENTS

## VOLUME I OF II

Page

Docket Sheet ....................................................................................... 1

Complaint............................................................................................ 13

Defendant Louise E. Goldston's Motion to Dismiss ........................... 51

    Exhibit A, Memorandum in Support of Defendant
    Louise E. Goldston's Motion to Dismiss .................................. 57

Memorandum in Support of Defendant
Louise E. Goldston's Motion to Dismiss............................................ 75

Plaintiff's Response to Defendant
Louise E. Goldston's Motion to Dismiss............................................ 92

Reply Memorandum of Law in Support of Defendant
Louise E. Goldston's Motion to Dismiss............................................ 107

Order ................................................................................................... 114

Supplemental Memorandum In Support of Defendant
Louise E. Goldston's Motion to Dismiss............................................ 115

    Exhibit 1, WVSCA Order *In re Goldston*................................. 122

Plaintiff's Supplemental Brief in Response to
Defendant Louise E. Goldston's Motion to Dismiss....................... 152

Defendant Louise E. Goldston's Motion for Summary Judgment ....... 171

    Exhibit A, Defendant Louise E. Goldston's Responses to
    Defendant Kyle Lusk's First Set of Requests
    for Admission ......................................................................... 175

    Exhibit B, Portions of Deposition of Matthew Gibson............... 181

    Exhibit C, Portions of the Deposition of Louise E. Goldston ... 191

    Exhibit D, Video previously uploaded)

    Exhibit E, Video (previously uploaded)

i

Exhibit F, Portions of Deposition of Jeff McPeake ................................... 209

Exhibit G, Portions of Deposition of Brian White ..................................... 215

Memorandum in Support of Defendant Louise E. Goldston's
Motion for Summary Judgment ................................................................. 221

Plaintiff's Motion for Summary Judgment Against
Defendant Louise E. Goldston ................................................................... 235

Exhibit 1, Deposition of Louise Goldston ................................................ 239

Exhibit 2, Exhibits to the Deposition of Louise Goldston ....................... 347

Exhibit 3, Deposition of Jeff McPeake .................................................... 433

## **VOLUME II OF II**

Exhibits to Plaintiff's Motion for Summary Judgment Against
Defendant Louise E. Goldston, *Continued*:

Exhibit 4, Deposition of Bobby Stump ..................................................... 510

Exhibit 5, Deposition of Matthew Gibson ................................................ 572

Exhibit 6, Glen R. Stotler Letter .............................................................. 790

Exhibit 7, Lawyer Disciplinary Board Investigative Panel Closing ......... 793

Plaintiff's Memorandum in Support of His Motion for
Summary Judgment Against Defendant Louse E. Goldston ........................... 844

Defendant Louise E. Goldston's Response to Plaintiff's
Motion for Summary Judgment ..................................................................... 866

Plaintiff's Response in Opposition to Defendant
Louise E. Goldston's Motion for Summary Judgment .................................. 878

Reply Memorandum in Support of Defendant
Louise E. Goldston's Motion for Summary Judgment .................................. 882

Memorandum and Order ................................................................................. 886

Defendant Louise E. Goldston's Notice of Appeal ....................................... 905

STAYED,CLOSED,APPEAL,LC-3

# United States District Court
## Southern District of West Virginia (Beckley)
## CIVIL DOCKET FOR CASE #: 5:21-cv-00181

Gibson v. Goldston et al                              Date Filed: 03/22/2021
Assigned to: Judge Frank W. Volk                     Date Terminated: 07/18/2022
Cause: 42:1983 Civil Rights Act                      Jury Demand: Plaintiff
                                                     Nature of Suit: 440 Civil Rights: Other
                                                     Jurisdiction: Federal Question

**Plaintiff**

**Matthew Gibson**                    represented by  **John H. Bryan**
                                                     JOHN H. BRYAN, ATTORNEYS AT LAW
                                                     P. O. Box 366
                                                     Union, WV 24983
                                                     304/772-4999
                                                     Fax: 304/772-4998
                                                     Email: jhb@johnbryanlaw.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Louise E. Goldston**                represented by  **Adam K. Strider**
*individually*                                       BAILEY & WYANT
                                                     P.O. Box 3710
                                                     Charleston, WV 25337-3710
                                                     304/345-4222
                                                     Email: astrider@baileywyant.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jennifer E. Tully**
                                                     BAILEY & WYANT
                                                     P. O. Box 3710
                                                     Charleston, WV 25337-3710
                                                     304/345-4222
                                                     Fax: 304/343-3133
                                                     Email: jtully@baileywyant.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **John P. Fuller**
                                                     BAILEY & WYANT
                                                     P. O. Box 3710
                                                     Charleston, WV 25337-3710
                                                     304/345-4222
                                                     Fax: 304/343-3133

WVSD NextGen CM/ECF Release 1.7.1

Email: jfuller@baileywyant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**County Commission of Raleigh County**          represented by    **J. Victor Flanagan**
*a political subdivision*                                                          PULLIN FOWLER FLANAGAN BROWN
& POE
252 George Street
Beckley, WV 25801
304-254-9300
Fax: 304-255-5519
Email: vflanagan@pffwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin J. Robinson**
PULLIN FOWLER FLANAGAN BROWN
& POE
252 George Street
Beckley, WV 25801
304/254-9300
Fax: 304/255-5519
Email: krobinson@pffwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeff McPeake**                    represented by    **J. Victor Flanagan**
*individually*                                              (See above for address)
*TERMINATED: 07/13/2022*                          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin J. Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brian White**                    represented by    **J. Victor Flanagan**
*individually*                                              (See above for address)
*TERMINATED: 07/13/2022*                          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin J. Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bobby Stump**                    represented by    **J. Victor Flanagan**
*individually*                                              (See above for address)
*TERMINATED: 07/13/2022*                          *LEAD ATTORNEY*

WVSD NextGen CM/ECF Release 1.7.1

*ATTORNEY TO BE NOTICED*

**Kevin J. Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kyle Lusk**                                    represented by  **Arie M. Spitz**
*individually*                                                    DINSMORE & SHOHL
*TERMINATED: 03/29/2022*                                          P. O. Box 11887
                                                                 Charleston, WV 25339-1887
                                                                 304/357-0900
                                                                 Fax: 304/357-0919
                                                                 Email: arie.spitz@dinslaw.com
                                                                 *LEAD ATTORNEY*

                                                                 **Jason L. Holliday**
                                                                 DINSMORE & SHOHL
                                                                 Suite 1300
                                                                 707 Virginia Street, East
                                                                 Charleston, WV 25301
                                                                 304-357-9918
                                                                 Fax: 304-357-0919
                                                                 Email: jason.holliday@dinsmore.com
                                                                 *LEAD ATTORNEY*

                                                                 **Kevin A. Nelson**
                                                                 DINSMORE & SHOHL
                                                                 P. O. Box 11887
                                                                 Charleston, WV 25339
                                                                 304/357-0900
                                                                 Fax: 304/357-0919
                                                                 Email: kevin.nelson@dinsmore.com
                                                                 *LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2021 | 1 | COMPLAINT. Filing Fee $402.00. Receipt # AWVSDC-7908653. (Attachment: # 1 Civil Cover Sheet) (btm) (Entered: 03/23/2021) |
| 03/22/2021 | | CASE assigned to Judge Frank W. Volk. (klc) (Entered: 03/23/2021) |
| 03/23/2021 | 2 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED JANUARY 4, 2016. Discovery referred to Magistrate Judge Aboulhosn. (cc: counsel of record; any unrepresented party) (btm) |
| 03/24/2021 | 3 | SUMMONS SUBMITTED by Matthew Gibson for All Defendants, (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Bryan, John) |
| 03/24/2021 | 4 | ELECTRONIC SUMMONS ISSUED as to Louise E. Goldston, County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White, Kyle Lusk, re: 1 Complaint. Summons returnable 21 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate |

JA003

|  |  |  |
|---|---|---|
|  |  | service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (Attachments: # 1 Summons - Raleigh County Commission, # 2 Summons - Jeff McPeake, # 3 Summons - Brian White, # 4 Summons - Bobby Stump, # 5 Summons - Kyle Lusk) (btm) |
| 03/25/2021 | 5 | NOTICE OF ATTORNEY APPEARANCE by J. Victor Flanagan and Kevin J. Robinson on behalf of County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White. (Flanagan, J.) (Modified text on 3/25/2021 to include additional attorney) (mk). |
| 04/05/2021 | 6 | SUMMONS RETURNED EXECUTED by Matthew Gibson for service re: 4 Summons upon Louise E. Goldston, Louise Goldston served on 3/29/2021; County Commission of Raleigh County served on 3/29/2021; Person Served: Carolyn Lilly; Jeff McPeake served on 3/29/2021; Brian White served on 3/29/2021; Bobby Stump served on 3/29/2021; Kyle Lusk served on 3/29/2021. (Attachments: # 1 Executed Summons, # 2 Executed Summons, # 3 Executed Summons, # 4 Executed Summons, # 5 Executed Summons) (Bryan, John) (Modified on 4/6/2021 to add defendants' names, dates of service and to set answer deadline)(mk). |
| 04/05/2021 |  | SET ANSWER DEADLINE for Louise E. Goldston, County Commission of Raleigh County, Jeff McPeake, Brian White, Bobby Stump, Kyle Lusk to 4/19/2021 (mk) (Entered: 04/06/2021) |
| 04/15/2021 | 7 | NOTICE OF ATTORNEY APPEARANCE by Arie M. Spitz, Kevin A. Nelson and Jason L. Holliday on behalf of Kyle Lusk. (Spitz, Arie) |
| 04/16/2021 | 8 | ORDER AND NOTICE. Pursuant to LR Civ P 16.1, it is ORDERED that the following dates are hereby fixed as the time by or on which certain events must occur: Motions under FR Civ P 12(b) - 5/17/2021. Last day for Rule 26(f) meeting - 6/15/2021. Last day to file Report of Parties Planning Meeting and Scheduling Order Worksheet - 6/22/2021. Telephonic Scheduling Conference at 4:00 p.m. on 7/9/2021, before the undersigned, unless canceled. Entry of Scheduling Order - 7/16/2021. Last day to serve FR Civ P 26(a)(1) disclosures - 7/20/2021. Signed by Judge Frank W. Volk on 4/16/2021. (cc: counsel of record; any unrepresented parties) (slr) |
| 04/19/2021 | 9 | MOTION by Louise E. Goldston to Dismiss With Prejudice re: 1 Complaint. (Tully, Jennifer) (Modified on 4/19/2021 to remove Exhibit A-Memorandum in Support of Motion. Memorandum in Support filed as stand-alone document; see next entry) (mk). |
| 04/19/2021 | 10 | MEMORANDUM by Louise E. Goldston in support of 9 MOTION by Louise E. Goldston to Dismiss With Prejudice re: 1 Complaint. (Tully, Jennifer) |
| 04/19/2021 |  | NOTICE OF DOCKET CORRECTION re: 9 Motion by Louise E. Goldston to Dismiss With Prejudice re: 1 Complaint. ERROR: Memorandum in Support of Motion filed as an attachment. CORRECTION: Removed Memorandum in Support as it is also filed as stand-alone document; see next entry #10. (mk) |
| 04/19/2021 | 11 | MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White to Dismiss With Prejudice re: 1 Complaint. (Attachment: # 1 Exhibit A) (Robinson, Kevin) (Modified on 4/19/2021 to add link to #1 Complaint) (mk). |
| 04/19/2021 | 12 | MEMORANDUM OF LAW by County Commission of Raleigh County, Jeff McPeake, Brian White, Bobby Stump in support of 11 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White to Dismiss With Prejudice. (Robinson, Kevin) (Modified on 4/19/2021 to add party filer)(mk). |
| 04/19/2021 | 13 | MOTION by Kyle Lusk to Dismiss With Prejudice. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Spitz, Arie) |
| 04/19/2021 | 14 | MEMORANDUM OF LAW by Kyle Lusk in support of 13 MOTION by Kyle Lusk to |

| | | Dismiss With Prejudice. (Spitz, Arie) |
|---|---|---|
| 05/03/2021 | 15 | RESPONSE by Matthew Gibson in opposition to 9 MOTION by Louise E. Goldston to Dismiss With Prejudice re: 1 Complaint. (Bryan, John) |
| 05/03/2021 | 16 | RESPONSE by Matthew Gibson in opposition to 11 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White to Dismiss With Prejudice. (Bryan, John) (Modified on 5/4/2021 to remove second event response in support) (mk). |
| 05/03/2021 | 17 | RESPONSE by Matthew Gibson in opposition to 13 MOTION by Kyle Lusk to Dismiss With Prejudice. (Bryan, John) |
| 05/10/2021 | 18 | REPLY by County Commission of Raleigh County, Jeff McPeak, Bobby Stump, Brian White to 16 Response In Opposition. (Robinson, Kevin) (Modified on 5/11/2021 to replace image; no signature) (mk) |
| 05/10/2021 | 19 | REPLY Memorandum by Louise E. Goldston to 15 Response In Opposition. (Tully, Jennifer) |
| 05/10/2021 | 20 | REPLY by Kyle Lusk to 17 Response In Opposition. (Spitz, Arie) |
| 05/11/2021 | | NOTICE OF DOCKET CORRECTION re: 18 Reply by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White to 16 Response In Opposition. ERROR: Document did not contain signature. CORRECTION: Obtained signature and replaced image. (mk) |
| 06/15/2021 | 21 | RULE 26(f) REPORT OF PLANNING MEETING by Kyle Lusk, Louise E. Goldston, County Commission of Raleigh County, Jeff McPeak, Brian White, Bobby Stump, Matthew Gibson. (Spitz, Arie) (Modified on 6/15/2021 to add party filers) (mk). |
| 06/21/2021 | 22 | ORDER. The telephonic scheduling conference is CANCELED. This case shall proceed as follows: Amending the pleadings or joining parties - 8/11/2021. Last date to serve discovery requests - 12/25/2021. Opening Rule 26 expert disclosures - 12/9/2021. Responsive Rule 26 expert disclosures - 1/10/2022. Rebuttal Rule 26 expert disclosure - 1/24/2022. Discovery to close - 2/7/2022. Dispositive motions deadline - 2/28/2022. Response to dispositive motion - 3/14/2022. Reply to response to dispositive motion - 3/21/2022. Settlement Meeting - 5/2/2022. Motion in limine deadline - 5/9/2022. Responses for motions in limine deadline - 5/16/2022. Proposed pretrial order to defendant - 5/4/2022. Integrated pretrial order - 5/11/2022. Pretrial Conference on 5/23/2022, at 10:00 a.m. Proposed jury charge - 6/13/2022. Final settlement conference on 6/20/2022, at 10:00 a.m. Civil Jury Trial on 6/21/2022, at 9:00 a.m. All proceedings shall be held by the court at the Robert C. Byrd United States Courthouse, Beckley, West Virginia. Signed by Judge Frank W. Volk on 6/21/2021. (cc: counsel of record; any unrepresented parties) (msa) |
| 07/20/2021 | 23 | CERTIFICATE OF SERVICE by Kyle Lusk for Rule 26(a)(1) Initial Disclosures. (Spitz, Arie) |
| 07/20/2021 | 24 | CERTIFICATE OF SERVICE by Matthew Gibson for Rule 26(a)(1) Initial Disclosures. (Bryan, John) |
| 07/20/2021 | 25 | CERTIFICATE OF SERVICE by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Rule 26(a)(1) Initial Disclosures. (Robinson, Kevin) |
| 07/20/2021 | 26 | CERTIFICATE OF SERVICE by Louise E. Goldston for Rule 26(a)(1) Initial Disclosures. (Strider, Adam) |
| 08/16/2021 | 27 | CERTIFICATE OF SERVICE by Jeff McPeake for First Set of Interrogatories and Request for Production of Documents to the Plaintiff. (Robinson, Kevin) |

| 08/16/2021 | 28 | CERTIFICATE OF SERVICE by Bobby Stump, Brian White for First Set of Interrogatories and Request for Production of Documents to the Plaintiff. (Robinson, Kevin) |
| 08/17/2021 | 29 | CERTIFICATE OF SERVICE by Louise E. Goldston for Request for Admission to Plaintiff. (Tully, Jennifer) |
| 08/18/2021 | 30 | AMENDED CERTIFICATE OF SERVICE by Louise E. Goldston for Request for Admission to Plaintiff. (Tully, Jennifer) |
| 09/20/2021 | 31 | CERTIFICATE OF SERVICE by Matthew Gibson for Response To Defendant Jeff McPeake's First Set of Interrogatories And Request For Production Of Documents To Plaintiff. (Bryan, John) |
| 09/20/2021 | 32 | CERTIFICATE OF SERVICE by Matthew Gibson for Response To Defendants Brian White And Bobby Stump's First Set of Interrogatories And Request For Production Of Documents. (Bryan, John) |
| 09/20/2021 | 33 | CERTIFICATE OF SERVICE by Matthew Gibson for Response To Defendant Louise E. Goldston's Request For Admission To Plaintiff. (Bryan, John) |
| 10/29/2021 | 34 | CERTIFICATE OF SERVICE by Matthew Gibson for Plaintiff's First Set of Combined Discovery Requests to Defendant Louise E. Goldston. (Bryan, John) |
| 11/08/2021 | 35 | CERTIFICATE OF SERVICE by Kyle Lusk for First Set of Interrogatories, Requests for Production and Requests for Admission to Plaintiff. (Holliday, Jason) |
| 11/08/2021 | 36 | CERTIFICATE OF SERVICE by Kyle Lusk for First Set of Requests for Admission to Defendant Judge Louise E. Goldston. (Holliday, Jason) |
| 11/29/2021 | 37 | CERTIFICATE OF SERVICE by Louise E. Goldston for Responses to Plaintiff's First Set of Combined Discovery Requests. (Tully, Jennifer) |
| 11/29/2021 | 38 | CERTIFICATE OF SERVICE by Louise E. Goldston for Responses to Defendant Kyle Lusk's First Set of Requests for Admission. (Tully, Jennifer) |
| 12/03/2021 | 39 | ORDER directing Plaintiff Matthew Gibson and Defendant Louise E. Goldston each file a supplemental brief on or before 12/17/2021, addressing the effect herein, if any, of In re Goldston. Signed by Judge Frank W. Volk on 12/3/2021. (cc: counsel of record; any unrepresented party) (arb) |
| 12/10/2021 | 40 | CERTIFICATE OF SERVICE by Matthew Gibson for Response To Defendant Kyle Lusk's First Set of Interrogatories, Requests For Production of Documents and Requests For Admission To Plaintiff. (Bryan, John) |
| 12/10/2021 | 41 | CERTIFICATE OF SERVICE by Matthew Gibson for First Set Of Combined Discovery Requests To Defendant Kyle Lusk. (Bryan, John) |
| 12/17/2021 | 42 | SUPPLEMENTAL MEMORANDUM by Louise E. Goldston re: the Court's 39 Order. (Attachment: # 1 Exhibit 1)(Tully, Jennifer) |
| 12/17/2021 | 43 | SUPPLEMENTAL BRIEF by Matthew Gibson re: the Court's 39 Order. (Bryan, John) |
| 01/10/2022 | 44 | CERTIFICATE OF SERVICE by Kyle Lusk for Rule 26(a)(2) Expert Testimony Disclosures. (Spitz, Arie) |
| 01/10/2022 | 45 | CERTIFICATE OF SERVICE by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Rule 26(a)(2) Expert Testimony Disclosures. (Robinson, Kevin) |
| 01/10/2022 | 46 | CERTIFICATE OF SERVICE by Louise E. Goldston for Rule 26(a)(2) Expert Testimony |

| | | |
|---|---|---|
| | | Disclosures. (Strider, Adam) |
| 01/11/2022 | 47 | STIPULATION EXTENDING TIME for Kyle Lusk to Respond to Plaintiff's Discovery Requests by Kyle Lusk, Matthew Gibson (Holliday, Jason) (Modified on 1/11/2022 to add party filer) (mk). |
| 02/02/2022 | 48 | NOTICE OF DEPOSITION by Louise E. Goldston of Matthew Gibson on 02/07/2022 at 10:00 a.m. (Tully, Jennifer) |
| 02/02/2022 | 49 | NOTICE OF DEPOSITION by Matthew Gibson of Louise E. Goldston on 2/9/22 at 10:00 am (Bryan, John) |
| 02/03/2022 | 50 | NOTICE OF DEPOSITION by Matthew Gibson of Jeff McPeake on 2/7/2022 at 1:00 p.m. (Bryan, John) |
| 02/03/2022 | 51 | NOTICE OF DEPOSITION by Matthew Gibson of Bobby Stump on 2/7/2022 at 2:00 p.m. (Bryan, John) |
| 02/07/2022 | 52 | JOINT MOTION by Matthew Gibson, Louise E. Goldston, County Commission of Raleigh County, Kyle Lusk to Modify the Scheduling Order re: 22 Order. (Bryan, John) (Modified on 2/7/2022 to add party filers) (mk). |
| 02/07/2022 | 53 | NOTICE OF Cancelled Deposition of Bobby Stump by Matthew Gibson re: 51 Notice to Take or Amend Deposition (Bryan, John) |
| 02/07/2022 | 54 | NOTICE of Canceled Deposition of Jeff McPeake by Matthew Gibson re: 50 Notice to Take or Amend Deposition (Bryan, John) |
| 02/07/2022 | 55 | NOTICE of Canceled Deposition of Louise E. Goldston by Matthew Gibson re: 49 Notice to Take or Amend Deposition (Bryan, John) |
| 02/14/2022 | 56 | ORDER granting in part parties' 52 Joint Motion to Modify the Scheduling Order and directing that the Scheduling Order previously entered on 6/21/2021 is AMENDED as follows: Discovery to close - 3/8/2022. Dispositive motions deadline - 3/28/2022. Response to dispositive motion - 4/11/2022. Reply to response to dispositive motion - 4/18/2022. Settlement Meeting - 5/30/2022. Motion in limine deadline - 6/6/2022. Responses for motions in limine deadline - 6/13/2022. Proposed pretrial order to defendant - 6/2/2022. Integrated pretrial order - 6/9/2022. Pretrial Conference on 6/24/2022 at 10:00 AM. Proposed jury charge - 7/11/2022. Final settlement conference on 7/15/2022 at 10:30 AM. Civil Jury Trial on 7/19/2022 at 09:00 AM. All proceedings shall be held by the court at the Robert C. Byrd United States Courthouse, Beckley, West Virginia. Signed by Judge Frank W. Volk on 2/14/2022. (cc: counsel of record; any unrepresented parties) (mfo) |
| 02/18/2022 | 57 | NOTICE OF DEPOSITION by Matthew Gibson of Louise E. Goldston on 3/1/2022 at 9:00 a.m. (Bryan, John) |
| 02/18/2022 | 58 | AMENDED NOTICE OF DEPOSITION by Louise E. Goldston of Matthew Gibson on 02/23/2022 at 10:00 a.m. (Tully, Jennifer) |
| 02/18/2022 | 59 | NOTICE OF DEPOSITION by Matthew Gibson of Jeff McPeake on 2/23/22 at 1:00 p.m. (Bryan, John) |
| 02/18/2022 | 60 | NOTICE OF DEPOSITION by Matthew Gibson of Bobby Stump on 03/01/22 at 1:00 p.m. (Bryan, John) |
| 02/18/2022 | 61 | NOTICE OF DEPOSITION by Matthew Gibson of Brian White on 03/01/22 at 2:00 p.m. (Bryan, John) |
| 03/28/2022 | 62 | PROPOSED ORDER Agreed Dismissal Order as to Kyle Lusk by Kyle Lusk, Matthew |

| | | |
|---|---|---|
| | | Gibson (Spitz, Arie) (Modified on 3/28/2022 to add party filer) (mk). |
| 03/28/2022 | 63 | MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Summary Judgment (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (Robinson, Kevin) |
| 03/28/2022 | 64 | MEMORANDUM OF LAW by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in support of 63 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Summary Judgment (Robinson, Kevin) |
| 03/28/2022 | 65 | MOTION by Louise E. Goldston for Summary Judgment (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit H)(Strider, Adam) See entry #69 for Exhibits D and E (thumb drive)(ts). |
| 03/28/2022 | 66 | MEMORANDUM by Louise E. Goldston in support of 65 MOTION by Louise E. Goldston for Summary Judgment (Strider, Adam) |
| 03/28/2022 | 67 | MOTION by Matthew Gibson for Summary Judgment Against Defendant Louise E. Goldston (Attachments: # 1 Goldston Deposition, # 2 Goldston Deposition Exhibits, # 3 McPeake Deposition, # 4 Stump Deposition, # 5 Gibson Deposition, # 6 Stotler Letter, # 7 ODC Report)(Bryan, John) |
| 03/28/2022 | 68 | MEMORANDUM by Matthew Gibson in support of 67 MOTION by Matthew Gibson for Summary Judgment Against Defendant Louise E. Goldston (Bryan, John) |
| 03/29/2022 | 69 | EXHIBITS D AND E by Louise E. Goldston in support of 65 Motion for Summary Judgment. (Thumb drive maintained in the Clerk's Office, Beckley Division) (btm) |
| 03/29/2022 | 70 | ORDER The 9 , 11 , and 13 Motions to Dismiss are DENIED WITHOUT PREJUDICE. Signed by Judge Frank W. Volk on 3/29/2022. (cc: counsel of record; any unrepresented party) (kew) |
| 03/29/2022 | 71 | DISMISSAL ORDER directing that this action is DISMISSED WITH PREJUDICE as to Kyle Lusk only, each party is to bear their own attorney fees and costs of action. Signed by Judge Frank W. Volk on 3/29/2022. (cc: counsel of record; any unrepresented party) (kew) |
| 04/11/2022 | 72 | RESPONSE by Louise E. Goldston in opposition to 67 MOTION by Matthew Gibson for Summary Judgment Against Defendant Louise E. Goldston (Strider, Adam) |
| 04/11/2022 | 73 | RESPONSE by Matthew Gibson in opposition to 63 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Summary Judgment (Bryan, John) |
| 04/11/2022 | 74 | RESPONSE by Matthew Gibson in opposition to 65 MOTION by Louise E. Goldston for Summary Judgment (Bryan, John) |
| 04/14/2022 | 75 | REPLY MEMORANDUM by Louise E. Goldston to 74 Response In Opposition. (Strider, Adam) |
| 04/18/2022 | 76 | REPLY by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White to 73 Response In Opposition. (Robinson, Kevin) |
| 04/18/2022 | 77 | REPLY by Matthew Gibson to 72 Response In Opposition. (Bryan, John) |
| 04/20/2022 | 78 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Kevin A. Nelson requesting removal from the Court service list on behalf of Kyle Lusk. (Nelson, Kevin) |
| 04/20/2022 | 79 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Jason L. Holliday |

| | | requesting removal from the Court service list on behalf of Kyle Lusk. (Holliday, Jason) |
|---|---|---|
| 04/20/2022 | 80 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Arie M. Spitz requesting removal from the Court service list on behalf of Kyle Lusk. (Spitz, Arie) |
| 05/23/2022 | 81 | NOTICE *of Settlement Meeting on May 24, 2022* by Matthew Gibson (Bryan, John) |
| 05/31/2022 | 82 | ORDER directing that the Pretrial Conference is CONTINUED to 7/1/2022, at 11:30 a.m. in Beckley. Signed by Judge Frank W. Volk on 5/31/2022. (cc: counsel of record; any unrepresented party) (msa) |
| 06/01/2022 | 83 | CERTIFICATE OF SERVICE by Matthew Gibson for Rule 26(a)(3) Pretrial Disclosures. (Bryan, John) |
| 06/01/2022 | 84 | CERTIFICATE OF SERVICE by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Rule 26(a)(3) Pretrial Disclosures. (Robinson, Kevin) |
| 06/01/2022 | 85 | CERTIFICATE OF SERVICE by Louise E. Goldston for Rule 26(a)(3) Pretrial Disclosures. (Tully, Jennifer) |
| 06/02/2022 | 86 | CERTIFICATE OF SERVICE by Matthew Gibson for Proposed Integrated Pretrial Order. (Bryan, John) |
| 06/02/2022 | 87 | NOTICE *OF NON-PARTY FAULT* by Louise E. Goldston (Attachment: # 1 Exhibit 1) (Tully, Jennifer) |
| 06/06/2022 | 88 | MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine *to Exclude Lay Opinion Testimony* (Robinson, Kevin) |
| 06/06/2022 | 89 | OMNIBUS MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine (Robinson, Kevin) |
| 06/06/2022 | 90 | MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of Orders, Findings, and Other Filings of The Judicial Investigatory Commission and West Virginia Supreme Court Of Appeals In Re: Goldston* (Tully, Jennifer) |
| 06/06/2022 | 91 | MOTION/JOINDER by Louise E. Goldston to 88 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine to Exclude Lay Opinion Testimony (Tully, Jennifer) |
| 06/06/2022 | 92 | MOTION/JOINDER of Louise E. Goldston to 89 OMNIBUS MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine/i> (Tully, Jennifer) |
| 06/06/2022 | 93 | MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of The Letter from the Hon. Glen R. Stotler, Admonishment of The Hon. Eric Shuck, And Testimony Of Gail Camp Ray* (Tully, Jennifer) |
| 06/06/2022 | 94 | MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of Undisclosed Evidence Of Damages* (Tully, Jennifer) |
| 06/06/2022 | 95 | MOTION by Louise E. Goldston in Limine *to Preclude the Testimony of Teresa Tarr and Brian Lanham* (Tully, Jennifer) |
| 06/06/2022 | 96 | MOTION by Matthew Gibson in Limine *Regarding Underlying Contempt Allegations* (Bryan, John) |
| 06/06/2022 | 97 | MOTION by Matthew Gibson in Limine *Regarding Defendant Goldston's State Supreme Court Adjudication* (Bryan, John) |
| 06/09/2022 | 98 | PROPOSED INTEGRATED PRETRIAL ORDER by Louise E. Goldston, County |

|  |  |  |
|---|---|---|
|  |  | Commission of Raleigh County, Jeff McPeake, Brian White, Bobby Stump, Matthew Gibson (Attachment: # 1 Exhibit A)(Tully, Jennifer) (Modified on 6/10/2022 to add party filers) (mk). |
| 06/09/2022 | 99 | MOTION by Matthew Gibson to Strike 87 NOTICE OF NON-PARTY FAULT by Louise E. Goldston (Attachment: # 1 Excerpt of Gibson Deposition)(Bryan, John) |
| 06/09/2022 | 100 | MEMORANDUM OF LAW by Matthew Gibson in support of 99 MOTION by Matthew Gibson to Strike 87 NOTICE OF NON-PARTY FAULT by Louise E. Goldston (Other) (Bryan, John) |
| 06/13/2022 | 101 | RESPONSE by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in opposition to 96 MOTION by Matthew Gibson in Limine *Regarding Underlying Contempt Allegations* (Robinson, Kevin) |
| 06/13/2022 | 102 | RESPONSE by Louise E. Goldston in opposition to 96 MOTION by Matthew Gibson in Limine *Regarding Underlying Contempt Allegations* (Attachment: # 1 Exhibit 1)(Tully, Jennifer) |
| 06/13/2022 | 103 | RESPONSE by Louise E. Goldston in opposition to 97 MOTION by Matthew Gibson in Limine *Regarding Defendant Goldston's State Supreme Court Adjudication* (Tully, Jennifer) |
| 06/13/2022 | 104 | RESPONSE by Matthew Gibson in opposition to 93 MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of The Letter from the Hon. Glen R. Stotler, Admonishment of The Hon. Eric Shuck, And Testimony Of Gail Camp Ray (Bryan, John)* |
| 06/13/2022 | 105 | RESPONSE by Matthew Gibson in opposition to 95 MOTION by Louise E. Goldston in Limine *to Preclude the Testimony of Teresa Tarr and Brian Lanham (Bryan, John)* |
| 06/13/2022 | 106 | RESPONSE by Matthew Gibson in opposition to 94 MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of Undisclosed Evidence Of Damages (Bryan, John)* |
| 06/13/2022 | 107 | RESPONSE by Matthew Gibson in opposition to 89 OMNIBUS MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine (Bryan, John) |
| 06/13/2022 | 108 | RESPONSE by Matthew Gibson in opposition to 90 MOTION by Louise E. Goldston in Limine *to Preclude the Introduction of Orders, Findings, and Other Filings of the Judicial Investigatory Commission and West Virginia Supreme Court of Appeals In Re: Goldston (Bryan, John)* |
| 06/13/2022 | 109 | RESPONSE by Matthew Gibson in opposition to 88 MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White in Limine *to Exclude Lay Opinion Testimony* (Bryan, John) |
| 06/16/2022 | 110 | RESPONSE by Louise E. Goldston in opposition to 99 MOTION by Matthew Gibson to Strike 87 NOTICE OF NON-PARTY FAULT by Louise E. Goldston (Tully, Jennifer) |
| 06/21/2022 | 111 | REPLY by Louise E. Goldston to 104 Response In Opposition. (Tully, Jennifer) |
| 06/21/2022 | 112 | REPLY by Louise E. Goldston to 105 Response In Opposition. (Tully, Jennifer) |
| 06/21/2022 | 113 | REPLY by Louise E. Goldston to 108 Response In Opposition. (Tully, Jennifer) |
| 07/01/2022 | 114 | PRETRIAL CONFERENCE held by Judge Frank W. Volk on 7/1/2022; Court Reporter: Lisa Cook. (sbw) (Entered: 07/05/2022) |
| 07/06/2022 | 115 | ORDER rescheduling the final settlement conference to 7/14/2022, at 10:30 AM in Beckley. Signed by Judge Frank W. Volk on 7/6/2022. (cc: counsel of record; any unrepresented party) (btm) |

JA010

| 07/07/2022 | 116 | MOTION by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White for Disclosure of Jury Questionnaires (Robinson, Kevin) (Modified on 7/7/2022 to convert event to motion for jury questionnaires) (mk). |
| --- | --- | --- |
| 07/07/2022 | 117 | NOTICE OF CERTIFICATION FOR USE OF COURTROOM TECHNOLOGY on July 19, 2022 at 9:00 a.m. in Judge Volk's Courtroom in USDC of Beckley (Robinson, Kevin) |
| 07/07/2022 | 118 | NOTICE OF CERTIFICATION FOR USE OF COURTROOM TECHNOLOGY by Louise E. Goldston on 7/19/2022 in Beckley. (Tully, Jennifer) (Modified on 7/7/2022 to convert event to notice of certification for use of courtroom technology). (mk) |
| 07/07/2022 | 119 | NOTICE OF CERTIFICATION FOR USE OF COURTROOM TECHNOLOGY on July 14, 2022 at 9:15 a.m. in the Beckley Courtroom (Bryan, John) |
| 07/11/2022 | 120 | UNOPPOSED MOTION by Louise E. Goldston to Attend the Final Settlement Conference by Telephone, Zoom or Teams (Tully, Jennifer) |
| 07/11/2022 | 121 | PROPOSED JURY INSTRUCTIONS by Louise E. Goldston (Tully, Jennifer) |
| 07/11/2022 | 122 | PROPOSED JURY VERDICT by Defendant Louise E. Goldston (Tully, Jennifer) |
| 07/11/2022 | 123 | PROPOSED JURY INSTRUCTIONS by County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White (Robinson, Kevin) |
| 07/11/2022 | 124 | PROPOSED JURY VERDICT by Defendants County Commission of Raleigh County, Jeff McPeake, Bobby Stump, Brian White (Robinson, Kevin) |
| 07/11/2022 | 125 | PROPOSED JURY INSTRUCTIONS by Matthew Gibson (Bryan, John) |
| 07/11/2022 | 126 | PROPOSED JURY VERDICT by Plaintiff Matthew Gibson (Bryan, John) |
| 07/12/2022 | 127 | ORDER granting Defendants' 116 MOTION for Disclosure of Jury Questionnaires; directing the jury administrator to make available to counsel for all parties a list of prospective jurors and copies of the Juror Qualification Questionnaires for the jury panel to be used at trial. Signed by Judge Frank W. Volk on 7/12/2022. (cc: jury administrator and all counsel of record) (msa) |
| 07/13/2022 | 128 | JUROR LIST AND QUESTIONNAIRES. Jurors are randomly selected as stated in the Courts Plan Prescribing Method for the Composition of Jury Wheels and the Qualification and Random Selection of Grand and Petit Jurors located on our website www.wvsd.uscourts.gov. The number of Qualification Questionnaires transmitted may not reflect the final list of potential jurors to appear in the trial of this matter. A final Persons Attending List of potential jurors will be made available on the day of trial. (Attachments: # 1 Juror Questionnaires) (msa) |
| 07/13/2022 | 129 | NOTICE OF APPEARANCE by John P. Fuller and Jennifer E. Tulley on behalf of Louise E. Goldston. (Fuller, John) |
| 07/13/2022 | 130 | MEMORANDUM OPINION AND ORDER directing that Judge Goldston's 65 Motion for Summary Judgment is DENIED; Mr. Gibson's 67 Motion for Summary Judgment is DENIED; the Raleigh County Defendant's 63 Motion for Summary Judgment is GRANTED IN PART as to Bailiff McPeake and Deputies Stump and White and DENIED IN PART as to the Raleigh County Commission. Signed by Judge Frank W. Volk on 7/13/2022. (cc: counsel of record; any unrepresented party) (btm) |
| 07/13/2022 | 131 | NOTICE OF APPEAL (Interlocutory) by Louise E. Goldston re: 130 Memorandum Opinion and Order (Tully, Jennifer) (Modified on 7/13/2022 to convert event to notice of appeal - interlocutory appeal - to 4CCA) (mk). |
| 07/13/2022 | 132 | MOTION by Louise E. Goldston to Stay Proceedings Pending Disposition of Appeal |

WVSD NextGen CM/ECF Release 1.7.1

|  |  | (Tully, Jennifer) |
|---|---|---|
| 07/13/2022 | 133 | 4CCA APPEAL FEES RECEIVED: $505.00, Receipt Number 2000022, re: 131 Notice of Appeal. (ts) |
| 07/14/2022 | 134 | RESPONSE by Matthew Gibson in opposition to 132 MOTION by Louise E. Goldston to Stay Proceedings Pending Disposition of Appeal and MOTION to Dismiss 131 Notice of Appeal as Frivolous (Bryan, John) (Modified on 7/14/2022 to convert event to motion to dismiss) (mk). |
| 07/14/2022 | 135 | INCORRECT ENTRY; SEE ENTRY #134. (Modified on 7/14/2022 to remove duplicate image, see entry #134) (mk). |
| 07/14/2022 |  | NOTICE OF DOCKET CORRECTION re: #135 Response/Motion. ERROR: Image is a duplicate image of ECF #134. CORRECTION: Image removed. (mk) |
| 07/14/2022 | 136 | REPLY by Louise E. Goldston to 134 MOTION by Matthew Gibson to Dismiss 131 Notice of Appeal as Frivolous. (Tully, Jennifer) |
| 07/14/2022 | 137 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET re: 131 Notice of Appeal. (ts) |
| 07/14/2022 | 138 | ORDER The Court GRANTS the 132 MOTION by Louise E. Goldston to Stay Proceedings Pending Disposition of Appeal and STAYS all proceedings pending dismissal or issuance of mandate. Signed by Judge Frank W. Volk on 7/14/2022. (cc: jury administrator; counsel of record) (mk) |
| 07/18/2022 | 139 | NOTICE OF APPELLATE CASE OPENING BY 4CCA as to Louise E. Goldston re: 131 Notice of Appeal in 4CCA Case No. 22-1757. Case Manager: Naeemah R. Sims. (mfo) |
| 07/18/2022 | 140 | ORDER denying without prejudice all pending Motions and retiring the case to the inactive docket. Signed by Judge Frank W. Volk on 7/18/2022. (cc: counsel of record) (btm) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/12/2022 12:00:30 | | |
| **PACER Login:** | SamuelMBloom | **Client Code:** | 1700-1623 crh |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-00181 |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

      Plaintiff,

vs.                        Civil Action No. _5:21-cv-00181_

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

      Defendant.

## COMPLAINT

This complaint, brought pursuant to 42 U.S.C. Section 1983, the Fourth Amendment, First Amendment and 14th Amendment to the United States Constitution, arises out of the defendants' commission of an unreasonable search and seizure against the Plaintiff, and other violations, at his home on March 4, 2020, pursuant to an official policy and practice engaged-in by the defendants, occurring in Raleigh County, West Virginia, within the Beckley Division of the Southern District of West Virginia.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

1.      The Plaintiff, Matthew Gibson, was at all times relevant hereto a resident of Raleigh County, West Virginia.

1

2.      Defendant Louise E. Goldston was at all times relevant hereto a Judge of the 13th Family Court Circuit, and has served in that capacity for approximately 26 years. At all times relevant to the allegations herein she was acting under color of law. She is named herein as a defendant in her individual capacity.

3.      Defendant Raleigh County Commission ("RCC") is a political subdivision of the State of West Virginia, located within the Southern District of West Virginia.

4.      Defendant Jeff McPeake is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through the Raleigh County Sheriff's Office, and more specifically as a bailiff for Defendant Louise E. Goldston in the 13th Family Court Circuit.

5.      Defendant Brian White is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through his employment with the Raleigh County Sheriff's Office, as a sworn member of law enforcement in the Raleigh County Sheriff's Office.

6.      Defendant Bobby Stump is named herein as an individual. At all times relevant hereto he was acting in the capacity as an employee of the RCC through his employment with the Raleigh County Sheriff's Office, as a sworn member of law enforcement in the Raleigh County Sheriff's Office.

7.      Defendant Kyle Lusk is named herein as an individual. At all times relevant hereto he was a resident of Raleigh County, West Virginia.

2

JA014

**FACTS**

8.      Over the past twenty years as a Family Court Judge, Defendant Goldston has been

engaging in the practice of visiting homes of litigants appearing in front of her. Defendant

Goldston went to the litigants' homes to either determine if certain disputed marital property was

present and/or to supervise the transfer of disputed property. Defendant Goldston admitted to

conducting these home visits in her capacity as a Family Court Judge on twelve separate

occasions in different cases.

9.      On September 18, 2020, the West Virginia Judicial Investigation Commission

filed a Formal Statement of Charges against Defendant Goldston following the commission of

one of these so-called home visits at the home of the Plaintiff, Matthew Gibson. The Formal

Statement of Charges alleged that probable cause existed to formally charge Defendant Goldston

with violations of the Code of Judicial Conduct and that formal discipline was appropriate.

10.     The Formal Statement of Charges alleged, as is also alleged hereby by the

Plaintiff, that on March 4, 2020, during a contempt hearing in the Plaintiff's divorce case,

Defendant Goldston, along with her Co-Defendants herein, entered the Plaintiff's home to search

and seize items of personal property which Mr. Gibson was alleged to have failed to turn over to

his ex-wife following the finalization of his divorce more than one year earlier.

11.     Plaintiff appeared before Judge Goldston on September 18, 2018, for the final

hearing in his divorce action. Plaintiff's s ex-wife was represented by Defendant Kyle Lusk, Esq.

The Court granted the divorce at the request of the parties, adopting a settlement agreement

between the parties.

12.      The final order in the divorce action provides, in-part, that "the parties divided their household furnishings by agreement which is represented by a four page exhibit entered before the Court and attached hereto." The final order further provided that, "The circled items are Respondents" and "The items not circled are the Petitioners."

13.      Contrary to the representations contained in the order itself, the original personal property disbursement agreement list document was not actually attached to the order, as it was represented to be verbally by the Court on the record. In the Investigative Panel Findings and Conclusions of the Lawyer Disciplinary Board in Complaint No. 20-05-104 against Defendant Kyle Lusk, in a footnote on page 15 of the said document, the Board noted that "The Court noted the original property form was not attached to the Order from the September 2018 hearing in the divorce."

14.      Just over a year after the final divorce hearing, on or about September 26, 2019, the Plaintiff's ex-wife, by Defendant Lusk, filed a Petition for Contempt against the Plaintiff, alleging that she did not receive all of the items of personal property from the original personal property disbursement list, or alternatively she alleged that items received by the Plaintiff were allegedly damaged. The ex-wife's petition, as drafted by Defendant Lusk, alleged that "many of the items had great sentimental value to the Petitioner" and that Mr. Gibson's actions "were carried out to inflict emotional harm and suffering to the Petitioner."

15.      Pursuant to the filing of the Petition for Contempt, Defendant Lusk submitted an altered property disbursement agreement list to the Court, as the original had not been attached to the final order. The altered personal property agreement list submitted by Defendant Lusk

4

contained numerous discrepancies with the original property list document introduced to the Court at the final hearing.

16.     On March 4, 2020, the parties appeared before Judge Goldston for a hearing on the petition for contempt. During the hearing, Judge Goldston suddenly and without explanation asked Mr. Gibson, who was representing himself *pro se*, for his home address. Judge Goldston *sua sponte* stopped the hearing and ordered the parties to meet at Mr. Gibson's house in ten minutes. She failed to explain the reason for the spontaneous visit to the Plaintiff's home. Because of Judge Goldston's failure to explain the reason for the home visit, Mr. Gibson was unable to raise any objection while still at the hearing.

17.     The act of Judge Goldston visiting Mr. Gibson's home was threatened by Mr. Lusk, as recorded in a conversation he had with Mr. Gibson's then-attorney, back during the divorce final hearing on September 18, 2018. The parties and their counsel had been discussing the division of marital personal property between the parties, which was alleged to have been located at Mr. Gibson's home. Speaking to Mr. Gibson's attorney, in the presence of the parties, Defendant Lusk stated:

> *I'm gonna tell you right now - and the Judge is big on that - I want [Mr. Gibson] to say certain things aren't there, and we'll get the Bailiff, and the Judge, and we'll go there and see.*

After the search threat leveled by Defendant Lusk, the parties came to an agreement on the separation of all items of marital personal property, which was listed on a typed form with particular items circled, which was tendered to the Court for inclusion into the final order.[1]

_____

[1] However, the original personal property list form was never attached to the final order.

5

JA017

18.     The night prior to the contempt hearing - a year and a half after the final hearing - Defendant Lusk called Mr. Gibson directly on the telephone and again made a threat towards Mr. Gibson to utilize the Family Court against him:

> This is Kyle Lusk. I'm calling for Matthew Gibson. The Court has asked me to convey to you any settlement proposal I may have. Ms. Gibson would settle tomorrow's matter for a fee of $5,000.00. That would cover her damages and her attorney fees and costs. I believe there are a few personal items she still wants, which are mainly pictures, diplomas, certificates and the like. And that's that. That's non-negotiable. That's what she'd take. Otherwise we'll see you tomorrow…."

19.     Once everyone arrived at Mr. Gibson's home on March 4, 2020, and the purpose of the visit became clear, the Plaintiff moved to recuse Defendant Goldston on the grounds that she had become a potential witness in the case. Judge Goldston denied the motion as untimely.

20.     Plaintiff then verbally refused to allow Defendant Goldston or anyone else in his house without a search warrant. Defendant Goldston threatened to put Mr. Gibson in jail if he denied them entry into his house. Plaintiff felt he had no choice but to relent.

21.     Upon Judge Goldston's arrival at Plaintiff's property, Plaintiff instructed a third party to video record the initial interactions outside the house between Defendant Goldston and the parties. Plaintiff also recorded several minutes of audio of the initial interaction on his cell phone before being forced to turn it off.

22.     When the video and audio recording were discovered by Defendant Goldston, she ordered both recordings stopped, following her threat of arrest and incarceration. However, once inside the house, Defendant Goldston's bailiff, Defendant McPeake, used his personal phone to record both video and audio of the separation of alleged marital assets. Plaintiff was unaware at the time that Defendant McPeake was recording video inside his home. He observed a phone in

6

McPeake's hand at the time, but did not observe that he was recording. McPeake recorded for a total of 7 minutes - though the total search lasted 20 to 30 minutes.[2] McPeake never disclosed to the Plaintiff that he had been recording video in his home. McPeake did however, provide the video to Defendant Judge Goldston, which she disclosed in the ensuing judicial disciplinary investigation. Neither McPeake, nor Goldston disclosed the existence of the video, nor provided a copy of the video, to the Plaintiff. Nor did McPeake enter the video into any investigative file with the Raleigh County Sheriff's Office, his employer. Nor did any of the defendant deputies complete a report, nor any sort of documentation, of having been in Plaintiff's house and participated in a search and seizure thereon on March 4, 2020.[3]

23.     After the Plaintiff was forced by Defendant Goldston to stop recording the incident, while standing in the front yard of his residence, Defendant Goldston stated, "Now are you gonna let me in, or am I gonna have to put you in jail!" At that point, Defendant Deputy McPeake signaled on his radio for law enforcement assistance and seized the Plaintiff's phone. Due to Plaintiff being a federal law enforcement officer, he was aware that McPeake had signaled for assistance for other law enforcement officers, as well as the significance of his doing so, which was for the purpose of taking Plaintiff into custody and/or possibly engaging in a use of force against him, should he choose to attempt to refuse to stop recording and/or deny the defendants entry into his home.

24.     Defendant Judge Goldston then led defendants McPeake, Lusk, and Plaintiff's ex-wife, from the gazebo in the yard towards Plaintiff's house. Plaintiff felt under immense duress

---

[2] JIC Brief at 9.

[3] Plaintiff served a FOIA request on the Raleigh County Sheriff's Office, which was returned with with a response that the RCSO had no copy of the video, nor any report or documentation of any incident occurring at Plaintiff's property that day.

following the threat to incarcerate him, after which he anticipated that he would most likely lose

custody of his children to his ex-wife, should he offer resistance or continued objection.

Defendant Goldston threatened Plaintiff with incarceration approximately seven times on March

4, 2020. Defendant Goldston also threatened to have the third party bystander who was filming

video footage arrested if she did not turn off the camera. Despite being Plaintiff's significant

other, and despite acting under the directions of the Plaintiff, the third party bystander had no

choice but to comply with Defendant Goldston's orders. At all relevant times, the third party

bystander was located on the Plaintiff's private property.

      25.    Defendant Lusk assisted Defendant Judge Goldston in ensuring that Plaintiff was

not able to acquire audio or video footage of what was occurring on his property. Judge Goldston

instructed the third party recording video for Mr. Gibson to stop recording. At all relevant times,

she was located on Plaintiff's private property and acting pursuant to his direction. Defendant

Lusk then advised Judge Goldston that the third party who had been recording for the Plaintiff

still had the phone in her hand - implying that she was still recording. Judge Goldston turned

towards the third party and told her that - not only did her phone have to be turned off, but that

she also had to put it away, or else she was going to jail. Defendant Lusk also advised Judge

Goldston that he didn't think Plaintiff's phone was off, which was recording audio at that time,

after which Judge Goldston ordered Deputy McPeake to seize Plaintiff's phone. At that time,

Defendant McPeake physically seized the Plaintiff's phone from his person, all the while

standing on Plaintiff's private property outside his residence.

      26.    At no time did Plaintiff voluntarily grant consent to any defendant herein to enter

his property, including his residence. At no time did Plaintiff voluntarily grant consent to

participating in Family Court proceedings outside the courtroom, and especially not on his

property and inside of his home. At no time did Plaintiff voluntarily grant consent to stop filming

video and audio footage of the events which were transpiring on his property. At no time did

Plaintiff voluntarily grant consent to the seizure of his phone. At no time did the Plaintiff

voluntarily grant consent to the seizure of items removed from the inside of his residence at the

direction of Defendant Goldston.

27.    Once inside the Plaintiff's home, Judge Goldston directed the deputies to assist

Plaintiff's ex-wife and Defendant Lusk in searching and seizing the home's contents. The search

of Plaintiff's home lasted a total of 20 to 30 minutes.[4] During the search and seizure, Respondent

acknowledged that Mr. Gibson had already turned over most of the disputed items on the list.

She also told the ex-wife that "I can't let you search [for particular items] unless you have some

idea of where they might be." When they went downstairs to go through DVDs, Respondent sat

down in a rocking chair uninvited and remained there while Mr. Gibson and the bailiff went into

another room to look at the gun cabinet for other items.[5] Plaintiff was forced by Defendant

Goldston to open his combination gun safe for inspection by his ex-wife and the deputies.

28.    During the search, the Plaintiff's ex-wife removed many different items of

personal property - much of which was never listed on the original four page property agreement

list, which was supposed to have been attached to the divorce order, but which was never

actually attached. Numerous items were seized from Mr. Gibson's home without his consent.

During the search, defendant police officers Stump and White arrived and entered Plaintiff's

_____

[4] JIC Brief at 9.

[5] JIC Brief at 8-9.

residence, after being called by Defendant McPeake. Thereafter they began to jointly participate in the search and seizure occurring inside Plaintiff's home. Shortly after arriving, Defendant Stump went back outside and instructed Plaintiff's witnesses to leave the property. Meanwhile, Defendant Goldston allowed Plaintiff's ex-wife's boyfriend, father and brother to remain on Plaintiff's property without Plaintiff's consent.

29.    Many different items of personal property were taken out of Mr. Gibson's home during the search, some of which belonged to Mr. Gibson's children, as well as Mr. Gibson's significant other. Some items which were taken were later returned. Some of the items were never returned. None of the items were documented in writing by the Defendants. They were merely handed over to the possession of Plaintiff's ex-wife. Following the search, there was no inventory made of the items taken from Mr. Gibson's home. Following the search, there was no court order issued, establishing and describing what had occurred at Mr. Gibson's home, nor listing an inventory or description of the items which had been seized from inside the home. Defendant Judge Goldston did recite for the record, following the search and seizure, what had been seized from Plaintiff's home, "to the best of her recollection." Some of what she listed for the record were not items of personal property listed in the original property disbursement list which was supposed to have been attached to the final order.

30.    Following the public release of the video footage showing Defendant Goldston on Plaintiff's property on March 4, 2020, two complaints were opened with Judicial Disciplinary Counsel. Following the opening of the two complaints, on or about July 22, 2020, Judicial Disciplinary Counsel took Defendant Goldston's sworn statement. She admitted to investigators that she failed to inform Mr. Gibson of the purpose of the home visit while the parties were in the

courtroom and that she did not give him any opportunity to object thereto until everyone was at his house.

31.    Defendant Goldston opined to Judicial Disciplinary Counsel that she believed it was proper to visit litigants' homes in her role as a Family Court Judge. During the March 4, 2020 hearing in the matter, Defendant Goldston stated that "I do this probably two or three times a year and we have jury views all the time." During her questioning by Judicial Disciplinary Counsel, Defendant Goldston claimed to have made visits into litigants' homes on at least 11 different occasions.[6]

32.    When asked by Judicial Disciplinary Counsel, Defendant Goldston could provide no statute, rule or case that gave her the authority to conduct what she described as "home visits." She also acknowledged that there was nothing in the Family Court's contempt powers that gave her the authority to conduct a so-called "home visit." Defendant Goldston admitted that in the past twenty years of engaging in these behaviors, she never held anyone in contempt prior to going to the litigants' homes and that she failed to enter orders subsequent to the visits to litigants' homes reflecting what had occurred at the litigants' residences, including whether items of personal property had been seized from the homes. Nor did she reflect in subsequent court orders whether or not a party was in contempt of any court order.

33.    Defendant Goldston admitted to Judicial Disciplinary Counsel that she never had any clear or written procedures for conducting a so-called "home visit," including but not limited to, when the proceedings should be utilized and how the process should take place. She also

_____

[6] JIC Brief at 4.

11

JA023

acknowledged that she never took a court reporter to the scene, or otherwise preserved a record of proceedings during the "home visits."

34.     Defendant Goldston admitted to Judicial Disciplinary Counsel that the practice could make her a potential witness to a future proceeding which could then result in her disqualification as a judge.

35.     Defendant Goldston also admitted that pursuant to West Virginia law, as well as the Rules of Practice and Procedure for Family Courts, the burden of proof in a contempt proceeding rests not with the Family Court Judge but with the moving party. She agreed that it is the moving party's responsibility to provide evidence in support of his or her contention that the other side has failed to produce the items in question. Defendant Goldston admitted to improperly putting herself in the role of litigant during the Plaintiff's contempt proceedings.

36.     On or about September 18, 2020, the West Virginia Judicial Investigation Commission issued a Formal Statement of Charges, filed with the West Virginia Supreme Court of Appeals. Subsequent to the issuance and filing of the Formal Statement of Charges against Defendant Goldston, the Judicial Disciplinary Counsel and Defendant Goldston reached a Settlement Agreement, which admitted the factual allegations in the Formal Statement of Charges and which admitted to violations of Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the West Virginia Code of Judicial Conduct.

37.     As further part of the Settlement Agreement which she signed, Defendant Goldston "admitted her wrongdoing" and jointly agreed to recommend to the Judicial Hearing Board and the State Supreme Court that she be censured and fined $5,000.00 as an appropriate sanction for her violations.

38.     On August 25, 2020, the Judicial Investigation Commission issued a public admonishment against another Family Court Judge, Eric Shuck, also of the 13th Family Court Circuit, following an investigation of judicial misconduct. The "gravamen of the complaint was that Respondent was going to the homes of litigants to determine if certain disputed marital personal property was in the possession of the occupant and/or to supervise the transfer of said items."

39.     The public admonishment of Judge Shuck stated that, "Respondent opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years." A footnote following that statement noted that Judge Shuck was referring to Judge Goldston, who was at that time, also the subject of a judicial disciplinary proceeding for visiting a litigant's home.

40.     The public admonishment of Judge Shuck further stated that, "The Commission further found that formal discipline was not essential as Respondent had no prior disciplinary actions and had been led astray, in part, by another colleague's actions. It further noted that "Home visits by a Family Court Judge to locate and/or secure personal property in a contempt proceeding are ill-advised and inappropriate" and that "Such visits are not authorized by any statute, rule or case law…."

41.     Following public disclosure and media reports about the defendants' visit to the Plaintiff's home, Plaintiff became aware of other prior litigants who had appeared before Judge Goldston who had either been subjected to a "home visit" by Defendant Goldston, or who had been threatened with such an event during negotiations.

13

JA025

42.     One such prior litigant relayed to the Plaintiff that, in her divorce proceeding, she had been advised by her lawyer that Judge Goldston, the presiding judge in her divorce, was well known for "packing everybody up from a hearing and taking them to go through the house." Such a possibility caused severe anxiety in the woman because she did not want her husband in her private home, which had not been the marital residence. The woman stated that she was a victim of abuse during the marriage and absolutely did not want her ex-husband in her home. The woman's lawyer and her ex-husband's lawyer talked with Defendant Judge Goldston outside of her presence. The woman's lawyer returned and said that she could either pay a certain amount of money to her ex-husband, or else Judge Goldston would take the lawyers and her ex-husband into her private residence to search for items sought by the ex-husband. The woman stated that in order to avoid the Judge and ex-husband going into her home, she was forced to literally write a check payable to her husband right there in the Family Court. The woman never personally saw Judge Goldston that day. Her mother and her daughter were present and also witnessed the disturbing events.

43.     Another prior litigant who had appeared in the 13th Family Court Circuit, in a divorce action pending before Judge Eric Shuck, advised that his ex-wife's lawyer was Defendant Kyle Lusk. He advised that Defendant Lusk requested Judge Shuck to go to his home in order to search for personal property, which in fact occurred. He stated that Defendant Lusk was "pushing" Judge Shuck to take the action. He recalled that Lusk said, "I think we just need to make a trip over to [his] house and have a look," to which the Judge responded, "I think that's a good idea, that way we'll know who's lying." The litigant recalled that many of the items

14

subsequently seized during the "home visit" search were items which had never been discussed before in the divorce action, such as pots and pans and Christmas decorations.

44.     Reports were received by the Plaintiff of other prior litigants in the 13th Family Court Circuit who had either experienced the "home visits," or who had been threatened with "home visits" during negotiations, who did not want to further discuss the experiences, or testify as witnesses. Upon information and belief, the 13th Family Court Circuit, in Raleigh County, West Virginia, was the only Family Court Circuit subjecting litigants to the so-called "home visits" and threatened "home visits."

45.     Upon information and belief, defendants Goldston and Lusk had long conspired with each other to engage in the unlawful practice of so-called "home visits," thereby violating the federal constitutional rights of litigants appearing in the 13th Family Court Circuit. Upon information and belief, Defendant Lusk profited from the conspiracy, in that he received the material benefit of the ability to leverage Judge Goldston's "home visits" against opposing litigants and counsel, as he had done to the Plaintiff. Likewise, upon information and belief, Judge Goldston profited from the conspiracy in that she received campaign donations and political and social support from Defendant Lusk, partially enabling her to stay in office for over 26 years.

## COUNT ONE - UNREASONABLE SEARCH AND SEIZURE
## IN VIOLATION OF THE FOURTH AMENDMENT

46.     Defendants Goldston, McPeake, White and Stump acted under color of law when they entered the Plaintiff's home and property as alleged herein on March 4, 2020. Acts are done under color of law when a person acts in the performance of official duties under any state,

15

JA027

county, or municipal law, ordinance or regulation. *See* <u>Monroe v. Pape</u>, 365 W.S. 167 (1961), *overruled in part*, <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).[7]

47.    While acting under color of state law, Defendants Goldston, McPeake, White and Stump deprived Matthew Gibson of a federal constitutional right under the Fourth Amendment of the U.S. Constitution, to be free from unreasonable searches and seizures.

48.    Amendment IV of the U.S. Constitution provides that "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.  Article III, Section 6 of the West Virginia Constitution provides for the same protections, almost verbatim.

49.    The said defendants acted unreasonably and therefore unlawfully by failing to obtain a warrant prior to entering and searching the Plaintiff's home on March 4, 2020. The Fourth Amendment requires that law enforcement and government officials seeking to execute a search inside the Plaintiff's home must apply under oath to a neutral magistrate or judge for a warrant, supported by probable cause, prior to entering and searching a home. <u>Katz v. United States</u>, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The said defendants furthermore acted unreasonably in not just searching the Plaintiff's home, but also by seizing items therein, some of which were never mentioned in the parties' divorce settlement agreement, and also by seizing the Plaintiff's phone while he attempted to record the events which were transpiring.

---

[7] *See also* Third Circuit Model Jury Instructions 4.4.1 Section 1983 - Action under Color of State Law.

50. An individual's home is highly protected under the Fourth Amendment. When searches and seizures take place in an individual's home, there is no reasonableness analysis, since such actions are a "search" *per se* under the Fourth Amendment. As such, the only applicable analysis is whether a warrant was obtained by the defendants, and if not, whether an exception applies. Id.

51. The 4th Amendment also applies to civil cases, as well as criminal. *See* The Emergency Doctrine, Civil Search and Seizure and the Fourth Amendment, 43 Fordham Law Review 571 (1972); The Civil and Criminal Methodologies of the Fourth Amendment, 93 Yale Law Journal 1126 (1984); and Applicability of the Fourth Amendment in Civil Cases, 1963 Duke Law Review 473 (1963). For instance, in 1967, the United States Supreme Court held that administrative inspections to detect building code violations must be undertaken pursuant to a warrant if the occupant objects to the search. *See* Camara v. Municipal Court, 387 U.S. 523 (1967) (search involving home) and City v. Seattle, 387 U.S. 541 (1967) (search involving warehouse).

52. The defendants herein did not seek, nor obtain, a valid search warrant prior to entering, searching and seizing the Plaintiff's home on March 4, 2020. Plaintiff stated to Defendant Judge Goldston on March 4, 2020 that she was not getting inside his home without a warrant, to which Defendant Goldston responded, "Oh yes I will." She then threatened the Plaintiff with arrest if he tried to prevent her from going inside his home and performing a search and seizure therein.

17

JA029

53.     The said defendants did not obtain voluntary consent to enter, nor to search, the Plaintiff's residence on March 4, 2020. Nor did they obtain voluntary consent to seize items of personal property, nor his cell phone, from his residence on March 4, 2020.

54.     The said defendants did not allege that exigent circumstances existed on March 4, 2020 as justification for their entry and search of the Plaintiff's residence. Nor did exigent circumstances objectively exist on March 4, 2020.

55.     No state or federal law or rule of procedure authorizes a West Virginia Family Court judge to enter or search a litigant's home, nor to verbally authorize law enforcement to do so, as occurred on March 4, 2020 at the Plaintiff's home. Nor would any such state law or rule of procedure be constitutional under the Fourth Amendment.

56.     As a court of limited jurisdiction under West Virginia law, a family court has no authority to conduct home "views" or searches. *See* W. Va. Code § 51-2A-2(e). The jurisdiction of family courts is limited to only those matters specifically authorized by the Legislature." Syl. pt. 5, *in part*, Lindsie D.L. v. Richard W.S., 214 W. Va. 750 (2003).

57.     Even if there were some colorable state law or authority for a search and seizure to be conducted under the circumstances alleged herein, searches and seizures are an executive branch function, and not a function of the judicial branch, which is a fundamental concept of law, of which an objectively reasonable government official or law enforcement officer should know.

58.     The said defendants' actions as alleged herein were performed under color of law, objectively unreasonable, willful, wanton, intentional and done with a callous and reckless disregard for the Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure.

59.     The West Virginia Code of Judicial Conduct precludes a judge from engaging in independent investigations of cases. Defendant Goldston engaged in an inappropriate judicial investigation of facts. Rule 2.9(C) of the Code of Judicial Conduct states that "[a] judge shall not investigate facts in a matter independently and shall consider only the evidence presented and any facts that may be properly judicially noticed."

60.     Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the search and seizure inside the Plaintiff's home, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

61.     No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to conduct a warrantless search and seizure of a Family Court litigant's residence to ascertain whether certain items of personal property sought in a contempt petition is located in his home and to seize any such items therein. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right to deny entry to his home to government officials and law enforcement in the absence of a search warrant as occurred on March 4, 2020. Such a basic and fundamental constitutional question is "beyond debate" under existing federal legal precedent. Therefore, neither Judge Goldston, nor the law enforcement officer defendants, are entitled to qualified immunity for their

actions taken on the property of the Plaintiff on March 4, 2020. *See generally* <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

62.    As a direct and proximate result of the defendants' violation of the Plaintiff's Fourth Amendment rights, the Plaintiff was damaged, for which he is entitled to recover.

### <u>COUNT TWO - VIOLATION OF THE FIRST AMENDMENT</u>

63.    The First Amendment, in relevant part, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *See* <u>Fisher v. King</u>, 232 F.3d 391, 396 (4th Cir. 2000).

64.    The Plaintiff engaged in protected First Amendment speech and activity when he began to video and audio record the defendants on his property engaging in a search and seizure on March 4, 2020, both through the audio recording device on his person, as well as through the video being filmed at his direction and on his private property with the assistance of the third party bystander at his home.

65.    The First Amendment, in relevant part, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. *See* <u>Fisher v. King</u>, 232 F.3d 391, 396 (4th Cir. 2000).

66.    Not only does the First Amendment protect freedom of speech, it also protects "the right to be free from retaliation by a public official for the exercise of that right." <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000).

67.    The First Amendment protects the public's right of access to information about their officials' public activities. It "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members

20

JA032

of the public may draw." First Nat'l. Bank of Bos. v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407,

55 L.Ed.2d 707 (1978). Access to information regarding public police activity is particularly

important because it leads to citizen discourse on public issues, "the highest rung of the hierarchy

of First Amendment values, and is entitled to special protection." Snyder v. Phelps, 562 U.S. 443,

452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (*quoting* Connick v. Myers, 461 U.S. 138, 145, 103

S.Ct. 1684, 75 L.Ed.2d 708 (1983) ); Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 13

L.Ed.2d 125 (1964) (recognizing the "paramount public interest in a free flow of information to

the people concerning public officials, their servants"). That information is the wellspring of our

debates; if the latter are to be " 'uninhibited, robust, and wide-open,' " Snyder , 562 U.S. at 452,

131 S.Ct. 1207 (*quoting* N. Y. Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.

2d 686 (1964) ), the more credible the information the more credible are the debates (*quoting*

Fields v. City of Phila., 862 F.3d 353, 359 (3rd Cir. 2017)).

     68.    By Plaintiff personally recording, and by also directing a third party to record, the

actions of the defendants intruding onto his private property on March 4, 2020, and engaging in a

search and seizure thereon, Plaintiff was engaging in the protected First Amendment activity of

documenting the actions of government officials who he believed were acting outside of the law

and in violation of his constitutional rights, so as to expose their actions to the public at large, as

well as for the purpose of preserving evidence for use in subsequent civil and/or criminal

litigation necessary as a consequence of their actions.

     69.    To record what there is for the eye to see, or the ear to hear, corroborates or lays

aside subjective impressions for objective facts. Hence to record is to see and hear more

accurately. Recordings also facilitate discussion because of the ease in which they can be widely

distributed via different forms of media. Accordingly, recording police activity in public falls

squarely within the First Amendment right of access to information. As no doubt the press has

this right, so does the public. *See* PG Publ'g. Co. v. Aichele, 705 F.3d 91, 99 (3d Cir. 2013);

Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (*quoting* Fields v.

City of Phila., 862 F.3d 353, 359 (3rd Cir. 2017)).

      70.    Under the First Amendment's right of access to information the public has the

commensurate right to record—photograph, film, or audio record—police officers conducting

official police activity in public areas. Fields v. City of Phila., 862 F.3d 353, 360 (3rd Cir. 2017)

("The First Amendment protects actual photos, videos, and recordings, and for this protection to

have meaning the Amendment must also protect the act of creating that material." (citation

omitted)); *See also* ACLU v. Alvarez, 679 F.3d 583, 599–600 (7th Cir.), cert. denied, —— U.S.

——, 133 S.Ct. 651, 184 L.Ed.2d 459 (2012) (holding that an Illinois eavesdropping statute did

not protect police officers from a civilian openly recording them with a cell phone); Turner v.

Lieutenant Driver, 848 F.3d 678, 689 (5th Cir. 2017) ("[T]he First Amendment protects the act of

making film, as there is no fixed First Amendment line between the act of creating speech and

the speech itself." (quotation omitted); W. Watersheds Project v. Michael, 869 F.3d 1189 (10th

Cir. 2017) (agreeing with several sister circuits that recording the conduct of officials in general

is protected First Amendment speech); Glik v. Cunniffe, 655 F.3d 78, 79 (1st Cir.2011) (holding

there is an "unambiguous[ ]" constitutionally protected right to videotape police carrying out

their duties in public); Smith v. Cumming, 212 F.3d 1332, 1333 (11th Cir.2000) (finding

plaintiffs "had a First Amendment right, subject to reasonable time, manner and place

restrictions, to photograph or videotape police conduct"); Fordyce v. City of Seattle, 55 F.3d 436,

439 (9th Cir.1995) (recognizing plaintiff's videotaping of police officers as a "First Amendment right to film matters of public interest"). Furthermore, there can be no doubt that the public has the right to record police officers and government officials from the vantage point of standing on their own private property - and indeed, standing in their own front yard, or within their home.

71.    Recently, the Fourth Circuit observed in the context of a claim of seizure of cell phone video footage by law enforcement, that we live "[i]n an era in which cell phones are increasingly used to capture much of what happens in daily life" and that such recordings are protected from seizure by law enforcement under the Fourth Amendment. Hupp v. State Trooper Seth Cook, 931 F.3d 307, 329 (4th Cir. 2019).

72.    Plaintiff and the third party bystander acting pursuant to his direction, were located on his private property at the time the protected First Amendment actions of recording the defendants was taking place on March 4, 2020. They were subject to no time, place or manner restrictions purporting to limit their ability to record the actions of the defendant government officials on March 4, 2020 which would have lawfully restricted them from recording from the Plaintiff's private property.

73.    Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's First Amendment rights by stopping him from recording her and other government officials searching and seizing his home, under threat of arrest, including the actual seizure of the Plaintiff's phone, all the while taking place on the Plaintiff's private property, consisted of an executive act, rather

23

JA035

than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

74.    No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to forcibly stop the Plaintiff and those acting under his direction, from recording the events occurring on the Plaintiff's property on March 4, 2020. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right, both to deny the defendants entry onto his property and into his home, in the absence of a search warrant, but also to record the events which were transpiring and which actually occurred on March 4, 2020. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein, is "beyond debate" under existing federal legal precedent. Therefore, neither Judge Goldston, nor the law enforcement officer defendants, are entitled to qualified immunity for their actions taken on the property of the Plaintiff on March 4, 2020. *See generally* Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).[8]

75.    As a direct and proximate result of the defendants' violation of the Plaintiff's First Amendment rights, the Plaintiff was damaged, for which he is entitled to recover.

---

[8] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity, but rather only qualified immunity for the constitutional violations occurring during her personal participation of a search and seizure on the Plaintiff's property.

## COUNT THREE - MONELL CLAIM AGAINST THE RCC

76.     The Raleigh County Commission, which is the political subdivision under which the Raleigh County Sheriff's Office operates, instituted an official policy, custom, and practice of assisting Defendant Judge Goldston with searches and seizures of the homes of litigants appearing before her. This official policy, custom, and practice continued over the course of at least twenty years, until such time as the Plaintiff's March 4, 2020 video was released to the public, after which, upon information and belief, the RCC terminated the official policy, custom and practice.

77.     The actions of the defendant employees of the Raleigh County Commission - defendants McPeake, White and Stump - of engaging in and assisting in the search and seizure of the Plaintiff's home on March 4, 2020, were taken in furtherance of the said official policy, custom, and practice of assisting Defendant Judge Goldston with her search and seizure of the homes of litigants appearing before her.

78.     As a direct and proximate result of the said policy, custom and practice, the Plaintiff was damaged as described herein, for which he is entitled to recover.

## COUNT FOUR - 14TH AMENDMENT DUE PROCESS

79.     The U.S. Constitution, the Supreme Law of the Land, prohibits government from depriving the plaintiffs of their life, liberty and property interests, without due process of law. The plaintiffs and their constituents owned protected liberty interests in the right to live without arbitrary governmental interference with his liberty and property interests. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1988). Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of

25

JA037

life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972).

80.     Likewise, Article III, § 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers. In Syl. pt., Crone v. Crone, 180 W. Va. 184, 375 S.E.2d 816 (1988), the State Supreme Court stated that "[t]he due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." See Crone at 185-186, 375 S.E.2d at 817-818; see also Henry v. Johnson, 192 W. Va. 82, 450 S.E.2d 779 (1994) ("Divorce and custody proceedings are subject to traditional standards of procedural and substantive due process….").

81.     "[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).  "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).

82.     "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the

truth-finding process...." <u>Carey v. Piphus</u>, 435 U.S. 247, 259 (1978) (*citing* <u>Mathews v. Eldridge</u>, 424 U.S. 319, 344 (1976)).

83.     At its core, procedural due process requires "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." <u>Garcia v. Fed. Nat'l Mortg. Ass'n</u>, 782 F.3d 736, 741 (6th Cir. 2015).

84.     The West Virginia Judicial Investigation Commission submitted a brief in support of discipline against Defendant Goldston, arguing that she had engaged in due process violations against the Plaintiff:

> Respondent violated Mr. Gibson's due process rights in two ways. First, she never let him present his case during the contempt hearing. She only heard from one witness - the wife - before suddenly deciding to go to the home. Mr. Gibson was not allowed to present his case. He was never given his opportunity to be heard or to present his witness. Therefore, Respondent denied Mr. Gibson his right to be heard during the hearing. Secondly, Respondent did not afford Mr. Gibson any opportunity to be heard about the search of his home until after the damage had already been done. She never told him in the courtroom why she was going to his house and once there, she patently ignored his right to object by saying it was not timely made. Accordingly, Respondent clearly violated Mr. Gibson's right to due process.

JIC Brief at 36.

85.     Defendant Goldston did not provide the Plaintiff basic due process to which he was entitled under the state contempt laws in the contempt proceedings on March 4, 2020.[9] A judge must afford parties notice and an opportunity to be heard in contempt cases. <u>PG&H Coal v. International Union, United Mine Workers of America</u>, 182 W. Va. 569,390 S.E.2d 551 (1988) (union cannot be held in civil contempt when it was not given adequate notice of contempt charges). In civil contempt proceedings that don't involve child support arrearage, the general

_____

[9] *See* W. Va. Code §51-2A-9 and W. Va. Code §48-1-304 for contempt provisions applicable to Family Court in West Virginia.

rule is that the burden of proof rests with the complaining party to demonstrate that the defendant is in noncompliance with a court order. <u>Carpenter v. Carpenter</u>, 227 W. Va. 214, 707 S.E.2d 41 (2011). The moving party is also required to prove that the alleged contempt prejudiced his or her rights. <u>Id</u>. When the moving party establishes such, the burden then shifts to the nonmoving party to establish any defense he or she may have. <u>Id</u>. At the conclusion of the proceedings, either a final order or an interlocutory order approximating a final order in its nature and effect must be entered. *See* <u>Guido v. Guido</u>, 202 W. Va. 198, 503 S.E.2d 511 (1998) (order finding divorced father in civil contempt for not paying child support pursuant to divorce decree, but which reserved imposition of a sanction was not a final appealable order).[10]

86.     The Judicial Investigation Commission also argued in their brief to the Judicial Hearing Board that Defendant Judge Goldston improperly entered and searched the Plaintiff's home, purporting to be acting within the context of a petition for contempt, in a manner wholly absent of due process to which litigants are entitled in contempt proceedings, and in a manner wholly inconsistent with the nature of judicial proceedings generally:

> The March 4, 2020 hearing involved a contempt petition. Respondent failed to hear all of the wife's evidence. She heard none of Mr. Gibson's evidence. Respondent made no findings or conclusions. She never gave Mr. Gibson an opportunity to purge himself of the contempt. She also never entered an order granting or denying the wife's contempt petition. As the State Supreme Court has repeatedly stated and Respondent clearly recognized during the March 4, 2020 hearing, "[i]t is a paramount principle of jurisprudence that a court speaks only through its orders."
>
> Without an order finding Mr. Gibson in contempt, Respondent inappropriately went into his home, searched his house and seized property. As such, Respondent failed to apply an appropriate statutory remedy and violated the Code of Judicial Conduct by engaging in an improper search and seizure. Had, she applied the contempt statutes as written, Respondent would have avoided judicial discipline.

_____

[10] Quoting JIC Brief at 40.

JIC Brief at 41 (citations omitted).

87.    Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's Fourteenth Amendment rights as discussed herein in detail, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

88.    No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to engage in the events occurring on the Plaintiff's property on March 4, 2020, including the Fourteenth Amendment violations which occurred thereby and therein. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right to basic Due Process as guaranteed by the Fourteenth Amendment and as outlined herein. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein in the absence of Due Process and Equal Protection, is "beyond debate" under existing federal legal precedent. Therefore, Judge Goldston is not entitled to qualified immunity for their actions taken on the property of the Plaintiff on March 4, 2020, nor for those violations leading up to the

search and seizure which deprived Plaintiff of his Fourteenth Amendment rights. *See generally*

Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).[11]

### COUNT FIVE - 14TH AMENDMENT EQUAL PROTECTION

89.      The Equal Protection Clause of the Fourteenth Amendment forbids the states to

"deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th

Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were

made on the basis of a suspect classification such as race, nationality, gender or religion, the

claim arises under the "class of one" theory. Village of Willowbrook v. Olech, 528 U.S. 562, 564

(2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him

differently than others similarly situated, 2) the defendant did so intentionally, and 3) there was

no rational basis for the difference in treatment. Hill v. Borough of Kutztown, 455 F.3d 225, 239

(3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in

its deference. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not

rely on a classification whose relationship to an asserted goal is so attenuated as to render the

distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432,

446(1985).

90.      The West Virginia Constitution also provides a guarantee of equal protection to

West Virginians. With respect to equal protection, the State Supreme Court has stated:

> Where economic rights are concerned, we look to see whether the classification is a
> rational one based on social, economic, historic or geographic factors, whether it bears a
> reasonable relationship to a proper governmental purpose and whether all persons within
> the class are treated equally. Where such classification is rational and bears the requisite

---

[11] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity,
but rather only qualified immunity for the constitutional violations occurring during her personal
participation of a search and seizure on the Plaintiff's property.

reasonable relationship, the statute does not violate Section 10 of Article II of the West Virginia Constitution, which is our equal protection clause.

Syl. pt. 1, <u>State ex rel. Boan v. Richardson</u>, 198 W. Va. 545, 482 S.E.2d 162 (1996).

91.     Defendant Goldston violated equal protection as it relates to unrepresented parties appearing before her in the 13th Family Court Circuit of West Virginia. By her own admission, as noted by the Judicial Investigation Commission in their findings, Respondent's practice of going to litigant's home is designed largely to benefit those represented by counsel. It creates two classes: represented parties who get the "benefit" of a home visit, or the negotiation leverage of being able to threaten doing so, and unrepresented parties who don't receive the same beefit and tactical advantage. Thus, Respondent violated Mr. Gibson's right to due process and equal protection.[12]

92.     Defendant Goldston admitted to personally searching the homes of litigants on numerous occasions over the course of 20 years during her time on the bench as a Family Court Judge.

93.     According to Defendant Goldston, the majority of the home visits were prompted at hearing upon an oral motion by one party's attorney without objection from the opposing attorney. After granting the motion, Respondent would meet the parties at the home.

94.     Defendant Goldston acknowledged that the sole criteria for going to a party's home was largely based on the consent of both parties and/or the loss of items of sentimental value. Concerning the lawyer's request, Respondent testified:

Q. You said the word was out after you'd done this a few times that you better be truthful or else:

_____

[12] JIC Brief at 36.

31

JA043

**A. Well, let me rephrase that -**

Q. Okay

**A. - the lawyers - the lawyers love that I do this because it enables them to say, you know, be truthful in your disclosure because if you try to hide something, she might go out and look for it.**

Q. Doesn't that put the lawyer, the parties who are represented by lawyers at an unfair advantage because they're aware of this while the pro se litigants are not.

**A. Possibly. But again, that's only happened twice that the pro se's have been -**

Q. And how do you decide when it's appropriate to do when it's not appropriate? You say 95 percent of the cases, you don't do it. In five percent of the - or 11 cases, you've decided to do it. What are the criteria for doing it versus not doing it?

**A. Generally, it's the attorney asks me to do it, and there appears to me - and, again, it's generally agreed to that if I don't do it, the party without the asset they are awarded is not going to get it any other way.**

Q. So just by what I am hearing you say, it does put individuals with lawyers at an advantage because they know to ask while pro-se litigants do not know to ask. Would you agree with that statement?

**A. Yes, Except I'll make this caveat, the two pro se cases where I've been, one being Gibson and one being -I can't believe I can't remember that name - I don't see it - anyway, both had been represented by counsel at one time.**

Q But you would agree that if pro-se litigants came before you and knew about this, you might've been doing it more than 11 times, correctly - I mean is that correct?

**A. Maybe, but I doubt it.**

Q. So, it's only when lawyers - so the benchmark for deciding when to go and when not to go is when the lawyers ask for it?

**A. The benchmark, generally, is if the lawyers agree to go, agree that I should go-**

JIC Brief at 4-5.

32

JA044

95.     The stated and obvious purpose for litigants appearing in divorce actions pending in Family Court is the division of marital assets and debts, such as items of personal property which may be in the possession of either party after the date of separation.

96.     Defendant Goldston's actions of favoring litigants represented by lawyers over *pro se* litigants in her Court did not rationally relate to this end of ensuring equitable distribution of assets between the parties. Rather, her actions rationally relate to a practice of engaging in *quid pro quo* behavior or other inappropriate impartial favorable treatment between attorneys and Defendant Goldston - to the disadvantage of litigants appearing before her who were unable to afford counsel or who were otherwise acting *pro se*.

97.     Defendant Goldston and Defendant Lusk had a long-standing *quid pro quo* relationship, where Defendant Goldston allowed Defendant Lusk to exercise unfair, inappropriate and unlawful leverage over his opponents. In exchange, upon information and belief, Defendant Lusk contributed the maximum amount of money to Defendant Goldston's campaigns for reelection and otherwise supported her socially and politically so as to partially enable her to retain her position as Family Court Judge in the 13th Circuit. Upon information and belief, Defendant Goldston also shared this relationship with other local attorneys who were in her inner-circle, to the disadvantage of both *pro se* litigants, as well as litigants represented by other counsel.

98.     Defendant Goldston's favorable treatment of select attorneys, including Defendant Lusk, to the disadvantage of *pro se* litigants was arbitrary in both origin and application. She had no rational basis for such treatment. Her disparate treatment did not rationally relate to any legitimate effort at achieving an unbiased and fair equitable distribution

33

between divorce litigants appearing before her. Moreover, giving preferential, favorable, or special treatment to litigants who could afford to hire lawyers like Defendant Lusk, as opposed to those who could not afford to hire any lawyer, discriminates along social and economic lines. It therefore violates the Equal Protection Clause of the 14th Amendment.

99.      Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's Fourteenth Amendment rights as discussed herein in detail, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

100.      No objectively reasonable government official or law enforcement officer would have a reason to believe that they possessed authority to engage in the events occurring on the Plaintiff's property on March 4, 2020, including the Fourteenth Amendment violations which occurred thereby and therein. Any reasonable person would have known that Plaintiff possessed a clearly established constitutional right to basic Equal Protection as guaranteed by the Fourteenth Amendment and as outlined herein. Such a basic constitutional question of the sanctity of one's home under the Fourth Amendment, as well as the First Amendment right to record government officials trespassing on one's property and engaging in a warrantless search and seizure therein in the absence of Due Process and Equal Protection, is "beyond debate" under existing federal legal precedent. Therefore, Judge Goldston is not entitled to qualified

immunity for their actions taken on the property of the Plaintiff on March 4, 2020, nor for those

violations leading up to the search and seizure which deprived Plaintiff of his Fourteenth

Amendment rights. *See generally* <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (internal

quotation marks omitted).[13]

### <u>COUNT SIX - CONSPIRACY WITH A STATE OFFICIAL</u>

101.    The prior paragraphs are hereby incorporated by reference as though fully restated

herein.

102.    Defendants Lusk and Goldston engaged in a long-term practice, agreement,

relationship and understanding where Defendant Lusk possessed the ability, as well as the

perceived ability, to request that Defendant Goldston illegally visit the homes of opposing

litigants appearing before her in order to search and seize items of personal property therein.

Defendant Lusk would threaten to invoke this ability during settlement negotiations with other

attorneys and *pro se* litigants in order to gain an advantage. This relationship, understanding and

agreement was demonstrated on March 4, 2020 when Judge Goldston searched and seized, and

actually removed items of personal property, from inside the Plaintiff's home on March 4, 2020

as detailed herein. This search and seizure was performed pursuant to a private *ex parte*

agreement between Defendant Lusk and Defendant Goldston. Plaintiff's only means of stopping

Defendants Goldston and Lusk from searching his home was to pay the arbitrary and outrageous

sum of $5,000.00 to his ex-wife.

_____

[13] For the reasons discussed in paragraph 60 above, Defendant Goldston cannot claim judicial immunity,
but rather only qualified immunity for the constitutional violations occurring during her personal
participation of a search and seizure on the Plaintiff's property.

103.    Defendant Kyle Lusk is not a state official. However, Defendant Lusk acted under color of state law by conspiring with one or more state officials to deprive the Plaintiff of his federally protected rights. A private party who jointly participates in the alleged constitutional wrongdoing with a state or local official is engaged in state action. *See* Lugar v. Edmonson Oil Co., 457 U.S. 922, 941 (1982); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970).

104.    Defendant Lusk agreed with and/or engaged in concerted action with, Defendant Goldston to participate in a conspiracy with Goldston to do an act that deprived Plaintiff of his federally protected rights, including the Fourth Amendment right to be free from unreasonable search and seizure, the First Amendment right to record the actions of the defendants on Plaintiff's property, as well as the Fourteenth Amendment Due Process and Equal Protection rights, as alleged in detail herein.

105.    Defendant Lusk also proactively assisted Defendant Goldston in ensuring that Plaintiff had no means of recording their illicit actions on March 4, 2020, forcing Plaintiff to stop recording their actions under threat of arrest and incarceration, in violation of the Plaintiff's First Amendment right to document the illicit and outrageous actions of the defendants.

106.    Defendant Lusk and Defendant Goldston shared the common goals of utilizing the power and discretion of Goldston being a Family Court Judge to assist Lusk in leveraging said power for the unfair benefit of his clients - especially against *pro se* parties such as the Plaintiff, who could not afford legal counsel, as well as opposing litigants who were represented by lawyers who did not share a similar close relationship with Defendant Judge Goldston.

36

JA048

107.    In exchange for Defendant Goldston's assistance to Defendant Lusk, she was provided with campaign donations, as well as political and social support from Defendant Lusk. This relationship, agreement and understanding helped secure her position as a Family Court Judge for a period of over 26 years.

108.    Defendant Lusk and Defendant Goldston engaged in an act in furtherance of the conspiracy when the defendants entered onto the Plaintiff's property on March 4, 2020, as alleged in detail herein.

109.    As a direct and proximate result of the conspiracy between defendants Lusk and Goldston, the Plaintiff suffered violations of his federally protected rights, for which he is entitled to recover.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff demands judgment against the Defendants as prayed for, including:

1.    Damages against the Defendants in an amount to be determined at trial which will fairly and reasonably compensate the Plaintiff for:

a.    Past, present and future counseling or medical expenses;

b.    Past, present and future pain and/or suffering;

c.    Loss of enjoyment of life;

d.    Psychological and emotional distress;

e.    Any other compensatory damages to be proven at trial;

f.    Punitive damages against the individual Defendants in an amount to be determined at trial;

37

g.    Reasonable attorney fees and costs under 42 U.S.C. § 1988;

h.    Any other relief that this Court deems is just and fair;

i.    All other damages provided by law;

j.    Injunctive relief requiring appropriate training, supervision and discipline in

order to remedy all constitutional deprivations which the Plaintiff suffered;

k.    Declaratory judgment relief establishing the Defendants' above-described

conduct violates the Plaintiff's clearly established constitutional rights.

**PLAINTIFF DEMANDS A TRIAL BY JURY**


                                   MATTHEW GIBSON,
                                   By Counsel



/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

38

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

**MATTHEW GIBSON,**

   **Plaintiff,**

**v.**                                                     **Civil Action No. 5:21-cv-00181**
                                                          **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

   **Defendants.**

### DEFENDANT LOUISE E. GOLDSTON'S
### <u>MOTION TO DISMISS</u>

**COMES NOW** this Defendant, the Hon. Louise E. Goldston, by counsel Jennifer E. Tully,

Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers for this Honorable

Courts' consideration the following Memorandum in support of their contemporaneously-filed

Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Defendant Louise E. Goldston must be dismissed from this case as judicial immunity

applies to all claims by the Plaintiff. As more fully discussed in the attached Memorandum of Law,

the Plaintiff has pled five (5) counts in his Complaint against this Defendant, all pursuant to 42

U.S.C. § 1983. *See Memorandum of Law in Support of Defendant Louise E. Goldston's Motion to*

*Dismiss, attached hereto as **Exhibit A**.* First, he alleges an unlawful search and seizure claim in

violation of the Fourth Amendment to the United States Constitution for ordering the search of the

Plaintiff's home, allegedly without a warrant. *Complaint, ¶¶ 46-62.* Second, he alleges violations of

the First Amendment for preventing him from video recording the events. *Complaint, ¶¶ 63-75.*

JA051

Third, he alleges violations of the Fourteenth Amendment Due Process Clause for allegedly failing to provide him with due process during the contempt hearing. *Complaint, ¶¶ 79-88.* Fourth, he alleges violations of the Equal Protection Clause of the Fourteenth Amendment via his claims that Judge Goldston's practice of home inspections disadvantaged pro se litigants. *Complaint, ¶¶ 89-100.* Finally, he alleges that Judge Goldston conspired with Defendant Lusk to take the aforementioned actions. *Complaint, ¶¶ 100-109.*

## A. As a judicial officer acting in that capacity, Judge Goldston is absolutely immune from Plaintiff's claims.

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS 86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). The issue is not, as the Plaintiff frames it in his Complaint, whether Judge Goldston acted outside her authority. The issue is not even whether her actions ran afoul of the Constitution. The issue is whether she ceased to act as a judge. Otherwise, she is absolutely immune from civil liability. As addressed in the attached Memorandum, the actions alleged in the Complaint were taken during the course of adjudicating a Family Court dispute. *See **Exhibit A.*** Accordingly, even if the Plaintiff has alleged that she acted improperly, he has not alleged that she was not acting in her capacity as a judge. Accordingly, Judge Goldston is absolutely immune from Plaintiff's claims, and is entitled to dismissal.

## B. This Court lacks subject matter jurisdiction over the Plaintiff's claims against Judge Goldston due to the application of the Eleventh Amendment to the United States

**Constitution.**

The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.  It therefore preserves sovereign immunity of the states of the Union in federal court. It is well settled that "this protection extends also to 'state agents and state instrumentalities' or stated otherwise, to 'arms of the State' and State Officials." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (quotations omitted). There can be no dispute that the West Virginia Supreme Court of Appeals is an arm of the state, as it is a state agency, and its employee Judge Goldston is a State Official.  As discussed more fully in the attached Memorandum of Law, none of the three narrow exceptions apply to the facts and circumstances of this matter and therefore this Defendant is shielded from liability of the allegations of Plaintiff's Complaint by the Eleventh Amendment's sovereign immunity. *See **Exhibit A.***  As a result, Judge Goldston is entitled to Eleventh Amendment protections.

**WHEREFORE**, based on the foregoing and the attached Memorandum of Law, this Defendant respectfully prays this Honorable Court GRANT her Motion to Dismiss with prejudice, and grant such other relief as the Court deems just and proper.

**Louise E. Goldston,**
**By Counsel,**

3

JA053

  /s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**                                    **Civil Action No. 5:21-cv-00181**
                                         **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that a true and correct copy of foregoing **"DEFENDANT LOUISE**

**E. GOLDSTON'S MOTION TO DISMISS"** was served upon the following parties through the

Court's Electronic Case Filing (ECF) system on this day, April 19, 2021:

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV  25301
*Attorney For: Brian White, Jeff McPeake, Bobby Stump,*
*County Commission of Raleigh County*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl LLP
P.O. Box 11887
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*

  **/s/ Jennifer E. Tully**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

                                        **Civil Action No. 5:21-cv-00181**
                                        **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually, COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision, JEFF MCPEAKE, individually, BRIAN WHITE, individually, BOBBY STUMP, individually, KYLE LUSK, individually,**

    **Defendants.**

## MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS

**COMES NOW** this Defendant, the Hon. Louise E. Goldston, by counsel Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers for this Honorable Courts' consideration the following Memorandum in support of their contemporaneously-filed Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### I.  ISSUE OF LAW

Defendant Louise E. Goldston must be dismissed from this case as judicial immunity applies to all claims by the Plaintiff.

### II.  STATEMENT OF THE CASE

The Plaintiff, Matthew Gibson, was a party to a divorce action in the Family Court of Raleigh County, West Virginia, appearing for final hearing in that matter on or about September 18, 2018. Defendant Louise E. Goldston is a Family Court Judge of the 13th Family Court Circuit, based in

Beckley, Raleigh County, West Virginia, and presided over the Plaintiff's divorce hearing. At that hearing, the Court granted the parties a divorce, and adopted a settlement agreement between the parties as to property distribution. *Complaint, ¶ 11.* The Plaintiff also alleges that, at that hearing, his ex-wife's attorney, Defendant Lusk, advised the Plaintiff against stating that assets aren't at his home, because Judge Goldston would go to his house and look. *Complaint, ¶ 17.*

On or about September 26, 2019, the Plaintiff's ex-wife filed a Petition for Contempt against the Plaintiff, alleging that he had not turned over certain items of property as determined in the settlement agreement, or that some items he did turn over were damaged. *Complaint, ¶ 14.* Prior to the hearing on this Petition for Contempt, Defendant Lusk allegedly contacted the Plaintiff with a settlement demand. *Complaint, ¶ 18.* At a subsequent hearing on that Petition for Contempt, the Plaintiff alleges that this Defendant *sua sponte* stopped the hearing, asked the Plaintiff for his home address, and announced that all parties would reconvene at the Plaintiff's home to determine whether certain disputed items of property were there. *Complaint, ¶ 16.*

The Plaintiff claims that, upon arrival at his house, he made a motion for this Defendant to recuse herself as he believed she had become a witness by being present at the house, which motion was denied. *Complaint, ¶ 19.* The Plaintiff claims he then verbally denied any of the parties present access to his home without a search warrant, whereafter he was allegedly told that he would be jailed if he did not let them in. *Complaint, ¶ 20.* Thereafter, this Defendant allegedly permitted law enforcement personnel, the Plaintiff's ex-wife, and her attorney into the Plaintiff's residence to search for disputed items of personal property. *Complaint, ¶ 27.* Several such items were allegedly removed, some of which the Plaintiff claims were not included in the settlement agreement. *Complaint, ¶ 28.* The Plaintiff claims that, at certain points, he attempted to video record the events, and was told to stop, again being threatened with arrest if he persisted. *Complaint, ¶ 22.*

2

The Plaintiff claims that Judge Goldston has carried out this practice of home searches in divorce cases for around twenty (20) years. *Complaint, ¶ 8.* He claims that the fact that Judge Goldston is known to do this gives an advantage to represented parties over non-represented parties, as attorneys are familiar with the habits of judges and can therefore anticipate this occurring, whereas *pro se* parties are not. *Complaint, ¶ 91.* He also alleges that there was an explicit or tacit agreement between Judge Goldston and Defendant Lusk to specifically advantage his clients. *Complaint, ¶ 45.*

Based on the foregoing, the Plaintiff has pled five (5) counts in his Complaint against this Defendant, all pursuant to 42 U.S.C. § 1983. First, he alleges an unlawful search and seizure claim in violation of the Fourth Amendment to the United States Constitution for ordering the search of the Plaintiff's home, allegedly without a warrant. *Complaint, ¶¶ 46-62.* Second, he alleges violations of the First Amendment for preventing him from video recording the events. *Complaint, ¶¶ 63-75.* Third, he alleges violations of the Fourteenth Amendment Due Process Clause for allegedly failing to provide him with due process during the contempt hearing. *Complaint, ¶¶ 79-88.* Fourth, he alleges violations of the Equal Protection Clause of the Fourteenth Amendment via his claims that Judge Goldston's practice of home inspections disadvantaged pro se litigants. *Complaint, ¶¶ 89-100.* Finally, he alleges that Judge Goldston conspired with Defendant Lusk to take the aforementioned actions. *Complaint, ¶¶ 100-109.* This Defendant now moves to dismiss the Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### III. STANDARDS OF REVIEW

#### A. Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

A motion to dismiss under Rule 12(b)(1) tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998). On a motion to dismiss brought pursuant to

3

Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of proving that subject matter jurisdiction exists. See *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). This is because federal courts are courts of limited subject matter jurisdiction. See *United States ex rel Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2008). Further, there is no presumption that the federal court has jurisdiction. See *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). When faced with a challenge to its subject matter jurisdiction, the federal court is to "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." See *Evans* at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). While not converting the motion to one for summary judgment, the district court "should apply the standard applicable to a motion for summary judgment" and the moving party should prevail "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond* at 768.

**B. Motion to Dismiss for failure to state a claim under Rule 12(b)(6).**

"In general, a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130 (1993) (citing *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991)). Nonetheless, the Fourth Circuit has noted, "[t]he court need not, however, accept unsupported legal conclusions, legal conclusions couched as factual allegations, or conclusory factual allegations devoid of any reference to actual events." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "The inclusion of conclusory legal terms,

4

however, does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint do not support the legal conclusion, 'since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint.'" *Randall v. U.S.*, 30 F.3d 518, 522 (4th Cir.1994); *Trulock v. Freeh*, 275 F.3d 391, 405, n. 9 (4th Cir.2001)).

"Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, [the 4th Circuit has] held that when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity. *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). It is well established that, in deciding a motion to dismiss, a court may consider any document that is a matter of public record as well as any exhibits attached to the complaint. *Allen v. Bank of Am. Corp.*, 2011 U.S. Dist. LEXIS 92383, 2011 WL 3654451 (D. Md., Aug. 11, 2001) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

## IV. ARGUMENTS

### A. As a judicial officer acting in that capacity, Judge Goldston is absolutely immune from Plaintiff's claims.

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS 86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). As stated, "[j]udicial

immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). This long-standing common law doctrine is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). Judicial immunity ensures that while a judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages [*13] in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019)

The Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity. As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages. See *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and

6

JA063

eventual trial. See *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967) ("Immunity applies even when the judge is accused of acting maliciously and corruptly"); see also *Harlow v. Fitzgerald*, 457 U.S. 800, 815-819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) (allegations of malice are insufficient to overcome qualified immunity).

There are only two sets of circumstances in which judicial immunity is overcome. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's role as a judge. See *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988); *Stump v. Sparkman*, 435 U.S. 349, 360, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Stump* at 356-357. This does not mean, however, that judges are liable for actions which are merely beyond their authority. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." *Id*. at Syl. Pt. (a). "[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *Stump* at 362; see also *Forrester* at 227-229.

The scope of this immunity was addressed at length by the Supreme Court in *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). In *Mireles*, a California judge ordered that bailiffs bring an attorney who had failed to appear for the calling of the calendar into the courtroom, and instructed them to use excessive force on him in the process. The Supreme Court held that this action, while certainly violative of the attorney's rights and outside the judge's authority, was not outside his judicial immunity, reasoning as follows:

> Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge." *Stump v. Sparkman*, 435 U.S. at 362. But if only the particular act in question were to be

scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority." *Id.*, at 356. See also *Forrester v. White*, 484 U.S. at 227 (a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Accordingly, as the language in Stump indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." 435 U.S. at 362. In other words, we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

*Mireles* at 12-13.

The facts of this case are a direct allegory to *Mireles*. Even if it is assumed that Judge Goldston exceeded her authority in ordering the hearing moved to the Plaintiff's home, and ordering that he permit his home to be searched by his ex-wife, she did not leave her role as a judge. This entire exercise was the adjudication of a motion in a divorce case, even if done in an unorthodox or arguably impermissible manner. This is what is meant in *Stump* by saying that a judge is immune from liability arising from situations in which a plaintiff "dealt with the judge in his judicial capacity." *Stump* at 362. They are dealing with a judge, as a judge. Judge Goldston would not be immune from liability if she had rear-ended the Plaintiff's car at a stoplight, because she is not acting as a judge in that circumstance. But actions she takes with regard to litigants appearing before her which are calculated to advance the resolution of their dispute are insulated from liability.

The fact that Judge Goldston exited the courtroom for these proceedings does not mean that she exited her role as a judge. It is not uncommon for a judge, with or without a jury, to move proceedings to the site of an incident in order to view the scene or evidence.

Nor did she go beyond her judicial capacity in allegedly prohibiting the Plaintiff, or those at his direction, from video recording the events. In fact, the West Virginia Rules of Practice and Procedure for Family Courts expressly prohibit persons who are not court officials from recording

8

judicial proceedings. See W. Va. R. Fam. Ct. 8. Therefore, prohibiting the recording of family court proceedings, far from being an affront to the Constitution, is an ordinary and expected aspect of any Family Court proceeding.

The issue is not, as the Plaintiff frames it in his Complaint, whether Judge Goldston acted outside her authority. The issue is not even whether her actions ran afoul of the Constitution. The issue is whether she ceased to act as a judge. Otherwise, she is absolutely immune from civil liability. As addressed in this Memorandum, the actions alleged in the Complaint were taken during the course of adjudicating a Family Court dispute. Accordingly, even if the Plaintiff has alleged that she acted improperly, he has not alleged that she was not acting in her capacity as a judge. Accordingly, Judge Goldston is absolutely immune from Plaintiff's claims, and is entitled to dismissal.

**B. This Court lacks subject matter jurisdiction over the Plaintiff's claims against Judge Goldston due to the application of the Eleventh Amendment to the United States Constitution.**

The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. It therefore preserves sovereign immunity of the states of the Union in federal court. It is well settled that "this protection extends also to 'state agents and state instrumentalities' or stated otherwise, to 'arms of the State' and State Officials." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (quotations omitted). There can be no dispute that the West Virginia Supreme Court of Appeals is an arm of the state, as it is a state agency, and its employee Judge Goldston is a State Official. As a result, Judge Goldston is entitled to Eleventh Amendment

protections.

Eleventh Amendment immunity functions as a bar to the exercise of subject matter jurisdiction. As held by the U.S. Court of Appeals for the Fourth Circuit in *Roach v. West Va. Regional Jail & Correctional Facility Auth.*, 74 F.3d 46 (4th Cir. 1996), the Eleventh Amendment "limits the ability of a federal district court to exercise its subject-matter jurisdiction over an action brought against a state or one of its entities." *Roach* at 48; see also *Noe v. West Virginia*, No. 3:10-CV-38, 2010 U.S. Dist. LEXIS 76906, 2010 WL 3025561, *9-10 (N.D.W.Va. 2010) (Bailey, J.). ("In its motion, the State of West Virginia argues that this Court lacks subject matter jurisdiction insofar as the plaintiff seeks monetary damages in the amount of one billion dollars from the State. For the reasons that follow, this Court agrees."); *Republic of Paraguay v. Allen*, 949 F. Supp. 1269, 1271 (E.D.Va. 1996), *aff'd*, 134 F.3d 622 (4th Cir. 1998) ("The text of the amendment divests this Court of jurisdiction over actions against a state by "Citizens of another State or by Citizens or Subjects of any Foreign State."). Because sovereign immunity can be waived only expressly in statute by the state, this defense can be raised at any time during litigation without being waived, even when raised for the first time on appeal. See *Schlossberg v. Comptroller of Treasury (In re Creative Goldsmiths)*, 119 F.3d 1140 (4th Cir. 1997) (remanding case to the District Court with instruction for dismissal, due to the application of Eleventh Amendment immunity raised for the first time on appeal).

Being that this Defendant is entitled to Eleventh Amendment immunity, the only issue that remains is whether the facts or circumstances of this matter fall within a recognized exception to the Eleventh Amendment. Three narrow exceptions to the immunity enjoyed by the state and its instrumentalities pursuant to the Eleventh Amendment have been recognized, which are:

**1.    These Defendants have not waived their immunity nor consented to this suit.**

10

A state may waive its Eleventh Amendment immunity in a number of manners, such as by statute or consent to the jurisdiction. *Lapides v. Bd. of Regents Univ. Sys. of Ga.*, 535 U.S. 613, 618, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002). Such a waiver must be express. In other words, the waiver must be an "unequivocal statement of the state's intention to subject itself to suit in federal court." *See Regueno*, 2013 U.S. Dist. LEXIS 62041, 2013 WL 1837881, at *3 (quoting *Westinghouse Elec. Corp. v. W. Va. Dept. of Highways*, 845 F.2d 468, 471 (4th Cir. 1988)) (markings omitted); *and Price v. W. Va. Air Nat'l Guard*, No. 2:15-CV-11002, 2016 U.S. Dist. LEXIS 71165, 2016 WL 3094010, at *2-3 (S.D.W. Va. June 1, 2016) (holding that insurance provisions contained in the West Virginia Code provide a limited waiver of the State's sovereign immunity in state courts; however, that waiver does not extend to suits brought against the State in federal court). With respect to statutory wavier, while West Virginia Code § 29-12-5(a) has been interpreted as constituting a waiver up to the limits of an applicable liability insurance policy, it has been held only to constitute a waiver of sovereign immunity for claims in *state court*, not federal court. *Westinghouse Elec. Corp. v. W.Va. Dept. of Highways*, 845 F.2d 468, 470-471 (4th Cir. 1988) ("[W. Va. Code §§ 29-12-5 and 33-6-14a] can, at most, be construed as waiving the state's immunity from suit in state court. Neither contains the "unequivocal" statement of the state's intention to subject itself to suit in federal court required by *Atascadero*, even assuming the legislature had the power under state law to do so."); see also *Noe v. West Virginia*, No. 3:10-CV-36, 2010 U.S. Dist. LEXIS 78808, at *10-11 (N.D. W.Va. Aug. 4, 2010) (Bailey, J.); *Regueno v. Erwin*, No. 2:13-CV-00815, 2013 U.S. Dist. LEXIS 62041, at *8-9 (S.D. W.Va. May 1, 2013). The Fourth Circuit even expressed doubt that the state legislature had the power to waive Eleventh Amendment immunity by statute, even if it so desired. *Westinghouse* at 470-471 (quoting W. Va. Const. art. VI, § 35 ("the State of West Virginia shall never be made defendant in any court of law or equity, . . . except [in any] garnishment or attachment

11

proceeding, as garnishee or suggestee.").

This interpretation has been consistent in the federal courts of West Virginia. In *Wei-Ping Zeng v. Marshall University*, No. 3:17-cv-3008, 2018 U.S. Dist. LEXIS 46151 (S.D.W.Va. March 21, 2018) (Chambers, J.), a plaintiff sought to subvert sovereign immunity via waiver by asserting that the West Virginia Whistle Blower Law ("WVWBL"), W. Va. Code § 6C-1-1, *et seq*., authorized suits against the state. See *Wei-Ping Zeng* at *23. Acknowledging that this was true, the Court nonetheless held that, because Eleventh Amendment immunity is not waived unless the statute specifically authorizes suits in *federal* court, that statute also did not constitute a waiver of Eleventh Amendment immunity. See *id*. at *23-24. A general waiver, such as the one at issue in *Wei-Ping Zeng*, only permits suits against the state in *state* court. See *id*. The Plaintiffs have identified, and these Defendants are aware of, no explicit waiver of Eleventh Amendment immunity to suit in federal court potentially applicable to the claims asserted by the Plaintiffs. As a result, this Defendant has not waived her Eleventh Amendment immunity by statute under the facts and circumstances of this matter.

With respect to consent, this argument equally fails. In general, if a state removes a matter to federal court, the state is deemed to have waived its Eleventh Amendment protections. See e.g. *Lapides v. Board of Regents*, 535 U.S. 613, 616, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002). Here, however, the Plaintiffs initially filed this matter in federal court. Thus, this Defendant has not waived her Eleventh Amendment immunity by consent.

### 2.    Congress has not authorized suits of this type against the States.

To subvert Eleventh Amendment immunity via congressional authorization, as discussed in *College Savings Bank*, a plaintiff must show: "first, whether Congress has 'unequivocally expressed its intent to abrogate the immunity,' . . . and second, whether Congress has acted 'pursuant to a valid

12

exercise of power.'" *College Savings Bank* at 635 (quoting *Seminole Tribe of Fla v. Florida*, 517 U.S. 44, 55 (1996)). Where Congress wishes to so authorize suits, they must do so explicitly and in plain language, stemming from "a clear legislative statement." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 (1991).

This principle evidences a recognition of the important policy purpose of the Eleventh Amendment, and that the immunity it provides cannot be lightly abrogated. In *Atascadero,* the Supreme Court of the United States held that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero* at 238-239. An example of such an authorization appears in the statute at issue in *College Savings Bank*, the Patent and Plant Variety Protection Remedy Clarification Act. This authorization stated:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person . . . for infringement of a patent under section 271, or for any other violation under this title.

*College Savings Bank* at 632 (quoting 35 U.S.C. § 235(a)).

Plaintiff, who bears the burden of showing that subject matter jurisdiction in federal court exists, have pointed to no act of Congress authorizing suits against the states for damages involving the alleged *sua sponte* home inspections by family judges, or for a denial of attempts to video record the same. In fact, the U.S. Supreme Court has previously expressly held that 42 U.S.C. § 1983, upon which the Plaintiff bases all of his claims, does not include a Congressional abrogation of Eleventh Amendment immunity to suits against the states. See *Quern v. Jordan*, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979). Accordingly, the exception to Eleventh Amendment immunity for congressionally authorized suits is equally inapplicable.

3.    **This Defendant has not acted in violation of any federal law.**

Congressional authorization through § 5 of the Fourteenth Amendment, see *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 627, 636-637, 119 S. Ct. 2199, 144 L. Ed. 2d 575 (1999), waiver, see e.g. *Palmer v. Ohio*, 248 U.S. 32, 39 S. Ct. 16, 63 L. Ed. 108 (1918), and solely prospective relief from a state official, see *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). Because this matter is a claim for damages arising from past conduct, the exception recognized in *Ex Parte Young* does not apply.  See, e.g., *Al-Asbahi v. W. Va. Univ. Bd. of Governors*, No. 1:15-CV-144, 2017 U.S. Dist. LEXIS 12400, 2017 WL 402983, *26-*27 (N.D.W.Va. Jan. 30, 2017) (Keeley, J.), *aff'd* 724 Fed. Appx. 266 (4th Cir. 2018) (holding that the *Ex Parte Young* exception applies only where "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." (quoting *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998)); see also Complaint at *ad damnum* clause.

None of the above exceptions apply to the facts and circumstances of this matter and therefore this Defendant is shielded from liability of the allegations of Plaintiff's Complaint by the Eleventh Amendment's sovereign immunity.

## V.  CONCLUSION

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays this Honorable Court GRANT her Motion to Dismiss with prejudice, and grant such other relief as the Court deems just and proper.

**Louise E. Goldston,**
**By Counsel,**

  /s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

                                     **Civil Action No. 5:21-cv-00181**
                                     **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a true and correct copy of foregoing **"MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS"** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, April 19, 2021:

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV  25301
*Attorney For: Brian White, Jeff McPeake, Bobby Stump,*
*County Commission of Raleigh County*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

JA073

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl LLP
P.O. Box 11887
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*

  /s/ Jennifer E. Tully  
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**
                                   **Civil Action No. 5:21-cv-00181**
                                   **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually, COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision, JEFF MCPEAKE, individually, BRIAN WHITE, individually, BOBBY STUMP, individually, KYLE LUSK, individually,**

    **Defendants.**

### MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S <u>MOTION TO DISMISS</u>

**COMES NOW** this Defendant, the Hon. Louise E. Goldston, by counsel Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers for this Honorable Courts' consideration the following Memorandum in support of their contemporaneously-filed Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### I.   ISSUE OF LAW

Defendant Louise E. Goldston must be dismissed from this case as judicial immunity applies to all claims by the Plaintiff.

### II.   STATEMENT OF THE CASE

The Plaintiff, Matthew Gibson, was a party to a divorce action in the Family Court of Raleigh County, West Virginia, appearing for final hearing in that matter on or about September 18, 2018. Defendant Louise E. Goldston is a Family Court Judge of the 13th Family Court Circuit, based in

Beckley, Raleigh County, West Virginia, and presided over the Plaintiff's divorce hearing. At that hearing, the Court granted the parties a divorce, and adopted a settlement agreement between the parties as to property distribution. *Complaint, ¶ 11.* The Plaintiff also alleges that, at that hearing, his ex-wife's attorney, Defendant Lusk, advised the Plaintiff against stating that assets aren't at his home, because Judge Goldston would go to his house and look. *Complaint, ¶ 17.*

On or about September 26, 2019, the Plaintiff's ex-wife filed a Petition for Contempt against the Plaintiff, alleging that he had not turned over certain items of property as determined in the settlement agreement, or that some items he did turn over were damaged. *Complaint, ¶ 14.* Prior to the hearing on this Petition for Contempt, Defendant Lusk allegedly contacted the Plaintiff with a settlement demand. *Complaint, ¶ 18.* At a subsequent hearing on that Petition for Contempt, the Plaintiff alleges that this Defendant *sua sponte* stopped the hearing, asked the Plaintiff for his home address, and announced that all parties would reconvene at the Plaintiff's home to determine whether certain disputed items of property were there. *Complaint, ¶ 16.*

The Plaintiff claims that, upon arrival at his house, he made a motion for this Defendant to recuse herself as he believed she had become a witness by being present at the house, which motion was denied. *Complaint, ¶ 19.* The Plaintiff claims he then verbally denied any of the parties present access to his home without a search warrant, whereafter he was allegedly told that he would be jailed if he did not let them in. *Complaint, ¶ 20.* Thereafter, this Defendant allegedly permitted law enforcement personnel, the Plaintiff's ex-wife, and her attorney into the Plaintiff's residence to search for disputed items of personal property. *Complaint, ¶ 27.* Several such items were allegedly removed, some of which the Plaintiff claims were not included in the settlement agreement. *Complaint, ¶ 28.* The Plaintiff claims that, at certain points, he attempted to video record the events, and was told to stop, again being threatened with arrest if he persisted. *Complaint, ¶ 22.*

2

JA076

The Plaintiff claims that Judge Goldston has carried out this practice of home searches in divorce cases for around twenty (20) years. *Complaint, ¶ 8.* He claims that the fact that Judge Goldston is known to do this gives an advantage to represented parties over non-represented parties, as attorneys are familiar with the habits of judges and can therefore anticipate this occurring, whereas *pro se* parties are not. *Complaint, ¶ 91.* He also alleges that there was an explicit or tacit agreement between Judge Goldston and Defendant Lusk to specifically advantage his clients. *Complaint, ¶ 45.*

Based on the foregoing, the Plaintiff has pled five (5) counts in his Complaint against this Defendant, all pursuant to 42 U.S.C. § 1983. First, he alleges an unlawful search and seizure claim in violation of the Fourth Amendment to the United States Constitution for ordering the search of the Plaintiff's home, allegedly without a warrant. *Complaint, ¶¶ 46-62.* Second, he alleges violations of the First Amendment for preventing him from video recording the events. *Complaint, ¶¶ 63-75.* Third, he alleges violations of the Fourteenth Amendment Due Process Clause for allegedly failing to provide him with due process during the contempt hearing. *Complaint, ¶¶ 79-88.* Fourth, he alleges violations of the Equal Protection Clause of the Fourteenth Amendment via his claims that Judge Goldston's practice of home inspections disadvantaged pro se litigants. *Complaint, ¶¶ 89-100.* Finally, he alleges that Judge Goldston conspired with Defendant Lusk to take the aforementioned actions. *Complaint, ¶¶ 100-109.* This Defendant now moves to dismiss the Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### III. STANDARDS OF REVIEW

### A. Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

A motion to dismiss under Rule 12(b)(1) tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998). On a motion to dismiss brought pursuant to

3

JA077

Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of proving that subject matter jurisdiction exists. See *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). This is because federal courts are courts of limited subject matter jurisdiction. See *United States ex rel Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2008). Further, there is no presumption that the federal court has jurisdiction. See *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). When faced with a challenge to its subject matter jurisdiction, the federal court is to "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." See *Evans* at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). While not converting the motion to one for summary judgment, the district court "should apply the standard applicable to a motion for summary judgment" and the moving party should prevail "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond* at 768.

### B. Motion to Dismiss for failure to state a claim under Rule 12(b)(6).

"In general, a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130 (1993) (citing *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991)). Nonetheless, the Fourth Circuit has noted, "[t]he court need not, however, accept unsupported legal conclusions, legal conclusions couched as factual allegations, or conclusory factual allegations devoid of any reference to actual events." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "The inclusion of conclusory legal terms,

4

however, does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint do not support the legal conclusion, 'since the purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint.'" *Randall v. U.S.*, 30 F.3d 518, 522 (4th Cir.1994); *Trulock v. Freeh*, 275 F.3d 391, 405, n. 9 (4th Cir.2001)).

"Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, [the 4th Circuit has] held that when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether to dismiss the complaint if it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity. *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  It is well established that, in deciding a motion to dismiss, a court may consider any document that is a matter of public record as well as any exhibits attached to the complaint. *Allen v. Bank of Am. Corp.*, 2011 U.S. Dist. LEXIS 92383, 2011 WL 3654451 (D. Md., Aug. 11, 2001) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

## IV. ARGUMENTS

### A. As a judicial officer acting in that capacity, Judge Goldston is absolutely immune from Plaintiff's claims.

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS 86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). As stated, "[j]udicial

immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). This long-standing common law doctrine is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). Judicial immunity ensures that while a judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages [*13] in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019)

The Plaintiff's claims herein against Judge Goldston are subject to dismissal due to the application of judicial immunity. As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id*. (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages. See *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985). Accordingly, judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and

6

JA080

eventual trial. See *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)

("Immunity applies even when the judge is accused of acting maliciously and corruptly"); see also

*Harlow v. Fitzgerald*, 457 U.S. 800, 815-819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) (allegations

of malice are insufficient to overcome qualified immunity).

There are only two sets of circumstances in which judicial immunity is overcome. First, a

judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's role as

a judge. See *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988);

*Stump v. Sparkman*, 435 U.S. 349, 360, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). Second, a judge is

not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.

*Stump* at 356-357. This does not mean, however, that judges are liable for actions which are merely

beyond their authority. "A judge will not be deprived of immunity because the action he took was in

error, was done maliciously, or was in excess of his authority." *Id*. at Syl. Pt. (a). "[W]hether an act

by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function

normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with

the judge in his judicial capacity." *Stump* at 362; see also *Forrester* at 227-229.

The scope of this immunity was addressed at length by the Supreme Court in *Mireles v.

Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). In *Mireles*, a California judge ordered that

bailiffs bring an attorney who had failed to appear for the calling of the calendar into the courtroom,

and instructed them to use excessive force on him in the process. The Supreme Court held that this

action, while certainly violative of the attorney's rights and outside the judge's authority, was not

outside his judicial immunity, reasoning as follows:

> Of course, a judge's direction to police officers to carry out a judicial order with
> excessive force is not a "function normally performed by a judge." *Stump v.
> Sparkman*, 435 U.S. at 362. But if only the particular act in question were to be

scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority." *Id.*, at 356. See also *Forrester v. White*, 484 U.S. at 227 (a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Accordingly, as the language in Stump indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." 435 U.S. at 362. In other words, we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

*Mireles* at 12-13.

The facts of this case are a direct allegory to *Mireles*. Even if it is assumed that Judge Goldston exceeded her authority in ordering the hearing moved to the Plaintiff's home, and ordering that he permit his home to be searched by his ex-wife, she did not leave her role as a judge. This entire exercise was the adjudication of a motion in a divorce case, even if done in an unorthodox or arguably impermissible manner. This is what is meant in *Stump* by saying that a judge is immune from liability arising from situations in which a plaintiff "dealt with the judge in his judicial capacity." *Stump* at 362. They are dealing with a judge, as a judge. Judge Goldston would not be immune from liability if she had rear-ended the Plaintiff's car at a stoplight, because she is not acting as a judge in that circumstance. But actions she takes with regard to litigants appearing before her which are calculated to advance the resolution of their dispute are insulated from liability.

The fact that Judge Goldston exited the courtroom for these proceedings does not mean that she exited her role as a judge. It is not uncommon for a judge, with or without a jury, to move proceedings to the site of an incident in order to view the scene or evidence.

Nor did she go beyond her judicial capacity in allegedly prohibiting the Plaintiff, or those at his direction, from video recording the events. In fact, the West Virginia Rules of Practice and Procedure for Family Courts expressly prohibit persons who are not court officials from recording

judicial proceedings. See W. Va. R. Fam. Ct. 8. Therefore, prohibiting the recording of family court proceedings, far from being an affront to the Constitution, is an ordinary and expected aspect of any Family Court proceeding.

The issue is not, as the Plaintiff frames it in his Complaint, whether Judge Goldston acted outside her authority. The issue is not even whether her actions ran afoul of the Constitution. The issue is whether she ceased to act as a judge. Otherwise, she is absolutely immune from civil liability. As addressed in this Memorandum, the actions alleged in the Complaint were taken during the course of adjudicating a Family Court dispute. Accordingly, even if the Plaintiff has alleged that she acted improperly, he has not alleged that she was not acting in her capacity as a judge. Accordingly, Judge Goldston is absolutely immune from Plaintiff's claims, and is entitled to dismissal.

**B. This Court lacks subject matter jurisdiction over the Plaintiff's claims against Judge Goldston due to the application of the Eleventh Amendment to the United States Constitution.**

The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. It therefore preserves sovereign immunity of the states of the Union in federal court. It is well settled that "this protection extends also to 'state agents and state instrumentalities' or stated otherwise, to 'arms of the State' and State Officials." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (quotations omitted). There can be no dispute that the West Virginia Supreme Court of Appeals is an arm of the state, as it is a state agency, and its employee Judge Goldston is a State Official. As a result, Judge Goldston is entitled to Eleventh Amendment

protections.

Eleventh Amendment immunity functions as a bar to the exercise of subject matter jurisdiction. As held by the U.S. Court of Appeals for the Fourth Circuit in *Roach v. West Va. Regional Jail & Correctional Facility Auth.*, 74 F.3d 46 (4th Cir. 1996), the Eleventh Amendment "limits the ability of a federal district court to exercise its subject-matter jurisdiction over an action brought against a state or one of its entities." *Roach* at 48; *see also Noe v. West Virginia*, No. 3:10-CV-38, 2010 U.S. Dist. LEXIS 76906, 2010 WL 3025561, *9-10 (N.D.W.Va. 2010) (Bailey, J.). ("In its motion, the State of West Virginia argues that this Court lacks subject matter jurisdiction insofar as the plaintiff seeks monetary damages in the amount of one billion dollars from the State. For the reasons that follow, this Court agrees."); *Republic of Paraguay v. Allen*, 949 F. Supp. 1269, 1271 (E.D.Va. 1996), *aff'd*, 134 F.3d 622 (4th Cir. 1998) ("The text of the amendment divests this Court of jurisdiction over actions against a state by "Citizens of another State or by Citizens or Subjects of any Foreign State."). Because sovereign immunity can be waived only expressly in statute by the state, this defense can be raised at any time during litigation without being waived, even when raised for the first time on appeal. See *Schlossberg v. Comptroller of Treasury (In re Creative Goldsmiths)*, 119 F.3d 1140 (4th Cir. 1997) (remanding case to the District Court with instruction for dismissal, due to the application of Eleventh Amendment immunity raised for the first time on appeal).

Being that this Defendant is entitled to Eleventh Amendment immunity, the only issue that remains is whether the facts or circumstances of this matter fall within a recognized exception to the Eleventh Amendment. Three narrow exceptions to the immunity enjoyed by the state and its instrumentalities pursuant to the Eleventh Amendment have been recognized, which are:

**1.      These Defendants have not waived their immunity nor consented to this suit.**

A state may waive its Eleventh Amendment immunity in a number of manners, such as by statute or consent to the jurisdiction. *Lapides v. Bd. of Regents Univ. Sys. of Ga.*, 535 U.S. 613, 618, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002). Such a waiver must be express. In other words, the waiver must be an "unequivocal statement of the state's intention to subject itself to suit in federal court." *See Regueno*, 2013 U.S. Dist. LEXIS 62041, 2013 WL 1837881, at *3 (quoting *Westinghouse Elec. Corp. v. W. Va. Dept. of Highways*, 845 F.2d 468, 471 (4th Cir. 1988)) (markings omitted); *and Price v. W. Va. Air Nat'l Guard*, No. 2:15-CV-11002, 2016 U.S. Dist. LEXIS 71165, 2016 WL 3094010, at *2-3 (S.D.W. Va. June 1, 2016) (holding that insurance provisions contained in the West Virginia Code provide a limited waiver of the State's sovereign immunity in state courts; however, that waiver does not extend to suits brought against the State in federal court). With respect to statutory wavier, while West Virginia Code § 29-12-5(a) has been interpreted as constituting a waiver up to the limits of an applicable liability insurance policy, it has been held only to constitute a waiver of sovereign immunity for claims in *state court*, not federal court. *Westinghouse Elec. Corp. v. W.Va. Dept. of Highways*, 845 F.2d 468, 470-471 (4th Cir. 1988) ("[W. Va. Code §§ 29-12-5 and 33-6-14a] can, at most, be construed as waiving the state's immunity from suit in state court. Neither contains the "unequivocal" statement of the state's intention to subject itself to suit in federal court required by *Atascadero*, even assuming the legislature had the power under state law to do so."); see also *Noe v. West Virginia*, No. 3:10-CV-36, 2010 U.S. Dist. LEXIS 78808, at *10-11 (N.D. W.Va. Aug. 4, 2010) (Bailey, J.); *Regueno v. Erwin*, No. 2:13-CV-00815, 2013 U.S. Dist. LEXIS 62041, at *8-9 (S.D. W.Va. May 1, 2013). The Fourth Circuit even expressed doubt that the state legislature had the power to waive Eleventh Amendment immunity by statute, even if it so desired. *Westinghouse* at 470-471 (quoting W. Va. Const. art. VI, § 35 ("the State of West Virginia shall never be made defendant in any court of law or equity, . . . except [in any] garnishment or attachment

proceeding, as garnishee or suggestee.").

This interpretation has been consistent in the federal courts of West Virginia. In *Wei-Ping Zeng v. Marshall University*, No. 3:17-cv-3008, 2018 U.S. Dist. LEXIS 46151 (S.D.W.Va. March 21, 2018) (Chambers, J.), a plaintiff sought to subvert sovereign immunity via waiver by asserting that the West Virginia Whistle Blower Law ("WVWBL"), W. Va. Code § 6C-1-1, *et seq*., authorized suits against the state. See *Wei-Ping Zeng* at *23. Acknowledging that this was true, the Court nonetheless held that, because Eleventh Amendment immunity is not waived unless the statute specifically authorizes suits in *federal* court, that statute also did not constitute a waiver of Eleventh Amendment immunity. See *id*. at *23-24. A general waiver, such as the one at issue in *Wei-Ping Zeng*, only permits suits against the state in *state* court. See *id*. The Plaintiffs have identified, and these Defendants are aware of, no explicit waiver of Eleventh Amendment immunity to suit in federal court potentially applicable to the claims asserted by the Plaintiffs. As a result, this Defendant has not waived her Eleventh Amendment immunity by statute under the facts and circumstances of this matter.

With respect to consent, this argument equally fails. In general, if a state removes a matter to federal court, the state is deemed to have waived its Eleventh Amendment protections. See e.g. *Lapides v. Board of Regents*, 535 U.S. 613, 616, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002). Here, however, the Plaintiffs initially filed this matter in federal court. Thus, this Defendant has not waived her Eleventh Amendment immunity by consent.

**2.     Congress has not authorized suits of this type against the States.**

To subvert Eleventh Amendment immunity via congressional authorization, as discussed in *College Savings Bank*, a plaintiff must show: "first, whether Congress has 'unequivocally expressed its intent to abrogate the immunity,' . . . and second, whether Congress has acted 'pursuant to a valid

exercise of power.'" *College Savings Bank* at 635 (quoting *Seminole Tribe of Fla v. Florida*, 517 U.S. 44, 55 (1996)).  Where Congress wishes to so authorize suits, they must do so explicitly and in plain language, stemming from "a clear legislative statement." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 (1991).

This principle evidences a recognition of the important policy purpose of the Eleventh Amendment, and that the immunity it provides cannot be lightly abrogated.  In *Atascadero,* the Supreme Court of the United States held that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero* at 238-239.  An example of such an authorization appears in the statute at issue in *College Savings Bank*, the Patent and Plant Variety Protection Remedy Clarification Act.  This authorization stated:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person . . . for infringement of a patent under section 271, or for any other violation under this title.

*College Savings Bank* at 632 (quoting 35 U.S.C. § 235(a)).

Plaintiff, who bears the burden of showing that subject matter jurisdiction in federal court exists, have pointed to no act of Congress authorizing suits against the states for damages involving the alleged *sua sponte* home inspections by family judges, or for a denial of attempts to video record the same.  In fact, the U.S. Supreme Court has previously expressly held that 42 U.S.C. § 1983, upon which the Plaintiff bases all of his claims, does not include a Congressional abrogation of Eleventh Amendment immunity to suits against the states.  See *Quern v. Jordan*, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979).  Accordingly, the exception to Eleventh Amendment immunity for congressionally authorized suits is equally inapplicable.

13

JA087

3.    **This Defendant has not acted in violation of any federal law.**

Congressional authorization through § 5 of the Fourteenth Amendment, see *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 627, 636-637, 119 S. Ct. 2199, 144 L. Ed. 2d 575 (1999), waiver, see e.g. *Palmer v. Ohio*, 248 U.S. 32, 39 S. Ct. 16, 63 L. Ed. 108 (1918), and solely prospective relief from a state official, see *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). Because this matter is a claim for damages arising from past conduct, the exception recognized in *Ex Parte Young* does not apply.  See, e.g., *Al-Asbahi v. W. Va. Univ. Bd. of Governors*, No. 1:15-CV-144, 2017 U.S. Dist. LEXIS 12400, 2017 WL 402983, *26-*27 (N.D.W.Va. Jan. 30, 2017) (Keeley, J.), *aff'd* 724 Fed. Appx. 266 (4th Cir. 2018) (holding that the *Ex Parte Young* exception applies only where "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." (quoting *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998)); see also Complaint at *ad damnum* clause.

None of the above exceptions apply to the facts and circumstances of this matter and therefore this Defendant is shielded from liability of the allegations of Plaintiff's Complaint by the Eleventh Amendment's sovereign immunity.

## V.  CONCLUSION

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays this Honorable Court GRANT her Motion to Dismiss with prejudice, and grant such other relief as the Court deems just and proper.

**Louise E. Goldston,**
**By Counsel,**

  /s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

JA089

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

   **Plaintiff,**

**v.**

                                            **Civil Action No. 5:21-cv-00181**
                                            **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP,
individually, KYLE LUSK, individually,**

   **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

     **I HEREBY CERTIFY** that a true and correct copy of foregoing **"MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS"** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, April 19, 2021:

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV  25301
*Attorney For: Brian White, Jeff McPeake, Bobby Stump,*
*County Commission of Raleigh County*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

JA090

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl LLP
P.O. Box 11887
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*

  /s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

MATTHEW GIBSON,

        Plaintiff,

vs.                          Civil Action No. 5:21-cv-00181
                                  Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT**
**LOUISE E. GOLDSTON'S MOTION TO DISMISS**

      Now comes the Plaintiff, by and through counsel, John H. Bryan, pursuant to Rule 12(b)

(6) of the Federal Rules of Civil Procedure, and moves the Court to deny Defendant Louise E.

Goldston's motion to dismiss.  In support hereof, the Plaintiff states as follows:

INTRODUCTION

      This case arises from actions taken by Defendant Goldston on March 4, 2020 at the

Plaintiff's home, wherein she personally directed, and participated in, a search and seizure of the

Plaintiff, his home, and personal possessions, under the auspices of holding a Family Court

contempt hearing at the Plaintiff's residence.

1

<u>FACTS ALLEGED IN THE COMPLAINT</u>

Plaintiff's divorce action was litigated in the Family Court of Raleigh County, West Virginia, which is the 13th Family Court Circuit. Defendant Louise E. Goldston was the presiding Family Court judge. The divorce was finalized at a final hearing on September 18, 2018. During the final hearing, Plaintiff's ex-wife was represented by Defendant Kyle Lusk, who threatened during the hearing to bring Defendant Goldston to Plaintiff's home and search the home for items of personal property sought by Mr. Lusk's client. An agreement pertaining to disputed personal property was reached, with a document being submitted to the Court memorializing and describing the agreement. The agreement was supposed to have been attached to the final order, but was not attached to the final order.

Approximately a year and a half later, Mr. Lusk filed a petition for contempt on behalf of Plaintiff's ex-wife, claiming that she didn't receive all of the items of personal property. Plaintiff was now acting *pro se*. Mr. Lusk called the Plaintiff the night prior to the scheduled hearing at the Family Court of Raleigh County, which was to be held before Defendant Goldston. Lusk left a voicemail claiming that Judge Goldston had asked him to convey his settlement proposal, which was a demand for $5,000.00, "[o]therwise, we'll see you tomorrow." Plaintiff arrived at the hearing *pro se* to defend against the contempt allegations.

At the hearing, prior to any finding of contempt, Defendant Goldston stopped the hearing, acting sua sponte, suddenly and without explanation asked Mr. Gibson for his home address and ordered the parties to meet at Mr. Gibson's house in ten minutes. She failed to explain the reason for the parties traveling to Plaintiff's home. He was unable to raise an objection while still at the hearing. Once everyone arrived at Mr. Gibson's home on March 4, 2020, and the purpose of the

2

visit became clear, the Plaintiff moved to recuse Defendant Goldston on the grounds that she had

become a potential witness in the case. Judge Goldston denied the motion as untimely. Plaintiff

then verbally refused to allow Defendant Goldston or anyone else in his house without a search

warrant. Defendant Goldston threatened to put Mr. Gibson in jail if he denied them entry into his

house. Defendant Goldston threatened to jail the Plaintiff six times while on his property that

day.

Plaintiff video and audio recorded the initial few minutes of the interactions on his

property, including the portion where Plaintiff's motion for recusal was denied, as well as

Plaintiff stating that nobody was going in his house without a search warrant. The video captured

Defendant Goldston stating, "oh yes I will." Ultimately Defendant Goldston instructed

Defendant McPeake to seize the Plaintiff's cell phone in order to stop it from recording. Without

Plaintiff's recording, there was no other method of retaining a record of the ongoing search and

seizure which was occurring on his property and in his home. Despite the fact that Family Court

judges are required to record their proceedings for the record, Defendant Goldston was not

recording her actions. At one point, a deputy sheriff, Bobby Stump, on his own began recording

inside the Plaintiff's home, recording a small portion of the search and seizure occurring inside.

The Plaintiff was never provided with a copy of the video, despite requesting it and submitting

FOIA requests.

Defendant Goldston's bailiff, Jeff McPeake, called two other deputies to assist in forcing

the Plaintiff to allow the defendants inside Plaintiff's home. A search and seizure occurred inside

Plaintiff's home, lasting approximately 20 to 30 minutes. Items of personal property were seized,

some of which were later returned due to being the incorrect items. There was no inventory or

3

JA094

written documentation created pertaining to what was taken, and what was not taken. There was no police report created by either of the three police officers who participated in the search and seizure.

Following public release of the small portion of video which was recorded prior to Defendant Goldston forcing the recordings to stop, the Judicial Investigation Commission opened an investigation into Defendant Goldston. This investigation culminated in a Formal Statement of Charges against Defendant Goldston, wherein it was revealed that she had been engaging in searches and seizures in the homes of litigants appearing in her court for around twenty years. Through counsel, Defendant Goldston entered a settlement agreement with Judicial Disciplinary Counsel, wherein she admitted the factual allegations in the Formal Statement of Charges and admitted to engaging in violations of Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the West Virginia Code of Judicial Conduct. As further part of the Settlement Agreement which she signed, Defendant Goldston "admitted her wrongdoing" and jointly agreed to recommend to the Judicial Hearing Board and the State Supreme Court that she be censured and fined $5,000.00 as an appropriate sanction for her violations.

<u>ARGUMENT</u>

**A.    Judicial Immunity**

Defendant Goldston's primary argument is an assertion of judicial immunity. In her view of judicial immunity, there is no action she could take that would deprive her of judicial immunity, so long as those actions are taken against a litigant who has an active proceeding pending in her court. However, her interpretation of the law of judicial immunity is overly broad and ignores the established exceptions, which after examining the allegations in the light most

4

favorable to the Plaintiff, deprive Defendant Goldston of any claim to judicial immunity - especially at the 12(b)(6) stage.

Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court - or any court. Defendant Goldston's personal direction of, and personal participation in, the search and seizure inside the Plaintiff's home, consisted of an executive enforcement act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. *See* Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).

The Supreme Court has made clear that "[t]he proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity. Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993). The justification must take care to explain why the official hoping to secure absolute immunity would not be sufficiently shielded by qualified immunity, which already affords officials considerable leeway to perform their jobs without fear of personal liability. Indeed, as the Court has explained, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been 'quite sparing' in our recognition of absolute immunity, and have refused to extend it any 'further than its justification would warrant.' " Burns v. Reed, 500 U.S. 478, 486–87, (1991).

Defendant Goldston cites Mireles for her argument that judicial immunity should apply. However, Mireles demonstrates the opposite. The Supreme Court has also made clear that "a

judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity." Forrester v. White, 484 U.S. 219, 227-229 (1988). To determine whether a judge performs a "judicial act," courts consider whether the judge engaged in action normally performed by a judge, and whether the parties dealt with the judge in her judicial capacity. Mireles, 502 U.S. at 12. In Mireles, the defendant judge became angry at an attorney who was absent from morning call in his courtroom and ordered the police officer bailiff "to forcibly and with excessive force seize and bring plaintiff into his courtroom." Id. at 11. The Court noted that a "judge's direction to court officers to bring a person who is in the courthouse before him is a function normally performed by a judge." Id; *but see* Id. at 14-15 (Stevens, J. Dissenting) ("Ordering a battery has no relation to a function normally performed by a judge. If an interval of a minute or two had separated the two orders, it would be undeniable that no immunity would attach to the latter order. The fact that both are alleged to have occurred as part of the same communication does not enlarge the judge's immunity.").

The allegations that Defendant Judge Goldston personally engaged in, and directed, a search and seizure at and inside the Plaintiff's residence, along with three law enforcement officers, which resulted in the actual seizure of items of physical property from inside the Plaintiff's home, exists in stark contrast to allegations against the judge in Mireles. The Supreme Court expressly distinguished "judicial" actions from actions taken by a judge which are "executive" in nature, and therefore not protected by judicial immunity:

> Accordingly, as the language in Stump indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." Id. 435 U.S., at 362 . In other words, we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

Nor does the fact that Judge Mireles' order was carried out by police officers somehow transform his action from "judicial" to "executive" in character. As <u>Forrester</u> instructs, it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." 484 U.S., at 229 . A judge's direction to an executive order to bring counsel before the court is no more executive in character than a judge's issuance of a warrant for an executive officer to search a home. *See* <u>Burns v. Reed</u>, 500 U.S. 478 (1991) ("[T]he issuance of a search warrant is unquestionably a judicial act").

<u>Mireles</u> at 13. Indeed, as Justice Stevens pointed out in Footnote 1 of his dissent, a judge is not entitled to immunity when acting in an enforcement capacity. <u>Supreme Court of Virginia v. Consumers Union of United States, Inc.</u>, 446 U.S. 719, 736-737, 100 S.Ct. 1967 1977, 64 L.Ed. 2d 641 (1980); *cf.* <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 520-524, 105 S.Ct. 2806, 2812-2814, 86 L.Ed.2d 411 (1985) (Attorney General not absolutely immune when performing "national security," rather than prosecutorial, function).[1] It's the nature of the function which invokes immunity - not the identity of the individual.

Moreover, the act of a judge personally bringing law enforcement to a litigant's home and then engaging in a search and seizure inside the home, is not a general function normally performed by a judicial officer. The alleged conduct doesn't consist of mere "mistakes" or "erroneous acts" in excess of  authority during an otherwise appropriate judicial act. Rather, Judge Goldston's conduct - searching and seizing - is entirely "executive" in nature. In contrast, the Supreme Court explained that issuing a search warrant is inherently judicial in nature. <u>Mireles</u> at 13. Therefore executing a search warrant is inherently executive in nature. Here,

---

[1] *See also* <u>Archie v. Lanier</u>, 95 F.3d 438, 441 (6th Cir. 1996) (holding that "stalking and sexually assaulting a person, no matter the circumstances, do not constitute 'judicial acts'"); <u>Zarcone v. Perry</u>, 572 F.2d 52, 53 (2d Cir. 1978) (ordering coffee vendor handcuffed and subjecting him to "pseudo-official inquisition" because judge did not like his coffee are not judicial acts), *cert. denied*, 439 U.S. 1072 (1979).

Defendant Goldston did not issue a search warrant. Nor did she issue an order finding Plaintiff in contempt. She acted wholly outside the general practice and authority of a judge, much less a Family Court judge.

In her memorandum, Defendant Goldston claims, "It is not uncommon for a judge, with or without a jury, to move proceedings to the site of an incident in order to view the scene or evidence."[2] However, the West Virginia Judicial Investigation Commission already debunked this fallacious example during the judicial disciplinary proceedings against the Defendant. When asked by Judicial Disciplinary Counsel, Defendant Goldston could provide no statute, rule or case that gave her the authority to conduct what she described as "home visits." She also acknowledged that there was nothing in the Family Court's contempt powers that gave her the authority to conduct a so-called "home visit."[3] Defendant Goldston admitted to improperly putting herself in the role of litigant during the Plaintiff's contempt proceedings.[4] Given that Defendant Goldston admittedly placed herself in the role of litigant against the Plaintiff, which resulted in the unconstitutional search and seizure of Plaintiff's home, which occurred only following the threat of arrest and imprisonment of the Plaintiff, she has admittedly has departed from actions of a "judicial" nature. This is evidenced by the fact that she admitted to violations of Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the West Virginia Code of Judicial Conduct and agreed that she should be censured and fined for her wrongdoing.[5] As such, it is highly uncommon for a judge to engage in investigatory actions or search and seizure actions. Where

_____

[2] Def.'s Mem. at 8

[3] Complaint at 32.

[4] Complaint at 35.

[5] Complaint at 36, 37.

such extrajudicial wrongdoing has occurred, albeit rarely occurring, it has been punished with disciplinary charges and sanctions.[6]

Moreover, similar to the Supreme Court's example of a probate judge trying a criminal case,[7] the Defendant's request for judicial immunity must be viewed through the lens of the fact that Defendant Goldston is a Family Court Judge. As a limited jurisdiction court, a Family Court has no authority to conduct home views. W. Va. Code § 51-2A-2(e) provides:

> A family court is a court of limited jurisdiction. A family court is a court of record only for the purposes of exercising jurisdiction in the matters for which the jurisdiction of the family court is specifically authorized in this section and in chapter 48 of the code. A family court may not exercise the powers given courts of record in § 51-5-1 of this code or exercise any other powers provided for courts of record in this code unless specifically authorized by the Legislature. A family court judge is not a "judge of any court of record" or a "judge of a court of record" as the terms are defined and used in § 51-9-1 et seq. of this code.

As the Judicial Disciplinary Counsel stated in their brief to the State Supreme Court in the Defendant's disciplinary proceedings:

> The instant case is about a family court judge who violated the Code of Judicial Conduct. It is not about a magistrate or a circuit court judge. There is no statute, rule or case law that allows a family court judge to conduct a home view in a contempt proceeding. Respondent could provide none, the family court judge representatives to the JIC[8] and the JHB[9] could provide none, and the undersigned could find none. It is because none exists. As such, the family court has no independent authority to conduct a home view and Respondent violated the Code of Judicial Conduct by exceeding her authority. If family court judges want to conduct home visits, they should have the legislature enact a statute or the State Supreme Court adopt a rule that gives them the authority to take such action…..

_____

[6] See.e.g., August 25, 2020 Public Admonishment of Judge Eric Shuck; In the Matter of Aboulhosn, Complaint No. 91-2013.

[7] *See infra* at 10.

[8] Judicial Investigation Commission

[9] Judicial Hearing Board

Based upon the foregoing, the family court does not have the inherent authority to conduct a home view absent consent of the parties. Moreover, this was not a home view in the traditional sense. It was an unreasonable search and seizure. Search and seizure is an executive branch function. Therefore, Respondent exceeded her authority and in doing so repeatedly violated the Code of Judicial Conduct. On the other hand, the contempt statutes gave Respondent appropriate remedies, but she ignored them. She could have found Mr. Gibson in contempt after hearing all of the evidence and given him an opportunity to purge himself of his contumacious behavior. Failing that, she could have issued some type of order that allowed the Sheriffs Office to go in and retrieve the items.[10]

In Stump v. Sparkman, the Supreme Court held that Judge Harold D. Stump had performed a judicial act when he ordered a mentally retarded girl to undergo a tubal ligation at the request of her mother. The Court explained that absolute immunity applies to actions taken by judges "in error, . . . maliciously, or . . . in excess of [their] authority," but not in the "clear absence of all jurisdiction." To distinguish between these two standards, the Court provided an example:

[I]f a probate judge, with jurisdiction over only wills and estates should try a criminal case, he would be acting in the clear absence of jurisdiction. . . . [O]n the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction.

Stump v. Sparkman, 435 U.S. 349, 356-57 (1978). A judge is protected only by qualified immunity when carrying out administrative functions. In Forrester v. White, 484 U.S. 219 (1988) the Supreme Court held that when a judge fired a probation officer, he performed an administrative act and was thus protected only by qualified immunity. The Court rejected the argument that judges should have absolute immunity for employment decisions because an incompetent employee can impair the judge's ability to make sound judicial decisions. The Court reasoned that employment decisions made by judges "cannot meaningfully be distinguished

_____

[10] Judicial Disciplinary Counsel's Brief in Support of Joint Agreement to Discipline at 21, 24-25.

10

from" employment decisions made by district attorneys and other executive officials, and "no one claims they give rise to absolute immunity from liability in damages under § 1983." Id. at 229.

Viewing the allegations in the light most favorable to the Plaintiff, and assuming those facts to be true, Defendant Goldston is not entitled to judicial immunity. It is her burden of proving its application, and such a burden cannot be established given the allegations: that Judge Goldston improperly removed herself from the role of Family Court Judge, and inserted herself into the role of a litigant against the Plaintiff, culminating in the forcible search and seizure of his home, along with three law enforcement officers. Such actions are not judicial in nature, and therefore are not entitled to judicial immunity, but rather only qualified immunity, which has not been asserted. Therefore the Defendants' motion to dismiss must be denied.

**B.      Eleventh Amendment**

Defendant Goldston also claims that this Court lacks subject matter jurisdiction due to the application of the Eleventh Amendment to the U.S. Constitution. However, the Defendant misunderstands the application of the Eleventh Amendment. The Eleventh Amendment provides, in relevant part, that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." By "draw[ing] upon principles of sovereign immunity," the Supreme Court has "construe[d] the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *See* Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (internal quotation marks omitted). The Court has also recognized that the States'

11

JA102

Eleventh Amendment immunity may extend to "state agents and state instrumentalities." *See* Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *quoted by* Pense v. Md. Dep't of Pub. Safety & Corr. Servs., 926 F.3d 97 (4th Cir. 2019).

In the case *sub judice*, the Eleventh Amendment does not foreclose the relief requested by the Plaintiff. As against Defendant Louise E. Goldston, named as a defendant in her individual capacity, the Eleventh Amendment is irrelevant because she cannot invoke it, because she is not a state agency or state official sued in her official capacity. The Eleventh Amendment does not grant immunity when a §1983 claim for damages is asserted against a state official in her personal capacity. Hafer v. Melo, 502 U.S. 21, 30–31 (1991). The monetary relief awarded on such a claim would not be payable out of the state treasury, but would come from the state official's personal funds, which are not protected by the Eleventh Amendment. Id. The fact that the state agreed to indemnify the state official for a personal capacity monetary judgment does not create Eleventh Amendment immunity because the decision to indemnify is a voluntary policy choice of state government; it is not compelled by mandate of the federal court. *See, e.g.*, Stoner v. Wis. Dep't of Agric., 50 F.3d 481, 482–83 (7th Cir. 1995).

Viewing the Complaint, it's clear that Defendant Goldston is named in her personal and individual capacity. In the header, it expressly states "LOUISE E. GOLDSTON, individually." In the "PARTIES" SECTION, in paragraph 2, it states that "[s]he is named herein as a defendant in her individual capacity." Therefore, the Eleventh Amendment is inapplicable and the Defendant's motion to dismiss on those grounds must be denied.

12

<u>CONCLUSION</u>

Rule 12(b)(6) provides for a defense to a claim by motion for "failure to state a claim upon which relief can be granted." In deciding motions under 12(b)(6), federal courts can take judicial notice of all matters of public record, such as the Formal Statement of Charges against Judge Louise E. Goldston, as well as her admission to having violated violations of Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the West Virginia Code of Judicial Conduct, including admittedly improperly placing herself into the role of litigant against Matthew Gibson. *See* <u>Hall v. Virginia</u>, 385 F.3d 421, 424 (4th Cir. 2004). Judicial immunity is awarded to the function and nature of the act, rather than the identity of the individual. Defendant Goldston engaged in an unconstitutional warrantless search and seizure. Therefore, Plaintiff respectfully requests that the motion to dismiss be denied.

> MATTHEW GIBSON,
> By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

vs.                            Civil Action No. 5:21-cv-00181
                                   Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

       Defendant.

**<u>CERTIFICATE OF SERVICE</u>**

    I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFFS' RESPONSE TO DEFENDANT LOUISE E. GOLDSTON'S MOTION TO

DISMISS has been served upon counsel of record by using the CM/ECF System, this the 3rd day

of May, 2021 and addressed as follows:

| | |
|---|---|
| Jennifer E. Tully, Esq. | J. Victor Flanagan, Esq. |
| Adam K. Strider, Esq. | Kevin J. Robinson, Esq. |
| Bailey & Wyant, PLLC | Pullin Fowler Flanagan, Brown & Poe, PLLC |
| 500 Virginia Street, East, Suite 600 | 252 George Street |
| PO Box 3710 | Beckley, WV 25801 |
| Charleston, WV 25337-3710 | *Counsel for Raleigh County Defendants* |
| *Counsel for Louise E. Goldston* | |

Arie M. Spitz, Esq.
Kevin A. Nelson, Esq.
Jason L. Holliday, Esq.
Dinsmore & Shohl, LLP
707 Virginia Street, East, Suite 1300

14

Charleston, WV 25339-1887
*Counsel for Kyle Lusk*

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

                                   **Civil Action No. 5:21-cv-00181**
                                   **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

### REPLY MEMORANDUM IN SUPPORT OF
### <u>DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS</u>

      **COMES NOW** this Defendant, the Honorable Louise E. Goldston, by counsel Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers the following Reply Memorandum in support of her previously-filed Motion to Dismiss for this Court's consideration.

    **I.**      **Defendant Louise E. Goldston must be dismissed from this case as judicial immunity applies to all claims by the Plaintiff.**

      In his Response, the Plaintiff argues that Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity when she moved the hearing to the Plaintiff's home in an effort to allow his ex-wife to obtain the property previously awarded to her by the Court. However, the Plaintiff makes it clear in both this Complaint and in his Statement of Facts that he did in fact view Defendant Goldston in her judicial capacity at all times, including when they were at his home. Plaintiff states in his Complaint that, upon arrival at his house, he made a motion for this Defendant

to recuse herself as he believed she had become a witness by being present at the house, which motion was denied. *Complaint, ¶ 19.* Additionally, in his Response he states "…the Plaintiff moved to recuse Defendant Goldston on the grounds that she had become a potential witness in the case. Judge Goldston denied the motion as untimely." *See Response, Document 15, page 3.* It can only be assumed that the Plaintiff had to view Defendant Goldston in her judicial capacity if he believed he should be making motions before her. It has long been established that judges, whether federal or state, enjoy absolute immunity from civil actions for damages challenging their judicial acts, "'even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.'" *Stephens v. Herring, 827 F. Supp. 359, 361 (E.D. Va. 1993); see also Stump v. Sparkman,* 435 U.S. 349, 355-56, 55 L. Ed. 2d 331, 98 S. Ct. 1099 (1978) *(quoting Bradley v. Fisher,* 80 U.S. 335, 13 Wall. 335, 20 L. Ed. 646 (1872)); *see also Clay v. Yates, 809 F. Supp.* 417, 422-23 (E.D. Va. 1992). In particular, the Supreme Court of the United States has expressly recognized that judicial immunity precludes actions for civil damages against state judges under 42 U.S.C. § 1983. *Pierson v. Ray,* 386 U.S. 547, 18 L. Ed. 2d 288, 87 S. Ct. 1213 (1967).

Plaintiff argues that Defendant Goldston bears the burden of establishing the justification for her immunity, pursuant to *Antoine v. Byers & Anderson, Inc.* 508 U.S. 429, 432, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993). However, the Court did not make that observation in the context of judicial immunity, but rather in the context of immunity for a court reporter. In the *Antonie* matter, the Court stated:

> The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." 500 U.S. at 500 (SCALIA, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functionally comparable" to those of judges -- that is, because they, too, "exercise a discretionary judgment" as a part of their

2

JA108

function. *Imbler* v. *Pachtman*, 424 U.S. at 423, n.20. Cf. *Westfall* v. *Erwin*, 484 U.S. 292, 297-298, 98 L. Ed. 2d 619, 108 S. Ct. 580 (1988) (absolute immunity from state-law tort actions available to executive officials only when their conduct is discretionary).

The function performed by court reporters is not in this category.

*Antoine v. Byers & Anderson*, 508 U.S. 429, 435-36, 113 S. Ct. 2167, 2171 (1993). Thus, the burden of establishing the justification for claimed absolute judicial immunity does not fall upon the judiciary pursuant to *Antoine*, but upon those who are working as "part of the judicial function."

Although Plaintiff argues that Defendant Goldston ceased acting in her judicial capacity and instead acted in an "executive" manner, it is clear the actions alleged in the Complaint were taken during the course of adjudicating a Family Court dispute.  It is clear from the Complaint and Plaintiff's Response that the Plaintiff at all times viewed Defendant Goldston as "Judge Goldston" and that the parties of the Family Court dispute were still taking part in the hearing before her, especially given that Plaintiff made a motion before the Judge while the parties were at his home. This is what is meant in *Stump* by saying that a judge is immune from liability arising from situations in which a plaintiff "dealt with the judge in his judicial capacity."  *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978).

Plaintiff further argues that the West Virginia Judicial Investigation Commission has already determined that she acted outside her authority and that Defendant Goldston made various admissions during the investigation.  However, an agreement was reached by the Office of Judicial Disciplinary Counsel and Judge Goldston, which resulted in Judge Goldston making certain admissions.  While a recommended decision has been issued by the West Virginia Judicial Investigation Commission that matter has not been formally decided by the West Virginia Supreme Court of Appeals.  However, the judicial immunity still applies in this matter.  It is well established that "[j]udicial immunity is an absolute immunity: it does not merely protect a defendant from

3

JA109

assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). Judicial immunity ensures that while a judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019). Therefore, if it is determined that Judge Goldston acted improperly that is subject to correction through the West Virginia Judicial Investigation Commission and the West Virginia Supreme Court of Appeals, not through a civil lawsuit for money damages.

## II. This Court lacks subject matter jurisdiction over the Plaintiff's claims against Judge Goldston due to the application of the Eleventh Amendment to the United States Constitution.

Although Plaintiff argues that Defendant Goldston is not entitled to immunity pursuant to the Eleventh Amendment because she is named in her individual capacity, all allegations in the Complaint against Defendant Goldston are wholly in her official capacity as a Judge in the 13th Family Court Circuit of the State of West Virginia. There can be no dispute that the West Virginia Supreme Court of Appeals is an arm of the state and its employee Judge Goldston is a State Official. As a result, Judge Goldston is entitled to Eleventh Amendment protections. It is well settled that "this protection extends also to 'state agents and state instrumentalities' or stated otherwise, to 'arms of the State' and State Officials." *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001) (quotations omitted). Eleventh Amendment immunity functions as a bar to the exercise of subject matter jurisdiction. As held by the United States Court of Appeals for the Fourth Circuit in *Roach v. West Va. Regional Jail & Correctional Facility Auth.*, 74 F.3d 46 (4th Cir. 1996), the Eleventh Amendment "limits the ability of a federal district court to exercise its subject-matter

jurisdiction over an action brought against a state or one of its entities." *Roach* at 48; see also *Noe v. West Virginia*, No. 3:10-CV-38, 2010 U.S. Dist. LEXIS 76906, 2010 WL 3025561, *9-10 (N.D.W.Va. 2010) (Bailey, J.).

Being that this Defendant is entitled to Eleventh Amendment immunity, the only issue that remains is whether the facts or circumstances of this matter fall within a recognized exception to the Eleventh Amendment.  As fully briefed in this Defendant's Memorandum of Law in Support of the Motion to Dismiss, none of the three narrow exceptions to the immunity enjoyed by the State and its instrumentalities pursuant to the Eleventh Amendment apply to the facts and circumstances of this matter and therefore this Defendant is shielded from liability of the allegations of Plaintiff's Complaint by the Eleventh Amendment's sovereign immunity.

## CONCLUSION

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays this Honorable Court GRANT her Motion to Dismiss with prejudice, and grant such other relief as the Court deems just and proper.

**Louise E. Goldston,**
**By Counsel,**

 **/s/ Jennifer E. Tully**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
jtully@baileywyant.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**
                                      **Civil Action No. 5:21-cv-00181**
                                        **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP,
individually, KYLE LUSK, individually,**

    **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of foregoing **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, May 10, 2021:

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV 25301
*Attorney For: Brian White, Jeff McPeake, Bobby Stump,*
*County Commission of Raleigh County*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV 24983
*Attorney For: Matthew Gibson*

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday

JA112

Dinsmore & Shohl LLP
P.O. Box 11887
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*


  **/s/ Jennifer E. Tully**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

MATTHEW GIBSON,

       Plaintiff,

v.                                                                CIVIL ACTION NO. 5:21-cv-00181

LOUISE E. GOLDSTON,
COUNTY COMMISSION OF RALEIGH
COUNTY, JEFF MCPEAKE, BRIAN WHITE,
BOBBY STUMP, and KYLE LUSK,

       Defendants.

**<u>ORDER</u>**

Pending is Defendant Louise E. Goldston's Motion to Dismiss [Doc. 9], filed April 19, 2021. On November 18, 2021, the Supreme Court of Appeals of West Virginia entered an opinion respecting Ms. Goldston's judicial disciplinary proceeding. The West Virginia Court censured and fined Ms. Goldston for the actions forming the basis for this litigation. *In re Goldston*, No. 20-0742, 2021 WL 5370473 (W. Va. Nov. 18, 2021).

The Court **ORDERS** that Plaintiff Matthew Gibson and Ms. Goldston each file a supplemental brief on or before December 17, 2021, addressing the effect herein, if any, of *In re Goldston*.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:       December 3, 2021



Frank W. Volk
United States District Judge

JA114

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP, individually,
KYLE LUSK, individually,**

    **Defendants.**

**Civil Action No. 5:21-cv-00181
Honorable Frank W. Volk**

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT
### <u>LOUISE E. GOLDSTON'S MOTION TO DISMISS</u>

**COMES NOW** this Defendant, the Hon. Louise E. Goldston, by counsel Jennifer E. Tully,

Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers for this Honorable

Courts' consideration the following Supplemental Memorandum in support of their previously-filed

Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

as ordered by the Court on December 3, 2021.

### I.   SUPPLEMENTAL STATEMENT OF THE CASE

The Plaintiff filed his Complaint in this matter on March 22, 2021. On April 19, 2021, this

Defendant filed her Motion to Dismiss and supporting Memorandum of Law, which was fully

briefed by the parties. While that Motion was pending, the West Virginia Supreme Court of Appeals

issued its Opinion in *In re Goldston*, No. 20-0742, 2021 WL 5370473 (W. Va. Nov. 18, 2021),

which is the final stage of the judicial disciplinary proceeding arising from the same events as does

this matter.  On December 3, 2021, this Court ordered the Plaintiff and this Defendant to file

supplemental briefs addressing the impact, if any, of *In re Goldston* on this case.

The West Virginia Supreme Court of Appeals' topline holdings in *In re Goldston* were that

this Defendant had caused a "search" of the Plaintiff's home, and that she had violated the Code of

Judicial Conduct, and ordered the imposition of a censure and a fine.  In holding that the relocation

of a hearing concerning items of property involved in a divorce settlement to the Plaintiff's home in

order to determine whether the property was located there was a "search," rather than a judicial

"view," the Supreme Court found it significant that this Defendant went to the property to "locate"

things, rather than merely to observe them.  See *WVSCA Order In re Goldston,* attached hereto

**Exhibit 1** at Pg. 15.  The Court held that by participating in a "search," which is a quintessentially

executive function, this Defendant exceeded her authority as a Judge, and thus violated the Code of

Judicial Conduct.

Based on those findings, the Court held that a censure and the imposition of a $1,000 fine

were the appropriate sanction.  In reaching this conclusion, the Court analyzed the five factors

derived from *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) utilized for gauging the

appropriateness of disciplinary sanctions against a judge.  **Exhibit 1** at Pg. 20.  Of key applicability

to this proceeding, the Court held that this Defendant's actions were (1) related to the administration

of justice, and (2) carried out in her public persona (i.e., as a judge).  See *id*. at Pg. 22.

## II.  SUPPLEMENTAL ARGUMENTS

In truth, *In re Goldston* changes the merits of this Defendant's Motion to Dismiss little, if at

all.  First, a judicial disciplinary proceeding conducted pursuant to the West Virginia Code of

Judicial Conduct, has no preclusive effect in this case, which is conducted under an entirely different

set of authorities.  Second, while the WVSCA held that Judge Goldston had exceeded her authority

2

as a Family Court Judge, this does not impact the application of absolute judicial immunity.  In fact, the fact that Judge Goldston's alleged actions subjected her to professional discipline under the West Virginia Code of Judicial Conduct, which is applicable only to judges, is a powerful indicator that she was in fact acting in her role as a judge at the time.  This is the key component of the judicial immunity which shields Judge Goldston, and her Motion to Dismiss thus retains merit after the issuance of *In re Goldston*.

As discussed in depth in this Defendant's Memorandum and Reply Memorandum, absolute judicial immunity shields a judge "from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (internal citations omitted).  This immunity is bypassed only in two circumstances: First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's role as a judge. See *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988); *Stump v. Sparkman*, 435 U.S. 349, 360, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978).  Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Stump* at 356-357.  In this case, the first exception is unsatisfied, because Judge Goldston was acting in her capacity as a Family Court Judge in Raleigh County, addressing a divorce hearing in that role.  The WVSCA's holding that Judge Goldston exceeded her authority as a Judge by participating in a search (and that the events which occurred constituted a "search" rather than a "view") does not alter this conclusion.  Indeed, United States Supreme Court precedent establishes that "[a]judge will not be deprived of immunity because the action he took [...] was in excess of his authority." Syl. Pt. (a), *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988).

3

Irrespective of whether Judge Goldston exceeded her authority in ordering and attending what the WVSCA considered to be a "search," it is nonetheless difficult to argue that she did not do so as a Judge. She addressed the litigants as a Family Court Judge in the course of a hearing in a divorce case, and ordered the hearing to reconvene at the Plaintiff's home from the bench. It is uncontroversial that it is the role of a Judge to order a search (in fact, with very few and narrow exceptions, only a Judge may order a search); what the WVSCA took issue with is that Judge Goldston attended the search and continued to participate in proceedings while the purported "search" took place.

This is analogous to the actions addressed in *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991), discussed in this Defendant's prior filings. In *Mireles*, a California judge ordered that bailiffs bring an attorney who had failed to appear for the calling of the calendar into the courtroom, and instructed them to use excessive force on him in the process. The Supreme Court held that this action, while certainly violative of the attorney's rights and outside the judge's authority, was not outside his judicial immunity. The Court reasoned that while ordering a bailiff to use excessive force was not a judge's function, ordering the bailiff to summon an attorney to court certainly is. In that respect, the judge undertook an activity which was within the role of a judge in a manner which exceeded his authority, and was protected by absolute judicial immunity. This WVSCA's findings in *In re Goldston* should be read the same way.

In this case, Judge Goldston allegedly undertook a task outside her authority in order to accomplish an end which was within her authority. The WVSCA specifically noted that a Family Court Judge may order the search for and seizure of property in order to secure compliance with a prior order. Her attendance at and participation in the alleged "search" can at worst be characterized as an *ultra vires* act in pursuit of a legitimate judicial end – a thing which, under *Mireles*, is within a

4

judicial role and protected by judicial immunity.  This conclusion is supported by the WVSCA's

holdings that Judge Goldston's actions were related to the administration of justice, and carried out

in her public persona (i.e., as a judge).  See **Exhibit 1** at Pg. 22.  While the WVSCA held that for a

judge to take part in a search was to act "as an adjunct law enforcement officer," it held that for a

judge to do this exposed them to professional discipline under the Code of Judicial Conduct, which

applies only to judges.

The WVSCA's Opinion in *In re Goldston* changes little as it applies to this case.  *In re*

*Goldston* was the culmination of a disciplinary proceeding operating under a set of professional rules

of conduct which do not govern § 1983 claims.  The Motion presently at issue addresses different

standards, and the WVSCA's holdings, even if applied to this case, still place Judge Goldston well

within the confines of absolute judicial immunity.

### III.CONCLUSIONS

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays this Honorable

Court GRANT her Motion to Dismiss with prejudice, and grant such other relief as the Court deems

just and proper.

                                    **LOUISE E. GOLDSTON,**
                                    **By Counsel,**

 **/s/ Jennifer E. Tully**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

                                      **Civil Action No. 5:21–cv–00181**
                                        **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of foregoing **"SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION TO DISMISS"** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, December 17, 2021:

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV  25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*


 /s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

# EXHIBIT 1

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

———————

No. 20-0742

———————

**FILED**
**November 18, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE MATTER OF:

THE HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE THIRTEENTH
FAMILY COURT CIRCUIT

———————————————————————

JUDICIAL DISCIPLINARY PROCEEDING
No. 30-2020
No. 33-2020

PUBLIC CENSURE AND FINE

———————————————————————

Submitted: September 15, 2021
Filed: November 18, 2021

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

Andrew S. Nason, Esq.
Pepper & Nason
Charleston, West Virginia
Attorney for Respondent Goldston

Susan Shelton Perry, Esq.
Logan, West Virginia
Attorney for Amicus Curiae, Family
Judicial Association

JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate Opinion.

JUSTICE HUTCHISON deeming himself disqualified, did not participate in the decision of this case.

JUDGE JENNIFER P. DENT, sitting by temporary assignment.

ii

## SYLLABUS BY THE COURT

1.     "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

2.     The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.   W. Va. Const. art. 5, § 1.

3.     "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." Syl. Pt. 2, in part, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020) (internal quotation marks omitted).

4.     "Stipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

5.     "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

6.     In determining what sanction or sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019], this

i

Court will consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

**Armstead, Justice:**

In this judicial disciplinary proceeding, a family court judge searched a self-represented party's home for marital property. When the homeowner protested, the judge responded to the homeowner's resistance by threatening to jail him for contempt. This interaction was recorded, and the recording soon appeared on the internet.

The judge was reported to the West Virginia Judicial Investigation Commission, and after investigation, the Judicial Investigation Commission charged the judge with violating the West Virginia Code of Judicial Conduct ("Code of Judicial Conduct"). The judge professed remorse and entered into a settlement agreement with Judicial Disciplinary Counsel. Under the agreement, the judge admitted to both the conduct in question and to the fact that it violated the Code of Judicial Conduct; both parties agreed to recommend that the judge be censured and fined $5,000. The Judicial Hearing Board, however, rejected the parties' recommendation. The Hearing Board recommended that the judge be *admonished* and fined $1,000, and—believing that a judge's "inherent authority" to conduct "judicial views" is "uncertain"—requested guidance from this Court.

Both Judicial Disciplinary Counsel and the judge object to the Judicial Hearing Board's recommendation. Seizing on the Judicial Hearing Board's uncertainty about "judicial views," the judge now attempts to persuade us that her search of the residence was lawful—even as she professes to remain bound by the settlement agreement.

1

After considering the record and the parties' written[1] and oral arguments, we reject the judge's attempt to reframe her conduct. We find that she led a *search* of the homeowner's residence, not a "judicial view," and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution. We find, further, that the judge compounded her error by the manner in which she conducted the search. Accordingly, we disagree with the Judicial Hearing Board and publicly censure the judge for her serious misconduct. In addition, we order the judge to pay a total fine of $1,000.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Honorable Louise E. Goldston is a family court judge who presides in Raleigh, Summers, and Wyoming Counties. She has served since 1994,[2] and until now, she has never been disciplined for judicial misconduct.

Judge Goldston admits that she had a 20-year practice of going to parties' homes "to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property." In almost every instance, these searches were requested by counsel and were performed without objection. In most cases, the search followed counsel's request immediately, indeed while the hearing was taking place.

———————————

[1] We acknowledge the contribution of the Family Judicial Association, which filed a brief in this case as amicus curiae. We value the Family Judicial Association's participation and have considered the Family Judicial Association's brief in conjunction with the parties' arguments.

[2] Judge Goldston began her career as a "family law master." In 2001, the Legislature made several changes to the law governing family court proceedings, including changing the title of "family law master" to "family court judge." W. Va. Code § 51-2A-23(c) (2001).

2

The search that led to this disciplinary matter happened on March 4, 2020, in the context of a contempt hearing. One of the parties, an ex-wife, claimed that her former husband had damaged items of property and had refused to turn over other items of sentimental value that she was entitled to receive.

For this proceeding the ex-wife was represented by counsel. The ex-husband was not represented by counsel. During the ex-wife's testimony, Judge Goldston asked the ex-husband for his address. Upon learning his address, Judge Goldston stopped the hearing, *sua sponte*, and ordered the parties to meet her in ten minutes at the ex-husband's house. Judge Goldston admits that she failed to tell the ex-husband why the parties were going to his home and that she gave the ex-husband no opportunity to object.

Judge Goldston's intent became clear, however, when everyone arrived at the residence. The ex-husband voiced his objections, requesting that Judge Goldston recuse herself because she had placed herself in a "witness capacity." Judge Goldston denied his request as not timely filed.

After the ex-husband stated that he needed a search warrant to allow Judge Goldston to enter his house, Judge Goldston told the ex-husband that he was either going to let her in the house or her bailiff, who had accompanied her to the house, was going to arrest the ex-husband. Judge Goldston also asked the ex-husband if he was recording her attempt to enter his home and when he confirmed that he was, she directed that he stop recording and told him (and apparently his girlfriend who was also attempting to record their conversation) to turn off their phones. Judge Goldston also indicated that if they did

3

not turn off their phones and stop recording she would take the ex-husband, or perhaps both he and his girlfriend, to jail. Although the conversation between Judge Goldston and the ex-husband was not transcribed, the recording of the conversation appears to include Judge Goldston stating: "I am the judge *trying to effect equitable distribution*. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

Faced with these threats, the ex-husband relented, and Judge Goldston agrees that the ex-husband felt he had no choice to do otherwise. Judge Goldston brought with her into the house the bailiff, the ex-wife, and the ex-wife's attorney and personally supervised the search for and recovery of items. Several items were located and recovered, including photographs, yearbooks, DVDs, recipes, and a chainsaw. While the home was being searched, a dispute emerged about an umbrella stand. After a brief colloquy with the ex-husband, the judge awarded the stand to the ex-wife, who removed it from the home with the other items.

Judge Goldston, herself, made no arrangement to record what went on inside the home (or outside the home). Indeed, when she found out afterward that her bailiff had made his own cell-phone recording of the search inside the home, she believed that making the recording was improper and told him not to do it again.

After the search, the parties reconvened in the courtroom. On the record, Judge Goldston listed the items that had been recovered and some items that remained to

4

be exchanged.  However, no written order was entered regarding either the search of the home or the items recovered.

Though Judge Goldston may have stopped the ex-husband (and a bystander) from recording what went on outside the home, she did not order the recordings destroyed. Audio and video footage of what took place was uploaded to the internet.  Some online comments were deeply critical of the judge and her conduct.

Judicial Disciplinary Counsel became aware of these matters, and on March 11, 2020, Judicial Disciplinary Counsel filed a complaint with the Judicial Investigation Commission.[3]  Judge Goldston responded to the complaint on March 18, 2020.  In her letter, she explained that, during the March 4, 2020 hearing, the ex-wife showed that the ex-husband had left the ex-wife's property outside in the rain, causing it to be damaged, and, further, that the ex-husband admitted that certain items awarded to the ex-wife remained in the house.  Judge Goldston went on to explain that

> [a]t that point, because of the alleged damage to the other items, I felt it imperative *to secure those remaining items* before they were either damaged or ruined.  It was at that time that I informed the parties we would meet at the residence *to effectuate the return of the remaining items*.  The situation was volatile[,] and I didn't want either party to decide between themselves or *place the burden on a Law Enforcement Officer* of determining what was the [ex-wife]'s and what was not.

(Emphasis added.)

_____

[3] Judicial Disciplinary Counsel's filing was designated Complaint No. 30-2020.  A week later, the ex-husband filed a second complaint regarding the same incident and regarding other incidents that are not relevant to the matter before the Court.  This filing was designated Complaint No. 33-2020.

5

On July 22, 2020, Judge Goldston provided a sworn statement to Judicial Disciplinary Counsel. In her statement, Judge Goldston likened the search to a "jury view," explaining that she was both "judge and jury," yet she claimed that she "never took any testimony." Though she agreed that such proceedings were a "continuation" of the court matter and should have been recorded, she admitted that she had not done so and that her failure to record these searches had "always been a concern[.]" She also agreed that in "some cases, probably" she was "enforcing an order, a contempt order[.]" Nevertheless, she could not remember a single time when she had found someone in contempt before she went to the home "because [she] wasn't sure if they were in contempt." Ultimately, her guiding rationale seems to have been that going to a party's home, searching for items of personal property, and seizing them was "necessary to preserve the marital assets" from destruction, particularly irreplaceable items of "sentimental" value. "I guess it comes down to me thinking if we don't go, they're not going to get it back." With respect to the March 4, 2020 search, she explained:

> And so what made me do it was I just thought, well, if we go now and *get the stuff*, he admits that is there, then that— those assets are preserved. She can't claim he ruined them. He can't claim she ruined them, and I guess judicial economy was that was the easiest and quickest way to get *to retrieve those assets*.

(Emphasis added.)

Judge Goldston agreed that the task of enforcing her orders is an "executive branch" function, and she knew that she could dispatch law enforcement to search for and

6

seize property that a party retained in violation of her order.  She simply believed that this

method was ineffective:

> I have been told by every sheriff that I've worked with
> over the 26 years that that's not something they do [i.e.,
> sending law enforcement, or a party accompanied by law
> enforcement, to look for property], that they're not going for
> more than 15 minutes to anything, to do anything.

In this particular instance, she explained, "I knew that law enforcement wouldn't know

what to do with the [umbrella] stand.  I just—wrongly or rightly, I thought it was important

for me to be there and make sure that stuff was safely gathered and not damaged."

On September 18, 2020, the Judicial Investigation Commission issued a

formal statement of charges.  The statement of charges described Judge Goldston's

longstanding "practice of visiting homes of litigants" and the events that occurred on March

4, 2020.  Significantly, the statement of charges alleged that Judge Goldston "could provide

no statute, rule, or case that gave her the authority to conduct home visits"; "acknowledged

that there was nothing in the contempt powers that gave her the authority to conduct a home

visit"; and "confessed that she never held anyone in contempt prior to going to the home[.]"

The statement of charges further alleged that Judge Goldston "confessed . . . that she failed

to enter any order subsequent to the visit reflecting what had happened at the residence";

"admitted that she never had any clear or written procedures for conducting a home visit";

and "acknowledged that she never took a court reporter to the scene."  Finally, the

statement of charges alleged Judge Goldston "agreed that the practice could make her a

potential witness to a future proceeding which could then result in her disqualification";

and "admitted to improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]."

On September 30, 2020, Judge Goldston signed an agreement with Judicial Disciplinary Counsel. Pursuant to the agreement, she admitted the allegations of fact set forth in the formal statement of charges. She further admitted that, by engaging in such conduct, she had violated the following Rules of the Code of Judicial Conduct:

(a) Rule 1.1, which states that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct";

(b) Rule 1.2, which states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";

(c) Rule 1.3, which states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";

(d) Rule 2.2, which states that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially";

(e) Rule 2.4(A), which states that "[a] judge shall not be swayed by public clamor or fear of criticism";

(f) Rule 2.4(B), which states that "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; and

8

(g) Rule 2.5, which states that "[a] judge shall perform judicial and administrative duties, competently and diligently . . . [and] shall cooperate with other judges and court officials in the administration of court business."

In addition, Judge Goldston agreed to join Judicial Disciplinary Counsel's recommendation that she be censured and fined $5,000.[4]  Both sides agreed, however, that "the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Judge Goldston appeared before the Judicial Hearing Board on January 15, 2021, and ratified the agreement under oath.  One Judicial Hearing Board member,[5] however, expressed doubt about the charges, suggesting that a power to conduct "views" falls within the family court's inherent powers or its express statutory authority to seize

---

[4] The agreement also required Judge Goldston to pay costs resulting from the investigation and prosecution of the complaints against her, but the agreement further stipulated that Judicial Disciplinary Counsel and the Judicial Investigation Commission had not incurred any costs.

[5] In its brief to this Court, Judicial Disciplinary Counsel contends that the member's comments and subsequent actions "are an extreme example of bias" and that the member should have disqualified himself from this matter.  The Judicial Hearing Board member, however, is not presently before this Court; therefore, we decline to address this argument.

9

property[6] and supervise the production of evidence.[7]    Judicial Disciplinary Counsel responded that the question was "whether [Judge Goldston] followed an appropriate procedure or not."  Judge Goldston's counsel appeared to agree, stating, "[T]he procedures and the due process is the problem that she is admitting to."

The Judicial Hearing Board requested post-hearing briefs, which were filed, and on March 15, 2021, the Judicial Hearing Board issued its recommended decision.  The Judicial Hearing Board adopted the parties' stipulations but chose to recommend that Judge Goldston "be admonished and fined $1,000 as an appropriate sanction for her stipulated violations of the Code of Judicial Conduct."   In support of this recommendation, the Judicial Hearing Board invoked Judge Goldston's "unblemished disciplinary record and cooperation[,]" and "the absence of any aggravating factors" and the  "extensive record" Judge Goldston made "after the incident as to what had occurred at the complainant's residence."[8] The Judicial Hearing Board further cited the fact that another judge, in an

---

[6] *See* W. Va. Code § 51-2A-9(b) (eff. 2012) ("A family court judge may enforce compliance with his or her lawful orders with remedial or coercive sanctions designed to compensate a complainant for losses sustained and to coerce obedience for the benefit of the complainant. . . .  Sanctions may include, but are not limited to, seizure or impoundment of property to secure compliance with a prior order.").

[7] *See* W. Va. Code § 51-2A-7(a) (eff. 2013) ("[T]he family court judge has the authority to . . . (4) Compel and supervise the production of evidence . . . .").

[8] Because no written order was entered regarding the search, we assume that the Hearing Board is referring to what Judge Goldston put on the record when the parties returned to the courtroom.

10

unrelated disciplinary action,[9] had been admonished for accompanying law enforcement to a litigant's residence to execute a warrant of seizure, but acknowledged the uncertainty regarding "the scope of a judicial officer's inherent authority relative to judicial views[,]" and the need for "guidance to judicial officers from the Supreme Court of Appeals through rule-making or otherwise regarding the proper scope of conducting judicial views[.]"

Both Judicial Disciplinary Counsel and Judge Goldston filed objections to the Judicial Hearing Board's recommended decision.  Despite her admissions under oath, Judge Goldston now argues that "[i]t is inexplicable . . . how she could be fined or sanctioned for violating ethical canons when the Hearing Board itself found that the law is unclear regarding [her] inherent authority to conduct a judicial view."  Nevertheless, she claims that she "is not seeking to abrogate her agreement."

## II.  STANDARD OF REVIEW

The standard of review in this matter flows from our "inherent rule-making power" to "promulgate and amend rules prescribing a judicial code of ethics" and "to censure or temporarily suspend any justice, judge[,] or magistrate having the judicial power of the state . . . for any violation of any such code of ethics[.]"  W. Va. Const. art. VIII, § 8.[10]  This power to sanction is "exclusive."  Syl. Pt. 5, in part, *State ex rel. Workman v. Carmichael*, 241 W. Va. 105, 819 S.E.2d 251 (2018).  Therefore, our review is "plenary"

---

[9] *See In the Matter of Aboulhosn*, JIC Complaint No. 91-2013.

[10] Family court judges were created and placed under our "general supervisory control" in 2000.  W. Va. Const. art. VIII, § 16.

11

and "independent." *Matter of Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). The standard of proof is clear and convincing evidence. Syl. Pt. 2, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020).

Our constitutional power to sanction necessarily includes the power to select the particular form of lawful discipline that we will impose. Accordingly, we have "the right to accept or reject the disciplinary sanction recommended by the [Judicial Hearing] Board." *Matter of Crislip*, 182 W. Va. 637, 638, 391 S.E.2d 84, 85 (1990). In all such cases, our goal and "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

With these principles in mind, we will consider Judge Goldston's alleged violations of the Code of Judicial Conduct and what discipline, if any, is appropriate.

### III. ANALYSIS

Judicial Disciplinary Counsel argues that Judge Goldston is bound by the findings of fact and conclusions of law set forth in her agreement, namely that Judge Goldston's "view" of the home was unlawful, unconstitutional, and unethical; and that the Court should impose the censure and fine that the parties agreed to recommend.

For her part, Judge Goldston agrees that she remains bound by her prior statements of fact, yet she contends that "what constitutes a violation, and the effect of a violation, w[ere] always to be reviewed by the [Judicial Hearing Board] and this Court."

12

Accordingly, she contends that the parties remain free to "argue questions of law[.]"  She denies that the Judicial Investigation Commission ever charged her with, or that she has ever confessed to, any constitutional violations.   On the contrary, she contends that "[s]ubsequent research . . . revealed a body of law that supports" her actions.  In particular, she claims that she had "inherent authority to conduct an onsite visit" and that "view[ing] the division of property" allowed the ex-husband to "purge his contempt."  She contends that, "[u]nlike the execution of a search warrant, the view was conducted with judicial oversight.  Therefore, it was not *per se* unreasonable."  Ultimately, Judge Goldston believes that her conduct was lawful and that, if she is mistaken, her mistake was error, not an ethical violation.  She urges the Court to "clarify the law and either affirm the ruling of the [Judicial Hearing Board] or as the final arbiter conclude that there [wa]s no wrongdoing[.]"

### A. Judge Goldston Searched the Ex-Husband's Home.

We begin with a threshold question:  Did Judge Goldston view the ex-husband's home, or did she search it?  We find that she searched it.  A "view" is "the act or proceeding by which a tribunal goes to *observe* an object that *cannot be produced in court because it is immovable or inconvenient to remove*."  *View*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added); *accord Barron v. United States*, 818 A.2d 987, 990 (D.C. 2003) ("A jury view is proper when 'an object in question cannot be produced in court because it is immovable or inconvenient' and, therefore, it is necessary for the fact-finder 'to go to the object in its place and there observe it.'  *Dailey v. District of Columbia,* 554 A.2d 339, 340–41 (D.C.1989) (quoting IV WIGMORE ON EVIDENCE

13

§ 1162 at 362 (1972 & 1988 Supp.)).”); *State v. Pauline*, 100 Haw. 356, 374, 60 P.3d 306,

324 (2002) *overruled on other grounds as stated in State v. Abdon*, 134 Haw. 114, 334

P.3d 777 (Ct. App. 2014), *as corrected* (Oct. 27, 2014), *aff'd*, 137 Haw. 19, 364 P.3d 917

(2016) (“The very definition of a view favors treating it as evidence. *Black's Law

Dictionary* defines a 'view' as 'the act or proceeding by which [a] tribunal goes to an object

which cannot be produced in court because it is immovable or inconvenient to remove, and

there observes it.' *Black's Law Dictionary* 1568 (6th ed.1990).”); § 219. *Views*, 2

MCCORMICK ON EVID. § 219 (8th ed.) (“Courts have sensibly recognized that if a thing

cannot be brought to the observer, the observer must go to the thing. Venturing forth to

observe places or objects that are material to litigation but which cannot feasibly be

brought, or satisfactorily reproduced, within the courtroom, is termed a 'view.'”); *see, e.g.,*

*State v. Thomas*, 179 W. Va. 811, 374 S.E.2d 719 (1988) (view of parking lot); *Bennett v.

Walton*, 170 W. Va. 283, 294 S.E.2d 85 (1982) (view of roadway); *State Rd. Comm'n v.

Bowling*, 152 W. Va. 688, 166 S.E.2d 119 (1969) (view of land acquired for highway);

*Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W. Va. 549, 165 S.E.2d 113 (1968)

(view of swimming pool).

   We agree that the ex-husband's home was “immovable” and certainly

“inconvenient” to produce in court. *View*, BLACK'S LAW DICTIONARY (11th ed. 2019).

However, Judge Goldston did not go to the property to *observe* the ex-husband's house;

she went there to locate and seize certain of its contents—pictures, DVDs, and other items

of personal property. These items of personal property were not “immovable or

14

JA140

inconvenient to remove" from the home. *Ibid*. In fact, the ex-wife removed many of these items during the so-called "view." Accordingly, we find that Judge Goldston's actions at the residence were not a view. [11]

On the contrary, the record is clear that Judge Goldston went to the property to *locate* things, not simply to observe them. Her own words support this conclusion. When the ex-husband demanded a list of what she was seeking, she appeared to reply, "[y]ou have a list of everything [unintelligible] attached to the order." When the ex-husband professed not to "know where some of it's at[,]" she replied, "Well, *we're gonna find it*." (Emphasis added.)

Looking for things is a "search" by any sensible definition of the term. As the United States Supreme Court stated in *Terry v. Ohio*, 392 U.S. 1, 16 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful *exploration* of the outer surfaces of a person's clothing all over his or her body *in an attempt to find* weapons is not a 'search'" (emphasis added). *Accord Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' N. Webster,

---

[11] Because we find that Judge Goldston's conduct at the residence was a search, not a view, we refuse to decide whether a family court judge, or other judicial officer, has the inherent or other authority to conduct a true view under different circumstances. We are not in the business of "making advisory decrees or resolving academic disputes." Syl. Pt. 1, in part, *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 836 S.E.2d 441 (2019) (quoting Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991)).

15

An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989)."); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) ("[T]he defendants went to the school *for the specific purpose of gathering information*, an activity that most certainly constitutes a search under the Fourth Amendment." (emphasis added)); *§ 2.1(a) Definition of "searches" and "seizures,"* 1 SEARCH & SEIZURE § 2.1(a) (6th ed.) ("Under the traditional approach, the term 'search' is said to imply 'some exploratory investigation, or an invasion and quest, a looking for or seeking out.'" (quoting C.J.S., *Searches and Seizures* § 1 (1952)).

Searches are an activity of the executive department. *State ex rel. Parma Cmty. Gen. Hosp. v. O'Donnell*, 2013-Ohio-2923, ¶ 7 (stating that "searches are executive in nature."). "Indeed, searches are so quintessentially executive in nature that even a judge who participates in one acts 'not * * * as a judicial officer, but as an adjunct law enforcement officer.'" *State ex rel. Hensley v. Nowak*, 52 Ohio St. 3d 98, 99, 556 N.E.2d 171, 173 (1990) (per curiam) (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)) (holding that a writ of prohibition would not issue to restrain administrative searches because they are neither judicial nor quasi-judicial acts).

To say that searches are an executive activity is to announce no new principle of law. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party *which was essentially a police operation*." *Lo-Ji Sales, Inc.* at 327 (emphasis

16

added).  The Supreme Court found that, in doing so, the town justice "*was not acting as a judicial officer* but as an adjunct law enforcement officer[,]" *ibid*., and that "[i]t [wa]s difficult to discern when he was acting as a 'neutral and detached' judicial officer and when he was one with the police and prosecutors *in the executive seizure*," *id*. at 328 (emphasis added).  Other courts, often following *Lo-Ji Sales*, routinely assume that searching is a law enforcement activity.  *United States v. Barnes*, 895 F.3d 1194, 1202 (9th Cir. 2018) (noting that "*Lo-Ji Sales* was an extreme case where the judicial officer allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." (internal quotation marks removed)); *United States v. Clyburn*, 806 F. Supp. 1247, 1252 (D.S.C. 1992), *aff'd*, 24 F.3d 613 (4th Cir. 1994) (noting that, "[i]n *Lo Ji Sales,* the Court held that the judge who issued the warrant did not manifest that neutrality and detachment demanded of a judicial officer because the judge took an active law enforcement type role in conducting the search" (internal quotation marks removed)).

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments *shall be separate and distinct*[.]"  W. Va. Const. art. V, § 1 (emphasis added). The Constitution further specifies, in unmistakable terms, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time[.]"  *Ibid*.[12]  In light of these

---

[12] Article V, Section 1 provides a single exception for justices of the peace, who may serve in the Legislature.  *Ibid*.  "Justices of the peace" are now called "magistrates."  W. Va. Code § 50-1-17 (eff. 1976).

17

clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.   W. Va. Const. art. 5, § 1.  Because Judge Goldston plainly engaged in such a search, we find that the so-called "view" was improper.

### B. Judge Goldston Violated the Code of Judicial Conduct.

Having resolved the threshold question, we turn to the question of whether Judge Goldston violated the Code of Judicial Conduct.  "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." *Ferguson*, 242 W. Va. at ___, 841 S.E.2d at 888, syl. pt. 2, in part (internal quotation marks removed).  However, we note that Judge Goldston has admitted, under oath, the allegations of fact set forth in the formal statement of charges.  Under oath, she has further admitted that those facts are clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2. 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct and that she did, *in fact*, violate those rules.

We have held that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed."  Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).  We have further held that

> [i]n a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated.

18

*Id.* at 56-57, 501 S.E.2d at 773-74, syl. pt. 4.  Based on our review of the record in this matter, we agree that the above-mentioned violations have been proven by clear and convincing evidence, and we see no reason, in the context of our plenary review, to reject or qualify Judge Goldston's admissions.  *Law. Disciplinary Bd. v. Sidiropolis*, 241 W. Va. 777, 785, 828 S.E.2d 839, 847 (2019) ("Because the relevant facts underlying this disciplinary proceeding are not disputed and Mr. Sidiropolis has voluntarily stipulated to his violation of Rule 8.4(b), we focus our analysis of this matter on the proper sanctions to be imposed.").

### C.  Judge Goldston's Misconduct Warrants Censure and a Fine.

The question now becomes what sanction or sanctions, if any, we should impose.  Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019] authorizes us to "impose *any one or more* of the following sanctions for a violation of the Code of Judicial Conduct: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement" (emphasis added);[13] *see also* Syl. Pt. 5, in part, *In re Toler*, 218 W. Va. 653, 625 S.E.2d 731 (2005) (holding that "it is clearly within this Court's power and discretion to impose multiple sanctions . . . for separate and distinct violations").  Rule 4.12 further explains that "[a]n admonishment constitutes *advice or caution* to a judge to refrain from

---

[13] Involuntary retirement may only be imposed in the case of "a judge . . . of advancing years and attendant physical or mental incapacity . . . who is eligible to receive retirement benefits under the judges' retirement system or public employees retirement system." *Ibid.*

19

engaging in similar conduct which is deemed to constitute a violation of the Code of

Judicial Conduct"; "[a] censure constitutes *formal condemnation*" for such a violation. W.

Va. R. Jud. Disc. P. 4.12 (emphasis added).

> We have held that
>
>> in determining *whether to suspend a judicial officer with or without pay*, [we] should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) (emphasis

added). Though *Cruickshanks* speaks in terms of suspension, we believe that *Cruickshanks*

provides an appropriate guide that may be applied whenever we contemplate imposing

sanctions under Rule 4.12. Accordingly, we hold that in determining what sanction or

sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial

Disciplinary Procedure [eff. 2019], this Court will consider various factors, including, but

not limited to, (1) whether the charges of misconduct are directly related to the

administration of justice or the public's perception of the administration of justice, (2)

whether the circumstances underlying the charges of misconduct are entirely personal in

nature or whether they relate to the judicial officer's public persona, (3) whether the

charges of misconduct involve violence or a callous disregard for our system of justice, (4)

20

JA146

whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

In this case, the parties have agreed to recommend a *censure* and a $5,000 fine. The Judicial Hearing Board recommended an *admonishment* and a $1,000 fine. Neither recommendation binds us. Rather, applying *Cruickshanks* as a guide, we note the following.

*First*, Judge Goldston's misconduct was directly related to the administration of justice. She forced her way into the ex-husband's home—over his reasonable objections—by threatening to jail him for contempt. She said, "I am the judge trying to effect equitable distribution. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

*Second*, Judge Goldston's misconduct was carried out in her public persona and seriously undermined the public's perception of the administration of justice. Public comments show that many who viewed her conduct on the internet were justly and deeply offended. Without question, Judge Goldston's conduct cast doubt in the minds of the citizens who viewed the recording of the incident as to whether the parties were being treated with justice and fairness.

*Third*, Judge Goldston's misconduct displayed a callous disregard for our system of justice. Even setting aside the inappropriateness of the search, Judge Goldston went about the search in a highhanded and procedurally flawed manner. Instead of receiving both sides' testimony and evidence and rendering a decision, she interrupted the

21

ex-wife's testimony and directed the parties to meet her at the ex-husband's residence, affording the ex-husband no explanation and no opportunity to object until she arrived at the scene. Though she claimed she was "having a hearing[,]" she made no attempt of any kind to contemporaneously record what transpired. Indeed, she forbade others to make a recording, at risk of incarceration. Failing to record what transpired made her a potential witness. Most significantly, though she seems to have been well-aware of the lawful procedures at her disposal to enforce her order,[14] she chose not to use them because she deemed them ineffective.

   *Fourth*, weighing in her favor, Judge Goldston's actions do not entail any criminal action for which she has been indicted.

   *Fifth*, as mitigating factors, we note that Judge Goldston has been forthright about her conduct and that, in her twenty-seven years on the bench, this is the first time she has been disciplined. In addition, we find that Judge Goldston has shown some degree of remorse for her conduct.

   Weighing the factors set forth in *Cruickshanks*, we find that the seriousness of Judge Goldston's conduct, coupled with the manner in which such conduct was carried out, has undermined the public's confidence in the administration of justice and justifies imposition of a censure in this matter. As set forth in Rule 4.12 of the West Virginia Rules

---

[14] *See, e.g.*, W. Va. Code § 48-1-304(b) (eff. 2001) (authorizing a family court to incarcerate a person who "fails or refuses to purge himself [or herself] of contempt"); W. Va. Code § 51-2A-9(b) (eff. 2012) (authorizing a family court judge to impose "remedial or coercive sanctions" including "seizure or impoundment of property").

22

of Judicial Disciplinary Procedure, an admonishment, as recommended by the Judicial Hearing Board, merely constitutes "advice or caution" to refrain from further violations, while a censure constitutes "formal condemnation" for such conduct. We find that the nature of the conduct clearly warrants such condemnation by this Court.

As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search. As we have previously held:

> A Judge is not expected to and should not summarily step from his judicial function and become an investigator, prosecutor, arresting officer, or instigator of legal actions, for when he does, he lessens the public confidence in the impartiality of his office. It is important that the Judge not only actually maintain integrity and impartiality, but that he must

23

also give the appearance of such.  No Judge should take unto himself activities or functions which are delegated to other branches of the government.

*W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 237, 271 S.E.2d 427, 429–30 (1980) (quoting West Virginia Judicial Review Board findings).

Finally, we find that the parties' previous stipulations in this matter, while not binding on our decision, are nonetheless relevant to our determination.  Judge Goldston clearly agreed with the Judicial Disciplinary Counsel's recommendation that she be censured and fined $5,000.  Admittedly, however, such agreement was made with the acknowledgment that "the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Ultimately, the decision as to the proper sanction to be imposed rests with this Court, and we may "accept or reject the disciplinary sanction" recommended by the Judicial Hearing Board.  *Crislip*, 182 W. Va. at 638, 391 S.E.2d at 85.  We find that the facts of this case warrant a censure, as was stipulated by the parties, and to the extent that the Judicial Hearing Board determined otherwise, we reject such recommendation.  An admonishment is insufficient to address the seriousness of Judge Goldston's conduct and the impact such violations have on the public's confidence in the judiciary.

However, further exercising our authority to accept or reject the recommendation of the Judicial Hearing Board, we accept the Board's recommendation that Judge Goldston be fined $1,000.  We believe that the imposition of a censure, rather than an admonishment, adequately recognizes the seriousness of Judge Goldston's

24

conduct.  Such sanction, coupled with the $1,000 fine, will fulfill the disciplinary goals of preserving and enhancing the public's confidence in the "honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." *Cruickshanks*, 220 W. Va. at 514, 648 S.E.2d at 20, syl. pt. 1, in part.

Based upon the facts and circumstances of this case, and taking into account the mitigating factors present, as well as the parties' previous stipulations in this matter, we impose a censure and a fine of $1,000.

## IV.  CONCLUSION

For the foregoing reasons, the Court orders that Judge Goldston is **censured** and ordered to pay a **fine of $1,000**.

Censure and fine ordered.

25

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                              Civil Action No. 5:21-cv-00181
                                         Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendant.

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO DEFENDANT
LOUISE E. GOLDSTON'S MOTION TO DISMISS**

Now comes the Plaintiff, by and through counsel, John H. Bryan, pursuant to Rule 12(b)

(6) of the Federal Rules of Civil Procedure, and pursuant to this Court's December 3, 2021 Order

directing Plaintiff and Defendant Goldston to file supplemental briefs in this matter, and provides

the following supplemental arguments in support of his request that this Court deny Defendant

Goldston's motion to dismiss:

I.       THE WEST VIRGINIA SUPREME COURT OPINION

On November 18, 2021, the West Virginia Supreme Court of Appeals issued their

published opinion in the case of In the matter of Goldston, No. 20-0742 (2021), censuring and

fining Defendant Goldston for her serious misconduct. The central issue in both Goldston and

the § 1983 action currently *sub judice*, is the allegation that a Family Court judge, under color of

1

JA152

law, personally engaged in a search and seizure of the Plaintiff's residence in violation of state law and federal constitutional rights. The Court in <u>Goldston</u> established conclusively and categorically that the Defendant's conduct was, as a matter of law, "executive" in nature, and expressly not "judicial." Syllabus Point 2 held that, "The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power." Moreover, Syllabus Point 3 held that the underlying disciplinary allegations against Defendant Goldston were proven under the high standard of proof by clear and convincing evidence.

Ultimately, the <u>Goldston</u> established, as a matter of law, that the Defendant "led a *search* of the [Plaintiff's] residence, not a 'judicial view,' and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution." <u>Id</u>. at 2 (emphasis original). The Court also took issue with the "manner in which [Judge Goldston] conducted the search," labeling her actions "serious misconduct," ordering that she be publicly censured and fined $1,000. <u>Id</u>. The Court expressly rejected Judge Goldston's "attempt to reframe her conduct" as judicial.[1] Likewise, this Court is compelled to do the same, due to the binding application of Goldston on the instant proceedings, as will be discussed in greater detail below.

## II.    THE APPLICATION OF JUDICIAL IMMUNITY

Judges may not properly assert judicial immunity just by virtue of being a defendant based on allegations of conduct performed while acting as a judge. Judicial immunity extends only to a judge's judicial acts and does not encompass purely administrative actions, even if they "may be essential to the very function of the courts." <u>Forrester v. White</u>, 484 U.S. 219, 227-230,

_____

[1] <u>Id</u>. at 2 ("After considering the record and the parties' written and oral arguments, we reject the judge's attempt to reframe her conduct.").

2

JA153

108 S.Ct. 538, 544-546, 98 L.Ed.2d 555, 565-567 (1988). Selecting a jury pool; promulgating an attorney code of conduct; enforcing such a code; and hiring and firing persons under the judge's supervision have all been held to be administrative acts and hence without judicial immunity. Id. at 228-29, 108 S.Ct. at 544-45, 98 L.Ed.2d at 565-67; Goldhaber v. Higgins, 576 F.Supp.2d 694, 703 (W.D. Pa. 2007). For instance, actions taken by a judge in his capacity as a member of the county prison board were not judicial acts, and thus not subject to judicial immunity. Goldhaber at 706; citing Padgett v. Stein, 406 F.Supp. 287, 305 (M.D.Pa. 1975) ("'In the performance of their duties on the prison board, the county judges are not acting within the scope of their *judicial* jurisdiction. They are not involved in a judicial function and they are not exercising judicial power.') (emphasis in original)."). An act that is administrative or otherwise non-judicial does not become judicial merely because the person performing that act happens to be the judge assigned to a particular individual's case." Id at 707.

Absolute judicial immunity is lost only when the judge either did not perform a judicial act or when the judge "acted in the clear absence of all jurisdiction." Stump v. Sparkman, 435 U.S. 349, 356– 57 (1978) (quoting Bradley v. Fisher, 80 U.S. 335, 351 (1872). To determine whether the judge performed a "judicial act," courts consider whether the judge engaged in action normally performed by a judge, and whether the parties dealt with the judge in her judicial capacity. Mireles, 502 U.S. at 12.

In Archie v. Lanier, 95 F.3d 438, 441 (6th Cir. 1996) the Court examined a claim of judicial immunity in light of allegations of sexual misconduct taken by a judge against employees and litigants who encountered the defendant judge in otherwise judicial settings. The Court determined that, "[w]hether [Judge] Lanier's actions were 'judicial acts' must be answered

3

by looking at the 'nature' and 'function' of the act, not the 'act itself.'" Id. at 441; citing Mireles

at 13, 112 S.Ct. at 288 (quoting Stump, 435 U.S. at 362, 98 S.Ct. at 1107-08). It's less important

that a defendant asserting judicial immunity is a "judge," than it is that they are performing an

act of the nature normally performed by a judge:

> That is to say, "we look to the particular act's relation to a general function normally
> performed by a judge" to determine whether the action complained of was indeed a
> judicial act. Id. Ultimately, it is the "nature" of the function performed, rather than the
> identity of the person who performed it, that informs a court's immunity analysis. Id.
> (quoting Forrester, 484 U.S. at 229, 108 S.Ct. at 545).
>
> This court explained that the analytical key "in attempting to draw the line" between
> functions for which judicial immunity attaches and those for which it does not is the
> determination whether the questioned activities are "truly judicial acts" or "acts that
> simply happen to have been done by judges." It is the nature of the function involved that
> determines whether an act is "truly" judicial. Sparks v. Character and Fitness Comm. of
> Kentucky, 859 F.2d 428, 432 (6th Cir.1988) (citations omitted), cert. denied, 489 U.S.
> 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989).

Archie v. Lanier, 95 F.3d 438, 441 (6th Cir. 1996). The burden is on the judge to justify the

assertion of such immunity. See Buckley v. Fitzsimmons, 509 U.S. 259, 273-75, 113 S.Ct. 2606

2616, 125 L.Ed.2d 209 (1993)."

In Goldhaber v. Higgins, 576 F.Supp.2d 694, 703 (W.D. Pa. 2007), the Western District of

Pennsylvania provided an illustration which is analogous to the present circumstances:

> By way of illustration, consider a case where a judge presides at a murder trial and upon
> the defendant's conviction sentences him to death. Even though the judge's actions up to
> that point are undisputably judicial, and even though the defendant is clearly within the
> judge's jurisdiction, if the judge then shoots and kills the defendant himself the judge's act
> would be an undisputably non-judicial action from whose consequences the judge would
> certainly not be immune.

Id. at 707. Another example of non-judicial acts is the case of Zarcone v. Perry, 572 F.2d 52 (2nd

Cir. 1978) cert. denied, 439 U.S. 1072 (1979), where the Second Circuit upheld an award of

punitive damages against a judge who ordered a nearby coffee vendor to be handcuffed and ordered law enforcement to subject him to "pseudo-official inquisition" because the judge did not like his coffee.

Obviously shooting and killing a litigant is dramatically more severe than performing a search and seizure at the home of a litigant. However, the logical conclusions must be the same in both scenarios. Even though Judge Goldston's actions up to the point on March 4, 2020 were undisputedly judicial up to a point, once she left the judicial branch and trespassed into the dominion of the executive branch, her actions at that point, and thereafter, were undisputedly non-judicial actions. Pursuant to the Goldston opinion, they were executive in nature, and therefore judicial immunity must be denied.

### III.    JUDGE GOLDSTON IS NOT ENTITLED TO JUDICIAL IMMUNITY

In her memorandum in support of her motion to dismiss, Judge Goldston asserts judicial immunity, which is not surprising under the circumstances. However, as the State Supreme Court opinion demonstrates, this is one of those unique scenarios where judicial immunity must be denied to a judicial defendant. In order for judicial immunity to apply, Defendant Goldston must "reframe" her conduct so as to come within the scope of judicial immunity. In the matter of Goldston, No. 20-0742 (2021) established as a matter of law, however, that Defendant Goldston's "serious misconduct," consisting of a "search" of Plaintiff's residence, falls outside the ambit of judicial immunity protection as a non-judicial act.

In her memorandum, Judge Goldston argues that, "The facts of this case are a direct allegory to" the facts of Mireles v. Waco, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991).[2]

_____

[2] Goldston Mem. at 8.

Reliance on <u>Mireles</u> requires that Judge Goldston's conduct remain wholly judicial in nature. The Court explained that in order to determine whether an act is judicial, "we look to the particular act's relation to a general function normally performed by a judge," which in <u>Mireles</u> consisted of "the function of directing police officers to bring counsel in a pending case before the court." <u>Id</u>. at 12-13. Defendant Goldston argues that just because she exited the courtroom on March 4, 2020, that she was still acting as a judge, because the "entire exercise was the adjudication of a motion in a divorce case, even if done in an unorthodox or arguably impermissible manner."[3] Defendant Goldston argues that she "would not be immune from liability if she had rear-ended the Plaintiff's car at a stoplight, because she is not acting as a judge in that circumstance."[4]

Utilizing the Defendant's logic, her example of a car wreck begs the question of whether she would be immune from liability had she rear-ended the Plaintiff's car on the way to his home on March 4, 2020? Such a position would require the application of absolute judicial immunity against any liability whatsoever, for any action whatsoever, so long as the judicial officer claims subjectively to be in the process of adjudicating the claims of a litigant. Such a position would effectively abolish the long-existing exceptions to the application of judicial immunity for any plaintiff who was a litigant before the defendant judge, which of course would be contrary to binding Supreme Court holdings.

Judge Goldston also argues that she was acting in a judicial capacity by "allegedly prohibiting the Plaintiff, or those at his direction, from video recording the events . . . ." and that, "In fact, the West Virginia Rules of Practice and Procedure for Family Courts expressly prohibit

―――――――――――

[3] <u>Id</u>.

[4] <u>Id</u>.

persons who are not court officials from recording judicial proceedings."[5] Once again, Defendant Goldston attempts to "reframe" her conduct, even refusing to admit that she was caught on video prohibiting the Plaintiff from recording the incident. In any event, the <u>Goldston</u> opinion is categorically binding on all factual and legal issues addressed therein.

In the matter of Goldston, No. 20-0742 (2021) conclusively establishes that Judge Goldston did in-fact prohibit recording, as well as the fact that so doing was an egregious act of misconduct. The Court wrote that, "Judge Goldston . . . indicated that if they did not turn off their phones and stop recording she would take the [Plaintiff], or perhaps both he and his girlfriend, to jail," and that "Judge Goldston, herself, made no arrangements to record what went on inside the home (or outside the home)." <u>Id</u>. at 4. The Court ultimately held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." <u>Id</u>. at 23.

### A.      Judge Goldston's actions were not "Judicial" in nature

The State Supreme Court conclusively held in <u>In the matter of Goldston</u>, No. 20-0742 (2021) that Judge Goldston's actions, as alleged in the Complaint, were not judicial in nature, but rather wholly executive. The Court found by clear and convincing evidence that Judge Goldston engaged in a "*search*," rather than a "*view*." The Court wrote that, "Judge Goldston did not go to the property to *observe* the ex-husband's house; she went there to locate and seize certain of its contents - pictures, DVDs, and other items of personal property." <u>Id</u>. at 14 (emphasis original). The Court concluded that her conduct was executive in nature, rather than judicial. "Searches are

_____

[5] Goldston Mem. at 8-9.

an activity of the executive department." Id. at 16; citing State ex rel. Parma Cmty. Gen. Hosp. v. O'Donnell, 2013-Ohio-2923, ¶ 7 (stating that "searches are executive in nature.").

The Court found that Judge Goldston was acting in an executive law enforcement capacity on March 4, 2020, even though she was vested with no executive enforcement law enforcement authority. "Indeed, searches are so quintessentially executive in nature that even a judge who participates in one acts 'not * * * as a judicial officer, but as an adjunct law enforcement officer.'" Id. at 16; quoting State ex rel. Hensley v. Nowak, 52 Ohio St. 3d 98, 99, 556 N.E.2d 171, 173 (1990) (per curiam) (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327 (1979)) (holding that a writ of prohibition would not issue to restrain administrative searches because they are neither judicial nor quasi-judicial acts). The Goldston Court held in no uncertain terms that Judge Goldston's search was an impermissible exercise of executive powers under the State Constitution:

> Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments *shall be separate and distinct*[.]" W. Va. Const. art. V, § 1 (emphasis added). The Constitution further specifies, in unmistakable terms, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time[.]" In light of these clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power. W. Va. Const. art. 5, § 1. Because Judge Goldston plainly engaged in such a search, we find that the so-called "view" was improper.

Id. at 17-18 (citations omitted).

### B.    The Goldston Opinion applies to categorically estop and preclude the Defendant's assertion of qualified immunity

Due to the fact that Defendant Goldston was already provided with a full and fair opportunity to litigate the factual and legal issues arising from her actions of March 4, 2020 in

8

the underlying judicial disciplinary proceedings, she is now categorically barred from further challenging those factual and legal findings litigated therein. The Complaint's allegations, as well as the Defendant's ensuing assertion of judicial immunity in her motion to dismiss, consist of substantially identical factual and legal issues as were decided in the <u>Goldston</u> opinion, and to which the Defendant is now bound.

Under the full-faith and credit statute, 28 U.S.C. § 1738, federal courts in § 1983 actions must give state court judgments the same preclusive effect they would receive in state court under state law. <u>San Remo Hotel v. San Francisco</u>, 545 U.S. 323, 337–38 (2005); <u>Migra v. Warren City Sch. Dist</u>., 465 U.S. 75, 81 (1984); <u>Allen v. McCurry</u>, 449 U.S. 90, 94–95 (1980). *See also* <u>Haring v. Prosise</u>, 462 U.S. 306, 313–14 (1983). This principle controls so long as the federal litigant against whom preclusion is asserted had a full and fair opportunity to litigate his federal claims in state court. A full and fair opportunity to be heard requires only that state judicial procedures meet minimal procedural due process requirements. <u>Kremer v. Chem. Constr. Corp</u>., 456 U.S. 461, 480–81 (1982); <u>Allen</u>, 449 U.S. at 95. The full-faith and credit statute applies even to claims that could have been, but were not, litigated in the state court proceeding, if state preclusion law encompasses the doctrine of claim preclusion. <u>Migra v. Warren City Sch. Dist</u>., 465 U.S. 75, 83–85 (1984).

In 1980, the U.S. Supreme Court applied the doctrines of *res judicata* and *collateral estoppel* to Section 1983 actions. *See* <u>Allen v. Curry</u>, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). However, even prior to <u>Allen</u>, the Fourth Circuit had already established the same holding. *See* <u>Rimmer v. Fayetteville Police Dept</u>., 567 F.2d 273 (4th Cir., 1977) ("There is nothing new in the concept that full litigation of an issue in a criminal proceeding forecloses

subsequent relitigation of the issue in a civil proceeding when resolution of the issue was essential to the conviction."); *See also* Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 85 (1984) ("We hold, therefore, that petitioner's state-court judgment in this litigation has the same claim preclusive effect in federal court that the judgment would have in the Ohio state courts.") (cited by Gilliam v. Sealey No. 18-1366, No. 18-1402 (4th Cir., 2019)). It is well established that a prior criminal judgment or decree may be used to establish *prima facie* all matters of fact and law adjudicated in the criminal litigation. *See* Emich Motors Corporation v. General Motors Corporation 8212 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). "Collateral estoppel precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." In re McNallen, 62 F.3d 619, 624 (4th Cir. 1995).

Though Defendant Judge Goldston's underlying state action wasn't a criminal case, which tends to be scenario when preclusion is applied in Section 1983 cases, the application is the same here. It is well established law in West Virginia that the Supreme Court of Appeals of West Virginia conducts an independent review of the record in judicial disciplinary cases and is the final arbiter in all disciplinary cases. *See* In re Browning, 192 W. Va. 231, 452 S.E.2d 34 (1994) and Syl. Pt. 3, Committee on Legal Ethics v. Blair, 174 W. Va. 494, 327, S.E.2d 671 (1984). "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, Matter of Starcher, 202

W. Va. 55, 501 S.E.2d 772 (1998).[6] The West Virginia Supreme Court's review in such matters is "plenary" and "independent." Matter of Starcher, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998).

The claims litigated in the underlying judicial disciplinary proceedings are mostly identical to the claims currently *sub judice*. At issue in the state proceeding was both the factual and legal allegations which formed the basis of the formal "Statement of Charges" issued against Defendant Goldston on September 18, 2020 by the Judicial Investigation Commission.[7] The Statement of Charges described Judge Goldston's longstanding "practice of visiting homes of litigants" and her actions on March 4, 2020 with respect to the Plaintiff.[8] As the Court noted, on September 30, 2020, "Judge Goldston signed an agreement with Judicial Disciplinary Counsel" admitting the allegations of fact set forth in the formal statement of charges, and further admitting that, "by engaging in such conduct, she had violated" numerous Rules of the Code of Judicial Conduct.[9] The Court noted that, "Judge Goldston agreed [in her sworn statement to Judicial Disciplinary Counsel] that the task of enforcing her orders is an 'executive branch' function, and she knew that she could dispatch law enforcement to search for and seize property that a party retained in violation of her order," but that "[s]he simply believed that this method was ineffective…."[10] Moreover, the Court observed that Defendant Goldston "admitted to

---

[6] *See also* Syl. Pt. 5 of Goldston.

[7] Goldston at 7.

[8] Id.

[9] Id. at 8.

[10] Id. at 6-7.

improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]."[11]

The issues in the disciplinary proceedings did not go uncontested. In Goldston, the Court noted that Judge Goldston argued that, though she "remains bound by her prior statements of fact," that "she contends that the parties remain free to "argue questions of law[:]"

> She denies that the Judicial Investigation Commission ever charged her with, or that she has ever confessed to, any constitutional violations. On the contrary, she contends that "[s]ubsequent research . . . revealed a body of law that supports" her actions. In particular, she claims that she had "inherent authority to conduct an onsite visit" and that "view[ing] the division of property" allowed the ex-husband to "purge his contempt." She contends that, "[u]nlike the execution of a search warrant, the view was conducted with judicial oversight. Therefore, it was not per se unreasonable." Ultimately, Judge Goldston believes that her conduct was lawful and that, if she is mistaken, her mistake was error, not an ethical violation. She urges the Court to "clarify the law and either affirm the ruling of the [Judicial Hearing Board] or as the final arbiter conclude that there [wa]s no wrongdoing[.]"

Id. at 12-13. Thus Defendant Goldston had a full and fair opportunity to address all issues pertaining to the  constitutional validity of her actions taken at the Plaintiff's residence on March 4, 2020, including the specific issue of whether such actions were judicial in nature, or not. She did in fact litigate those issues, represented by counsel.[12] Thereafter, as the final arbiter of such issues in the context in which they arose, the Goldston Court repudiated the Defendant's position, instead holding conclusively that she indeed engaged in a search and seizure of the Plaintiff's residence, as defined by well established federal Fourth Amendment jurisprudence.[13]

---

[11] Id. at 8.

[12]

[13] See Goldston at 15-17; citing Terry v. Ohio, 392 U.S. 1, 16 (1968); Kyllo v. United States, 533 U.S. 27, 32 n.1 (2001); Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327 (1979); United States v. Barnes, 895 F.3d 1194, 1202 (9th Cir. 2018); United States v. Clyburn, 806 F. Supp. 1247, 1252 (D.S.C. 1992), aff'd, 24 F. 3d 613 (4th Cir. 1994).

Regarding the West Virginia State Constitution, the Court expressly concluded that it "forbids a judicial officer to participate in a search because a search is an exercise of executive power."[14]

The Court explicitly condemned Defendant Goldston for the actions which are the subject of the Complaint:

> As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.
>
> Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search….

Goldston at 23. Any attempt by Defendant Goldston to subsequently claim in this civil action, that she did not commit state and federal constitutional violations against the Plaintiff, or that in so doing she was engaging in an alleged judicial act, is effectively an inappropriate collateral attack on the State Supreme Court judgment.

### C.      The Rooker-Feldman Doctrine bars the Defendant from collaterally attacking the State Supreme Court Opinion

The so-called Rooker-Feldman Doctrine, named after the Supreme Court's decisions in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), provides that a federal district court does not have jurisdiction to

---

[14] Id. at 17; citing W. Va. Const. art. V, § 1.

overturn a state court judgment. To the extent that Defendant Goldston disagrees with the West

Virginia Supreme Court's rulings in <u>In the matter of Goldston</u>, No. 20-0742 (2021) and desires to

resubmit the issues for federal court adjudication, she is limited solely to U.S. Supreme Court

review, as only the Supreme Court has federal appellate jurisdiction over state court judgments.[15]

The Supreme Court has recognized that the *Rooker–Feldman* doctrine may apply even when the

claim asserted in federal court was not determined in the state court proceeding if that claim was

"inextricably intertwined" with the state court judgment. <u>Exxon Mobil</u>, 544 U.S. at 286 n.1

(citing <u>D.C. Ct. of App. v. Feldman</u>, 460 U.S. 462, 483 n.16 (1983)).

### D.    As a matter of law, Defendant Goldston violated the Code of Judicial Conduct and the underling factual allegations

The Court concluded in <u>In the matter of Goldston</u>, No. 20-0742 (2021) that Judge

Goldston's actions, as proven by clear and convincing evidence, "violated Rules 1.1, 1.2, 1.3,

2.2. 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct and that she did, in fact, violate

those rules." <u>Id</u>. at 18. Said rules consisted of the following:

> (a) Rule 1.1, which states that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct";
> (b) Rule 1.2, which states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";
> (c) Rule 1.3, which states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";
> (d) Rule 2.2, which states that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially";
> (e) Rule 2.4(A), which states that "[a] judge shall not be swayed by public clamor or fear of criticism";

---

[15] 28 U.S.C. § 1257 (2006).

14

(f) Rule 2.4(B), which states that "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; and

(g) Rule 2.5, which states that "[a] judge shall perform judicial and administrative duties, competently and diligently . . . [and] shall cooperate with other judges and court officials in the administration of court business."

Id. at 8-9. The Court also noted that, among other factual admissions, Defendant Goldston "admitted to improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]." Id. at 7-8. Such findings by the Court, establish as a matter of law that Defendant Goldston's actions on March 4, 2020 were unequivocally not *judicial* in nature; that they consisted of serious misconduct and ethical violations; and that they are not an allegory to Mirales, as Defendant argues.

## **CONCLUSION**

Defendant Judge Goldston is categorically estopped and precluded from re-litigating the factual and legal issues decided by the West Virginia Supreme Court of Appeals in In the matter of Goldston, No. 20-0742 (2021), which held that the March 4, 2021 search and seizure performed by Defendant Goldston was a non-judicial, executive law enforcement action, performed in violation the state and federal constitutions, as well as an egregious act of ethical misconduct under the Code of Judicial Conduct. She is barred from asserting judicial immunity in this action due to the fact that doing so would require this Court to determine the issue of whether her actions taken on March 4, 2020 at the Plaintiff's residence were "judicial" in nature, which has already been decided by Goldston. This Court is consequently without jurisdiction to review issues covered by Goldston - only the United States Supreme Court could do so.[16]

---

[16] Upon information and belief, there has been no indication that Defendant intends to petition for appeal to the U.S. Supreme Court.

15

JA166

Moreover, the Plaintiff is arguably entitled to judgment as a matter of law on many, if not all, of the constitutional claims asserted in the Complaint, for the same reasons, which further weakens the Defendant's protestations.

Even without the existence of the <u>Goldston</u> opinion, the allegations in the Complaint must be taken as true when resolving a motion to dismiss. The Complaint herein is 38 pages long and highly-detailed, specifically addressing and incorporating the factual and legal allegations asserted in the judicial disciplinary action,[17] including the Code of Judicial Conduct, as well as addressing judicial immunity directly.[18] Taken as true, even without the Defendant being precluded from re-asserting her arguments, the motion to dismiss must be denied pending further development of the record and dispositive motions. Similarly, the Western District of Missouri just days ago denied a motion to dismiss in another judicial immunity case, also involving a family court judge, ruling that the assertion of judicial immunity could not be resolved by a motion to dismiss where the complaint alleged a non-judicial act.[19] Defendant Goldston's motion should likewise be denied.

---

[17] *See* Complaint at ¶ ¶ 30-40, 84, 86.

[18] *See* Complaint at ¶ ¶ 60, 73, 87, 99 ("Defendant Goldston engaged in nonjudicial actions which were not taken in a judicial capacity. She engaged in functions and behaviors which are not normally performed by a judge and which are wholly outside the expectations of litigants in Family Court. Defendant Goldston's personal direction of, and personal participation in, the violation of Plaintiff's Fourteenth Amendment rights as discussed herein in detail, consisted of an executive act, rather than a judicial act in nature. As a consequence, Judge Goldston does not enjoy judicial immunity for her actions taken on the property of the Plaintiff on March 4, 2020, as alleged herein in detail. See Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991).").

[19] *See* <u>Rockett v. Hon. Eric Eighmy</u>, Case No. 6:21-cv-03152-MDH (W.D. MO) at 4 ("The allegations contained in the complaint are that the judge acted without jurisdiction and outside his judicial role when personally taking the children to jail, then subsequently ordering them picked up in Louisiana, when there were no judicial proceedings pending that would allow for this judicial sanction. Whether Plaintiff will be able to ultimately prevail is a question for another day. However, here, based on the allegations contained in the pleadings Plaintiff has stated a claim that judicial immunity may not apply and certainly a claim that cannot be resolved by a motion to dismiss.").

16

MATTHEW GIBSON,
By Counsel


/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

17

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

MATTHEW GIBSON,

        Plaintiff,

vs.                         Civil Action No. 5:21-cv-00181
                                Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendant.

**<u>CERTIFICATE OF SERVICE</u>**

      I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO DEFENDANT LOUISE E.

GOLDSTON'S MOTION TO DISMISS has been served upon counsel of record by using the

CM/ECF System, this the 17th day of December, 2021 and addressed as follows:

| | |
|---|---|
| Jennifer E. Tully, Esq. | J. Victor Flanagan, Esq. |
| Adam K. Strider, Esq. | Kevin J. Robinson, Esq. |
| Bailey & Wyant, PLLC | Pullin Fowler Flanagan, Brown & Poe, PLLC |
| 500 Virginia Street, East, Suite 600 | 252 George Street |
| PO Box 3710 | Beckley, WV 25801 |
| Charleston, WV 25337-3710 | *Counsel for Raleigh County Defendants* |
| *Counsel for Louise E. Goldston* | |

Arie M. Spitz, Esq.
Kevin A. Nelson, Esq.
Jason L. Holliday, Esq.
Dinsmore & Shohl, LLP
707 Virginia Street, East, Suite 1300

Charleston, WV 25339-1887
*Counsel for Kyle Lusk*

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

     **Plaintiff,**

v.                                                    Civil Action No. 5:21-cv-00181
                                                      Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP,
individually, KYLE LUSK, individually,

     **Defendants.**

### DEFENDANT LOUISE E. GOLDSTON'S
### MOTION FOR SUMMARY JUDGMENT

**COMES NOW** this Defendant, Louise E. Goldston, by counsel Jennifer E. Tully, Adam K.

Strider, and the law firm of Bailey & Wyant, PLLC, pursuant to Rule 56(c) of the *Federal Rules of*

*Civil Procedure* and hereby move this Court for an Order of Summary Judgment in regard to all

claims asserted against the Defendant because there is no genuine issues of material fact as to

Plaintiff's claims asserted herein.

As more thoroughly discussed in the contemporaneously-filed Memorandum of Law

submitted in support of this Motion, the Defendant is entitled to Summary Judgment because the

undisputed facts on the case record show that she is entitled to absolute judicial immunity from the

Plaintiff's claims.

**WHEREFORE,** based on the foregoing, as well as the contemporaneously filed

Memorandum of Law, Defendant Louise E. Goldston respectfully prays that this Honorable Court

**GRANT** her Motion for Summary Judgment, as grant her such other relief as the Court deems just and proper.

**LOUISE E. GOLDSTON,**

**By Counsel,**

 /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

2

JA172

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**

                                     **Civil Action No. 5:21-cv-00181**
                                     **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

### <u>CERTIFICATE OF SERVICE</u>

        **I HEREBY CERTIFY** that a true and correct copy of foregoing "**DEFENDANT LOUISE E. GOLDSTON'S MOTION FOR SUMMARY JUDGMENT**" was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, Monday, March 28, 2022:

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV  25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

 /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

v.

                                              **Civil Action No. 5:21-cv-00181**
                                              **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

### DEFENDANT LOUISE E. GOLDSTON'S RESPONSES TO DEFENDANT KYLE LUSK'S FIRST SET OF REQUESTS FOR ADMISSION

COMES NOW Defendant, Louise E. Goldston, by and through counsel, Jennifer E. Tully, Adam K. Strider and the law firm of Bailey &Wyant, PLLC and hereby files her responses to Defendant Kyle Lusk's First Set of Requests for Admission and states as follows:

### REQUESTS FOR ADMISSION

1.      Please admit that you <u>did not</u> engage with Defendant Lusk "in a long-term practice, agreement, relationship and understanding where Defendant Lusk possessed the ability" to request to visit the homes of opposing parties "in order to search and seize items of personal property therein" as alleged by Plaintiff.

**RESPONSE:** Admit.


2.      Please admit that the home visit <u>did not</u> occur "pursuant to a private *ex parte* agreement," as alleged by Plaintiff.

JA176

**RESPONSE:** Admit.

3.    Please admit that at the March 4, 2020 hearing on the Petition for Contempt, prior to the home visit, Plaintiff admitted to the Court that he had not handed over certain property that was at issue in the Petition for Contempt.

**RESPONSE:** Admit.

4.    Please admit that you <u>did not</u> use your power and discretion as a Family Court Judge to assist Defendant Lusk.

**RESPONSE:** Admit.

5.    Please admit that Defendant Lusk <u>did not</u> request any assistance or favor from you as a Family Court Judge in exchange for campaign donations, or political and social support.

**RESPONSE:** Admit.

6.    Please admit that you <u>did not</u> agree with and/or engage in concerted action with Defendant Lusk to participate in a conspiracy with Defendant Lusk to deprive Plaintiff of his federally protected rights.

**RESPONSE:** Admit.

7.    Please admit that you <u>did not</u> have a "close relationship" with Defendant Lusk, as alleged by Plaintiff.

**RESPONSE:** Admit.

2

8.    Please admit that you <u>did not</u> conspire with Defendant Lusk to commit any of the acts alleged in Plaintiff's Complaint.

**RESPONSE:** Admit.

9.    Please admit that, prior to the home visit, you had a preference as a Family Court Judge for the parties to attempt to settle contested matter without court involvement.

**RESPONSE:** Admit.

**Louise E. Goldston,**
**By Counsel,**

**_/s/ Jennifer E. Tully_**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**                                                                    **Civil Action No. 5:21-cv-00181**
                                                                         **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the "**DEFENDANT LOUISE E. GOLDSTON'S RESPONSES TO DEFENDANT KYLE LUSK'S FIRST SET OF REQUESTS FOR ADMISSION**" was electronically filed with the Clerk of the Court using the Court's Electronic Case Filing (CM/ECF) system, which will send notification of such filing to the following on this day, November 29, 2021:

Arie M. Spitz
Jason L. Holliday
Kevin A. Nelson
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV 25301
*Attorney For: Brian White, County Commission of Raleigh County, Jeff McPeake*
John H. Bryan

Law Office of John H. Bryan
PO Box 366
Union, WV 24983
*Attorney For: Matthew Gibson*

I hereby certify that I have mailed, by United States Postal Service, to the to the following on this day, November 29, 2021:

Arie M. Spitz
Jason L. Holliday
Kevin A. Nelson
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV 25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
901 Quarrier St
Charleston, WV 25301
*Attorney For: Brian White, County Commission of Raleigh County, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV 24983
*Attorney For: Matthew Gibson*

/s/ Jennifer E. Tully
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

# EXHIBIT B

**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

MATTHEW GIBSON

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

1   are still sitting outside, correct?

2        A.  Yes, sir.

3            MR. BRYAN:  Kevin, can I take a

4   bathroom break?  I'm sorry.

5            (Break in proceedings.)

6   BY MR. ROBINSON:

7        Q.  When you got to this hearing, you

8   admitted you failed to follow through on

9   court-ordered counseling for one of your

10  children, correct?

11       A.  Say that again.

12       Q.  When you got to the hearing on

13  March 4th, you admitted during this hearing

14  that you failed to follow through on court-

15  ordered counseling for one of your children?

16       A.  No.  March 4th was the contempt

17  only.

18       Q.  But that wasn't brought up at any

19  time?

20       A.  I think -- they were contesting.

21  But at that time the counselor had already

22  released her.

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

23       Q.  Okay.  So if the transcripts say

24  you failed to follow through on that, that

Page 103

1    would be incorrect?

2         A.  I can't recall.  I do know that at

3    that time part of my evidence was she had

4    already been released.

5         Q.  All right.  So at no time during

6    this hearing, this March 4th, 2020 hearing

7    did you say to the court, hey, I have already

8    turned over all of this stuff, I don't know

9    what you all are talking about?

10        A.  You know, in words, I -- I believe

11   I tried to tell Judge Goldston.  And she

12   said, what does the order say?  And I was

13   just trying to explain to her that the photos

14   were ordered to be copied, which I did.  And

15   I never could -- I mean, I never could

16   present my defense or evidence.  I mean, I

17   tried.

18        Q.  I believe I saw where the court

19   went off record at 10:34 a.m.  I guess that's

20   when you all went to your house.  After the

21   court went off record at 10:34 a.m., what did

22   you do?

23        A.  I ran to the interview room, and I

24   told Doug Black, Sharon Masual and Tommy, I

1   said, hey, I think they are coming to my

2   house, we need to get back to my house.

3       Q.  What did they say?

4       A.  What?  You are kidding me.  I am

5   like, no.

6       Q.  That's it?  You all got --

7       A.  Got and go.  She give me 10 minutes

8   to get there.  And that's about how far it

9   is.

10      Q.  So you drove to -- from the

11  courthouse to your house in your vehicle.

12  And was Sharon Masual with you?

13      A.  Yes, sir.

14      Q.  And I guess Doug Black and Tommy

15  Carter went in separate vehicles?

16      A.  Yes, sir.

17      Q.  And did it take you ten minutes to

18  get to your house?

19      A.  I can't recall.

20      Q.  Do you recall what you and your

21  wife were talking about as you were driving

22  to your house?    Elite Court Reporting, LLC
                       MATTHEW GIBSON, 02/23/2022

23      A.  My girlfriend?

24      Q.  Oh, yeah, your girlfriend.

Page 105

1          A.  Oh, man.  Probably what should I

2   do, how this is going to go, what.  How do I

3   -- how do I stop, you know, them from coming

4   on my property?  Just random thoughts.

5          Q.  So you were thinking how to stop

6   them from coming onto your property during

7   that drive -- strike that.

8              You are driving, correct?

9          A.  Yes, sir.

10         Q.  How long were you in the interview

11  room before you went down to your house --

12  went down to your car to drive to your house?

13         A.  Less than a minute for sure.

14         Q.  All right.  So you drive to your

15  home at 113 Quiet Oak Street.  How long are

16  you there before any other witnesses arrive

17  at the house?

18         A.  As soon as we got out of the

19  driveway.  I mean, we basically almost had

20  the audio and video going.

21         Q.  Okay.

22         A.  So real close.  I don't know, maybe

23  a minute.

24         Q.  From looking at the video, it

Page 106

1    seemed like you were reading from something

2    on your phone, correct?

3          A.  Uh-huh.

4          Q.  Okay.  Where did you get that

5    information from?

6          A.  Talking to Sharon -- she is a real

7    smart lady.  But we were kind of discussing

8    how I was going to get her to recuse herself.

9    I learned that that is wrong.  It is called

10   disqualify.

11         Q.  Where did you learn that?

12         A.  You know, throughout the process, I

13   learned that it is not a motion -- Judge

14   Goldston actually told me it is not a motion

15   to recuse, it is a motion to disqualify.

16   And, you know, I just learned that.  I mean,

17   I --

18         Q.  You learned that all in the

19   10 minutes it took you to drive from the

20   courthouse to your home?

21         A.  Sure.

22         Q.  Did you look it up, or did your

23   girlfriend look it up?

24         A.  I mean, I can't.  I am driving.

Page 107

```
 1          Q.  So your girlfriend looked it up?

 2          A.  I am assuming.

 3          Q.  Okay.  It wasn't her phone -- did

 4   she just look it up on your phone?

 5          A.  I can't recall how -- how it all

 6   came together.  At this 10-minute ride, it is

 7   -- my mind is spinning.

 8          Q.  Were you reading off of your phone?

 9          A.  I was.  Because we were trying to

10   get words together.  And she actually helped

11   -- got my phone and did a voice text.

12          Q.  Who did a voice text, your

13   girlfriend?

14          A.  My girlfriend.

15          Q.  Okay.  Did you get to your home

16   before Doug Black and Tommy Carter?

17          A.  I think they got there before I

18   did.  Because I -- yeah, I am parked behind

19   one of them.  So maybe behind Doug.

20          Q.  Why did they go to your house

21   instead of going home?

22          A.  Because I told them to.

23          Q.  Oh, you told them to go to your

24   house?
```

Page 108

1        A.  They are my witnesses.

2        Q.  So you thought the hearing was

3   continuing too then, correct?

4        A.  No.  I knew it wasn't proper.  I

5   mean, that's why I asked her to recuse

6   herself.  I knew that I had never heard of a

7   judge searching a house, ever.

8        Q.  You get there.

9            MR. ROBINSON:  You know what, can

10  we fire that up again if there is no

11  objection from counsel?

12           MS. TULLY:  Sure.

13       Q.  Before we start the video -- you

14  are standing -- let the record reflect on the

15  video, the plaintiff is standing there in it

16  looks like a blue button-down shirt?

17       A.  That's me.

18       Q.  And khakis?

19       A.  That's me.

20       Q.  And had sunglasses on.  You have

21  something in -- is that your left hand?

22       A.  That's my phone, sir.

23       Q.  That's your phone.  And there is a

24  vehicle right in front of you, looked like a

Page 109

1    pickup truck.  Whose vehicle was that?

2          A.  It's either Tommy or Doug's.

3          Q.  And there is a --

4          A.  That's a Yukon Denali.

5          Q.  -- Yukon Denali behind it.  Whose

6    vehicle is that?

7          A.  That was my ex-wife's at the time.

8          Q.  Okay.  So she's already there --

9          A.  Yes.

10         Q.  -- at this point?

11         A.  Yes, sir.

12         Q.  Okay.  We will go ahead and press

13   play.

14              (Video played.)

15         Q.  Okay.  Stop.  Sorry.  Go back.

16         A.  Go ahead.  I got you.

17         Q.  Who was the guy in that royal blue?

18         A.  That's Tommy Carter.

19         Q.  Who was the guy that was next --

20         A.  No, no.  That's Doug Black.  Sorry.

21         Q.  That's Doug Black.  Who was this

22   person right here?

23         A.  That's Tommy Carter.

24         Q.  This video was actually -- this

# EXHIBIT C

1      IN THE UNITED STATES DISTRICT COURT FOR THE

2          SOUTHERN DISTRICT OF WEST VIRGINIA

3                   AT BECKLEY

4
* * * * * * * * * * * * * * * * * * * * * * * *
5
MATTHEW GIBSON,
6
          Plaintiff,
7
vs.                                  CIVIL ACTION NO.
8                                    5:21-cv-00181
LOUISE E. GOLDSTON, Individually,
9  COUNTY COMMISSION OF RALEIGH
   COUNTY, a political subdivision,
10 JEFF MCPEAKE, Individually,
   BRIAN WHITE, Individually,
11 BOBBY STUMP, Individually,
   KYLE LUSK, Individually,
12
          Defendants.
13
* * * * * * * * * * * * * * * * * * * * * * * *
14

15

16        Deposition of LOUISE E. GOLDSTON taken by
   the Plaintiff under the Federal Rules of Civil
17 Procedure in the above-entitled action, pursuant to
   notice, before Bradford L. Cooper, a Notary Public,
18 at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
   252 George Street, Beckley, West Virginia, on the
19 1st day of March, 2022.

20

21        REALTIME REPORTERS, a Huseby Company
      BRADFORD L. (Brad) COOPER, Notary Public
22                713 Lee Street
              Charleston, WV  25301
23               (304) 344-8463
              realtimereporters.net

24



1  they used it.

2      A.  They used it.  I disagree with it.

3      Q.  The Supreme Court found that you did a

4  search of the homeowner's residence, not a judicial

5  view.

6      A.  That's what they found.

7      Q.  The West Virginia Supreme Court further

8  found that in so doing, that you "exercised

9  executive powers forbidden to you under the West

10  Virginia Constitution".  Is that true?

11      A.  That is what they found.

12      Q.  Okay.  Do you disagree with that?

13      A.  Yes.

14      Q.  The Court further held in that Opinion that

15  you did not go to the property to observe the

16  ex-husband's house but that you went there to

17  locate and seize certain of its contents:

18  Pictures, DVDs, and other items of personal

19  property.  Is that true?

20      A.  That is true.

21      Q.  Do you disagree with the Supreme Court's

22  holding?

23      A.  Which holding?

24      Q.  That you went to the house to locate and



1  seize certain contents - personal property - in the

2  house.

3      A.  LOUISE GOLDSTON          March 01, 2022
           GIBSON V GOLDSTON I went there personally to

4  locate them.  I do agree that I went there to seize

5  them.

6      Q.  And why do you -- why do you disagree that

7  you went there to locate them?

8      A.  Because, as is clear on the tape taken by

9  Officer McPeake, I did not look for nor try to

10 locate anything.  I asked Mrs. Gibson where those

11 items that she was not given, as awarded in the

12 order -- where they were located when she lived

13 there.  I told her to look there.  She asked to

14 look other places.  I denied that request.

15      So I did not attempt to locate anything.

16 The things that she was awarded that were in the

17 same place that they'd been when the couple lived

18 there together, I allowed her to take.

19      Q.  However, the Supreme Court stated that "the

20 record is clear that Judge Goldston went to the

21 property to locate things, not simply to observe

22 them."  Right?

23      A.  That is what they found.

24      Q.  Okay.  That's -- that's what the Supreme





JA194

```
 1   Court found but you disagree.
 2       A.  I think I've already answered that but yes.
 3   I did not go there to locate them.  I went there to
 4   allow Mrs. Gibson to retrieve the items she had
 5   been awarded.
 6       Q.  Did you --
 7       A.  And Mister -- and only the items that
 8   Mr. Gibson had previously testified were still
 9   there.
10       Q.  Okay.  But you -- you didn't know where
11   they were inside his house, did you?
12       A.  I did not, and I did not look.
13       Q.  So they -- somebody had to locate them
14   inside the house.
15       A.  That's correct.
16       Q.  Okay.  And nobody asked Mr. Gibson to go in
17   his house and bring the items outside.
18       A.  No.
19       Q.  You went in, right?
20       A.  I did.
21       Q.  And the bailiff -- your bailiff went in.
22       A.  He did.
23       Q.  Mrs. Gibson went in.
24       A.  She did.
```



1      Q.  And Mr. Lusk went in.

2      A.  Yes.

3      LOUISE GOLDSTON                    March 01, 2022
GIBSON V GOLDSTON the items.

4      A.  Yes.  I would say retrieve the items but --

5      Q.  In fact, the Supreme Court noted in their

6  Opinion that when Mr. Gibson demanded a list of

7  what you were seeking, you replied, "You have a

8  list of everything attached to the order."

9          And when he professed not to know where

10 some of it's at, you replied, "Well, we're going to

11 find it."

12     A.  I did.

13     Q.  Okay.  So as the Supreme Court noted, you

14 told Mr. Gibson that you would be going inside his

15 house to find items.

16     A.  Correct.

17     Q.  But you disagree with the categorization of

18 that is a search.

19     A.  That that is a search by me, yes.

20     Q.  You would admit that it's a search by

21 somebody.

22     A.  Again, I told Mrs. Gibson she could look

23 only in places where the items she had been awarded

24 were located and that if they were not there she



```
 1  others inside his house.  Is that true?

 2       A.  Can you show me where that is?

 3            MS. TULLY:  Where does it say that?

 4            THE DEPONENT:  Right here.

 5       A.  I would agree that he probably felt he had

 6  no choice, unless he wanted to be arrested.

 7       Q.  Also referring to Page 4, the Court noted

 8  that you brought with you into Mr. Gibson's house

 9  "the ex-wife, the ex-wife's attorney, and

10  personally supervised the search for and recovery

11  of items."  Is that true?

12       A.  That's true what they said.  Again, I

13  disagree with the word "search".

14       Q.  Also on Page 4, the Court noted that:

15  "Several items were located and recovered,

16  including photographs, yearbooks, DVDs, recipes,

17  and a chainsaw."  Is that true?

18       A.  That's correct.

19       Q.  And the Court noted that you "made no

20  arrangements to record what went on inside the home

21  or outside the home."  Is that true?

22       A.  That is true.  Can I speak to that?

23       Q.  Sure.

24       A.  The Supreme Court talks about this
```


800.211.DEPO (3376)
EsquireSolutions.com

1  Opinion, that I did not take a court reporter with

2  me.  I do not have a court reporter.  That's why it

3  has always been my practice, and Rule 8 of the West

4  Virginia Rules of Practice and Procedure for Family

5  Courts specifically states that I am the only one

6  who has the authority to film that -- to record

7  those proceedings.

8        So that -- that is why when we returned to

9  the home -- to the courtroom, I made every effort

10 to set forth everything that happened at the house

11 and gave both Mr. Gibson and Mr. Lusk an

12 opportunity to add to, detract from, or correct

13 anything that I said that had happened at the

14 scene.

15       But I have no way to record those

16 proceedings.

17     Q.  How do you usually record proceedings?

18     A.  With a computer.

19     Q.  And that takes place in your courtroom?

20     A.  Yes.

21     Q.  Other than these so-called visits over the

22 course of your 20 years as a family court judge,

23 did you ever have proceedings anywhere else, other

24 than the courtroom or inside a litigant's home --



```
 1      A.  Yes and no.  There have been times when
 2  repairs or renovations to courtrooms were being
 3  made and we held them in jury rooms or conference
 4  rooms or that kind of thing.  Those all occurred
 5  prior to my recording things on -- by video and
 6  then recording.  Those were back in the days when I
 7  did it on cassette tape.
 8      Q.  In fact, the Court noted in the Opinion
 9  that your bailiff had made his own cellphone
10  recording inside Mr. Gibson's home.
11      A.  That's correct.
12      Q.  Were you aware of that at the time that
13  Deputy McPeake was filming with his cellphone?
14      A.  No.
15      Q.  When did you first find out about that?
16      A.  When I got back to the office, he sent it
17  to me on my phone.
18      Q.  So he provided that directly to you?
19      A.  Yes.
20      Q.  So when he testified that he did not
21  provide that directly to you, that was incorrect?
22      A.  He was mistaken.
23      Q.  And when he sent you that video, what did
24  you do?
```

LOUISE GOLDSTON                    March 01, 2022
GIBSON V GOLDSTON



```
 1      A.  I sent it immediately to my case
 2 coordinator and I deleted it from my phone.
 3      Q.  You never realized, at the time at
 4 Mr. Gibson's house, that Deputy McPeake was
 5 recording?
 6      A.  No.
 7      Q.  And you didn't ask him to record at the
 8 house?
 9      A.  No.
10      Q.  Had he been with you on prior visits to
11 litigants' homes?
12      A.  No.
13      Q.  So that was the first for McPeake?
14      A.  Yes.
15      Q.  So the Supreme Court Opinion was accurate
16 when it stated that you believed that McPeake
17 "making the recording was improper and that you
18 told him not to do it again"?
19      A.  Yes.  I have since reviewed Rule 8 and do
20 now realize that I have the authority to authorize
21 somebody to record it but I did not realize that at
22 the time.
23      Q.  Do you still believe that Rule 8, or any
24 other rule, authorizes you told proceed into the
```



LOUISE GOLDSTON                                  March 01, 2022
GIBSON V GOLDSTON                                          57

1  voluntary?

2      A.  Yes.

3      Q.  And what was your answer --

4      A.  Yes.

5      Q.  -- during that hearing?

6      A.  Yes.

7      Q.  Okay.  Do you recall whether that testimony

8  was taken under oath?

9      A.  To my knowledge, it was.  Yes.

10     Q.  And was your testimony truthful that day?

11     A.  Yes.

12          MS. TULLY:  She's not denied that this

13  is her signature on the agreement.

14          MR. BRYAN:  Right.  But she's denied

15  that -- she says she was coerced and she testified

16  during that hearing that she voluntarily entered

17  that agreement, knowingly.

18     A.  With the knowledge that I had at the time,

19  yes.

20  BY MR. BRYAN:

21     Q.  Okay.  So at the time you entered the

22  agreement, you did so knowingly, voluntarily, and

23  intelligently, right?

24          MS. TULLY:  Objection.  Asked and



1  answered.

2      Q.  But later changed your mind.

3      A.  I didn't change my mind.  I learned more

4  about the law and realized that some of those

5  canons I do not believe were violated.

6      Q.  Of course, the Supreme Court rejected your

LOUISE GOLDSTON                    March 01, 2022
GIBSON V GOLDSTON

7  --

8          MS. TULLY:  Objection.

9      Q.  -- your belief, right?

10     A.  Obviously.

11     Q.  Okay.  So rather than saying you were

12  coerced, wouldn't it be more accurate to say that

13  you had regret?

14     A.  I think it would be more accurate to say

15  that I think I made a mistake.

16     Q.  As we sit here today, do you believe that

17  you made any mistakes on March 4th, 2020 when you

18  visited Mr. Gibson's home?

19     A.  Yes.

20     Q.  And what -- what mistakes did you make?

21     A.  One mistake I think I made was I should

22  have informed Mr. Gibson before we left while we

23  were going to his house.  I could not imagine at

24  the time that he did not know why we were going to



1  the house, in that we were talking about stuff that

2  he testified under oath were still at the house.

3        But if I had to do it again, I would say,

4  "We are going to your house to get those items."

5        And, quite frankly, I would have made it

6  more clear to him that I was not doing it

7  punitively to him, but I did not want to put

8  Mr. Gibson in jail for not returning those items.

9        He's a corrections officer.  I did not

10  think he would be treated well if he went to jail,

11  and in my mind, if we could just go get those items

12  that he admitted were there, that he admitted she

13  was awarded, then that would solve everybody's

14  problem.

15        He would not be able to say that Ms. Gibson

16  destroyed the items after she got them.  Ms. Gibson

17  would not then be able to say that he destroyed or

18  he damaged the items after we retrieved them.  It

19  was the -- in my mind, it was the fairest, most

20  efficient way to resolve the case.

21      Q.  So what was your mistake?

22      A.  Not setting forth that clearly on the

23  record.

24      Q.  Is that it?



```
 1      A.  My mistake?  That's all I can think of.  I

 2  think -- well, I'm not going to volunteer.

 3      Q.  No, that's okay.  What?

 4      A.  I think if I'd had a more experienced

 5  bailiff -- I can think of another mistake I made.

 6  If I'd had a more experienced bailiff that had done

 7  this with me before, that that bailiff would not

 8  have called for backup.

 9          I had not known Deputy McPeake had called

10  for backup.  I knew he had said something on the

11  radio.  I always kind of assume they're saying

12  they're out of their vehicle or whatever.

13          The other mistake I made was when I arrived

14  there -- and I'm not saying he did it intentionally

15  but Mr. Gibson immediately came toward me, making

16  his motions, which he certainly was entitled to do

17  but it rattled me a little bit and I did not notice

18  all the other cars that were there.

19          And had I had the chance to get my

20  bearings, I would've had all those cars leave and

21  all those people leave because, as you know, Family

22  Court hearings are confidential, nobody is allowed

23  in the hearing except the parties and any

24  witnesses.  None of those other people had been
```



1  called as witnesses.

2        I did tell Ms. Gibson as we were leaving,

3  if she had a vehicle that she did not believe she

4  could fit the items that Mr. Gibson had admitted

5  were there that her father could come for the sole

6  purpose of hauling the items, but I would've

7  immediately had my bailiff clear out all the other

8  people because my experience is the more people you

9  have there, the more dangerous and out of hand it

10 can get.

11       But I did not do that because I was

12 immediately confronted with all these other

13 motions, which I was happy to rule on but it did

14 not give me the time I needed to assess the

15 situation and do the safety things I normally -- or

16 my bailiff normally would have done.

17     Q.  You would agree with me that your physical

18 safety was never in jeopardy at any point at

19 Mr. Gibson's house.

20     A.  I did not feel threatened.  No.  But as far

21 as speculating what could've happened, I don't

22 know.

23     Q.  Okay.  Mr. Gibson never threatened you in

24 any way, did he?



```
 1      A.  No.  As I said, he approached me quickly
 2  when I got out of the vehicle and that rattled me.
 3          Did it scare me?  No.
 4      Q.  And, to the contrary, you threatened
 5  Mr. Gibson with arrest, even though you knew he was
 6  a federal correctional officer.
 7          MS. TULLY:  Object to form.
 8      A.  Again, I did not just threaten him with
 9  arrest.  I told him that I was instructing him to
10  let us in the house so that we could retrieve the
11  items and that that was an order of the Court.  If
12  he refused to do that, he would be held in contempt
13  and one of the remedies for direct contempt of a
14  court order is arrest.
15      Q.  And Deputy McPeake was present as your
16  bailiff when you made these statements to
17  Mr. Gibson.
18      A.  Correct.
19      Q.  Okay.  And you were here when he testified
20  a few days ago during his deposition.
21      A.  I was.
22      Q.  Okay.  And I believe that he testified that
23  he heard you threaten to arrest Mr. Gibson.
24      A.  I just said that I -- what I said, which I
```



1  am sure can be perceived as a threat.

2      Q.  And had you ordered the arrest of

3  Mr. Gibson, it would've been Deputy McPeake that

4  made the arrest, right?

5      A.  I assume so, yes.

6      Q.  And, in fact, you wanted to make sure that

7  bailiffs who traveled with you to the home -- homes

8  of litigants had arrest powers.

9      A.  That's a misstatement.  When I asked --

10  because Deputy McPeake is a retired bailiff and

11  came in under this statute, they had been supplying

12  me with officers who were not certified.

13      I asked -- one of my requirements, as I am

14  entitled under the code, is to have a deputy with

15  arrest powers.  I have never arrested anybody at a

16  scene.  I have had people arrested in the courtroom

17  or outside the courtroom for direct contempt of

18  court.  So I wanted a bailiff that if the courtroom

19  got out of control, that person could effect an

20  arrest.  The two requests were not related.

21      Q.  At some point in Mr. Gibson's front yard,

22  did you threaten to arrest any other party,

23  other than Mr. Gibson?

24      A.  Not to my memory, and I know what you're



1  talking about.  Mr. Lusk pointed out to me that

2  Mister -- and I didn't know she was his girlfriend

3  -- that there was a woman at the top of the

4  driveway recording.

5        My memory is I said, "Stop recording.

6  You're not allowed to record."

LOUISE GOLDSTON                        March 01, 2022
GIBSON V GOLDSTON

7        I do not believe I threatened to arrest

8  her.

9     Q.  She was at the top of Mr. Gibson's

10  driveway.

11     A.  Correct.

12     Q.  And you're aware that that was somebody who

13  was with Mr. Gibson.

14     A.  I assume so.  I had never laid eyes on her

15  before.

16     Q.  All right.  Let me play some audio.

17           MR. BRYAN:  Which I have some

18  electronic exhibits on this thumb drive and I'll

19  provide that to the court reporter.

20           MS. TULLY:  Okay.

21     Q.  I think this would be Exhibit 6.  If I

22  click the right button here, this would be, I

23  believe, the audio recorded by Mr. Gibson

24  personally.



# EXHIBIT F

**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

JEFF MCPEAKE

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

```
 1        A.  Yes.

 2        Q.  Would it be fair to say that you

 3   did more inside Mr. Gibson's house than just

 4   ensure the judge's safety, but that you to

 5   some extent participated jointly with the

 6   judge by documenting what was happening

 7   inside?

 8              MS. TULLY:  Objection.

 9        Q.  Let me -- strike that.  Let me

10   rephrase that question.  It was pretty

11   sloppy.

12              Would you agree with me that you

13   did more on March 4, 2020, than merely

14   protect the judge's safety or guard the judge

15   inside Mr. Gibson's house?

16        A.  My role there is protecting the

17   judge as I stated.  And all of our hearings,

18   all of them, 100 percent of them, are

19   videotaped.  I felt as if we were still in a

20   courtroom setting.  So I felt that it would

21   be a good idea to video as much as I could.

22   My battery was low.  And I would have

23   videotaped start to end.

24        Q.  But you weren't -- you weren't just
```

Page 47

1  taking surveillance footage, you were

2  documenting --

3       A.  I was -- I was documenting what

4  people were saying and what people were

5  taking as much as I could.

6       Q.  Okay.  But when you are acting as a

7  bailiff in the courtroom, I mean, you're not

8  getting out your cell phone and

9  documenting --

10       A.  Did not.

11       Q.  -- exhibits or anything like that?

12       A.  No.  The courtroom facilities do

13  that for me.  I don't have -- I am not.

14       Q.  And that -- I mean, that, to be

15  fair, doesn't have anything to do with Judge

16  Goldston's safety -- personal safety, does

17  it?

18            MR. ROBINSON:  Object to the

19  form.

20            Do you understand the question?

21       A.  If you could rephrase it maybe.

22       Q.  Your actions in documenting with

23  your personal cell phone the inside of

24  Mr. Gibson's house, that goes beyond just

1   guarding Judge Goldston's personal safety,

2   right?

3        A.  I would say yes.

4        Q.  I mean, that is more akin to

5   helping Judge Goldston locate and retrieve

6   items of personal property inside Mr.

7   Gibson's house?

8        A.  No.

9            MS. TULLY:  Objection.

10       A.  I would not agree with that, no.

11       Q.  You were documenting items of

12   personal property inside Mr. Gibson's house

13   that was being retrieved by other people?

14       A.  More of recording what was being

15   said or not said, taken or not taken.  Trying

16   to keep an accurate record of what was going

17   on inside the home.

18       Q.  When you took photographs with your

19   personal cell phone of firearms during a

20   prior incident with Judge Shuck, that was not

21   done in the interest of Judge Shuck's safety,

22   was it?

23       A.  It was not.

24       Q.  Taking photographs of somebody's

1   firearms had absolutely nothing to do with

2   ensuring or protecting Judge Shuck's safety?

3        A.  Correct.

4        Q.  In fact, it was literally

5   documenting what was being taken out of that

6   residence?

7        A.  Correct.

8        Q.  And that's the same thing that you

9   were doing inside Matthew Gibson's house by

10  recording video, right?

11              MR. ROBINSON:  Object to the

12  form.

13          You can answer it.

14       A.  I may have recorded a television at

15  one point as I am recording.  That doesn't

16  mean that the television was taken.  I am not

17  -- I am not documenting -- I am not --

18  everything that I am recording is not being

19  taken.  I don't know how else to say that.

20       Q.  What did you do with the recording

21  after the search was over?  Did you provide

22  it to Judge Goldston?

23       A.  I provided it to Debra, which is

24  our case coordinator or Donzetta.  I can't

# EXHIBIT G

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     AT BECKLEY

 4
     * * * * * * * * * * * * * * * * * * * * * * * *
 5
     MATTHEW GIBSON,
 6
              Plaintiff,
 7
     vs.                              CIVIL ACTION NO.
 8                                    5:21-cv-00181
     LOUISE E. GOLDSTON, Individually,
 9   COUNTY COMMISSION OF RALEIGH
     COUNTY, a political subdivision,
10   JEFF MCPEAKE, Individually,
     BRIAN WHITE, Individually,
11   BOBBY STUMP, Individually,
     KYLE LUSK, Individually,
12
              Defendant.
13
     * * * * * * * * * * * * * * * * * * * * * * * *
14

15

16        Deposition of BRIAN WHITE taken by the
     Plaintiff under the Federal Rules of Civil
17   Procedure in the above-entitled action, pursuant to
     notice, before Bradford L. Cooper, a Notary Public,
18   at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
     252 George Street, Beckley, West Virginia, on the
19   1st day of March, 2022.

20

21        REALTIME REPORTERS, a Huseby Company
        BRADFORD L. (Brad) COOPER, Notary Public
22                  713 Lee Street
                Charleston, WV  25301
23                 (304) 344-8463
                realtimereporters.net
24
```



```
 1          A lot of people were in there talking and I
 2   just kind of stood back, and I don't know who I
 3   talked to, whether it was Bobby or McPeake.  I'm
 4   not sure.
 5        I probably was like, "What's going on?"  You
 6   know, or, "Who's fighting?"
 7        Just trying to get an idea of what was going
 8   on.
 9        Q.  You didn't observe anybody fighting or
10   anything like that?
11        A.  No.
12        Q.  What were the people doing?
13        A.  They were just talking downstairs.  There
14   wasn't nobody, like, swinging punches.
15        Q.  Did you ask McPeake why he called for
16   backup?
17        A.  No, I didn't.  Not that I can recall.  I
18   mean, they called for backup and they hollered at
19   us and tell us that they think they need backup, we
20   go.
21        Q.  Did you recognize Judge Goldston?
22        A.  Yeah.
23        Q.  Did you -- were you wondering what she was
24   doing inside Mr. Gibson's home?
```

800.211.DEPO (3376)
EsquireSolutions.com



USCA4 Appeal: 22-1757    Doc: 23-1        Filed: 10/21/2022        Pg: 221 of 512

```
 1        A.   No.   I didn't wonder.   I mean, that wasn't
 2   -- wasn't my place.   Like I said, I did some
 3   bailiff before the academy but I've worked -- I've
 4   been a road patrol deputy for all the time I been
 5   there.
 6             So as far as why they were there, I didn't
 7   have no idea.
 8        Q.   At some point, did it become apparent to
 9   you that the judge was holding a Family Court
10   proceeding inside Mr. Gibson's house?
11        A.   I didn't know if it was a court proceeding.
12   I mean, I understood there were people in there
13   were trying to figure out whose property was whose
14   property.   I mean, so, you see a judge there, a
15   bailiff there, and then there's parties and they're
16   talking about property, then I figured it was some
17   sort of -- something to do with the Court.
18        Q.   Did the judge ever talk to you?
19        A.   Not that I can remember.
20        Q.   Okay.   So what did you do next?
21        A.   I remember being there, and the next thing
22   I can remember is going upstairs to the kitchen
23   with a guy, and we was in the kitchen for a while
24   and, shortly after that, Bobby told me
```



```
 1    "Everything's good here.  I got it."
 2          So I left and went to another call that was
 3    holding.
 4       Q.  When you say you went upstairs in the
 5    kitchen with a guy, do you have any idea who the
 6    guy was?
 7       A.  I guess it was the -- I guess it was
 8    Mr. Gibson.
 9       Q.  Okay.  Well, this is Mr. Gibson sitting
10    next to me.
11       A.  Yeah.  I don't -- I don't recognize him.
12    Yeah.  If he and his wife -- if I passed them on
13    the street, I wouldn't even know what they looked
14    like.
15       Q.  Okay.  You were aware of the fact that you
16    weren't at the Family Court.
17       A.  Was I aware I wasn't at Family Court?
18       Q.  Yeah.
19       A.  Obviously.
20       Q.  Yes.  You were at somebody's house.
21       A.  Right.
22       Q.  Somebody's residence.
23       A.  I was.
24       Q.  Did it not seem unusual to you, first, why --
```

BRIAN WHITE                                    March 01, 2022
GIBSON V GOLDSTON


JA219

BRIAN WHITE                                            March 01, 2022
GIBSON V GOLDSTON                                                  12

1  you're observing what appears to be a Family Court

2  proceeding inside somebody's private residence?

3      A.  It wasn't unusual to me.  As far as I was

4  aware, that -- I mean, that's something that they

5  do.  I mean, I didn't know.

6      Q.  Had you heard that, that that's something

7  that happened in Raleigh County Family Court?

8      A.  I haven't.  No.

9      Q.  Have you ever had any Family Court

10  experience yourself, as a litigant?

11      A.  No.

12      Q.  Have you ever been in Family Court before,

13  other than as a bailiff?

14      A.  No.

15      Q.  So how long do you think you were in the

16  house total?

17      A.  I don't know.  Five, ten minutes.  That's

18  the best that I can remember anyway.

19      Q.  And then McPeake told you that we don't

20  need you here?

21      A.  No.  It wasn't McPeake.  It was Sergeant

22  Stump.  Bobby.

23      Q.  So --

24      A.  He -- I guess Mr. Gibson went outside.  We



**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY**

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**
                                          **Civil Action No. 5:21-cv-00181**
                                          **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP, individually,
KYLE LUSK, individually,**

    **Defendants.**

**MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S
MOTION FOR SUMMARY JUDGMENT**

    **COMES NOW** this Defendant, the Hon. Louise E. Goldston, by counsel Jennifer E. Tully,

Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers for this Court's

consideration the following Memorandum in support of her contemporaneously-filed Motion for

Summary Judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure*.

    **I.**      **STATEMENT OF FACTS**

    The Plaintiff, Matthew Gibson, was a party to a divorce action in the Family Court of

Raleigh County, West Virginia, appearing for final hearing in that matter on or about September 18,

2018. Defendant Louise E. Goldston is a Family Court Judge of the 13th Family Court Circuit,

based in Beckley, Raleigh County, West Virginia, and presided over the Plaintiff's divorce hearing.

At that hearing, the Court granted the parties a divorce, and adopted a settlement agreement between

the parties as to property distribution. *Complaint, ¶ 11.* The Plaintiff also alleges that, at that

1

hearing, his ex-wife's attorney, Defendant Lusk, advised the Plaintiff against stating that assets are

not at his home, because Judge Goldston would go to his house and look. *Complaint, ¶ 17.*

The Plaintiff's ex-wife subsequently filed a Petition for Contempt, alleging that he had not

turned over certain items of property as determined in the settlement agreement, or that some items

he did turn over were damaged. *Complaint, ¶ 14.* A hearing on that Petition was held on March 4,

2020, at which the Plaintiff appeared *pro se.* See Exhibit A, *Plaintiff Matthew Gibson's Response to*

*Defendant Louise E. Goldston's Request for Admission to Plaintiff* at Request No. 1. At that

hearing, Judge Goldston offered to recess the hearing to give the Plaintiff the opportunity to seek

court-appointed counsel. See *id.* at Request No. 3. She also offered for the hearing to be continued

in order to give the Plaintiff the opportunity to prepare a response to certain late disclosures by his

ex-wife's attorney. See *id.* at Request No. 4. The Plaintiff declined these opportunities and elected

to proceed *pro se* without a continuance. See id. at Request No. 5.

In the course of the March 4 hearing, Judge Goldston *sua sponte* recessed the hearing and

announced that all parties would reconvene at the Plaintiff's home to determine whether certain

disputed items of property were there. *Complaint, ¶ 16.* On the approximately ten (10) minute drive

from the courthouse to Plaintiff's home, he and/or his girlfriend, Sharon Masual, researched how to

make a motion to disqualify Judge Gol

dston. See Exhibit B, *Depo. of Matthew Gibson* at Pg. 105, Line 24 – Pg. 107, Line 2. Upon arrival

at the Plaintiff's home, the Plaintiff immediately approached Judge Goldston and made the Motion

to Disqualify. See Exhibit C, *Depo. of Louise Goldston* at Pg. 60, Line 13 – Pg. 61, Line 16; see also

Exhibit D, *Video Recording* at 1:30-1:50. Thereafter, Judge Goldston realized that the Plaintiff was

attempting to record the interaction, and ordered the recording ceased, noting that this was a hearing,

and that family court proceedings may not be recorded. See Exhibit D at 2:50-3:45.

The Plaintiff verbally refused to permit any persons present to enter his home without a search warrant. Judge Goldston informed him that if he refused entry or refused to cease recording, he would be in contempt of court and would be taken to jail. See *id*. Thereafter, the parties entered the Plaintiff's home, and the Plaintiff's ex-wife was permitted to locate certain items which had been allocated to her in the divorce settlement, but had not been provided to her. See *Depo. of Louise Goldston* at Pg. 10, Lines 3-18; see also Exhibit E, *Bailiff's Video* at 2:30-3:00. Ms. Gibson requested to search for certain items, and the Judge denied that request, permitting her only to retrieve items on the list the location of which she knew. See *Depo. of Louise Goldston* at Pg. 10, Lines 15-18; Exhibit E at 2:30-3:00. Ms. Gibson took the items she located which were identified on the property list but not produced. While the Plaintiff will likely dispute whether certain items of property were properly awarded to Ms. Gibson, such a disagreement is irrelevant to the substance of this Motion.

It was plain through the testimony of substantially all involved parties that the interaction at the Plaintiff's home was approached by all involved as a hearing, and that Judge Goldston was addressed as a judicial officer throughout the entirety of the incident. In addition to the fact that the Plaintiff and his ex-wife made Motions and accepted the rulings on them, the fact that this was a family court hearing was mutually understood. As with any court hearing, a bailiff was present. Further, the bailiff took a video recording of the interaction, because it was his understanding that all family court hearings are to be recorded. Judge Goldston's Bailiff, Deputy McPeake, testified in key part as follows:

> Q. Would you agree with me that you did more on March 4, 2020, than merely protect the judge's safety or guard the judge inside Mr. Gibson's house?
>
> A. My role there is protecting the judge as I stated. And all of our hearings, all of them, 100 percent of them, are videotaped. I felt as if we were still in a courtroom setting. So I felt that it would be a good idea to video as much as I could. My battery

was low. And I would have videotaped start to end.

Q. But you weren't -- you weren't just taking surveillance footage, you were documenting --

A. I was -- I was documenting what people were saying and what people were taking as much as I could.

Exhibit F, *Depo. of Jeff McPeake* at Pg. 46, Line 12 – Pg. 47, Line 5.  Deputy White, a Raleigh

County Deputy Sheriff called in by Deputy McPeake, testified likewise as follows:

Q. At some point, did it become apparent to you that the judge was holding a Family Court proceeding inside Mr. Gibson's house?

A. I didn't know if it was a court proceeding.  I mean, I understood there were people in there were trying to figure out whose property was whose property. I mean, so, you see a judge there, a bailiff there, and then there's parties and they're talking about property, then I figured it was some sort of -- something to do with the Court.

[…]

Q. Okay. You were aware of the fact that you weren't at the Family Court.

A. Was I aware I wasn't at Family Court?

Q. Yeah.

A. Obviously.

Q. Yes. You were at somebody's house.

A. Right.

Q. Somebody's residence.

A. I was.

Q. Did it not seem unusual to you that you -- you're observing what appears to be a Family Court proceeding inside somebody's private residence?

A. It wasn't unusual to me. As far as I was aware, that -- I mean, that's something that they do. I mean, I didn't know.

Exhibit G, *Depo. of Brian White* at Pg. 10, Lines 8-17; Pg. 11, Line 24 – Pg. 12, Line 5.

4

JA224

Based on the foregoing, the Plaintiff has pled five (5) counts in his Complaint against this Defendant, all pursuant to 42 U.S.C. § 1983. First, he alleges an unlawful search and seizure claim in violation of the Fourth Amendment to the *United States Constitution* for ordering the search of the Plaintiff's home, allegedly without a warrant. *Complaint,* ¶¶ *46-62.* Second, he alleges violations of the First Amendment for preventing him from video recording the events. *Complaint,* ¶¶ *63-75.* Third, he alleges violations of the Fourteenth Amendment Due Process Clause for allegedly failing to provide him with due process during the contempt hearing. *Complaint,* ¶¶ *79-88.* Fourth, he alleges violations of the Equal Protection Clause of the Fourteenth Amendment via his claims that Judge Goldston's practice of home inspections disadvantaged *pro se* litigants. *Complaint,* ¶¶ *89-100.* Finally, he alleges that Judge Goldston conspired with Defendant Lusk to take the aforementioned actions. *Complaint,* ¶¶ *100-109.*

During the pendency of this matter, the West Virginia Supreme Court of Appeals issued its Opinion in *In re Goldston*, No. 20-0742, 2021 WL 5370473 (W. Va. Nov. 18, 2021), which is the final stage of the judicial disciplinary proceeding arising from the same events as does the instant case. As discussed in this Defendant's Supplemental Memorandum in Support of Defendant Louise E. Goldston's Motion to Dismiss, the Supreme Court's topline holdings in *In re Goldston* were that this Defendant had caused a "search" of the Plaintiff's home, and that she had violated the Code of Judicial Conduct, and ordered the imposition of a censure and a fine. In holding that the relocation of a hearing concerning items of property involved in a divorce settlement to the Plaintiff's home in order to determine whether the property was located there was a "search," rather than a judicial "view," the Supreme Court found it significant that this Defendant went to the property to "locate" things, rather than merely to observe them. See Exhibit H, *WVSCA Order In re Goldston,* at Pg. 15. The Court held that by participating in a "search," which is a quintessentially

executive function, this Defendant exceeded her authority as a Judge, and thus violated the Code of Judicial Conduct.

Based on those findings, the Court held that a censure and the imposition of a $1,000 fine were the appropriate sanction. In reaching this conclusion, the Court analyzed the five factors derived from *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) utilized for gauging the appropriateness of disciplinary sanctions against a judge. See Exhibit H at Pg. 20. Of key applicability to this proceeding, the Court held that this Defendant's actions were (1) related to the administration of justice, and (2) carried out in her public persona (i.e., as a judge). See *id.* at Pg. 22.

Based on the foregoing facts, this Defendant now moves this Court for Summary Judgment on the basis of absolute judicial immunity.

## II.      STANDARD OF REVIEW

Rule 56(a) of the *Federal Rules of Civil Procedure* provides that:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

F.R.C.P., Rule 56(a). In analyzing the application of Rule 56, this Court has held that:

> At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried; if not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly.

*Workman v. United Artists Theatre Circuit, Inc.*, 84 F.Supp.2d 790 (S.D. W.Va. 2000).

Furthermore, "[s]ummary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kitchen v. Summers Continuous Care Center, LLC*, 552

F.Supp.2d 589, 592 (S.D.W.Va. 2008) (*quoting* F.R.C.P, Rule 56(c)). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, a case involving solely a question of law is ripe to be resolved at the summary judgment stage. *See Rogers v. City of Richmond*, 851 F. Supp. 2d 983, 985 (E.D. Va. 2012); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2006) ("[a] purely legal question . . . is always capable of decision at the summary judgment stage . . . .") (internal quotation and citation omitted).

It is important to note that genuine disputes of material facts are not demonstrated by the bald statements of a non-moving party in depositions. *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167 (4th. Cir. 1988). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Unsupported speculation by a non-moving party is insufficient to defeat a summary judgment motion. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987.) Mere unsupported speculation is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

### III.   ARGUMENTS

A.   **This Defendant is entitled to summary judgment based on the application of absolute judicial immunity.**

It is well-settled that "judges are absolutely immune from suit for a deprivation of civil rights brought under 42 U.S.C. § 1983" even if such acts were allegedly done maliciously, corruptly, or in bad faith and no matter "how erroneous the act may have been, and however injurious in its consequences [the judicial act] may have proved to the plaintiff." *King v. Myers*, 973 F.2d 354, 356 (4th Cir. 1992) (citations omitted); *Plotzker v. Lamberth*, No. 3:08-cv-00027, 2008 U.S. Dist. LEXIS

86198, 2008 WL 4706255, at *4 (W.D. Va. Oct. 22, 2008) (citations omitted). As stated, "[j]udicial immunity is an absolute immunity: it does not merely protect a defendant from assessment of damages, but also protects a judge from damages suits entirely." *Lemon v. Hong*, No. CV ELH-16-979, 2016 U.S. Dist. LEXIS 71756, 2016 WL 3087451, at *4 (D. Md. June 2, 2016) (citing *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991)). This long-standing common law doctrine is "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). Judicial immunity ensures that while a judge's actions are "subject to correction on appeal or other authorized review," they do "not expose him to a claim for damages in a private action, or put him to the trouble and expense of defending such an action." *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). *Black v. West Virginia*, No. 3:19-cv-00561, 2019 U.S. Dist. LEXIS 172020, at *12-13 (S.D. W. Va. Sep. 11, 2019).

The Plaintiff's claims herein against Judge Goldston should be subject to summary judgment based on the application of this immunity principle to the undisputed facts on the record. As stated above, judges are generally absolutely immune from suits for money damages. See, e.g., *Mireles v. Waco*, 502 U.S. 9, 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id*. (quoting *Bradley v. Fisher*, 80 U.S. 335, 13 Wall. 335, 347, 20 L. Ed. 646 (1872)) (internal quotation marks omitted).

Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages. See *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411,

105 S. Ct. 2806 (1985). Accordingly, judicial immunity is not overcome by allegations of bad faith

or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and

eventual trial. See *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)

("Immunity applies even when the judge is accused of acting maliciously and corruptly"); see also

*Harlow v. Fitzgerald*, 457 U.S. 800, 815-819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) (allegations

of malice are insufficient to overcome judicial immunity).

There are only two sets of circumstances in which judicial immunity is overcome. First, a

judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's role

as a judge. See *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988);

*Stump v. Sparkman*, 435 U.S. 349, 360, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). Second, a judge is

not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction.

*Stump* at 356-357. This does not mean, however, that judges are liable for actions which are merely

beyond their authority. "A judge will not be deprived of immunity because the action he took was in

error, was done maliciously, or was in excess of his authority." *Id*. at Syl. Pt. (a). "[W]hether an act

by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function

normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with

the judge in his judicial capacity." *Stump* at 362; see also *Forrester* at 227-229.

The scope of this immunity was addressed at length by the Supreme Court in *Mireles v.

Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). In *Mireles*, a California judge ordered

that bailiffs bring an attorney who had failed to appear for the calling of the calendar into the

courtroom, and instructed them to use excessive force on him in the process. The Supreme Court

held that this action, while certainly violative of the attorney's rights and outside the judge's

authority, was not outside his judicial immunity, reasoning as follows:

Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge." *Stump v. Sparkman*, 435 U.S. at 362. But if only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority." *Id.*, at 356. See also *Forrester v. White*, 484 U.S. at 227 (a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Accordingly, as the language in Stump indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." 435 U.S. at 362. In other words, we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

*Mireles* at 12-13.

The entire controversy in this respect reduces efficiently to one question. Judges are immune from civil suits for damages – so, was Judge Goldston a judge in this scenario? It should be apparent from the undisputed facts on the case record that the answer is in the affirmative, and this case in the same category as *Mireles*. While it can be argued that she exceeded her authority – and the Supreme Court held as much in *In Re Goldston* – issuing an *ultra vires* order does not remove a judge from the protections of absolute judicial immunity. The record of this case is replete with uncontroverted evidence that she approached the parties to this matter as a judge, and that they approached her as a judge.

The parties convened at the Plaintiff's home in response to an order issued from the bench in an effort to resolve a property dispute in a contested divorce proceeding. The proceeding was attended by a bailiff, who recorded the interaction while non-court personnel were prohibited from recording in accordance with Family Court Rule 8. See W. Va. R. Fam. Ct. 8. Upon arrival, the Plaintiff made a motion to disqualify the Judge and/or for her to recuse herself. Later in the proceedings, the Plaintiff's ex-wife made a motion to be permitted to search the home for items she did not know the location of. These motions were denied, and the parties abided by the Judge's

ruling. After the interaction at the Plaintiff's home concluded, the parties returned to the Courthouse

to continue proceedings, in which the judge discussed what had occurred at the Plaintiff's home on

the case record. See *Depo. of Louise Goldston* at Pg. 18, Lines 8-14. Clearly, irrespective of her

authority to act as she did, Judge Goldston approached this situation as a judge, and the parties

reacted to her as a judge. This is significant because a key consideration in the judicial immunity

analysis is "the expectations of the parties, i.e., whether they dealt with the judge in his judicial

capacity." *Stump* at 362; see also *Forrester* at 227-229.

The Supreme Court's rulings in *In Re Goldston* only reinforce this conclusion. The West

Virginia Supreme Court of Appeals specifically noted that a Family Court Judge may order the

search for and seizure of property in order to secure compliance with a prior order. Her attendance

at the alleged "search" can at worst be characterized as an *ultra vires* act in pursuit of a legitimate

judicial end – a thing which, under *Mireles*, is within a judicial role and protected by judicial

immunity. The record shows that she herself did not participate in the search, but rather simply

oversaw it, and continued to act judicially – hearing motions and issuing orders to the parties and

law enforcement – throughout the purported search. See *Depo. of Louise Goldston* at Pg. 10, Lines

8-14. This conclusion is supported by the West Virginia Supreme Court of Appeals' holdings that

Judge Goldston's actions were related to the administration of justice, and carried out in her public

persona (i.e., as a judge). See Exhibit H at Pg. 22. While the West Virginia Supreme Court of

Appeals held that for a judge to take part in a search was to act "as an adjunct law enforcement

officer," it held that for a judge to do this exposed them to professional discipline under the Code of

Judicial Conduct, which applies only to judges.

The undisputed facts on the record of the case indicate that Judge Goldston's actions at issue

in this case, irrespective of whether they were within her authority as a Family Court Judge, were

taken in her judicial persona. The net of absolute judicial immunity is purposely wide, and this case falls squarely within its bounds. Thus, summary judgment is appropriate on that basis.

## IV.    CONCLUSIONS

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays that this Honorable Court **GRANT** her Motion for Summary Judgment, and that this Honorable Court **GRANT** her such other relief as this Honorable Court deems just and proper.

**LOUISE E. GOLDSTON,**
**By Counsel,**

  /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT BECKLEY**

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**                                                                       Civil Action No. 5:21-cv-00181
                                                                            Honorable Frank W. Volk

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP, individually,**
**KYLE LUSK, individually,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of foregoing "**MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION FOR SUMMARY JUDGMENT**" was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, March 28, 2022:

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV  25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

**/s/ Adam K. Strider**
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                              Civil Action No. 5:21-cv-00181
                                      Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

        Defendant.

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
### AGAINST DEFENDANT LOUISE E. GOLDSTON

        Plaintiff, by counsel, John H. Bryan, pursuant to FED. R. CIV. P. 56, respectfully moves

the Court for summary judgment. As more fully set out in plaintiff's memorandum in support,

filed contemporaneously herewith and incorporated herein, the pleadings, depositions, sworn

testimony and other documents show that there is no genuine issue as to any material fact related

to Counts One, Two, Four and Five of the plaintiff's complaint and plaintiff is entitled to

judgment as a matter of law on the said counts, and for a jury trial on the issue of damages.

        Accordingly, the plaintiff respectfully requests the Court to GRANT his motion and

ORDER that summary judgment be entered in his favor on Counts One, Two, Four and Five of

the complaint.

MATTHEW GIBSON,
By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

vs.                           Civil Action No. 5:21-cv-00181
                                 Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

       Defendant.

### CERTIFICATE OF SERVICE

     I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT LOUISE E.

GOLDSTON has been served upon counsel of record by using the CM/ECF System, this the

28th day of March, 2022 and addressed as follows:

| | |
|---|---|
| Jennifer E. Tully, Esq. | J. Victor Flanagan, Esq. |
| Adam K. Strider, Esq. | Kevin J. Robinson, Esq. |
| Bailey & Wyant, PLLC | Pullin Fowler Flanagan, Brown & Poe, PLLC |
| 500 Virginia Street, East, Suite 600 | 252 George Street |
| PO Box 3710 | Beckley, WV 25801 |
| Charleston, WV 25337-3710 | *Counsel for Raleigh County Defendants* |
| *Counsel for Louise E. Goldston* | |

JA237

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    AT BECKLEY

 4
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5
     MATTHEW GIBSON,
 6
              Plaintiff,
 7
     vs.                              CIVIL ACTION NO.
 8                                    5:21-cv-00181

     LOUISE E. GOLDSTON, Individually,
 9   COUNTY COMMISSION OF RALEIGH
     COUNTY, a political subdivision,
10   JEFF MCPEAKE, Individually,
     BRIAN WHITE, Individually,
11   BOBBY STUMP, Individually,
     KYLE LUSK, Individually,

12
              Defendants.
13
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14

15

16           Deposition of LOUISE E. GOLDSTON taken by
     the Plaintiff under the Federal Rules of Civil
17   Procedure in the above-entitled action, pursuant to
     notice, before Bradford L. Cooper, a Notary Public,
18   at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
     252 George Street, Beckley, West Virginia, on the
19   1st day of March, 2022.

20

21        REALTIME REPORTERS, a Huseby Company
          BRADFORD L. (Brad) COOPER, Notary Public
22                   713 Lee Street
                  Charleston, WV  25301
23                   (304) 344-8463
                  realtimereporters.net
24
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                        APPEARANCES:

 2
    APPEARING FOR THE PLAINTIFF:
 3
            John H. Bryan, Esquire
 4          JOHN H. BRYAN, ATTORNEYS AT LAW
            411 Main Street
 5          P.O. Box 366
            Union, West Virginia 24983
 6          jhb@johnbryanlaw.com

 7
    APPEARING FOR THE DEFENDANTS STUMP, MCPEAKE, AND
 8  WHITE:

 9          Kevin J. Robinson, Esquire
            PULLIN, FOWLER, FLANAGAN, BROWN,
10           AND POE, PLLC
            252 George Street
11          Beckley, West Virginia 25801

12
    APPEARING FOR THE DEFENDANT, LOUISE E. GOLDSTON:
13
            Jennifer E. Tully, Esquire
14          BAILEY & WYANT, PLLC
            500 Virginia Street East, Suite 600
15          P.O. Box 3710
            Charleston, West Virginia 25337-3710
16

17  APPEARING FOR THE SUPREME COURT OF APPEALS OF WEST
    VIRGINIA:
18
            Bradley Schmalzer, Esquire (via telephone)
19          Julianne Wisman, Esquire (via telephone)

20
    ALSO PRESENT:
21
            Bobby Stump, Defendant
22          Matthew Gibson, Plaintiff
            J.R. Morgan
23

24
```



1                        EXAMINATION INDEX

2

3              BY MR. BRYAN                             6

4

5

6

                         EXHIBIT INDEX

7

8    Exhibit 1  Louise Goldston Judicial            6
                Disciplinary Proceeding
9
     Exhibit 2  Public Admonishment of the          23
10              Honorable Eric Shuck, Judge of the
                13th Family Court Circuit
11
     Exhibit 3  Louise Goldston Judicial            43
12              Disciplinary Counsel Agreement

13   Exhibit 4  Formal Statement of Charges          44

14   Exhibit 5  Transcript of Judicial Board         56
                Hearing of Louise Goldston dated
15              January 15, 2021

16   Exhibit 6  Audio Recording Recorded by          65
                Plaintiff Matthew Gibson
17
     Exhibit 7  Video of the Incident at the Home    82
18              of Matthew Gibson

19   Exhibit 8  Divorce Hearing Video dated April    84
                19, 2018
20
     Exhibit 9  Recording of Kyle Lusk at Hearing    90
21              re: Search

22   Exhibit 10 Voicemail Recording of Kyle Lusk     95

23

24

USCA4 Appeal: 22-1757   Doc: 23-1      Filed: 10/21/2022    Pg: 245 of 512

Case 5:21-cv-00181  Document 67-1  Filed 03/28/22  Page 4 of 108 PageID #: 674

```
 1                    OBJECTION INDEX

 2      BY MS.  TULLY                          13
        BY MS.  TULLY                          13
 3      BY MS.  TULLY                          24
        BY MS.  TULLY                          25
 4      BY MS.  TULLY                          26
        BY MS.  TULLY                          26
 5      BY MS.  TULLY                          28
        BY MS.  TULLY                          45
 6      BY MS.  TULLY                          45
        BY MS.  TULLY                          51
 7      BY MS.  TULLY                          52
        BY MS.  TULLY                          53
 8      BY MS.  TULLY                          53
        BY MS.  TULLY                          54
 9      BY MS.  TULLY                          54
        BY MS.  TULLY                          54
10      BY MS.  TULLY                          57
        BY MS.  TULLY                          58
11      BY MS.  TULLY                          62
        BY MS.  TULLY                          75
12      BY MS.  TULLY                          76
        BY MS.  TULLY                          79
13      BY MR.  ROBINSON                       91
        BY MS.  TULLY                          94
14      BY MS.  TULLY                          96
        BY MS.  TULLY                          98
15      BY MS.  TULLY                          99
        BY MS.  TULLY                         100
16      BY MS.  TULLY                         103
        BY MS.  TULLY                         103
17

18

19

20

21

22

23

24
```



```
 1              P R O C E E D I N G S
 2              COURT REPORTER:  This is the
 3  deposition of Louise E. Goldston in the matter of
 4  Matthew Gibson versus Louise E. Goldston, et al.,
 5  taking place at the offices of Pullin, Fowler,
 6  Flanagan, Brown, and Poe in Beckley, West Virginia
 7  on this 1st day of March, 2022.  The time is
 8  10:16 a.m.  We are now on the record.
 9              This case is venued in the United
10  States District Court for the Southern District of
11  West Virginia at Beckley, being Civil Action No.
12  5:21-cv-00181.
13              My name is Brad Cooper on behalf of
14  Realtime Reporters, located at 713 Lee Street in
15  Charleston, West Virginia.  I am your court
16  reporter and a Notary Public.
17              At this time, would counsel please
18  state their appearances and whom they represent and
19  then I'll swear in the witness.
20              MS. TULLY:  Jennifer Tully on behalf
21  of Defendant Judge Louise Goldston.
22              MR. BRYAN:  John Bryan on behalf of
23  the Plaintiff, Matthew Gibson.
24              MR. ROBINSON:  Kevin Robinson on
```



LOUISE GOLDSTON                                      March 01, 2022
GIBSON V GOLDSTON                                                6

 1 | behalf of Defendants Stump, McPeake, and White.
 2 |            MS. TULLY:  Hey Brad, we need you-all
 3 | to state your appearance, please.
 4 |            MR. SCHMALZER:  Bradley Schmalzer and
 5 | Julianne Wisman with the Supreme Court of Appeals
 6 | of West Virginia.
 7 |            (The witness was sworn.)
 8 |        GOLDSTON DEPOSITION EXHIBIT NO. 1
 9 |            (Louise Goldston Judicial Disciplinary
10 |            Proceeding was marked for
11 |            identification purposes as Goldston
12 |            Exhibit No. 1.)
13 |     L O U I S E   E .  G O L D S T O N
14 | was called as a witness by the Plaintiff, pursuant
15 | to notice, and having been first duly sworn,
16 | testified as follows:
17 |                    EXAMINATION
18 | BY MR. BRYAN:
19 |     Q.  Please state your name.
20 |     A.  Louise Ellen Goldston.
21 |     Q.  And have you ever had your deposition taken
22 | before?
23 |     A.  Unless you count the sworn statement I gave
24 | to the JDC, no.



LOUISE GOLDSTON                                            March 01, 2022
GIBSON V GOLDSTON                                                       7

1        Q.   Have you had an opportunity to review the

2   Supreme Court Opinion that was issued in your

3   judicial disciplinary case?

4        A.   I have.

5        Q.   I'm going to be referring to that, and I

6   went ahead and marked that as Exhibit 1 here.  So

7   if at any point you need to review it.

8        A.   If I review anything, I'll have to have my

9   glasses.  Okay.

10       Q.   All right.  In the Supreme Court Opinion of

11   which you were the Respondent, the issue came up

12   about whether your conduct consisted of a search of

13   a view.  Is that right?

14       A.   Correct.

15       Q.   Okay.  And the Supreme Court in their

16   Opinion held that regarding the threshold question

17   of whether you searched Mr. Gibson's home or

18   whether you viewed it, the Court said we find that

19   she searched it.  Is that true?

20       A.   That's true.

21            MS. TULLY:  Are you saying is it true

22   that that's what the Supreme Court said, or are you

23   asking her if it's true that she searched the home?

24            MR. BRYAN:  Well, I can ask her both.



800.211.DEPO (3376)
EsquireSolutions.com

JA245

LOUISE GOLDSTON                                      March 01, 2022
GIBSON V GOLDSTON                                               8

1              MS. TULLY:  I'm just trying to clarify

2    what she saying.

3              THE DEPONENT:  I interpreted it as did

4    the Supreme Court find that.

5    BY MR. BRYAN:

6        Q.  Right.  The Supreme Court found that you

7    searched Mr. Gibson's home, right?

8        A.  Correct.

9        Q.  Do you disagree with that, that you

10   searched Mr. Gibson's home?

11       A.  Yes.

12       Q.  The Supreme Court rejected what they called

13   your attempt to reframe your conduct.  Right?

14       A.  I disagree with the word "reframe".  They

15   disagreed with my argument that it was not a

16   search.

17       Q.  The West Virginia Supreme Court said in

18   their holding:  "We reject the Judge's attempt to

19   reframe her conduct."  Correct?

20       A.  I'm sure that's probably what they said.

21       Q.  Okay.  So the Supreme Court used the word

22   "reframe".

23       A.  They did.

24       Q.  You disagree with the use of that word but



 1  they used it.

 2      A.   They used it.  I disagree with it.

 3      Q.   The Supreme Court found that you led a

 4  search of the homeowner's residence, not a judicial

 5  view.

 6      A.   That's what they found.

 7      Q.   The West Virginia Supreme Court further

 8  found that in so doing, that you "exercised

 9  executive powers forbidden to you under the West

10  Virginia Constitution".  Is that true?

11      A.   That is what they found.

12      Q.   Okay.  Do you disagree with that?

13      A.   Yes.

14      Q.   The Court further held in that Opinion that

15  you did not go to the property to observe the

16  ex-husband's house but that you went there to

17  locate and seize certain of its contents:

18  Pictures, DVDs, and other items of personal

19  property.  Is that true?

20      A.   That is true.

21      Q.   Do you disagree with the Supreme Court's

22  holding?

23      A.   Which holding?

24      Q.   That you went to the house to locate and



LOUISE GOLDSTON                           March 01, 2022
GIBSON V GOLDSTON                                  10

1  seize certain contents - personal property - in the

2  house.

3     A.   I disagree that I went there personally to

4  locate them.  I do agree that I went there to seize

5  them.

6     Q.   And why do you -- why do you disagree that

7  you went there to locate them?

8     A.   Because, as is clear on the tape taken by

9  Officer McPeake, I did not look for nor try to

10  locate anything.  I asked Mrs. Gibson where those

11  items that she was not given, as awarded in the

12  order -- where they were located when she lived

13  there.  I told her to look there.  She asked to

14  look other places.  I denied that request.

15        So I did not attempt to locate anything.

16  The things that she was awarded that were in the

17  same place that they'd been when the couple lived

18  there together, I allowed her to take.

19     Q.   However, the Supreme Court stated that "the

20  record is clear that Judge Goldston went to the

21  property to locate things, not simply to observe

22  them."  Right?

23     A.   That is what they found.

24     Q.   Okay.  That's -- that's what the Supreme



1  Court found but you disagree.

2      A.   I think I've already answered that but yes.

3  I did not go there to locate them.  I went there to

4  allow Mrs. Gibson to retrieve the items she had

5  been awarded.

6      Q.   Did you --

7      A.   And Mister -- and only the items that

8  Mr. Gibson had previously testified were still

9  there.

10     Q.   Okay.  But you -- you didn't know where

11 they were inside his house, did you?

12     A.   I did not, and I did not look.

13     Q.   So they -- somebody had to locate them

14 inside the house.

15     A.   That's correct.

16     Q.   Okay.  And nobody asked Mr. Gibson to go in

17 his house and bring the items outside.

18     A.   No.

19     Q.   You went in, right?

20     A.   I did.

21     Q.   And the bailiff -- your bailiff went in.

22     A.   He did.

23     Q.   Mrs. Gibson went in.

24     A.   She did.



LOUISE GOLDSTON                                                    March 01, 2022
GIBSON V GOLDSTON                                                              12

1        Q.   And Mr. Lusk went in.

2        A.   Yes.

3        Q.   To locate the items.

4        A.   Yes.  I would say retrieve the items but --

5        Q.   In fact, the Supreme Court noted in their

6   Opinion that when Mr. Gibson demanded a list of

7   what you were seeking, you replied, "You have a

8   list of everything attached to the order."

9             And when he professed not to know where

10  some of it's at, you replied, "Well, we're going to

11  find it."

12       A.   I did.

13       Q.   Okay.  So as the Supreme Court noted, you

14  told Mr. Gibson that you would be going inside his

15  house to find items.

16       A.   Correct.

17       Q.   But you disagree with the categorization of

18  that is a search.

19       A.   That that is a search by me, yes.

20       Q.   You would admit that it's a search by

21  somebody.

22       A.   Again, I told Mrs. Gibson she could look

23  only in places where the items she had been awarded

24  were located and that if they were not there she



 1 | could not look further.

 2 |     Q.  So is it your position that the ex-wife,

 3 | Mrs. Gibson, was the one performing the search?

 4 |     A.  Again, I disagree --

 5 |             MS. TULLY:  Objection.  Asked and

 6 | answered.

 7 |             MR. BRYAN:  Well, I don't know that

 8 | that specific question was answered.  I'm just

 9 | trying to clarify.

10 | BY MR. BRYAN:

11 |     Q.  Do you -- do you deny -- you don't --

12 | correct me if I'm wrong, if I misunderstand your

13 | position.  You don't deny that a search took place.

14 | You just deny that you performed the search.

15 |     A.  I would not --

16 |             MS. TULLY:  Again, asked and answered.

17 |     A.  And again, I would not -- I would not

18 | characterize it as a search.

19 |     Q.  By anybody.

20 |     A.  By anybody.

21 |     Q.  The West Virginia Supreme Court held in

22 | their Opinion that:  "Judge Goldston admits that

23 | she had a 20-year practice of going to parties'

24 | homes 'to either determine if certain disputed



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                               14

1   marital property was present and/or to supervise

2   the transfer of disputed property.'"  Is that

3   right?

4       A.  Can you read that for me one more time?

5   I'm sorry.

6               MS. TULLY:  Do you want to show her

7   the Supreme Court order --

8               MR. BRYAN:  It's on -- yeah.

9               MS. TULLY:   -- and you can reference

10  the page numbers?

11              MR. BRYAN:  It's on Page 4.  I'll show

12  you Exhibit 1, if you want to review or open it to

13  Page 4.

14  BY MR. BRYAN:

15      A.  I'm sorry.  What am I looking for?

16      Q.  All right.  Let me rephrase the question.

17  The West Virginia Supreme Court stated in their

18  Opinion that you --

19              MR. BRYAN:  I'm sorry.  Strike that.

20  I'm on my wrong question here.

21      Q.  The West Virginia Supreme Court held -- I'm

22  sorry.  This is Page 2.  I apologize.  I'm

23  butchering that.  The bottom of Page 2.

24              The Court held that:  "Judge Goldston



1   admits that she had a 20-year practice of going to

2   parties' homes 'to either determine if certain

3   disputed marital property was present and/or to

4   supervise the transfer of disputed property.'"

5        A.   I agree that's what's they found.

6        Q.   Okay.  Do you disagree that that is

7   correct, that that is accurate?

8        A.   I would -- I would dispute that I had a

9   20-year practice of doing that.

10       Q.   Well, where did that fact come from?

11       A.   It probably came from my statement in which

12  I said that I had done it on several occasions,

13  probably over 20 years.  But as far as a 20-year

14  practice of going to homes, the 10 or 11 times I

15  did that over 20 years, to me, is not a 20-year

16  practice.

17       Q.   Okay.  The Supreme Court also stated in

18  their Opinion that you said to Mr. Gibson, "Let me

19  in the house or he [the bailiff] is going to arrest

20  you for being in direct contempt of court."

21       A.   Can you tell me where that is?

22       Q.   Page 4.

23       A.   They quote that.  That is not my memory of

24  what I said.



1          My memory of what I said was:  "Mr. Gibson,

2   I am directing you to let me in the house so that

3   Mrs. Gibson can retrieve her property.  If you do

4   not do that, you will be in direct contempt of a

5   court order for which you can be arrested."

6          And I believe that's a correct statement of

7   the law.

8      Q.  Okay.  So you told Mr. Gibson to let you in

9   the house or he would be arrested for being in

10  direct contempt of court?

11     A.  That's a summarization of what I just said.

12  It is not exactly what I said.  But the gist of it,

13  yes.

14     Q.  Okay.  And it's your testimony that the --

15  the quote of you contained in the Supreme Court

16  Opinion at Page 4 is inaccurate?

17     A.  It's not my memory of my exact words.

18     Q.  Well, do you have any idea where they would

19  have obtained that in the record?

20     A.  No, unless it came from my statement given

21  to the JDC.

22     Q.  The Court also noted – this is also on Page

23  4 – that you agreed – you agreed – that Mr. Gibson

24  felt that he had no choice but to let you and the



 1 | others inside his house.  Is that true?
 2 |     A.   Can you show me where that is?
 3 |            MS. TULLY:  Where does it say that?
 4 |            THE DEPONENT:  Right here.
 5 |     A.   I would agree that he probably felt he had
 6 | no choice, unless he wanted to be arrested.
 7 |     Q.   Also referring to Page 4, the Court noted
 8 | that you brought with you into Mr. Gibson's house
 9 | "the ex-wife, the ex-wife's attorney, and
10 | personally supervised the search for and recovery
11 | of items."  Is that true?
12 |     A.   That's true what they said.  Again, I
13 | disagree with the word "search".
14 |     Q.   Also on Page 4, the Court noted that:
15 | "Several items were located and recovered,
16 | including photographs, yearbooks, DVDs, recipes,
17 | and a chainsaw."  Is that true?
18 |     A.   That's correct.
19 |     Q.   And the Court noted that you "made no
20 | arrangements to record what went on inside the home
21 | or outside the home."  Is that true?
22 |     A.   That is true.  Can I speak to that?
23 |     Q.   Sure.
24 |     A.   The Supreme Court talks about, in this

1  Opinion, that I did not take a court reporter with

2  me. I do not have a court reporter. That's why it

3  has always been my practice, and Rule 8 of the West

4  Virginia Rules of Practice and Procedure for Family

5  Courts specifically states that I am the only one

6  who has the authority to film that -- to record

7  those proceedings.

8        So that -- that is why when we returned to

9  the home -- to the courtroom, I made every effort

10  to set forth everything that happened at the house

11  and gave both Mr. Gibson and Mr. Lusk an

12  opportunity to add to, detract from, or correct

13  anything that I said that had happened at the

14  scene.

15        But I have no way to record those

16  proceedings.

17    Q.  How do you usually record proceedings?

18    A.  With a computer.

19    Q.  And that takes place in your courtroom?

20    A.  Yes.

21    Q.  Other than these so-called visits over the

22  course of your 20 years as a family court judge,

23  did you ever have proceedings anywhere else, other

24  than the courtroom or inside a litigant's home?



1       A.   Yes and no.   There have been times when

2    repairs or renovations to courtrooms were being

3    made and I had them in jury rooms or conference

4    rooms or that kind of thing.   Those all occurred

5    prior to my recording things on -- by video and

6    then recording.   Those were back in the days when I

7    did it on cassette tape.

8       Q.   In fact, the Court noted in the Opinion

9    that your bailiff had made his own cellphone

10   recording inside Mr. Gibson's home.

11      A.   That's correct.

12      Q.   Were you aware of that at the time that

13   Deputy McPeake was filming with his cellphone?

14      A.   No.

15      Q.   When did you first find out about that?

16      A.   When I got back to the office, he sent it

17   to me on my phone.

18      Q.   So he provided that directly to you?

19      A.   Yes.

20      Q.   So when he testified that he did not

21   provide that directly to you, that was incorrect?

22      A.   He was mistaken.

23      Q.   And when he sent you that video, what did

24   you do?



1        A.   I sent it immediately to my case

2   coordinator and I deleted it from my phone.

3        Q.   But you never realized, at the time at

4   Mr. Gibson's house, that Deputy McPeake was

5   recording?

6        A.   No.

7        Q.   And you didn't ask him to record at the

8   house?

9        A.   No.

10       Q.   Had he been with you on prior visits to

11  litigants' homes?

12       A.   No.

13       Q.   So that was the first for McPeake?

14       A.   Yes.

15       Q.   So the Supreme Court Opinion was accurate

16  when it stated that you believed that McPeake

17  "making the recording was improper and that you

18  told him not to do it again"?

19       A.   Yes.  I have since reviewed Rule 8 and do

20  now realize that I have the authority to authorize

21  somebody to record it but I did not realize that at

22  the time.

23       Q.   Do you still believe that Rule 8, or any

24  other rule, authorizes you told proceedings in the



 1  home of a litigant?

 2      A.   I don't think Rule 8 does, no.

 3      Q.   Do you believe that anything authorizes you

 4  to hold a proceeding in the home of a litigant?

 5      A.   I think there's a statute that allows me to

 6  seize property that has not been turned over.

 7      Q.   Allows you to personally seize property?

 8      A.   It doesn't say anybody else.  It says I

 9  have the authority to seize.

10      Q.   And what statute is that?

11               THE DEPONENT:   You don't have my book

12  with you, do you?

13      A.   §51-2A-9(b)

14      Q.   So it says you have the authority to seize

15  and you take that to mean that -- that that could

16  authorize you to personally make the seizure?

17      A.   It doesn't say I can't.

18      Q.   So you wouldn't take that to mean that you

19  could order law enforcement to seize property?

20      A.   It doesn't say I can't do it either way.

21  It says:  "Sanctions may include, but are not

22  limited to, seizure or impoundment of property to

23  secure compliance with a prior order."

24      Q.   With that in mind, let's turn back to the



1  Supreme Court Opinion.

2        The Supreme Court Opinion said that

3  searches are an activity of the executive

4  department.  Is that true?

5     A.   That's what it says.

6     Q.   Okay.  Do you disagree?

7     A.   No.

8     Q.   The Court noted that:  "Indeed, searches

9  are quintessentially executive in nature that even

10  a judge who participates in one acts not as a

11  judicial officer but as an adjunct law enforcement

12  officer."

13     A.   Again, as -- I was acting as a judge and I

14  did not search.

15     Q.   Okay.  But the Supreme Court says that if

16  you participate in a search, you're acting as an

17  adjunct law enforcement officer.

18     A.   Correct.  I was not acting in a search.

19     Q.   Okay.  So if you believe that a statute

20  authorizes you to seize items, you would agree with

21  me that that does not include you personally

22  participating in a search and seizure.

23     A.   Not in a search, no.  In a seizure, it's

24  silent on that issue.



1      Q.   Okay.  So you would agree that a judge

2   shall not participate in a search but you think

3   possibly could personally participate in a seizure?

4      A.   I don't know of a statute that doesn't

5   allow me to do that as a judge.

6      Q.   Okay.  So you don't believe that the

7   seizure portion of a search and seizure is an

8   executive action?

9      A.   No, and I don't believe that search and

10  seizures go hand-in-hand necessarily every time.

11     Q.   Okay.  The Supreme Court further held that:

12  "Because Judge Goldston plainly engaged in a

13  search, we find that the so-called 'view' was

14  improper."  Is that true?

15     A.   That's what they found.

16     Q.   Do you disagree with that?

17     A.   Yes.

18     Q.   And why do you disagree with that?

19     A.   Because I didn't do a search.

20     Q.   I'll show you what has been marked as

21  Exhibit 2 here.

22          GOLDSTON DEPOSITION EXHIBIT NO. 2

23               (Public Admonishment of the Honorable

24               Eric Shuck, Judge of the 13th Family



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                             24

```
 1                    Court Circuit was marked for
 2                    identification purposes as Goldston
 3                    Exhibit No. 2.)
 4        Q.   That is a written admonishment of Judge
 5   Shuck.  Have you reviewed that before?
 6        A.   A long time ago.  I'm fairly familiar with
 7   it.
 8        Q.   On Page 2 of that document, the Shuck
 9   admonishment, it notes that on July 24th, 2020, the
10   Judicial Disciplinary Council took Judge Shuck's
11   sworn statement during which "he opined that he
12   believed it was proper to visit litigants' homes
13   because a colleague had engaged in the same
14   practice for several years."
15             Have you -- have you see where that was
16   written in that?
17        A.   Yes.
18        Q.   Okay.  Do you know who the colleague was
19   that Judge Shuck was referring to?
20                 MS. TULLY:  Objection.  Calls for
21   speculation.  Answer, if you know.
22        A.   I don't -- I can't -- I wasn't inside Judge
23   Shuck's mind.
24        Q.   Okay.  Well, did -- you agree with me that
```



1  it says that he thought he could do it because a

2  colleague had been doing it.

3      A.   That's what it says, yes.

4      Q.   And Shuck was a family court judge.

5      A.   Did you say Shuck?

6      Q.   Judge Shuck was a family --

7      A.   I thought you said Chuck.  I'm sorry.  He

8  was a family court judge.

9      Q.   And you are a family court judge.

10     A.   Yes.

11     Q.   So you were a colleague of his at the time

12  he was admonished.

13     A.   I was.

14     Q.   And you were engaging in the same behavior.

15          MS. TULLY:  Objection.

16     A.   I was conducting home visits.

17     Q.   Okay.  So he was --

18     A.   I had conducted them.

19     Q.   He was admonished for conducting what you

20  call these home visits.

21     A.   Correct.

22     Q.   He said that he thought he could do it

23  because a colleague of his had been doing it for

24  many years.



1        A.   Correct.

2        Q.   And my question to you is:  Who was he

3    referring to, if you know?

4             MS. TULLY:   Objection.

5        A.   I do not know.

6        Q.   You don't know if he was referring to you?

7        A.   I do not know.

8        Q.   All right.   Take a look at the footnote.  I

9    believe there's a footnote on Page 2 in the

10   sentence I was just reading to you.

11            Can I see it real quick?

12       A.   Uh-huh.

13       Q.   Footnote 2 on Page 2 of the Shuck

14   admonishment says that the colleague that Shuck was

15   referring to, "who is also the subject of a

16   judicial disciplinary proceeding, recently engaged

17   in a visit to a litigant's ex-husband's home to

18   search for marital property that had been the focus

19   of a contempt proceeding."

20            Does that indicate to you that you were the

21   colleague referenced in the Shuck admonishment?

22            MS. TULLY:   Objection.  Calls for

23   speculation.

24       A.   Again, as I was painfully told many times,



1  judicial investigations are confidential.  I do not

2  know all the judges that may or may not have been

3  under investigation at the time.

4      Q.  You would agree with me that it's

5  referencing you in the document.

6      A.  I don't know.

7      Q.  You don't know.  All right.  Well, let me

8  read some more.

9      A.  I will tell you that under -- I mean, I'm

10  not trying to argue with you.  I will tell you, at

11  the time, I wasn't under an investigation.  If

12  that's referring to me, I don't know it.

13      Q.  Okay.  I mean, it sounds like this case.

14          "The ex-husband was not represented by a

15  lawyer and was not advised of the purpose of the

16  visit prior to the judge, his ex-wife, and her

17  lawyer going to the home.  Once there, the

18  ex-husband moved to disqualify the judge but was

19  told the motion was not timely and would have to be

20  submitted in writing."

21          That's this case, right?

22      A.  Again, the facts are similar.  I do not

23  know.

24      Q.  You're not aware of any other family court



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                              28

 1 | judge who is under a -- subject to a judicial
 2 | disciplinary proceeding for visiting litigants'
 3 | homes, do you?
 4 |     A.  They're confidential.  I don't know of them
 5 | -- of any.
 6 |     Q.  So you don't -- you have no idea whether or
 7 | not this Shuck admonishment is referring to you as
 8 | the colleague?
 9 |              MS. TULLY:  Objection.  This has been
10 | asked and answered now five different times.
11 |              MR. BRYAN:  All right.
12 |              MS. TULLY:  Her answer is not
13 | changing.
14 |              MR. BRYAN:  Your objection is noted.
15 | BY MR. BRYAN:
16 |     Q.  Just for the record, you have no idea if
17 | this is referring to you?
18 |     A.  I cannot confirm nor deny.
19 |     Q.  Did you ever have any conversations with
20 | Judge Shuck about visiting the homes of litigants?
21 |     A.  No.
22 |     Q.  Never?
23 |     A.  Prior to the -- prior to either of us
24 | going?  No.



1      Q.  At any time.

2      A.  Once his admonishment came out we may have

3  had a conversation.

4      Q.  And what did you discuss?

5      A.  How unfair we thought it was.

6      Q.  And he didn't mention to you bringing you

7  up during his statement?

8      A.  Not that I recall.

9      Q.  Do you know how Judge Shuck would've known

10  that you had engaged in that practice previously?

11     A.  It wasn't a secret.  As far as he and I

12  ever talking about it as a remedy, we did not, to

13  my knowledge.

14     Q.  And why wasn't it a secret?

15     A.  Because I did it.

16     Q.  Over the course of 20 years.

17     A.  And I just want the record clear.  I've

18  been serving 28 years.  Probably did not do it

19  until I was a family court judge, so that would

20  have been about 20, 22 years.

21         And again, over that course I probably did

22  it 11 or 12 times.

23     Q.  Do you recall how many of those approximate

24  11 or 12 times involved Kyle Lusk as one of the



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                              30

 1 | lawyers?

 2 |     A.   Zero.

 3 |     Q.   Do you recall who any of the other lawyers

 4 | were who went on these visits with you?

 5 |     A.   Yes.

 6 |     Q.   And who were they?

 7 |     A.   I don't remember them all.  The ones I can

 8 | remember are Buck Byron, Thomas Evans, Tim

 9 | Lupardus.  Those are all the -- the only ones I can

10 | remember offhand.  I'm not saying at all that

11 | that's an exhaustive list.

12 |     Q.   Was -- do you remember -- was there always

13 | a bailiff with you when you did these?

14 |     A.   Always.

15 |     Q.   Do you remember who any of the other

16 | bailiffs are, other than McPeake, who went with you

17 | on these home visits?

18 |     A.   The great majority of them were Bobby

19 | Stump.  Dave Stafford went with me.  Aaron Lilly

20 | went with me.

21 |     Q.   So that would be Lieutenant Stafford?

22 |     A.   Yes.

23 |     Q.   And Greg Lilly would be --

24 |     A.   Not Greg Lilly.  Aaron Lilly.



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                            31

1        Q.   Aaron Lilly.  Is that Sergeant Lilly?

2        A.   Sergeant Lilly.  He is Judge McGraw's main

3   bailiff.  Jimmy Miller may have but I'm not sure of

4   that.

5        Q.   And did ever have any conversations with

6   these bailiffs about --

7              (Office door buzzer rings.)

8        A.   Is that all right?

9              MR. ROBINSON:  Yeah.  Somebody should

10  be here to answer that but it should be fine.

11              THE DEPONENT:  Okay.

12  BY MR. BRYAN:

13       Q.   Did you ever have any conversations with

14  these bailiffs about doing these so-called home

15  views?

16       A.   In what regard?

17       Q.   I mean, in any regard.  Did you give them

18  any rules or policies or procedures to follow when

19  you went to the home of a litigant?

20       A.   It's hard to explain a relationship between

21  a judge and a bailiff.  After any period of time,

22  they are my right hand and they know what I expect.

23              So did I give them any specific

24  conversations?  If we were there and I wanted them



```
 1  to do something, I instructed them to do that.  But
 2  as far as visits themselves, I will tell you I had
 3  a conversation with Sheriff VanMeter because one of
 4  my bailiffs was forced to leave and they had to
 5  hire, who turned out to be Jeff McPeake because
 6  they didn't have enough manpower.
 7          And when -- and I was concerned that he
 8  would have arrest powers and access to a car and
 9  Sheriff VanMeter said, "Why does he need a car?"
10          And I said, "On occasion, I will go to a
11  home to" -- I'm not sure of the exact words, but to
12  help execute transfer of property.
13          And he said, "I will make sure he has a
14  car."
15          But now Sheriff VanMeter never went with
16  me.
17      Q.  Do you recall when that conversation took
18  place?
19      A.  Immediately prior to the hiring of Jeff
20  McPeake.
21      Q.  So when was that?
22      A.  It was September -- what's this year -- '22
23  -- of '19, I believe.
24      Q.  So that's something that took place prior
```



 1  to the incident at Mr. Gibson's home?

 2      A.   Correct.

 3      Q.   So the sheriff was aware that you had this

 4  practice of visiting the homes of litigants.

 5      A.   Yes.

 6      Q.   It sounds like two different supervisors,

 7  sergeant Lilly and Lieutenant Stafford of the

 8  sheriff's department, were both aware that you had

 9  this practice of visiting litigants' homes.

10      A.   Yes, except I would not characterize

11  Sergeant Lilly as a supervisor.

12      Q.   Okay.  Well, if --

13      A.   The head bailiff was Lieutenant Stafford.

14      Q.   Okay.  And if Deputy McPeake characterized

15  Sergeant Lilly as somebody he went to similar to a

16  supervisor, you --

17      A.   I think he did that when Lieutenant

18  Stafford was not available because he outranked

19  him.

20      Q.   Okay.  So it's your understanding that

21  Stafford really was the supervisor for your

22  bailiff.

23      A.   He's the head bailiff of the judicial

24  annex.  Yes.



LOUISE GOLDSTON                                          March 01, 2022
GIBSON V GOLDSTON                                                    34

1      Q.   And Stafford, himself, had been on one of

2   these trips with you before?

3      A.   At least one, yes.

4      Q.   Possibly multiple.

5      A.   Possibly but I think just one.

6      Q.   Did any of them question to you whether

7   perhaps this is appropriate --

8      A.   No.

9      Q.   -- for you to be traveling to the homes?

10     A.   No.

11     Q.   So how does it work?  I mean, who -- when

12  you have a bailiff who presumably is the one

13  driving you to these places and, as you mentioned,

14  has arrest powers, who does the bailiff take orders

15  from:  You or Lieutenant Stafford or some other

16  supervisor on the sheriff's department?

17     A.   When we are on the scene, me.

18     Q.   Does -- is it your understanding that your

19  bailiff on the scene -- that your bailiff -- would

20  he have the ability to not follow one of your

21  orders?

22     A.   You'd have to ask the bailiff that.

23     Q.   Did you have any sort of written policies

24  or rules that you provided to your bailiffs?



800.211.DEPO (3376)
EsquireSolutions.com

JA272

LOUISE GOLDSTON                                      March 01, 2022
GIBSON V GOLDSTON                                               35

1        A.   No.

2        Q.   It would have been all verbal?

3        A.   Yes.

4        Q.   On any of these visits, including this one,

5   did your bailiffs ever do anything above and beyond

6   just ensuring your safety?

7        A.   They may, on occasion, have -- and I'm

8   thinking specifically of Lieutenant Stafford at

9   this time -- the home that he went with me, there

10  were, what I called, junk car parts there, and one

11  of them was heavy and the man who was retrieving --

12  we were retrieving the car parts for, one of them

13  was a transmission maybe.  Something that's heavy.

14  And Lieutenant Stafford actually helped this man's

15  brother pick up the transmission, or whatever it

16  was, and put it in the car -- in the back of the

17  truck.

18       Q.   Do you remember about when that was?

19       A.   No.  It would've been after -- I'm fairly

20  certain it would've been after Sergeant Stump left

21  me.

22       Q.   Do you recall when that was?

23       A.   2016-ish, '17-ish.

24       Q.   And how long --

1        A.   Shortly after VanMeter was elected.

2        Q.   How long was Sergeant Stump with you as a

3    bailiff?

4        A.   10 to 11 years.

5        Q.   Where did you first get the idea to do one

6    of these visits to a litigant's home?

7        A.   Mr. Byron was in a case, and it was the

8    first time I ever did this.

9        Q.   And that's a lawyer?

10       A.   That's a lawyer.  A very good lawyer.  He's

11   retired now.  And I can't for the life of me

12   remember the other lawyer on the other side, and I

13   think it was before Officer Stump worked for me but

14   it may not have been.

15            There was a piece of jewelry that had been

16   handed down to this lady for -- it had great

17   sentimental value to her, and she told me she knew

18   exactly where it was.

19            And Mr. Byron said, "Can we go look for

20   it?"

21            And I said, "Do I have the authority to do

22   that, Mr. Byron?"

23            The other lawyer said, "Judge, you do and

24   let's just go look."  And so we went and looked.



1      Q.   And that was your -- that was the first

2   time?

3      A.   Yes.  I'm sorry.

4      Q.   And prior to that you had never

5   participated in anything like that as a lawyer?

6      A.   As a lawyer?

7      Q.   Yes.

8      A.   No.

9      Q.   So, essentially, at the very beginning, it

10  was Mr. Byron's idea?

11      A.   Correct.  And he indicated, when he said I

12  have the authority, that other family law masters

13  that he had appeared before had done that.  So I

14  may have been a family law master at the time

15  instead of a -- that's all blurry to me.

16      Q.   As we sit here today, are you aware of any

17  other family court judges, other than Judge Shuck,

18  who have visited the homes -- home of a litigant?

19      A.   Yes.

20      Q.   Who else?

21      A.   Judge Clark.  I'll be honest with you, at

22  our last conference I had probably six or seven

23  come and tell me they had done it.  I don't

24  remember their names.



1      Q.   And when you say conference, you mean the

2   Family Court Judges Association?

3      A.   Yes.

4      Q.   And when was that conference?

5      A.   I'm trying to think if it was the spring or

6   the fall.  It must have been the spring of '21.

7      Q.   And was that in Morgantown?

8      A.   It was.

9      Q.   Okay.  So multiple family court judges came

10   up to you and admitted to engaging in the same

11   behavior?

12      A.   I disagree with the term "admitted" but

13   told me that they had done similar things, and they

14   thought I had the authority to do it.

15      Q.   And how many -- how many judges did you

16   say?

17      A.   I'd say six or seven.

18      Q.   And you don't recall the name of even one

19   of them?

20      A.   No.  You must remember it was a very

21   emotional time for me and I was just grateful for

22   the support I received.

23      Q.   Did you exchange any e-mail correspondence

24   or text message correspondence with any other



1  family court judges about visiting the home of a

2  litigant?

3      A.   Not to my recollection.

4      Q.   Did any of these six or seven family court

5  judges ever send you any e-mail correspondence?

6      A.   No.

7      Q.   How do you generally communicate with these

8  other family court judges who are also members of

9  this judicial association?

10     A.   I generally don't communicate with very

11  many.  There's very few that I'm close to.

12     Q.   Did you have --

13     A.   And I don't -- that doesn't mean I'm

14  enemies of the other ones.  Just naturally in a

15  group of however many of us there are, there are

16  several that I'm very close to.  The others I don't

17  generally communicate with.

18     Q.   Which ones are you close to?

19     A.   Close to that I talk to about this, or just

20  generally close to?

21     Q.   Just as you just referred to them.  There

22  are a few of them who you're close to.

23     A.   Mary Ellen Griffith.  Deanna Rock.  Dave

24  Greenberg.  Jim Douglas.  I would say Lera



1  VanMeter.  And that's probably about it that are

2  currently serving.

3      Q.  Out of the judges that you mentioned –

4  Griffith, Rock, Greenberg, Douglas, and VanMeter –

5  were any of those individuals one of the six or so

6  judges who came up to you and said that they had

7  done similar things?

8      A.  No.  I don't think so.  I -- it's not a

9  hard no but I don't think so.

10     Q.  Well, you're close to those judges, right?

11  Right?

12     A.  Yes.  I'm sorry.

13     Q.  And you would likely remember the name of

14  one of those judges had they been one of the ones

15  who came up to you.

16     A.  Correct.  I can tell you that they were

17  very supportive of what I had done.

18     Q.  Well, did any family court judge tell you

19  that they -- he or she was not supportive of what

20  you had done?

21     A.  Family court judges?  Not directly.  It was

22  evident to me from the occurrences at the Family

23  Court Conference that Trish Keller didn't think I

24  could do what I did.



1      Q.  Did you have any conversations with Judge
2   Stotler?
3      A.  At the conference or before?
4      Q.  Let me -- let me clarify that question.
5          Have you had any conversations with Judge
6   Stotler about the incident at Mr. Gibson's home?
7      A.  Not before the judicial board hearing memo
8   came out.
9      Q.  Okay.  After -- after the Judicial Hearing
10  Board hearing, did you have any communications with
11  Judge Stotler about the Gibson incident?
12     A.  We talked generally about it at the
13  conference.
14     Q.  And this was the same conference that we've
15  been discussing?
16     A.  Correct.
17     Q.  Okay.  And what did Judge Stotler
18  communicate to you?
19     A.  Mainly, he was glad it was over.
20     Q.  Anything else?
21     A.  He made it clear that he didn't think I had
22  done anything wrong but we both discussed the fact
23  that we didn't think there was anything wrong with
24  us talking about it now because his role on the



1  Judicial Hearing Board was complete.

2       Q.  But -- but you hadn't had any

3  communications with him prior to the Judicial

4  Hearing Board hearing?

5       A.  Absolutely not.

6       Q.  At some point, Judge Stotler sent a letter

7  to the Supreme Court and multiple politicians

8  regarding Judicial Disciplinary Counsel.  Have you

9  seen that?

10      A.  I have seen that.

11      Q.  Were you aware of that letter prior to it

12  being sent?

13      A.  No.

14      Q.  Did you ever have any conversations with

15  Judge Stotler about the accusations that he made in

16  the letter?

17      A.  No.

18      Q.  Did you -- did any of your communications

19  with Judge Stotler about this matter take place

20  prior to that letter being sent?

21      A.  No.

22      Q.  So the first time that you talked to Judge

23  Stotler was after he sent that letter?

24      A.  As far as I know.  I'm not real familiar of



1  when he sent it.

2                  THE DEPONENT:  I hate to ask but could

3  I have a bathroom break?

4                  MS. TULLY:  I was actually just

5  getting ready to say we've been going about an

6  hour.  Can we take a break?

7                  MR. BRYAN:  Sorry.

8                  COURT REPORTER:  The time is

9  11:03 a.m.  We're off the record.

10                  (A short break was taken after which

11                  the proceedings continued as follows:)

12                  COURT REPORTER:  The time is

13  11:18 a.m.  We're on the record.

14            GOLDSTON DEPOSITION EXHIBIT NO. 3

15                  (Louise Goldston Judicial Disciplinary

16                  Counsel Agreement was marked for

17                  identification purposes as Goldston

18                  Exhibit No. 3.)

19  BY MR. BRYAN:

20     Q.  All right.  I'm going to show you what's

21  been marked as Exhibit 3 to this deposition, and

22  that is an agreement.

23            On September 30th of 2020, you signed an

24  agreement with Judicial Disciplinary Counsel in

1  your pending judicial disciplinary case.  Is that

2  right?

3       A.   Yes.

4       Q.   And Exhibit 3, is that a copy of that

5  document?

6       A.   It appears to be.

7       Q.   And you signed that agreement?

8       A.   I did.

9       Q.   Pursuant to that agreement, you admitted

10 the allegations of facts set forth in the formal

11 statement of charges against you.  Is that right?

12      A.   That's correct.

13           GOLDSTON DEPOSITION EXHIBIT NO. 4

14                (Formal Statement of Charges was

15                marked for identification purposes as

16                Goldston Exhibit No. 4.)

17      Q.   And I have that document here as well.

18 That's marked as Exhibit No. 4.  That's the formal

19 statement of charges.  You've reviewed that before.

20 Correct?

21      A.   Oh yes.

22      Q.   Okay.  So it's true that you admitted the

23 allegations of fact that were set forth against you

24 in that Formal Statement of Charges?



1       A.   As a result of a negotiated agreement, yes.

2       Q.   So, yes, you did agree to the allegations

3   of fact in the Formal Statement of Charges?

4             MS. TULLY:   Asked and answered.

5             MR. BRYAN:   Well, she qualified her

6   answer, so --

7       A.   My answer would be the same.

8       Q.   Okay.  So the -- the allegations of fact

9   set forth in the Formal Statement of Charges are

10  true?

11      A.   Let me look at them real quick.  I think

12  that they are, because they were negotiated and we

13  worked on them.

14            Yes, they are true and I will -- I would

15  like to note that nowhere in this Formal Statement

16  of Charges, nor in the agreement, does the word

17  "search" appear.

18      Q.   But you would agree with me that the West

19  Virginia Supreme Court of Appeals made it extremely

20  clear that they believe that you conducted a search

21  and not a mere view.  Correct?

22            MS. TULLY:   Objection.  Asked and

23  answered.

24      A.   Correct again.



1      Q.   That agreement also admitted that by

2    engaging in such conduct that you had violated

3    numerous rules of the Code of Judicial Conduct.

4    Correct?

5      A.   That's correct.

6      Q.   Do you recall what those code of conduct

7    rules are?

8      A.   I don't.  I can tell you that I attempted

9    to sign it without admitting the violations and

10   they would not take the deal without me admitting

11   those and said that I did.

12     Q.   Are you saying that you didn't voluntarily

13   agree to that agreement?

14     A.   I'm saying I voluntarily agreed to it

15   because I was told that if I did not agree to it I

16   would be suspended from the bench, and as a 28-year

17   public servant, I could not afford that, either

18   financially or mentally.

19     Q.   Okay.  You had -- you had the advice of

20   counsel prior to signing that agreement, right?

21     A.   Immediately prior, yes.  It was not

22   negotiated with counsel.

23     Q.   Okay.  At the time that you signed it, you

24   had counsel.



1        A.   I had counsel.

2        Q.   And the Supreme Court, in their Opinion,

3   mentions the existence of this agreement.

4        A.   Correct.

5        Q.   And the Supreme Court accepted the

6   agreement as valid.

7        A.   Correct.

8        Q.   And I don't believe at any point that you

9   or your counsel made the argument to the Supreme

10  Court that your signature on that document was

11  obtained involuntarily.

12       A.   I don't think that -- that was our

13  argument.   I think our argument was that I now had

14  a clearer understanding of the law after doing

15  extensive research and no longer thought that I had

16  violated those canons, which, admittedly, the

17  Supreme Court rejected.

18       Q.   Okay.  So, at one time, you admitted that

19  you violated these rules and the Code of Judicial

20  Conduct, and then changed your mind?

21       A.   At one time, I signed it, I believe, under

22  duress.  Once the Judicial Hearing Board issued

23  questions that we were to answer and I did the

24  research they requested, I came to believe from



1  that research that I had not violated the canons

2  and I had not committed misconduct, as set forth in

3  my argument to the -- to the -- in my questions to

4  the hearing board.

5          And it was not until that time, I believe,

6  because the JDC could not find any law to the

7  contrary on the questions that were asked, the

8  issue of search came up for the very first time.

9      Q.  Okay.  Well, you signed that document in

10  September -- September 30th of 2020, right?

11     A.  If you -- I don't doubt that date.

12     Q.  Well, let me make sure.

13     A.  Yes.

14     Q.  And when were the Formal Statement of

15  Charges issued?  In other words, how long had they

16  been pending before you signed the agreement?

17     A.  They were contemporaneously -- I mean, it

18  was -- they -- they particularly wanted one

19  document to come out and the next document to come

20  out either a day or two later.  They did not want

21  them to be entered simultaneously.

22          So this shows the 23rd of September.  So

23  one week later.  But I had seen them.  I mean, it

24  was all one package deal and they determined how



1  they would be released.

2      Q.   Okay.  It all points, throughout that

3  process -- I mean, you had the ability to not come

4  to an agreement and to proceed forward with your

5  due process, didn't you?

6      A.   I did.  I received a call from Teresa Tarr

7  that she characterized as her --  "This is my

8  'bully call', and if you do not sign the agreement,

9  I will do my job, I do it well, and you know well

10 that the Commission is seeking your suspension."

11         And that was before I had retained counsel.

12 And, quite frankly, because I received that call, I

13 retained counsel.

14     Q.   Are you aware of the fact that the

15 allegations made by Judge Stotler against the

16 Judicial Disciplinary Counsel were investigated by

17 the Office of Disciplinary Counsel for lawyers?

18     A.   Can you repeat that?  I'm sorry.

19     Q.   Are you aware of the fact that the Office

20 of Disciplinary Counsel for lawyers investigated

21 the allegations made by Judge Stotler about the

22 Judicial Disciplinary Counsel?

23     A.   Yes.  I testified.

24     Q.   Did you -- did you review the report or



1  ever see the report that --

2      A.   I saw it.  I did not read it page-by-page.

3      Q.   Okay.  You're aware of the fact that there

4  was an investigation and a subsequent report by the

5  ODC.

6      A.   Right, and I found it insulting, that it

7  took the word over two lawyers over -- took the

8  word of two lawyers over the words of two sworn

9  long-serving judges.

10     Q.   Okay.  So the allegations from you about

11 alleged duress in the process, which mirror the

12 allegations made by Judge Stotler, were

13 investigated by the ODC and found to be untrue.  Is

14 that fair?

15     A.   That is what they found and, again, I'd

16 like to point out the ODC and the JDC share the

17 same office suite.

18     Q.   And --

19     A.   And the same receptionist.

20     Q.   And why would you like to point that out?

21     A.   Because I think it stinks.

22     Q.   Why?

23     A.   I'm not going to say anything further than

24 that.  It's obvious.  They share a suite.



1      Q.   Are you accusing the ODC of being biased or

2   impartial?

3      A.   I am saying that it has the look,

4   appearance, of impropriety.

5      Q.   Well, you said that you didn't even read

6   their conclusions though.

7      A.   I didn't say I didn't read their

8   conclusions.  I said I didn't read the report

9   through.

10      Q.   You read some of it?

11      A.   I read the conclusions.

12      Q.   Okay.  You read the conclusions but you

13   didn't read the whole report.

14      A.   Not word-for-word, no.

15      Q.   Okay.  Having read it myself and recalling

16   that it was pretty specific and contained a lot of

17   detail, are you able to, as we sit here today, tell

18   me any -- any of the substance of that report that

19   is untrue or mischaracterizes what happened?

20           MS. TULLY:  Objection.  She's already

21   said she didn't read -- read it word-for-word.  You

22   can answer, if you know.

23      A.   I know that they took the words of Brian

24   Lanham and Terri Tarr over the words of Judge



LOUISE GOLDSTON                                        March 01, 2022
GIBSON V GOLDSTON                                                  52

1  Stotler and myself, and I find that to be

2  offensive.

3      Q.  Well, Judge Stotler wasn't involved in this

4  though, was he?

5      A.  He was the subject of the Complaint.

6      Q.  Right.  But Judge Stotler was relaying what

7  -- what he believed happened to you, right?

8              MS. TULLY:  Objection.  Calls for

9  speculation.

10     A.  I don't know what he testified to.

11     Q.  Okay.  Well, Judge Stotler -- Judge Stotler

12  was not involved in the investigation by the JDC

13  against you.

14             MS. TULLY:  Objection.  Calls for

15  speculation.

16     Q.  Right?

17     A.  He was not involved in the investigation.

18  He sat on the hearing board that heard the --

19     Q.  Judge Stotler had made complaints about the

20  way you were allegedly treated by the JDC.

21     A.  That's -- yes.

22     Q.  Okay.  How did Judge Stotler have any

23  personal knowledge about how you were treated?

24     A.  From the pleadings.



1       Q.   From the pleadings.   You didn't communicate
2    any information to him?
3       A.   Again, no.
4       Q.   So, in other words, he was not a fact
5    witness to any of the events surrounding your
6    investigation by the JDC, right?
7            MS. TULLY:   Objection.   Calls for
8    speculation.   Answer, if you know.
9       A.   I don't understand the question.
10      Q.   Let me -- let me rephrase that.   You just
11   testified that the only thing the judge knew --
12   Judge Stotler knew was what he read in your
13   pleadings in your disciplinary case.
14      A.   Correct.
15      Q.   Other than what your lawyer drafted, Judge
16   Stotler had no personal information, to your
17   knowledge, about what the JDC did or did not do in
18   your investigation.
19            MS. TULLY:   Again, calls for
20   speculation.
21      A.   He read the pleadings.
22      Q.   So if the ODC -- when you say that the ODC
23   is not -- had chosen not to take the words of you
24   and Judge Stotler, really what you're complaining



LOUISE GOLDSTON                                    March 01, 2022
GIBSON V GOLDSTON                                              54

1   about is the ODC not -- just not believing you.

2              MS. TULLY:  Objection.

3       A.   Let me just say that Judge Stotler knows me

4   and knows my reputation and my character, and would

5   have absolutely no reason to doubt what I had put

6   in the pleadings.

7       Q.   So Judge Stotler believed you but the ODC

8   did not believe you.

9              MS. TULLY:  Objection.

10      A.   Again, I don't know.

11      Q.   Well, the only reason I bring it up is

12  because you said that they chose not to believe two

13  family court judges, and my point is it's really

14  only one family court judge and that's you.

15      A.   I'm not going to argue with you.

16      Q.   But I'm not wrong, am I?

17             MS. TULLY:  We've been through this.

18  She's answered your questions.

19      Q.   At some point, there was a hearing before

20  the Judicial Hearing Board, right?

21      A.   In my case?

22      Q.   In your case.

23      A.   Yes.

24      Q.   And at that time, Judge Stotler was serving



 1  | as a member of the Judicial Hearing Board.

 2  |     A.   Yes.

 3  |     Q.   And at the time of that hearing, you and he

 4  | were already friends.  Is that true?

 5  |     A.   Acquaintances, yes.  We're fellow family

 6  | court judges.

 7  |     Q.   But wasn't he one of the list of judges

 8  | that you said you were close to --

 9  |     A.   I don't think so.

10  |     Q.   -- or was he not?  Okay.  Did you know him

11  | before?

12  |     A.   Yeah, sure.

13  |     Q.   Okay.  During the Judicial Hearing Board

14  | hearing on January 15th, 2021, you provided

15  | testimony.  Is that true?

16  |     A.   Correct.

17  |     Q.   And during that hearing, the agreement –

18  | which we've marked as an exhibit – was admitted

19  | into evidence, right?

20  |     A.   As far as I can remember, yes.

21  |     Q.   And during that hearing, you were

22  | questioned about whether or not you signed that

23  | agreement.  Do you recall that?

24  |     A.   Yes.



1      Q.   Do you recall being asked when you signed

2    that agreement:  "Did you sign it knowingly,

3    voluntarily, and intelligently?"

4          Do you recall being asked that?

5      A.   Not specifically but I'm sure I was.

6               MR. BRYAN:   Let me go ahead and have

7    this marked, please.  I think we're on 5.

8               COURT REPORTER:   5

9          GOLDSTON DEPOSITION EXHIBIT NO. 5

10              (Transcript of Judicial Board Hearing

11              of Louise Goldston dated January 15,

12              2021 was marked for identification

13              purposes as Goldston Exhibit No. 5.)

14     Q.   All right.  I'm going to -- I'm going to

15   show you what's been marked as Exhibit No. 5 to

16   this deposition.  Let me direct your attention to

17   Page 7 specifically.  Take all the time you would

18   like.

19     A.   Where on Page 7?

20     Q.   Towards the top.  So let me ask the

21   question again.  Hopefully, that will refresh your

22   recollection.

23          Do you recall being asked whether your

24   signature on this agreement was knowing and

1  voluntary?

2       A.   Yes.

3       Q.   And what was your answer --

4       A.   Yes.

5       Q.   -- during that hearing?

6       A.   Yes.

7       Q.   Okay.   Do you recall whether that testimony

8  was taken under oath?

9       A.   To my knowledge, it was.   Yes.

10      Q.   And was your testimony truthful that day?

11      A.   Yes.

12           MS. TULLY:   She's not denied that this

13  is her signature on the agreement.

14           MR. BRYAN:   Right.   But she's denied

15  that -- she says she was coerced and she testified

16  during that hearing that she voluntarily entered

17  that agreement, knowingly.

18      A.   With the knowledge that I had at the time,

19  yes.

20  BY MR. BRYAN:

21      Q.   Okay.   So at the time you entered the

22  agreement, you did so knowingly, voluntarily, and

23  intelligently, right?

24           MS. TULLY:   Objection.   Asked and

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JA295

 1  answered.

 2      Q.  But later changed your mind.

 3      A.  I didn't change my mind.  I learned more

 4  about the law and realized that some of those

 5  canons I do not believe were violated.

 6      Q.  Of course, the Supreme Court rejected your

 7  --

 8            MS. TULLY:  Objection.

 9      Q.  -- your belief, right?

10      A.  Obviously.

11      Q.  Okay.  So rather than saying you were

12  coerced, wouldn't it be more accurate to say that

13  you had regret?

14      A.  I think it would be more accurate to say

15  that I think I made a mistake.

16      Q.  As we sit here today, do you believe that

17  you made any mistakes on March 4th, 2020 when you

18  visited Mr. Gibson's home?

19      A.  Yes.

20      Q.  And what -- what mistakes did you make?

21      A.  One mistake I think I made was I should

22  have informed Mr. Gibson before we left, while we

23  were going to his house.  I could not imagine at

24  the time that he did not know why we were going to



1   the house, in that we were talking about stuff that

2   he testified under oath were still at the house.

3          But if I had to do it again, I would say,

4   "We are going to your house to get those items."

5          And, quite frankly, I would have made it

6   more clear to him that I was not doing it

7   punitively to him, but I did not want to put

8   Mr. Gibson in jail for not returning those items.

9          He's a corrections officer.  I did not

10  think he would be treated well if he went to jail,

11  and in my mind, if we could just go get those items

12  that he admitted were there, that he admitted she

13  was awarded, then that would solve everybody's

14  problem.

15         He would not be able to say that Ms. Gibson

16  destroyed the items after she got them.  Ms. Gibson

17  would not then be able to say that he destroyed or

18  he damaged the items after we retrieved them.  It

19  was the -- in my mind, it was the fairest, most

20  efficient way to resolve the case.

21     Q.   So what was your mistake?

22     A.   Not setting forth that clearly on the

23  record.

24     Q.   Is that it?



1        A.   My mistake?  That's all I can think of.  I

2    think -- well, I'm not going to volunteer.

3        Q.   No, that's okay.  What?

4        A.   I think if I'd had a more experienced

5    bailiff -- I can think of another mistake I made.

6    If I'd had a more experienced bailiff that had done

7    this with me before, that that bailiff would not

8    have called for backup.

9             I had not known Deputy McPeake had called

10   for backup.  I knew he had said something on the

11   radio.  I always kind of assume they're saying

12   they're out of their vehicle or whatever.

13            The other mistake I made was when I arrived

14   there -- and I'm not saying he did it intentionally

15   but Mr. Gibson immediately came toward me, making

16   his motions, which he certainly was entitled to do

17   but it rattled me a little bit and I did not notice

18   all the other cars that were there.

19            And had I had the chance to get my

20   bearings, I would've had all those cars leave and

21   all those people leave because, as you know, Family

22   Court hearings are confidential, no one is allowed

23   in the hearing except the parties and any

24   witnesses.  None of those other people had been



1  called as witnesses.

2         I did tell Ms. Gibson as we were leaving,

3  if she had a vehicle that she did not believe she

4  could fit the items that Mr. Gibson had admitted

5  were there that her father could come for the sole

6  purpose of hauling the items, but I would've

7  immediately had my bailiff clear out all the other

8  people because my experience is the more people you

9  have there, the more dangerous and out of hand it

10  can get.

11         But I did not do that because I was

12  immediately confronted with all these other

13  motions, which I was happy to rule on but it did

14  not give me the time I needed to assess the

15  situation and do the safety things I normally -- or

16  my bailiff normally would have done.

17     Q.   You would agree with me that your physical

18  safety was never in jeopardy at any point at

19  Mr. Gibson's house.

20     A.   I did not feel threatened.   No.   But as far

21  as speculating what could've happened, I don't

22  know.

23     Q.   Okay.   Mr. Gibson never threatened you in

24  any way, did he?



```
 1        A.   No.  As I said, he approached me quickly
 2   when I got out of the vehicle and that rattled me.
 3             Did it scare me?  No.
 4        Q.   And, to the contrary, you threatened
 5   Mr. Gibson with arrest, even though you knew he was
 6   a federal correctional officer.
 7             MS. TULLY:  Object to form.
 8        A.   Again, I did not just threaten him with
 9   arrest.  I told him that I was instructing him to
10   let us in the house so that we could retrieve the
11   items and that that was an order of the Court.  If
12   he refused to do that, he would be held in contempt
13   and one of the remedies for direct contempt of a
14   court order is arrest.
15        Q.   And Deputy McPeake was present as your
16   bailiff when you made these statements to
17   Mr. Gibson.
18        A.   Correct.
19        Q.   Okay.  And you were here when he testified
20   a few days ago during his deposition.
21        A.   I was.
22        Q.   Okay.  And I believe that he testified that
23   he heard you threaten to arrest Mr. Gibson.
24        A.   I just said that I -- what I said, which I
```



1  am sure can be perceived as a threat.

2      Q.  And had you ordered the arrest of

3  Mr. Gibson, it would've been Deputy McPeake that

4  made the arrest, right?

5      A.  I assume so, yes.

6      Q.  And, in fact, you wanted to make sure that

7  bailiffs who traveled with you to the home -- homes

8  of litigants had arrest powers.

9      A.  That's a misstatement.  When I asked --

10  because Deputy McPeake is a retired bailiff and

11  came in under this statute, they had been supplying

12  me with officers who were not certified.

13      I asked -- one of my requirements, as I am

14  entitled under the code, is to have a deputy with

15  arrest powers.  I have never arrested anybody at a

16  scene.  I have had people arrested in the courtroom

17  or outside the courtroom for direct contempt of

18  court.  So I wanted a bailiff that if the courtroom

19  got out of control, that person could effect an

20  arrest.  The two requests were not related.

21      Q.  At some point in Mr. Gibson's front yard,

22  did you threaten to arrest any other third party,

23  other than Mr. Gibson?

24      A.  Not to my memory, and I know what you're



1  talking about.  Mr. Lusk pointed out to me that

2  Mister -- and I didn't know she was his girlfriend

3  -- that there was a woman at the top of the

4  driveway recording.

5        My memory is I said, "Stop recording.

6  You're not allowed to record."

7        I do not believe I threatened to arrest

8  her.

9    Q.  She was at the top of Mr. Gibson's

10 driveway.

11   A.  Correct.

12   Q.  And you're aware that that was somebody who

13 was with Mr. Gibson.

14   A.  I assume so.  I had never laid eyes on her

15 before.

16   Q.  All right.  Let me play some audio.

17        MR. BRYAN:  Which I have some

18 electronic exhibits on this thumb drive and I'll

19 provide that to the court reporter.

20        MS. TULLY:  Okay.

21   Q.  I think this would be Exhibit 6.  If I

22 click the right button here, this would be, I

23 believe, the audio recorded by Mr. Gibson

24 personally.



1            GOLDSTON DEPOSITION EXHIBIT NO. 6

2                    (Audio Recording Recorded by Plaintiff

3                    Matthew Gibson was marked for

4                    identification purposes as Goldston

5                    Exhibit No. 6.)

6                    MR. BRYAN:   I'm going to fast-forward

7    it some towards the end.

8                    (An excerpt of exhibit 6 was played.)

9    BY MR. BRYAN:

10       Q.  All right.  Could you hear that?

11       A.  Yes.

12       Q.  All right.  And so you threatened somebody

13   with being taken to jail if they don't turn off

14   their phones and their recordings, right?

15       A.  Yes.

16       Q.  And then you can hear somebody respond.

17       A.  Yes.

18       Q.  Is that the individual you were just

19   talking about --

20       A.  I don't know.

21       Q.  -- standing at the top of the driveway?

22       A.  I don't know.

23       Q.  Okay.  That wasn't Mr. Gibson you were

24   talking to?

1        A.   No, because he was not recording it

2   visually, so far as I knew.  I do know that he told

3   Mr. Lusk he had turned it off.

4        When I told him to give it to Mister -- to

5   Officer McPeake, I said -- and Mr. Gibson says,

6   "Yes.  It's off."

7        When he gave it to Deputy McPeake, I said,

8   "Is it off?" and it, in fact, was not.  In fact,

9   you can hear Mr. Gibson talking after he gave it to

10  Officer McPeake.

11       Q.   Okay.  So --

12       A.   And that's why I thought it was important

13  for Mr. McPeake to keep it, because he had kept

14  recording after -- not only after I'd told him not

15  to but after he said he had.

16       Q.   Okay.  So the recording that we were --

17  part of what we just listened to, that was the

18  recording that Matt Gibson was taking off of his

19  phone, the audio?

20       A.   Correct.

21       Q.   And --

22       A.   So far as I know.  I am not an audio

23  person.

24       Q.   And this conversation took place in



800.211.DEPO (3376)
EsquireSolutions.com

JA304

 1   Mr. Gibson's front yard?

 2       A.  At the gazebo, as I recall.

 3       Q.  Okay.  Which is on Mr. Gibson's property,

 4   right?

 5       A.  Right.

 6       Q.  And during that conversation, Mr. Lusk

 7   points out that Matt Gibson was recording with his

 8   phone.

 9       A.  Right.

10       Q.  And you told him to stop recording, right?

11       A.  And he did not.

12       Q.  And then you threatened him with being

13   arrested by your bailiff if he did not, right?

14       A.  That's not my memory.

15       Q.  Or did you --

16       A.  I said -- I said, "Give the phone to the

17   bailiff," and then I asked the bailiff, "Is it

18   still recording," because he had told me he had

19   turned it off.

20            And Officer McPeake said, "It is still

21   recording."

22            I said, "Turn it off."

23       Q.  You instructed a bailiff to seize

24   Mr. Gibson's cellphone to stop it from recording.



1      A.   Yes.

2      Q.   And then --

3      A.   Because Rule 8 does not allow recordings of

4   court hearings, other than done by me.

5      Q.   But this is on Mr. Gibson's property.

6      A.   Right, which was a continuation of a

7   hearing, as is evidenced that he referred to me as

8   Judge during the hearing, he made motions to me

9   during the hearing which I ruled on.  So it was the

10  continuation of my hearing.

11     Q.   Okay.  And then you -- you told other third

12  parties who were on Mr. Gibson's property to stop

13  recording or else go to jail, right?

14     A.   Yes, and they should have not been there.

15  They were not allowed to be in a hearing.

16     Q.   Okay.  But you -- this was Mr. Gibson's

17  home.

18     A.   It was.

19     Q.   Right.  And this was not in a courtroom.

20     A.   It was not.

21     Q.   Let's continue.

22             (An excerpt of Exhibit 6 was played.)

23  BY MR. BRYAN:

24     Q.   So we can hear on the recording, standing



1  in Mr. Gibson's yard, you threaten to arrest

2  Mr. Gibson if he didn't let you in his house.

3      A.   For being in direct contempt of a court

4  order.  Yes.

5      Q.   Okay.  Well, regardless of what you say the

6  reason was, you said -- you threatened Mr. Gibson

7  with being arrested by your bailiff if he did not

8  let you in his house, right?

9      A.   Yes, but again, saying "regardless of the

10  reason" is silly.

11     Q.   Okay.  Well, he hadn't been found in

12  contempt at that point, had he?

13     A.   He would have been found in direct contempt

14  had he not let me in the house.

15     Q.   Okay.  Well, he hadn't even -- he hadn't

16  been found in contempt yet because he hadn't even

17  had an opportunity to tell his side of the story,

18  did he?

19     A.   He testified, and he, in fact, testified

20  that the items that we went to get were, in fact,

21  in the house.

22          So did I find him in contempt before I

23  left?  No.

24          Did he admit it under oath?  Yes.



800.211.DEPO (3376)
EsquireSolutions.com

1        Could anybody who listened to that tape

2    determine that he was in contempt?  Yes.

3        Q.  Looking back at the West Virginia Supreme

4    Court Opinion, and this is referencing Page 21, if

5    you want to verify this.

6        The Supreme Court noted in their Opinion,

7    again on Page 21, that you forced your "way into

8    the ex-husband's home - over his reasonable

9    objections - by threatening to jail him for

10   contempt.

11       She said, 'I am the judge trying to effect

12   equitable distribution.  We're having a hearing.

13   Now, you let me in that house or [the bailiff] is

14   going to arrest you for being in direct contempt of

15   court.'"  Is that true?

16       A.  That's what it says.  Yes.

17       Q.  And, in fact, that's what we can hear on

18   the audio as well, right?

19       A.  The quote, yes.

20       Q.  Okay.  And just following that, the Supreme

21   Court says that:  "Judge Goldston's misconduct

22   displayed a callous disregard for our system of

23   justice."  Did you read that?

24       A.  Can you say that again?  Oh.  It does say



 1  that.

 2      Q.   And the Court said that:  "Even setting

 3  aside the inappropriateness of the search, Judge

 4  Goldston went about the search in a highhanded and

 5  procedurally flawed manner."

 6      A.   I see that.

 7      Q.   Okay.  Do you agree with that?

 8      A.   No.

 9      Q.   The Court continued:  "Instead of receiving

10  both sides' testimony and evidence and rendering a

11  decision, she interrupted the ex-wife's testimony

12  and directed the parties to meet her at the

13  ex-husband's residence, affording the ex-husband no

14  explanation and no opportunity to object until she

15  arrived at the scene."  Is that true?

16      A.   That's what it says.

17      Q.   But you disagree?

18      A.   Yes.  The ex-husband, while we were time-

19  constrained and he was not allowed to put on his

20  entire case, he did, in fact, testify and he did,

21  in fact, admit contempt on the record under oath.

22      Q.   Okay.  But that's not what the Supreme

23  Court said, is it?

24      A.   No.



1      Q.   Also, in that Supreme Court decision,

2   around the bottom of Page 21 and continuing to 22,

3   the Court held:  "Though she claimed she was

4   'having a hearing', she made no attempt of any kind

5   to contemporaneously record what transpired.

6   Indeed, she forbade others to make a recording, at

7   risk of incarceration."  Is that true?

8      A.   I don't see that.

9           MS. TULLY:  Where does that start?

10          MR. BRYAN:  I believe it's from the

11  bottom of 21, going on to 22.

12          MS. TULLY:  Here.  It's on Page 22.

13          THE DEPONENT:  Oh okay.

14  BY MR. BRYAN:

15     A.   That's what it says.

16     Q.   Okay.  And I take it you disagree with the

17  Supreme Court?

18     A.   I agree with that statement but I -- I

19  would like to add that they did not refer to, in

20  any way, Rule 8, which forbids anybody else to

21  record it.

22     Q.   I mean, you -- to be fair, would you agree

23  that the -- these issued were briefed, at length,

24  in the record in your disciplinary case?

1       A.   Yes.

2       Q.   I mean, both the JDC and your lawyer and

3   the Family Court Judicial Association all briefed

4   these issues and discussed this ad nauseum.

5       A.   Yes.

6       Q.   The Supreme Court ruled -- or reviewed that

7   record before issuing this Opinion.

8       A.   Right.  Can I ask you a question?

9       Q.   Sure.

10      A.   Do you agree with every Supreme Court

11  decision that's issued?

12      Q.   That's -- that's a fair point.  No.  But I

13  agree that the lawyers representing people have the

14  opportunity in the underlying litigation to make

15  those arguments to get that due process.

16      A.   They do, and the Judicial Hearing Board, in

17  fact, found that there was no law guiding this

18  theory of the law and specifically asked the

19  Supreme Court for guidance on these kinds of cases.

20      Q.   And, as you know and the Judicial Hearing

21  Board knows, it's not up to them in the end.  It's

22  up to the Supreme Court, right?

23      A.   That's right.

24      Q.   Also, just to -- to get this in, I would



1  like to just take a look at part of the video that
2  we're here about.
3              (Video of the incident at the home of
4              Matthew Gibson was played.)
5      Q.  You've seen this video, right?
6      A.  Which one.  I'm not sure I've seen it all
7  but --
8      Q.  Well, this is the only video footage we
9  have of what occurred in Mr. Gibson's driveway and
10 front yard.
11     A.  The only video I have seen is what was put,
12 I believe by you, on YouTube.
13     Q.  Okay.  Well, this is the same footage.
14             Have you seen -- have you seen this footage
15 before?
16     A.  I don't remember seeing this part right
17 here.
18     Q.  And this was an exhibit to Deputy McPeake's
19 deposition as well, I believe.  Or -- Matt --
20 Mr. Gibson's deposition.
21             All right.  So in that video, Mr. Gibson
22 makes a motion, in his front yard, to recuse you as
23 the presiding family court judge.
24     A.  Correct.



1      Q.   And you denied that motion as untimely.

2      A.   Correct.

3      Q.   And then --

4      A.   The rules require that to recuse me, you

5   must file it -- the -- the motion seven days prior

6   to the hearing.

7      Q.   Okay.  Well, he didn't know seven days

8   prior to the hearing that you would be in his front

9   yard, did he?

10      A.   No.  Which I set forth on the record, after

11   we came back and gave him an opportunity, should he

12   want to do that, to do that and explained to him

13   how to do that.

14      Q.   Okay.  And he did do that, didn't he?

15      A.   He did.

16      Q.   And he said, "You won't get in my house

17   without a search warrant."

18           And you said, "Oh, yes, I will."  Right?

19      A.   Correct.

20      Q.   In hindsight, when we were talking about

21   mistakes -- in hindsight, do you believe that that

22   was a mistake, to respond, "Oh, yes, I will"?

23                MS. TULLY:   Objection.

24      A.   It may have seemed flippant but I intended



1  to go in the house.

2      Q.   Would you agree with me that this video

3  illustrates that Matt Gibson did not voluntarily

4  consent to you or anyone else entering his house on

5  March 4th, 2020?

6              MS. TULLY:   Objection.

7      A.   Can you restate it?  I'm not sure.

8      Q.   Would you agree with me that this video

9  that we just watched illustrates that Matthew

10  Gibson did not voluntarily consent to you going

11  inside his house or bringing his ex-wife and her

12  lawyer in?

13     A.   I don't think I've ever said that he

14  voluntarily let me in.

15     Q.   And I'm not saying that you did but it

16  sometimes can come up, whether there's consent to

17  enter under the Fourth Amendment.

18              I just want to make clear that he did not

19  consent, as this video illustrates, right?

20     A.   There was a point during the exchange,

21  after we talked about the swing, that I said -- he

22  had told me several times he didn't want me in his

23  house.

24              At some point during the swing discussion,



```
 1   I said, "Now, are you going to let me in the
 2   house?"
 3           And he said, "Sure."
 4           Do I contend that was voluntary?  Not
 5   necessarily, no.
 6                MR. BRYAN:  I need to plug in my
 7   laptop.  It's running through the battery faster
 8   than I thought.  It may be a good time to take a
 9   couple of minutes.
10                MS. TULLY:  Okay.
11                COURT REPORTER:  The time is
12   12:02 p.m.  We're off the record.
13                (A short break was taken after which
14                the proceedings continued as follows:)
15                COURT REPORTER:  The time is
16   12:10 p.m.  We're on the record.
17   BY MR. BRYAN:
18      Q.  I'll try to keep -- try to keep this brief
19   but I just wanted to ask you one more follow-up
20   question about the Judicial Hearing Board
21   transcript that was Exhibit 5.
22      A.  Okay.
23      Q.  I had asked you earlier whether you thought
24   you had made any mistakes and I believe you
```



1  explained that you felt like you had made a mistake

2  and you explained that.

3         You do recall giving a statement or

4  speaking at the Judicial Hearing Board hearing in

5  your case.

6     A.   Yes.

7     Q.   Okay.  And do you recall saying:  "I am

8  embarrassed.  This Family Court has been my life.

9  And I have strived to perfect it, improve it, for

10  26 and a half years.  And mistakes were made that I

11  am very sorry for, but I do accept the agreement,

12  and I certainly accept my responsibility for the

13  errors that were made that day."

14         Do you recall saying that?

15     A.   I do.

16     Q.   Do you stand by that statement?

17     A.   No.

18     Q.   Why not?

19     A.   Because, since then, I have done research,

20  I have had other people do research, and I don't

21  believe I violated the canons of ethics.

22     Q.   When you say you had other people do

23  research, do you mean your lawyers?

24     A.   Uh-huh.



1      Q.   Did you have anyone else, other than your

2    lawyers, do research?

3      A.   Some other family court judges.

4      Q.   And who were they?

5      A.   Mainly, David Greenberg and my ex-husband,

6    who is not a family court judge.

7      Q.   So, as we sit here today, you do not accept

8    responsibility for errors that were made that day?

9      A.   There were errors that were made that day

10   and I do accept responsibility for those.  I do not

11   believe that I violated the canons of ethics.

12     Q.   But, previously, you admitted that you

13   violated Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B),

14   and 2.5 of the Code of Judicial Conduct.

15             MS. TULLY:  Objection.  We've

16   discussed this ad nauseum today.  But you can

17   answer.

18             MR. BRYAN:  I didn't ask that

19   question.

20   BY MR. BRYAN:

21     Q.   You do --

22     A.   Yes.  I do -- I do admit that I did admit

23   those but I would like to explain.

24             During the entire negotiations, I asked, on



1  several occasions, the Judicial Hearing Board and

2  the Judicial -- not the board -- the Judicial

3  Counsel -- to explain to me, canon-by-canon, how I

4  had violated each canon, and I was refused that

5  opportunity.  I was told they do not do that that

6  way.

7       And again, this is -- was the first time in

8  27 years that I had been called up in front of the

9  Judicial Disciplinary Board and I was, quite

10  frankly, paralyzed with fear.

11       I was petrified, I wanted to do anything I

12  could to cooperate, and again, I was threatened

13  both off the record at the time I gave my statement

14  and at the time we were negotiating that the

15  Judicial Hearing Commission - or the Board -- I

16  don't know what they're called -- the Judicial

17  Investigation Commission would not accept anything

18  less than my suspension from the bench, and I was

19  doing whatever I could to cooperate so that that

20  did not happen.

21       Q.  So the only reason you signed the agreement

22  was because you were afraid of being suspended?

23       A.  And because I believed what they told me.

24       Q.  So once they agreed not to suspend you,



 1   then you --

 2        A.   That was part of the plea agreement.

 3        Q.   -- regretted it.

 4        A.   And frankly, until Judge Stotler spoke up

 5   at the Judicial Hearing Board and was adamant that

 6   I was being mistreated and that that was not the

 7   law and that I had not violated the ethics of --

 8   the canon of ethics, that I began to believe that

 9   something was wrong.

10        Q.   So, as we sit here today, do you think that

11   Judge Stotler was correct or do you think the

12   Judicial Disciplinary Counsel was correct in their

13   opinions on whether your conduct was appropriate?

14        A.   I think Judge Stotler was correct, for all

15   the reasons stated in my briefs to the Supreme

16   Court and to the -- and the answers that I gave to

17   the Judicial Hearing Board that they requested

18   answers to.

19             MR. BRYAN:   For the record, the last

20   video that we watched will be marked as an exhibit.

21   7?

22             COURT REPORTER:   Yes.

23             MR. BRYAN:   Okay.

24        GOLDSTON DEPOSITION EXHIBIT NO. 7



LOUISE GOLDSTON                                          March 01, 2022
GIBSON V GOLDSTON                                                     82

```
 1                    (Video of the Incident at the Home of
 2                    Matthew Gibson was marked for
 3                    identification purposes as Goldston
 4                    Exhibit No. 7.)
 5               MS. TULLY:  Now, is that the video and
 6      the audio recording that'll be marked as Exhibit 7?
 7               MR. BRYAN:  The audio recording is a
 8      separate exhibit.
 9               COURT REPORTER:  6.
10               MS. TULLY:  Okay.
11      BY MR. BRYAN:
12         A.  And I want to say that one of the things
13      that threw me off when I got to the scene was that
14      at the hearing Mr. Gibson was very -- he was
15      obviously not happy to be there but he was very
16      respectful of the Court, he was very forthcoming,
17      and the Mr. Gibson that was at his house when I
18      arrived there was a completely different -- had a
19      completely different attitude and demeanor, and
20      that -- that threw me.
21         Q.  Now, there had been a lot of discussion
22      about Mr. Gibson allegedly not turning over
23      photographs that his ex-wife was entitled to.
24         A.  Correct.
```

1       Q.   Isn't it true that the -- that either the

2   agreement or your order, or both, provided that

3   Mr. Gibson was to copy photographs?

4       A.   That was not what the order said.

5           During the hearing, he said, "Before I turn

6   them over, can I make copies of them?"   Which is

7   common.   That does not mean that he could turn the

8   copies over to her, but that, in fact, he could

9   make copies of them to keep before he turned them

10  over to her.

11          And his testimony at the hearing was that

12  he had not -- he had done neither.  He had not made

13  copies because they were -- and I understand this

14  -- they were -- the ones we retrieved that day

15  were, I call them, Olan Mills-type pictures that

16  are not easily copied because a lot of people won't

17  copy them because they're trademarked.

18          But his testimony that day was not only

19  that he had not turned over them but that he had

20  not been able to make copies.

21      Q.   Okay.  I'm going to show you part of that

22  -- part of the discussion at the hearing and

23  perhaps you can tell me what's said here.

24          So let's mark this as Exhibit 8.  I believe



800.211.DEPO (3376)
EsquireSolutions.com

JA321

```
 1   -- this is about 22 minutes long.  This is from a
 2   hearing on April 19th, 2018 in Mr. Gibson's divorce
 3   action.
 4              GOLDSTON DEPOSITION EXHIBIT NO. 8
 5                   (Divorce Hearing Video dated April 19,
 6                   2018 was marked for identification
 7                   purposes as Goldston Exhibit No. 8.)
 8       A.   And can I -- can I just ask that -- I'm a
 9   little nervous about this being put in the record
10   because it is a confidential hearing and not
11   released to the public -- not releaseable to the
12   public.  So I --
13       Q.   If --
14              MS. TULLY:  I think this needs to be
15   placed under seal.
16              MR. BRYAN:  All right.  Well --
17              THE DEPONENT:  I'm nervous about that.
18              MR. BRYAN:  Why don't we go off the
19   record and play it off the record, and then you can
20   -- then you can --
21              MS. TULLY:  Well --
22              MR. BRYAN:  Well, she's already
23   testified about what was said or not said.
24              MS. TULLY:  Well, but if you're going
```



 1 | to rely upon this at some point, I don't want it
 2 | off the record.  I just think we need to seal the
 3 | exhibits.
 4 |           MR. BRYAN:  We can seal this -- we can
 5 | seal this one.
 6 |           MS. TULLY:  This one.  Okay.  That's
 7 | fine.
 8 |           MR. BRYAN:  And I have just an audio
 9 | version of it as well but this has the video.
10 |           THE DEPONENT:  And just so I'm clear,
11 | this is the haering when we placed the agreement on
12 | the record.  Is that correct?
13 |           MR. BRYAN:  This is the April 19th,
14 | 2018 hearing.  I'm not -- I wasn't there.  I'm not
15 | sure --
16 |           MR. GIBSON:  What was your question,
17 | ma'am?  I didn't hear it.
18 |           MR. BRYAN:  The April 19th hearing.
19 |           THE DEPONENT:  This is when we placed
20 | the agreement on the record.
21 |           MR. GIBSON:  No.  The agreement on the
22 | record was September 18th.
23 |           MR. BRYAN:  Okay.  So --
24 |           MR. GIBSON:  So this was -- the photos

 1 | were not part of the agreement.
 2 |                  THE DEPONENT:  I'm not going to argue
 3 | about that.
 4 |                  MR. BRYAN:  Are we off the record?
 5 |                  MS. TULLY:  No.  We're on the record.
 6 |                  COURT REPORTER:  No.  We're on the
 7 | record.
 8 |                  MR. BRYAN:  Do you want to stay on the
 9 | record?
10 |                  MS. TULLY:  Yes.
11 |                  MR. BRYAN:  Okay.  All right.  I want
12 | to play it and then you can tell -- I guess you can
13 | --
14 |                  THE DEPONENT:  It says at the top what
15 | the date of it was.
16 |                  MR. BRYAN:  Well, let me just play
17 | this and then perhaps you can tell me what was said
18 | and what that means.
19 |                  (An excerpt of Exhibit 7 was played.)
20 |                  MR. BRYAN:  Let me back it up a little
21 | bit.
22 |                  MS. TULLY:  Can you turn the volume
23 | up?
24 |                  THE DEPONENT:  I can't hear him.

1              MR. BRYAN:  It's all the way up.

2                   (An excerpt of Exhibit 7 was played.)

3              MR. BRYAN:  I can move it closer to

4    you but it's as loud as it will go.

5              THE DEPONENT:  And I really can't see

6    it either.

7                   (An excerpt of Exhibit 7 was played.)

8    BY MR. BRYAN:

9        Q.  Did you hear that, what you said?

10       A.  Right.

11       Q.  What did you say?

12            It sounded like you said, "You shall make a

13   copy."

14       A.  I lied.  I didn't hear that.  I was

15   listening to what they were saying.  And so the

16   record is clear, these are not the photos we were

17   talking about at the -- at the contempt hearing.

18       Q.  Okay.  These are different photos?

19       A.  Yeah.  These were ones that were hanging on

20   the wall.

21              MS. TULLY:  That you were talking

22   about at the contempt hearing.

23              THE DEPONENT:  Correct.

24              MS. TULLY:  And what you're talking

LOUISE GOLDSTON                                                      March 01, 2022
GIBSON V GOLDSTON                                                              88

 1  about at this hearing are separate and apart from
 2  those.
 3              THE DEPONENT:  Correct.
 4              MR. BRYAN:  Okay.  All right.  Let me
 5  play a little bit more and I believe it explains.
 6              (An excerpt of Exhibit 7 was played.)
 7  BY MR. BRYAN:
 8     Q.  All right.  So, I mean, I wasn't there.
 9  You were there.  But watching that, it looks like
10  the parties are discussing and you're discussing
11  copying marital photographs, including pictures on
12  the wall, right?
13     A.  Right.  They worked out how they were going
14  to do, what I just call, pictures.  You know, not
15  framed pictures on the wall.  They were discussing
16  how they were going to get that.
17              You can't put a picture that's on the wall,
18  hanging, that's in canvas -- and I'm not sure it
19  was canvas but it was like a canvas picture --
20  there's no way to put that on a DVD.
21              So they were, at that time, talking about
22  all of their family pictures.
23     Q.  And so, really, your only order there was
24  -- I think you said, "You shall copy the

1  photographs."

2      A.   Right.

3      Q.   And you were talking to Mr. Gibson.

4      A.   Right.

5      Q.   So, I mean --

6      A.   But we were not talking about the pictures

7  on the walls.

8           She said -- after they said how they'd do

9  it, she said, "But there's also pictures on the

10  wall."

11          And at the contempt hearing, he admitted

12  that he had not made copies of the pictures on the

13  wall because he couldn't find anybody that would do

14  it.

15          And he said, "But Judge, you said I could

16  make copies."

17          And I said, "You can but you've had 18

18  months to do it and you haven't done it."

19      Q.   Let me play some audio here, which I will

20  label as Exhibit 8.

21               MR. BRYAN:   Or 9?

22               COURT REPORTER:   9.

23               MR. BRYAN:   9.

24          GOLDSTON DEPOSITION EXHIBIT NO. 9



800.211.DEPO (3376)
EsquireSolutions.com

JA327

1                    (Recording of Kyle Lusk at Hearing re:

2                    Search was marked for identification

3                    purposes as Goldston Exhibit No. 9.)

4        Q.   Exhibit 9.  Hopefully, this will be a

5    little louder.

6        A.   Is it a hearing?

7        Q.   I think it's -- it's from a hearing.  I'm

8    not sure whether you were present at the time or

9    not, but you'll hear it and I'll ask you.

10                   MS. TULLY:  Can we agree that any

11   audio or video that you present from a hearing will

12   be sealed, given that these are confidential

13   hearings?

14                   MR. BRYAN:  Is that from a hearing?  I

15   think it was during a hearing.

16                   MR. GIBSON:  Which one?

17                   MR. BRYAN:  The 2018.

18                   MR. GIBSON:  No.  That was not during

19   a hearing.

20                   MR. BRYAN:  Okay.  I think this -- I

21   don't think this was --

22                   MS. TULLY:  Where did this come from

23   then?  Do you know?

24                   MR. BRYAN:  This is -- I'm going to

1 | play the audio of Kyle Lusk threatening a home
2 | search in 2018.
3 |              MS. TULLY:  Okay.
4 |              MR. BRYAN:  I believe it was during
5 | the negotiations.  I wasn't there.  I don't know.
6 |              THE DEPONENT:  Was I there?
7 |              MR. BRYAN:  It doesn't sound to me
8 | like you were.
9 |              MR. GIBSON:  No, you wasn't.
10 |              MR. BRYAN:  I don't know if it was in
11 | a side room or what.
12 |              THE DEPONENT:  I don't know how I can
13 | answer any questions about it but if I wasn't
14 | there, go ahead.
15 |              MR. BRYAN:  If you can, you can.
16 |              MR. ROBINSON:  I'm going to object to
17 | a proper foundation has not been established as to
18 | when this was recorded, who recorded, and how it
19 | was recorded.
20 |              MR. BRYAN:  Well, let me play it --
21 |              MS. TULLY:  Thank you.  You took my
22 | next objection out of my mouth.
23 |              MR. BRYAN:  Let me play it first and
24 | we'll see if we can establish that.

LOUISE GOLDSTON                                      March 01, 2022
GIBSON V GOLDSTON                                              92

```
 1                    (Exhibit 9 was played.)
 2        Q.  All right.  So the audio I just played --
 3    just give me a second -- could you hear it all
 4    right?
 5        A.  Yes.  I could hear it.
 6        Q.  Okay.  Did you recognize any voices on it?
 7        A.  Yes.
 8        Q.  All right.  So did you recognize Kyle
 9    Lusk's voice?
10        A.  Yes.
11        Q.  Did you recognize Matt Gibson's voice?
12        A.  Yes.
13        Q.  Okay.  Did you recognize Brandon Johnson's
14    voice?
15        A.  No.
16        Q.  All right.  If I were to represent to you
17    --
18        A.  I would recognize his voice and I didn't
19    hear it, but I'm not --
20        Q.  Do you want me to play it again?
21        A.  If you want to.
22                    (Exhibit 9 was played.)
23        A.  Yeah.  That's Brandon right there.
24                    (Exhibit 9 was played.)
```

1      A.   I apologize.  I do recognize Brandon

2   Johnson's.

3      Q.   All right.  So if I were to represent to

4   you that this -- this was a conversation between

5   Mr. Gibson and his lawyer and his ex-wife and her

6   lawyer during the final hearing in 2018, would you

7   have any reason to disbelieve that?

8      A.   That was not a conversation that was held

9   during the final hearing.  No.

10     Q.   So you don't recall being present when

11  those words were spoken?

12     A.   I was not present when those words were

13  spoken, and could not have been present.  Those

14  were settlement negotiations that I am not allowed

15  to be a part of --

16     Q.   All right.

17     A.   -- as a judge.

18     Q.   And here's my question and why I played

19  that for you:  At that time in 2018, Defendant --

20  or former Defendant Lusk can be heard to say to

21  Mr. Gibson's lawyer, at that time:  "I'm going to

22  tell you right now, and the judge is big on that.

23  I want Mr. Gibson to say certain things aren't

24  there and we'll get the bailiff and the judge and



 1  we'll go there and see."

 2          Do you recall hearing that on that

 3  recording?

 4      A.   I do.

 5      Q.   Okay.  And do you have -- do you know what

 6  Mr. Lusk meant by saying that you were "big on

 7  that"?

 8              MS. TULLY:   I'm going to object to

 9  this entire line of questioning in that we don't

10  know who recorded this, there's -- we don't have

11  anybody to stipulate to the authenticity of this

12  recording, and then I'm going to further stipulate

13  -- or object to this is asking for speculation on

14  what Mr. Lusk is thinking.

15              MR. BRYAN:   Well, your objections are

16  noted but, fortunately, I am allowed to do that in

17  a deposition, and this was provided --

18              MS. TULLY:   I am not saying she can't

19  answer the question.   I am simply objecting.

20              MR. BRYAN:   This was provided in

21  discovery, so you've had it.

22  BY MR. BRYAN:

23      Q.   I know you don't know what Mr. Lusk was

24  thinking but do you know what he was referring to



1   as "the judge is big on that"?

2       A.   I would never try to speculate on why

3   Mr. Lusk thought anything he thinks.

4       Q.   You previously testified that it was no

5   secret that you did these visits to litigants'

6   homes, right?

7       A.   It was not.

8       Q.   Okay.  So, at this time, having practiced

9   before you for many years, Mr. Lusk would've been

10  aware that you engaged in this practice.

11      A.   I don't know what he was aware of.

12      Q.   Let me play you another recording, which

13  we'll say is Exhibit 10, and this is a voicemail

14  that Mr. Lusk left for Mr. Gibson the night before

15  the March 4th, 2020 hearing.

16          GOLDSTON DEPOSITION EXHIBIT NO. 10

17              (Voicemail Recording of Kyle Lusk was

18              marked for identification purposes as

19              Goldston Exhibit No. 10.)

20              (Exhibit 10 was played.)

21      Q.   Okay.  Could you hear that all right?

22      A.   Yes.

23      Q.   So I'll represent to you that that was a

24  voicemail left by Mr. Lusk on Mr. Gibson's



1  voicemail the night before the March 4th, 2020

2  hearing, where Mr. Lusk called Mr. Gibson and said,

3  "The Court has asked me to convey to you any

4  settlement proposal I may have" - offering $5,000

5  to settle - "Otherwise, we'll see you tomorrow."

6          You heard that, right?

7     A.   I heard that.

8     Q.   By Court, was Mr. Lusk referring to you?

9             MS. TULLY:  Objection.  Calls for

10  speculation.

11    A.   I don't know who he was referring to.

12    Q.   Okay.  You were the presiding Family Court

13  judge in the case --

14    A.   I was.

15    Q.   -- that Mr. Lusk was calling about.

16    A.   I was.

17    Q.   Okay.  So is there any other judge that

18  Mr. Lusk could be referring to as the Court?

19    A.   Again, I don't know what Mr. Lusk was

20  referring to.

21    Q.   Okay.  Did you ask Mr. Lusk to convey a

22  settlement offer to Mr. Gibson?

23    A.   No.

24    Q.   So you have no idea what Mr. Lusk was



1   talking about?

2       A.   I know why he may have made the call.

3       Q.   Why is that?

4       A.   Because when we have contempt hearings, or

5   any hearings, the rules require that the parties

6   attempt a settlement before going to trial.

7            And that is one of the issues that I

8   consider when deciding whether to award attorney

9   fees is whether or not an attempt has been made to

10  settle the case.

11           So I assume that's why that call was made.

12  I do not know.

13      Q.   But you heard Mr. Lusk say, "The Court has

14  asked me to convey to you..."  Right?

15      A.   Yes.

16      Q.   And it's your testimony that you did not

17  ask Mr. Lusk to convey a settlement offer to

18  Mr. Gibson.

19      A.   I did not, and I think if you ask Mr. Lusk

20  he would tell you the same thing.

21      Q.   But that's not what he said, is it?

22      A.   It is not what he said.

23      Q.   Just briefly, back to what happened in

24  Mr. Gibson's yard on March 4th, 2020.  As we



1  watched in the video and listened to the audio,

2  while you were standing in Mr. Gibson's yard, you

3  had threatened to have other individuals arrested

4  who were filming, right?  I believe you already

5  admitted that.

6              MS. TULLY:  Objection.  Asked and

7  answered.

8      A.  One other individual.

9      Q.  Okay.  And that was Mr. Gibson's

10  girlfriend, who was filming the video.

11      A.  It was who was filming the video.  I don't

12  know whether that's Mr. Gibson's girlfriend or not.

13      Q.  And the reason I bring this up again is --

14  but I forgot to ask you before -- as a family court

15  judge in that situation, do you believe that you

16  had any jurisdiction over that individual that you

17  threatened with arrest?

18      A.  I think that person had no authority or

19  right to be at a hearing, and I think that

20  individuals that violate rules in front of a judge

21  are subject to finding of contempt.

22              Would I have arrested her?  Probably not,

23  but I wanted to make it clear to her that she was

24  not allowed, No. 1, to be there, or to film.



1        Q.   So she was not a litigant before you, was
2   she?
3        A.   She was not.
4        Q.   And she was on Mr. Gibson's property at
5   that time, right?
6                MS. TULLY:   Objection.   Asked and
7   answered.
8        A.   I think so.   I'm not sure exactly where she
9   was standing.
10       Q.   You said -- well, you said, at one point,
11   she was at the top of the driveway.
12       A.   Correct.   But she was behind a car.   I
13   don't know if she was actually on his property or
14   on the driveway.   She was in the direct area.
15       Q.   Well, did you ever communicate to her, or
16   anyone else, that you were in the process of
17   conducting a judicial hearing?
18       A.   Certainly.   I said we are conducting a
19   hearing.   Mr. Gibson obviously knew it was a
20   hearing.   He was making motions before the Judge,
21   that the Judge was ruling on, and that can only be
22   done orally in a hearing before a Judge.
23       Q.   Following this incident, have you developed
24   or implemented any sort of written policies or



 1  procedures regarding visiting the homes of

 2  litigants?

 3      A.  No.

 4      Q.  Have you ever done it again?

 5      A.  No.

 6      Q.  Do you ever -- would you ever do it again?

 7      A.  I don't know.

 8      Q.  Is there anything that you would do

 9  differently from March 4th, 2020?

10      A.  I would fashion a way that the Court itself

11  could record it -- record the proceeding, and not a

12  biased witness or a party or anything else.

13      Q.  But you don't regret physically going

14  inside Mr. Gibson's home?

15              MS. TULLY:  Objection.  Asked and

16  answered.

17              MR. BRYAN:  I don't think I asked

18  that.

19      A.  Do I think I did anything wrong?  No.

20          Do I regret the consequences of it?

21  Absolutely.

22      Q.  Do you regret threatening Mr. Gibson with

23  arrest?

24      A.  No.  When I'm conducting a hearing, I



1   expect the litigants and the witnesses who are in

2   front of me to do what I ask them to do.  I think

3   that's my role as judge.

4           And, again, I believed I was helping him as

5   much as I was helping her.

6                MR. BRYAN:  Okay.  I don't know that I

7   have much -- anything else.  Let me just talk to my

8   people here --

9                MS. TULLY:  Sure.

10               MR. BRYAN:  -- and maybe we're done.

11               (Off the record at 12:41 p.m.)

12               (A short break was taken after which

13               the proceedings continued as follows:)

14               COURT REPORTER:  The time is

15  12:47 p.m.  We're on the record.

16  BY MR. BRYAN:

17      Q.  When your sworn statement was taken by the

18  Judicial Disciplinary Counsel, I believe you were

19  -- you were asked about the so-called home visits

20  and you said that "the lawyers love that I do this

21  because it enables them to say, you know, 'Be

22  truthful in your disclosure because if you try to

23  hide something, she might go out and look for it.'"

24               Do you recall saying that?



800.211.DEPO (3376)
EsquireSolutions.com

JA339

1      A.  Yes.

2      Q.  And do you stand by that?

3      A.  I was told that by different lawyers.

4  Those are their words, not mine.

5      Q.  And you further testified that:

6  "Generally, it's the attorney that asks me to do

7  it."

8      A.  Yes.  An attorney.  One of the attorneys or

9  -- I've since remembered there was a -- and I may

10  have testified about it in my statement, that there

11  was a case where one of the parties was pro se, and

12  they were saying that she had gotten rid of a bunch

13  of Confederate memorabilia and she said, "It's not

14  there.  You're welcome to come and look for it,"

15  and so we did.

16      Q.  So the lawyers knew that you would go to a

17  litigant's home and look for something, but on

18  March 4th, 2020, Mr. Gibson was representing

19  himself pro se.

20      A.  Correct.

21      Q.  Mr. Gibson didn't know that you would do

22  this.

23      A.  Well, according to the -- the tape you just

24  played, he did know because Mr. Lusk had told him



1  that I would -- that I had done that on occasion.

2  So, yes, he did know.

3      Q.  All right.  So could Mr. Gibson have

4  requested you to go to his ex-wife's house to look

5  for something that he didn't get?

6      A.  If there had -- if there had been evidence

7  that it was there, yes.  In this case, there was

8  evidence that the stuff was at his house because he

9  told me it was.

10     Q.  Generally speaking -- generally speaking,

11  pro se litigants before you wouldn't be aware of

12  the fact that they could ask you to go look for

13  something at the other party's house.

14              MS. TULLY:  Objection.  Calls for

15  speculation.

16     A.  I don't know what pro se litigants know.

17     Q.  But you do know that the lawyers know it.

18              MS. TULLY:  Objection.  Calls for

19  speculation.

20     A.  The lawyers that I've done it with know it,

21  and I can tell you that I have, since this

22  proceeding, because the proceeding was ongoing, I

23  had two pro se litigants ask me to go and my mama

24  didn't make no fools, so I sent a deputy, not my



1  bailiff, out to their house and it was a fiasco,

2  and nothing was accomplished.

3      Q.   So you didn't go yourself?

4      A.   No.

5      Q.   You sent law enforcement and it didn't work

6  out well.

7      A.   It did not, because there was a

8  disagreement at the scene about who got what, and

9  the deputy was in no position whatsoever to figure

10  out whose was what, because that's not his job.

11  That's the judge's job.

12      Q.   So it's your opinion that it would be a

13  better process, or more efficient, if you, as the

14  Judge, just went there yourself?

15      A.   In that particular circumstance, yes.  My

16  thought has always been deputies do not make

17  decisions about who gets what, and if I send a

18  deputy to get, in this case, pictures, and

19  Mrs. Gibson has said -- had said, "No, these are

20  the pictures," and Mr. Gibson said, "No, those are

21  not the pictures", what does the deputy do?

22          If I'm there, I can make the decision and

23  we can go on about it.

24              MR. BRYAN:  All right.  Thank you.  I



 1  don't have any other questions right now.

 2              MR. ROBINSON:  I don't have any

 3  questions.

 4              MS. TULLY:  I have no questions.

 5  Judge, I'm sure I don't have to explain to you the

 6  right to read or waive your deposition testimony.

 7              THE DEPONENT:  I'll waive.

 8              MS. TULLY:  You'll waive?  Okay.  Oh,

 9  can we do one more thing on the record?

10              There is a chainsaw that Mrs. Gibson

11  -- we talked about the chainsaw in your deposition

12  last week.  She had gotten one, then a different

13  one was awarded, and the judge had her bring the

14  other chainsaw back to the courtroom that

15  Mr. Gibson is supposed to have.

16              It is still sitting in her chambers.

17              THE DEPONENT:  And so it's clear,

18  Mr. Gibson did come and get that chainsaw but then

19  brought it back and said it wasn't the right one.

20              MS. TULLY:  Okay.

21              THE DEPONENT:  Whatever.

22              MR. BRYAN:  Do you want to pickup the

23  chainsaw?

24              MS. TULLY:  Can you come pickup that



LOUISE GOLDSTON                                           March 01, 2022
GIBSON V GOLDSTON                                                    106

1  chainsaw?

2                  MR. GIBSON:   It's not the right one.

3  It wasn't entered on the search warrant.   I don't

4  know which one.

5                  MS. TULLY:   The fact of the matter is,

6  though, it's property that belongs to somebody, to

7  one of the Gibsons.

8                  THE DEPONENT:   I've been told it

9  doesn't work and it leaks -- it leaks oil on my

10  floor, which I do not appreciate.

11                 MR. BRYAN:   Just go get the chainsaw.

12                 MR. GIBSON:   Okay.

13                 THE DEPONENT:   And whoever's at the

14  window --

15                 MR. BRYAN:   He'll get the chainsaw.

16                 THE DEPONENT:   -- will provide it to

17  you.   I just don't want it in my chambers anymore.

18                 MS. TULLY:   Okay.

19                 THE DEPONENT:   If possible.

20                 MS. TULLY:   I think we're finished

21  now.

22                 COURT REPORTER:   The time is

23  12:55 p.m.   This concludes the deposition.

24                     (Having indicated she would like

1  to waive reading and signing of her

2  deposition, further this deponent

3  saith not.)

4          --oOo--

 1  STATE OF WEST VIRGINIA,

 2  COUNTY OF RALEIGH, to wit:

 3          I, Bradford L. Cooper, a Notary Public

 4  within and for the County and State aforesaid, duly

 5  commissioned and qualified, do hereby certify that

 6  the foregoing deposition of LOUISE E. GOLDSTON was

 7  duly taken by me and before me at the time and

 8  place and for the purpose specified in the caption

 9  hereof.

10          I do further certify that the said

11  proceedings were correctly taken by me in shorthand

12  notes, and that the same were accurately written

13  out in full and reduced to typewriting by means of

14  computer-aided transcription.

15          My commission expires May 14, 2023.

16          Given under my hand this 15 day of March,

17  2022.

18          Bradford L. Cooper

19          _____

20          BRADFORD L. COOPER, Notary Public

21

22

23

24



IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

**FILED**
**November 18, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0742

IN THE MATTER OF:

THE HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE THIRTEENTH
FAMILY COURT CIRCUIT

JUDICIAL DISCIPLINARY PROCEEDING
No. 30-2020
No. 33-2020

PUBLIC CENSURE AND FINE

Submitted: September 15, 2021
Filed: November 18, 2021

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

Andrew S. Nason, Esq.
Pepper & Nason
Charleston, West Virginia
Attorney for Respondent Goldston

Susan Shelton Perry, Esq.
Logan, West Virginia
Attorney for Amicus Curiae, Family
Judicial Association

JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate Opinion.

EXHIBIT
I
Goldston
3/1/2022    BC

JUSTICE HUTCHISON deeming himself disqualified, did not participate in the decision of this case.

JUDGE JENNIFER P. DENT, sitting by temporary assignment.

ii

## SYLLABUS BY THE COURT

1.    "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

2.    The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.   W. Va. Const. art. 5, § 1.

3.    "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." Syl. Pt. 2, in part, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020) (internal quotation marks omitted).

4.    "Stipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

5.    "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

6.    In determining what sanction or sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019], this

i

Court will consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

ii

**Armstead, Justice:**

In this judicial disciplinary proceeding, a family court judge searched a self-represented party's home for marital property. When the homeowner protested, the judge responded to the homeowner's resistance by threatening to jail him for contempt. This interaction was recorded, and the recording soon appeared on the internet.

The judge was reported to the West Virginia Judicial Investigation Commission, and after investigation, the Judicial Investigation Commission charged the judge with violating the West Virginia Code of Judicial Conduct ("Code of Judicial Conduct"). The judge professed remorse and entered into a settlement agreement with Judicial Disciplinary Counsel. Under the agreement, the judge admitted to both the conduct in question and to the fact that it violated the Code of Judicial Conduct; both parties agreed to recommend that the judge be censured and fined $5,000. The Judicial Hearing Board, however, rejected the parties' recommendation. The Hearing Board recommended that the judge be *admonished* and fined $1,000, and—believing that a judge's "inherent authority" to conduct "judicial views" is "uncertain"—requested guidance from this Court.

Both Judicial Disciplinary Counsel and the judge object to the Judicial Hearing Board's recommendation. Seizing on the Judicial Hearing Board's uncertainty about "judicial views," the judge now attempts to persuade us that her search of the residence was lawful—even as she professes to remain bound by the settlement agreement.

1

JA351

After considering the record and the parties' written[1] and oral arguments, we reject the judge's attempt to reframe her conduct. We find that she led a *search* of the homeowner's residence, not a "judicial view," and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution. We find, further, that the judge compounded her error by the manner in which she conducted the search. Accordingly, we disagree with the Judicial Hearing Board and publicly censure the judge for her serious misconduct. In addition, we order the judge to pay a total fine of $1,000.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Honorable Louise E. Goldston is a family court judge who presides in Raleigh, Summers, and Wyoming Counties. She has served since 1994,[2] and until now, she has never been disciplined for judicial misconduct.

Judge Goldston admits that she had a 20-year practice of going to parties' homes "to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property." In almost every instance, these searches were requested by counsel and were performed without objection. In most cases, the search followed counsel's request immediately, indeed while the hearing was taking place.

___

[1] We acknowledge the contribution of the Family Judicial Association, which filed a brief in this case as amicus curiae. We value the Family Judicial Association's participation and have considered the Family Judicial Association's brief in conjunction with the parties' arguments.

[2] Judge Goldston began her career as a "family law master." In 2001, the Legislature made several changes to the law governing family court proceedings, including changing the title of "family law master" to "family court judge." W. Va. Code § 51-2A-23(c) (2001).

2

The search that led to this disciplinary matter happened on March 4, 2020, in the context of a contempt hearing. One of the parties, an ex-wife, claimed that her former husband had damaged items of property and had refused to turn over other items of sentimental value that she was entitled to receive.

For this proceeding the ex-wife was represented by counsel. The ex-husband was not represented by counsel. During the ex-wife's testimony, Judge Goldston asked the ex-husband for his address. Upon learning his address, Judge Goldston stopped the hearing, *sua sponte*, and ordered the parties to meet her in ten minutes at the ex-husband's house. Judge Goldston admits that she failed to tell the ex-husband why the parties were going to his home and that she gave the ex-husband no opportunity to object.

Judge Goldston's intent became clear, however, when everyone arrived at the residence. The ex-husband voiced his objections, requesting that Judge Goldston recuse herself because she had placed herself in a "witness capacity." Judge Goldston denied his request as not timely filed.

After the ex-husband stated that he needed a search warrant to allow Judge Goldston to enter his house, Judge Goldston told the ex-husband that he was either going to let her in the house or her bailiff, who had accompanied her to the house, was going to arrest the ex-husband. Judge Goldston also asked the ex-husband if he was recording her attempt to enter his home and when he confirmed that he was, she directed that he stop recording and told him (and apparently his girlfriend who was also attempting to record their conversation) to turn off their phones. Judge Goldston also indicated that if they did

3

not turn off their phones and stop recording she would take the ex-husband, or perhaps both he and his girlfriend, to jail. Although the conversation between Judge Goldston and the ex-husband was not transcribed, the recording of the conversation appears to include Judge Goldston stating: "I am the judge *trying to effect equitable distribution.* We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

Faced with these threats, the ex-husband relented, and Judge Goldston agrees that the ex-husband felt he had no choice to do otherwise. Judge Goldston brought with her into the house the bailiff, the ex-wife, and the ex-wife's attorney and personally supervised the search for and recovery of items. Several items were located and recovered, including photographs, yearbooks, DVDs, recipes, and a chainsaw. While the home was being searched, a dispute emerged about an umbrella stand. After a brief colloquy with the ex-husband, the judge awarded the stand to the ex-wife, who removed it from the home with the other items.

Judge Goldston, herself, made no arrangement to record what went on inside the home (or outside the home). Indeed, when she found out afterward that her bailiff had made his own cell-phone recording of the search inside the home, she believed that making the recording was improper and told him not to do it again.

After the search, the parties reconvened in the courtroom. On the record, Judge Goldston listed the items that had been recovered and some items that remained to

4

be exchanged. However, no written order was entered regarding either the search of the home or the items recovered.

Though Judge Goldston may have stopped the ex-husband (and a bystander) from recording what went on outside the home, she did not order the recordings destroyed. Audio and video footage of what took place was uploaded to the internet. Some online comments were deeply critical of the judge and her conduct.

Judicial Disciplinary Counsel became aware of these matters, and on March 11, 2020, Judicial Disciplinary Counsel filed a complaint with the Judicial Investigation Commission.[3] Judge Goldston responded to the complaint on March 18, 2020. In her letter, she explained that, during the March 4, 2020 hearing, the ex-wife showed that the ex-husband had left the ex-wife's property outside in the rain, causing it to be damaged, and, further, that the ex-husband admitted that certain items awarded to the ex-wife remained in the house. Judge Goldston went on to explain that

> [a]t that point, because of the alleged damage to the other items, I felt it imperative *to secure those remaining items* before they were either damaged or ruined. It was at that time that I informed the parties we would meet at the residence *to effectuate the return of the remaining items.* The situation was volatile[,] and I didn't want either party to decide between themselves or *place the burden on a Law Enforcement Officer* of determining what was the [ex-wife]'s and what was not.

(Emphasis added.)

_____

[3] Judicial Disciplinary Counsel's filing was designated Complaint No. 30-2020. A week later, the ex-husband filed a second complaint regarding the same incident and regarding other incidents that are not relevant to the matter before the Court. This filing was designated Complaint No. 33-2020.

5

On July 22, 2020, Judge Goldston provided a sworn statement to Judicial Disciplinary Counsel. In her statement, Judge Goldston likened the search to a "jury view," explaining that she was both "judge and jury," yet she claimed that she "never took any testimony." Though she agreed that such proceedings were a "continuation" of the court matter and should have been recorded, she admitted that she had not done so and that her failure to record these searches had "always been a concern[.]" She also agreed that in "some cases, probably" she was "enforcing an order, a contempt order[.]" Nevertheless, she could not remember a single time when she had found someone in contempt before she went to the home "because [she] wasn't sure if they were in contempt." Ultimately, her guiding rationale seems to have been that going to a party's home, searching for items of personal property, and seizing them was "necessary to preserve the marital assets" from destruction, particularly irreplaceable items of "sentimental" value. "I guess it comes down to me thinking if we don't go, they're not going to get it back." With respect to the March 4, 2020 search, she explained:

> And so what made me do it was I just thought, well, if we go now and *get the stuff*, he admits that is there, then that— those assets are preserved. She can't claim he ruined them. He can't claim she ruined them, and I guess judicial economy was that was the easiest and quickest way to get *to retrieve those assets*.

(Emphasis added.)

Judge Goldston agreed that the task of enforcing her orders is an "executive branch" function, and she knew that she could dispatch law enforcement to search for and

6

seize property that a party retained in violation of her order. She simply believed that this method was ineffective:

> I have been told by every sheriff that I've worked with over the 26 years that that's not something they do [i.e., sending law enforcement, or a party accompanied by law enforcement, to look for property], that they're not going for more than 15 minutes to anything, to do anything.

In this particular instance, she explained, "I knew that law enforcement wouldn't know what to do with the [umbrella] stand. I just—wrongly or rightly, I thought it was important for me to be there and make sure that stuff was safely gathered and not damaged."

On September 18, 2020, the Judicial Investigation Commission issued a formal statement of charges. The statement of charges described Judge Goldston's longstanding "practice of visiting homes of litigants" and the events that occurred on March 4, 2020. Significantly, the statement of charges alleged that Judge Goldston "could provide no statute, rule, or case that gave her the authority to conduct home visits"; "acknowledged that there was nothing in the contempt powers that gave her the authority to conduct a home visit"; and "confessed that she never held anyone in contempt prior to going to the home[.]" The statement of charges further alleged that Judge Goldston "confessed . . . that she failed to enter any order subsequent to the visit reflecting what had happened at the residence"; "admitted that she never had any clear or written procedures for conducting a home visit"; and "acknowledged that she never took a court reporter to the scene." Finally, the statement of charges alleged Judge Goldston "agreed that the practice could make her a potential witness to a future proceeding which could then result in her disqualification";

7

and "admitted to improperly putting herself in the role of litigant [i.e., a litigant who had the burden of proof in a contempt proceeding]."

On September 30, 2020, Judge Goldston signed an agreement with Judicial Disciplinary Counsel. Pursuant to the agreement, she admitted the allegations of fact set forth in the formal statement of charges. She further admitted that, by engaging in such conduct, she had violated the following Rules of the Code of Judicial Conduct:

(a) Rule 1.1, which states that "[a] judge shall comply with the law, including the West Virginia Code of Judicial Conduct";

(b) Rule 1.2, which states that "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety";

(c) Rule 1.3, which states that "[a] judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so";

(d) Rule 2.2, which states that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially";

(e) Rule 2.4(A), which states that "[a] judge shall not be swayed by public clamor or fear of criticism";

(f) Rule 2.4(B), which states that "[a] judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment"; and

8

(g) Rule 2.5, which states that "[a] judge shall perform judicial and
administrative duties, competently and diligently . . . [and] shall cooperate with other
judges and court officials in the administration of court business."

In addition, Judge Goldston agreed to join Judicial Disciplinary Counsel's
recommendation that she be censured and fined $5,000.[4] Both sides agreed, however, that
"the decision to accept the recommendation concerning discipline rests solely within the
purview of the Judicial Hearing Board and the State Supreme Court."

Judge Goldston appeared before the Judicial Hearing Board on January 15,
2021, and ratified the agreement under oath. One Judicial Hearing Board member,[5]
however, expressed doubt about the charges, suggesting that a power to conduct "views"
falls within the family court's inherent powers or its express statutory authority to seize

---

[4] The agreement also required Judge Goldston to pay costs resulting from the
investigation and prosecution of the complaints against her, but the agreement further
stipulated that Judicial Disciplinary Counsel and the Judicial Investigation Commission
had not incurred any costs.

[5] In its brief to this Court, Judicial Disciplinary Counsel contends that the
member's comments and subsequent actions "are an extreme example of bias" and that the
member should have disqualified himself from this matter. The Judicial Hearing Board
member, however, is not presently before this Court; therefore, we decline to address this
argument.

9

property[6] and supervise the production of evidence.[7]   Judicial Disciplinary Counsel responded that the question was "whether [Judge Goldston] followed an appropriate procedure or not." Judge Goldston's counsel appeared to agree, stating, "[T]he procedures and the due process is the problem that she is admitting to."

The Judicial Hearing Board requested post-hearing briefs, which were filed, and on March 15, 2021, the Judicial Hearing Board issued its recommended decision. The Judicial Hearing Board adopted the parties' stipulations but chose to recommend that Judge Goldston "be admonished and fined $1,000 as an appropriate sanction for her stipulated violations of the Code of Judicial Conduct." In support of this recommendation, the Judicial Hearing Board invoked Judge Goldston's "unblemished disciplinary record and cooperation[.]" and "the absence of any aggravating factors" and the "extensive record" Judge Goldston made "after the incident as to what had occurred at the complainant's residence."[8] The Judicial Hearing Board further cited the fact that another judge, in an

---

[6] *See* W. Va. Code § 51-2A-9(b) (eff. 2012) ("A family court judge may enforce compliance with his or her lawful orders with remedial or coercive sanctions designed to compensate a complainant for losses sustained and to coerce obedience for the benefit of the complainant. . . . Sanctions may include, but are not limited to, seizure or impoundment of property to secure compliance with a prior order.").

[7] *See* W. Va. Code § 51-2A-7(a) (eff. 2013) ("[T]he family court judge has the authority to . . . (4) Compel and supervise the production of evidence . . . .").

[8] Because no written order was entered regarding the search, we assume that the Hearing Board is referring to what Judge Goldston put on the record when the parties returned to the courtroom.

10

unrelated disciplinary action,[9] had been admonished for accompanying law enforcement to a litigant's residence to execute a warrant of seizure, but acknowledged the uncertainty regarding "the scope of a judicial officer's inherent authority relative to judicial views[,]" and the need for "guidance to judicial officers from the Supreme Court of Appeals through rule-making or otherwise regarding the proper scope of conducting judicial views[.]"

Both Judicial Disciplinary Counsel and Judge Goldston filed objections to the Judicial Hearing Board's recommended decision. Despite her admissions under oath, Judge Goldston now argues that "[i]t is inexplicable . . . how she could be fined or sanctioned for violating ethical canons when the Hearing Board itself found that the law is unclear regarding [her] inherent authority to conduct a judicial view." Nevertheless, she claims that she "is not seeking to abrogate her agreement."

## II. STANDARD OF REVIEW

The standard of review in this matter flows from our "inherent rule-making power" to "promulgate and amend rules prescribing a judicial code of ethics" and "to censure or temporarily suspend any justice, judge[,] or magistrate having the judicial power of the state . . . for any violation of any such code of ethics[.]" W. Va. Const. art. VIII, § 8.[10] This power to sanction is "exclusive." Syl. Pt. 5, in part, *State ex rel. Workman v. Carmichael*, 241 W. Va. 105, 819 S.E.2d 251 (2018). Therefore, our review is "plenary"

---

[9] *See In the Matter of Aboulhosn*, JIC Complaint No. 91-2013.

[10] Family court judges were created and placed under our "general supervisory control" in 2000. W. Va. Const. art. VIII, § 16.

11

and "independent." *Matter of Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). The standard of proof is clear and convincing evidence. Syl. Pt. 2, *Matter of Ferguson*, 242 W. Va. 691, 841 S.E.2d 887 (2020).

Our constitutional power to sanction necessarily includes the power to select the particular form of lawful discipline that we will impose. Accordingly, we have "the right to accept or reject the disciplinary sanction recommended by the [Judicial Hearing] Board." *Matter of Crislip*, 182 W. Va. 637, 638, 391 S.E.2d 84, 85 (1990). In all such cases, our goal and "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl. Pt. 1, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

With these principles in mind, we will consider Judge Goldston's alleged violations of the Code of Judicial Conduct and what discipline, if any, is appropriate.

### III. ANALYSIS

Judicial Disciplinary Counsel argues that Judge Goldston is bound by the findings of fact and conclusions of law set forth in her agreement, namely that Judge Goldston's "view" of the home was unlawful, unconstitutional, and unethical; and that the Court should impose the censure and fine that the parties agreed to recommend.

For her part, Judge Goldston agrees that she remains bound by her prior statements of fact, yet she contends that "what constitutes a violation, and the effect of a violation, w[ere] always to be reviewed by the [Judicial Hearing Board] and this Court."

12

Accordingly, she contends that the parties remain free to "argue questions of law[.]" She denies that the Judicial Investigation Commission ever charged her with, or that she has ever confessed to, any constitutional violations. On the contrary, she contends that "[s]ubsequent research . . . revealed a body of law that supports" her actions. In particular, she claims that she had "inherent authority to conduct an onsite visit" and that "view[ing] the division of property" allowed the ex-husband to "purge his contempt." She contends that, "[u]nlike the execution of a search warrant, the view was conducted with judicial oversight. Therefore, it was not *per se* unreasonable." Ultimately, Judge Goldston believes that her conduct was lawful and that, if she is mistaken, her mistake was error, not an ethical violation. She urges the Court to "clarify the law and either affirm the ruling of the [Judicial Hearing Board] or as the final arbiter conclude that there [wa]s no wrongdoing[.]"

### A. Judge Goldston Searched the Ex-Husband's Home.

We begin with a threshold question: Did Judge Goldston view the ex-husband's home, or did she search it? We find that she searched it. A "view" is "the act or proceeding by which a tribunal goes to *observe* an object that *cannot be produced in court because it is immovable or inconvenient to remove.*" *View*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added); *accord Barron v. United States*, 818 A.2d 987, 990 (D.C. 2003) ("A jury view is proper when 'an object in question cannot be produced in court because it is immovable or inconvenient' and, therefore, it is necessary for the fact-finder 'to go to the object in its place and there observe it.' *Dailey v. District of Columbia*, 554 A.2d 339, 340–41 (D.C.1989) (quoting IV WIGMORE ON EVIDENCE

13

§ 1162 at 362 (1972 & 1988 Supp.))."); *State v. Pauline*, 100 Haw. 356, 374, 60 P.3d 306, 324 (2002) *overruled on other grounds as stated in State v. Abdon*, 134 Haw. 114, 334 P.3d 777 (Ct. App. 2014), *as corrected* (Oct. 27, 2014), *aff'd*, 137 Haw. 19, 364 P.3d 917 (2016) ("The very definition of a view favors treating it as evidence. *Black's Law Dictionary* defines a 'view' as 'the act or proceeding by which [a] tribunal goes to an object which cannot be produced in court because it is immovable or inconvenient to remove, and there observes it.' *Black's Law Dictionary* 1568 (6th ed.1990)."); § 219. *Views*, 2 MCCORMICK ON EVID. § 219 (8th ed.) ("Courts have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing. Venturing forth to observe places or objects that are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom, is termed a 'view.'"); *see, e.g., State v. Thomas*, 179 W. Va. 811, 374 S.E.2d 719 (1988) (view of parking lot); *Bennett v. Walton*, 170 W. Va. 283, 294 S.E.2d 85 (1982) (view of roadway); *State Rd. Comm'n v. Bowling*, 152 W. Va. 688, 166 S.E.2d 119 (1969) (view of land acquired for highway); *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W. Va. 549, 165 S.E.2d 113 (1968) (view of swimming pool).

We agree that the ex-husband's home was "immovable" and certainly "inconvenient" to produce in court. *View*, BLACK'S LAW DICTIONARY (11th ed. 2019). However, Judge Goldston did not go to the property to *observe* the ex-husband's house; she went there to locate and seize certain of its contents—pictures, DVDs, and other items of personal property. These items of personal property were not "immovable or

14

inconvenient to remove" from the home. *Ibid.* In fact, the ex-wife removed many of these items during the so-called "view." Accordingly, we find that Judge Goldston's actions at the residence were not a view. [11]

On the contrary, the record is clear that Judge Goldston went to the property to *locate* things, not simply to observe them. Her own words support this conclusion. When the ex-husband demanded a list of what she was seeking, she appeared to reply, "[y]ou have a list of everything [unintelligible] attached to the order." When the ex-husband professed not to "know where some of it's at[,]" she replied, "Well, *we're gonna find it*." (Emphasis added.)

Looking for things is a "search" by any sensible definition of the term. As the United States Supreme Court stated in *Terry v. Ohio*, 392 U.S. 1, 16 (1968), "it is nothing less than sheer torture of the English language to suggest that a careful *exploration* of the outer surfaces of a person's clothing all over his or her body *in an attempt to find* weapons is not a 'search'" (emphasis added). *Accord Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' N. Webster,

---

[11] Because we find that Judge Goldston's conduct at the residence was a search, not a view, we refuse to decide whether a family court judge, or other judicial officer, has the inherent or other authority to conduct a true view under different circumstances. We are not in the business of "making advisory decrees or resolving academic disputes." Syl. Pt. 1, in part, *State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 836 S.E.2d 441 (2019) (quoting Syl. Pt. 2, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991)).

15

An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989)."); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) ("[T]he defendants went to the school *for the specific purpose of gathering information*, an activity that most certainly constitutes a search under the Fourth Amendment." (emphasis added)); *§ 2.1(a) Definition of "searches" and "seizures,"* 1 SEARCH & SEIZURE § 2.1(a) (6th ed.) ("Under the traditional approach, the term 'search' is said to imply 'some exploratory investigation, or an invasion and quest, a looking for or seeking out.'" (quoting C.J.S., *Searches and Seizures* § 1 (1952)).

Searches are an activity of the executive department. *State ex rel. Parma Cmty. Gen. Hosp. v. O'Donnell*, 2013-Ohio-2923, ¶ 7 (stating that "searches are executive in nature."). "Indeed, searches are so quintessentially executive in nature that even a judge who participates in one acts 'not * * * as a judicial officer, but as an adjunct law enforcement officer.'" *State ex rel. Hensley v. Nowak*, 52 Ohio St. 3d 98, 99, 556 N.E.2d 171, 173 (1990) (per curiam) (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)) (holding that a writ of prohibition would not issue to restrain administrative searches because they are neither judicial nor quasi-judicial acts).

To say that searches are an executive activity is to announce no new principle of law. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party *which was essentially a police operation*." *Lo-Ji Sales, Inc.* at 327 (emphasis

16

.

added). The Supreme Court found that, in doing so, the town justice "*was not acting as a judicial officer* but as an adjunct law enforcement officer[.]" *ibid.*, and that "[i]t [wa]s difficult to discern when he was acting as a 'neutral and detached' judicial officer and when he was one with the police and prosecutors *in the executive seizure*," *id.* at 328 (emphasis added). Other courts, often following *Lo-Ji Sales*, routinely assume that searching is a law enforcement activity. *United States v. Barnes*, 895 F.3d 1194, 1202 (9th Cir. 2018) (noting that "*Lo-Ji Sales* was an extreme case where the judicial officer allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." (internal quotation marks removed)); *United States v. Clyburn*, 806 F. Supp. 1247, 1252 (D.S.C. 1992), *aff'd*, 24 F.3d 613 (4th Cir. 1994) (noting that, "[i]n *Lo Ji Sales*, the Court held that the judge who issued the warrant did not manifest that neutrality and detachment demanded of a judicial officer because the judge took an active law enforcement type role in conducting the search" (internal quotation marks removed)).

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments *shall be separate and distinct*[.]" W. Va. Const. art. V, § 1 (emphasis added). The Constitution further specifies, in unmistakable terms, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time[.]" *Ibid.*[12] In light of these

---

[12] Article V, Section 1 provides a single exception for justices of the peace, who may serve in the Legislature. *Ibid.* "Justices of the peace" are now called "magistrates." W. Va. Code § 50-1-17 (eff. 1976).

17

clear prohibitions, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power.   W. Va. Const. art. 5, § 1.  Because Judge Goldston plainly engaged in such a search, we find that the so-called "view" was improper.

### B.  Judge Goldston Violated the Code of Judicial Conduct.

Having resolved the threshold question, we turn to the question of whether Judge Goldston violated the Code of Judicial Conduct.  "Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding must be proved by clear and convincing evidence." *Ferguson*, 242 W. Va. at ___, 841 S.E.2d at 888, syl. pt. 2, in part (internal quotation marks removed).  However, we note that Judge Goldston has admitted, under oath, the allegations of fact set forth in the formal statement of charges.  Under oath, she has further admitted that those facts are clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct and that she did, *in fact*, violate those rules.

We have held that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, in part, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).  We have further held that

> [i]n a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated.

18

*Id.* at 56-57, 501 S.E.2d at 773-74, syl. pt. 4. Based on our review of the record in this matter, we agree that the above-mentioned violations have been proven by clear and convincing evidence, and we see no reason, in the context of our plenary review, to reject or qualify Judge Goldston's admissions. *Law. Disciplinary Bd. v. Sidiropolis*, 241 W. Va. 777, 785, 828 S.E.2d 839, 847 (2019) ("Because the relevant facts underlying this disciplinary proceeding are not disputed and Mr. Sidiropolis has voluntarily stipulated to his violation of Rule 8.4(b), we focus our analysis of this matter on the proper sanctions to be imposed.").

### C. Judge Goldston's Misconduct Warrants Censure and a Fine.

The question now becomes what sanction or sanctions, if any, we should impose. Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019] authorizes us to "impose *any one or more* of the following sanctions for a violation of the Code of Judicial Conduct: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement" (emphasis added);[13] *see also* Syl. Pt. 5, in part, *In re Toler*, 218 W. Va. 653, 625 S.E.2d 731 (2005) (holding that "it is clearly within this Court's power and discretion to impose multiple sanctions . . . for separate and distinct violations"). Rule 4.12 further explains that "[a]n admonishment constitutes *advice or caution* to a judge to refrain from

---

[13] Involuntary retirement may only be imposed in the case of "a judge . . . of advancing years and attendant physical or mental incapacity . . . who is eligible to receive retirement benefits under the judges' retirement system or public employees retirement system." *Ibid.*

19

engaging in similar conduct which is deemed to constitute a violation of the Code of Judicial Conduct"; "[a] censure constitutes *formal condemnation*" for such a violation. W. Va. R. Jud. Disc. P. 4.12 (emphasis added).

> We have held that

> > in determining *whether to suspend a judicial officer with or without pay*, [we] should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007) (emphasis added). Though *Cruickshanks* speaks in terms of suspension, we believe that *Cruickshanks* provides an appropriate guide that may be applied whenever we contemplate imposing sanctions under Rule 4.12. Accordingly, we hold that in determining what sanction or sanctions, if any, to impose under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure [eff. 2019], this Court will consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4)

20

whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

In this case, the parties have agreed to recommend a *censure* and a $5,000 fine. The Judicial Hearing Board recommended an *admonishment* and a $1,000 fine. Neither recommendation binds us. Rather, applying *Cruickshanks* as a guide, we note the following.

*First*, Judge Goldston's misconduct was directly related to the administration of justice. She forced her way into the ex-husband's home—over his reasonable objections—by threatening to jail him for contempt. She said, "I am the judge trying to effect equitable distribution. We're having a hearing. Now, you let me in that house or he [the bailiff] is going to arrest you for being in direct contempt of court."

*Second*, Judge Goldston's misconduct was carried out in her public persona and seriously undermined the public's perception of the administration of justice. Public comments show that many who viewed her conduct on the internet were justly and deeply offended. Without question, Judge Goldston's conduct cast doubt in the minds of the citizens who viewed the recording of the incident as to whether the parties were being treated with justice and fairness.

*Third*, Judge Goldston's misconduct displayed a callous disregard for our system of justice. Even setting aside the inappropriateness of the search, Judge Goldston went about the search in a highhanded and procedurally flawed manner. Instead of receiving both sides' testimony and evidence and rendering a decision, she interrupted the

21

ex-wife's testimony and directed the parties to meet her at the ex-husband's residence, affording the ex-husband no explanation and no opportunity to object until she arrived at the scene. Though she claimed she was "having a hearing[,]" she made no attempt of any kind to contemporaneously record what transpired. Indeed, she forbade others to make a recording, at risk of incarceration. Failing to record what transpired made her a potential witness. Most significantly, though she seems to have been well-aware of the lawful procedures at her disposal to enforce her order,[14] she chose not to use them because she deemed them ineffective.

*Fourth*, weighing in her favor, Judge Goldston's actions do not entail any criminal action for which she has been indicted.

*Fifth*, as mitigating factors, we note that Judge Goldston has been forthright about her conduct and that, in her twenty-seven years on the bench, this is the first time she has been disciplined. In addition, we find that Judge Goldston has shown some degree of remorse for her conduct.

Weighing the factors set forth in *Cruickshanks*, we find that the seriousness of Judge Goldston's conduct, coupled with the manner in which such conduct was carried out, has undermined the public's confidence in the administration of justice and justifies imposition of a censure in this matter. As set forth in Rule 4.12 of the West Virginia Rules

---

[14] *See, e.g.*, W. Va. Code § 48-1-304(b) (eff. 2001) (authorizing a family court to incarcerate a person who "fails or refuses to purge himself [or herself] of contempt"); W. Va. Code § 51-2A-9(b) (eff. 2012) (authorizing a family court judge to impose "remedial or coercive sanctions" including "seizure or impoundment of property").

22

of Judicial Disciplinary Procedure, an admonishment, as recommended by the Judicial Hearing Board, merely constitutes "advice or caution" to refrain from further violations, while a censure constitutes "formal condemnation" for such conduct. We find that the nature of the conduct clearly warrants such condemnation by this Court.

As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search. As we have previously held:

> A Judge is not expected to and should not summarily step from his judicial function and become an investigator, prosecutor, arresting officer, or instigator of legal actions, for when he does, he lessens the public confidence in the impartiality of his office. It is important that the Judge not only actually maintain integrity and impartiality, but that he must

23

also give the appearance of such. No Judge should take unto himself activities or functions which are delegated to other branches of the government.

*W. Va. Jud. Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 237, 271 S.E.2d 427, 429–30 (1980) (quoting West Virginia Judicial Review Board findings).

Finally, we find that the parties' previous stipulations in this matter, while not binding on our decision, are nonetheless relevant to our determination. Judge Goldston clearly agreed with the Judicial Disciplinary Counsel's recommendation that she be censured and fined $5,000. Admittedly, however, such agreement was made with the acknowledgment that "the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court."

Ultimately, the decision as to the proper sanction to be imposed rests with this Court, and we may "accept or reject the disciplinary sanction" recommended by the Judicial Hearing Board. *Crislip*, 182 W. Va. at 638, 391 S.E.2d at 85. We find that the facts of this case warrant a censure, as was stipulated by the parties, and to the extent that the Judicial Hearing Board determined otherwise, we reject such recommendation. An admonishment is insufficient to address the seriousness of Judge Goldston's conduct and the impact such violations have on the public's confidence in the judiciary.

However, further exercising our authority to accept or reject the recommendation of the Judicial Hearing Board, we accept the Board's recommendation that Judge Goldston be fined $1,000. We believe that the imposition of a censure, rather than an admonishment, adequately recognizes the seriousness of Judge Goldston's

24

conduct. Such sanction, coupled with the $1,000 fine, will fulfill the disciplinary goals of preserving and enhancing the public's confidence in the "honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." *Cruickshanks*, 220 W. Va. at 514, 648 S.E.2d at 20, syl. pt. 1, in part.

Based upon the facts and circumstances of this case, and taking into account the mitigating factors present, as well as the parties' previous stipulations in this matter, we impose a censure and a fine of $1,000.

## IV. CONCLUSION

For the foregoing reasons, the Court orders that Judge Goldston is **censured** and ordered to pay a **fine of $1,000**.

Censure and fine ordered.

25

## BEFORE THE JUDICIAL INVESTIGATION COMMISSION OF WEST VIRGINIA

**IN THE MATTER OF,**                                    **COMPLAINT NO. 56-2020**
**THE HONORABLE ERIC SHUCK, JUDGE**
**OF THE 13ᵀᴴ FAMILY COURT CIRCUIT**

### PUBLIC ADMONISHMENT OF THE HONORABLE ERIC SHUCK,
### JUDGE OF THE 13ᵀᴴ FAMILY COURT CIRCUIT

The matter is before the Judicial Investigation Commission ("JIC") upon a complaint filed by Judicial Disciplinary Counsel setting forth certain allegations against the Honorable Eric Shuck, Judge of the 13ᵗʰ Family Court Circuit ("Respondent"). An investigation was conducted pursuant to the Rules of Judicial Disciplinary Procedure ("RJDP"). After a review of the complaint, the Judge's written response, the information and documents obtained from the investigation and the pertinent Rules contained in the Code of Judicial Conduct, the JIC found probable cause that Judge Shuck violated Rules 1.1, 1.2, 1.3, and 2.5(A) of the Code of Judicial Conduct at a recent meeting and ordered that he be publicly admonished pursuant to RJDP 1.11 and 2.7(c) as set forth in the following statement of facts and conclusions found by the Commission.

### STATEMENT OF FACTS

Respondent successfully ran for Family Court Judge in the May 2016 election and took office on January 1, 2017. He has served continuously in that position since that time. At all times relevant to the instant complaint, Respondent was serving in his capacity as a Family Court Judge.

On or about June 16, 2020, Judicial Disciplinary Counsel opened a complaint against Respondent. The gravamen of the complaint was that Respondent was going to the homes of litigants to determine if certain disputed marital personal property was in the possession of the occupant and/or to supervise the transfer of said items. By reply dated July 8, 2020, Respondent admitted to taking such action in two separate cases in September and November 2019. In each

1



case, the Respondent stated that both parties were represented by attorneys; one attorney requested the home visit to "see if property which w[as] to be provided to [his/her client] was still located at the home;" "the marital home and the property were still under the jurisdiction of the Court;" and there was no objection by the other lawyer.

On July 24, 2020, Judicial Disciplinary Counsel took Respondent's sworn statement. Respondent opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years.[1] Respondent also stated that no one objected to the home visit. He stated that had one party raised an objection in either case, he would have denied the home visit. Respondent likened the practice to a jury view or similar continuation of the court proceeding and stated that as a finder of fact it was necessary to determine whether a party could be held in contempt for not turning over personal property as previously ordered by the Court.

When asked, Respondent could provide no statute, rule or case that gave him the authority to conduct home visits. Respondent also acknowledged that there was nothing in the contempt powers that gave him the authority to conduct a home visit. Respondent confessed that he never held anyone in contempt prior to going to the home and that he failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt. Respondent admitted that he never had any clear or written procedures for conducting a home visit, including but not limited to, when the proceeding should be utilized and how the process should take place. He also acknowledged that he never took a court reporter to the scene and that he only recorded one of the two visits. Upon

---

[1] The colleague, who is also the subject of a judicial disciplinary proceeding, recently engaged in a visit to a litigant ex-husband's home to search for marital property that had been the focus of a contempt proceeding. The ex-husband was not represented by a lawyer and was not advised of the purpose of the visit prior to the judge, his ex-wife and her lawyer going to the home. Once there, the ex-husband moved to disqualify the judge but was told the motion was not timely and would have to be submitted in writing.

2

reflection, Respondent agreed that the practice could make him a potential witness to a future proceeding which could then result in his disqualification.

## CONCLUSIONS

The Commission unanimously[2] found that probable cause exists in the matters set forth

above to find that the Honorable Eric Shuck, Judge of the 13th Family Court Circuit, violated Rules

1.1, 1.2, 1.3 and 2.5(A) of the Code of Judicial Conduct as set forth below:

### 1.1 – Compliance With the Law

A judge shall comply with the law, including the West Virginia Code of Judicial
Conduct.

### 1.2 – Confidence in the Judiciary

A judge shall act at all times in a manner that promotes public confidence in the
independence, integrity, and impartiality of the judiciary, and shall avoid
impropriety and the appearance of impropriety.

### 1.3 – Avoiding Abuse of the Prestige of Judicial Office

A judge shall not abuse the prestige of judicial office to advance the personal or
economic interests of the judge or others, or allow others to do so.

### 2.5 – Competence, Diligence and Cooperation

(A)  A judge shall perform judicial and administrative duties, competently and
diligently.

The Commission further found that formal discipline was not essential as Respondent had

no prior disciplinary actions and had been led astray, in part, by another colleague's actions.

However, the Commission found that the violations were serious enough to warrant a public

admonishment.

The Preamble to the Code of Judicial Conduct provides:

Our legal system is based on the principle that an independent, fair and
competent judiciary will interpret and apply the laws that govern us. The

---

[2] The vote was 8-0. The Honorable H.L. Kirkpatrick, III, Judge of the 10th Judicial Circuit recused himself.

3

JA378

> role of the judiciary is central to the American concepts of justice and the
> rule of law. Intrinsic to all sections of this Code are the precepts that judges,
> individually and collectively, must respect and honor the judicial office as
> a public trust and strive to enhance and maintain confidence in our legal
> system. The judge is an arbiter of facts and law for the resolution of disputes
> and a highly visible symbol of government under the rule of law. . . . Good
> judgment and adherence to high moral and personal standards are also
> important.

Home visits by a Family Court Judge to locate and/or secure personal property in a contempt proceeding are ill-advised and inappropriate. Such visits are not authorized by any statute, rule or case law, and a family court judge runs the risk of disqualification if he/she were to become a witness in a subsequent proceeding pertaining thereto. Judges have a duty to preside over cases whenever possible and should limit their activity so as to avoid the risk of disqualification. The risk is clearly more likely when a judge fails to document proceedings either by transcription, recordation, or order.

The burden of proof in a contempt proceeding rests with the moving party. In other words, it is the moving party's responsibility to provide evidence in support of their contention that the other side has failed to produce the items in question. When a judge goes to a scene to gather evidence, he/she places himself/herself in the stead of the moving party and ceases to serve as a factfinder. More importantly, when a judge goes to a home to help enforce a prior court order, he abrogates his responsibility as a judge in favor of some nonexistent role in the the executive branch.

Therefore, it is the decision of the Judicial Investigation Commission that the Honorable Eric Shuck, Judge of the 13th Family Court Circuit, be disciplined by this Admonishment. Accordingly, the Judicial Investigation Commission hereby publicly admonishes Judge Shuck for his conduct as fully set forth in the matters asserted herein.

*****

4

Pursuant to Rule 2.7(c) of the Rules of Judicial Disciplinary Procedure, the Respondent has

fourteen (14) days after receipt of the public admonishment to file a written objection to the contents

thereof. If the Respondent timely files an objection, the Judicial Investigation Commission shall,

pursuant to the Rule, file formal charges with the Clerk of the Supreme Court of Appeals of West

Virginia.

The Honorable Alan D. Moats Chairperson
Judicial Investigation Commission

08/25/2020
Date

ADM/tat

5

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                    SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,    JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13th FAMILY COURT CIRCUIT

### AGREEMENT

COMES NOW the Honorable Louise E. Goldston, Judge of the 13th Family Court Circuit, ("Respondent" or "Judge Goldston") and Teresa A. Tarr and Brian J. Lanham, Judicial Disciplinary Counsel, and hereby enter into this Agreement consisting of the following terms:

1.   Respondent has served as a Family Law Master/Family Court Judge for 26 years. At all times relevant to the charges set forth below Respondent was serving in her capacity as a Family Court Judge;

2.   On March 11, 2020, Judicial Disciplinary Counsel opened Complaint 30-2020 and on March 18, 2020, Matthew Gibson filed Complaint 33-2020. The two complaints involved the same conduct;

3.   The Judicial Investigation Commission ("JIC") immediately began an investigation into the complaint. On September 23, 2020, the JIC filed a one-count formal statement of charges against Respondent;

4.   Accordingly, the parties understand, acknowledge and agree to the following:

     a.   "[A]greements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed. . . ." Syl. pt.3, *In the Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998);

     b.   The burden of proof in judicial disciplinary cases is clear and convincing evidence. *Id.*;

1

EXHIBIT
3
Goldston
3/1/2022   BC

c.  Respondent admits the allegations contained in Paragraph Nos. 1 through 14 of the Formal Statement of Charges in their entirety;

d.  Respondent admits that all the facts contained in Paragraph Nos. 1 through 14 of the Formal Statement of Charges contain clear and convincing evidence that she violated Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the Code of Judicial Conduct.

e.  Respondent also admits to violating Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B) and 2.5 of the Code of Judicial Conduct for engaging in the conduct set forth in Paragraph Nos. 1 through 14 of the Formal Statement of Charges.

f.  In exchange for the admissions set forth above Judicial Disciplinary Counsel agrees not to pursue any other possible alleged violations of the Code of Judicial Conduct.

g.  As mitigation, both parties acknowledge and agree that Respondent has never been subject to judicial discipline, was completely cooperative during the investigation of the instant complaint and admitted her wrongdoing;

h.  Judicial Disciplinary Counsel and Respondent agree to jointly recommend to the Judicial Hearing Board and the State Supreme Court that Respondent be censured and fined $5,000 as an appropriate sanction for the foregoing violations of the Code of Judicial Conduct;

i.  Judicial Disciplinary Counsel and Respondent agree that Respondent will be responsible for costs incurred as a result of the investigation and prosecution of the complaints;

2

j.    Both parties understand, acknowledge, and agree that the decision to accept the recommendation concerning discipline rests solely within the purview of the Judicial Hearing Board and the State Supreme Court. The parties understand, acknowledge and agree that the Judicial Hearing Board and the State Supreme Court may award more or less severe discipline than what is recommended by the parties and that the parties are bound by the decisions;

k.    Both parties acknowledge and agree that neither the Judicial Investigation Commission nor Judicial Disciplinary Counsel incurred any costs as a result of the investigation into the disciplinary charges; and

Respondent understands, acknowledges, and agrees that he is entering into this agreement because it is in her best interest and that no other inducements have been promised other than what is contained within the four corners of this document. All parties agree to do everything necessary to ensure that the foregoing terms of this agreement take effect.

AGREED:

_____                    9/30/2080
Judge Louise E. Goldston, Respondent           Date

_____                    9/30/2020
Counsel for Respondent Andrew S Nason (WVBar#2707) Date

_____                    10/5/2020
Teresa A. Tarr, Esquire                        Date
Judiciary Disciplinary Counsel

_____                    10-5-2028
Brian J. Lanham                                Date
Judicial Disciplinary Counsel

3

JA383

## IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                            SUPREME COURT No. 20-0742
THE HONORABLE LOUISE E. GOLDSTON,          JIC COMPLAINT NOS. 30 & 33-2020
JUDGE OF THE 13ᵗʰ FAMILY COURT CIRCUIT

### FORMAL STATEMENT OF CHARGES

The West Virginia Judicial Investigation Commission, pursuant to Rules 2.7 (a) and (d) and
2.8 of the Rules of Judicial Disciplinary Procedure, has determined that probable cause does exist to
formally charge the Honorable Louise E. Goldston, Judge of the 13th Family Court Circuit
("Respondent" or "Judge Goldston"), with violations of the Code of Judicial Conduct and that formal
discipline is appropriate:

Respondent has served as a Family Law Master/Family Court Judge for approximately 26
years. At all times relevant to the charges set forth below Respondent was serving in her capacity as
a Family Court Judge.

On March 11, 2020, Judicial Disciplinary Counsel opened Complaint No. 30-2020 and on
March 18, 2020, Matthew Gibson filed Complaint No. 33-2020. The two complaints alleged the
same misconduct.

After investigating and evaluating the Complaints, the Judicial Investigation
Commission finds that there is probable cause to make the following CHARGES and
FINDINGS:

FAMILY COURT JUDGE GOLDSTON violated Rule 1.1 (compliance with the law),
Rule 1.2 (confidence in the judiciary), Rule 1.3 (avoiding abuse of prestige of office), Rule 2.2
(impartiality and fairness), Rule 2.4(B) (external influences), Rule 2.5 (competence, diligence
and cooperation) and Rule 3.1(A), (B), (D) (extrajudicial activities in general) of the Code of
Judicial Conduct as set forth in the attached Appendix when she committed the following acts:



1

1.  Over the past twenty years as a Family Court Judge, Respondent has been engaging in the practice of visiting homes of litigants appearing in front of her. Respondent went to the litigants' homes to either determine if certain disputed marital property was present and/or to supervise the transfer of disputed property. Respondent admitted to conducting these home visits in her capacity as a Family Court Judge on eleven separate occasions in different cases.

2.  In every instance except Mr. Gibson's case, all of Respondent's home visits were prompted by a motion by a litigant's attorney and not objected to by the opposing party and with full knowledge of the purpose therein. Most of the Respondent's home visits occurred during a court hearing in the case. A party's attorney would move the Court to leave directly from the bench and accompany the parties to the home. After granting the motion, Respondent would meet the parties at the home.

3.  On March 4, 2020, during a contempt hearing in the Matthew Gibson divorce case, there was an allegation that Mr. Gibson negligently damaged marital property he was ordered to turn over to the opposing property. The opposing party further alleged that Mr. Gibson failed to turn over several items of sentimental value as previously ordered by the Court.

4.  During the hearing, Respondent suddenly and without explanation asked Mr. Gibson, who was representing himself *pro se*, for his address. Respondent *sua sponte* stopped the hearing and ordered the parties to meet her at Mr. Gibson's house in ten minutes again without any explanation. Because of Respondent's failure to explain the reason for the home visit, Mr. Gibson was unable to raise any objection while still at the hearing.

2

5.  Once everyone arrived at Mr. Gibson's home and the purpose of the visit became clear, Mr. Gibson moved to recuse Respondent on the ground that she had become a potential witness in the case. Respondent denied the motion as untimely.

6.  Mr. Gibson then verbally refused to allow Respondent or anyone else in his house without a search warrant. Respondent threatened to put Mr. Gibson in jail if he denied them entry into his house. Mr. Gibson felt he had no choice but to relent.

7.  Upon Respondent's arrival at Mr. Gibson's property, Mr. Gibson had a bystander video record the initial interactions outside the house between Respondent and the parties. Mr. Gibson also secretly recorded several minutes of audio of the initial interaction on his cell phone.

8.  When the video and audio recordings were discovered by Respondent, she ordered both recordings stopped. However, once inside the house, Respondent's bailiff used his phone to record both video and audio of the separation of marital assets.

9.  On July 22, 2020, Judicial Disciplinary Counsel took Respondent's sworn statement. Respondent admitted that she failed to inform Mr. Gibson of the purpose of the home visit while the parties were in the courtroom and that she did not give him any opportunity to object thereto until everyone was at his house.

10. Respondent opined that she believed it was proper to visit litigants' homes. Respondent likened the practice to a jury view or similar continuation of the court proceeding and stated that as a finder of fact it was necessary to determine whether a party could be held in contempt for not turning over personal property as previously ordered by the Court.

11. When asked, Respondent could provide no statute, rule or case that gave her the authority to conduct home visits. Respondent also acknowledged that there was nothing in the

3

contempt powers that gave her the authority to conduct a home visit. Respondent confessed that she never held anyone in contempt prior to going to the home and that she failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt.

12.    Respondent admitted that she never had any clear or written procedures for conducting a home visit, including but not limited to, when the proceeding should be utilized and how the process should take place. She also acknowledged that she never took a court reporter to the scene.

13.    Upon reflection, Respondent agreed that the practice could make her a potential witness to a future proceeding which could then result in her disqualification.    Respondent further agreed that family court judges run the risk of disqualification if he/she were to become a witness in a subsequent proceeding pertaining thereto.

14.    Respondent also agreed that the burden of proof in a contempt proceeding rests not with the Family Court Judge but with the moving party. She agreed that it is the moving party's responsibility to provide evidence in support of his/her contention that the other side has failed to produce the items in question. Respondent admitted to improperly putting herself in the role of litigant.

*    *    *    *    *    *    *

Respondent is advised that she has the right to file responsive pleadings to the charges made against her not more than 30 days after service of the formal charges upon her by the Clerk of the Supreme Court of Appeals of West Virginia. Rule 2.10 of the Rules of Judicial Disciplinary Procedure provides:

4

JA387

The judge may file responsive pleadings as provided in the West Virginia Rules of Civil Procedure. Any such pleadings shall be filed by the judge with the Clerk of the Supreme Court of Appeals and the Office of Disciplinary Counsel not more than thirty (30) days after the date of the formal charges. For good cause shown, the Office of Disciplinary Counsel may extend the time for filing of such pleadings.

**STATEMENT OF CHARGES** issued this *18th* day of *September*, 2020.

The Honorable Alan D. Moats, Chairperson
Judicial Investigation Commission

ADM/bjl

APPENDIX

WEST VIRGINIA CODE OF JUDICIAL CONDUCT

**Rule 1.1 Compliance With the Law**

A judge shall comply with the law, including the West Virginia Code of Judicial Conduct.

**Rule 1.2 Confidence in the Judiciary**

A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.

**Rule 1.3 Avoiding Abuse of the Prestige of Judicial Office**

A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others or allow others to do so.

**Rule 2.2 Impartiality and Fairness**

A judge shall uphold and apply the law and shall perform all duties of judicial office fairly and impartially.

**Rule 2.4 External Influences on Judicial Conduct**

B.    A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.

**Rule 2.5 Competence, Diligence, and Cooperation**

A.    A judge shall perform judicial and administrative duties, competently and diligently.

**Rule 3.1 Extrajudicial Activities in General**

A judge may engage in extrajudicial activities, except as prohibited by law or this Code. However, when engaging in extrajudicial activities, a judge shall not:

6

A.    participate in activities that will interfere with the proper performance of the judge's judicial duties;

B.    participate in activities that will lead to frequent disqualification of the judge; . . . .

D.    engage in conduct that would appear to a reasonable person to be coercive;

7

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                            SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,   JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13th FAMILY COURT CIRCUIT

### RULE 2.8 NOTICE OF FILING OF
### FORMAL STATEMENT OF CHARGES

Comes now Judicial Disciplinary Counsel pursuant to Rule 2.8 of the Rules of Judicial

Disciplinary Procedure and on behalf of the Judicial Investigation Commission and provides notice

to Louise E. Goldston, Judge of the 13th Family Court Circuit, by email and United States Mail

that on the 23rd day of September 2020, he duly filed the attached Formal Statement of Charges in

the above-captioned matter with the Clerk of the Supreme Court of Appeals of West Virginia by

hand delivering the original and nine copies to the Clerk's Office located at the Capitol Complex,

Building One, Room E-317, 1900 Kanawha Boulevard East, Charleston, West Virginia 25305.


Respectfully submitted,


Brian J. Lanham, Deputy Counsel
WV Bar I.D. No. 7736
Judicial Investigation Commission
City Center East Suite 1200A
4700 MacCorkle Avenue SE
Charleston, WV 25304
(304) 558-0169

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

IN THE MATTER OF:                               SUPREME COURT No. _____
THE HONORABLE LOUISE E. GOLDSTON,    JIC COMPLAINT Nos. 30-2020 & 33-2020
JUDGE OF THE 13th FAMILY COURT CIRCUIT

### CERTIFICATE OF SERVICE

I, Brian J. Lanham, Deputy Counsel for the Judicial Investigation Commission, do hereby

certify that I served the Notice of Filing and a true and accurate copy of the Formal Statement of

Charges on Respondent by placing the same in the United States mail first-class postage pre-paid and

addressed as follows: Family Court Judge Louise Goldston, Raleigh County Judicial Center, 222 Main

Street, Beckley, WV 25801; and by email to Lou.Goldston@courtswv.gov on this the 23rd day of

September, 2020.

Brian J. Lanham, Deputy Counsel
Judicial Investigation Commission
WV Bar I.D. No. 7736
City Center East, Suite 1200 A
4700 MacCorkle Avenue
Charleston, WV 25304
(304) 558-0169

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

BEFORE THE JUDICIAL HEARING BOARD OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

In the Matter of:

HONORABLE LOUISE E. GOLDSTON,
JUDGE OF THE 13th FAMILY COURT CIRCUIT
Supreme Court No. 20-0742
JIC Complaint Nos. 30-2020, 33-2020

* * * * * ** * * * * * * * * * * * * * * * * * * * * * * * * * *

        Hearing held in the above-entitled matter before
The Honorable Michael D. Lorensen, Hearing Examiner, via
remote video conference, on the 15th day of January, 2021 at
10:30 a.m.; all participants appearing remotely.

                CHERYL G. MUNSON, CCR
                REALTIME REPORTERS, LLC
                    713 Lee Street
                Charleston, WV   25301
                    (304) 344-8463
                www.realtimereporters.net

EXHIBIT
5
Goldston
3/1/2022    BC

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                     HEARING
                                                          January 15, 2021

```
                    REMOTE APPEARANCES:


APPEARING FOR THE JUDICIAL HEARING BOARD (via video):
     Ancil Ramey, Esquire
     STEPTOE & JOHNSON
     825 Third Avenue, Suite 400
     Huntington, West Virginia  25701

APPEARING FOR THE JUDICIAL INVESTIGATION COMMISSION
(via video):
     Teresa Tarr, Esquire
     Brian J. Lanham, Esquire
     JUDICIAL INVESTIGATION COMMISSION
     4700 MacCorkle Avenue S.E., Suite 1200A
     Charleston, West Virginia  25304

APPEARING FOR AND WITH RESPONDENT,
HONORABLE LOUISE E. GOLDSTON (via telephone):
     Andrew Nason, Esquire
     PEPPER & NASON
     8 Hale Street
     Charleston, West Virginia  25301

JUDICIAL HEARING BOARD MEMBERS PRESENT:
     Honorable Richard Postalwait (via telephone)
     Honorable Glen Stotler (via video)
     Honorable Paul T. Farrell (via video)

APPEARING ON BEHALF OF MATT GIBSON:
     John Bryan, Esquire (via video)
     ATTORNEY AT LAW
     411 Main Street
     Union, West Virginia  24983

ALSO PRESENT:
     Janet Fink, Judicial Assistant (via video)
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

```
                            INDEX

                                                     Page
HON. LOUISE E. GOLDSTON
     Examination by Mr. Lanham                         6
                          EXHIBITS

                                                     Page
JOINT EXHIBITS
Joint Exhibit Nos. 1-7                                10
     Exhibit No. 1
        Formal Statement of Charges
     Exhibit No. 2
        JIC Complaint 30-2020
     Exhibit No. 3
        JIC Complaint 33-2020 including video
     Exhibit No. 4
        Respondent's written response
     Exhibit No. 5
        Courtroom video from morning of March 4, 2020
     Exhibit No. 6
        Transcript of Respondent's July 22, 2020
        Statement Under Oath
     Exhibit No. 7
        Stipulations, agreement and recommended
        disposition
Post-Hearing Video Exhibit                            29
     (Courtroom video March 4, 2020 post home visit)
Court Reporter's Certificate..........................30
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

```
 1                    P R O C E E D I N G S
 2                      (January 15, 2021)
 3              HEARING EXAMINER LORENSEN:  Well, we're at
 4   the appointed hour, so let's go ahead and undertake and
 5   call to order our matter of In Re: Goldston.  It is
 6   Supreme Court No. 20-0742, and there are two JIC numbers,
 7   30 and 33, both of the year 2020.  So it's 30-2020, 33-
 8   2020.
 9              Let's see.  So, Mr. Nason, may I go ahead
10   and administer the oath to Judge Goldston, so that we may
11   proceed?
12              MR. NASON:  Yes, Your Honor.
13              HEARING EXAMINER LORENSEN:  All right.  And
14   Judge Goldston, I'm just going to have to use my
15   imagination.  If you would, raise your right hand.
16              (Witness sworn.)
17              HEARING EXAMINER LORENSEN:  All right.  And
18   you might want to get as close to the phone as you can,
19   Judge Goldston, so that the court reporter can hear you,
20   and she'll -- she'll give me -- she'll give me the evil
21   eye if -- if you don't -- if you don't come through loud
22   and clear, and I may -- I may interrupt you, and apologize
23   if I do that.  It is for the purpose of making a clear
24   record.
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1                    All right --
 2                    THE RESPONDENT:  Is that --
 3                    HEARING EXAMINER LORENSEN:  -- so, Ms. Tarr?
 4                    That's -- I think I heard that.  And I
 5      overtalked you a little bit, so that was me.
 6                    COURT REPORTER:  I did not understand what
 7      she said.
 8                    HEARING EXAMINER LORENSEN:  Okay.  The --
 9                    THE RESPONDENT:  I said -- I said, is that
10      better?
11                    HEARING EXAMINER LORENSEN:  That is.  That
12      -- yes.
13                    COURT REPORTER:  Okay, great.
14                    THE RESPONDENT:  Okay.
15                    HEARING EXAMINER LORENSEN:  Is that one of
16      those things where the very saying it proves it?  Okay.
17      That's -- that's a verbal act, or something like that.  I
18      -- it's been a long time since law school.
19                    All right.  Ms. Tarr or Mr. Lanham, who --
20      who wishes to inquire for the JIC?
21                    MR. LANHAM:  That would be me, Your Honor.
22                    HONORABLE LOUISE GOLDSTON
23      the Respondent herein, having been duly sworn to tell the
24      truth, testified as follows:
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON          HEARING
                                                                    January 15, 2021

```
 1                        EXAMINATION
 2   BY MR. LANHAM:
 3      Q.   Judge Goldston, how long have you been a Family
 4   Court judge?
 5      A.   26 -- since -- Family Court Judge or Family Law
 6   Master since July 1st of 1994.
 7      Q.   And at all times relevant to this proceeding and
 8   this statement of charges, were you a family law judge?
 9   Family court judge, sorry.
10      A.   Yes, sir.
11      Q.   Do you happen to have a copy of the joint
12   exhibits in front of you?
13      A.   I could get them real quick.
14              MR. NASON:   I believe we have them
15   available.
16              MR. LANHAM:   If you don't mind, if you
17   could get Joint Exhibit No. 7, which is the agreement.
18      A.   We're getting there.
19           Yes, sir, I have it.
20      Q.   Could you turn to page 3 of the agreement, please?
21      A.   Okay.
22      Q.   Near the bottom, there is a signature line that
23   appears to have the signature of a Louise Goldston, dated
24   September the 30th, 2020.
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                               HEARING
                                                                        January 15, 2021

```
 1          Do you see that?
 2     A.   I do.
 3     Q.   Is that your signature?
 4     A.   Well, I will tell you that the copy that I have
 5   been handed does not have my signature on it, but I will
 6   testify that I have signed an agreement.  And I have
 7   signed this agreement.
 8     Q.   When you signed it, did you sign it knowingly,
 9   voluntarily, and intelligently?
10     A.   Yes.
11     Q.   I have just a few questions about the agreement
12   itself.  You understand -- is your understanding of the
13   agreement that you're going to admit to the allegations
14   contained in paragraphs 1 through 14 of the formal
15   statement of charges?
16     A.   Let me look at those real quick.
17          That is correct.
18     Q.   Is it also your understanding of the agreement
19   that you're going to admit that all the facts contained in
20   paragraphs 1 through 14 of the Formal Statement of Charges
21   show clear and convincing evidence that you violated Rules
22   1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B), and 2.5 of the Code of
23   Judicial Conduct?
24     A.   Yes.  Though I would like to state that those
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

1   violations were not intentional, and that the conduct that
2   is charged was not known to me at the time to be a
3   violation of those ethics, canons.
4        Q.   Do you have a copy of Joint Exhibit No. 1, which
5   is the Formal Statement of Charges, in front of you?
6        A.   I do.
7        Q.   Okay.  As to paragraphs 1 through 14 of the
8   Formal Statement of Charges, do you admit the conduct
9   contained therein?
10       A.   Yes.
11       Q.   Okay.  And do you also admit these rules -- that
12  the conduct that you participated in, violated the rules
13  that were stated?
14       A.   I understand that now.
15       Q.   Okay.  And is your understanding of the
16  agreement also that, as to the investigation, that we both
17  are going to agree, both you and the JIC are going to
18  agree, you've never been subject to judicial discipline
19  before?
20       A.   That's correct.
21       Q.   And that you were completely cooperative
22  throughout the entire investigation?
23       A.   I believe I was.
24       Q.   And that once you were made aware of the rules

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
January 15, 2021

```
 1  violation, that you admitted your wrongdoing promptly?
 2       A.   Yes.
 3       Q.   Okay.  Is it also your understanding of the
 4  agreement that you and the JIC are going to recommend both
 5  to the Hearing Board and to the Supreme Court that the
 6  punishment be a censure and a $5,000 fine?
 7       A.   Yes.
 8       Q.   Is it also your understanding of the agreement
 9  that you'll be responsible for any costs incurred by the
10  JIC for the investigation?
11       A.   Yes.
12            MR. LANHAM:  Your Honor, I have no further
13  questions.
14            MS. TARR:  Judge, you're muted.
15            MR. LANHAM:  You're muted.
16            HEARING EXAMINER LORENSEN:  Here I was
17  trying to make things work better.  Okay.
18            The -- did you wish to move the admission
19  of the joint exhibits?
20            MR. LANHAM:  I do.
21            MR. NASON:  I do, Your Honor.
22            HEARING EXAMINER LORENSEN:  Anybody want to
23  be heard on that?
24            Hearing no objection, the joint exhibits
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1   are admitted.
 2              JOINT EXHIBITS 1 through 7 inclusive
 3                   (7 items premarked for identification as
 4                   Joint Exhibit Nos. 1 through 7 were
 5                   admitted into evidence.)
 6              HEARING EXAMINER LORENSEN:  Do any of the
 7   Board members wish to inquire of Judge Goldston?  Judge
 8   Farrell?  That's a negative head shake, I understand that
 9   in all languages.  And you're --
10              JUDGE FARRELL:  Yes.
11              HEARING EXAMINER LORENSEN:  And Judge
12   Stotler -- Judge Stotler, did you wish to inquire, sir?
13              JUDGE STOTLER:  Not at this time, but I do
14   have some questions for the JDC.
15              HEARING EXAMINER LORENSEN:  Okay.  Well,
16   we'll have -- we'll have an argument piece that -- that we
17   can address that at, I think, if you wish to just have a
18   discussion with counsel about your views.
19              Let's see.  So Mr. Nason, did you wish to
20   inquire of your client?
21              MR. NASON:  Your Honor, at this time, she
22   would rely on the statement that we submitted to the
23   Judicial Hearing Board.  I believe that she would like to
24   express her embarrassment and contrition briefly.
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                                    HEARING
                                                                              January 15, 2021

```
 1                      HEARING EXAMINER LORENSEN:  I think we're --
 2   we're at this stage where we're just going to -- I tell you
 3   what, Mr. Nason, before we close these out, I offer -- I
 4   offer counsel the opportunity to make their statement, just
 5   so that there's a record.  Your feelings -- just because of
 6   the open nature of what the Board can recommend and what
 7   the Supreme Court can do, I'm pleased to allow -- actually,
 8   you know what, I forgot Magistrate Postalwait.  I
 9   apologize.
10                      Magistrate Postalwait, did you wish to
11   inquire?
12                      MAGISTRATE POSTALWAIT:  No.  No, I'm fine.
13                      HEARING EXAMINER LORENSEN:  All right.
14   Very good.  Okay.  So, let's see.  I just want to make
15   sure I have -- there was a statement, Mr. Nason, I thought
16   I saw it in my materials.  I tried to compile a file
17   before we got to this point, and there's a statement of
18   Judge Goldston that I received that bears a certificate of
19   service dated December 28, 2020.  Is that what you're
20   referring to, sir?
21                      MR. NASON:  Yes, Your Honor.
22                      HEARING EXAMINER LORENSEN:  All right.  And
23   I have received that, and we'll make sure that that makes
24   -- makes the package of materials that the Board gets, and
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                                      HEARING
                                                                              January 15, 2021

```
 1  I believe they already have it.  And also that it makes it
 2  into the record for the Supreme Court to consider on its
 3  own.
 4              Okay.  So I think on my list of
 5  participants, I do have Mr. Bryan, who I know was going to
 6  be given the opportunity to make a -- we're at the stage
 7  now where we're going to discuss -- just have our
 8  discussion in terms of why the Board should accept and
 9  ultimately the Supreme Court should -- or why the Board
10  should recommend, I should say, and the Supreme Court
11  should ultimately accept, the recommendation proposed by
12  the parties.
13              And Mr. Bryan, if you're online and wish to
14  be heard, this -- this is your opportunity.
15              All right.
16              Judge Stotler, did you wish to inquire --
17              MR. BRYAN:  Hold on.  This is John Bryan.
18  Can -- I think I was muted.  Can you hear me?
19              HEARING EXAMINER LORENSEN:  I can hear you,
20  yes, sir.
21              MR. BRYAN:  All right.
22              HEARING EXAMINER LORENSEN:  Did you wish to
23  say something?
24              MR. BRYAN:  Yeah.  Is this the appropriate
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1   time?
 2                   HEARING EXAMINER LORENSEN:   This is the
 3   time, yes, sir.
 4                   MR. BRYAN:   Okay.  Yeah.
 5                   Thank you.  I appreciate you for letting me
 6   be heard here.  I am counsel for Matt Gibson, who was one
 7   of the complainants in the underlying complaint.  And I --
 8   I had an opportunity to speak with my client in order to
 9   make a statement on his behalf here, and as you all know,
10   he wanted to -- to be heard here.
11                   And we have received a copy of the
12   agreement, and, of course, the statement of charges, and --
13   and you know, it's our position, or my client's position,
14   anyways, that the -- the recommended or the agreed result
15   here, if the JIC should -- should recommend it, that it is
16   fair, and we do -- we do also ask that this be accepted.
17                   Judge Goldston has taken responsibility for
18   her actions and her decisions by admitting these
19   paragraphs 1 through 14 in the statement of charges and
20   also by admitting to the violations of the Rules of
21   Judicial Conduct.
22                   And pursuant to Rule 4.12 of the Rules of
23   Judicial Disciplinary Procedure, the parties have agreed
24   that they jointly recommended the highest possible fine in
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

1   this case of $5,000, as well as the highest possible --
2   sort of second highest possible sanction of censure.  The
3   only harsher penalty, of course, being suspension without
4   pay for up to one year.
5                Now, my client recognizes that there are
6   mitigating factors here, including apparently no prior
7   disciplinary history, a long history of service as a
8   Family Court judge, which is, of course, you know, perhaps
9   the most difficult, or one of the most difficult judicial
10  positions in existence.
11               You know, Judge Goldston has, despite what
12  happened to -- and with these charges, you know, she has
13  gained confidence to many of her colleagues and -- who
14  practiced before her and work with her.  Mr. Gibson
15  acknowledges that, so that's why he does believe that this
16  is fair.
17               You know, Family Courts are perhaps the
18  most vulnerable to the dangers of loss of perceived
19  integrity or legitimacy in the eyes of the public.  And
20  one thing that we've realized as a result of Mr. Gibson's
21  situation, is that even many practicing attorneys don't
22  realize that, or fully appreciate the fact, that litigants
23  in a Family Court also have rights, just like in other
24  courts.  And Mr. Gibson certainly felt that way at the

JA406

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                                    HEARING
                                                                        January 15, 2021

1    time that all of this occurred.

2                    But we -- we do ask that the JIC accepts

3    this recommendation and that the Supreme Court accepts it

4    as fair, because this process, you know, it -- it has put

5    a stop to the practice that -- that is described in the

6    statement of charges.

7                    And while Mr. Gibson, as many of you have

8    realized through some of the -- this process, he doesn't

9    feel necessarily that he's been completely made whole at

10   this point, he understands that that is not -- is not the

11   purpose of these proceedings, and it's not about him, but

12   rather upholding the -- the integrity and the public

13   confidence in the judicial system.

14                   And so on behalf of Mr. Gibson, I want to

15   thank the Judicial Disciplinary Counsel, Brian Lanham, and

16   Teresa Tarr for keeping a close watch on the integrity of

17   the judicial system in West Virginia, and also the

18   Judicial Investigation Commission for taking on, you know,

19   this difficult job in all of these cases, but not only

20   that, but doing so through what was a year of

21   extraordinary difficulties.

22                   So we do believe that the agreement is

23   fair, and we ask that it be recommended to the Supreme

24   Court and that the Supreme Court adopt it.  Thank you.

1         HEARING EXAMINER LORENSEN:   Thank you, sir.

2              All right.   Judge Stotler, did you want to

3    -- you had some -- just some inquiry to make, for the --

4              JUDGE STOTLER:   Well, questions of the JDC,

5    and I guess I've got a different perspective on this whole

6    thing, and I guess the -- the complaint in this matter

7    disturbs me, and the applications of this case concerns me

8    about the precedence that's being established here.

9              I mean, it appears that the JDC and the JIC

10   have taken the position that Family Court and maybe

11   Magistrate Courts or Circuit Court judges do not have the

12   power to do a view, or as you relate to it as a home

13   visit.

14             And I guess my question to Ms. Tarr and to

15   Mr. Lanham, what authority have they relied on, that they

16   seem to make that determination that a Family Court judge

17   does not have the authority to do what Judge Goldston did?

18             MR. LANHAM:   Your Honor, the -- what Judge

19   Goldston did is not covered, or that power to do what she

20   did, is not provided for in any statute.   It's not a jury

21   view.   So it is not covered by that statute.   There is

22   noth-- there is no statute, there is no rule, there is no

23   -- there's nothing that we could find that allows Judge

24   Goldston to go and continue her court hearing at a

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1  resident, a participant's residence.
 2              We --
 3              JUDGE STOTLER:  Why would that not fall
 4  within the inherent power of the Court?
 5              MR. LANHAM:  To just go into a person's
 6  house?
 7              JUDGE STOTLER:  Well, let me -- let me ask
 8  this question.  Let me ask this question.
 9              MR. LANHAM:  Yes, sir.
10              JUDGE STOTLER:  It appears that there is no
11  statutory authority of any kind for other judges to do
12  views, but they do them.  It's a common practice for them
13  to do them.  So where's the authority come from for that?
14              MS. TARR:  There is a specific statute for
15  jury views.  And if you look at the specific statute for
16  jury views, even if you liken it to a jury view, she
17  didn't follow the procedure that was set forth in the jury
18  view.  You're supposed to take a court reporter with you.
19  She didn't -- she didn't have any other -- (cross talk)
20              JUDGE STOTLER:  Wait -- a minute, Ms. Tarr.
21  Wait a minute.  We don't have court reporters.
22              MS. TARR:  It's not -- she didn't -- I
23  didn't say -- she -- Mr. -- Judge Stotler, I didn't --
24  what I'm saying is, the closest thing you have is a jury
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1  view, by statute.  She didn't even follow the procedure
 2  for a jury view by statute.  Okay?
 3             And first of all, it's not a jury view.
 4  There's no jury in a Family Court case.
 5             And if you look at what she did, Judge, she
 6  -- if you're -- if you're going to -- if you're going to
 7  take a step, then you have to announce that step in court,
 8  and you have to ask both parties if it's okay.  She didn't
 9  do that.  She said, what's your address?  He told her the
10  address.  She said, okay, we'll meet you at your house in
11  10 minutes.  He had no clue why.
12             And then when she showed up, and -- and
13  they wanted to enter the house, she said, you -- help me
14  out here, Brian -- she -- he moved to recuse her.  She --
15  she -- she wouldn't be recused, and then he objected to
16  her going into the house, and she said it was untimely.
17             And he wanted a search warrant.  She
18  threatened to arrest him.  All of this is totally
19  inappropriate.
20             Now, she said she may not have known it,
21  but the fact of the matter is, with her experience, she
22  should have known it.
23             JUDGE STOTLER:  Well, let me say this.
24  During the time that I practiced law, I participated in
```

1  several views that were conducted.  Of course, what do you
2  do if a magistrate does a view?  He doesn't have a court
3  reporter.  So what does he or she do?
4              MS. TARR:  You're -- you're supposed to
5  follow the jury view statutes there, if there's a hearing
6  there, and --
7              JUDGE STOTLER:  Where does it say you're
8  supposed to follow the jury statute?  I mean, the jury
9  statute in Chapter -- in Chapter 56, the Family Court
10  operates up to Chapter 51-2A, and derives their authority
11  from that chapter.  How does Chapter 56 apply to the
12  Family Court?
13              MR. LANHAM:  Your Honor, we're just saying
14  that that is the closest thing that we can make it, to try
15  to give her the authority.  She testified to us that she
16  was going there to enforce her contempt order.  Instead of
17  writing the contempt order and giving it to law
18  enforcement and having them to enforce the contempt order,
19  she took her court and continued the court proceeding at
20  the defendant's house.
21              And we could find -- we asked, we could
22  find -- we ask Judge Goldston to -- if she had, knew of
23  any that we could find.  We could not find any in any
24  research; any statute, any court rule that allowed her to

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                              January 15, 2021

```
 1  have that authority.
 2              MS. TARR:  And -- and she's the one that
 3  raised the jury view initially, and we said that it's not
 4  applicable.
 5              So I -- and I'm not sure why we're being
 6  questioned when all parties agree to both the facts and
 7  the violations, and she has agreed that the violat-- that
 8  she violated the Code of Judicial Conduct, Judge.
 9              JUDGE STOTLER:  Well, I guess I'm asking
10  the questions, because the impact of this decision has the
11  impact on the entire Family Court, that basically where a
12  decision is being rendered here, that the Family Court
13  does not have the ability, even to do views.
14              I mean, we derive our authority from
15  Chapter 51-2A.  Chapter 51-2A-7 says that the Family Court
16  judge has the ability to supervise the production of
17  evidence.  It doesn't say that it has to be done in the
18  courtroom.  Chapter 51-2A-9 says that the Family Court
19  judge has to -- has the authority to seize property.  It
20  doesn't say that it has to be done in the courtroom, or
21  that the Family Court judge cannot be present for that.
22              MS. TARR:  Judge, there is also prior
23  precedent, in that in 2013 or 2014, the JIC admonished
24  Circuit Court Judge Aboulhosn for going to somebody's
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                January 15, 2021

```
 1  house on a asset forfeiture matter and directing what
 2  assets should be taken and should not be taken.
 3              JUDGE FARRELL:  This is Judge Farrell.  Can
 4  I interject here?
 5              HEARING EXAMINER LORENSEN:  Sure.  Well,
 6  Mr. -- Judge Stotler, have you asked all the questions you
 7  wish to ask, or --
 8              JUDGE STOTLER:  Well, I'm not sure -- I'm
 9  not sure that I have, but if Judge Farrell wants to
10  interject here, that's fine.
11              MS. TARR:  Well, and -- and without getting
12  in trouble, I would object to these questions.  This --
13  this seems to me to be more something that would be a
14  decision from you all, whether it's appropriate or not,
15  not from -- I mean we've -- we've got both parties saying
16  that what she did violated the Code.
17              HEARING EXAMINER LORENSEN:  Okay.
18              JUDGE FARRELL:  Yeah, my question or
19  injection is, this should be taken up at noontime when the
20  group is talking, and something to discuss amongst
21  ourselves during deliberations, not in the context or
22  within the parameters of this hearing.  That's just my
23  feelings.
24              HEARING EXAMINER LORENSEN:  Well, and it
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON
                                                    HEARING
                                                    January 15, 2021

 1  seems that the counsel don't really wish to -- well, and I
 2  guess in the spirit of just addressing the concern,
 3  because you know it's going to come up, if you -- if --
 4  other than the fact that we agree, because I think the
 5  issue for Judge Stotler is going to be, if we make a rule
 6  that sets out a bright line that prohibits Family Court
 7  judges from -- I mean, is it the particulars of this case,
 8  or is it the practice at large, that you're -- you know,
 9  are you going to set a precedent now, or is it, is the
10  Supreme Court being asked to set a precedent?  Because if
11  they write an opinion on the case, it's going to be --
12  that's not going to be a tool for Family Court judges to
13  evaluate and discern facts relevant to the exercise of
14  their discretion.

15              MS. TARR:  If, Your Honor, if I can just
16  interject one thing.  I think you have to look at the
17  specific factors, which is why it was that we have asked
18  to have it warranted, in that the -- even if you were
19  going to allow a view, she did not follow a procedure that
20  was appropriate.  And the procedure that was appropriate
21  was to tell him ahead of time, before they went to the
22  house, why they were going to the house, give him an
23  opportunity to object, and then she never put anything on
24  record afterward.  There is no order that was entered that

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON
HEARING
January 15, 2021

```
 1  set forth any of this.
 2                  And so I think, if -- if I understand what
 3  you were saying, I am in agreement that what you need to
 4  look at are the particular facts of this particular case,
 5  and whether she followed an appropriate procedure or not.
 6  And all parties agree she did not follow an appropriate
 7  procedure, from beginning to end.
 8                  HEARING EXAMINER LORENSEN:  And you're not
 9  -- you're -- the import of your complaint is no broader
10  than that; is that what I'm hearing?
11                  MS. TARR:    That's correct.
12                  HEARING EXAMINER LORENSEN:  Okay.
13                  Judge Stotler, I think I'll -- well, I will
14  note JIC's objection to my permitting a Board member to
15  inquire of them during the course of a hearing.  To me --
16  well, just for what it's worth --
17                  JUDGE STOTLER:  Well, I guess my question,
18  Mr. -- Judge Lorensen, is, if that is true, and there's
19  questions that need to be answered in regards to the
20  process, who are those questions posed to, then?
21                  HEARING EXAMINER LORENSEN:  The Supreme
22  Court.  I mean, we make a recommendation of what we think
23  it ought to be, and then, you know, based upon the
24  allegations in the context of this specific complaint, and
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                              January 15, 2021

```
 1  the Supreme Court -- you know, I mean, they -- they're --
 2  they're not going to just rubberstamp what we do.  They're
 3  going to review it and give it an independent evaluation,
 4  although I think they're looking to us to develop a
 5  record, so that they have some appendix of proceeding, so
 6  that if either party objects to what we do with their
 7  complaint and disposition, they have some basis to make a
 8  decision.
 9               And, of course, factual context often lends
10  clarity to the rule that's being -- and now, especially
11  when it's not, you know, a court rule or statute or other,
12  you know, other -- other guide to appropriate conduct for
13  judges.  So I -- I hear your objection and I -- I'll --
14               JUDGE STOTLER:  Well, I guess, note my
15  objection to the fact that I'm not being allowed to ask my
16  questions.
17               HEARING EXAMINER LORENSEN:  You want to
18  proffer for the record what other questions you would like
19  to ask, Judge Stotler?
20               JUDGE STOTLER:  Well, no, not at this
21  particular point in time, but it appears that, I guess
22  there's nobody else to hold accountable here in regards to
23  the transaction that has taken place here, so no.
24               HEARING EXAMINER LORENSEN:  All right.
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1              Well, and to that rocky end, Judge
 2   Goldston, I have your -- your statement.  We have talked
 3   about some things after -- after we last -- last spoke to
 4   you.
 5              Mr. Nason, does -- does Judge Goldston wish
 6   to be heard further on the matter before it is considered
 7   submitted to the Board?
 8              MR. NASON:  Your Honor, I would like to
 9   place a few things on the record.
10              Although there may not have been an order
11   entered after they went to Mr. Gibson's house, they did
12   come back on the record and the judge delineated some of
13   the things that happened at Mr. Gibson's house.  And I
14   believe at that point, the hearing was continued and a
15   motion was filed for her to be recused.  And she was
16   recused.
17              So she had no further hearings, and had no
18   further ability to do anything in the case, because of the
19   recusal order.
20              And I agree with the statement from Ms.
21   Tarr and Mr. Lanham, that the problem was the procedure,
22   and there may have been ways for the person who is
23   bringing the contempt action, Mr. Gibson's former wife, to
24   have had an opportunity to view what was there at the
```

JA417

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
January 15, 2021

1  property, but the procedures and the due process is the
2  problem that she is admitting to.
3           THE RESPONDENT:  And -- and this is Judge
4  Goldston.  The only -- only thing I want to say, aside from
5  my statement -- and I want to say a lot of things, but I
6  emotionally can't do that; I'll be honest with you -- but
7  after this procedure was done, the statement that I did
8  nothing else to preserve the record, I disagree with,
9  because we came back on the record, and to the very best of
10  my ability, I set forth on the record everything that had
11  occurred during the visit.  I gave counsel and Mr. Gibson
12  an opportunity to object to anything that I had said or
13  supplement anything that I had said.  I also was very clear
14  to Mr. Gibson on the fact that he had the right to make a
15  motion to recuse me, gave him specific instructions on how
16  to do that.
17           And again, I am embarrassed.  This Family
18  Court has been my life.  And I have strived to perfect it,
19  improve it, for twenty-six-and-a-half years.  And mistakes
20  were made that I am very sorry for, but I do accept the
21  agreement, and I certainly accept my responsibility for
22  the errors that were made that day.
23           HEARING EXAMINER LORENSEN:  All right.
24           MR. NASON:  Thank you, Your Honor.

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON
HEARING
January 15, 2021

```
 1              HEARING EXAMINER LORENSEN:  Thank you, Mr.
 2   Nason and Ms. -- Judge Goldston.
 3              For -- for the investigatory counsel, I did
 4   what I hope was a complete review of all the materials
 5   submitted with the -- with the joint appendix.  I saw the
 6   hearing up to the point where she said, see you at -- at
 7   Mr. Gibson's house in ten minutes.
 8              Did we get the video record that's from the
 9   hearing that followed this proceeding?
10              MR. LANHAM:  No, Your Honor.  That wasn't
11   contemplated, but we have it, if you -- if -- I don't
12   know.  It's too big to email, so I don't know how I could
13   get it to you before your meeting at noon.
14              HEARING EXAMINER LORENSEN:  Can -- can you
15   send it in parts, or can you get it to a place where I
16   could download it?
17              MR. LANHAM:  If someone could tell me how
18   to do that, I will.
19              MS. TARR:  Do -- do you have a -- Judge,
20   the problem is, is we're limited to five megabytes on what
21   we can send.  Perhaps if we try sending it from our
22   personal email to your personal email, we might be able to
23   do that.  If you, off the record, want to email us your
24   personal email, then we can email it from our personal
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

```
 1  email and see if we can bypass the system.
 2              HEARING EXAMINER LORENSEN:  Maybe Steptoe
 3  and Johnson has a fix.  You all have a site we can
 4  download from, don't you?
 5              MR. RAMEY:  Yeah, we do.  Terri, just email
 6  it to me, ancil@ancil.net, A-N-C-I-L at ancil.net.  And
 7  then I can -- once I get an email, I can upload it to
 8  ShareFile, and then anybody who wants to access it, can
 9  access it through ShareFile.
10              MS. TARR:  Okay.
11              HEARING EXAMINER LORENSEN:  By the way,
12  that's incredibly cool email address, Mr. Ramey.  All
13  right.
14              MR. RAMEY: I was an early adopter of email.
15              HEARING EXAMINER LORENSEN:  Well, and Judge
16  Goldston, for the record, was a family law judge before
17  family law judging was a thing.  So there's that too.
18              So anything else then, before we close our
19  proceeding and consider the matter submitted, Mr. Lanham?
20              MR. LANHAM:  No, Your Honor.
21              HEARING EXAMINER LORENSEN:  All right.
22              And Mr. Nason, are you satisfied we've made
23  our record?
24              MR. NASON:  Yes, Your Honor.  Thank you.
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON                    HEARING
                                                                 January 15, 2021

```
 1                HEARING EXAMINER LORENSEN:  All right.
 2   Very well.
 3                Anybody object, before I close it, to us
 4   receiving the hear -- the follow-on hearing after the
 5   meeting out at Mr. Gibson's house?
 6                MR. NASON:  None from the Respondent, Your
 7   Honor.  Andrew Nason.
 8                HEARING EXAMINER LORENSEN:  Anything from
 9   Counsel?  The investigative counsel?
10                MR. LANHAM:  No, Your Honor.  No.
11                HEARING EXAMINER LORENSEN:  All right.
12   Very good.  Thank you.  So we'll consider that a
13   supplement to the agreed-upon exhibits.
14                All right.  If there's nothing further,
15   think you.  Appreciate -- I appreciate -- I appreciate
16   everybody's cooperation in getting the matter heard and
17   submitted.
18                All right.  We'll be adjourned.
19                (Whereupon, the hearing was adjourned.)
20
21
22
23
24
```

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

STATE OF WEST VIRGINIA,

To-wit:

I, Cheryl Munson, a Notary Public and Certified Court
Reporter within and for the State aforesaid, duly
commissioned and qualified, do hereby certify that the
foregoing proceedings were duly taken by me and before me
via remote videoconferencing at the time and place and for
the purpose specified in the caption hereof.

I do further certify that said proceedings were
correctly taken by me in voice writing, and accurately
written out in full and reduced to typewriting by means of
computer-aided transcription.

I further certify that I am neither attorney nor
counsel for, nor related to or employed by, any of the
parties to the action in which these proceedings were had;
and further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or
financially interested in the action, and that the attached
transcript meets the requirements set forth within Article
27, Chapter 47 of the West Virginia Code.

My commission expires the 24th  day of February, 2023.
Given under my hand this 21st day of January, 2021.


Cheryl G Munson
Notary Public

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

| | | | | |
|---|---|---|---|---|
| | 2.5 7:22 | accept 12:8,11 | announce 18:7 | **Brian** 15:15 18:14 |
| **Exhibits** | 20-0742 4:6 | 26:20,21 | apologize 4:22 | briefly 10:24 |
| | | accepted 13:16 | 11:9 | bright 22:6 |
| **GoldstonJointEx** | 2013 20:23 | accepts 15:2,3 | apparently 14:6 | bringing 25:23 |
| hibit1 3:0 8:4 | 2014 20:23 | accountable | appears 6:23 16:9 | broader 23:9 |
| **GoldstonJointEx** | 2020 4:7,8 6:24 | 24:22 | 17:10 24:21 | **Bryan** 12:5,13,17, |
| hibit2 3:0 | 11:19 | acknowledges | appendix 24:5 | 21,24 13:4 |
| **GoldstonJointEx** | 2021 4:2 | 14:15 | 27:5 | |
| hibit3 3:0 | 26 6:5 | act 5:17 | applicable 20:4 | **C** |
| **GoldstonJointEx** | 28 11:19 | action 25:23 | applications 16:7 | |
| hibit4 3:0 | | actions 13:18 | apply 19:11 | call 4:5 |
| **GoldstonJointEx** | **3** | address 10:17 | appointed 4:4 | canons 8:3 |
| hibit6 3:0 | | 18:9,10 | argument 10:16 | case 14:1 16:7 |
| **GoldstonJointEx** | 3 6:20 | addressing 22:2 | arrest 18:18 | 18:4 22:7,11 23:4 |
| hibit7 3:0 6:17 | 30 4:7 | administer 4:10 | asset 21:1 | 25:18 |
| **$** | 30-2020 4:7 | admission 9:18 | assets 21:2 | cases 15:19 |
| | 30th 6:24 | admit 7:13,19 8:8, | attorneys 14:21 | censure 9:6 14:2 |
| $5,000 9:6 14:1 | 33 4:7 | 11 | authority 16:15,17 | certificate 11:18 |
| | 33- 4:7 | admitted 9:1 10:1, | 17:11,13 19:10,15 | chapter 19:9,10,11 |
| **1** | | 5 | 20:1,14,19 | 20:15,18 |
| 1 7:14,20 8:4,7 | **4** | admitting 13:18, | aware 8:24 | charged 8:2 |
| 10:2,4 13:19 | | 20 26:2 | | charges 6:8 7:15, |
| 1.1 7:22 | 4.12 13:22 | admonished | **B** | 20 8:5,8 13:12,19 |
| 1.2 7:22 | **5** | 20:23 | | 14:12 15:6 |
| 1.3 7:22 | | adopt 15:24 | back 25:12 26:9 | Circuit 16:11 20:24 |
| 10 18:11 | 51-2A 19:10 20:15 | afterward 22:24 | based 23:23 | clarity 24:10 |
| 14 7:14,20 8:7 | 51-2A-7 20:15 | agree 8:17,18 20:6 | basically 20:11 | clear 4:22,23 7:21 |
| 13:19 | 51-2A-9 20:18 | 22:4 23:6 25:20 | basis 24:7 | 26:13 |
| 15 4:2 | 56 19:9,11 | agreed 13:14,23 | bears 11:18 | client 10:20 13:8 |
| 1994 6:6 | | 20:7 | beginning 23:7 | 14:5 |
| 1st 6:6 | **7** | agreement 6:17, | behalf 13:9 15:14 | client's 13:13 |
| | | 20 7:6,7,11,13,18 | big 27:12 | close 4:18 11:3 |
| **2** | 7 6:17 10:2,3,4 | 8:16 9:4,8 13:12 | bit 5:5 | 15:16 |
| | | 15:22 23:3 26:21 | **Board** 9:5 10:7,23 | closest 17:24 |
| 2.2 7:22 | **A** | ahead 4:4,9 22:21 | 11:6,24 12:8,9 | 19:14 |
| 2.4(A) 7:22 | ability 20:13,16 | allegations 7:13 | 23:14 25:7 | clue 18:11 |
| 2.4(B) 7:22 | 25:18 26:10 | 23:24 | bottom 6:22 | Code 7:22 20:8 |
| | Aboulhosn 20:24 | allowed 19:24 | | 21:16 |
| | | 24:15 | | |

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

colleagues 14:13

Commission 15:18

common 17:12

compile 11:16

complainants 13:7

complaint 13:7 16:6 23:9,24 24:7

complete 27:4

completely 8:21 15:9

concern 22:2

concerns 16:7

conduct 7:23 8:1, 8,12 13:21 20:8 24:12

conducted 19:1

confidence 14:13 15:13

considered 25:6

contained 7:14,19 8:9

contemplated 27:11

contempt 19:16, 17,18 25:23

context 21:21 23:24 24:9

continue 16:24

continued 19:19 25:14

contrition 10:24

convincing 7:21

cooperative 8:21

copy 6:11 7:4 8:4 13:11

correct 7:17 8:20 23:11

costs 9:9

counsel 10:18 11:4 13:6 15:15 22:1 26:11 27:3

court 4:6,19 5:6,13 6:4,5,9 9:5 11:7 12:2,9,10 14:8,23 15:3,24 16:10,11, 16,24 17:4,18,21 18:4,7 19:2,9,12, 19,24 20:11,12,15, 18,21,24 22:6,10, 12 23:22 24:1,11 26:18

courtroom 20:18, 20

courts 14:17,24 16:11

covered 16:19,21

cross 17:19

**D**

dangers 14:18

dated 6:23 11:19

day 26:22

December 11:19

decision 20:10,12 21:14 24:8

decisions 13:18

defendant's 19:20

deliberations 21:21

delineated 25:12

derive 20:14

derives 19:10

determination 16:16

develop 24:4

difficult 14:9 15:19

difficulties 15:21

directing 21:1

disagree 26:8

discern 22:13

disciplinary 13:23 14:7 15:15

discipline 8:18

discretion 22:14

discuss 12:7 21:20

discussion 10:18 12:8

disposition 24:7

disturbs 16:7

download 27:16

due 26:1

duly 5:23

**E**

email 27:12,22,23, 24

embarrassed 26:17

embarrassment 10:24

emotionally 26:6

end 23:7 25:1

enforce 19:16,18

enforcement 19:18

enter 18:13

entered 22:24 25:11

entire 8:22 20:11

errors 26:22

established 16:8

ethics 8:3

evaluate 22:13

evaluation 24:3

evidence 7:21 10:5 20:17

evil 4:20

**EXAMINATION** 6:1

**EXAMINER** 4:3, 13,17 5:3,8,11,15 9:16,22 10:6,11,15 11:1,13,22 12:19, 22 13:2 16:1 21:5, 17,24 23:8,12,21 24:17,24 26:23 27:1,14

exercise 22:13

**Exhibit** 6:17 8:4 10:4

exhibits 6:12 9:19, 24 10:2

existence 14:10

experience 18:21

express 10:24

extraordinary 15:21

eye 4:21

eyes 14:19

**F**

fact 14:22 18:21 22:4 24:15 26:14

factors 14:6 22:17

facts 7:19 20:6 22:13 23:4

factual 24:9

fair 13:16 14:16 15:4,23

fall 17:3

family 6:3,5,8,9 14:8,17,23 16:10, 16 18:4 19:9,12 20:11,12,15,18,21 22:6,12 26:17

**Farrell** 10:8,10 21:3,9,18

feel 15:9

feelings 11:5 21:23

felt 14:24

file 11:16

filed 25:15

find 16:23 19:21, 22,23

line 9:6 11:12 13:24 21:10

follow 17:17 18:1 19:5,8 22:19 23:6

forfeiture 21:1

forgot 11:8

formal 7:14,20 8:5, 8

front 6:12 8:5

fully 14:22

**G**

gained 14:13

gave 26:11,15

Gibson 13:6 14:14, 24 15:7,14 26:11, 14

Gibson's 14:20 25:11,13,23 27:7

give 4:20 19:15 22:22 24:3

giving 19:17

Goldston 4:5,10, 14,19 5:22 6:3,23

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

| | | | | |
|---|---|---|---|---|
| 10:7 11:18 13:17 14:11 16:17,19,24 19:22 25:2,5 26:4 27:2 | honest 26:6 | intelligently 7:9 | 14:9 15:13,15,17, 18 20:8 | 21 24:17,24 26:23 27:1,14 |
| good 11:14 | Honor 4:12 5:21 9:12,21 10:21 11:21 16:18 19:13 22:15 25:8 26:24 27:10 | intentional 8:1 | July 6:6 | loss 14:18 |
| great 5:13 | | interject 21:4,10 22:16 | jury 16:20 17:15, 16,17,24 18:2,3,4 19:5,8 20:3 | lot 26:5 |
| group 21:20 | | interrupt 4:22 | | loud 4:21 |
| guess 16:5,6,14 20:9 22:2 23:17 24:14,21 | HONORABLE 5:22 | investigation 8:16,22 9:10 15:18 | K | Louise 5:22 6:23 |
| guide 24:12 | hope 27:4 | investigatory 27:3 | keeping 15:16 | M |
| H | hour 4:4 | issue 22:5 | kind 17:11 | made 8:24 15:9 26:20,22 |
| | house 17:6 18:10, 13,16 19:20 21:1 22:22 25:11,13 27:7 | items 10:3 | knew 19:22 | magistrate 11:8, 10,12 16:11 19:2 |
| hand 4:15 | | J | knowingly 7:8 | make 9:17 11:4,14, 23 12:6 13:9 16:3, 16 19:14 22:5 23:22 24:7 26:14 |
| handed 7:5 | I | january 4:2 | L | |
| happen 6:11 | identification 10:3 | JDC 10:14 16:4,9 | languages 10:9 | makes 11:23,24 12:1 |
| happened 14:12 25:13 | imagination 4:15 | JIC 4:6 5:20 8:17 9:4,10 13:15 15:2 16:9 20:23 | Lanham 5:19,21 6:2,16 9:12,15,20 15:15 16:15,18 17:5,9 19:13 25:21 27:10,17 | making 4:23 |
| harsher 14:3 | impact 20:10,11 | JIC's 23:14 | | Master 6:6 |
| head 10:8 | import 23:9 | job 15:19 | | materials 11:16,24 27:4 |
| hear 4:19 12:18,19 24:13 | improve 26:19 | John 12:17 | large 22:8 | Matt 13:6 |
| heard 5:4 9:23 12:14 13:6,10 25:6 | inappropriate 18:19 | joint 6:11,17 8:4 9:19,24 10:2,4 27:5 | law 5:18 6:5,8 18:24 19:17 | matter 4:5 16:6 18:21 21:1 25:6 |
| hearing 4:3,13,17 5:3,8,11,15 9:5,16, 22,24 10:6,11,15, 23 11:1,13,22 12:19,22 13:2 16:1, 24 19:5 21:5,17,22, 24 23:8,10,12,15, 21 24:17,24 25:14 26:23 27:1,6,9,14 | including 14:6 | jointly 13:24 | legitimacy 14:19 | meet 18:10 |
| | inclusive 10:2 | judge 4:10,14,19 6:3,4,5,8,9 9:14 10:7,10,11,12,13 11:18 12:16 13:17 14:8,11 16:2,4,16, 17,18,23 17:3,7,10, 20,23 18:5,23 19:7, 22 20:8,9,16,19,21, 22,24 21:3,6,8,9,18 22:5 23:13,17,18 24:14,19,20 25:1,5, 12 26:3 27:2,19 | lends 24:9 | meeting 27:13 |
| | incurred 9:9 | | letting 13:5 | megabytes 27:20 |
| | independent 24:3 | | life 26:18 | member 23:14 |
| | inherent 17:4 | | liken 17:16 | members 10:7 |
| | initially 20:3 | | limited 27:20 | mind 6:16 |
| | injection 21:19 | | list 12:4 | |
| hearings 25:17 | inquire 5:20 10:7, 12,20 11:11 12:16 23:15 | | litigants 14:22 | minute 17:20,21 |
| highest 13:24 14:1,2 | | judges 16:11 17:11 22:7,12 24:13 | long 5:18 6:3 14:7 | minutes 18:11 27:7 |
| history 14:7 | inquiry 16:3 | | Lorensen 4:3,13, 17 5:3,8,11,15 9:16,22 10:6,11,15 11:1,13,22 12:19, 22 13:2 16:1 21:5, 17,24 23:8,12,18, | mistakes 26:19 |
| hold 12:17 24:22 | instructions 26:15 | judicial 7:23 8:18 10:23 13:21,23 | | mitigating 14:6 |
| home 16:12 | integrity 14:19 15:12,16 | | | motion 25:15 |

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

26:15

move 9:18

moved 18:14

muted 9:14,15
12:18

**N**

Nason 4:9,12 6:14
9:21 10:19,21 11:3,
15,21 25:5,8 26:24
27:2

nature 11:6

necessarily 15:9

negative 10:8

noon 27:13

noontime 21:19

Nos 10:4

note 23:14 24:14

noth-- 16:22

numbers 4:6

**O**

oath 4:10

object 21:12 22:23
26:12

objected 18:15

objection 9:24
23:14 24:13,15

objects 24:6

occurred 15:1
26:11

offer 11:3,4

online 12:13

open 11:6

operates 19:10

opinion 22:11

opportunity 11:4
12:6,14 13:8 22:23
25:24 26:12

order 4:5 13:8
19:16,17,18 22:24
25:10,19

overtalked 5:5

**P**

package 11:24

paragraphs 7:14,
20 8:7 13:19

parameters 21:22

participant's 17:1

participants 12:5

participated 8:12
18:24

particulars 22:7

parties 12:12
13:23 18:8 20:6
21:15 23:6

parts 27:15

party 24:6

pay 14:4

penalty 14:3

perceived 14:18

perfect 26:18

permitting 23:14

person 25:22

person's 17:5

personal 27:22,24

perspective 16:5

phone 4:18

piece 10:16

place 24:23 25:9
27:15

pleased 11:7

point 11:17 15:10
24:21 25:14 27:6

posed 23:20

position 13:13
16:10

positions 14:10

Postalwait 11:8,
10,12

power 16:12,19
17:4

practice 15:5
17:12 22:8

practiced 14:14
18:24

practicing 14:21

precedence 16:8

precedent 20:23
22:9,10

premarked 10:3

present 20:21

preserve 26:8

prior 14:6 20:22

problem 25:21
26:2 27:20

procedure 13:23
17:17 18:1 22:19,
20 23:5,7 25:21
26:7

procedures 26:1

proceed 4:11

proceeding 6:7
19:19 24:5 27:9

proceedings
15:11

process 15:4,8
23:20 26:1

production 20:16

proffer 24:18

prohibits 22:6

promptly 9:1

property 20:19
26:1

proposed 12:11

proves 5:16

provided 16:20

public 14:19 15:12

punishment 9:6

purpose 4:23
15:11

pursuant 13:22

put 15:4 22:23

**Q**

question 16:14
17:8 21:18 23:17

questioned 20:6

questions 7:11
9:13 10:14 16:4
20:10 21:6,12
23:19,20 24:16,18

quick 6:13 7:16

**R**

raise 4:15

raised 20:3

real 6:13 7:16

realize 14:22

realized 14:20
15:8

received 11:18,23
13:11

recognizes 14:5

recommend 9:4
11:6 12:10 13:15

recommendation
12:11 15:3 23:22

recommended
13:14,24 15:23

record 4:24 11:5
12:2 22:24 24:5,18
25:9,12 26:8,9,10
27:8,23

recusal 25:19

recuse 18:14
26:15

recused 18:15
25:15,16

referring 11:20

relate 16:12

relevant 6:7 22:13

relied 16:15

rely 10:22

rendered 20:12

reporter 4:19 5:6,
13 17:18 19:3

reporters 17:21

research 19:24

residence 17:1

resident 17:1

Respondent 5:2,
9,14,23 26:3

responsibility
13:17 26:21

responsible 9:9

result 13:14 14:20

review 24:3 27:4

rights 14:23

rocky 25:1

rubberstamp 24:2

rule 13:22 16:22
19:24 22:5 24:10,
11

IN THE MATTER OF: HONORABLE LOUISE E. GOLDSTON

HEARING
January 15, 2021

| | | | | |
|---|---|---|---|---|
| rules 7:21 8:11,12, 24 13:20,22 | state 7:24 | talked 25:2 | underlying 13:7 | watch 15:16 |
| | stated 8:13 | talking 21:20 | understand 5:6 7:12 8:14 10:8 23:2 | ways 25:22 |
| **S** | statement 6:8 7:15,20 8:5,8 10:22 11:4,15,17 13:9,12, 19 15:6 25:2,20 26:5,7 | Tarr 5:3,19 9:14 15:16 16:14 17:14, 20,22 19:4 20:2,22 21:11 22:15 23:11 25:21 27:19 | West 15:17 |
| sanction 14:2 | understanding 7:12,18 8:15 9:3,8 | wife 15:23 |
| school 5:18 | understands 15:10 | wishes 5:20 |
| search 18:17 | statute 16:20,21, 22 17:14,15 18:1,2 19:8,9,24 24:11 | ten 27:7 | work 9:17 14:14 |
| seize 20:19 | Teresa 15:16 | undertake 4:4 | worth 23:16 |
| send 27:15,21 | statutes 19:5 | terms 12:8 | untimely 18:16 | write 22:11 |
| sending 27:21 | statutory 17:11 | testified 5:24 19:15 | upholding 15:12 | writing 19:17 |
| September 6:24 | step 18:7 | wrongdoing 9:1 |
| service 11:19 14:7 | stop 15:5 | testify 7:6 | **V** | |
| set 17:17 22:9,10 23:1 26:10 | Stotler 10:12,13 12:16 16:2,4 17:3, 7,10,20,23 18:23 19:7 20:9 21:6,8 22:5 23:13,17 24:14,19,20 | thing 14:20 16:6 17:24 19:14 22:16 26:4 | verbal 5:17 | **Y** |
| video 27:8 | year 4:7 14:4 15:20 |
| sets 22:6 | things 5:16 9:17 25:3,9,13 26:5 | view 16:12,21 17:16,18 18:1,2,3 19:2,5 20:3 22:19 25:24 | years 26:19 |
| shake 10:8 | thought 11:15 |
| she'll 4:20 | strived 26:18 | threatened 18:18 | views 10:18 17:12, 15,16 19:1 20:13 |
| show 7:21 | subject 8:18 | time 5:18 8:2 10:13,21 13:1,3 15:1 18:24 22:21 24:21 | violat-- 20:7 |
| showed 18:12 | submitted 10:22 25:7 27:5 | violated 7:21 8:12 20:8 21:16 |
| sign 7:8 | supervise 20:16 | times 6:7 | violation 8:3 9:1 |
| signature 6:22,23 7:3,5 | supplement 26:13 | told 18:9 | violations 8:1 13:20 20:7 |
| signed 7:6,7,8 | supposed 17:18 19:4,8 | tool 22:12 | Virginia 15:17 |
| sir 6:10,19 10:12 11:20 12:20 13:3 16:1 17:9 | totally 18:18 | visit 16:13 26:11 |
| Supreme 4:6 9:5 11:7 12:2,9,10 15:3,23,24 22:10 23:21 24:1 | transaction 24:23 | voluntarily 7:9 |
| situation 14:21 | trouble 21:12 | vulnerable 14:18 |
| somebody's 20:24 | suspension 14:3 | true 23:18 | |
| sort 14:2 | sworn 4:16 5:23 | truth 5:24 | **W** |
| speak 13:8 | system 15:13,17 | turn 6:20 | |
| specific 17:14,15 22:17 23:24 26:15 | twenty-six-and-a-half 26:19 | Wait 17:20,21 |
| **T** | wanted 13:10 18:13,17 |
| spirit 22:2 | | **U** | |
| spoke 25:3 | taking 15:18 | warrant 18:17 |
| stage 11:2 12:6 | talk 17:19 | ultimately 12:9,11 | warranted 22:18 |

Realtime Reporters, LLC
schedulerealtime@gmail.com 304-344-8463

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

6

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

7

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

8

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT
**9**

# Exhibit Placeholder

Files archived in Box.com

https://esquire.box.com/s/yqy3y2e416zqf2mk3xhbhqz96upaeg6w

EXHIBIT

**10**

In the Matter of:

## MATTHEW GIBSON

vs

## LOUISE E. GOLDSTON

## JEFF MCPEAKE

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,


  -vs-     Civil Action No. 5:21-cv-00181


LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

        Defendants.



DEPOSITION OF JEFF McPEAKE

_____

    The deposition of Jeff McPeake was
taken on February 23, 2022, at 1:36 p.m.,
at 252 George Street, Beckley, West
Virginia.

_____




ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

JA434

```
                                                        Page 2
 1                A P P E A R A N C E S

 2    John H. Bryan
      Attorney at Law
 3    Edwin Morgan
      Law Office of John H. Bryan
 4    P.O. Box 366
      Union, West Virginia  24983
 5
      Kevin J. Robinson
 6    Attorney at Law
      Pullin Fowler Flanagan Brown & Poe
 7    252 George Street
      Beckley, West Virginia  25801
 8
      Jennifer E. Tully
 9    Attorney at Law
      Bailey & Wyant, PLLC
10    P.O. Box 3710
      Charleston, West Virginia  25337-3710
11
      Also Present:  Louise E. Goldston
12                   Matthew Gibson

13

14

15

16

17

18

19

20

21

22

23

24
```

```
                                                          Page 3
 1                    I  N  D  E  X

 2        WITNESS

 3             Jeff McPeake

 4        EXAMINATION

 5             by Mr. Bryan          Page 04

 6        EXHIBITS

 7             None

 8

 9

10

11

12

13

14

15

16

17

18   Reporter's Certificate:     Page 67
     Errata Sheet/Signature Page:   Enclosed
19

20

21

22

23

24
```

Page 4

1                    JEFF McPEAKE,

2     called as a witness, first being duly sworn

3     by the Court Reporter/Notary Public,

4     testified as follows, to wit:

5                    EXAMINATION

6     BY MR. BRYAN:

7          Q.  Hi.  I am John Bryan.  I will be

8     asking you the questions here.  I am the

9     plaintiff's lawyer in this case.  I represent

10    Matthew Gibson.

11             Please state your name.

12         A.  Jeffrey McPeake.

13         Q.  And I will note for the record that

14    you are wearing a law enforcement uniform

15    here today; is that right?

16         A.  Yes.

17         Q.  Okay.  Who is your employer?

18         A.  Raleigh County Sheriff's

19    Department.

20         Q.  And are you a sheriff's deputy?

21         A.  I am.

22         Q.  And how long have you been in that

23    job title?

24         A.  Just over two years.

Page 5

1          Q.  All right.  And as far as the

2     uniform you are wearing here today, that's

3     the Raleigh County Sheriff's Department

4     uniform?

5          A.  Yes.

6          Q.  We are here about a search that

7     took place on March 4, 2020.  Do you recall

8     that day?

9          A.  I remember that day, yes.

10         Q.  Were you wearing the same type of

11    uniform then?

12         A.  Yes.

13         Q.  And were you employed by the

14    Raleigh County Sheriff's Department then?

15         A.  Yes.

16         Q.  And were you wearing the same type

17    of uniform that day?

18         A.  Yes.

19         Q.  Do you carry a gun?

20         A.  Yes.

21         Q.  Do you have one on you today?

22         A.  Yes.

23         Q.  Did you have one on you on March 4,

24    2020?

Page 6

1          A.  Yes.

2          Q.  All right.  How long had you --

3     well, strike that.

4               Do you work as a bailiff now?

5          A.  I do.

6          Q.  And did I already ask you how long

7     you have been doing that?

8          A.  Yes.  Just over two years.

9          Q.  Two years.  All right.

10              What did you do before that,

11    two years ago?

12         A.  I was retired from the Beckley

13    Police Department.

14         Q.  Were you working at all?

15         A.  Prior to coming here, no.  No.

16    Retired for a couple of years.

17         Q.  So when did you leave the Beckley

18    Police Department?

19         A.  2017.

20         Q.  And how long had you been employed

21    there?

22         A.  Twenty years.

23         Q.  So had you ever worked as a bailiff

24    before?

Page 7

1        A.  No.

2        Q.  So before two years ago, you hadn't

3   worked as a bailiff?

4        A.  Correct.

5        Q.  So about when was it that you

6   started as a bailiff?

7        A.  September of '19.

8        Q.  So roughly six months or so before

9   this incident took place, you started as a

10  bailiff?

11       A.  Correct.

12       Q.  And you have been working in that

13  job position ever since?

14       A.  Yes.

15       Q.  Who is your -- do you have a

16  supervisor?

17       A.  I do.  It is Lieutenant Stafford.

18       Q.  Okay.  So who -- I mean, who is

19  your -- who do you take orders from?  Would

20  it be the judge or your -- someone in -- you

21  know, Lieutenant Stafford, or both?

22       A.  I don't see Lieutenant Stafford on

23  a regular basis.  There may be days where we

24  don't see each other in the courthouse.  We

Page 8

1    work at different levels, different floors.

2    When the judge needs me, she will say, we are

3    ready for a hearing, and I will go out and

4    get the parties and escort them into the room

5    -- to the courtroom.

6          Q.   Okay.  So, I mean, if you have a

7    policy or procedure question, something like

8    that, do you go to the judge, or do you go to

9    some --

10         A.   I would go to Lieutenant Stafford

11   with something like that.

12         Q.   Do you still work as a bailiff for

13   Judge Goldston?

14         A.   Yes.

15         Q.   Have you ever worked as a bailiff

16   for any other judge?

17         A.   I do.  I have worked for all of the

18   judges that are currently judges in the

19   courthouse now at one time or another as a

20   fill-in if someone is sick or can't be there

21   for some reason or --

22         Q.   Both circuit court and family

23   court?

24         A.   Correct.

Page 9

1        Q.   But would you say that primarily

2   you are the bailiff for Judge Goldston?

3        A.   That's my primary position, yes.

4        Q.   Did you prior to becoming a bailiff

5   or even after becoming a bailiff undergo any

6   specific training to be a bailiff, you know,

7   that the other deputies wouldn't necessarily

8   receive?

9        A.   Not prior to becoming a bailiff.

10   However, I did go to a class in Charleston on

11   courthouse security for some in-service

12   hours.  And as I recall, that was about --

13   about three days of classroom instruction.

14        Q.   Do you recall where that -- where

15   that took place?

16        A.   The Marriott in Charleston.

17        Q.   Was that by the LEPS subcommittee?

18        A.   I believe it was, yes, LEPS.

19        Q.   Do you recall about when that was?

20        A.   I do not.

21        Q.   Where --

22        A.   It was roughly -- after I -- after

23   I was hired, I needed to get some in-service

24   hours fairly quickly.  So I am thinking it

Page 10

1   was in the winter of '19.

2         Q.  So it sounds like it was probably

3   before this incident took place?

4         A.  Yes.

5         Q.  Was that something that your

6   employer sent you for?

7         A.  Yes.

8         Q.  Or was that something that you had

9   found in --

10        A.  No.

11        Q.  Okay.  So your employer came to you

12  and said, this is training we are sending you

13  for, you have to do it?

14        A.  Sent me and Officer Johnson who

15  worked as a bailiff.  We both went down

16  together.

17        Q.  Do you recall whether there was any

18  written materials that you received during

19  that?

20        A.  There may have been handouts.  It

21  was mostly overheads.

22        Q.  All right.  Do you still have --

23        A.  No.

24        Q.  -- have that?

Page 11

1        A.  No.

2        Q.  During the time that you had been a

3   bailiff for Judge Goldston, had you traveled

4   with her to the home of any other litigant

5   other than my client?

6        A.  No.

7        Q.  So this was the only time that you

8   went with Judge Goldston to somebody's house?

9        A.  Yes.

10       Q.  Do you know of any other bailiffs

11  who traveled with Judge Goldston to the home

12  of a litigant?

13       A.  Not while I have been working

14  there.

15       Q.  Did you know of any other bailiff

16  prior to you working there?

17       A.  Going with her -- I had never

18  asked.  I had gone with another judge,

19  another family court judge.  And I asked the

20  guy that works on my floor, which is Sergeant

21  Lilly, if it is okay if we do this.  And he

22  told me affirmative that we could do that.

23       Q.  When you say you went with another

24  judge, do you mean to the home of a litigant?

Page 12

1      A.  Yes.

2      Q.  Which judge was that?

3      A.  Judge Shuck.

4      Q.  Okay.  So you traveled to the home

5   of a litigant when you were acting as a

6   bailiff for Judge Shuck?

7      A.  Correct.

8      Q.  How often did you act as a bailiff

9   for Judge Shuck?

10      A.  Weekly.  We have three family court

11   judges on the floor, and we have two

12   bailiffs.  So if Judge Goldston is off, I

13   will bailiff for Judge Shuck.

14      Q.  And when you went to talk to

15   Sergeant Lilly, was that after this event had

16   already occurred, or was this before?

17      A.  This was before the Judge Goldston

18   visit.

19      Q.  Was it after the visit with Judge

20   Shuck that you participated?

21      A.  I don't understand your question.

22      Q.  All right.  You said that you

23   traveled with Judge Shuck to the home of a

24   litigant in a case before Judge Shuck?

Page 13

1        A.  Two cases actually.

2        Q.  Two cases.  Okay.

3            Well, the first of those two cases,

4    that is the one where you had the

5    conversation with Sergeant Lilly?

6        A.  Correct.

7        Q.  When you had the conversation with

8    Sergeant Lilly, was that before or after the

9    first Shuck incident took place?

10       A.  Before any incident -- anytime I

11   left the courthouse, I said, is it okay if we

12   go?  And he goes, yeah, we do that from time

13   to time.

14       Q.  Okay.  What's Sergeant Lilly's

15   first name?

16       A.  Aaron.

17       Q.  Is he still with the sheriff's

18   department?

19       A.  He is.

20       Q.  And so why did you ask Sergeant

21   Lilly?

22       A.  He is the only other officer on my

23   floor.  He is the only other family court

24   bailiff.

Page 14

1          Q.  Was he higher in rank than you at

2     the time?

3          A.  Yes.

4          Q.  Was he in the role of a supervisor

5     for you at that time?

6          A.  Yes.

7          Q.  So if you -- you know, he is the

8     type of person if you did have a question

9     like that, you felt like you could go to him?

10         A.  Correct.

11         Q.  Did he have the ability to issue

12    you orders that you had to -- you were

13    compelled to follow?

14         A.  He does have that ability, yes.

15         Q.  But would it be fair to say that he

16    wasn't your direct supervisor at that time?

17         A.  He was not the supervisor at the

18    courthouse at that time.

19         Q.  Prior to the first time doing this

20    with Judge Shuck, had you heard of these

21    sorts of incidents taking place?

22         A.  No.

23         Q.  So when the first one was about to

24    happen, I guess you -- it seemed unusual --

Page 15

1   it must have seemed unusual enough to you to

2   ask Sergeant Lilly?

3          A.  Well, the lawyers that were

4   involved seemed to be -- it wasn't unusual

5   for them, it appeared.  They said, okay,

6   let's go look and see.  And so it appeared to

7   me as if it was something that occurred on a

8   fairly regular basis.

9          Q.  Do you recall who those lawyers

10  were?

11         A.  I am not sure.  I think it was Jim

12  Keenan and Kyle Lusk, I believe.  One of

13  those two on the first visit.

14         Q.  And do you recall about when that

15  was?

16         A.  I don't.

17         Q.  But it was prior to the incident we

18  are here about today?

19         A.  Yes.

20         Q.  What about the second -- the second

21  time, was that also prior to --

22         A.  Yes.

23         Q.  -- this incident?

24             Do you recall when that was

Page 16

1    approximately?

2        A.  I don't.

3        Q.  Do you recall who the lawyers were

4    who were involved in the second one?

5        A.  I am thinking Todd Kirby may have

6    been one, but I'm -- I may -- may not be

7    right on that.

8        Q.  And did you have any conversations

9    with any supervisors or other deputies about

10   the second Shuck incident?

11       A.  No.  No.

12       Q.  Do you have an independent

13   recollection of this incident that we are

14   here about today before we start talking

15   about it?

16       A.  Yes.

17       Q.  I mean, do you recall it in your

18   mind?  Or are you going to be testifying and

19   answering questions about what you have

20   reviewed?

21       A.  I haven't reviewed anything.

22   Actually, it is all --

23       Q.  So whatever I ask you about and you

24   answer, this is just your recollection?

Page 17

1          A.  Correct.

2          Q.  Okay.  Good.

3              When you arrived at Matthew

4    Gibson's house on March 4, 2020, you were

5    driving a marked police cruiser; is that

6    right?

7          A.  Yes.

8          Q.  And that said, what, Raleigh County

9    Sheriff's Department on it?

10         A.  Yes.

11         Q.  And was anyone else in the vehicle

12   with you?

13         A.  Judge Goldston.

14         Q.  Okay.  And why did you -- did you

15   know what was happening, or did you know why

16   you were going to Matthew Gibson's house?

17         A.  Yes.

18         Q.  Had you been in the hearing --

19         A.  Yes.

20         Q.  -- that took place immediately

21   prior to that?

22         A.  I had, yes.

23         Q.  So you had heard the conversations

24   that were taking place in the courtroom?

Page 18

1       A.   That's correct.

2       Q.   So what is your recollection was

3   the reason that you were traveling with Judge

4   Goldston to Mr. Gibson's home?

5       A.   It appeared that there had been a

6   previous hearing that his wife -- ex-wife had

7   been awarded some items that she didn't

8   receive.  And he indicated that he did have

9   the items.  And it seems that one of the

10   lawyers said, well, let's go get them or -- I

11   may be getting that confused with another

12   case.

13          But it just seemed like -- I knew

14   we were going to the residence to retrieve

15   specific items that were not provided.  As I

16   recall, it was a contempt case.  And those

17   specific items were what we were going to

18   retrieve or attempt to retrieve.

19       Q.   After you arrived on the property

20   with Judge Goldston, Mr. Gibson verbally

21   voiced objections to you and the judge being

22   there on his property, isn't that true?

23       A.   He approached the judge and spoke

24   with her, yes.

Page 19

1          Q.  Okay.  He asked her to recuse

2     herself because he said she had placed

3     herself in a witness capacity, I believe,

4     right?

5          A.  Something along those lines, yes.

6          Q.  And then Judge Goldston denied his

7     request saying that it wasn't timely filed?

8          A.  Yes.

9          Q.  Do you recall Mr. Gibson demanding

10    a search warrant before he allowed anyone in

11    his home?

12         A.  Yes.

13         Q.  You were aware of the fact that

14    there was no search warrant, right?

15         A.  Correct.

16         Q.  Okay.  So you knew at the time that

17    you did not have a search warrant?

18         A.  Correct.

19         Q.  You knew that Judge Goldston did

20    not have a search warrant?

21         A.  Correct.

22         Q.  You knew what a search warrant was,

23    right?

24         A.  I do.

Page 20

1          Q.  And how long did you work for the

2    Beckley Police Department?

3          A.  Twenty years.

4          Q.  During that 20 years, did you ever

5    seek and obtain a search warrant?

6          A.  Yes.

7          Q.  Did you ever execute a search

8    warrant?

9          A.  Yes.

10          Q.  Are you able to give me some

11    approximation of how many search warrants you

12    participated -- participated in executing

13    during the time you worked for Beckley?

14          A.  Me personally filing the paperwork

15    for the search warrant, I would say roughly

16    20.

17          Q.  What about participating in the

18    execution of a search warrant?

19          A.  I did many of those -- as my

20    capacity -- I eventually made the deputy

21    chief of police.  So I was over the drug

22    units and drug -- the detective bureau.  So I

23    would accompany those guys on occasion --

24          Q.  So you were --

Page 21

1          A.   -- in a supervisory capacity.

2          Q.   So you were supervising other

3    officers who were investigating drug cases?

4          A.   Correct.

5          Q.   Would you agree with me that in

6    drug cases, it's extremely common to obtain

7    and execute search warrants?

8          A.   Yes.

9          Q.   So you are familiar -- I mean, you

10   are familiar with what -- you know what a

11   search warrant is?

12         A.   Yes.

13         Q.   You are familiar with the process

14   of how they can be obtained?

15         A.   I am.

16         Q.   Right?

17         A.   I am.

18         Q.   You are familiar with the process

19   of executing search warrants?

20         A.   Yes.

21         Q.   And to be clear, there was no

22   question in your mind on March 4, 2020, that

23   there was no search warrant which had been

24   issued or even requested to be able to search

Page 22

1    Mr. Gibson's home?

2         A.  Correct.

3         Q.  Also on March 4, 2020, you were

4    aware of the fact that Judge Goldston was not

5    a law enforcement officer, right?

6         A.  Correct.

7         Q.  You were aware at all times that

8    she was in fact a family court judge?

9         A.  Correct.

10        Q.  You were also aware of the fact on

11   March 4, 2020, that -- you were aware that

12   judges don't search homes, right?

13        A.  No.  I was not aware of that.

14        Q.  Okay.  So on March 4, 2020, you

15   were not aware that judges do not search

16   homes?

17        A.  That's correct.

18        Q.  Okay.  At some point did you become

19   aware that judges do not search homes?

20        A.  After this case was brought up -- I

21   had no idea if family court judges could go

22   in homes or not.  The process of obtaining a

23   search warrant, as far as my history as a

24   police officer goes, is if we need a search

Page 23

1    warrant, we go to a judge, they issue the

2    search warrant and then we go back to home.

3    So with the judge being with me, I felt as if

4    that base had been covered so to speak.

5        Q.  Okay.  But you did not request that

6    Judge Goldston issue a search warrant for

7    Mr. Gibson's home, right?

8        A.  I did not.

9        Q.  I mean, you weren't involved in

10   that process at all?  You were just the

11   bailiff?

12       A.  Correct.

13       Q.  So you accompanied her on that day

14   to Mr. Gibson's home because she told you to?

15       A.  Right.

16       Q.  During your time at the Beckley

17   Police Department, including supervising

18   other police officers, did you ever

19   experience a judge personally searching any

20   property?

21       A.  No.  I was always involved with

22   criminal cases, never civil cases.

23       Q.  But you were aware of the fact that

24   on March 4, 2020, that the process that you

Page 24

1    were familiar with -- in your experience as

2    far as obtaining search warrants and

3    executing search warrants -- there was no

4    process like that followed on March 4, 2020?

5          A.   No.  I had -- like I said, this was

6    a civil case that I had no experience in.

7          Q.   Okay.  So you were confused or

8    unsure about what the law with family court

9    as opposed to a criminal investigation; is

10   that right?

11         A.   Yes.  By having the judge with

12   me -- I didn't feel it necessary for me to go

13   to a judge and get a search warrant if I had

14   a judge with me.

15         Q.   In your law enforcement career, did

16   you ever in lieu of getting a search warrant

17   just take a judge with you to the property?

18         A.   No.

19         Q.   Had you ever heard of anyone else

20   doing that?

21         A.   No.

22         Q.   But it was just your assumption at

23   the time that it might be okay because the

24   judge was with you?

Page 25

1          A.  I felt as if we recessed from the

2     courtroom and re-adjourned at the home.

3     Therefore, I -- I didn't need another judge

4     -- I mean, the judge was there.

5          Q.  There was no emergency situation

6     occurring inside Mr. Gibson's home on

7     March 4, 2020, right?

8          A.  Correct.

9          Q.  So the reason that the judge wanted

10    inside was solely to search for property?

11               MS. TULLY:  Objection.

12         Q.  If that's your recollection?

13         A.  I don't remember us going there to

14    search.  I remember us going there to

15    retrieve items that were agreed that were

16    going to be taken from him and given to her.

17         Q.  You were going in his house to look

18    for items?

19         A.  To obtain what he said he did have

20    and was going to provide her.

21         Q.  So you were going inside Mr.

22    Gibson's house to retrieve items, correct?

23         A.  Correct.

24         Q.  And not to -- not because there was

Page 26

1    some emergency occurring inside?

2         A.   Correct.

3         Q.   There was no choking baby inside?

4         A.   Correct.

5         Q.   There was no 911 caller inside?

6         A.   Correct.

7         Q.   Now, would it be fair to say -- or

8    would you agree with me that Mr. Gibson did

9    not voluntarily consent to you and the judge

10   entering his house?

11        A.   When we got on the property, he did

12   voluntarily object to us going in the house.

13        Q.   So he did not consent -- Mr. Gibson

14   did not consent to a search of his house, is

15   what I am asking?

16        A.   At first, yes.

17        Q.   Okay.  He did not consent at any

18   point, did he?

19        A.   I think as we went along, he said

20   okay.

21        Q.   And he only went along with it

22   after he was threatened with arrest, right?

23        A.   I can't answer for him.

24        Q.   All right.  Do you recall Mr.

Page 27

1    Gibson being threatened with arrest?

2         A.  Yes.

3         Q.  And who made that threat?

4         A.  The judge.

5         Q.  And who would have arrested him if

6    she followed through with that threat?

7         A.  I would have.

8         Q.  So at the beginning, you were the

9    only law enforcement officer there, right?

10        A.  Yes.

11        Q.  And you were a sworn law

12   enforcement officer on March 4, 2020?

13        A.  Yes.

14        Q.  You had handcuffs with you?

15        A.  I did.

16        Q.  You had a police cruiser?

17        A.  Yes.

18        Q.  You had a gun?

19        A.  Uh-huh.

20        Q.  You had a radio?

21        A.  Yes.

22        Q.  You had arrest powers?

23        A.  Yes.

24        Q.  And had Judge Goldston instructed

Page 28

1    you to arrest Mr. Gibson for not letting her

2    inside his house, you would have done so?

3         A.  I would have checked with my

4    supervisor before arresting him, yes.

5         Q.  Okay.  You didn't tell Mr. Gibson

6    that at the time though, did you?

7         A.  He and I really didn't talk.

8         Q.  Okay.  Well, you were present when

9    the judge looked at him and said you will be

10   arrested if you don't let us in your house?

11        A.  Yes.

12        Q.  And you didn't speak up and say,

13   well --

14        A.  No.

15        Q.  -- let me check with my supervisor

16   first?

17        A.  No, I did not.

18        Q.  So would it be fair to say that

19   Mr. Gibson was under the impression that he

20   would be arrested by you if he chose not to

21   allow you in his house?

22        A.  Yes.  I would say yes.

23        Q.  And at some point before you went

24   in the house, didn't you call for a response

Page 29

1    by other deputies?

2           A.   Yes.

3           Q.   And how did that occur?

4           A.   Well, when we are in the courtroom

5    -- the plaintiff and respondent, their

6    attorneys, the judge and myself are in the

7    courtroom.  It is a very small courtroom.

8    And when we were going to go to the home --

9    we were probably the last people to get to

10   the home.  I didn't realize there were

11   witnesses involved for both parties.  And

12   once we pulled in, I realized how many people

13   were there.  And then I became a little

14   nervous about it.  I didn't know who was with

15   whom, and who should be there, who shouldn't.

16              And we got out of the car pretty

17   quickly as I recall, and we started walking

18   over toward the gazebo with a swing.  And

19   then he talked to the judge about getting a

20   search warrant --

21          Q.   Who was "he"?

22          A.   The --

23          Q.   Mr. Gibson?

24          A.   Mr. Gibson.

Page 30

1                -- about getting a search warrant.

2      And then it became a little what I would call

3      contentious back and forth.  And I went ahead

4      and called for a backup officer at that

5      point.  And typically I do that as I pull

6      into a restaurant -- or a restaurant -- or a

7      residence.  Can you tell it is lunch time?

8                When I pull into a residence -- I

9      should have gone out on the radio and

10     informed EOC that I was at a residence with

11     the judge.

12          Q.  Which is not -- hang on.  Which is

13     not something that you would do in a hearing

14     at the courthouse?

15          A.  Right.  Correct.

16          Q.  Okay.  So at some point you called

17     for other officers.  And why?  What is the

18     reason that you would want other police

19     officers?

20          A.  There were a lot of people there.

21     And it is a smart thing to do, I think, to

22     get other officers there.

23          Q.  At that point --

24          A.  Anytime you have people disagreeing

Page 31

1    over certain things, you want -- you know, I

2    want EOC to know I am there.  And if there is

3    somebody available, they can send a backup

4    officer.

5           Q.  And who is EOC?

6           A.  The emergency operations center.

7           Q.  So at some point, did additional

8    officers show up?

9           A.  Yes.

10          Q.  And who was that that showed up?

11          A.  Stump and Brian White, I believe.

12          Q.  But you didn't call them right when

13   you showed up at the property?  You called

14   them well into the interaction, right?

15          A.  Correct.  I called EOC, and EOC

16   called them.  It wasn't like me calling them

17   directly.

18          Q.  So you requested additional police

19   officers to be at the scene via EOC?

20          A.  Correct.

21          Q.  And you did that after Mr. Gibson

22   voiced objections to you and Judge Goldston

23   being on his property?

24          A.  Correct.

Page 32

1          Q.  In fact, you did that after you

2    seized Mr. Gibson's cell phone?

3          A.  I didn't seize Mr. Gibson's cell

4    phone.

5          Q.  All right.  Well, let's talk about

6    that.  At some point, did you come into

7    possession of Mr. Gibson's cell phone?

8          A.  I did.

9          Q.  Well, how did Mr. Gibson's cell

10   phone get into your possession?

11         A.  He handed it to me, and I stuck it

12   in my shirt pocket.

13         Q.  And why did Mr. Gibson hand you

14   Mr. Gibson's cell phone?

15         A.  The judge told him that it was

16   against the law to record a court hearing,

17   and we were in the middle of a court hearing.

18         Q.  And when this took place, as you

19   say in the middle of a court hearing,

20   physically where were you standing at that

21   time?

22         A.  On the gazebo, as I recall.

23         Q.  And where was the gazebo located?

24         A.  In the front yard of his home.

Page 33

1          Q.  So you were standing in the front

2     yard of Mr. Gibson's home at the time that

3     his cell phone was handed to you?

4          A.  Correct.

5          Q.  And Mr. Gibson handed you his cell

6     phone because the judge ordered him to,

7     right?

8          A.  Correct.

9          Q.  And the judge ordered him to

10    because Mr. Gibson had been attempting to

11    record what was happening, right?

12         A.  Correct.

13         Q.  And he was told by the judge that

14    he could not record what was happening --

15         A.  Yes.

16         Q.  -- right?

17             And so he had to give over his cell

18    phone to you?

19         A.  Yes.

20         Q.  He had to stop recording?

21         A.  Yes.

22         Q.  Even though he was standing on his

23    own property?

24         A.  Yes.

Page 34

```
 1          Q.  Now, there were other people there
 2     recording as well, correct?
 3          A.  I wasn't aware of it, no.
 4          Q.  Do you recall anyone else being
 5     told to turn off --
 6          A.  No.
 7          Q.  -- recordings?
 8          A.  No.
 9          Q.  And at the time that the cell phone
10     was handed to you and you put it in your
11     pocket, again, you were on duty as a law
12     enforcement officer, right?
13          A.  Yes.
14          Q.  You were on the clock?
15          A.  Yes.
16          Q.  And you were in uniform?
17          A.  Yes.
18          Q.  Had you already called for backup
19     at that time?
20          A.  I am not sure if I had or not.
21          Q.  But it was about that time that you
22     radioed for more officers to arrive?
23          A.  Yes.
24          Q.  Would you agree with me that Matt
```

Page 35

1    Gibson did not consent to giving you his cell

2    phone?  I mean, you know what consent is,

3    right?  You deal with consent in your career

4    as a police officer?

5         A.  Right.

6         Q.  You obtain consent before you

7    search someone's car for instance, right?

8         A.  Right.

9         Q.  So you know what consent is?

10        A.  I do.

11        Q.  My question to you is, in your

12   opinion, being an eyewitness there, do you

13   think Mr. Gibson consented to handing you his

14   cell phone?

15        A.  No.

16        Q.  Do you recall how long the search

17   of Mr. Gibson's home lasted?

18        A.  I would guess -- no.  I don't

19   recall.  I would --

20        Q.  You were there the entire time?

21        A.  Yes.

22        Q.  So the entire time that the judge

23   was there, you were there?

24        A.  I was.

Page 36

1      Q.  Okay.  Do you think it was at least

2   20 minutes long?

3      A.  Yes.

4      Q.  At some point, you began to record

5   what was happening inside the house, right?

6      A.  I think I started to record before

7   we went in -- in the home.  But I am not

8   sure.

9      Q.  Well, we have a recording that you

10   took of inside the house during the search.

11      A.  Okay.

12      Q.  Right?

13      A.  We should have.

14      Q.  I mean, that -- that was a

15   recording that you took?

16      A.  Uh-huh.

17      Q.  Yes or no?

18      A.  Yes.

19      Q.  Was that taken on your personal

20   cell phone?

21      A.  Yes.

22      Q.  Why did you -- why did you start

23   recording inside Mr. Gibson's house?

24      A.  For the protection of everyone

Page 37

1    involved.

2         Q.  Now, you had been on two of these

3    before with Judge Shuck, right?

4         A.  Yes.

5         Q.  During either of the searches with

6    Judge Shuck or whatever -- whatever occurred,

7    did you record what took place in either of

8    those two prior instances?

9         A.  Yes.

10        Q.  Do you still have those videos?

11        A.  No.

12        Q.  What did you do with them?

13        A.  They were deleted.

14        Q.  Were they given to anybody before

15   they were deleted?

16        A.  In this incident, I gave it to our

17   case coordinator.  And then it was deleted.

18        Q.  And in the incident that we are

19   here about today?

20        A.  Right.

21        Q.  In either of the two Shuck

22   incidents, did you do anything with the

23   videos?

24        A.  They were actually photos of guns,

Page 38

1    firearms that we took when the video just --

2    individual photos.

3         Q.  And what did you do with those

4    photos?

5         A.  They were deleted.

6         Q.  Before being deleted, were they

7    provided to anybody?

8         A.  No.  That case settled quickly.

9    And I was told we didn't need them.

10        Q.  Do you recall whether there were

11   any search warrants involved in those?

12        A.  There were not.

13        Q.  After this incident, did you ever

14   have any additional conversations with any of

15   your supervisors about whether it was

16   appropriate or within your employer's

17   policies to accompany judges outside of the

18   courthouse?

19        A.  Yes.

20        Q.  And tell me about that.  Who did

21   you have a conversation with?

22        A.  The guy I work with, which is

23   Sergeant Lilly.

24        Q.  So the same Sergeant Lilly that you

Page 39

1    talked to --

2         A.   Uh-huh.

3         Q.   -- before going with Judge Shuck?

4         A.   Yes.

5         Q.   And when did that take place?

6         A.   I think the day that we got back

7    from his home.

8         Q.   From whose home?

9         A.   Mr. Gibson's home.

10        Q.   And did you approach Sergeant

11   Lilly, or did he approach you?

12        A.   Yeah.  I went to him and told him

13   that we had to call and have a backup officer

14   come -- come to the home.  And as I recall,

15   he said he would -- he knew Mr. Gibson or

16   someone at the police department knew Mr.

17   Gibson.  I don't remember who it was.

18        Q.   Was he already aware of the

19   incident?

20        A.   I don't think he was aware of it

21   until I made him aware of it.

22        Q.   So did he say anything else?

23        A.   No.

24        Q.   Did you have any other

Page 40

1   conversations about whether you would

2   continue to go on these visits or searches

3   with a judge?

4          A.  Not as I recall.

5          Q.  Were there ever any written

6   policies or procedures with your employer

7   that pertain specifically to bailiff duties?

8          A.  Not that I -- not that I recall.

9              MR. ROBINSON:  Object to the

10  form.  Just -- well, go ahead.

11         Q.  Do you recall what -- was there

12  ever any change in policy after the -- after

13  the incident at Mr. Gibson's house, was there

14  ever any change in policy, whether written or

15  unwritten as you understood it, as to whether

16  or not you were allowed to ever again

17  accompany a judge to a litigant's house?

18         A.  Not as I recall, no.

19         Q.  So you were never told by your

20  employer not to do that again?

21         A.  No.  My job is the judge's safety.

22  So if she or he goes somewhere or feels the

23  need to go somewhere, I would accompany them

24  for their safety.

Page 41

1      Q.  Okay.  I mean, your job is also to

2    protect the safety of any citizen, right?

3      A.  Secondarily.  When I am -- when I

4    am with the judge, she is my primary concern

5    or he, whatever judge is there.  As far as

6    what the petitioners or respondents are

7    doing, that's not really why I'm there.

8      Q.  Okay.  Well, I mean, you are there

9    to protect the petitioners and respondents as

10   well, right?

11     A.  If something happened, I would grab

12   the judge and go and let whatever happened

13   happened.  So I don't know if that answers

14   your question or not.

15     Q.  Well, yeah.  It does.  I mean, is

16   that -- is that something that you were --

17   that is a policy, or that you are taught to

18   do?  Or is that just something you do on your

19   own?

20     A.  Well, all law enforcement officers

21   are there to protect the safety of the good

22   guy and the bad guy.  I mean, I don't want

23   anything to happen to anybody while I am on a

24   scene.

Page 42

1        Q.  Is there some rule somewhere that

2   says, I mean, your job is to only protect the

3   judge and not protect anyone else?

4        A.  No.  And that's not what I am

5   saying.  I am saying the judge is my primary

6   responsibility.

7        Q.  After going inside Mr. Gibson's

8   house, what did you do inside?

9        A.  I stood, watched what was happening

10  for the most part.

11       Q.  Did you help to look for anything?

12       A.  No.

13       Q.  Did you ever grab a hold of any

14  item of personal property?

15       A.  No.

16       Q.  But at some point, you did film

17  inside Mr. Gibson's house?

18       A.  Yes.  As I recall, the phone

19  battery was -- typically, I don't keep it

20  charged up well.  It was low.  But I wanted

21  to make sure and get as much recorded -- I

22  don't want someone to say we did this or

23  didn't do this.  I wasn't filming Mr. Gibson

24  or Mrs. Gibson or the judge.  I was filming

Page 43

1    overall, as I think it would be appropriate

2    -- any officer with a body camera would have

3    the same footage as what I was filming.

4         Q.  And when you say "we," you are

5    talking about you and the judge?

6         A.  Yeah.  I am not sure what context I

7    said we.  I mean, you could refresh my

8    memory.

9         Q.  Okay.  Well, you had done -- you

10   had done this twice before with Judge Shuck,

11   right?

12        A.  Yes.

13        Q.  And you said that both of those

14   times you either took video or took pictures?

15        A.  Not both of those times.  One --

16   one time.

17        Q.  All right.  Well, one of those

18   times at least you took photographs of some

19   firearms to document what was taken from the

20   residence?

21        A.  Correct.

22        Q.  And when you went to Matthew

23   Gibson's house, you didn't take photos, but

24   you took video to document what was happening

Page 44

1    inside his house?

2          A.  Correct.

3          Q.  And at one point, in fact, you are

4    filming the inside of Mr. Gibson's gun safe?

5          A.  Probably.

6          Q.  You are filming Mr. Lusk and his

7    client walking around inside Mr. Gibson's

8    house?

9          A.  Probably.

10          Q.  You are filming items that are

11    being taken by Mr. Gibson's ex-wife pursuant

12    to the instructions of the judge?

13          A.  Right.  I stayed in the room with

14    the judge until Mr. Gibson approached me and

15    asked me if I would accompany him to look in

16    his gun safe.  At that point, I left.  I

17    asked the judge if she felt comfortable with

18    me doing that.  She told me yes.  We went to

19    the gun safe.  And he actually opened the

20    safe and showed me in the gun safe.

21          Q.  And that was after you had already

22    been filming?

23          A.  Correct.

24          Q.  And that was after the search was

Page 45

1   already under way?

2        A.   Correct.

3             MS. TULLY:  Object to the use of

4   the term "search."

5        But go ahead.

6             MR. BRYAN:  I could read the

7   Supreme Court's holding if you want me to.

8             MS. TULLY:  And I can still

9   object.  Go right ahead.

10            MR. BRYAN:  Your objection is

11  noted.

12       Q.   The search was under way at the

13  time that Mr. Gibson first mentioned -- or

14  showed you the inside of his gun safe, right?

15       A.   Yes.

16       Q.   And Mr. Gibson had already been

17  threatened with arrest prior to that, right?

18       A.   Yes.

19       Q.   His cell phone had already been

20  seized prior to that?

21       A.   Yes.

22       Q.   You had already called for

23  additional law enforcement officers to show

24  up to back you up prior to that, right?

Page 46

1          A.  Yes.

2          Q.  Would it be fair to say that you

3    did more inside Mr. Gibson's house than just

4    ensure the judge's safety, but that you to

5    some extent participated jointly with the

6    judge by documenting what was happening

7    inside?

8              MS. TULLY:  Objection.

9          Q.  Let me -- strike that.  Let me

10   rephrase that question.  It was pretty

11   sloppy.

12             Would you agree with me that you

13   did more on March 4, 2020, than merely

14   protect the judge's safety or guard the judge

15   inside Mr. Gibson's house?

16         A.  My role there is protecting the

17   judge as I stated.  And all of our hearings,

18   all of them, 100 percent of them, are

19   videotaped.  I felt as if we were still in a

20   courtroom setting.  So I felt that it would

21   be a good idea to video as much as I could.

22   My battery was low.  And I would have

23   videotaped start to end.

24         Q.  But you weren't -- you weren't just

Page 47

```
 1    taking surveillance footage, you were

 2    documenting --

 3          A.  I was -- I was documenting what

 4    people were saying and what people were

 5    taking as much as I could.

 6          Q.  Okay.  But when you are acting as a

 7    bailiff in the courtroom, I mean, you're not

 8    getting out your cell phone and

 9    documenting --

10          A.  Did not.

11          Q.  -- exhibits or anything like that?

12          A.  No.  The courtroom facilities do

13    that for me.  I don't have -- I am not.

14          Q.  And that -- I mean, that, to be

15    fair, doesn't have anything to do with Judge

16    Goldston's safety -- personal safety, does

17    it?

18                    MR. ROBINSON:  Object to the

19    form.

20          Do you understand the question?

21          A.  If you could rephrase it maybe.

22          Q.  Your actions in documenting with

23    your personal cell phone the inside of

24    Mr. Gibson's house, that goes beyond just
```

Page 48

1    guarding Judge Goldston's personal safety,

2    right?

3         A.  I would say yes.

4         Q.  I mean, that is more akin to

5    helping Judge Goldston locate and retrieve

6    items of personal property inside Mr.

7    Gibson's house?

8         A.  No.

9              MS. TULLY:  Objection.

10         A.  I would not agree with that, no.

11         Q.  You were documenting items of

12    personal property inside Mr. Gibson's house

13    that was being retrieved by other people?

14         A.  More of recording what was being

15    said or not said, taken or not taken.  Trying

16    to keep an accurate record of what was going

17    on inside the home.

18         Q.  When you took photographs with your

19    personal cell phone of firearms during a

20    prior incident with Judge Shuck, that was not

21    done in the interest of Judge Shuck's safety,

22    was it?

23         A.  It was not.

24         Q.  Taking photographs of somebody's

Page 49

1    firearms had absolutely nothing to do with

2    ensuring or protecting Judge Shuck's safety?

3        A.  Correct.

4        Q.  In fact, it was literally

5    documenting what was being taken out of that

6    residence?

7        A.  Correct.

8        Q.  And that's the same thing that you

9    were doing inside Matthew Gibson's house by

10   recording video, right?

11              MR. ROBINSON:  Object to the

12   form.

13          You can answer it.

14       A.  I may have recorded a television at

15   one point as I am recording.  That doesn't

16   mean that the television was taken.  I am not

17   -- I am not documenting -- I am not --

18   everything that I am recording is not being

19   taken.  I don't know how else to say that.

20       Q.  What did you do with the recording

21   after the search was over?  Did you provide

22   it to Judge Goldston?

23       A.  I provided it to Debra, which is

24   our case coordinator -- or Donzetta.  I can't

Page 50

1  remember.  One of the two that work in our

2  office.  I said, there it is, put it in the

3  file, whatever you need to do with it.  And

4  then I immediately deleted it from my phone.

5          Q.  What are their names?

6          A.  Donzetta Roush and Debra Johnson.

7          Q.  And they are case coordinators?

8          A.  They work in -- one of them is a

9  coordinator, and one is a clerical secretary.

10         Q.  For the sheriff's department?

11         A.  For the judge -- judge's office.

12         Q.  For the family court?

13         A.  Uh-huh.

14         Q.  So you provided the family court --

15 somebody inside the family court with a copy

16 of the video that you took inside the

17 plaintiff's house?

18         A.  Correct.

19         Q.  And then you deleted it off your

20 phone?

21         A.  Correct.

22         Q.  And so you didn't keep a copy of

23 it?

24         A.  No.  Absolutely not.

Page 51

1          Q.  Did you ever have any conversations

2   with Judge Goldston about the video footage

3   that you took inside Mr. Gibson's house?

4          A.  I told her I took video.  And she

5   acknowledged that she saw me with my phone.

6          Q.  When did that conversation take

7   place?

8          A.  Immediately either when we got back

9   in the Jeep or when we got back to the

10  courthouse.

11         Q.  Did she say anything else?

12         A.  No.

13         Q.  Did you ever have any conversations

14  with Judge Goldston about the propriety of

15  you filming inside Mr. Gibson's house?

16         A.  Not as I recall.

17         Q.  Did she ever say to you not to do

18  that again?

19         A.  No.  I did get a call from someone

20  at the Supreme Court that said I shouldn't

21  have done that.

22         Q.  Did you personally receive that

23  call?

24         A.  I did.

Page 52

1          Q.  Do you recall who --

2          A.  I do not.

3          Q.  -- called you?

4          A.  Lieutenant Stafford I think took

5    the call.  I remember going to his office and

6    talking with somebody.  I don't recall if I

7    called them back or they called me at a

8    certain time.  But I remember having the

9    discussion on the phone, and they said to not

10   -- asked why I did it.  And I explained why.

11   They said, that's not a good idea.

12         Q.  Who told you that?

13         A.  Whoever I talked to.  I don't

14   remember who it was.

15         Q.  Was this a lawyer?

16         A.  I don't know.

17         Q.  What's Lieutenant Stafford's first

18   name?

19         A.  David.

20         Q.  And is he a supervisor for you?

21         A.  He is.

22         Q.  Is he over Sergeant Lilly, I

23   presume?

24         A.  He is.

Page 53

1          Q.  So at some point, Lieutenant

2    Stafford called you into his office, and he

3    had somebody from the Supreme Court on the

4    phone?

5          A.  No.  He told me that someone had

6    called, and I -- like I said, I can't

7    remember if I was supposed to call them back.

8    And that may have been what it was.  I went

9    to his office and he had the phone number

10   there and I called them back or something --

11   something of that nature.

12         Q.  Did you call -- did you call that

13   person back from inside Lieutenant Stafford's

14   office?

15         A.  Yes.

16         Q.  With him present?

17         A.  No.

18         Q.  So he called you into his office,

19   and then he left the room?

20         A.  Correct.

21         Q.  Did Lieutenant Stafford say

22   anything else to you other than about

23   somebody is on the phone?

24         A.  No.  He just told me that someone

Page 54

1    had called from the Supreme Court's office

2    and asked them that I call them back.  And I

3    explained to them the entirety of, you know,

4    what we are going on now.  And he said I

5    probably shouldn't have recorded it.

6         Q.  So somebody from the Supreme Court

7    whose name you don't remember told you while

8    you were sitting in Lieutenant Stafford's

9    office that you probably should not have

10   recorded --

11        A.  Right.

12        Q.  -- recorded inside Mr. Gibson's

13   house?

14        A.  Correct.

15        Q.  Did that individual also tell you

16   that you probably should not or that you

17   should not accompany Judge Goldston to

18   anyone's house in the first place?

19        A.  No.

20        Q.  Did Lieutenant Stafford have any

21   conversations with you about going to the

22   home of a litigant when you are a bailiff?

23        A.  No.

24        Q.  Did Lieutenant Stafford have any

Page 55

1    conversations with you about whether or not

2    you should record inside someone's house?

3         A.   No.

4         Q.   Did you receive any discipline or

5    anything as a result of this incident?

6         A.   No.

7         Q.   Have you ever been disciplined in

8    your capacity as a law enforcement officer?

9         A.   No.

10        Q.   Formally or informally?

11        A.   Not at the sheriff's office.

12        Q.   What about at Beckley?

13        A.   I am sure I was for speeding or

14   whatever.  I drive fast.  That's why I'm a

15   policeman.  If you can't beat them, join

16   them.

17        Q.   Have you ever had your deposition

18   taken before?

19        A.   Not since I have been a policeman

20   that I am aware of.

21        Q.   Have you ever been charged with a

22   crime?

23        A.   No.

24        Q.   When you were inside Mr. Gibson's

Page 56

1    house, did you ever observe Judge Goldston

2    participating in looking for things?

3         A.  No.

4         Q.  What did you -- as -- I probably

5    should have asked you this first.  What did

6    you observe Judge Goldston doing inside

7    Mr. Gibson's house?

8         A.  As I recall, we went in.  And it

9    seemed like we go to the left and down the

10   set of stairs, and then to the right into a

11   den with -- DVDs I think were in question.

12   And that was -- I think that was the primary

13   reason for us being there, was to retrieve

14   some DVDs and some photos.

15        Q.  When the other deputies arrived,

16   what did they do?  Did they go inside the

17   house?

18        A.  Yes.  They came down and asked if I

19   needed anything.  And they dispersed the

20   crowd that was outside --

21        Q.  And why?

22        A.  -- as far as I know.  I stayed

23   downstairs.

24        Q.  Well, how do you know that they did

Page 57

1    that?

2         A.  He told me that's -- he went up and

3    made sure.

4         Q.  Who is "he"?

5         A.  Officer Stump.

6         Q.  So Officer Stump told you that he

7    dispersed the crowd outside of Mr. Gibson's

8    house?

9         A.  Right.

10        Q.  When did he tell you that?

11        A.  I am not sure.

12        Q.  Do you know who he would be

13   referring to as the crowd?

14        A.  No.  Like I said, initially I --

15   there were people there.  And I am assuming

16   they were from both sides as witnesses or

17   maybe just giving rides to people.  I don't

18   know why they were there.

19        Q.  You knew --

20        A.  But I didn't know there were going

21   to be that many people there when I got

22   there.  I thought it was just going to be the

23   few of us.

24        Q.  Okay.  Well, you knew that Mr.

Page 58

1    Gibson had people with him on his property

2    when you arrived?

3         A.   Yes.   There were several people

4    there.

5         Q.   And it was your understanding that

6    they were there with his permission?

7         A.   I would assume so.

8         Q.   I mean, you saw Mr. Gibson's

9    girlfriend with a phone recording -- video

10   recording you and Judge Goldston?

11        A.   I don't know if -- I didn't see

12   anybody videotaping.

13        Q.   Okay.   So it is your understanding

14   that Officer Stump, once he arrived, made

15   everybody leave Mr. Gibson's property?

16        A.   Right.   He told me he -- he got rid

17   of the crowd, and asked me if I needed

18   anything else.   And I told him we seem to be

19   fine -- everybody seemed to be fine.

20        Q.   When you had that conversation with

21   Mr. Stump, was that inside Mr. Gibson's

22   house?

23        A.   I believe so.

24        Q.   Do you recall where inside the

Page 59

1    house that took place?

2          A.  Probably in the den downstairs.

3          Q.  Did Mr. Gibson ever invite Officer

4    Stump inside his house?

5          A.  No.  I think we were already

6    downstairs when Officer Stump came down.

7          Q.  So Mr. Gibson wasn't even aware

8    that Stump came in?

9          A.  Not that I am aware of, no.

10         Q.  Were you in Mr. Gibson's presence

11   pretty much the whole time during that

12   search?

13         A.  I think so, yes.

14         Q.  I may have asked you.  But did you

15   ever physically pick up any item of property

16   inside Mr. Gibson's house?

17         A.  Not -- unless somebody asked me to

18   help move something.  But I -- I don't think

19   -- I don't remember touching anything, no.

20         Q.  Who else -- what other deputies

21   arrived other than Officer Stump?

22         A.  I think it was Officer White.

23         Q.  And do you recall whether or not he

24   came inside Mr. Gibson's house?

Page 60

1          A.  I believe I did see him downstairs,

2     yes.

3          Q.  Did he come in at the same time as

4     Stump?

5          A.  I don't know who came first.

6          Q.  Did they come in at about the same

7     time?

8          A.  They could have.  I do remember on

9     the radio they were -- there was some mix-up

10    about the address.  And I think -- I don't

11    know if that had anything to do with the

12    order in which they arrived or not.

13         Q.  Do you know whether they knew what

14    they -- what kind of scene they were

15    responding to or why?

16         A.  No.  I got on the radio and said

17    that I am out at whatever -- I don't remember

18    the address -- but whatever road or drive or

19    something with the judge, and I -- if there

20    was an officer available, I needed backup.

21         Q.  So you communicated that you were

22    with the judge inside Mr. Gibson's home?

23         A.  No.  We weren't in the home.

24         Q.  So you were still in the front

Page 61

1    yard --

2         A.   Uh-huh.

3         Q.   -- at that time?

4              So you communicated that you were

5    with the judge --

6         A.   Out at a residence with the judge.

7    And I asked if there was a unit that could

8    come and back me up.

9         Q.   And in either of the prior two

10   times that you visited the home with Judge

11   Shuck, was there any other backup that was

12   involved or any other law enforcement

13   officers that arrived at those incidents?

14        A.   No.

15        Q.   I may have asked you that.

16             Do you have any recollection about

17   what Officer White did inside Mr. Gibson's

18   house?

19        A.   As far as I remember, they just

20   came down and talked, made sure everything

21   was okay and left.

22        Q.   Do you have any idea how long they

23   were inside the house?

24        A.   I don't.  It was very brief.

Page 62

1        Q.  Now, you testified that you gave

2   the video taken inside Mr. Gibson's house to

3   some case coordinators --

4        A.  Right.

5        Q.  -- right?

6        A.  Uh-huh.

7        Q.  Is it your testimony that you did

8   not directly provide this video to Judge

9   Goldston?

10       A.  Yes.

11       Q.  So you are positive you didn't

12   directly give this video to Judge Goldston?

13       A.  That's correct.

14       Q.  So if she got a copy of that video,

15   it wasn't from you?

16       A.  Right.

17       Q.  Not directly?

18       A.  Right.

19       Q.  We played the video that you took

20   here a couple times so far before you came

21   in.  And you can correct me if I am wrong

22   here.  But it is my understanding that on the

23   video, you said -- you said to somebody that

24   you might want to place a limit on the number

Page 63

1    of items taken because it might be too much

2    to carry.  Do you recall -- do you recall

3    that?

4         A.  I don't.

5         Q.  I believe you were talking to the

6    judge about placing a limit on what physical

7    property could be carried out of there?

8         A.  That's possible.  I don't recall.

9         Q.  Have you watched the video

10   recently?

11        A.  Huh-uh.

12            MR. BRYAN:  Give me one second to

13   talk to them.

14               (Break in proceedings.)

15   BY MR. BRYAN:

16        Q.  Just to clarify -- just so I

17   understand, it is your testimony that your

18   employer has never told you even to this day

19   that you are not to accompany Judge Goldston

20   or any other judge to the home of a litigant

21   ever again as had occurred on March 4, 2020?

22        A.  I don't recall being told directly

23   not to.  But common sense would tell me right

24   now that -- definitely get the clearance

Page 64

1   before I did it again.

2       Q.  Well, to be fair to you, you did --

3   it is your testimony that you did go to

4   Sergeant Lilly before the first Shuck

5   incident, right?

6       A.  Correct.

7       Q.  And Sergeant Lilly told you that it

8   was fine for you to go with Judge Shuck to

9   the home of a litigant?

10      A.  His response is -- was we do do

11  that from time to time.

12      Q.  And if I understand you correctly,

13  at no point after that did any supervisor

14  ever tell you not to do that again?

15      A.  Correct.

16      Q.  And it is your testimony here today

17  that you are not aware of any written policy

18  changes or anything like that pertaining to

19  going to the home of a litigant with a judge?

20      A.  Not that I am aware of, no.

21      Q.  Okay.  It is just your own common

22  sense that tells you not to do that again?

23      A.  Right.

24      Q.  So let me ask you this.  You know,

Page 65

1    if a judge asks you to go with her or him

2    again to the home of a litigant, would you do

3    it again?

4        A.  I would check with Lieutenant

5    Stafford and say, Judge McGraw or Judge Shuck

6    or Judge Goldston is requesting to go to a

7    home.  And if he gave me clearance to do it,

8    I would do it.

9        Q.  But as we sit here today, none of

10   your supervisors have proactively come

11   forward to tell you, look, don't do that

12   again?

13       A.  No.  I may have gone to them and

14   said, I won't do it again.

15       Q.  They are aware of the fact that you

16   are still serving as a bailiff?

17       A.  Yes.

18            MR. BRYAN:  I don't think I have

19   any other questions.  Thank you.

20            MR. ROBINSON:  I don't have

21   anything.

22            MS. TULLY:  I don't have

23   anything.

24            MR. ROBINSON:  You can read your

Page 66

1    deposition to see if there were any mistakes

2    that were made, or you can waive it.

3                THE WITNESS:  I waive.

4                (Deposition concluded at 2:45

5    p.m.)        * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 67

1                    **CERTIFICATE**

2

3        I, Tara Arthur, Certified Stenotype

4    Reporter and Notary Public, do hereby

5    certify that the foregoing deposition of the

6    above-named witness, was duly taken by me in

7    mechine shorthand, and that the same were

8    accurately written out in full and reduced

9    to computer transcription.

10        I further certify that I am neither

11   attorney or counsel for, nor related to or

12   employed by any of the parties to the action

13   in which this deposition is taken; and

14   furthermore, that I am not a relative or

15   employee of any attorney or counsel employed

16   by the parties hereto or financially

17   interested in the action.

18        My commission expires April 16, 2022.

19

20   _____

     Tara Arthur
21   Certified Court Reporter/Notary Public

22

23

24

1

**1**

**100** 46:18

**19** 7:7 10:1

**2**

**20** 20:4,16
36:2

**2017** 6:19

**2020** 5:7,24
17:4 21:22
22:3,11,14
23:24 24:4
25:7 27:12
46:13 63:21

**2:45** 66:4

**4**

**4** 5:7,23 17:4
21:22 22:3,
11,14 23:24
24:4 25:7
27:12 46:13
63:21

**9**

**911** 26:5

**A**

**Aaron** 13:16

**ability** 14:11,
14

**absolutely**
49:1 50:24

**accompanied**
23:13

**accompany**
20:23 38:17
40:17,23
44:15 54:17
63:19

**accurate**
48:16

**acknowledge
d** 51:5

**act** 12:8

**acting** 12:5
47:6

**actions** 47:22

**additional**
31:7,18 38:14
45:23

**address**
60:10,18

**affirmative**
11:22

**agree** 21:5
26:8 34:24
46:12 48:10

**agreed** 25:15

**ahead** 30:3
40:10 45:5,9

**akin** 48:4

**allowed**
19:10 40:16

**answering**
16:19

**answers**
41:13

**anyone's**
54:18

**anytime**
13:10 30:24

**appeared**
15:5,6 18:5

**approach**
39:10,11

**approached**
18:23 44:14

**approximatel
y** 16:1

**approximatio
n** 20:11

**arrest** 26:22
27:1,22 28:1
45:17

**arrested** 27:5
28:10,20

**arresting**
28:4

**arrive** 34:22

**arrived** 17:3
18:19 56:15
58:2,14 59:21
60:12 61:13

**asks** 65:1

**assume** 58:7

**assuming**
57:15

**assumption**
24:22

**attempt** 18:18

**attempting**
33:10

**attorneys**
29:6

**awarded** 18:7

**aware** 19:13
22:4,7,10,11,
13,15,19
23:23 34:3
39:18,20,21
55:20 59:7,9
64:17,20
65:15

**B**

**baby** 26:3

**back** 23:2
30:3 39:6
45:24 51:8,9
52:7 53:7,10,
13 54:2 61:8

**backup** 30:4
31:3 34:18
39:13 60:20
61:11

**bad** 41:22

**bailiff** 6:4,23
7:3,6,10 8:12,
15 9:2,4,5,6,9
10:15 11:3,15
12:6,8,13
13:24 23:11
40:7 47:7
54:22 65:16

**bailiffs** 11:10
12:12

**base** 23:4

**basis** 7:23
15:8

**battery** 42:19
46:22

**beat** 55:15

**Beckley** 6:12,
17 20:2,13
23:16 55:12

**began** 36:4

**beginning**
27:8

**body** 43:2

**break** 63:14

**Brian** 31:11

**brought**
22:20

**Bryan** 4:6,7
45:6,10
63:12,15
65:18

**bureau** 20:22

**C**

**call** 28:24
30:2 31:12
39:13 51:19,
23 52:5 53:7,
12 54:2

**called** 4:2
30:4,16
31:13,15,16
34:18 45:22
52:3,7 53:2,6,
10,18 54:1

**caller** 26:5

**calling** 31:16

**camera** 43:2

**capacity** 19:3 20:20 21:1 55:8

**car** 29:16 35:7

**career** 24:15 35:3

**carried** 63:7

**carry** 5:19 63:2

**case** 4:9 12:24 18:12,16 22:20 24:6 37:17 38:8 49:24 50:7 62:3

**cases** 13:1,2,3 21:3,6 23:22

**cell** 32:2,3,7,9,14 33:3,5,17 34:9 35:1,14 36:20 45:19 47:8,23 48:19

**center** 31:6

**change** 40:12,14

**charged** 42:20 55:21

**Charleston** 9:10,16

**check** 28:15 65:4

**checked** 28:3

**chief** 20:21

**choking** 26:3

**chose** 28:20

**circuit** 8:22

**citizen** 41:2

**civil** 23:22 24:6

**clarify** 63:16

**class** 9:10

**classroom** 9:13

**clear** 21:21

**clearance** 63:24 65:7

**clerical** 50:9

**client** 11:5 44:7

**clock** 34:14

**comfortable** 44:17

**common** 21:6 63:23 64:21

**communicated** 60:21 61:4

**compelled** 14:13

**concern** 41:4

**concluded** 66:4

**confused** 18:11 24:7

**consent** 26:9,13,14,17 35:1,2,3,6,9

**consented** 35:13

**contempt** 18:16

**contentious** 30:3

**context** 43:6

**continue** 40:2

**conversation** 13:5,7 38:21 51:6 58:20

**conversations** 16:8 17:23 38:14 40:1 51:1,13 54:21 55:1

**coordinator** 37:17 49:24 50:9

**coordinators** 50:7 62:3

**copy** 50:15,22 62:14

**correct** 7:4,11 8:24 12:7 13:6 14:10 17:1 18:1 19:15,18,21 21:4 22:2,6,9,17 23:12 25:8,22,23 26:2,4,6 30:15 31:15,20,24 33:4,8,12 34:2 43:21 44:2,23 45:2 49:3,7 50:18,21 53:20

54:14 62:13,21 64:6,15

**correctly** 64:12

**County** 4:18 5:3,14 17:8

**couple** 6:16 62:20

**court** 4:3 8:22,23 11:19 12:10 13:23 22:8,21 24:8 32:16,17,19 50:12,14,15 51:20 53:3 54:6

**Court's** 45:7 54:1

**courthouse** 7:24 8:19 9:11 13:11 14:18 30:14 38:18 51:10

**courtroom** 8:5 17:24 25:2 29:4,7 46:20 47:7,12

**covered** 23:4

**crime** 55:22

**criminal** 23:22 24:9

**crowd** 56:20 57:7,13 58:17

**cruiser** 17:5 27:16

**D**

**David** 52:19

**day** 5:8,9,17 23:13 39:6 63:18

**days** 7:23 9:13

**deal** 35:3

**Debra** 49:23 50:6

**deleted** 37:13,15,17 38:5,6 50:4,19

**demanding** 19:9

**den** 56:11 59:2

**denied** 19:6

**department** 4:19 5:3,14 6:13,18 13:18 17:9 20:2 23:17 39:16 50:10

**deposition** 55:17 66:1,4

**deputies** 9:7 16:9 29:1 56:15 59:20

**deputy** 4:20 20:20

**detective** 20:22

direct 14:16

directly 31:17
62:8,12,17
63:22

disagreeing
30:24

discipline
55:4

disciplined
55:7

discussion
52:9

dispersed
56:19 57:7

document
43:19,24

documenting
46:6 47:2,3,9,
22 48:11
49:5,17

Donzetta
49:24 50:6

downstairs
56:23 59:2,6
60:1

drive 55:14
60:18

driving 17:5

drug 20:21,22
21:3,6

duly 4:2

duties 40:7

duty 34:11

DVDS 56:11,
14

**E**

emergency
25:5 26:1
31:6

employed
5:13 6:20

employer
4:17 10:6,11
40:6,20 63:18

employer's
38:16

end 46:23

enforcement
4:14 22:5
24:15 27:9,12
34:12 41:20
45:23 55:8
61:12

ensure 46:4

ensuring
49:2

entering
26:10

entire 35:20,
22

entirety 54:3

EOC 30:10
31:2,5,15,19

escort 8:4

event 12:15

eventually
20:20

ex-wife 18:6
44:11

EXAMINATIO
N 4:5

execute 20:7
21:7

executing
20:12 21:19
24:3

execution
20:18

exhibits
47:11

experience
23:19 24:1,6

explained
52:10 54:3

extent 46:5

extremely
21:6

eyewitness
35:12

**F**

facilities
47:12

fact 19:13
22:4,8,10
23:23 32:1
44:3 49:4
65:15

fair 14:15
26:7 28:18
46:2 47:15
64:2

fairly 9:24
15:8

familiar 21:9,
10,13,18 24:1

family 8:22
11:19 12:10
13:23 22:8,21
24:8 50:12,
14,15

fast 55:14

feel 24:12

feels 40:22

felt 14:9 23:3
25:1 44:17
46:19,20

file 50:3

filed 19:7

filing 20:14

fill-in 8:20

film 42:16

filming 42:23,
24 43:3 44:4,
6,10,22 51:15

fine 58:19
64:8

firearms 38:1
43:19 48:19
49:1

floor 11:20
12:11 13:23

floors 8:1

follow 14:13

footage 43:3
47:1 51:2

form 40:10
47:19 49:12

familiar 21:9,
10,13,18 24:1

Formally
55:10

forward
65:11

found 10:9

front 32:24
33:1 60:24

**G**

gave 37:16
62:1 65:7

gazebo 29:18
32:22,23

Gibson 4:10
18:20 19:9
26:8,13 27:1
28:1,5,19
29:23,24
31:21 32:13
33:5,10 35:1,
13 39:15,17
42:23,24
44:14 45:13,
16 58:1 59:3,
7

Gibson's
17:4,16 18:4
22:1 23:7,14
25:6,22 32:2,
3,7,9,14 33:2
35:17 36:23
39:9 40:13
42:7,17 43:23
44:4,7,11
46:3,15 47:24
48:7,12 49:9
51:3,15 54:12
55:24 56:7
57:7 58:8,15,

4

21 59:10,16,
24 60:22
61:17 62:2

**girlfriend**
58:9

**give** 20:10
33:17 62:12
63:12

**giving** 35:1
57:17

**Goldston**
8:13 9:2 11:3,
8,11 12:12,17
17:13 18:4,20
19:6,19 22:4
23:6 27:24
31:22 48:5
49:22 51:2,14
54:17 56:1,6
58:10 62:9,12
63:19 65:6

**Goldston's**
47:16 48:1

**good** 17:2
41:21 46:21
52:11

**grab** 41:11
42:13

**guard** 46:14

**guarding**
48:1

**guess** 14:24
35:18

**gun** 5:19
27:18 44:4,
16,19,20
45:14

**guns** 37:24

**guy** 11:20
38:22 41:22

**guys** 20:23

———————

**H**

**hand** 32:13

**handcuffs**
27:14

**handed** 32:11
33:3,5 34:10

**handing**
35:13

**handouts**
10:20

**hang** 30:12

**happen** 14:24
41:23

**happened**
41:11,12,13

**happening**
17:15 33:11,
14 36:5 42:9
43:24 46:6

**heard** 14:20
17:23 24:19

**hearing** 8:3
17:18 18:6
30:13 32:16,
17,19

**hearings**
46:17

**helping** 48:5

**higher** 14:1

**hired** 9:23

**history** 22:23

**hold** 42:13

**holding** 45:7

**home** 11:4,
11,24 12:4,23
18:4 19:11
22:1 23:2,7,
14 25:2,6
29:8,10 32:24
33:2 35:17
36:7 39:7,8,9,
14 48:17
54:22 60:22,
23 61:10
63:20 64:9,19
65:2,7

**homes** 22:12,
16,19,22

**hours** 9:12,24

**house** 11:8
17:4,16
25:17,22
26:10,12,14
28:2,10,21,24
36:5,10,23
40:13,17
42:8,17 43:23
44:1,8 46:3,
15 47:24
48:7,12 49:9
50:17 51:3,15
54:13,18 55:2
56:1,7,17
57:8 58:22
59:1,4,16,24
61:18,23 62:2

**Huh-uh** 63:11

———————

**I**

**idea** 22:21
46:21 52:11
61:22

**immediately**
17:20 50:4
51:8

**impression**
28:19

**in-service**
9:11,23

**incident** 7:9
10:3 13:9,10
15:17,23
16:10,13
37:16,18
38:13 39:19
40:13 48:20
55:5 64:5

**incidents**
14:21 37:22
61:13

**including**
23:17

**independent**
16:12

**individual**
38:2 54:15

**informally**
55:10

**informed**
30:10

**initially** 57:14

**inside** 25:6,
10,21 26:1,3,
5 28:2 36:5,

10,23 42:7,8,
17 44:1,4,7
45:14 46:3,7,
15 47:23
48:6,12,17
49:9 50:15,16
51:3,15 53:13
54:12 55:2,24
56:6,16
58:21,24
59:4,16,24
60:22 61:17,
23 62:2

**instance** 35:7

**instances**
37:8

**instructed**
27:24

**instruction**
9:13

**instructions**
44:12

**interaction**
31:14

**interest** 48:21

**investigating**
21:3

**investigation**
24:9

**invite** 59:3

**involved** 15:4
16:4 23:9,21
29:11 37:1
38:11 61:12

**issue** 14:11
23:1,6

**issued** 21:24

item 42:14
59:15

items 18:7,9,
15,17 25:15,
18,22 44:10
48:6,11 63:1

___

**J**

Jeep 51:9

JEFF 4:1

Jeffrey 4:12

Jim 15:11

job 4:23 7:13
40:21 41:1
42:2

John 4:7

Johnson
10:14 50:6

join 55:15

jointly 46:5

judge 7:20
8:2,8,13,16
9:2 11:3,8,11,
18,19,24
12:2,3,6,9,12,
13,17,19,23,
24 14:20
17:13 18:3,
20,21,23
19:6,19 22:4,
8 23:1,3,6,19
24:11,13,14,
17,24 25:3,4,
9 26:9 27:4,
24 28:9 29:6,
19 30:11
31:22 32:15

33:6,9,13
35:22 37:3,6
39:3 40:3,17
41:4,5,12
42:3,5,24
43:5,10
44:12,14,17
46:6,14,17
47:15 48:1,5,
20,21 49:2,22
50:11 51:2,14
54:17 56:1,6
58:10 60:19,
22 61:5,6,10
62:8,12 63:6,
19,20 64:8,19
65:1,5,6

judge's 40:21
46:4,14 50:11

judges 8:18
12:11 22:12,
15,19,21
38:17

___

**K**

Keenan 15:12

kind 60:14

Kirby 16:5

knew 18:13
19:16,19,22
39:15,16
57:19,24
60:13

Kyle 15:12

___

**L**

lasted 35:17

law 4:14 22:5
24:8,15 27:9,
11 32:16
34:11 41:20
45:23 55:8
61:12

lawyer 4:9
52:15

lawyers 15:3,
9 16:3 18:10

leave 6:17
58:15

left 13:11
44:16 53:19
56:9 61:21

LEPS 9:17,18

letting 28:1

levels 8:1

lieu 24:16

Lieutenant
7:17,21,22
8:10 52:4,17
53:1,13,21
54:8,20,24
65:4

Lilly 11:21
12:15 13:5,8,
21 15:2
38:23,24
39:11 52:22
64:4,7

Lilly's 13:14

limit 62:24
63:6

lines 19:5

literally 49:4

litigant 11:4,
12,24 12:5,24
54:22 63:20
64:9,19 65:2

litigant's
40:17

locate 48:5

located 32:23

long 4:22 6:2,
6,20 20:1
35:16 36:2
61:22

looked 28:9

lot 30:20

low 42:20
46:22

lunch 30:7

Lusk 15:12
44:6

___

**M**

made 20:20
27:3 39:21
57:3 58:14
61:20 66:2

make 42:21

March 5:7,23
17:4 21:22
22:3,11,14
23:24 24:4
25:7 27:12
46:13 63:21

marked 17:5

Marriott 9:16

materials

10:18

Matt 34:24

Matthew 4:10
17:3,16 43:22
49:9

Mcgraw 65:5

Mcpeake 4:1,
12

memory 43:8

mentioned
45:13

middle 32:17,
19

mind 16:18
21:22

minutes 36:2

mistakes
66:1

mix-up 60:9

months 7:8

move 59:18

___

**N**

names 50:5

nature 53:11

necessarily
9:7

needed 9:23
56:19 58:17
60:20

nervous
29:14

note 4:13

noted 45:11

number 53:9
62:24

---

**O**

object 26:12
40:9 45:3,9
47:18 49:11

objection
25:11 45:10
46:8 48:9

objections
18:21 31:22

observe 56:1,
6

obtain 20:5
21:6 25:19
35:6

obtained
21:14

obtaining
22:22 24:2

occasion
20:23

occur 29:3

occurred
12:16 15:7
37:6 63:21

occurring
25:6 26:1

office 50:2,11
52:5 53:2,9,
14,18 54:1,9
55:11

officer 10:14
13:22 22:5,24

27:9,12 30:4
31:4 34:12
35:4 39:13
43:2 55:8
57:5,6 58:14
59:3,6,21,22
60:20 61:17

officers 21:3
23:18 30:17,
19,22 31:8,19
34:22 41:20
45:23 61:13

opened 44:19

operations
31:6

opinion 35:12

opposed 24:9

order 60:12

ordered 33:6,
9

orders 7:19
14:12

overheads
10:21

---

**P**

p.m. 66:5

paperwork
20:14

part 42:10

participated
12:20 20:12
46:5

participating
20:17 56:2

parties 8:4
29:11

people 29:9,
12 30:20,24
34:1 47:4
48:13 57:15,
17,21 58:1,3

percent 46:18

permission
58:6

person 14:8
53:13

personal
36:19 42:14
47:16,23
48:1,6,12,19

personally
20:14 23:19
51:22

pertain 40:7

pertaining
64:18

petitioners
41:6,9

phone 32:2,4,
7,10,14 33:3,
6,18 34:9
35:2,14 36:20
42:18 45:19
47:8,23 48:19
50:4,20 51:5
52:9 53:4,9,
23 58:9

photographs
43:18 48:18,
24

photos 37:24
38:2,4 43:23

56:14

physical 63:6

physically
32:20 59:15

pick 59:15

pictures
43:14

place 5:7 7:9
9:15 10:3
13:9 14:21
17:20,24
32:18 37:7
39:5 51:7
54:18 59:1
62:24

placing 63:6

plaintiff 29:5

plaintiff's 4:9
50:17

played 62:19

pocket 32:12
34:11

point 22:18
26:18 28:23
30:5,16,23
31:7 32:6
36:4 42:16
44:3,16 49:15
53:1 64:13

police 6:13,
18 17:5 20:2,
21 22:24
23:17,18
27:16 30:18
31:18 35:4
39:16

policeman

55:15,19

policies
38:17 40:6

policy 8:7
40:12,14
41:17 64:17

position 7:13
9:3

positive
62:11

possession
32:7,10

powers 27:22

presence
59:10

present 28:8
53:16

presume
52:23

pretty 29:16
46:10 59:11

previous 18:6

primarily 9:1

primary 9:3
41:4 42:5
56:12

prior 6:15
9:4,9 11:16
14:19 15:17,
21 17:21 37:8
45:17,20,24
48:20 61:9

proactively
65:10

procedure
8:7

7

procedures
40:6

proceedings
63:14

process
21:13,18
22:22 23:10,
24 24:4

property
18:19,22
23:20 24:17
25:10 26:11
31:13,23
33:23 42:14
48:6,12 58:1,
15 59:15 63:7

propriety
51:14

protect 41:2,
9,21 42:2,3
46:14

protecting
46:16 49:2

protection
36:24

provide 25:20
49:21 62:8

provided
18:15 38:7
49:23 50:14

Public 4:3

pull 30:5,8

pulled 29:12

pursuant
44:11

put 34:10
50:2

**Q**

question 8:7
12:21 14:8
21:22 35:11
41:14 46:10
47:20 56:11

questions 4:8
16:19 65:19

quickly 9:24
29:17 38:8

**R**

radio 27:20
30:9 60:9,16

radioed 34:22

Raleigh 4:18
5:3,14 17:8

rank 14:1

re-adjourned
25:2

read 45:6
65:24

ready 8:3

realize 29:10

realized
29:12

reason 8:21
18:3 25:9
30:18 56:13

recall 5:7
9:12,14,19
10:17 15:9,
14,24 16:3,17
18:16 19:9

26:24 29:17
32:22 34:4
35:16,19
38:10 39:14
40:4,8,11,18
42:18 51:16
52:1,6 56:8
58:24 59:23
63:2,8,22

receive 9:8
18:8 51:22
55:4

received
10:18

recently
63:10

recessed
25:1

recollection
16:13,24 18:2
25:12 61:16

record 4:13
32:16 33:11,
14 36:4,6
37:7 48:16
55:2

recorded
42:21 49:14
54:5,10,12

recording
33:20 34:2
36:9,15,23
48:14 49:10,
15,18,20
58:9,10

recordings
34:7

recuse 19:1

referring
57:13

refresh 43:7

regular 7:23
15:8

remember
5:9 25:13,14
39:17 50:1
52:5,8,14
53:7 54:7
59:19 60:8,17
61:19

rephrase
46:10 47:21

Reporter/
notary 4:3

represent 4:9

request 19:7
23:5

requested
21:24 31:18

requesting
65:6

residence
18:14 30:7,8,
10 43:20 49:6
61:6

respondent
29:5

respondents
41:6,9

responding
60:15

response
28:24 64:10

responsibility

42:6

restaurant
30:6

result 55:5

retired 6:12,
16

retrieve
18:14,18
25:15,22 48:5
56:13

retrieved
48:13

reviewed
16:20,21

rid 58:16

rides 57:17

road 60:18

ROBINSON
40:9 47:18
49:11 65:20,
24

role 14:4
46:16

room 8:4
44:13 53:19

roughly 7:8
9:22 20:15

Roush 50:6

rule 42:1

**S**

safe 44:4,16,
19,20 45:14

safety 40:21,
24 41:2,21

8

46:4,14 47:16
48:1,21 49:2

scene 31:19
41:24 60:14

search 5:6
19:10,14,17,
20,22 20:5,7,
11,15,18
21:7,11,19,
23,24 22:12,
15,19,23,24
23:2,6 24:2,3,
13,16 25:10,
14 26:14
29:20 30:1
35:7,16 36:10
38:11 44:24
45:4,12 49:21
59:12

searches
37:5 40:2

searching
23:19

Secondarily
41:3

secretary
50:9

security 9:11

seek 20:5

seize 32:3

seized 32:2
45:20

send 31:3

sending
10:12

sense 63:23
64:22

September
7:7

Sergeant
11:20 12:15
13:5,8,14,20
15:2 38:23,24
39:10 52:22
64:4,7

serving 65:16

set 56:10

setting 46:20

settled 38:8

sheriff's 4:18,
20 5:3,14
13:17 17:9
50:10 55:11

shirt 32:12

show 31:8
45:23

showed
31:10,13
44:20 45:14

Shuck 12:3,6,
9,13,20,23,24
13:9 14:20
16:10 37:3,6,
21 39:3 43:10
48:20 61:11
64:4,8 65:5

Shuck's
48:21 49:2

sick 8:20

sides 57:16

sit 65:9

sitting 54:8

situation 25:5

sloppy 46:11

small 29:7

smart 30:21

solely 25:10

somebody's
11:8 48:24

someone's
35:7 55:2

sorts 14:21

sounds 10:2

speak 23:4
28:12

specific 9:6
18:15,17

specifically
40:7

speeding
55:13

spoke 18:23

Stafford 7:17,
21,22 8:10
52:4 53:2,21
54:20,24 65:5

Stafford's
52:17 53:13
54:8

stairs 56:10

standing
32:20 33:1,22

start 16:14
36:22 46:23

started 7:6,9
29:17 36:6

state 4:11

stated 46:17

stayed 44:13
56:22

stood 42:9

stop 33:20

strike 6:3
46:9

stuck 32:11

Stump 31:11
57:5,6 58:14,
21 59:4,6,8,
21 60:4

subcommitte
e 9:17

supervising
21:2 23:17

supervisor
7:16 14:4,16,
17 28:4,15
52:20 64:13

supervisors
16:9 38:15
65:10

supervisory
21:1

supposed
53:7

Supreme
45:7 51:20
53:3 54:1,6

surveillance
47:1

swing 29:18

sworn 4:2
27:11

T

taking 14:21
17:24 47:1,5
48:24

talk 12:14
28:7 32:5
63:13

talked 29:19
39:1 52:13
61:20

talking 16:14
43:5 52:6
63:5

taught 41:17

television
49:14,16

tells 64:22

term 45:4

testified 4:4
62:1

testifying
16:18

testimony
62:7 63:17
64:3,16

thing 30:21
49:8

things 31:1
56:2

thinking 9:24
16:5

thought
57:22

threat 27:3,6

threatened 26:22 27:1 45:17

time 8:19 11:2,7 13:12, 13 14:2,5,16, 18,19 15:21 19:16 20:13 23:16 24:23 28:6 30:7 32:21 33:2 34:9,19,21 35:20,22 43:16 45:13 52:8 59:11 60:3,7 61:3 64:11

timely 19:7

times 22:7 43:14,15,18 61:10 62:20

title 4:23

today 4:15 5:2,21 15:18 16:14 37:19 64:16 65:9

Todd 16:5

told 11:22 23:14 32:15 33:13 34:5 38:9 39:12 40:19 44:18 51:4 52:12 53:5,24 54:7 57:2,6 58:16, 18 63:18,22 64:7

touching 59:19

training 9:6 10:12

traveled 11:3, 11 12:4,23

traveling 18:3

true 18:22

TULLY 25:11 45:3,8 46:8 48:9 65:22

turn 34:5

Twenty 6:22 20:3

type 5:10,16 14:8

typically 30:5 42:19

U

Uh-huh 27:19 36:16 39:2 50:13 61:2 62:6

undergo 9:5

understand 12:21 47:20 63:17 64:12

understanding 58:5,13 62:22

understood 40:15

uniform 4:14 5:2,4,11,17 34:16

unit 61:7

units 20:22

unsure 24:8

unusual 14:24 15:1,4

unwritten 40:15

V

vehicle 17:11

verbally 18:20

video 38:1 43:14,24 46:21 49:10 50:16 51:2,4 58:9 62:2,8, 12,14,19,23 63:9

videos 37:10, 23

visit 12:18,19 15:13

visited 61:10

visits 40:2

voiced 18:21 31:22

voluntarily 26:9,12

W

waive 66:2,3

walking 29:17 44:7

wanted 25:9 42:20

warrant 19:10,14,17, 20,22 20:5,8, 15,18 21:11, 23 22:23 23:1,2,6 24:13,16 29:20 30:1

warrants 20:11 21:7,19 24:2,3 38:11

watched 42:9 63:9

wearing 4:14 5:2,10,16

Weekly 12:10

White 31:11 59:22 61:17

wife 18:6

winter 10:1

wit 4:4

witnesses 29:11 57:16

work 6:4 8:1, 12 20:1 38:22 50:1,8

worked 6:23 7:3 8:15,17 10:15 20:13

working 6:14 7:12 11:13,16

works 11:20

written 10:18 40:5,14 64:17

wrong 62:21

Y

yard 32:24 33:2 61:1

years 4:24 6:8,9,11,16, 22 7:2 20:3,4