No. 22-1757

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

**MATTHEW GIBSON,
Plaintiff-Appellee**
v.

**LOUISE E. GOLDSTON, individual
Defendant-Appellant**

**and**

**COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision;
JEFF MCPEAKE, individually; BOBBY STUMP, individually, BRIAN WHITE,
Individually**

**Defendants.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY**

---

**JOINT APPENDIX – VOLUME II OF II
(Pages 510 - 908)**

---

**Jennifer E. Tully (WV Bar #9356)**
**John P. Fuller (WV Bar #9116)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**jfuller@baileywyant.com**
**astrider@baileywyant.com**

*Counsel for Defendants-Appellants*

**John H. Bryan (WV Bar #10259)**
**John H. Bryan, Attorney at Law**
**411 Main Street**
**P.O. Box 366**
**Union, WV 24983**
**T: 304.772.4999**
**F: 304.772.4998**
**jhb@johnbrvanlaw.com**

*Counsel for Plaintiff-Appellee*

## **TABLE OF CONTENTS**

## **VOLUME I OF II**

Page

Docket Sheet ............................................................................. 1

Complaint.................................................................................. 13

Defendant Louise E. Goldston's Motion to Dismiss ............................................. 51

    Exhibit A, Memorandum in Support of Defendant
    Louise E. Goldston's Motion to Dismiss ................................... 57

Memorandum in Support of Defendant
Louise E. Goldston's Motion to Dismiss........................................ 75

Plaintiff's Response to Defendant
Louise E. Goldston's Motion to Dismiss........................................ 92

Reply Memorandum of Law in Support of Defendant
Louise E. Goldston's Motion to Dismiss........................................ 107

Order ........................................................................................ 114

Supplemental Memorandum In Support of Defendant
Louise E. Goldston's Motion to Dismiss........................................ 115

    Exhibit 1, WVSCA Order *In re Goldston*................................. 122

Plaintiff's Supplemental Brief in Response to
Defendant Louise E. Goldston's Motion to Dismiss....................... 152

Defendant Louise E. Goldston's Motion for Summary Judgment ...................... 171

    Exhibit A, Defendant Louise E. Goldston's Responses to
    Defendant Kyle Lusk's First Set of Requests
    for Admission ........................................................................ 175

    Exhibit B, Portions of Deposition of Matthew Gibson............................ 181

    Exhibit C, Portions of the Deposition of Louise E. Goldston ................... 191

    Exhibit D, Video previously uploaded)

    Exhibit E, Video (previously uploaded)

i

Exhibit F, Portions of Deposition of Jeff McPeake ...................................209

Exhibit G, Portions of Deposition of Brian White.....................................215

Memorandum in Support of Defendant Louise E. Goldston's
Motion for Summary Judgment........................................................ 221

Plaintiff's Motion for Summary Judgment Against
Defendant Louise E. Goldston........................................................ 235

Exhibit 1, Deposition of Louise Goldston................................. 239

Exhibit 2, Exhibits to the Deposition of Louise Goldston ........................ 347

Exhibit 3, Deposition of Jeff McPeake .................................... 433

## VOLUME II OF II

Exhibits to Plaintiff's Motion for Summary Judgment Against
Defendant Louise E. Goldston, *Continued*:

Exhibit 4, Deposition of Bobby Stump ..................................... 510

Exhibit 5, Deposition of Matthew Gibson ................................ 572

Exhibit 6, Glen R. Stotler Letter............................................... 790

Exhibit 7, Lawyer Disciplinary Board Investigative Panel Closing ......... 793

Plaintiff's Memorandum in Support of His Motion for
Summary Judgment Against Defendant Louse E. Goldston ........................... 844

Defendant Louise E. Goldston's Response to Plaintiff's
Motion for Summary Judgment........................................................ 866

Plaintiff's Response in Opposition to Defendant
Louise E. Goldston's Motion for Summary Judgment................................... 878

Reply Memorandum in Support of Defendant
Louise E. Goldston's Motion for Summary Judgment.................................. 882

Memorandum and Order................................................................. 886

Defendant Louise E. Goldston's Notice of Appeal ............................... 905

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     AT BECKLEY

 4
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 5
      MATTHEW GIBSON,
 6
                Plaintiff,
 7
      vs.                              CIVIL ACTION NO.
 8                                     5:21-cv-00181

      LOUISE E. GOLDSTON, Individually,
 9    COUNTY COMMISSION OF RALEIGH
      COUNTY, a political subdivision,
10    JEFF MCPEAKE, Individually,
      BRIAN WHITE, Individually,
11    BOBBY STUMP, Individually,
      KYLE LUSK, Individually,
12
                Defendants.
13
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14

15

16            Deposition of BOBBY STUMP taken by the
      Plaintiff under the Federal Rules of Civil
17    Procedure in the above-entitled action, pursuant to
      notice, before Bradford L. Cooper, a Notary Public,
18    at Pullin, Fowler, Flanagan, Brown, and Poe, PLLC,
      252 George Street, Beckley, West Virginia, on the
19    1st day of March, 2022.

20

21        REALTIME REPORTERS, a Huseby Company
        BRADFORD L. (Brad) COOPER, Notary Public
22                713 Lee Street
               Charleston, WV  25301
23               (304) 344-8463
               realtimereporters.net
24
```



800.211.DEPO (3376)
EsquireSolutions.com

BOBBY STUMP                                                       March 01, 2022
GIBSON V GOLDSTON                                                             2

```
 1                        APPEARANCES:

 2
      APPEARING FOR THE PLAINTIFF:
 3
               John H. Bryan, Esquire
 4             JOHN H. BRYAN, ATTORNEYS AT LAW
               411 Main Street
 5             P.O. Box 366
               Union, West Virginia 24983
 6             jhb@johnbryanlaw.com

 7
      APPEARING FOR THE DEFENDANTS STUMP, MCPEAKE, AND
 8    WHITE:

 9             Kevin J. Robinson, Esquire
               PULLIN, FOWLER, FLANAGAN, BROWN,
10              AND POE, PLLC
               252 George Street
11             Beckley, West Virginia 25801

12
      APPEARING FOR THE DEFENDANT, LOUISE E. GOLDSTON:
13
               Jennifer E. Tully, Esquire
14             BAILEY & WYANT, PLLC
               500 Virginia Street East, Suite 600
15             P.O. Box 3710
               Charleston, West Virginia 25337-3710
16

17    APPEARING FOR THE SUPREME COURT OF APPEALS OF WEST
      VIRGINIA:
18
               Bradley Schmalzer, Esquire (via telephone)
19             Julianne Wisman, Esquire (via telephone)

20
      ALSO PRESENT:
21
               Louise Goldston, Defendant
22             Matthew Gibson, Plaintiff
               J.R. Morgan
23

24
```



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                              3

1                    **EXAMINATION INDEX**

2

3            **BY MR. BRYAN**                          **5**

4

5

6

7

8

9

10

11               **OBJECTION INDEX**

12   BY MR. ROBINSON                          21
     BY MR. ROBINSON                          25
13   BY MR. ROBINSON                          26
     BY MR. ROBINSON                          27
14   BY MR. ROBINSON                          28
     BY MR. ROBINSON                          30
15   BY MR. ROBINSON                          44
     BY MR. ROBINSON                          46
16   BY MR. ROBINSON                          57
     BY MS. TULLY                             59
17   BY MR. ROBINSON                          59

18

19

20

21

22

23

24



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                           4

```
 1              P R O C E E D I N G S
 2              COURT REPORTER:   This is the
 3   deposition of Bobby Stump in the matter of Matthew
 4   Gibson versus Louise E. Goldston, et al., taking
 5   place at the offices of Pullin, Fowler, Flanagan,
 6   Brown, and Poe in Beckley, West Virginia on this
 7   1st day of March, 2022.  The time is 12:57 p.m.  We
 8   are now on the record.
 9              This case is venued in the United
10   States District Court for the Southern District of
11   West Virginia at Beckley, being Civil Action No.
12   5:21-cv-00181.
13              My name is Brad Cooper on behalf of
14   Realtime Reporters, located at 713 Lee Street in
15   Charleston, West Virginia.  I am your court
16   reporter and a Notary Public.
17              At this time, would counsel please
18   state their appearances and whom they represent and
19   then I'll swear in the witness.
20              MR. ROBINSON:   Kevin Robinson on
21   behalf of Defendants Stump, White, and McPeake.
22              MS. TULLY:   Jennifer Tully on behalf
23   of Defendant Judge Louise Goldston.
24              MR. BRYAN:   John Bryan on behalf of
```



1  the Plaintiff, Matthew Gibson.

2              MR. SCHMALZER:  Bradley Schmalzer and

3  Julianne Wisman with the Supreme Court of Appeals

4  of West Virginia.

5              (The witness was sworn.)

6                  B O B B Y   S T U M P

7  was called as a witness by the Plaintiff, pursuant

8  to notice, and having been first duly sworn,

9  testified as follows:

10                     EXAMINATION

11 BY MR. BRYAN:

12     Q.  Please state your name.

13     A.  Bobby Stump.

14     Q.  And how are you employed?

15     A.  Raleigh County Sheriff's Office.

16     Q.  And you're still employed there?

17     A.  Correct.

18     Q.  As a sworn law enforcement officer?

19     A.  Correct.

20     Q.  A deputy, basically?

21     A.  Correct.

22     Q.  And what sort of work do you do right now?

23     A.  I'm a sergeant.  I'm a supervisor and I'm

24 in charge of the K-9 Narcotic and Apprehension.



```
 1   K-9s.
 2        Q.   And for the record, you were in the room
 3   for the deposition of Judge Goldston here this
 4   morning?
 5        A.   Correct.
 6        Q.   And you listened to the questioning and the
 7   answer session that took place in that deposition?
 8        A.   Correct.
 9        Q.   So at some point, as Judge Goldston
10   testified, you had served as her bailiff.
11        A.   Correct.
12        Q.   Do you recall how many years?
13        A.   Ten-ish.  Around ten, give or take a little
14   bit.
15        Q.   And when did you -- when did you last work
16   as a bailiff for Judge Goldston?
17        A.   I'm not for sure.  Three or four years ago.
18   I'm not for sure.
19        Q.   She testified that you had been present
20   with her on at least one prior visit to the home of
21   a litigant.  Do you recall that?
22        A.   Numerous times I've been with Judge
23   Goldston.  Yes.
24        Q.   Okay.  So numerous times you have gone with
```



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                                 7

1   Judge Goldston to the homes of litigants?

2       A.   Correct.

3       Q.   In cases presiding in front of her.

4       A.   Correct.

5       Q.   Do you have any estimation about how many

6   times?

7       A.   I was Judge Goldston's primary bailiff for

8   ten years but I also worked with Judge Lazenby,

9   Judge McGraw, Judge Shuck, and numerous other

10  judges that filled in, so -- and all the judges

11  have sent me to homes to get children, four-

12  wheelers, vehicles throughout; over 1,000 divorces.

13          So there's no possible way to put my finger

14  on how many.  It'd be total speculation.

15      Q.   All right.  Well, we're talking about a

16  judge personally going somewhere, not ordering a

17  deputy to go somewhere.

18      A.   Correct.

19      Q.   How many prior occasions, to your

20  recollection, did you, personally, go with or

21  observe a judge go into the home of a litigant?

22      A.   There's no way I could -- over thousands of

23  divorce cases, I don't remember the litigants'

24  names.  There's no way I could give you an accurate



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                             8

1  number.  I mean, I have no idea.

2      Q.  Did you ever go to the home of a litigant

3  with any judge other than Judge Goldston?

4      A.  I'm thinking yes but I -- there again --

5  and over ten years, I've done so many things of

6  being a bailiff in Family Court and been to so many

7  jury views through Circuit Court that, you know,

8  it'd be speculation for me to guess.

9      Q.  Well, I'm not asking you about jury views

10 in Circuit Court.

11     A.  I understand that.

12     Q.  That's not what we're here about today.

13 I'm talking about you working as a bailiff in

14 Family Court.

15     A.  Exactly.  Yeah.  I understand and I'm

16 telling you that with the numerous family court

17 judges that I worked with, yes, it's a possibility

18 but I can't remember if it's -- you know, if it was

19 just Judge Goldston every time or other judges.

20 I'm not 100-percent sure if I went with any other

21 judges.

22     Q.  Well, you remember, for a fact, that you

23 went to -- went with Judge Goldston on one of these

24 visits.



BOBBY STUMP                                                March 01, 2022
GIBSON V GOLDSTON                                                        9

1        A.   Numerous.  Yes.

2        Q.   But you can't recall for a fact the

3    identification of any other judge that you went to

4    the home of a litigant personally with?

5        A.   I can't think of anything off the top of my

6    head but I am not saying that I have not been to a

7    home with another judge because that's a very

8    distinct possibility.

9        Q.   Did you -- did you ever serve as a bailiff

10   for Judge Shuck?

11       A.   Yes.

12       Q.   And did you ever -- do you recall ever

13   going with Judge Shuck to the home of a litigant?

14       A.   Not off the top of my head but it's a

15   distinct possibility that I could have.  But, there

16   again, I've set through thousands of these hearings

17   so I don't remember exactly if I have or not but

18   there's a possibility I have.

19       Q.   All right.  What is your job description

20   when you're serving as a bailiff?

21       A.   My only job description, which is how I

22   trained all the people that worked under me, is the

23   three rules of being a bailiff:  Safety, safety,

24   safety.  And that's the judge's safety.



```
 1          That's my only -- of course, keeping
 2   control of the courtroom but my No. 1, No. 2, and
 3   No. 3 top rules was the judge's safety and I took
 4   pride in that, and that's my No. 1 goal and what I
 5   teach everyone is the judge's safety.
 6      Q.  Okay.  So your No. 1 priority when you're
 7   serving as a bailiff is to protect the physical
 8   safety of the judge.
 9      A.  Correct.
10      Q.  And, in fact, you not only have served as a
11   bailiff for a long time but you had trained other
12   law enforcement officers to work as a bailiff.
13      A.  Correct.  I was the stable for 10-ish
14   years.  I was the stable one there.  They would
15   send me new ones every six months, a year, two
16   years.  I went through a plethora of different
17   deputies and civilians that were bailiffs.  So I
18   was the stable there for many years.
19      Q.  And do you recall giving other bailiffs or
20   traineers any sort of instructions or guidance on
21   traveling to the home of a -- of a litigant?
22      A.  Pretty simple.  If the judge tells you to
23   do it, you do it and you don't ask questions.
24      Q.  So if there's -- say if there's a variance
```



BOBBY STUMP                                              March 01, 2022
GIBSON V GOLDSTON                                                     11

1  between your policies or your rules as a deputy and

2  what the judge tells you to do, who -- I mean, who

3  wins?

4      A.   The judge always wins.  The judge is the

5  boss.  The judge is the supervisor.  Whatever the

6  judge says, you do.

7      Q.   Okay.  So if the -- if the -- if your

8  supervisor, your sheriff at the Sheriff's

9  Department, tells you not to go with the judge

10 somewhere and the judge tells you to go with her

11 somewhere, you listen to the judge?

12     A.   Hypothetically, if the sheriff come and

13 said, "Don't do this," then the judge would -- any

14 judge would never put me in that situation.

15          But the sheriff, when you're a bailiff, the

16 first thing to do -- one of the first things they

17 tell you is to do what the judge tells you, you're

18 in -- the judge is your boss.

19          So from every sheriff I've ever worked with

20 - there's been three or four - that, you know, the

21 judge is -- the judge is the one in charge.

22     Q.   But your employer, technically, at all

23 times, was the Raleigh County Sheriff's Office.

24     A.   Correct.



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          12

1        Q.    Is it Office or Department?

2        A.    Whichever.   It's about 50/50, really.

3        Q.    So you follow the judge's instructions but

4   she's not your employer, the Sheriff's Department

5   is.

6        A.    Yes.   The Sheriff's Office is the one that

7   signs my paycheck.   Yes.   But I work for the judge,

8   no matter which judge it is.

9        Q.    Do you recall having any conversations with

10  Judge Goldston about going to the homes of

11  litigants in cases before her?

12       A.    Yes.   Yes.   Numerous.   Like I said, we've

13  been there numerous times.

14       Q.    What types of conversations?

15       A.    We're going -- well, I would be in the

16  hearing so I would know that we were going to the

17  home and, really, when I say conversations, I don't

18  want to sound arrogant but Judge Goldston and I

19  didn't have to have conversations in the courtroom,

20  we didn't have to have conversations at

21  Mr. Gibson's house because she knew I would do my

22  job and I knew what to do.

23            And she didn't have to have conversations

24  and instruct me because I would have it done before



800.211.DEPO (3376)
EsquireSolutions.com

JA521

BOBBY STUMP                                                March 01, 2022
GIBSON V GOLDSTON                                                      13

1  she even thought about it and she knew that.  We

2  worked very, very, very, very well together.

3      Q.  So you -- it sounds like you -- you did

4  more than just ensure her physical safety.  You

5  helped her with other things.

6      A.  That is very safe to say.  Yes, sir.

7  Numerous things.  Yes.  We've been through a lot.

8      Q.  So when -- when she would go to the home of

9  a litigant, you would drive her there?

10     A.  Yes.  She always rode with me.

11     Q.  And you had, like, a police cruiser?

12     A.  Correct.

13     Q.  That would say Raleigh County Sheriff's

14  Department on it?

15     A.  Correct.  Most of the time it was a marked

16  cruiser.  Correct.

17     Q.  Okay.  And then you would be in uniform?

18     A.  Correct.

19     Q.  And did you have arrest powers and a gun?

20     A.  I've always -- yes, sir.  Ever since I was

21  sworn in, I've had arrest powers and a gun.

22     Q.  Do you recall ever actually arresting

23  somebody when you were with Judge Goldston?

24     A.  I've arrested dozens of people when I was



BOBBY STUMP                                           March 01, 2022
GIBSON V GOLDSTON                                              14

1  with Judge Goldston.  What are you referring to as

2  being with -- I mean I've arrested people out of

3  the courtroom, in the hallway.  I mean, I've

4  arrested dozens and dozens and dozens of people

5  with Ms. Goldston.

6     Q.  Okay.  What about at the home -- at

7  somebody's house?

8         At the home of a litigant, do you recall

9  ever making an arrest?

10    A.  No.  But, there again, in ten years with

11 thousands of cases in the ten years, hundreds of

12 arrest, you know, it's hard to recall every time

13 I've arrested someone.

14    Q.  Have you ever observed Judge Goldston in

15 somebody's house actually searching for items of

16 personal property?

17    A.  No.  No.  When --

18    Q.  What --

19    A.  I'm sorry.

20    Q.  What was she generally doing when you -- I

21 mean, you -- well, let me back that up to be fair.

22        Have you ever observed Judge Goldston

23 actually in somebody's house?

24    A.  Yes.  We've been there.  Yes.



 1      Q.  All right.  So, to your recollection, what

 2   was -- what was the judge doing inside these homes?

 3      A.   I was most -- when I went, I would be the

 4   organizer and we would have the list and there'd

 5   mostly be, you know, attorneys on each side or

 6   sometimes they would be pro se -- very rarely.

 7           And I would have the list and it was

 8   equitable distribution, which has already been

 9   worked out in court.  And it'd say, hey, the wife

10   gets this, the husband gets this, and I would have

11   the list and I would say, "Okay.  I found the

12   chainsaw," and the wife would get the chainsaw.  I

13   found the dishes and the husband would get the

14   dishes.

15           So I was the one that usually orchestrated

16   -- I didn't orchestrate that.  Judge Goldston

17   always orchestrated everything but I would be the

18   one that would have the list and mark it off and

19   let her know that I -- or that the litigant had

20   found whatever they were looking for.

21      Q.  Well, you said that you found.  It sounds

22   like you were saying that you were actually finding

23   these items.

24      A.   No.  I would have the list and the litigant



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                            16

1  would looked for whatever was on the list and I

2  would mark it on the list, and I would usually keep

3  track of that.

4      Q.  Okay.  Did you ever actually do any of the

5  looking for items yourself?

6      A.  Yes.  Numerous times.  All the judges sent

7  me out to look for items.  In the middle of a court

8  hearing they would send me out to look for items at

9  a home.  I mean, in the middle of court hearings

10  I've been sent out of the hearing to go get kids in

11  in the middle of the hearing, to look for kids, to

12  track down kids.  That's happened dozens of times.

13      So, yes, I've looked for items right in the

14  middle of a court hearing to be sent to someone's

15  home.

16      Q.  Have you ever observed Judge Goldston

17  actually looking for items inside someone's house?

18      A.  No.  She was the organizer of the hearings

19  and in charge of the hearings.

20      Q.  What does that mean?

21      A.  It means usually she would sit with the two

22  attorneys and I would be with the litigants, and I

23  would have a list, the attorney would have a list

24  -- both attorneys and the judge would have a list,



1  and they would say he gets this, she gets that, and
2  I would make sure that when they found something,
3  that, "Hey, they found this," and mark it off the
4  list, and I would report it to the judge and report
5  it to both attorneys.
6      Q.   Did you ever film or record?
7      A.   I would never do that.
8      Q.   Did you ever -- do you ever recall that
9  coming up?  Like anyone trying to or asking to or
10 --
11     A.   I would not have let that happen.
12     Q.   Why not?
13     A.   Because the judge is the only one that
14 records a hearing.  That's -- that's a big no-no
15 and that's just not something that I would've
16 treaded on.
17     Q.   So did the judge record any of those
18 so-called hearings?
19     A.   Not that I'm aware of.  There was really no
20 way to record hearings because the only way we
21 could do it was on the video in the courtroom.
22     Q.   Okay.  And did anyone have cellphones?
23     A.   Correct.  Yes.
24     Q.   But they -- they -- you're saying they



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          18

1   couldn't have used their cellphones to record?

2       A.   I'm sure they could've but if I seen

3   someone doing that - an attorney or anyone else

4   besides the judge - I would've took their cellphone

5   immediately.

6       Q.   You didn't -- you didn't hear the judge

7   allow it?

8       A.   No.  We didn't even have to speak about

9   that because I knew that wasn't allowed, since day

10  one, so that was a big thing.  We even had people

11  in our courtrooms trying to -- at different times

12  trying to record the hearings when judges -- one of

13  the judges was having hearings and I would take

14  their phones.

15          So, no, that was a basic 101.  No

16  recordings allowed.

17      Q.   But those hearings were recorded already.

18      A.   From the judge.  Correct.  The judge is the

19  only one that can record hearings.

20      Q.   But when these hearings went to inside

21  people's houses, no recordings were being made, to

22  your recollection.

23      A.   Not to -- no.  Not to my knowledge.

24      Q.   There was no court reporter there or



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                         19

1  anything like that.

2      A.  In Family Court, we've never had a court

3  reporter.

4      Q.  Did you train Bailiff McPeake?

5      A.  No.  When I left the Family Court, he was

6  hired under grant money as a retired Beckley city

7  officer, so I did not train McPeake.

8      Q.  So when he came on, do you know -- I mean,

9  would there have been some sort of written handbook

10  or anything like that?

11      A.  No.  No.  He would've shadowed another

12  deputy -- another bailiff, and that bailiff

13  would've trained him, just like I had done numerous

14  times before.

15      Q.  Did you ever have any conversations with

16  Deputy -- or -- yeah -- Deputy McPeake about

17  working as a bailiff?

18      A.  Yeah.  I called him when he got the job and

19  congratulated him and told him what I thought of

20  Judge Goldston and what I expected of him, and

21  that, you know, he needs to take good care of her.

22          So, absolutely.  Everybody she had after

23  me, I'd always call and give them the same speech.

24  I never told her that but, you know, that was just



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          20

 1  me.

 2     Q.  And did you ever have any discussions with

 3  McPeake about the judge going out to people's

 4  homes?

 5     A.  No.  I didn't train him.  If I trained him,

 6  I would have.

 7     Q.  And what would you have said?

 8     A.  If the judge says go, go.  You don't call a

 9  supervisor.  You don't do anything.  The judge is

10  in charge.  And, I mean, I would have done things a

11  whole lot differently than McPeake did.  I'm not

12  casting stones at McPeake but half of this wouldn't

13  have been an issue if I would've been the bailiff.

14     Q.  Okay.  What do you mean?  What would you

15  have done differently?

16     A.  When we arrived, Judge Goldston knows when

17  I was there, I wouldn't have let her out of the car

18  until I secured the area.  No one would be out of

19  their vehicles until I secured the area.  I

20  would've gotten rid of every single person there,

21  except for Mister -- your -- the Defendant and his

22  wife -- or the Plaintiff and his wife, and that

23  would've been the only two people there besides the

24  attorneys.

1    I would not have allowed -- the second I

2  arrived on scene, I evacuate everybody because the

3  first three rules:  Safety, safety, safety of the

4  judge.

5    Q.  Well, the judge just testified earlier that

6  she didn't feel that her physical safety was

7  compromised on March 4th, 2020.  So what was the

8  problem with how Deputy McPeake handled it?

9              MR. ROBINSON:  Object to the form.

10  You can go ahead and answer.

11    A.  I'm not saying there was a problem.  I'm

12  not trying to throw stones at Deputy McPeake.  I

13  would have just handled it differently and Judge

14  Goldston knows I would've handled it differently.

15          For the safety of the judge, I can only

16  keep my eyes on so many people, so I would not have

17  allowed anyone there and when Mr. Gibson's attitude

18  with his sense of anger, I would have pulled him to

19  the side and took care of that well before he ever

20  approached the judge.  He would not have been

21  allowed to approach the judge at all until I made

22  sure he was calm.

23    Q.  Okay.  Now, you weren't -- you didn't

24  witness -- what you're telling me about right now,



```
 1  you were not there to witness.  Correct?

 2      A.  Oh, I witnessed his anger.  Certainly I

 3  did.  As soon as I walked in the door of the house,

 4  he come straight to me.

 5      Q.  Of his house.

 6      A.  Of his house.  Correct.

 7      Q.  Okay.  You weren't there.  You're telling

 8  that you wouldn't have let Mr. Gibson approach the

 9  judge.

10      A.  No, sir.

11      Q.  You weren't there when he first approached

12  the judge in his front yard.

13      A.  No, sir.  I was not.

14      Q.  Just make sure you let me finish the

15  question --

16      A.  Yes, sir.

17      Q.  -- and I'll give you time to answer

18  because, remember, there's a court reporter.

19      A.  Yes, sir.

20      Q.  So what you're telling me about and your,

21  sort of, critique of Deputy McPeake, this is based

22  on the video footage?

23      A.   Video footage and all that I've learned and

24  investigated through what had happened.  And I'm
```



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          23

1  not critiquing Deputy McPeake.  I'm just stating I

2  would have done things a little different.

3      Q.  All right.  So when you watched the video

4  footage that showed Mr. Gibson approach the judge

5  as we see on the video, which you've seen, you

6  wouldn't have allowed that to happen.  You wouldn't

7  have allowed Mr. Gibson to approach Judge Goldston.

8      A.  Not in that matter, no, I wouldn't have.

9  I've arrested people in the courtroom and took them

10  down for a lot lesser approaching the judges of

11  standing up in your chair and -- you know, in the

12  middle of the courtroom and I just -- I would not

13  have let that happen.

14      Q.  But they weren't in a courtroom.  They were

15  in Mr. Gibson's front yard.  Correct?

16      A.  Correct.  Yes, sir.

17      Q.  Okay.  So you think that Mr. Gibson never

18  should have approached the judge in the first

19  place?

20      A.  I didn't say that.  I said if I'd have been

21  there, he wouldn't have approached the judge in

22  that manner.

23      Q.  Okay.  And what else -- what else would be

24  different if you were the bailiff instead of



 1  McPeake?
 2      A.   I would've secured the scene before anyone
 3  got out of the vehicle and, like I said, there
 4  would only have been four people there - five
 5  people, counting me.
 6      Q.   "Secure the scene."  What does that mean?
 7      A.   Secure the scene meaning all the people
 8  that were there - the correctional officers, prison
 9  guards that were there on his behalf, the
10  girlfriend that was there, the Payne family that
11  was there -- they, before the judge got out of the
12  vehicle, they would have been forced to leave, and
13  the only people on that property when my judge got
14  out of the vehicle, no matter who it was -
15  especially Judge Goldston - would have been the
16  judge, the attorney, the husband and wife, and the
17  bailiff.
18      Q.   And how would that have changed things?
19      A.   How would it have changed things not having
20  8 or 10 people there arguing and just having the
21  Plaintiff and the Defendant there?  Is that what
22  you're asking me?
23           Because I wouldn't have had to keep an eye
24  on two prison guards that were there on your -- on



```
 1  his behalf, and then I wouldn't have to keep an eye
 2  on the Payne family that was there on their
 3  daughter's and their sister's behalf, and watching
 4  all these people.  I could have focused on my judge
 5  and my judge only, with the attorney and the two
 6  litigants.  That's how that would have been.
 7      Q.  And how would that -- how would that have
 8  -- how would that have changed the result of what
 9  happened that day?
10      A.  I didn't say -- you asked me how it would
11  have changed the result of her safety.  That's what
12  I took it as.  I have nothing to do with the result
13  of the hearing.  I don't care about the results of
14  hearings.  I care about my judge's safety.
15      Q.  Well, there was no safety problem, was
16  there?
17              MR. ROBINSON:  Object to the form.
18  You can answer.
19      A.  Yes.  In my opinion, there was.
20      Q.  All right.  What was the safety problem?
21      A.  When I got there, the judge being
22  surrounded by people that didn't have no business
23  being in a hearing and your client's attitude --
24  forthcoming attitude, approaching the judge in her
```



 1  comfort judge, in my comfort zone, that, if I

 2  would've been in charge, there wouldn't have been o

 3  one invading her private zone or approaching her in

 4  the way he did.

 5      Q.  All right.  Well, let's separate what you

 6  saw on the video with what you actually observed

 7  that day.

 8      A.  Okay.

 9      Q.  All right?  Because I know you showed up at

10  some point.

11      A.  Correct.

12      Q.  So I don't want to conflate those two

13  things.

14      A.  Yes, sir.

15      Q.  And we'll get to -- we'll get to what you

16  observed when you got there but, to be clear, it

17  sounds like you're saying to me that had you been

18  the bailiff rather than McPeake, there wouldn't

19  have ever been this video showing Mr. Gibson

20  confronting the judge in his front yard and asking

21  for a search warrant.

22              MR. ROBINSON:  Object to the form.  If

23  you understand the question.

24      Q.  Do you understand what I'm saying?



 1    A.  No clue.

 2    Q.  Let me rephrase that.  The judge said she

 3  didn't think there was a safety problem there.  You

 4  sound like, in my words, you were being critical of

 5  her bailiff for how it went down.

 6        My take on what you're saying is that had

 7  you been that bailiff, we'd never have this video

 8  showing Mr. Gibson confronting the judge about

 9  going inside his house.

10            MR. ROBINSON:  My question is:  Are

11  you asking him whether or not Mr. Gibson would have

12  confronted Judge Goldston or whether or not there

13  would have actually been a video being taken?

14  That's my objection to the form of it.

15            MR. BRYAN:  Yeah.  All right.  Well,

16  fair enough.

17  BY MR. BRYAN:

18    Q.  When you watched -- let me back that up

19  some.  When you watched the video showing what

20  happened in the front yard, you didn't like what

21  you saw, did you?

22    A.  No.  At to be a little more -- break it

23  down a little bit more, I wouldn't even let my

24  judge walk out into the waiting room or to the



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          28

1  other courthouse without me.  When she was in that
2  courthouse - courtroom - she wasn't -- and she'll
3  tell you this -- she wasn't -- I would freak out if
4  she would just walk in the waiting room to talk to
5  an attorney.
6        So I went overboard a little bit when it
7  come to protecting my judges but I had zero
8  instances where she was ever in danger.  So I'm not
9  critiquing McPeake and saying he did anything
10 wrong.  I'm just saying I would have done things
11 differently for the safety of my judge.
12    Q.  So perhaps this is a better way to ask what
13 I'm trying to ask here.
14        Had you been the bailiff, it sounds to me
15 like we wouldn't have any video footage of -- let
16 me finish -- we wouldn't have any video footage of
17 Mr. Gibson going up to the judge and asking her to
18 recuse herself.
19            MR. ROBINSON:  Object to the form but
20 you may answer it.
21    A.  That would've been the first thing I'd done
22 is secure the cellphones and make sure nobody was
23 recording, and she wouldn't have had to told me
24 that she knows she wouldn't have had to told me



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                         29

1 | that because that's how we conducted all of our
2 | hearings.
3 |       So, yes, the first thing I'd have done is
4 | take all the cellphones and make sure nobody was
5 | recording before anyone ever even got out of their
6 | vehicle.
7 |   Q.  In which case, even the Supreme Court,
8 | nobody would be able to look at any sort of
9 | recording, any sort of video footage, in order to
10 | see what happened that day and what didn't happen.
11 |   A.  I guess if there's no recording, no one
12 | could look at a recording.  I mean, if they didn't
13 | record, they couldn't look at the recording that
14 | wasn't recorded.
15 |   Q.  And that's how you would've done it?
16 |   A.  Correct.  Yes, sir.
17 |   Q.  And that's how you did it in the past as
18 | bailiff for Judge Goldston?
19 |   A.  That's how I did it in every single hearing
20 | I've ever been in with Judge Goldston and every
21 | Family Court judge.
22 |   Q.  So all those prior visits to the homes of
23 | litigants that you went with Judge Goldston to,
24 | there are -- there's no recordings that anyone



BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          30

 1  could look at, including disciplinary authorities

 2  or the Supreme Court or whomever, to see what

 3  happened or what did not happen?

 4              MR. ROBINSON:  Object to the form.

 5  Also, lacks the proper foundation as you have not

 6  asked him whether or not anybody ever tried to

 7  record other hearings.

 8              You understand why I'm objecting your

 9  form?  I'm not understanding what your questions --

10              MR. BRYAN:  I understand.  You're

11  keeping me -- you're keeping me logical here.

12              MR. ROBINSON:  Okay.

13              MR. BRYAN:  Let me back it up.

14              MR. ROBINSON:  Can you understand me

15  with that mask on?

16              COURT REPORTER:  Sure.

17              MR. ROBINSON:  Okay.  Just wanted to

18  make sure.

19  BY MR. BRYAN:

20     Q.  During the -- during the time period in

21  which you served with -- for Judge Goldston --

22     A.  Yes, sir.

23     Q.  -- during these home visits that you've

24  testified about, there were no recordings



BOBBY STUMP                                                        March 01, 2022
GIBSON V GOLDSTON                                                            31

1  documenting what happened during those home visits.

2       A.   To my knowledge, there was no recordings.

3       Q.   And, in fact, it was your -- your policy,

4  your practice, to make sure that there were no

5  recordings.

6       A.   It was not my policy.  It was the Family

7  Court rules policy and Judge Staton informed me of

8  that Day 1 -- I'm sorry -- forgive me.  Judge

9  Goldston --

10            MS. GOLDSTON:  You used to be right.

11      A.   -- informed me, you know, that was Bailiff

12  101.  So it wasn't my policy.  It was the Family

13  Court's policy.  So, therefore, it was their

14  policy.  I was going to enforce whatever policy any

15  of my judges told me.  No questions asked.

16      Q.   But the Family Court's policy is that the

17  hearings are recorded.

18      A.   Correct.  By the judge and the judge only.

19      Q.   Okay.  And you knew that these other

20  visits, that the judge was not recording them?

21      A.   I didn't physically see her recording them

22  but I never asked her, "Hey, are you recording this

23  hearing?"  Because I would never question a judge.

24      Q.   Did you -- did you ever -- well, let me ask



1  you first:  During the period of time in which you

2  served as a bailiff for Judge Goldston, did you

3  have a supervisor or were you basically your own

4  supervisor?

5      A.  I was usually the second in charge but,

6  yeah, I usually had a supervisor.

7      Q.  Who was that?

8      A.  Let's see.  Skee Barley.  Jimmy Miller.

9      Q.  Well, rather than going through them --

10     A.  I mean, I just -- I've had so many

11  different --

12     Q.  Hang on.  Rather than going through all

13  those, do you recall ever having any conversations

14  with any of your supervisors about what you should

15  or shouldn't do on these home visits with the

16  judge?

17     A.  No.  It was none of their business what I

18  was doing.  If the judge told me to do it, I was

19  doing it.  I didn't care.  I mean, if they told me

20  not to do it, I'd have done it anyway if the judge

21  directed me to, and she knows that and all my other

22  judges know that.  I work for the judge.

23     Q.  So what do you recall of that, as far as

24  your own personal involvement, on March 4th, 2020?



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                             33

```
 1        A.   Is that the date of the hearing?

 2        Q.   Yes.

 3        A.   I was road patrol supervisor and I usually

 4   do not get dispatched to 911 calls.  Usually,

 5   whoever is working with me that day gets dispatched

 6   and I just kind of organize them going to calls.

 7            So I don't think I was dispatched but

 8   either one of my guys was dispatched or I was

 9   dispatched to assist on a -- from a Family Court

10   judge.  So the 911 dispatcher come over the radio

11   and said that the officer wanted some backup, so I

12   went.  I keyed up the radio and I think -- and

13   Corporal White keyed up the radio and said we was

14   on our way, and I think I was the closest one so I

15   beat everybody there.

16            But I was going to back up the officer.  At

17   the time, I had no clue it was Judge Goldston until

18   I arrived on scene.

19        Q.   And when you arrived on scene, what did you

20   observe?

21        A.   Numerous people in the road, numerous

22   people in the driveway, and as soon as I got on the

23   scene I knew that I was going to clear the crowd

24   out.  So I walked in and, as soon as I walked in,
```



BOBBY STUMP                                      March 01, 2022
GIBSON V GOLDSTON                                          34

 1 | Mr. Gibson approached me and I was just -- "Hey,
 2 | hold on."
 3 |        And he was just complaining that they were
 4 | there -- that everyone was there.  So I went
 5 | directly to Judge Goldston and I said, "I don't
 6 | feel comfortable with the environment and
 7 | everyone's here.  I'm going to start clearing out
 8 | people and make everyone leave."
 9 |        And she goes, "I didn't even think about
10 | that.  I'm sorry."
11 |        And I was like, "Well, I'm going to do
12 | that."
13 |        So I went outside and had everyone leave,
14 | and then I went back inside and stood beside the
15 | judge for the rest of the time.
16 |    Q.  So when you first got there, you went
17 | straight in the house?
18 |    A.  Yes.  Well, I mean, I looked at everyone
19 | and, you know, made sure nobody was armed or
20 | anything like that, nothing obvious, and then I
21 | walked into the garage and I think Mrs. Gibson had
22 | the chainsaw in her hand, and she was making a trip
23 | down to her family, down to their vehicle.  Her
24 | brother was there, meeting him halfway to get the



800.211.DEPO (3376)
EsquireSolutions.com

JA543

BOBBY STUMP                                                    March 01, 2022
GIBSON V GOLDSTON                                                          35

1  chainsaw.

2          And then I walked on in to another little

3  foyer and that's where Mr. Gibson approached me and

4  I seen the judge and Officer McPeake and Kyle Lusk.

5      Q.  At what point did you understand what was

6  going on there?

7      A.  When I went in and spoke to Judge Goldston.

8      Q.  As far as getting called there, there was

9  no 911 call by anybody, right?

10     A.  911 call?  I don't understand.

11     Q.  Nobody had called 911 asking for police to

12 arrive at that residence.

13     A.  I have no idea whether Officer McPeake

14 called 911 or whether he -- I know he -- he had to

15 have called 911.  Yes.  Officer McPeake called 911

16 because I remember him stating that he couldn't

17 figure out how to switch his radio, the band, from

18 the bailiff band to the 911 frequency.

19         So, yes, I'm sure Officer McPeake called

20 911.

21     Q.  Do you recall what he communicated?

22     A.  No.  I didn't speak to him about it.  It

23 was just dispatched that an officer needed backup

24 on a Family Court hearing, so that's what I --



1 | that's what I responded to.

2 |    Q.  Okay.  So you don't recall any more

3 | information other than that?

4 |    A.  There could've been.  No.  I mean, when you

5 | hear the words "officer needs backup", you don't

6 | really -- you go, no matter what.  So, I mean, if

7 | there was more info, I didn't really listen.  I

8 | just turned the blue lights on and went.

9 |    Q.  So at the time that you arrived, you didn't

10 | -- you didn't hear any allegations or receive any

11 | allegations that any individual had committed any

12 | criminal act?

13 |    A.  No.

14 |    Q.  All you -- all you knew was that another

15 | police officer had asked for backup?

16 |    A.  Correct.

17 |    Q.  At a Family Court hearing.

18 |    A.  Correct.

19 |    Q.  And when you arrived there, you saw people

20 | outside the house.

21 |    A.  Correct.  I was familiar with everyone

22 | there.

23 |    Q.  You were familiar?

24 |    A.  Yeah.  Yes, sir.



1      Q.  Had -- how were you familiar with everyone
2   there?
3      A.  With every person on scene?
4      Q.  Well, let me ask you:  Did you know whose
5   house this was?
6      A.  No.
7      Q.  Okay.  How were you familiar with all the
8   people at the scene?
9      A.  Well, because when I pulled up I seen
10  Mr. Payne.
11         You want me to go into detail of how I know
12  all these people?
13         I mean, I will.  I'm just asking you if you
14  want me to tell how I knew each person.
15     Q.  Every person outside, you had some sort of
16  preexisting relationship, it sounds like.
17     A.  Correct.  Everyone except for the new
18  girlfriend.
19     Q.  All right.  Well, did you put 2 and 2
20  together while you were there or what was going on?
21     A.  I didn't.  I didn't speak to the Paynes
22  until I got in the garage and I seen Carrie Gibson-
23  Payne -- Carrie Payne-Gibson -- and she said that
24  they were here to split their assets, and I said,



1  "Oh okay."

2          So that's when I walked inside and that's

3  when I seen Mr. Gibson approach me.  And then

4  that's when I went and spoke to Judge Goldston and

5  she informed me what was going on.

6      Q.  All right.  Did you know Matt Gibson prior

7  to this?

8      A.  Yes and no.  I mean, yes, but I -- we

9  weren't buddies or anything.  I mean, we're polar

10 opposites.

11     Q.  You knew his ex?

12     A.  I knew of her.  I was friends with her

13 brother in high school and her dad -- her dad and

14 -- Carrie Payne's dad and mother was a victim of a

15 real bad burglary a couple of years earlier and

16 they had called and asked me if I could help them,

17 and I ended up finding everything that was stolen

18 from their house.  So I knew them from there.

19          And then Little League.  I mean, I knew

20 them all from Little League.

21     Q.  When you encountered Carrie Gibson, or

22 Payne, in the garage with the chainsaw, as you

23 said, at that point, did you realize that this was

24 a Family Court hearing?



BOBBY STUMP                                              March 01, 2022
GIBSON V GOLDSTON                                                  39

```
 1       A.   I mean, I don't remember when I realized it
 2   was a Family Court hearing.  I may have even known
 3   it was a Family Court hearing before I went.  I may
 4   have even called EOC.  I'm not for sure when I
 5   realized it was a Family Court hearing.
 6       Q.   Well, you just testified that -- you said
 7   that an officer needs backup at a Family Court
 8   hearing.
 9       A.   Correct.
10       Q.   And you knew that you were traveling to a
11   residence, not a Family Court.
12       A.   Correct.
13       Q.   Okay.  And you recognize everybody in the
14   yard.
15       A.   Correct.
16       Q.   Then, you encountered Carrie Gibson in the
17   garage.
18       A.   Correct.
19       Q.   And then you walked inside the house from
20   the garage.
21       A.   Correct.
22       Q.   So at what -- what was happening inside
23   when you walked in the house from the garage?  What
24   did you -- what did you observe?
```



BOBBY STUMP                                              March 01, 2022
GIBSON V GOLDSTON                                                    40

```
 1        A.   I observed Mr. Gibson.  As soon as he seen
 2   me, he come towards me and I calmed him down, and
 3   then I told him to hang out right there until I
 4   came back to talk to him.
 5            And then I went over and talked to Judge
 6   Goldston and Officer McPeake, and I just took
 7   charge, because that's -- I mean, that was my job
 8   as a supervisor.
 9            I just told McPeake, "Stay right here.  I'm
10   going to go out here and get everyone out that's on
11   the property that's not part of the case -- or part
12   of this hearing."
13        Q.   Well --
14        A.   Then, I did that and then I went back in
15   and conducted the rest of the hearing with Judge
16   Goldston.
17        Q.   You said Mr. Gibson approached you but I
18   want to ask you about where everyone else was at
19   that time.
20            Where was Judge Goldston when you walked
21   in?
22        A.   I call it a foyer but when you go, like, in
23   the garage, there's a door, and I'm thinking there
24   was a kitchen.  But anyway, you go in and there's
```



1  like, on the right, maybe in the living room foyer

2  -- but her and Kyle - Mr. Lusk - and -- was in

3  there with Officer McPeake.

4      Q.  Doing what?

5      A.  Just standing there.

6      Q.  They weren't doing anything?

7      A.  No.  They were just standing there and I'm

8  assuming they just had given the chainsaw to Carrie

9  Payne -- Carrie Gibson -- and they was sitting

10  there discussing whatever with Mr. Gibson, until he

11  seen me and then he approached me.  I guess he

12  recognized me.

13      Q.  Okay.  And did you observe any -- any sort

14  of arguing or anything like that?

15      A.  He was -- he was a little angry when he

16  approached me and I calmed him down.

17      Q.  What did he say?

18      A.  I don't remember what he said.  He just

19  approached me in an angry manner and I said, "Man,

20  you need to calm down.  You're a little out of

21  control."  And I said, "I'm going to go out here

22  and tell everyone to leave."  And he did not like

23  it when I told him I was going to get everyone to

24  leave.



 1            So then, for his sake, I said, "Okay.

 2    Here's what I'll do.  I will let one person stay

 3    for you and one person stay for Ms. Gibson to be

 4    your -- to help you with, you know, whatever you

 5    may be getting or whatever, carrying stuff to the

 6    vehicle, but everyone else has to leave," because

 7    it wasn't a safe environment for the judge.

 8        Q.  Okay.  So you knew, at that point, that the

 9    judge was conducting a hearing inside Mr. Gibson's

10    house, right?

11        A.  Correct.  As soon as I seen her, yeah.  I

12    mean, if I didn't know beforehand, as soon as I

13    seen her I knew exactly what was going on.  Yes.

14        Q.  Okay.  And so then you told each party that

15    they could keep one person there to --

16        A.  At first I said no one.  Mr. Gibson become

17    angry over his girlfriend, so I kind of bent my own

18    rules and said, "Okay.  One person each can stay."

19            And he wanted his girlfriend to stay and

20    Carrie Gibson wanted her brother to stay.

21        Q.  Okay.  So it was your own rules that

22    decided that you get to say who Mr. Gibson has on

23    his property and not him?

24        A.  It's not my rules.  It's securing the scene



BOBBY STUMP                                              March 01, 2022
GIBSON V GOLDSTON                                                    43

 1  and making it safe for my judge -- for the judge,

 2  and that's the way I made the scene.  In my

 3  opinion, that's the way I secured the scene and

 4  made it safe for the judge.  Yes.

 5      Q.  You weren't working as a bailiff that day,

 6  were you?

 7      A.  No, but the second I arrived on scene I was

 8  in charge.  I've been there for so long, when I'm

 9  on scene I'm usually in charge because, you know --

10  and I'm not trying to be arrogant but everyone is

11  -- you know, that works the road, the bailiffs are

12  usually lower rank.  So when I arrive, I'm the one

13  in charge most of the time.

14      Q.  So you were the bailiff now, basically?

15      A.  I'm not going to say I was the bailiff but,

16  from what I seen, I didn't think the scene was

17  secure so, yes, I took over.  Essentially, I was

18  the bailiff.

19          I'm not going to say I was the bailiff.  I

20  was the one in charge, you know, and that's -- and

21  I took charge.  That's just my personality.

22  Anytime we was in a hearing or anything, I always

23  took charge.

24      Q.  Okay.  So you took charge and, having done



1  this before when you were a bailiff for Judge

2  Goldston, you knew that what was taking place was

3  items of personal property were going to be located

4  and given to either party?

5      A.   Correct.  I did know that.

6      Q.   Okay.  And then you now were presiding over

7  that process taking place in Mr. Gibson's home.

8      A.   No, sir.  Judge Goldston is always

9  presiding.  I'm just there to make sure she's safe

10 and everyone maintains their behavior, but I didn't

11 preside.  She's the one that presides.

12     Q.   Okay.  And then after that point, after you

13 took over the scene, as you call it, what happened

14 next?  Did they continue on, or did you continue

15 on, with locating items and giving them to parties?

16             MR. ROBINSON:  Object to the form.

17 You can answer.

18     Q.   Well, that's why I asked you what happened

19 next.  After you took over --

20     A.   Next after what?

21     Q.   After you got there and you took control of

22 the scene, right?  What next happened inside

23 Mr. Gibson's house?

24     A.   I had everyone to leave.  That took a few



1  minutes.

2          And then, by that time, I think Corporal

3  White arrived on scene, and I told him, "Hey, make

4  sure nobody comes back in here.  I don't want

5  anybody on the property."

6          I went back inside and stood beside the

7  judge and I think - best I remember - there was a

8  safe or something that there was some property in,

9  and Mr. Gibson went with Officer McPeake and got

10  some property out of the safe and they divided that

11  property as well.

12          And they just divided the property and then

13  we left.  I left after the judge left.  And

14  Mr. Gibson had a bunch of questions for me and was

15  asking me some questions but, I mean, I don't

16  remember what they were.

17      Q.  Okay.  After you arrived in the house and

18  you took -- took over for McPeake, you were present

19  while additional items of personal property were

20  located inside Mr. Gibson's house?

21      A.  Correct.

22      Q.  Some of which were then removed from

23  Mr. Gibson's house.

24      A.  Yes, sir.  Like the box of DVDs.  They held



BOBBY STUMP                                                March 01, 2022
GIBSON V GOLDSTON                                                      46

 1  a box of DVDs up and he'd pick one, then she'd pick

 2  one.  He'd pick one, and she'd pick one.  So they

 3  just separated the property that was in the court

 4  order.

 5      Q.  And you were on duty and in uniform at this

 6  time?

 7      A.  Correct.

 8      Q.  You had a badge and a gun?

 9      A.  Correct.

10      Q.  Do you know whether or not a search warrant

11  was ever issued for law enforcement to enter

12  Mr. Gibson's home against his consent?

13      A.  I would -- I've never followed up on that

14  but when I have a judge there that's conducting a

15  hearing, that's my -- I would have went in anyway,

16  without a search warrant.

17      Q.  I understand that.  To your knowledge,

18  there was no search warrant on March 4th, 2020

19  pertaining to Mr. Gibson's house?

20      A.  I didn't do a search warrant and none of

21  the people working with me that day did a search

22  warrant.  But I wasn't searching.

23      Q.  But you were helping to locate items?

24          MR. ROBINSON:  Object to the form.



800.211.DEPO (3376)
EsquireSolutions.com

JA555

BOBBY STUMP                                    March 01, 2022
GIBSON V GOLDSTON                                          47

1      A.   No.   No, I was not.   I was there for the

2   strict safety of the judge.   Mrs. Gibson and

3   Mr. Gibson were locating the items.   I didn't

4   search for nothing.   There wasn't -- any of the

5   deputies didn't search for anything.

6      Q.   It was clear to you -- you said Mr. Gibson

7   didn't appear to be happy.   It was clear to you

8   that he didn't want these people in his house,

9   wasn't it?

10      A.   He never told me that.

11      Q.   That's why I asked if it was clear to you,

12   because he wasn't happy.   It was clear to you that

13   Mr. Gibson wasn't happy about having these people

14   in his house.

15      A.   I didn't know what he wasn't happy about.

16   I didn't know if he wasn't happy because he was

17   getting divorced or he had to separate his

18   property.   I had no clue why he wasn't happy.   I

19   just calmed him down and told him to chill.

20           But, no, I didn't know why he wasn't happy.

21   I wasn't there for all that.

22      Q.   Well, you knew that he wasn't happy that

23   you asked people to leave his property who were --

24      A.   It --



1       Q.   Let me finish.

2       A.   Sorry.

3       Q.   You knew that he was not happy that you had

4   ordered his guests on his private property to

5   leave, right?

6       A.   Correct.  He was yelling and screaming at

7   the Paynes, telling them to get off his property -

8   which they weren't on his property - and then his

9   jail buddies were there, and his girlfriend were

10   there, and he was not happy when I told them that

11   they had to leave.

12          But I told him I was also going to make the

13   Payne family leave.  It was just not his party that

14   was leaving.  Everyone was leaving the property for

15   the judge's safety.

16       Q.   So on March 4th, 2020, as a law enforcement

17   officer, you were telling Mr. Gibson, the property

18   owner, that his guests have to leave the property,

19   regardless of whether he wants them to stay or not?

20       A.   On March 4th, 2020, I was securing the

21   scene so my judge would be safe.

22       Q.   The scene of a Family Court hearing.

23       A.   Correct.

24       Q.   It wasn't a crime scene, right?



1      A.   Correct.  It was a Family Court hearing.
2  Correct.
3      Q.   You still had not received any sort of
4  allegation or indication that any crime had been
5  committed by anybody?
6      A.   No.  I wasn't aware of any crime.  No.
7      Q.   You weren't aware of any sort of emergency
8  taking place at the scene?
9      A.   Not that I was aware of, no.
10     Q.   You weren't aware that there was any sort
11  of threat to any individual's physical safety at
12  the scene?
13     A.   Yes.  I thought there was a physical threat
14  to my -- to Judge Goldston -- sorry -- Judge
15  Goldston's safety, and that's why I acted in the
16  manner that I did.  I didn't feel the environment
17  was conducive to her -- for her safety, so that's
18  why I cleared the property.
19     Q.   That's just because that's not -- you would
20  have done things differently as a bailiff.  That's
21  not -- that's not because you observed any actual
22  threat to Judge Goldston's safety.
23     A.   That's because there were too many people
24  there for me to watch and they had no business



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                              50

1  being there at that time, when the judge is having

2  a hearing, and I had them to leave because of the

3  judge's safety.

4      Q.  Okay.  You didn't observe any of those

5  individuals committing any crimes, did you?

6      A.  No.

7      Q.  You didn't observe any of those individuals

8  making any threats to anyone's safety, did you?

9      A.  No.  I didn't give them the opportunity.

10     Q.  It's just your policy, as a longtime

11 bailiff, that you wouldn't put any judge in that

12 position of even having people around in that

13 manner.

14     A.  No, I would not.

15     Q.  Okay.  It wasn't based on any actions by

16 any individuals present that caused the safety

17 issue.

18     A.  Mr. Gibson, where he was irate, I didn't

19 feel safe with him being in the house with her as

20 well.  So, you know, that's why I stood beside her

21 until the hearing was over.

22     Q.  Okay.  But you didn't hear him make any

23 threats, did you?

24     A.  No.  With his demeanor, I didn't feel -- I



1  didn't feel it was safe for her to be anywhere in

2  the house near him, so that's why after they left,

3  I went inside and stood beside the judge.

4      Q.  Okay.  She didn't -- Judge Goldston didn't

5  complain to you that -- about Mr. Gibson's conduct,

6  did she?

7      A.  No.  She didn't.  And there again, Judge

8  Goldston and I, when we went to the homes or we was

9  in the courtroom, she didn't have to tell me

10 anything because we knew each other so well, she

11 could just give me a look and I would know what to

12 do.

13         So when I walked in, I knew that it was an

14 unsafe environment, and so that's why I secured the

15 area.

16     Q.  Did you take any cellphone footage inside

17 Mr. Gibson's house?

18     A.  I would never do that because that's one of

19 the No. 1 rules.  Only the judge films a Family

20 Court hearing -- videos a Family Court hearing.

21     Q.  Did you observe -- did you observe Bailiff

22 McPeake taking any footage inside Mr. Gibson's

23 home?

24     A.  No.  I didn't observe him because if I did,



1  I would have took his phone, too.

2      Q.  Yet, it's your testimony that you saw

3  Mr. Gibson and Bailiff McPeake doing something with

4  Mr. Gibson's safe.

5      A.  They were getting something out, and then

6  they brought a -- I think it was, like, a box or a

7  tote of DVDs or something.

8          Yeah.  The property on the Family Court

9  order, they were going through that property and

10  separating it.  And I think there was the pictures

11  there, too.  And the chainsaw.

12      Q.  About how long were you inside Mr. Gibson's

13  house?

14      A.  I have no idea.  I haven't reviewed

15  anything.  I have no idea.

16      Q.  Did Mr. Gibson ever ask you to leave his

17  house?

18      A.  Ask me?

19      Q.  Yeah.

20      A.  No.

21      Q.  Okay.

22      A.  He didn't ask me to leave.

23      Q.  Did you -- did you overhear him asking

24  anyone else to leave?



1      A.   No.   I never heard him ask anyone to leave.

2      Q.   Did he ever invite you in?

3      A.   No.   I went in.   I was dispatched, so I

4   just went in.   When I went in, that's where he

5   looked at me and I guess he seen a familiar face,

6   and that's when he approached me.

7      Q.   So McPeake had called you to the scene for

8   backup.

9      A.   McPeake called 911 EOC for backup.   He

10  didn't call me.

11     Q.   All right.   Then you were dispatched in

12  response whenever McPeake asked for help.

13     A.   Correct.   Someone was dispatched.   I don't

14  know if I was dispatched.   Someone -- me or one of

15  my coworkers were dispatched but I was the closest

16  there.

17     Q.   All right.   So, generally, one of the first

18  things you would do if an officer asked for help

19  and you arrived at the scene would probably be to

20  talk to that officer, wouldn't it?

21     A.   Well, in a normal situation, but when I

22  walk in and see the judge, I don't have to ask

23  because I know what's going on because I've been

24  there, done that, many, many, many, many times.



 1        Q.   So did you talk to McPeake?

 2        A.   I don't think so, no.  Yes, I did.  I told

 3   him to stand with the judge and I was going to go

 4   clear out everyone from the property, and I told

 5   him not to leave her side until I got back.

 6        Q.   Is that the extend of the conversation

 7   between you and McPeake after you got to the scene?

 8        A.   We may have spoke but -- I'm not saying we

 9   did or we didn't.  I don't remember.  I know I told

10   him to stay with the judge while I cleared the

11   property from the other people.  I'm sure we spoke

12   and talked but I don't recall.

13        Q.   Did you ever ask McPeake why he called for

14   you?

15        A.   No.  I didn't need to because when I seen

16   Judge Goldston, I knew why he called for me.  When

17   I went there and seen all those people there, and

18   Mr. Gibson angry, I knew why I was there.

19        Q.   Did McPeake ever tell you why he called for

20   backup?

21        A.   No.  I never asked him about it, never

22   talked to him about it.

23        Q.   And you don't recall how much longer after

24   that that you stayed in the house?



1    A.   I have no idea.  I have no idea.

2    Q.   How did the -- how did this hearing end?

3    A.   Once the equitable distribution was

4    resolved, I walked Judge Staton to her vehicle and

5    they left, and I waited for Mr. Lusk, Judge

6    Goldston, and Mrs. Payne and her brother to leave.

7    And after they left, I was the last one to leave.

8    Q.   Okay.  And then after you left, did you do

9    anything else pertaining to that incident?

10   A.   No.  It was what we call non-reportable, so

11   it was -- I mean, we don't do reports for court

12   hearings, so I just went on to the next call.

13   Q.   Okay.

14   A.   The next 911 call.

15   Q.   That was my next question.  You never

16   filled out any sort of report following that

17   incident?

18   A.   No.  Per our policy at the Sheriff's

19   Office, it's non-reportable.  There was no crime.

20   Nothing happened.  I was just assisting in a family

21   court hearing.

22   Q.   And you're still working for the same

23   employer?

24   A.   Correct.  19 -- going on 19 years.



BOBBY STUMP                                        March 01, 2022
GIBSON V GOLDSTON                                               56

 1       Q.   After this incident, has there been any
 2   sort of change in policy about Sheriff's Department
 3   bailiffs going to the homes of litigants?
 4       A.   No.  My judge -- I'm sorry -- if Judge
 5   Goldston told me today to go to the house, I'd be
 6   the first one there.
 7            Or any judge.  Not only Judge Goldston.
 8   Any of the judges.  Circuit Court, Family Court.
 9                 MR. BRYAN:  I don't believe I have any
10   other questions but let me take a quick bathroom
11   break and, at the same time, let me talk to my
12   people here.
13                 COURT REPORTER:  The time is 1:49 p.m.
14   We're off the record.
15                 (A short break was taken after which
16                 the proceedings continued as follows:)
17                 COURT REPORTER:  The time is 1:54 p.m.
18   We're on the record.
19   BY MR. BRYAN:
20       Q.   You testified that even though you're an
21   employee of the Raleigh County Sheriff's Department
22   and a sworn law enforcement officer that you would
23   do what the judge tells you to do.
24       A.   If I was a bailiff.  Correct.



1      Q.   Okay.   Let me ask you this:   What if the

2   judge were to tell you to do something that you

3   thought was against the law?

4      A.   I know we're doing -- you have some

5   propaganda but I can say with 1,000-percent

6   certainty that none of the judges I ever worked

7   with would do that.

8      Q.   All right.   Well, my original line of

9   questioning was for you to help me understand, you

10  know, who's in charge.

11      If a judge would tell you to go rob a bank,

12  would you do it?

13            MR. ROBINSON:   Object to the form.

14  You can -- you can answer that.

15      A.   There again, I've never -- I've worked with

16  dozens of judges and I've never had a judge to ask

17  me to break the law and I'm 1,000-percent confident

18  that I never worked with a judge that ever would

19  ask me to break the law.

20            So of course I'm not going to break the

21  law.   My job is to uphold the law.   But I've never

22  had a judge to ask me to come remotely to breaking

23  the law.

24      Q.   Well, in the end, I mean, you have a higher



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                              58

1   duty other than just listening to the orders of the

2   judge, right?

3       A.   No.

4       Q.   And that's to obey the law.

5       A.   No.  From a bailiff -- yes, of course I've

6   got to obey the law but, no, my higher duty, if I'm

7   a bailiff, is the judge and the judge is the higher

8   authority.

9           If the judge tells me to do something, I'm

10  doing it and I'm not questioning it.

11      Q.   But aren't you a sworn law enforcement

12  officer first?

13      A.   I am.

14      Q.   Didn't you take an oath?

15      A.   I did.

16      Q.   Okay.  If the judge tells you to do

17  something which violates the Constitution, are you

18  going to do it?

19      A.   There again, the fourth time, I know,

20  without a doubt, no judge that I ever worked for

21  would ever ask me to violate the law, so I've never

22  been in that predicament and I can safely say I

23  never will.

24          No judge is going to tell me to violate the



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                               59

 1  law.
 2      Q.   And that's why I said "if".  If a judge
 3  told you to violate the law, violate the
 4  Constitution, would you do it?
 5              MS. TULLY:  Objection.  Calls for
 6  speculation.
 7      A.   If they judge asks me to violate the law
 8  and rob a bank, no, I wouldn't rob the bank.  I'd
 9  say, "Judge, I couldn't rob that bank because it's
10  against the law."
11          So, no, I wouldn't rob the bank if the
12  judge told me to go rob the bank.
13      Q.   Okay.  And you said you worked as a bailiff
14  for Circuit Court judges as well, right?
15      A.   Yes.
16      Q.   Okay.  So you've -- as a police officer for
17  so many years, you're familiar with the requirement
18  under the Constitution to obtain -- for law
19  enforcement to obtain a search warrant prior to
20  someone's house.
21              MR. ROBINSON:  Object to the form.
22      A.   Correct.
23      Q.   You're familiar with search warrants.
24      A.   Correct.  My job now is drugs and I do



1   search warrants all the time.

2       Q.   So you're familiar with the -- the Fourth

3   Amendment's requirement that law enforcement

4   generally have a search warrant?

5       A.   Correct.

6       Q.   So if a Circuit Court judge, say in a

7   criminal case, said, "Deputy Stump, I want you to

8   go search this criminal defendant's home.  Don't

9   worry about getting a search warrant.  Just do it.

10  We don't need a search warrant," would you do it?

11      A.   In my training, the words from a judge - a

12  Circuit Court judge - is -- and I've heard this on

13  the record 1,000 times -- just because there's not

14  a court order, when I speak it it's a court order.

15          So if a judge - Circuit Court judge - on

16  the record spoke a court order, yes, I would follow

17  that court order.

18      Q.   Okay.  And that's what you did,

19  essentially, when you worked as a bailiff for Judge

20  Goldston?

21      A.   Correct.

22              MR. BRYAN:  All right.  Thank you.  I

23  don't have any other questions.

24              THE DEPONENT:  Thank you.



```
 1                    MR. ROBINSON:   I don't have anything.
 2   Do you have anything?
 3                    MS. TULLY:   I don't have anything.
 4                    THE DEPONENT:   Thank you.
 5                    MR. ROBINSON:   Read or waive?   You
 6   want to waive?   Waive the reading of your
 7   deposition?
 8                    THE DEPONENT:   Yes, sir.
 9                    MR. ROBINSON:   Okay.   We'll waive.
10                    COURT REPORTER:   The time is 1:59 p.m.
11   This concludes the deposition.
12                       (Having indicated he would like
13                       to waive reading and signing of
14                       his deposition, further this
15                       deponent saith not.)
16                       --o0o--
17
18
19
20
21
22
23
24
```



BOBBY STUMP                                          March 01, 2022
GIBSON V GOLDSTON                                              62

1   STATE OF WEST VIRGINIA,

2   COUNTY OF RALEIGH, to wit:

3           I, Bradford L. Cooper, a Notary Public

4   within and for the County and State aforesaid, duly

5   commissioned and qualified, do hereby certify that

6   the foregoing deposition of BOBBY STUMP was duly

7   taken by me and before me at the time and place and

8   for the purpose specified in the caption hereof.

9           I do further certify that the said

10  proceedings were correctly taken by me in shorthand

11  notes, and that the same were accurately written

12  out in full and reduced to typewriting by means of

13  computer-aided transcription.

14          My commission expires May 14, 2023.

15          Given under my hand this 15th day of March,

16  2022.

17          Bradford L. Cooper

18  _____

19          BRADFORD L. COOPER, Notary Public

20

21

22

23

24



**In the Matter of:**

MATTHEW GIBSON

vs

LOUISE E. GOLDSTON

MATTHEW GIBSON

*February 23, 2022*



5010 Dempsey Drive
Cross Lanes WV 25313
304-415-1122

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY


MATTHEW GIBSON,

         Plaintiff,


 -vs-         Civil Action No. 5:21-cv-00181

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,
KYLE LUSK, individually,

         Defendants.


DEPOSITION OF MATTHEW GIBSON

———————————————————————————————————

    The deposition of Matthew Gibson was
taken on February 23, 2022, at 10:00 a.m.,
at 252 George Street, Beckley, West
Virginia.

———————————————————————————————————


ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia  25313
(304) 415-1122


Tara Arthur, CCR

```
                                                          Page 2
 1                    A P P E A R A N C E S

 2      John H. Bryan
        Attorney at Law
 3      Edwin Morgan
        Law Office of John H. Bryan
 4      P.O. Box 366
        Union, West Virginia  24983
 5
        Kevin J. Robinson
 6      Attorney at Law
        Pullin Fowler Flanagan Brown & Poe
 7      252 George Street
        Beckley, West Virginia  25801
 8
        Jennifer E. Tully
 9      Attorney at Law
        Bailey & Wyant, PLLC
10      P.O. Box 3710
        Charleston, West Virginia  25337-3710
11
        Also Present:  Louise E. Goldston
12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
                                                          Page 3
1                 I  N  D  E  X

2           WITNESS

3                Matthew Gibson

4           EXAMINATION

5                by Ms. Tully          Page 04
                 by Mr. Robinson       Page 56
6                By Mr. Bryan          Page 170
                 by Ms. Tully          Page 184
7                by Mr. Robinson       Page 188
                 by Ms. Tully          Page 189
8

9           EXHIBITS

10               Number 1              Page 19
                 Number 2              Page 19
11               Number 3              Page 121
                 Number 4              Page 121
12               Number 5              Page 162
                 Number 6              Page 167
13

14

15

16

17

18

19

20

21

22          Reporter's Certificate:    Page 191
            Errata Sheet/Signature Page:  Enclosed
23

24
```

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 4

```
 1                    MATTHEW GIBSON,
 2   called as a witness, first being duly sworn
 3   by the Court Reporter/Notary Public,
 4   testified as follows, to wit:
 5                    EXAMINATION
 6   BY MS. TULLY:
 7        Q.  Could you please state your name
 8   for the record?
 9        A.  My name is Matthew Aaron Gibson.
10        Q.  How do you spell Aaron, A-A-R-O-N?
11        A.  A-A-R-O-N.
12        Q.  Mr. Gibson, my name is Jennifer
13   Tully.  I represent Judge Goldston in the
14   lawsuit that you through your attorney have
15   filed against her and a couple of deputies as
16   a result of the incident on March 4, 2020.
17   So I have some questions for you today.
18            Have you ever had a deposition
19   taken before?
20        A.  No, ma'am.
21        Q.  All right.  I am sure your attorney
22   has kind of told you what to expect, but I am
23   going to go over kind of what I call
24   deposition ground rules.  That way you and I
```

1  make sure we are on the same page.

2          Tara here is taking everything down

3  that we say.  She is typing it up -- she is

4  going to eventually type it up into a

5  transcript.  So we need to both make sure

6  that we give vocal answers, keep our voices

7  up because she is also recording it.

8          Also, if you can, say yes or no as

9  opposed to uh-huh or huh-uh.  This will

10  become very conversational, and it will be

11  easy to flow into uh-huh that happened, or

12  shrugging your head --

13      A.  Yes, ma'am.

14      Q.  -- you know, shoulders.  That just

15  makes it easier when you go back and try to

16  read the transcript if it is a yes or no

17  answer as opposed to uh-huh or huh-uh.

18          If you don't understand a question

19  that I ask you -- because lawyers can get

20  real longwinded with their questions -- just

21  let me know, you know, I have no idea what

22  you just asked me.  And I am happy to

23  rephrase it.  If you need to take a break,

24  you let me know.  I don't think this will

1    take too super long.  But we are here at

2    your convenience.  So you let me know and we

3    can take a break.  The only thing I would

4    ask is that if there's a question pending,

5    you answer that question prior to taking a

6    break.  Okay?

7           A.  Yes, ma'am.

8           Q.  All right.  Can you give me your

9    date of birth, please?

10          A.  It's January 10, 1977.

11          Q.  And what's your current address?

12          A.  It is 113 Quiet Oak Street,

13   three words, Beaver, West Virginia 25813.

14          Q.  And is that the home that you

15   shared with your ex-wife?

16          A.  Yes, ma'am.

17          Q.  Okay.  And what's her name?

18          A.  It is Carrie Gibson.

19          Q.  All right.  It is my understanding

20   that you and Ms. Gibson have two children?

21          A.  Yes, ma'am.

22          Q.  What are their names?

23          A.  Brooklyn Gibson, Skyler Gibson.

24          Q.  Okay.  How old is Brooklyn?

Page 7

1          A.  Brooklyn is 18.

2          Q.  How old is Skyler?

3          A.  Skyler is 12, turns 13 March 31st.

4          Q.  Okay.  Do either of those girls

5      live with you on a full-time basis?

6          A.  Yes, ma'am.

7          Q.  Both or --

8          A.  Brooklyn Gibson.

9          Q.  Okay.  And Skyler, does she split

10     her time between you and her mother?

11         A.  Yes, ma'am.  Every other week.

12         Q.  Do you have any other children

13     besides Brooklyn and Skyler?

14         A.  No, ma'am.

15         Q.  Have you ever been married prior --

16     before or after being married to Carrie

17     Gibson?

18         A.  No, ma'am.

19         Q.  Who currently besides Brooklyn, and

20     every other week Skyler, lives with you at

21     113 Quiet Oak Street?

22         A.  Nobody, ma'am.

23         Q.  Okay.  How long have you lived in

24     this address?

Page 8

```
 1          A.  To my recollection, it would be
 2   2005 -- say summer of 2005.
 3          Q.  And is this a home that you and
 4   your ex-wife purchased together?
 5          A.  Yes, ma'am.
 6          Q.  Okay.  And in the divorce, I assume
 7   you were either awarded the property or you
 8   bought Ms. Gibson out of her share?
 9          A.  Yes, ma'am.
10          Q.  Okay.  All right.  Can you -- I
11   don't need to go back to elementary school.
12   But can you give me your educational
13   background, please?  When did you graduate
14   high school?
15          A.  1995.
16          Q.  Where was that from?
17          A.  Independence High School.
18          Q.  And that's here in Beckley,
19   correct?
20          A.  Yes, ma'am.
21          Q.  Did you go to college?
22          A.  One year, ma'am.
23          Q.  Where was that?
24          A.  Bluefield State, which was here in
```

Page 9

1  Beckley.

2      Q.  Did you obtain any kind of

3  certificate from Bluefield State?

4      A.  No, ma'am.

5      Q.  Okay.  How about since attending

6  that year at Bluefield State, have you done

7  any trade schools, obtained certificates,

8  certifications, any kind of -- anything?

9      A.  Probably through my work, I have

10  obtained some certificates, I am sure.

11     Q.  Okay.  And where are you currently

12  employed?

13     A.  I work at the federal prison in

14  Beckley, West Virginia.

15     Q.  And what's your position there?

16     A.  I am a foreman.

17     Q.  Can you tell me what that means?

18     A.  I basically teach inmates how to

19  build a chair.

20     Q.  Okay.  So you are not a

21  correctional officer; is that correct?

22     A.  No, ma'am.

23     Q.  How long have you been employed as

24  a foreman through the federal penitentiary?

1        A.  2018, approximately.

2        Q.  And where did you work prior to

3   that?

4        A.  I worked in the receiving and

5   discharge unit at the same place of course.

6        Q.  Okay.

7        A.  Everything I tell you -- I have

8   been there 22 years.  So I have had several

9   jobs.

10       Q.  Okay.  So you were in the receiving

11  and discharge.  What did that entail?

12       A.  Bringing new inmates in and

13  releasing inmates to the street.

14       Q.  Okay.  So you were the first and

15  last face they saw, huh?

16       A.  Yes, ma'am.

17       Q.  All right.  In terms of social

18  organizations -- do you belong to a church or

19  do you belong to anything like that?

20       A.  I was a member of New Prospect.

21  And I guess I still am because I haven't

22  rescinded that.  A Baptist church, to the

23  best of my recollection, around 20 years.

24       Q.  Okay.  Sounds like you don't attend

1  anymore?

2      A.  I go to I Heart church now.

3      Q.  Okay.  Are you on any kind of

4  medication today that would affect your

5  ability to testify?

6      A.  No, ma'am.

7      Q.  Are you on any medication at all?

8      A.  No, ma'am.

9      Q.  All right.  When did you and Ms.

10 Gibson marry?

11     A.  December 11, 1995.

12     Q.  It is my understanding that --

13 well, actually, I don't have an

14 understanding.  When did you and your ex-wife

15 begin divorce proceedings?

16     A.  Separation?

17     Q.  Yes.

18     A.  September 30th, 2017.

19     Q.  All right.  That's when you

20 separated?

21     A.  Yes, ma'am.

22     Q.  Who filed for divorce?

23     A.  She did, ma'am.

24     Q.  She did.  And do you know when she

Page 12

1   did that?  Would it have been around the

2   September of 2017 date?

3           A.  I am going to say at the end of

4   2017, to the best of my recollection.

5           Q.  That's fine.

6               All right.  And your divorce

7   proceedings, they occurred here in Raleigh

8   County?

9           A.  Yes, ma'am.

10          Q.  And that was in the family court?

11          A.  Yes, ma'am.

12          Q.  And Judge Louise Goldston was the

13  presiding judge at that point; is that

14  correct?

15          A.  Yes, ma'am.

16          Q.  Did you have an attorney for your

17  divorce proceedings?

18          A.  Yes, ma'am.

19          Q.  And who was that?

20          A.  Brandon Johnson.

21          Q.  Did you hire Mr. Johnson at the

22  beginning of the proceedings?

23          A.  Yes, ma'am.

24          Q.  And how long did he continue to

Page 13

1    represent you?

2         A.   Probably, to the best of my

3    recollection, March of 2019.

4         Q.   Okay.  Now, while I don't want to

5    know about any conversations that you had

6    with Mr. Johnson, it appears to me at some

7    point you all had a parting of the ways?

8         A.   Yes, ma'am.

9         Q.   Can you give me any indication as

10   to why?  Did you just decide you wanted to go

11   out on your own?

12        A.   You know, to the best of my

13   recollection, I just felt that the big

14   battles were over and, you know, I think it

15   was time to part ways.

16        Q.   Okay.  Did Mr. Johnson assist you

17   in reaching an agreement with your ex-wife

18   through her attorney, Mr. Lusk, regarding the

19   distribution of property?

20        A.   Yes, ma'am.

21        Q.   And can you explain to me how that

22   occurred?  I mean, did you all sit down in a

23   conference room and hash it out?

24        A.   We sat down in the courtroom.  Of

1   course no one was in the courtroom.  The

2   judge was gone and the bailiff was not there

3   also.  So yes.

4          Q.  And the four of you sat in there

5   and talked about all of the property?

6          A.  Yes, ma'am.

7          Q.  How did you develop your list of

8   property to be divided?

9          A.  I didn't develop it.  Either her or

10  Mr. Lusk developed a list.

11         Q.  So they approached you with this

12  list and said, here is a list of property, we

13  need to divide this up?

14         A.  And it was the first time I seen

15  that list, when it was presented to me,

16  September 18, 2018.

17         Q.  Did you have any objections to the

18  property that was on that list?

19         A.  Yes, ma'am.

20         Q.  Okay.  And what were those?

21         A.  To the best of my recollection -- I

22  would have to go back and look at it, the

23  property form.

24         Q.  Okay.

Page 15

1          A.  I don't remember.

2          Q.  But you know you didn't agree with

3     all of the property that was listed on there?

4          A.  No, ma'am.

5          Q.  But you don't remember why?

6          A.  There were things listed on the

7     property form that were my daughter's that I

8     have full custody of.  So on that property

9     form, her items were listed.

10          Q.  Okay.

11          A.  And we never went over those items

12     to pick to and from on who got those items.

13          Q.  Okay.

14          A.  So my belief was the kids' items

15     never should have been on the property list.

16          Q.  Okay.  Okay.  All right.  After you

17     all went through this property list and --

18     you I guess came to an agreement, is that

19     fair, as to who was going to take what?

20          A.  The agreement never really did --

21     there was a form entered into the record, but

22     it never was corrected.  So there was two

23     property forms that -- one was called Joint

24     Exhibit 1 that is in the file.  And one was

1   called Exhibit 1.  That's the one that I

2   referred to as an altered property form.

3   Things were added.  They caught additional

4   items.  There were mistakes -- like two leaf

5   blowers.

6            On Exhibit 1 that Mr. Lusk

7   presented to Judge Goldston during the

8   hearing, there was a leaf blower scratched

9   out.  Well, that's not -- it doesn't

10  accurately reflect what was on Joint

11  Exhibit 1, the copy that was in the file.

12           Also, guns was a mistake.  And

13  guns, I was -- I was to pay a thousand

14  dollars for the guns.  Again, my daughter

15  that I have full custody of, her property, if

16  you would look at it, looks like that --

17  where it wasn't circled, that the ex-wife got

18  my daughter's furniture.  And that's not the

19  case.  I have full custody of.  So there were

20  some things on there that wasn't accurately

21  reflected.

22       Q.  Okay.

23       A.  So if they were attached to the

24  final order, I would absolutely object to

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

1   that part.

2       Q.  Okay.  When they were entered into

3   evidence at the hearing, this property --

4   this property list --

5       A.  Yes, ma'am.

6       Q.  -- were you still represented by

7   Mr. Johnson?

8       A.  Yes, ma'am.

9       Q.  Did he note any kind of an

10  objection to this property list?

11      A.  So there was a discussion between

12  him and Mr. Lusk.  And Mr. Lusk was supposed

13  to make those annotations.

14      Q.  Okay.  And do you know if that

15  happened?

16      A.  Do what?

17      Q.  Do you know if that happened?

18      A.  Absolutely not.

19      Q.  It did not happen?  Or you do not

20  know?

21      A.  It did not happen.  Those changes

22  were not made as guns were not taken off.

23  Can I refer to Joint Exhibit 1?

24      Q.  Yeah.  Pull it out.  Let's see it.

Page 18

```
1          A.   Joint Exhibit 1.

2          Q.   Okay.

3          A.   That's the one that you attached, I

4     believe, to your-all's --

5          Q.   To my request for admissions?

6          A.   Yes, ma'am.

7          Q.   Okay.

8          A.   This is Exhibit 1.

9          Q.   Okay.  So you say that this --

10              MS. TULLY:  Can we get some

11    copies made of this?

12              MR. ROBINSON:  Yeah.

13              MS. TULLY:  Do you mind if we

14    make copies?

15              THE WITNESS:  Absolutely.  It is

16    all part of the record.

17              (A discussion was held off the

18    record.)

19    BY MS. TULLY:

20         Q.   Mr. Gibson, if you don't mind to

21    hand me the two copies of Exhibit 1 and

22    Joint Exhibit 1 that I handed you, I am going

23    to give them to the court reporter, and we

24    are going to mark them as Exhibit 1 again to
```

Page 19

```
1    your deposition.  That way we can make this

2    as confusing as possible.

3               MS. TULLY:  Why don't we mark

4    Petitioner's Exhibit 1 as Exhibit 1 and Joint

5    Exhibit 1 as Exhibit 2.  That way --

6               THE WITNESS:  As long as you all

7    have got them together --

8               (Exhibit 1 was marked.)

9               (Exhibit 2 was marked.)

10        Q.  So Petitioner's Exhibit 1 that has

11   the Raleigh County clerk's timestamp on it --

12   okay?

13        A.  Yeah.

14        Q.  -- is Exhibit 1 to your deposition.

15        A.  Got it.

16        Q.  And then what you have called Joint

17   Exhibit 1 -- and it says admitted on it -- is

18   going to be marked as Exhibit 2 to your

19   deposition.

20             All right.  So I am going to -- you

21   can't write on these.  Sorry.  They're now

22   exhibits to your deposition.  But they're

23   marked here.  So that way you can see --

24        A.  Okay.
```

Page 20

1          Q.  -- okay -- what we're talking

2      about.

3          A.  Okay.

4          Q.  All right.  So now tell me, which

5      of these -- and I am now going to call them

6      Exhibit 1 and Exhibit 2 -- do you say is the

7      correct property distribution?

8          A.  Neither one of those are correct.

9          Q.  Okay.

10         A.  There is one that was entered into

11     the court file that was not corrected by

12     Mr. Lusk that is referred to as your Exhibit

13     Number 2 --

14         Q.  Okay.

15         A.  -- which is called Joint Exhibit 1.

16         Q.  All right.  And you say that this

17     one was admitted into the court file?

18         A.  Yes, ma'am.

19         Q.  All right.  And it looks to me like

20     that was done on September 19, 2018, based

21     upon this timestamped copy?

22         A.  Yes, ma'am.

23         Q.  Okay.  Was that the date of the

24     hearing of the property distribution?

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 21

1          A.   I am thinking it was the 18th.

2          Q.   Sometimes it takes a day or so,

3   yeah.   Okay.

4               All right.   Now, this though is the

5   list that you all went down through -- when

6   I say "you all," you, your attorney, Ms.

7   Gibson and Kyle Lusk went down through to

8   divide up the property; is that correct?

9          A.   Uh-huh.   That was the list that he

10  was supposed to correct.

11         Q.   Okay.   But this is the list that

12  you all looked at?

13         A.   Yes, ma'am.

14         Q.   Okay.   And the things that are

15  circled on it, based upon the key up here,

16  says the circles equals husband; is that

17  correct?

18         A.   Yes, ma'am.

19         Q.   All right.   And so looking at this

20  -- if you flip over, there are some things

21  that say Sky's Bedroom and Brooklyn's Room.

22  And it looks to me like that is on page 3 of

23  this property list?

24         A.   Yes, ma'am.

Page 22

1          Q.  And these were things that you do

2     not believe should have been divided?

3          A.  Well, I mean, especially my

4     daughter that I have full custody of, her

5     bedroom furniture shouldn't go to the

6     ex-wife.

7          Q.  Okay.

8          A.  Their toys.

9          Q.  Okay.

10         A.  Their movies.

11         Q.  All right.  Okay.

12         A.  So I can go down if you want me to

13    -- but was you going to ask me -- go ahead.

14    Ask your question.  Sorry.

15         Q.  All right.  What I want to ask you

16    about is with Exhibit 1, there is a lot of

17    writing on here.

18         A.  Yes, ma'am.

19         Q.  Do you know whose handwriting this

20    is?

21         A.  I don't have a clue, ma'am.

22         Q.  Okay.  So this is not your

23    handwriting?

24         A.  No, ma'am.

Page 23

1          Q.  All right.  So at some point

2     Exhibit 2, called Joint Exhibit 1 Admitted,

3     was admitted into evidence at a hearing -- a

4     divorce hearing?

5          A.  Yes, ma'am.

6          Q.  So this was the property

7     distribution that was recognized by the

8     court?  Is that your understanding?

9          A.  Yes.  But just like with the final

10    order, there had to be a lot of mistakes --

11    or there had to be a lot of corrections made

12    to the final order.  Again, if he would have

13    submitted this with the final order, I would

14    have notated a list of things that needed to

15    be corrected due to the agreement.

16          Q.  Okay.  And you believe that your

17    attorney did voice an objection to this Joint

18    Exhibit 1 which is Exhibit 2 to your

19    deposition at that hearing?

20          A.  Not during the hearing.  Verbally

21    he spoke with Mr. Lusk -- just like the

22    photos that were seized off my walls.  Those

23    were ordered by Judge Goldston to be copied,

24    which I did.

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 24

1      Q.  Okay.

2      A.  Okay.  And that's -- that was her

3  verbal order in the April of 2018 hearing.

4      Q.  Okay.  What are you reading from

5  there?

6      A.  Would you like a copy of this also?

7  This is notes.

8      Q.  Are these notes that you developed

9  yourself?

10      A.  This is -- more than likely, you

11  probably got those maybe.

12          MR. ROBINSON:  You might want to

13  run it by your attorney first.

14          MR. BRYAN:  I already looked at

15  it.  This is his own notes.

16          MR. ROBINSON:  Oh, okay.

17          MR. BRYAN:  If he wants to share

18  it, it is fine with me.

19          MS. TULLY:  Okay.

20          MR. BRYAN:  I think it is to

21  refresh his own recollection.  I don't have

22  any objection to you seeing it or copying it.

23      Q.  Let me just ask -- so that we don't

24  have to go through this page by page.  This

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA596

1   entire file that you have in front of you

2   today, are these your notes and your photos

3   and things that you have?  Or are these

4   things that you have gotten from your

5   attorney?

6           MR. BRYAN:  I can answer that.

7   That is not -- that's not from me.  That's

8   his own stuff so that he can most accurately

9   answer questions.

10          MS. TULLY:  All right.

11      Q.  Do you mind if I take a look

12  through there?

13      A.  Absolutely.

14      Q.  For the record, your absolutely was

15  absolutely --

16      A.  Yes, ma'am.

17      Q.  -- I do not mind?

18      A.  Yes, ma'am.  And the rest of those

19  behind that was everything that was typed up.

20      Q.  Okay.  So there's some stapled

21  documents here that are just -- they are

22  pleadings within this lawsuit?

23      A.  Yes, ma'am.  That should be stuff

24  that you all received.

Page 26

1          Q.   Okay.

2          A.   The only thing -- probably from

3     that picture up.

4          Q.   All right.  So we have two pages

5     here that looks like notes regarding a

6     property list.  A timeline for picking up

7     property.  And then this is a picture of your

8     ex-wife, I am assuming?

9          A.   That is a picture of Judge Goldston

10    inside of my house holding Exhibit 1, the

11    altered property form.

12         Q.   Okay.

13         A.   That one -- that is not the

14    original.

15         Q.   Who took this picture?

16         A.   That's off your evidence from

17    Mr. McPeake -- Mr. McPeake's evidence.

18         Q.   Okay.  So that's off --

19         A.   The video.

20         Q.   -- of the video?

21         A.   Yes, ma'am.

22              MS. TULLY:  Why don't we just go

23    ahead and make copies of all --

24         Q.   Okay.  Do you have any objection to

Page 27

1  us having a copy of all of this?

2       A.  No, ma'am.

3       Q.  Okay.  I think that's easier than

4  us piecemealing here.

5            (A discussion was held off the

6  record.)

7  BY MS. TULLY:

8       Q.  Now, I don't want to continue

9  belaboring the point with these property

10 lists.  What I want to get to is -- Exhibit 2

11 is dated September 19, 2020, by the clerk's

12 timestamp?

13      A.  Yes, ma'am.

14      Q.  All right.  Then it looks like

15 Exhibit 1 by the clerk's timestamp is dated

16 March 4, 2020?

17      A.  Yes, ma'am.

18      Q.  So it appeared that on March 4th,

19 there was a contempt hearing; is that

20 correct?

21      A.  Yes, ma'am.

22      Q.  All right.  It would appear to me

23 that this Exhibit 1 was entered at that

24 point?

1       A.  Yes, ma'am.  It was introduced

2  December 4, 2019.

3       Q.  Okay.

4       A.  But it wasn't entered in until

5  March 4th.

6       Q.  All right.  Well, let's talk about

7  this Exhibit 2 dated with the timestamp of

8  September 19, 2018.

9       A.  Okay.

10      Q.  Did you provide to your ex-wife the

11  property off of this property distribution

12  list --

13      A.  No, ma'am.

14      Q.  -- that she had been awarded?

15      A.  No, ma'am.

16      Q.  Why not?

17      A.  I didn't know I had to.  I had an

18  attorney.  He guided me on what to do and

19  what not to.  So that's my answer.  I didn't

20  know that I had to.

21      Q.  You didn't know you had to give her

22  the property that she was awarded through the

23  divorce hearing?

24      A.  At that point, ma'am, I didn't know

1    how many more hearings -- we already had

2    four.  Her personal property was picked up on

3    March of 2018.

4           Q.  And you are looking at this --

5           A.  Timeline for picking up property.

6           Q.  -- time for picking up property?

7           A.  So her personal property was picked

8    up March of 2018.  I let her go through the

9    house and get whatever she wanted.

10          Q.  Okay.

11          A.  She was well over an hour there.

12   So as far as the distribution of property, I

13   would have done exactly what my attorney

14   asked me to do.

15          Q.  Okay.  Now, I understand that at

16   some point -- and I believe maybe it was

17   November of '18 -- she was supposed to come

18   and pick up some property from your home?

19          A.  Yes, ma'am.

20          Q.  And that was property that was on

21   this Exhibit 2 property list, is that --

22          A.  It is going to closely match that.

23   But I also -- to what the -- to what the

24   order, like the photos -- Judge Goldston

Page 30

1    ordered me to copy photos.  And to what the

2    attorneys agreed to before -- this property

3    form, it was supposed to be corrected.  So I

4    went by exactly -- I didn't give her my guns

5    as you can see in -- on Joint Exhibit 1,

6    which is your Exhibit 2.

7         Q.  Uh-huh.

8         A.  I didn't give her my guns because I

9    paid her a thousand dollars for the guns.  It

10   is going to be under workout room --

11        Q.  Okay.

12        A.  -- third page.  It is circled for

13   hers.  No, it's circled for me.  Sorry.  But

14   it is -- again, it never should have been on

15   the property form.

16        Q.  Gun safe, $250, was circled for

17   you?

18        A.  Yes.

19        Q.  Guns -- two AR-15's, three pistols

20   and ammo, $3,000 -- that was not circled?

21        A.  Right.

22        Q.  But you paid her the $3,000 for

23   that?

24        A.  I paid her a thousand dollars for

1  that.

2      Q.  Okay.  A thousand dollars?

3      A.  Yes, ma'am.

4      Q.  And was that a price that you all

5  came to an agreement on?

6      A.  Yes, ma'am.

7      Q.  Okay.

8      A.  And that happened during the

9  property exchange that we are -- you know,

10  between Mr. Lusk and Mr. Johnson and me and

11  my ex-wife.

12      Q.  Okay.

13      A.  That should have been took off.  It

14  looks here that she would have had that.  But

15  it is not so.

16      Q.  Okay.  How about under master

17  bedroom, this TV, $100?

18      A.  Yes, ma'am.

19      Q.  Did you pay her for that TV?  Or

20  did you give her that --

21      A.  That's hers.  The TV is not

22  circled.  So that's hers.

23      Q.  Okay.  So that is circled.  Did she

24  have to give you money for that?

1          A.  No, ma'am.

2          Q.  All right.  So some of these that

3    have dollar amounts, it wasn't because

4    somebody was paying for them, it was just the

5    general value that you all assigned?

6          A.  It was a value that whoever came up

7    with this property form - Mr. Lusk or Ms.

8    Gibson - put down.

9          Q.  Okay.  All right.  So she got her

10   initial personal property in March of 2018?

11         A.  Yes, ma'am.

12         Q.  Is that like her clothes?

13         A.  It was clothes and whatever that

14   was hers.  She had forgot some items after

15   that and texted me, and I give them to her;

16   Social Security card, birth certificate, high

17   school graduation, her softball glove.  So

18   March, she come and picked up all of her

19   clothes and whatever else.  It was -- her and

20   her dad were there.

21         Q.  Okay.

22         A.  So I let them in.  I sat on the

23   couch.  And they picked it up.

24         Q.  Okay.  And then sometime

Page 33

1    thereafter, you all went through and divided

2    up the remaining property?

3         A.  Yes, ma'am.

4         Q.  And then in November of 2018,

5    that's when she was to pick the remaining

6    property up?

7         A.  Yes, ma'am.

8         Q.  Did you allow her to come into your

9    home then?

10        A.  No, ma'am.

11        Q.  Why not?

12        A.  There had been a lot of allegations

13   throughout the divorce of abuse and so on.

14   And the one thing I have learned is, I am not

15   going to allow you -- I am not going to put

16   myself in this situation to get a DVP put on

17   myself.  Her dad was threatening, so I just

18   -- it was just best -- as my recording

19   showed, it was not raining when I set it out.

20   My whole goal was to keep it right there

21   together so they can just get it at the edge

22   of my property and they could leave.

23        Q.  And you recorded that?

24        A.  Yes, ma'am.

Page 34

1      Q.  Okay.  Have you provided that

2  recording to your attorney?

3              MR. ROBINSON:  We haven't seen

4  it.

5              MR. BRYAN:  I'm sorry.  Which

6  recording?

7              MS. TULLY:  The recording of him

8  putting the property out at the edge of his

9  property in November of 2018.

10             MR. BRYAN:  I don't recall.

11     A.  I can't recall.

12     Q.  Do you still have that recording?

13     A.  I can't recall.  I would have to

14  look at it.  I know the family court may have

15  it.

16     Q.  Okay.

17             MR. BRYAN:  Audio recording or

18  video?

19             THE WITNESS:  It is a video.

20             MR. BRYAN:  I don't think I have

21  seen it.

22     Q.  All right.  But it was raining by

23  the time she picked the property up; is that

24  correct?

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA606

Page 35

1          A.  No, ma'am.  No, ma'am.

2          Q.  It was not?

3          A.  No, ma'am.

4          Q.  Okay.

5          A.  On the record, Judge Clark, who was

6     over my case -- I submitted that video while

7     Judge Goldston was over my hearing.  So she

8     probably has it on the record.  It is on

9     record somewhere.  But Judge Clark said in

10    her own words -- I can't paraphrase her.  But

11    she said, it looks like mist or heavy dew.

12    And I took pictures of cardboard boxes that

13    remained dry.

14         Q.  All right.  Now, my understanding

15    is though what you put out in November of

16    2018 -- there still remained items in your

17    home that Ms. Gibson had been awarded?

18         A.  No, ma'am.  No, ma'am.

19         Q.  So you gave her everything?

20         A.  I give her everything that was

21    court ordered.

22         Q.  Okay.  Now, I understand there is a

23    disagreement between whether you were

24    supposed to provide her with pictures or

1  copies of pictures; is that correct?

2      A.  It is on the court record of Judge

3  Goldston.

4      Q.  Is that correct, there's a

5  disagreement?

6      A.  What was the question?  Can you

7  rephrase it?

8      Q.  As to whether or not you were to

9  provide her with the actual pictures hanging

10 on the walls or copies of those pictures.

11     A.  So you said is there a

12 disagreement?

13     Q.  Is there a dis- -- was there a

14 disagreement about that?  You did not provide

15 those pictures; is that correct?

16     A.  Yes, ma'am, I did not provide

17 those.

18     Q.  Okay.  It is your belief that you

19 were to provide copies of those pictures?

20     A.  Yes, ma'am.

21     Q.  Did you take any steps to make

22 copies of those pictures?

23     A.  I did provide copies.

24     Q.  And when was that?

Page 37

1          A.  I submitted them to her March 4th.

2          Q.  And when you say her, you

3    pointed --

4          A.  I'm sorry.  Judge Goldston.

5              And I also submitted them to Judge

6    Clark.  I got them copied at Staples.  And I

7    sent them via e-mail and over a thumb drive.

8    There's thousands of photos that I was

9    supposed to copy.  So I did both.  It is on

10   the thumb drive.  And the pictures on the

11   walls, I submitted via e-mail.

12         Q.  Okay.  All right.  So at some point

13   though there was a motion for contempt filed

14   against you with regard to the property

15   distribution; is that correct?

16         A.  Yes, ma'am.

17         Q.  All right.  And there was a hearing

18   regarding this motion on March 4, 2020?

19         A.  (Nods head.)

20         Q.  Yes?

21         A.  Yes, ma'am.  Sorry.

22         Q.  Okay.  Were you still represented

23   by your attorney at that point?

24         A.  No, ma'am.

Page 38

```
1         Q.  All right.  So you handled that
2    hearing pro se?
3         A.  Yes, ma'am.
4         Q.  Okay.
5         A.  Sorry.
6         Q.  And that hearing began in the
7    courtroom, correct?
8         A.  Yes, ma'am.
9         Q.  All right.  And at some point
10   during that hearing, the judge ordered you
11   all to appear at your house on Quiet Street?
12        A.  Yes, ma'am.
13        Q.  Okay.
14        A.  Quiet Oak, yes, ma'am.
15        Q.  Did you call anyone from the time
16   that you left the courthouse till the time
17   you arrived at your property?
18        A.  I can't recall, ma'am.  I can't
19   recall.
20        Q.  You don't know if you called an
21   attorney?
22        A.  No, ma'am.
23        Q.  All right.  I am going to show you
24   -- okay.  Hold on just a second.  All right.
```

Page 39

1    I am going to show you a video.

2              (Video played.)

3         Q.  Can you tell me who is taking this

4    video?

5         A.  My girlfriend, ma'am.

6         Q.  What's her name?

7         A.  Sharon Masual, M-A-S-U-A-L.

8              MR. BRYAN:  Are you going to mark

9    this as an exhibit?

10             MS. TULLY:  I plan to.

11        Q.  All right.  This video you say was

12   taken by your girlfriend, Sharon Masual?

13        A.  Yes, ma'am.

14        Q.  Does she live with you at your

15   home?

16        A.  No, ma'am.

17        Q.  Okay.  Why was she there that day?

18        A.  She was a witness that I was going

19   to call for that hearing.

20        Q.  So she was at the hearing initially

21   at the courthouse?

22        A.  Yes, ma'am.

23        Q.  And then she traveled with you to

24   your home?

```
                                              Page 40
 1         A.  Yes, ma'am.

 2         Q.  Does this video accurately reflect

 3    what occurred outside of your home on

 4    March 4, 2020?

 5         A.  As far as I can tell, yes, ma'am.

 6         Q.  And this is the same video taken by

 7    your girlfriend?  It has not been altered in

 8    any way to your knowledge?

 9         A.  I would have to go back and look --

10    listen to the words and everything to match

11    what I have.  But it seemed like it is right.

12         Q.  I believe I received this video

13    from your attorney.

14         A.  If you received it from him, it is

15    the right one, ma'am.

16         Q.  All right.  And then after this --

17    after everything was finished at your home,

18    then you all returned to Judge Goldston's

19    courtroom, correct?

20         A.  Yes, ma'am.

21         Q.  All right.  And concluded the

22    hearing?

23         A.  Concluded -- I guess continued on

24    to another date.  Does that sound right?
```

Page 41

```
1        Q.  Okay.

2        A.  So concluded, yes, I guess.

3        Q.  Okay.  Okay.  All right.  It is my

4   understanding from your discovery responses

5   that what occurred at your home on March 4,

6   2020, has caused you some emotional distress;

7   is that fair?

8        A.  That's fair, ma'am.

9        Q.  All right.  And can you explain to

10  me what kind of distress that caused you?

11       A.  You know, I have been in law

12  enforcement since 1996 in some form, some

13  fashion.  And I've always been taught when

14  you raise your right hand to the oath of the

15  constitution that you would abide by people's

16  rights.

17            Little did I ever know that this

18  could or should happen.  You know, some of

19  the guys that I have known in law

20  enforcement, it is just -- it just -- it is

21  wrong, ma'am.  That's all I can tell you.  I

22  can't even really put it in words.  It's just

23  wrong.

24       Q.  Have you sought any kind of
```

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA613

Page 42

1    counseling as a result of this?

2        A.  Yes, ma'am.

3        Q.  And when did you begin seeing a

4    counselor?

5        A.  To the best of my recollection,

6    around the middle of March.

7        Q.  Had you seen a counselor prior to

8    the middle of March of 2020?

9        A.  Not for the same issue.  But yes.

10       Q.  So you were currently seeing a

11   counselor; is that correct?

12       A.  No, I was not.

13       Q.  Okay.

14       A.  I hadn't seen a counselor -- sorry.

15       Q.  No.  Go ahead.

16       A.  I probably hadn't seen him, I don't

17   know, six, eight months, a year maybe.

18       Q.  Why did you initially start seeing

19   a counselor?

20       A.  Marriage counseling.

21       Q.  Was that something that you did

22   with your ex-wife?

23       A.  No, ma'am.  That is something I did

24   for myself.

Page 43

1          Q.  Okay.  You started doing that after

2    you-all had already separated?

3          A.  No, ma'am.  I did it before.

4          Q.  Okay.  Who was that counselor?

5          A.  His name was Jason Moore.

6          Q.  And who is he with?

7          A.  Life Strategies.

8          Q.  Is this the same counselor that you

9    went to after March 4, 2020?

10          A.  Yes, ma'am.

11          Q.  What caused you to go back to him?

12          A.  Just the -- you know, talking after

13    this incident?

14          Q.  Yes.

15          A.  Just the anxiety of not really

16    believing what just happened.  Again, I can't

17    hardly put it in words.  It just -- you know,

18    I got a judge who -- I didn't even get a

19    chance to defend myself.  This could have

20    been easily fixed if she let me defend and

21    explain my property form, here is the issues.

22    And, I mean, it would have been easy to

23    talk -- ma'am, you ordered me to do photos --

24    copy photos.  And I had to copy a thousand

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 44

1    other photos.  What's the difference between

2    those eight on the wall?  Do you know what

3    I mean?  So if I was able to present my

4    defense --

5              Any court that I have ever been

6    involved with, you are allowed some kind of

7    due process.  And it was just trampled on

8    that day.  That bothered me.  To say that I

9    have my faith in the justice system -- it

10   went down a notch, you know.

11        Q.  Okay.  How often -- do you still

12   see Mr. Moore?

13        A.  Yeah.  I am still under his care.

14        Q.  What are you seeing him for

15   currently?

16        A.  The same issue.

17        Q.  This same issue?

18        A.  Yes, ma'am.

19        Q.  So almost two years later, you are

20   still seeking counseling?

21        A.  Anytime that we do this, it

22   inflames it.  Anytime I get a deposition --

23   you know, I have been in family court since I

24   seen Judge Goldston.  Maybe seven times, I

1    have been back to court.  So this inflames

2    it.

3         Q.  How often do you see Mr. Moore?

4         A.  At one point, I was seeing him

5    weekly.  Then he went bi-weekly.  And so now

6    it is whenever I need --

7         Q.  Okay.

8         A.  -- I need to go back.  I have my

9    daughters' basketball schedule.  I've got two

10   of them playing, so ...

11        Q.  When is the last time that you saw

12   him?

13        A.  I can't recall.

14        Q.  Do you have a current appointment

15   set?

16        A.  No, ma'am.

17        Q.  In terms of -- has this had an

18   impact on your daily life?

19        A.  Like I said, it inflames it.  But

20   as far as daily life, no, I am able to go to

21   work and stuff.  But I will say it is -- you

22   know, sometimes I may take a day off for

23   stress, anytime that I have court or Kyle

24   files a case or -- my contempt hearing went

Page 46

1   on for a year, almost two years.

2          Q.  Uh-huh.

3          A.  So anytime there was a continuance

4   or so on, it just inflamed it.

5          Q.  What was the ultimate response of

6   your contempt hearing?

7          A.  As of last Tuesday, Judge Clark

8   said she is going to dismiss the case against

9   me.

10         Q.  Okay.  You keep telling me that it

11  inflames you.  I need to have a better

12  understanding of --

13         A.  I can't really put it in words,

14  ma'am.  It is a feeling of disbelief, maybe a

15  little bit of anger.  Sad that when I see a

16  Raleigh County Sheriff's Department -- you

17  know, I know a lot of them guys.  And a lot

18  of them -- you know, I see them driving down

19  the road.  Are they going to go search

20  somebody else's house illegally?  I mean, it

21  has been done for 20 years.  I can't believe

22  that my only crime was I went through a

23  divorce.  It was a nasty divorce evidently.

24  So, you know -- it is hard to put it in

Page 47

1   words, ma'am.

2        Q.  Okay.  If this matter goes to

3   trial, are you going to be able to find the

4   words to explain to the jury the impact this

5   has had on you?

6        A.  That's a good question, ma'am.

7        Q.  Well, because if you are going to

8   be able to find them then, I would like you

9   to try to find them today to explain to me.

10       A.  Sure.  It is hard to put my

11  emotions in words.  So I'm sorry that I don't

12  have the words for you.  But my emotions are

13  hard to explain.

14       Q.  Okay.  Other than Jason Moore, have

15  you ever sought any kind of medical treatment

16  as a result of this?

17       A.  No, ma'am.

18       Q.  Are you on any kind of medication?

19       A.  No, ma'am.

20       Q.  So you don't take any kind of

21  anxiety medication?

22       A.  No, ma'am.

23       Q.  Okay.  And you are able to continue

24  functioning and going to work?

Page 48

1        A.  Yes, ma'am.

2        Q.  You say you sometimes have to take

3   a day off.  Is that for hearings?

4        A.  Yes, ma'am.  It is for hearings.

5   Just prepping.  Anytime that I have a

6   hearing, it -- I had a hearing last week.  It

7   is like it is a mountain when you are pro se.

8   You are an attorney.

9        Q.  I am, yes.

10       A.  I am not.  I have to study tenfold.

11  You went to school.

12       Q.  So you're still representing

13  yourself in your divorce hearing?

14       A.  Well, I should be done now other

15  than child support cases.  So yes.

16       Q.  Okay.  Okay.  So then you take a

17  day off to prepare for your hearings and

18  attend the hearing?

19       A.  No.  Sometimes after, I take it off

20  for stress.  I have to decompress.

21       Q.  Okay.  But you don't interact

22  anymore with Judge Goldston?

23       A.  No, ma'am.

24       Q.  Okay.  And in fact you have not

1  since March 4, 2020; is that correct?

2      A.  Yes, ma'am.

3      Q.  Can you tell me who Doug Black is?

4      A.  He is a co-worker of mine, ma'am.

5      Q.  What would Mr. Black know about

6  this incident?

7      A.  He was there.  He was in the

8  driveway on the video.  He was one of the

9  guys that was standing in the driveway.

10      Q.  Okay.  Why was Mr. Black there?

11      A.  He was a witness to the property

12  exchange.  He helped me place the items at

13  the bottom of my driveway.

14      Q.  All right.  What were you going to

15  call Sharon -- how do you say your

16  girlfriend's last name?

17      A.  Masual.

18      Q.  Masual.  What were you going to

19  call her as a witness to testify to?

20      A.  She was there that night that we

21  exchanged property on November 30, 2018.  She

22  can testify what the weather was.  The

23  cardboard boxes were dry.  I took care of

24  what I could.

Page 50

1          Q.  Were you there when your ex-wife

2    Carrie Gibson showed up to actually pick up

3    the property?

4          A.  Yes, ma'am.

5          Q.  Was Ms. Masual there?

6          A.  Yes, ma'am.

7          Q.  How about Mr. Black?

8          A.  He'd done left by then, ma'am.

9          Q.  Have you discussed this incident

10   from March 4, 2020, with Ms. Masual?

11         A.  She was there.  She took the video.

12         Q.  I know.  But have you discussed it

13   since then?

14         A.  Oh, sure.

15         Q.  Okay.

16         A.  Yes, ma'am.

17         Q.  What have you-all discussed about

18   it?

19         A.  I mean, that's my girlfriend.  So

20   we have talked from A to Z probably on a

21   daily basis.

22         Q.  Okay.  Is this something that you

23   talk about daily?

24         A.  Probably.

Page 51

1      Q.  How about Mr. Black, have you

2  talked to him about the March 4, 2020

3  incident?

4      A.  I haven't in a while.

5      Q.  You did initially?

6      A.  Oh, yes, ma'am.

7      Q.  And what did you tell Mr. Black?

8      A.  I don't -- I can't recall.

9      Q.  Who is Tommy Carter?

10      A.  He is a co-worker of mine.

11      Q.  Is he a neighbor?

12      A.  He is a neighbor.

13      Q.  What would Mr. Carter know with

14  regard to the March 4, 2020 --

15      A.  I don't know what he would know.  I

16  don't know what he would know.

17      Q.  Okay.  Well, you have him listed as

18  somebody who would have information.

19      A.  So he was at the bottom of the

20  driveway -- not my driveway, the bottom of

21  the road -- whenever we were exchanging

22  property.  And the road was blocked.  So he

23  can verify what the weather was also that

24  night.

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 52

1          Q.  So that was from the November 2018

2   property exchange?

3          A.  Yes, ma'am.

4          Q.  Okay.  So he doesn't have any

5   information regarding anything that happened

6   on March 4th?

7          A.  He was in the driveway -- I'm

8   sorry.  I misunderstood your question.  He

9   was also in the driveway on March 4th, 2020.

10         Q.  Did he come up onto your property

11  to see what was going on?

12         A.  Mr. Black and Mr. Carter -- which I

13  don't know if you can see it on the video or

14  not.  When we get out of the truck, there's

15  two guys standing there.  That's them two at

16  the top of my driveway.

17         Q.  Okay.

18         A.  Along with Sharon Masual.

19         Q.  Did they stay the entire time?

20         A.  Yes, ma'am.  Until Bailiff Stump

21  made them leave -- or Deputy Stump.

22         Q.  And Brooklyn Gibson, that's your

23  daughter; is that correct?

24         A.  Yes, ma'am.

Page 53

1       Q.  Have you discussed this with

2  Brooklyn?

3       A.  Only what I had to because it was

4  on the news.  So if she gets questioned at

5  school -- when it hits the news, what

6  happened?

7       Q.  Okay.

8       A.  She wasn't there that day.

9       Q.  How did this get to the news

10  station?

11       A.  I can't answer that.

12       Q.  You have no idea?

13          MR. BRYAN:  If you know --

14          THE WITNESS:  Huh?

15          MR. BRYAN:  If you know, answer

16  the question.

17       Q.  I believe they have showed the

18  video on the news; is that correct?

19       A.  They have, right.

20       Q.  How did they obtain the video that

21  your girlfriend took?

22          THE WITNESS:  I believe I give it

23  to you, John, right?

24          LOUISE GOLDSTON:  You can't --

1   the judge in me.  I'm sorry.

2            MR. BRYAN:  Don't testify as to,

3   you know, our confidential communications.

4   But if you recall how the news ended up with

5   the video, then you can answer the question.

6   You don't have to say anything we've

7   discussed.

8            A.  So by that time, I done retained

9   Mr. Bryan.  And I am assuming Mr. Bryan

10  turned it over to the news station.

11           Q.  How quickly did you retain Mr.

12  Bryan?

13           A.  I'd say -- I can't recall.  But it

14  is middle of March maybe, first week of

15  March.  Somewhere in that line.

16           Q.  So within weeks?

17           A.  Yes, ma'am.

18           Q.  All right.  To have this shown on

19  the news and to have this video on YouTube

20  for anybody and everybody to see, has that

21  caused you any kind of anxiety or emotional

22  distress?

23           A.  Absolutely.

24           Q.  But that was something done by you

Page 55

1    and your attorney; is that correct?

2         A.  Yes.

3         Q.  Have you received comments or

4    anything with regard to --

5         A.  Yes, ma'am.

6         Q.  -- this video?

7              Who have you received comments

8    from?

9         A.  I don't know who.  There has been

10   positive and some negative.

11        Q.  Your co-workers said anything to

12   you?

13        A.  Sure.

14        Q.  What kinds of things have your

15   co-workers said?

16        A.  I can't recall.  But it's more off

17   the cuff like, I can't believe it.  Are you

18   kidding me, kind of stuff.  Stuff like that.

19              MS. TULLY:  All right.  Give me

20   just a couple of minutes, and I might be

21   finished.  Okay?

22              THE WITNESS:  Okay.

23              (Break in proceedings.)

24              MS. TULLY:  Mr. Gibson, I think

Page 56

1  that I am good.  I don't think I have any

2  further questions.  Mr. Robinson might have a

3  few.

4          MR. ROBINSON:  Yes.  I have some

5  questions.

6                  EXAMINATION

7  BY MR. ROBINSON:

8      Q.  My name is Mr. Robinson --

9  Mr. Robinson -- my name is Kevin Robinson.

10          (Laughter.)

11      Q.  I represent the deputy in this

12  case.  And I have some questions about the

13  lawsuit that you have filed.

14          Now, I might jump around a little

15  bit.  And I might ask some questions that

16  she asked.  And I understand I talk fast.

17  You can tell me to slow down, and I will try

18  to rephrase it for you.  But other than

19  that, I will get right into it.

20          I want to start out -- your family

21  court case -- your divorce case is in front

22  of what judge now?

23      A.  It was in front of -- I am assuming

24  it is still in front of Judge Lisa Clark,

Page 57

1   Mercer County.

2       Q.  Okay.  So it was transferred from

3   Judge Goldston to Judge Clark in Mercer

4   County?

5       A.  There was a slight stopping between

6   -- with Brad Dorsey out of Nicholas County.

7   But we never had any sworn testimony.  It was

8   more or less status conference hearings two

9   times.

10      Q.  Okay.  Let me make sure I got your

11  testimony correct.  Are you stating that all

12  of the items that you were supposed to turn

13  over to your ex-wife had already been turned

14  over before the contempt hearing?

15      A.  Before March 4, 2020, is that what

16  you're asking?

17      Q.  Is that the contempt hearing -- the

18  date of the contempt hearing, March 4th?

19      A.  Yes.

20      Q.  Are you stating that all of the

21  items that you were supposed to -- that you

22  had been ordered to turn over had already

23  been turned over to your ex-wife?

24      A.  All court items were turned over

1  before that date, yes, sir.

2        Q.  Okay.  I will have some questions

3  about that later, but -- okay.

4            This case was transferred to

5  another judge, correct?

6        A.  Yes, sir.

7        Q.  You said it was Dorsey.  But you

8  didn't have any hearings?

9        A.  No.

10        Q.  It was a status hearing?

11        A.  Status conference hearings.  But

12  there was no sworn testimony.  Nobody raised

13  their hand.

14        Q.  What were the status conference

15  hearings about?

16        A.  Evidence rules as far as I can

17  recall, stuff like that.

18        Q.  Evidence rules regarding what?

19        A.  On what we are going to submit --

20  or discovery -- shall we call it discovery on

21  rules?

22        Q.  Discovery on what?

23        A.  On the contempt hearing.

24        Q.  Okay.  Well, that's my question.

Page 59

1   You said you had already turned over

2   everything.  But there is still a contempt

3   hearing going on, correct?  Because I believe

4   you had not turned over all of the items; is

5   that correct?

6        A.  That was the belief.  But again,

7   when we -- the time I got in front of Judge

8   Lisa Clark, I was able to rectify those

9   items.  She did not allow me to testify on

10  the items that were seized from the house.

11  She didn't want any testimony on that.

12       Q.  What did she take testimony on?

13       A.  Basically the claim of if the items

14  were damaged or not.

15       Q.  Okay.  And how many times did you

16  go before Judge Clark?

17       A.  She had a status conference

18  hearing.  Then we had one -- we are talking

19  about just for contempt, right?

20       Q.  No.  All hearings you had in front

21  of Judge Clark.

22       A.  Child support too, and all of that?

23       Q.  Yes.

24       A.  I believe four would be the proper

Page 60

1    number.

2        Q.  Okay.  Four altogether?

3        A.  Yes.

4        Q.  So you had no hearing -- you didn't

5    have any hearing in front of Judge Clark

6    regarding any property that they claimed you

7    did not turn over?

8        A.  She would not allow if any -- any

9    property that was seized that day, she took

10   zero testimony.  I tried to object to it

11   and --

12       Q.  What do you mean you tried to

13   object to it?  Sorry for interrupting.  But

14   what do you mean you tried to object to it?

15       A.  I objected to it.

16       Q.  Oh, you mean you objected to the

17   property attempt from your home?  That's what

18   you're saying?

19       A.  Yes, sir.

20       Q.  You are saying Judge Clark would

21   not allow any testimony on that?

22       A.  She would not allow it.  She said

23   the proper authorities -- if I am misquoting

24   here -- have already -- or it's under

Page 61

1    investigation, so forth and so on.

2        Q.  Well, you were not ordered to turn

3    over any other property to your ex-wife after

4    the incident --

5        A.  No, sir.

6        Q.  -- that's the subject of this

7    matter?

8        A.  No, sir.

9        Q.  Okay.  And the only testimony that

10   was taken was regarding damaged property?

11       A.  (Nods head.)

12       Q.  Is that a yes or no?

13       A.  Yes, sir.

14       Q.  Sorry.

15           And you are saying you had video of

16   this damaged property?

17       A.  I have no video of no damaged

18   property.

19       Q.  Okay.  I might have misunderstood

20   your testimony earlier.  Did you say you took

21   video of you taking property out and putting

22   it at the end of --

23       A.  I have property of -- I have a

24   video of the property that I sat at the

Page 62

1  bottom of my driveway, yes.

2       Q.  What do you mean you have a video

3  of it?  You just have a video of the thing

4  that you took?  Or do you have a video of you

5  taking it and putting it out front?

6       A.  I have video -- we carried it down,

7  myself and Doug Black.  And I videoed the

8  condition, the weather, and everything that

9  was sat out.

10       Q.  Okay.  Did you play that video in

11  court?

12       A.  I did for Judge Lisa Clark, yes.

13       Q.  Did she take possession of that

14  video?

15       A.  Yes, sir.

16       Q.  Okay.

17       A.  If this will help you -- if you are

18  looking for it, I will help you with it.  It

19  was the September 2020 hearing.

20       Q.  Was Kyle Lusk there?

21       A.  Yes, sir.

22       Q.  Okay.  And it is your testimony

23  that it did not rain on her property?

24       A.  No, ma'am -- or no, sir.  Sorry.

Page 63

1          Q.   No, ma'am, that's fine.

2               (Laughter.)

3          Q.   Okay.  You say child support case.

4    Do you have a problem paying child support,

5    or is that just something that is part of the

6    divorce case?

7          A.   I don't pay child support, sir.

8          Q.   Are you supposed to pay child

9    support?

10         A.   No, sir.

11         Q.   Why is that?

12         A.   Because my wife pays me child

13   support.

14         Q.   Okay.  But you have custody of

15   Brooklyn?

16         A.   Yes, sir.

17         Q.   And she has custody of Sky?

18         A.   Yes, sir.

19         Q.   Okay.

20         A.   So I guess indirectly I do pay.

21   But it lowers her amount.

22         Q.   Okay.  Is Sharon Masual still your

23   girlfriend?

24         A.   As far as I know, yes, sir.

Page 64

1        Q.  As far as you know?

2        A.  Yes, sir.

3        Q.  Okay.  All right.  How long have

4   you two been together?

5        A.  This is tape-recorded?

6        Q.  Yeah.  We won't play it for her if

7   you don't know for sure.

8             (Laughter.)

9        Q.  We can redact that part.

10       A.  Yeah.  Four years, sir.

11       Q.  Four years.  And you two don't have

12  any children together?

13       A.  Thank God.  No, sir.

14       Q.  You might want to redact all of

15  this.

16            How old is she?

17       A.  Forty-five, sir.

18       Q.  You don't reside together?

19       A.  No, sir.

20       Q.  Where does she live?

21       A.  She lives on -- she lives in the

22  neighborhood.

23       Q.  Okay.

24       A.  She lives in the Oaks neighborhood.

Page 65

1        Q.  Does she have any children?

2        A.  Yes, sir.

3        Q.  How many children does she have?

4        A.  Two boys.

5        Q.  How old are they?

6        A.  Twelve and -- I'm sorry -- 13.  His

7   birthday just happened.  And 14.

8        Q.  What are their names?

9        A.  Jonas and Gabriel.  We call him

10  Gabe.  I can't spell it.

11       Q.  Masual?

12       A.  Yes, sir.

13       Q.  The property that is the subject of

14  this litigation -- the home is 113 Quiet Oak

15  Street?

16       A.  Quiet Oak Street, yes, sir.

17       Q.  And you and your wife bought this

18  property together?

19       A.  Yes, sir.

20       Q.  But only your name is on the title?

21       A.  Yes, sir.

22       Q.  Was her name ever on the title?

23       A.  It was before -- it was before I

24  was court ordered to remove her from the

Page 66

 1    title.

 2        Q.   Oh, okay.  Has anybody else ever

 3    been on the title of the house?

 4        A.   Just the bank.

 5        Q.   From looking at video, it has a

 6    yard -- it is a large yard, correct?

 7        A.   I wouldn't call it -- I mean, it

 8    might be a third of an acre.  When I am

 9    mowing it, it feels larger.  But keep going.

10        Q.   And how many stories in your home?

11        A.   I would call it a two-story.  Some

12    people think -- they call it tri-level maybe.

13        Q.   Why did you and Ms. Gibson get

14    divorced?

15        A.   Probably -- probably a good

16    question.

17        Q.   Any cheating going on?

18        A.   No.

19        Q.   Any physical abuse?

20        A.   No, sir.

21        Q.   You made reference to it earlier

22    that there may have been some accusation of

23    it.  Did she accuse you of that?

24        A.   I mean, no -- no verbal abuse, no.

Page 67

```
1   No adultery.  It was -- you know, anytime --
2        Q.  What about physical abuse?
3        A.  No.  No physical abuse, no.
4        Q.  Okay.  Because you also said
5   something about her father got upset about
6   something.  What did her father get upset
7   about?
8        A.  Anytime through a divorce, they are
9   going to get her back regardless.  So he
10  always wants to confront.  So I just really
11  stay out of the way.  At ball games, I will
12  sit to the furthest end of the gym from him.
13  I want zero trouble.
14       Q.  Confront you about what?
15       A.  Just whatever.  I mean, I don't
16  know what they are mad about.  I don't know.
17       Q.  What's her father's name?
18       A.  Paul Payne.
19       Q.  Payne?
20       A.  P-A-Y-N-E.
21       Q.  And he was there on the day of the
22  incident, correct?
23       A.  Yes, sir.  So was her brother, and
24  I believe it was her boyfriend.  There was --
```

Page 68

```
 1        Q.  What's her boyfriend's name?

 2        A.  Jeff.

 3        Q.  What's his last name?

 4        A.  Presley, I believe.

 5        Q.  Jeff Presley.  Do you know how long

 6   they have been together?

 7        A.  I don't.  It is more than a couple

 8   years, I would say.

 9        Q.  How long did you -- how long after

10   you got divorced from your wife did you start

11   dating your current girlfriend?

12        A.  After I got divorced?  I was dating

13   her throughout the proceedings.

14        Q.  Okay.  So you were with her

15   throughout the court proceedings?

16        A.  I think I started dating her in

17   June.  My final was in September.  So June of

18   '18 would sound right.  So it is almost

19   four years.

20        Q.  So you were dating her before you

21   were physically divorced; is that correct?

22        A.  Yes, sir.

23        Q.  You're currently employed with the

24   Federal Bureau of Prisons, correct?
```

Page 69

1         A.  Yes, sir.

2         Q.  Is that the one that is in like

3    Beaver?

4         A.  Yes, sir.

5         Q.  You say your job there is a

6    foreman?

7         A.  Yes, sir.

8         Q.  And you also -- I think you said

9    earlier you had been in law enforcement since

10   1996?

11        A.  Yes, sir.

12        Q.  Have you been at the Federal Bureau

13   of Prisons since 1996?

14        A.  2001, sir.

15        Q.  2001.  Okay.

16             And what type of law enforcement

17   job did you have before 2001?

18        A.  I was an Air Force police officer.

19        Q.  Okay.  My dad was in the Air Force

20   too.

21        A.  Good man.

22        Q.  What was your first job at the

23   Federal Bureau of Prisons?

24        A.  I was a corrections officer, sir.

Page 70

1          Q.  So you do have correction officer's

2     training then, correct?

3          A.  You know, it probably doesn't

4     matter to you guys.  But everybody in the

5     Federal Bureau of Prisons is considered a

6     corrections officer first.  We don't have --

7     when something kicks off, everybody responds.

8     Everybody is supposed to know what to do,

9     whether it be a secretary, a foreman, a

10    facilities guy, a food dude.  Everybody is

11    supposed to know.  That way you ain't got

12    half the people standing around looking

13    around.

14         Q.  What do you mean when something

15    kicks off?

16         A.  When there is a disturbance or a

17    fight or any major incident -- sorry.  I am

18    talking prison to you.

19         Q.  No.  Well, my dad retired from

20    there -- not from federal, but from the

21    state.  So I know a little bit about all of

22    this.

23         A.  So the state, the difference is --

24    there is custody and non-custody.  And

1   non-custody stands there and watches while

2   things go down.  You may be outmanned.  And

3   they basically don't help.

4        Q.  Okay.  So do you have any training

5   to be a corrections officer?

6        A.  Every year we take it, sir.

7        Q.  Okay.  That's everybody in the

8   Federal Bureau of Prisons?

9        A.  Yes, sir.

10       Q.  Okay.  So they give you training on

11  following orders, correct?

12       A.  Yes, sir.

13       Q.  Following judicial orders?

14       A.  (Nods head.)

15       Q.  Yes?

16       A.  I mean, judicial orders, I can't

17  say that they train us in that.  So the

18  answer is no, I don't have any specific

19  training on that.

20       Q.  Well, I would guess you were

21  intake, and you said out-take?

22       A.  I was receiving a discharge.

23       Q.  Okay.  I would assume you would get

24  an order from the federal court releasing

Page 72

1    somebody, correct?

2         A.  You know what, yes, sir.  Okay.

3    Yeah.  Sorry.  I misinterpreted the question.

4         Q.  That's all right.  So they send you

5    an order to release somebody, you can't say,

6    no, I am not going to release them?

7         A.  No.  You'd better do it.

8         Q.  Okay.  You served in the Air Force,

9    correct?

10        A.  Yes, sir.

11        Q.  How long?

12        A.  About a year of active duty.

13        Q.  Where were you stationed?

14        A.  Seymour Johnson Air Force Base.

15        Q.  Where is that located?

16        A.  Goldsboro, North Carolina.

17        Q.  Where did you do your training?

18        A.  Lackland Air Force Base.  And then

19   Camp Bullis, which is the Army there

20   connected to Lackland.

21        Q.  Did you receive an honorable

22   discharge or a dishonorable discharge?

23        A.  Honorable.

24        Q.  Okay.  And when was that?

1        A.  19 -- June of '96 through March of

2   1997 was my active duty time.

3        Q.  You weren't in there very long

4   then, were you?

5        A.  No.  I got out under a humanitarian

6   discharge, which is honorable.  My dad got

7   sick, and I had to take care of him.

8        Q.  All right.  Ever been convicted of

9   a crime?

10       A.  Oh, yeah.

11       Q.  You have?  Yeah?

12       A.  No.  I didn't hear you.  What was

13  your question?

14       Q.  Have you ever been convicted of a

15  crime?

16       A.  No, sir.

17       Q.  Okay.  You just had a failure to

18  yield in 1999?

19       A.  Yes, sir.

20       Q.  And speeding and illegal window

21  tint, correct?

22       A.  Yes, sir.

23           Sheww.  Sorry.

24       Q.  Have you ever been charged with a

1  crime?

2      A.  You know, I had a reckless driving

3  before I went in the Air Force.

4      Q.  Oh, okay.

5      A.  But it was dropped.  So 1995-ish.

6  But it was dropped.

7      Q.  Was that for driving too fast or

8  drunk driving?

9      A.  No.  I don't even drink.  I am

10  assuming it was driving too fast.

11      Q.  You are assuming it was driving too

12  fast?

13      A.  Yes, sir.

14      Q.  You don't know why he pulled you

15  over for reckless driving?

16      A.  1995, on prom night, a buddy of

17  mine was going like this through Crab

18  Orchard.

19      Q.  You and your buddy were racing?

20      A.  No, sir.

21      Q.  It was on prom night?

22      A.  Yes, sir.

23      Q.  Okay.  Got somebody in the car with

24  you at the time?

Page 75

1        A.  Yes, sir.

2        Q.  I am assuming it was your prom

3    date?

4        A.  Yes, sir.

5        Q.  Okay.  Ever sued anybody else

6    before?

7        A.  No, sir.

8        Q.  Okay.  Have you ever filed for

9    Social Security disability?

10       A.  No, sir.

11       Q.  Not taking any medications right

12   now?

13       A.  No, sir.

14       Q.  All right.  Never been on Medicaid

15   or anything like that?

16       A.  Medicaid?

17       Q.  Yeah.

18       A.  No, sir.

19       Q.  Or Medicare?

20       A.  No, sir.

21       Q.  You might have answered this

22   before.  Who initiated the divorce between

23   you and your wife?

24       A.  The wife, sir.

1        Q.  I think it was filed around 2017?

2        A.  Yes, sir.

3        Q.  And you hired Brandon Johnson?

4        A.  Yes, sir.

5        Q.  Okay.  Was he referred to you, or

6   was he somebody you picked out of the phone

7   book?

8        A.  No.  He was referred to me.

9        Q.  Okay.  And your wife has always had

10  Kyle Lusk?

11       A.  As far as I know, sir.

12       Q.  When did she move out of the

13  113 Quiet Oak Street residence?

14       A.  I am assuming it was the date of

15  separation.  I think it was September 30,

16  2017.

17       Q.  She just decided to up and leave?

18  Or was she court ordered to leave?

19       A.  No.  She left, sir.

20       Q.  Okay.  Where did she go?

21       A.  I believe she lived with her mom.

22       Q.  Okay.  Are her parents married?

23       A.  Yes, sir.

24       Q.  Did she move out before or after

Page 77

1    the divorce petition was filed?

2        A.  Before, sir.

3        Q.  And then did she take anything from

4    the house when she moved out?

5        A.  Yes, sir.

6        Q.  What did she take?

7        A.  I can't recall.  She took some

8    personal property that day.  I let her have a

9    key up until the April 2018 hearing.  So she

10   was in and out of the house, you know,

11   several times.

12       Q.  Okay.

13       A.  And then the official come get your

14   stuff was March of 2018.

15       Q.  She was in and out of the house

16   several times in between then, you said?

17       A.  Yes, sir.  She pulled some stuff

18   off of the computer, I do recall that.

19       Q.  What do you mean she pulled some

20   stuff off of the computer?

21       A.  She had some forms or something.

22       Q.  Was she ever there when you weren't

23   there?

24       A.  Yes, sir.

1          Q.  There are a lot of docs I had to go

2    through over here.  You said there was a time

3    when she officially came and got a bunch of

4    stuff?

5          A.  Right.  After the January hearing,

6    I do believe that -- I think it was brought

7    up that she should be allowed to go back to

8    the house and collect her items.  So we set a

9    date, which was March -- March of 2018.  Her

10   and her father come and retrieved those

11   items.

12         Q.  What items were those?

13         A.  Her personal property.

14         Q.  All of the ones that is on this

15   property list?

16         A.  No, sir.  That was the marital

17   items right there.  That was what was

18   divided.  Her personal items, she picked up

19   prior.

20         Q.  I don't do a whole lot of family

21   law stuff.  So that's why I'm trying to

22   figure out all of this stuff.

23         A.  I can tell you what I seen.  She

24   carried her clothes out.  She took a computer

Page 79

1    screen because she works from home --

2    computer screen.  Clothing.  She ran through

3    all of the closets, all of the doors and all

4    of that to get whatever she needed.

5        Q.  You were there when all of this

6    took place?

7        A.  Yes, sir.

8        Q.  Okay.  So when she moves out, she

9    takes her personal property; is that correct?

10       A.  Yes, sir.

11       Q.  Was anybody with her when she moved

12   out and taking her personal property?

13       A.  No.  She just -- she moved out at

14   that point with several suitcases.

15       Q.  Did she have a car, a vehicle?

16       A.  Yes, sir.

17       Q.  What kind of vehicle did she have?

18       A.  She had a Yukon Denali 2015 at that

19   time.

20       Q.  You can't recall what all she took

21   out of there at that time?

22       A.  I didn't inventory it.  She had

23   several suitcases, maybe a trash bag or so.

24   A handful of stuff.

Page 80

1      Q.  Okay.  And then I guess the next

2  time she picks up -- I guess -- are there

3  other times -- strike that.

4           She moves out of the home.  And

5  when was that?

6      A.  September 30th of 2017.

7      Q.  Okay.  When was the stuff laid out

8  at the bottom of your driveway?

9      A.  November 30 of 2018.

10     Q.  Did she come into your home at any

11  point in time to remove things?

12     A.  Yes, sir.

13     Q.  Do you know what she removed out of

14  the home?

15     A.  Yes, sir.  She come back for the

16  March of 2018 property pickup with her dad.

17  So that's a few months later.

18     Q.  Okay.

19     A.  She picked up the rest of her

20  clothing and items -- her personal items.

21     Q.  Did she say, hey, I am coming back

22  for other stuff at that time?

23     A.  After March, there was a text

24  message or two, hey, I've forgotten my birth

Page 81

1  certificate and softball glove, will you

2  bring it to me?  I said, sure.

3       Q.  And you brought it to her?

4       A.  Yes, sir.

5       Q.  Okay.  My question is, why was her

6  stuff put out at the bottom of the driveway?

7  Why can't you just sit there and wait for her

8  to come pick it up?

9       A.  At that point, the -- you know,

10  family court in my opinion allows a lot of

11  dissension that doesn't need to be when you

12  start making claims of abuse and this and

13  that.  And people's -- you know, when you go

14  through a divorce, in my opinion, it is

15  highly contentious.  And it can be, or it

16  shouldn't be.  At that point, I didn't feel

17  it would be smart to let her in my house.

18       Q.  Did she make a claim of abuse

19  against you in open court in front of Judge

20  Goldston?

21       A.  Yes.  Her attorney did.

22       Q.  Her attorney did.  What did Judge

23  Goldston do?

24       A.  Nothing.

1          Q.  Do you recall what hearing this

2     was?

3          A.  I don't.  January.  It might have

4     been April.  I don't know.  Matter of fact,

5     Kyle Lusk just did the same thing in Judge

6     Lisa Clark's courtroom in September -- or I'm

7     sorry -- last week.

8          Q.  Claim of physical abuse or what?

9          A.  No.  No.  Verbal.

10         Q.  Oh, just verbal abuse?

11         A.  Uh-huh.

12         Q.  Oh, okay.  So the abuse you said

13    that she alleged in front of Judge Goldston

14    was just verbal abuse?

15         A.  Verbal.

16         Q.  What kind of verbal abuse is it?

17         A.  I don't know.

18         Q.  Well, I mean --

19         A.  At this point --

20         Q.  What did she allege?

21         A.  It never was elaborated.  Just, you

22    know, he -- I think Kyle Lusk said he was

23    verbally abusive, a controlling man,

24    da-da-da.

Page 83

1                    MR. ROBINSON:  Do ya'll know if

2    we have any transcripts or not?

3                    MS. TULLY:  Family court cases

4    are sealed.

5                    MR. ROBINSON:  I am saying do we

6    have them?

7                    MS. TULLY:  No.  Because --

8         A.  Just on an aside here, as Judge

9    Lisa Clark said, the ship has sailed.  I just

10   hope to get on it and buy a ticket.

11        Q.  Okay.  So she's claiming there were

12   allegations of verbal abuse is the reason you

13   set all of her stuff out and into the

14   driveway?

15        A.  I mean, I live on the top of a

16   hill.  And you can't sit it at the top of the

17   driveway.

18        Q.  Why can't you?

19        A.  Because it would roll.  It is very

20   steep.

21        Q.  What would roll?

22        A.  There was stuff that was on a

23   trailer.  And again, I didn't want them in my

24   garage.  This is something that was talked

Page 84

1   about during the property exchange between

2   Mr. Lusk and Mr. Johnson and me and my

3   ex-wife.

4           My tree stand is still on their

5   property.  And they wouldn't give it to me.

6   So there was no way I was going to let them

7   in my garage.  If they are going to take my

8   tree stand, I am not going to let them in my

9   garage.  And I put it down at the bottom of

10  the driveway for the least amount of

11  resistance.  I didn't want no issues.

12          Q.  Okay.  Clarify something.  Who got

13  your tree stand?  You said your ex-wife had

14  your tree stand?

15          A.  Ex-wife's dad and brother.

16          Q.  So they came in there and took it

17  one day?

18          A.  No.  He was on our hunting lease.

19  And when I asked for them to get it back,

20  they wouldn't give it back.

21          Q.  Okay.  I might be a little confused

22  here.  You said it is on some hunting

23  property?

24          A.  Hunting lease, yes, sir.

1        Q.  Oh, okay.  All right.  Where is the
2    hunting property located?

3        A.  It's in Dawson, West Virginia.

4        Q.  I don't know where that is.

5        A.  Towards Lewisburg.  It is the exit
6    to the right.

7        Q.  And you claim that their tree stand
8    is on --

9        A.  My tree stand --

10       Q.  -- is on --

11       A.  -- is on a hunting lease.  And I
12   asked to go retrieve it.  And they said no.
13   So it just wasn't worth the argument.  It's
14   not worth the couple hundred dollars.

15       Q.  Did you bring that in front of
16   Judge Goldston?

17       A.  No.

18       Q.  Okay.

19       A.  At some point, I am not going to
20   argue over everything.

21              (A discussion was held off the
22   record.)

23   BY MR. ROBINSON:

24       Q.  I think we were talking about a

Page 86

1    tree stand on some hunting property, correct?

2         A.  Yes, sir.

3         Q.  I think you said there was some

4    property that was on a trailer.  And that's

5    the reason why you didn't want to put it at

6    the top, and then make it roll down I guess

7    the hill or something like that?

8         A.  Yes, sir.

9         Q.  How big is this trailer?

10        A.  It's a five-by-eight trailer.

11        Q.  Okay.

12        A.  It was big items -- I mean, I

13   carried them out of the house -- a couch, a

14   treadmill.

15        Q.  Did Doug Black help you carry it

16   out?

17        A.  Yes, sir.

18        Q.  And it was a couch, a treadmill?

19        A.  A few other odds and ends.

20        Q.  Okay.  And when was this done?

21   What time of the year?

22        A.  November -- we placed it on the

23   trailer in November of 2018.

24        Q.  It probably would have been cold

1    around that time, correct?

2         A.  It was the fall weather.

3         Q.  Did you put it out in the morning

4    or at night?

5         A.  Her property?

6         Q.  Yes.

7         A.  It was about 30 minutes before they

8    picked it up.

9         Q.  Okay.  So you say it probably was

10   only sitting there for 30 minutes before she

11   came and picked it up?

12        A.  No more than an hour.  Thirty

13   minutes to an hour.

14        Q.  Okay.  And you said it had not

15   rained, correct?

16        A.  No, sir.

17        Q.  But you --

18        A.  The day of.

19        Q.  The day of?  It had rained the day

20   of?

21        A.  Right.  So when I got home, it

22   wasn't raining.  So I made the decision just

23   to keep peace, to put it at the bottom.

24        Q.  Now, was it wet outside?

Page 88

1      A.  The ground was wet, yes.

2      Q.  You set the couch on the wet

3  ground?

4      A.  No, no, no.  Couch was on the

5  trailer.

6      Q.  Was the trailer wet?

7      A.  No.  Trailer was stored in the

8  garage.

9      Q.  Okay.  And you say she came and

10  picked it up 30 minutes later?

11      A.  Yes, sir.

12      Q.  But did you say that Judge Clark

13  believed that it came from like mist or dew?

14      A.  Her exact words were, it looks like

15  mist or heavy dew.

16      Q.  Okay.

17      A.  Again, my video will show that the

18  boxes were dry.

19      Q.  But you don't have that video

20  anymore?

21      A.  I would have to see it.  It is on

22  court record.  I turned it in to Judge Clark.

23      Q.  Judge Clark?

24      A.  It should be September 20th, I

Page 89

1  think.

2        Q.  September 20.  We will try to get

3  it.  But if everything is sealed ...

4           All right.  So you believe that

5  when you put all of her stuff out front of

6  your residence for her to pick up, that was

7  all of the items that she was ordered --

8  that you were ordered to turn over, correct?

9        A.  Yes, sir.

10        Q.  Therefore, after that, you didn't

11  have to turn over any other items?

12        A.  No, sir.

13        Q.  Was Brandon Johnson still your

14  attorney at the time?

15        A.  I am going to correct this.  When I

16  went back to the hearing, Judge Goldston

17  ordered me to turn over one more picture.

18        Q.  Okay.

19        A.  But yes, after March 4th, I was not

20  ordered by anybody else to turn anything else

21  over.

22        Q.  Okay.  But Kyle Lusk at some point

23  filed a contempt charge against you, correct,

24  alleging that you didn't -- had not turned

Page 90

1    over everything; is that correct?

2         A.   That was the hearing -- that was

3    the -- it started off December 4th, 2019.

4    And then it carried over to March 4th, the

5    day of the incident.

6         Q.   What happened at the December 4th

7    hearing?  What happened at that hearing?

8         A.   Mr. Lusk was ordered to turn over

9    discovery by a certain time, and he didn't.

10   And so Judge Goldston, I do believe, give me

11   a continuance until March 4th.

12        Q.   What was Kyle Lusk required to turn

13   over?

14        A.   Their video, their witness list,

15   some other documents I can't recall.

16        Q.   Okay.

17        A.   But the main thing was a witness

18   list and video so I could actually review it

19   and look at it.

20        Q.   And then you say Judge Goldston

21   continued that hearing, correct --

22        A.   Yes, sir.

23        Q.   -- in order for Kyle Lusk to give

24   you those items?

Page 91

1          A.  Yes, sir.

2          Q.  Okay.  The next hearing is the

3    contempt hearing?

4          A.  March 4, 2020.

5          Q.  Okay.  Did you have -- were you

6    still being represented by Brandon Johnson at

7    that time?

8          A.  No, sir.

9          Q.  Did you have any discussions with

10   Kyle Lusk in between that December hearing

11   and the March hearing regarding property that

12   had not been turned over?

13         A.  He called the house on March 3rd of

14   2020 to the message -- again, I am -- I am

15   going to paraphrase.  He offered me a

16   settlement of $5,000.  He said he'd talk to

17   the courts.  He later said he didn't.  Saying

18   that $5,000, he would let me out of the case

19   basically.  Again, I am paraphrasing.  I

20   don't have the --

21         Q.  Okay.  He said -- I'm assuming at

22   some point he had to say, hey, you have not

23   turned over all of these items.  Did he ever

24   tell you that?

Page 92

1        A.  I'm assuming he said -- I don't

2   know what he said.  I cannot recall.  I mean,

3   we had hearings.  So he might have said it in

4   the December 4th hearing.

5        Q.  Okay.  But my question is -- I

6   mean, somebody at some point had to say, hey,

7   you haven't turned over all of these items,

8   you need to turn them over.  My question is,

9   did you say to somebody, I don't know what

10  you're talking about, I thought we turned

11  over everything?

12       A.  I tried saying it March 4th, but I

13  was never able --

14       Q.  March 4th was the contempt hearing,

15  correct?  Okay.  Talking about before that.

16       A.  Other than December 4th -- he did

17  the complaint at whatever date.  So up until

18  December 4th, I don't think I even spoke.  If

19  I did speak -- I don't remember December 4th.

20       Q.  How do you know there was a

21  contempt hearing on March 4th?

22       A.  Because Judge Goldston rescheduled

23  me on March 4th.

24       Q.  Do you know when she sent out this

1    notice of the hearing?

2         A.  No, sir.

3         Q.  Okay.

4         A.  She might have told me on the

5    December 4th hearing.

6         Q.  Okay.

7         A.  But there was a notice sent out

8    too -- they don't always do that.

9         Q.  They don't always send out notices

10   of hearings?

11        A.  Yeah.  They normally do.

12        Q.  Okay.  And you say your girlfriend

13   never lived at your house?

14        A.  No, sir.

15        Q.  Okay.  Hold on.  I'm going over

16   some of this stuff I think you've already

17   gone over.

18             At any time between December 4,

19   2019, and March 4, 2020, did you try to give

20   your wife back any other items?

21        A.  Could you repeat your question?

22        Q.  At any time between December 4,

23   2019 -- which is the -- I guess the hearing

24   where you requested Kyle to turn over

Page 94

1   discovery; is that correct?

2          A.  Yes, sir.

3          Q.  -- until March 4, 2020, when I

4   believe is the contempt hearing, did you try

5   to give your wife back any of her items?

6          A.  No, sir.  Because I give her all of

7   the court-ordered items, sir.

8          Q.  Okay.  I believe you said you gave

9   your wife copies of pictures.  What do you

10  mean by copies?  Do you mean like

11  photocopies?  Or are they actually --

12         A.  I was ordered -- during the April

13  of 2018 hearing that I had in front of Judge

14  Goldston, the debate came over pictures, on

15  how we were going to put them on.  So my

16  ex-wife said that she would supply me with

17  DVDs or a thumb drive.  So it was decided

18  then that I would do digital copies that she

19  could print, however she wanted, and we'd

20  split the cost if that would be the case.

21         Q.  Oh, okay.  That's what you did, was

22  digital copies?

23         A.  Digital copies.

24         Q.  Oh, okay.

Page 95

1        A.  So I took it to Staples and got it

2   professionally --

3        Q.  Oh, okay.  All right.

4            How did you tell her to come pick

5   her property up at the bottom of the

6   driveway?  Did you text her or call her?

7        A.  I texted her.

8        Q.  Do you still have a copy of that

9   text?

10       A.  I don't know.  I changed phones.  I

11  would have to look for it.

12       Q.  Who was your phone carrier at the

13  time?

14       A.  At the time was -- going to be

15  Sprint.  Yeah.  That's the one over beside

16  Food Lion, right?  Sprint?

17       Q.  I guess.

18       A.  Mobile, TG Mobile, Sprint.

19       Q.  Do you remember your phone number

20  at the time?

21       A.  Yeah.  The same as it is now.

22       Q.  What is it?

23       A.  304-673-2986.

24       Q.  And that wasn't some type of --

Page 96

1    they call them burner phones.  That wasn't

2    some type of like prepaid phone or anything

3    like that, was it?

4          A.  No, sir.

5          Q.  Were your kids at home when you

6    left the items at the bottom of the driveway?

7          A.  Yes, sir.

8          Q.  Both Brooklyn and Skyler?

9          A.  Yes, sir.

10          Q.  How old are they now?

11          A.  Skyler is 12, turns 13 in March.

12    Brooklyn turned 18 in December.

13          Q.  Okay.  I will direct your attention

14    to March 4, 2020.  That's the day of the

15    incident, the subject of this litigation.

16    How did you get to the courthouse that day?

17          A.  March 4th, I drove, sir.

18          Q.  Okay.  Was anybody riding with you?

19          A.  Sharon Masual.

20          Q.  Had she stayed the night with you

21    at your house?

22          A.  No, sir.

23          Q.  Did you go pick her up, or did she

24    walk down there?

Page 97

```
 1          A.  I think she drove to my house.

 2          Q.  Did you say she lives near you?

 3          A.  Yes, sir.

 4          Q.  Okay.  Did you bring any witnesses

 5   to the courthouse?

 6          A.  They drove in their own cars.

 7          Q.  Who were they?

 8          A.  Doug Black and Tommy Carter.

 9          Q.  I think you said -- did they both

10   work with you?

11          A.  Yeah.  Doug is retired.  Tommy

12   still works with me.

13          Q.  Okay.  What does Tommy do?

14          A.  Tommy is a case manager

15   coordinator.

16          Q.  Okay.  And is Doug Black still

17   around?

18          A.  He is retired.  He is somewhere.

19          Q.  In Raleigh County?

20          A.  I believe.  But he travels a lot.

21          Q.  Okay.  Doug Black, what is he going

22   to testify to?

23          A.  For the --

24          Q.  At the hearing.  At that March 4,
```

Page 98

1    2020 hearing, what would he have testified

2    to?

3         A.  He is going to say that -- or I

4    can't tell you what he is going to say.  But

5    he helped me carry the property down.  And

6    how the weather was when he left.  He left

7    about 30 minutes or an hour prior to.

8         Q.  He left 30 or an hour prior to

9    what?

10        A.  To the actual pickup.

11        Q.  Okay.  But you said that the stuff

12   was only out there for 30 minutes, correct?

13        A.  Yes, sir.  I said 30 minutes, no

14   more than an hour.  But yes, sir.

15        Q.  What was no more than an hour?  The

16   stuff laying out there --

17        A.  Yes, sir.

18        Q.  -- or the time he left?

19             So the stuff wasn't out there no

20   more than an hour?

21        A.  After we carried it down, he left.

22   So it is going to be between 30 minutes to an

23   hour window.

24        Q.  Okay.  What's Tommy Carter going to

1    testify to?

2         A.   He was trying -- he just lives a

3    few houses up from me.  So he was trying to

4    get through.  And they were still loading the

5    property in the middle of the road because it

6    is at the bottom.  So they had a U-Haul

7    parked in the road.  So he can testify what

8    the weather was at that point in time.

9         Q.   So what time of day would they have

10   picked it up?

11        A.   Evening time.  Don't quote me.  It

12   is dark.  So November.  5:00 p.m. to 6:00

13   p.m., say.

14        Q.   Okay.  When you got to the

15   courthouse that day -- family court is on the

16   second floor.  So when you arrived there, who

17   all was -- strike that.

18            When you arrived at the courthouse,

19   where did you go?  Did you go straight to

20   the courtroom or --

21        A.   No, sir.  There is an interview

22   room, I guess it is what it is called --

23   conference room or --

24        Q.   Right outside?

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

1          A.  Yes, sir.

2          Q.  When you went there, you went out

3    to that conference room, correct?

4          A.  Yes, sir.

5          Q.  Who all was there when you got

6    there?

7          A.  Inside the conference room?

8          Q.  Yes, sir.

9          A.  I am thinking me, Tommy, Doug and

10   Sharon all walked in at the same time.  But I

11   don't remember.

12         Q.  Okay.  Was your ex-wife there?

13         A.  I don't know.

14         Q.  Was her father there?

15         A.  I can't recall who was there.

16         Q.  Okay.  All right.  So you

17   eventually go into the courtroom, correct?

18         A.  Yes, sir.

19         Q.  Was your ex-wife waiting in the

20   courtroom?

21         A.  When they call us, they call us

22   together.  So when the bailiff -- Bailiff

23   McPeake at that time was the bailiff.  He

24   called us.  And we walked in.  The parties

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 101

1    walk in together.

2         Q.  Okay.  So when you are sitting out

3    there waiting to be called, you are not

4    sitting there with your ex-wife, correct?

5         A.  No.  You know, I try not to.

6    Again, she is in one waiting room.  I am in

7    the conference room.

8         Q.  Okay.  So when you go into the

9    courtroom, it is just you and your ex-wife?

10        A.  It is going to be me and the

11   ex-wife and the attorneys.

12        Q.  So it would have been you, your

13   ex-wife, Kyle Lusk, McPeake, who was the

14   deputy --

15        A.  Yes, sir.

16        Q.  -- and Judge Goldston, correct?

17        A.  And Brandon Johnson.

18        Q.  Is that the contempt hearing?

19        A.  Yes, sir.

20        Q.  Okay.

21        A.  No.  Don't -- shoot.  I'm sorry.

22   No.  Brandon wasn't there.  Sorry.  Just me.

23   You are right.  I'm sorry.

24        Q.  All right.  And all the witnesses

Page 102

1  are still sitting outside, correct?

2       A.  Yes, sir.

3            MR. BRYAN:  Kevin, can I take a

4  bathroom break?  I'm sorry.

5            (Break in proceedings.)

6  BY MR. ROBINSON:

7       Q.  When you got to this hearing, you

8  admitted you failed to follow through on

9  court-ordered counseling for one of your

10  children, correct?

11      A.  Say that again.

12      Q.  When you got to the hearing on

13  March 4th, you admitted during this hearing

14  that you failed to follow through on court-

15  ordered counseling for one of your children?

16      A.  No.  March 4th was the contempt

17  only.

18      Q.  But that wasn't brought up at any

19  time?

20      A.  I think -- they were contesting.

21  But at that time the counselor had already

22  released her.

23      Q.  Okay.  So if the transcripts say

24  you failed to follow through on that, that

Page 103

1  would be incorrect?

2      A.  I can't recall.  I do know that at

3  that time part of my evidence was she had

4  already been released.

5      Q.  All right.  So at no time during

6  this hearing, this March 4th, 2020 hearing

7  did you say to the court, hey, I have already

8  turned over all of this stuff, I don't know

9  what you all are talking about?

10     A.  You know, in words, I -- I believe

11  I tried to tell Judge Goldston.  And she

12  said, what does the order say?  And I was

13  just trying to explain to her that the photos

14  were ordered to be copied, which I did.  And

15  I never could -- I mean, I never could

16  present my defense or evidence.  I mean, I

17  tried.

18     Q.  I believe I saw where the court

19  went off record at 10:34 a.m.  I guess that's

20  when you all went to your house.  After the

21  court went off record at 10:34 a.m., what did

22  you do?

23     A.  I ran to the interview room, and I

24  told Doug Black, Sharon Masual and Tommy, I

1  said, hey, I think they are coming to my

2  house, we need to get back to my house.

3        Q.  What did they say?

4        A.  What?  You are kidding me.  I am

5  like, no.

6        Q.  That's it?  You all got --

7        A.  Got and go.  She give me 10 minutes

8  to get there.  And that's about how far it

9  is.

10       Q.  So you drove to -- from the

11 courthouse to your house in your vehicle.

12 And was Sharon Masual with you?

13       A.  Yes, sir.

14       Q.  And I guess Doug Black and Tommy

15 Carter went in separate vehicles?

16       A.  Yes, sir.

17       Q.  And did it take you ten minutes to

18 get to your house?

19       A.  I can't recall.

20       Q.  Do you recall what you and your

21 wife were talking about as you were driving

22 to your house?

23       A.  My girlfriend?

24       Q.  Oh, yeah, your girlfriend.

Page 105

```
1          A.  Oh, man.  Probably what should I
2    do, how this is going to go, what.  How do I
3    -- how do I stop, you know, them from coming
4    on my property?  Just random thoughts.
5          Q.  So you were thinking how to stop
6    them from coming onto your property during
7    that drive -- strike that.
8              You are driving, correct?
9          A.  Yes, sir.
10         Q.  How long were you in the interview
11   room before you went down to your house --
12   went down to your car to drive to your house?
13         A.  Less than a minute for sure.
14         Q.  All right.  So you drive to your
15   home at 113 Quiet Oak Street.  How long are
16   you there before any other witnesses arrive
17   at the house?
18         A.  As soon as we got out of the
19   driveway.  I mean, we basically almost had
20   the audio and video going.
21         Q.  Okay.
22         A.  So real close.  I don't know, maybe
23   a minute.
24         Q.  From looking at the video, it
```

Page 106

1   seemed like you were reading from something

2   on your phone, correct?

3          A.   Uh-huh.

4          Q.   Okay.  Where did you get that

5   information from?

6          A.   Talking to Sharon -- she is a real

7   smart lady.  But we were kind of discussing

8   how I was going to get her to recuse herself.

9   I learned that that is wrong.  It is called

10  disqualify.

11         Q.   Where did you learn that?

12         A.   You know, throughout the process, I

13  learned that it is not a motion -- Judge

14  Goldston actually told me it is not a motion

15  to recuse, it is a motion to disqualify.

16  And, you know, I just learned that.  I mean,

17  I --

18         Q.   You learned that all in the

19  10 minutes it took you to drive from the

20  courthouse to your home?

21         A.   Sure.

22         Q.   Did you look it up, or did your

23  girlfriend look it up?

24         A.   I mean, I can't.  I am driving.

Page 107

1          Q.  So your girlfriend looked it up?

2          A.  I am assuming.

3          Q.  Okay.  It wasn't her phone -- did

4    she just look it up on your phone?

5          A.  I can't recall how -- how it all

6    came together.  At this 10-minute ride, it is

7    -- my mind is spinning.

8          Q.  Were you reading off of your phone?

9          A.  I was.  Because we were trying to

10   get words together.  And she actually helped

11   -- got my phone and did a voice text.

12         Q.  Who did a voice text, your

13   girlfriend?

14         A.  My girlfriend.

15         Q.  Okay.  Did you get to your home

16   before Doug Black and Tommy Carter?

17         A.  I think they got there before I

18   did.  Because I -- yeah, I am parked behind

19   one of them.  So maybe behind Doug.

20         Q.  Why did they go to your house

21   instead of going home?

22         A.  Because I told them to.

23         Q.  Oh, you told them to go to your

24   house?

1    A.  They are my witnesses.

2    Q.  So you thought the hearing was

3  continuing too then, correct?

4    A.  No.  I knew it wasn't proper.  I

5  mean, that's why I asked her to recuse

6  herself.  I knew that I had never heard of a

7  judge searching a house, ever.

8    Q.  You get there.

9        MR. ROBINSON:  You know what, can

10  we fire that up again if there is no

11  objection from counsel?

12        MS. TULLY:  Sure.

13    Q.  Before we start the video -- you

14  are standing -- let the record reflect on the

15  video, the plaintiff is standing there in it

16  looks like a blue button-down shirt?

17    A.  That's me.

18    Q.  And khakis?

19    A.  That's me.

20    Q.  And had sunglasses on.  You have

21  something in -- is that your left hand?

22    A.  That's my phone, sir.

23    Q.  That's your phone.  And there is a

24  vehicle right in front of you, looked like a

Page 109

1    pickup truck.  Whose vehicle was that?

2         A.   It's either Tommy or Doug's.

3         Q.   And there is a --

4         A.   That's a Yukon Denali.

5         Q.   -- Yukon Denali behind it.  Whose

6    vehicle is that?

7         A.   That was my ex-wife's at the time.

8         Q.   Okay.  So she's already there --

9         A.   Yes.

10        Q.   -- at this point?

11        A.   Yes, sir.

12        Q.   Okay.  We will go ahead and press

13   play.

14             (Video played.)

15        Q.   Okay.  Stop.  Sorry.  Go back.

16        A.   Go ahead.  I got you.

17        Q.   Who was the guy in that royal blue?

18        A.   That's Tommy Carter.

19        Q.   Who was the guy that was next --

20        A.   No, no.  That's Doug Black.  Sorry.

21        Q.   That's Doug Black.  Who was this

22   person right here?

23        A.   That's Tommy Carter.

24        Q.   This video was actually -- this

Page 110

1   audio is actually really good to be taken on

2   a cell phone.  Did you have a microphone on?

3        A.  No, sir.

4        Q.  Okay.  So all of this audio is

5   coming from a -- is it your cell phone?

6        A.  She is running a cell phone.  I am

7   running an audio.

8        Q.  You are running audio off of your

9   phone?

10        A.  Yes, sir.

11        Q.  The same time you are reading off

12   of --

13        A.  Yeah.  You can do it at the same

14   time.  Different apps.

15             (Video played.)

16        Q.  And that looks like that is Kyle

17   Lusk walking.  Okay.  Hold on.  Go back.

18   Let's stop.

19             Did you just tell her to turn on

20   the audio?

21        A.  I wanted to make sure she had the

22   camera rolling.

23        Q.  Well, it sounded like you said,

24   make sure the audio is going.

Page 111

1        A.   There is no other audio footage.

2   If you are trying to get at that, the answer

3   is no.

4             MR. ROBINSON:  Play it back just

5   a little bit, please, just a little bit.

6             MS. TULLY:  Now, listen, you've

7   got a bad technical assistant here.  I'll do

8   what I can.

9             MR. ROBINSON:  That's okay.  I

10  couldn't do any better.

11            (Video played.)

12       A.   I might have told her I am turning

13  my audio on.

14       Q.   All right.  Keep going.

15            And coming up here, it looks like

16  the sheriff's deputy vehicle, SUV?

17       A.   And Judge Goldston.

18       Q.   Okay.  Is that your wife -- your

19  girlfriend talking?

20       A.   That's my girlfriend, sir.

21       Q.   Who was that walking over there by

22  that flag -- what's that, a gazebo?

23       A.   Yeah.  That's my ex-wife's dad.  He

24  decided he would go on the property whenever

Page 112

1   he wants.

2          Q.   Is that Kyle with the gray suit on?

3          A.   It is Kyle, him.

4          Q.   Okay.  Go ahead.

5               (Video played.)

6          Q.   Right there you're telling

7   everybody to get off of your property except

8   the judge and the deputy?

9          A.   I am at this point.  I didn't want

10  the whole posse to come with them.  I never

11  heard that a whole posse comes with you.  So,

12  for lack of better words, I didn't want other

13  people on my land.

14         Q.   Other than your witnesses?

15         A.   Right.

16         Q.   Okay.  Go ahead.

17              (Video played.)

18         Q.   She said you have a list of

19  everything.  But you said you never got a

20  list of anything?

21         A.   That's where -- the disagreement

22  between Exhibit 1 and Joint Exhibit 1.  I

23  turned over everything that was court

24  ordered.  And, you know, my understanding of

Page 113

1  how the search warrant works is, with a

2  search warrant, you've got to have what you

3  are coming for specifically.  So I needed to

4  know what she was coming for specifically,

5  not just coming to my house looking for

6  things.  Again, this is before I got to

7  provide my defense and exhibits and so forth

8  and so on.

9       Q.  But you had been provided a list of

10  items that they believed you had not turned

11  over, correct?

12       A.  That's what they believed, sir.

13       Q.  That's what they believed --

14       A.  Yes, sir.

15       Q.  -- that you had not turned over

16  items, correct?

17       A.  Yes.

18       Q.  Okay.  That's a fairly big yard.

19  Maybe because I grew up in the city.  I don't

20  know.

21       A.  Yeah.  It is really not that big.

22  It feels like it when you mow it though.

23       Q.  That's what I'm going to say, you

24  mow it.

Page 114

1        A.  The hill is a beast.

2        Q.  Yeah.

3             MR. ROBINSON:  That's enough.

4    All right.  Thanks.

5             MS. TULLY:  No problem.  I am

6    here to serve you, Kevin.

7        Q.  When you were driving from the

8    courthouse to your house, you didn't make any

9    stops along the way?

10       A.  No, sir.

11       Q.  I think I might have asked you this

12   before.  But you were not the first to get to

13   your house, correct?

14       A.  It don't look like it.  My truck is

15   parked behind somebody.  So it is either Doug

16   Black or Tommy.  I don't know which one.

17       Q.  All right.  When you were driving

18   from the courthouse to your house, did you

19   attempt to contact anyone?  Did you try to

20   call like anyone at all?

21       A.  Not that I can recall.

22       Q.  Okay.  Did you send any texts to

23   anyone?

24       A.  No.  I was driving.

Page 115

1          Q.  Okay.  It looks like from that

2     video -- you said that that was her father

3     that walked up to the gazebo.  Had he arrived

4     before you arrived?

5          A.  I can't recall.

6               (A discussion was held off the

7     record.)

8     BY MR. ROBINSON:

9          Q.  It looks like Kyle might have

10    already been there too.  Does that sound

11    right?

12         A.  It is possible.  I don't know how

13    he even got there.  He might have rode with

14    him.  I don't even know.  Again, it is a

15    blur, some of it is.

16         Q.  It looks like in your driveway that

17    there was a pickup truck in front of you.

18    You believe that was whose vehicle?

19         A.  It is either Tommy's or Doug's.

20         Q.  Was there a vehicle in front of

21    that?

22         A.  No.

23         Q.  Okay.  And then there was your

24    vehicle -- or was that your ex-wife's?

1          A.  It is going to be a vehicle, my

2    truck.  The ex-wife pulled up.  Maybe

3    somebody told her to move.  So by then -- you

4    are right, maybe it was Kyle or her dad had

5    told her to move so the judge could pull in

6    or something -- somebody said something.

7          Q.  That's my question.  Where was --

8    here, we can do that now.  Why don't you draw

9    -- you don't have to be artistic.  You don't

10   have to be -- what's his name -- Bob Ross?

11   What's that guy's name?  You don't have to

12   be -- why don't you draw a picture of your

13   house and your property.  And I want you to

14   mark where each vehicle was located if you

15   can remember.

16         A.  Man.

17         Q.  Can you remember?

18         A.  I am going to give you what I know.

19   How is that?

20         Q.  Okay.  All right.

21              MR. ROBINSON:  If there's no

22   objection from counsel?

23              MR. BRYAN:  No objection.  Every

24   case needs a good diagram off scale.

Page 117

1          (A discussion was held off the

2  record.)

3                (Witness draws diagram.)

4                MR. ROBINSON:  Back on the

5  record.  What I have here is a diagram that

6  the plaintiff has drawn.  He has drawn --

7       Q.  I believe this box up here is your

8  house?

9       A.  Yes, sir.

10      Q.  Can you write "house" in there?

11      A.  (Complies.)

12      Q.  And then next is truck.  That's

13  whose truck?

14      A.  I don't know if it is a truck.  It

15  is a vehicle.

16      Q.  Well, it looks like -- well, in the

17  video, it was a pickup truck.  Is that the

18  same pickup truck?

19      A.  If it is -- if the video shows a

20  truck, then it was a truck.

21      Q.  Then behind that was an SUV?

22      A.  No.  My truck.

23      Q.  Your truck.

24      A.  I think you might be looking at my

Page 118

1    truck.  I don't know in the video that you

2    can see this.

3          Q.  Okay.

4          A.  But I know where my truck was

5    parked -- that I was parked behind somebody.

6    Because my truck would go all the way up to

7    the garage.

8          Q.  And then that's when the sheriff's

9    department's vehicle comes up?

10         A.  Yes, sir.

11         Q.  And then your ex-wife's vehicle was

12   parked past the driveway?

13         A.  I can't swear to this one.  But I

14   can -- I seen this one on the video.  There

15   was a black truck.  And that was the

16   ex-wife's brother.

17         Q.  Okay.  Now, where you have the

18   ex-wife marked on here, is that still

19   considered part of your property?

20         A.  Where her car was parked at?

21         Q.  Yes.

22         A.  The answer is no.

23         Q.  Okay.  Where the brother is parked,

24   is that still considered part of your

Page 119

1    property?

2        A.  No.

3        Q.  Does that say Dad?

4        A.  Yes.

5        Q.  Now, that's not your dad, correct?

6        A.  No.  No.  It was the ex-wife's

7    brother, dad and Mr. Lusk.

8        Q.  That's where the dad's vehicle was

9    parked?

10       A.  I think it was her brother's truck.

11       Q.  Okay.  So did they all come in the

12   same vehicle?

13       A.  Maybe.  Probably.  Because I didn't

14   see no other vehicles.  But again, by the

15   time I went inside -- I don't know how

16   things --

17       Q.  All right.  You also believe that

18   her boyfriend was there, correct?

19       A.  Yes, sir.

20       Q.  Do you think they all rode

21   together?

22       A.  I think that he rode in her car.

23       Q.  In her car.  I'm sorry.  You said

24   ex.  Okay.  Her brother didn't bring anybody

Page 120

1    -- well, other than her father?

2        A.  The brother brought Dad and Lusk.

3        Q.  He didn't have like a -- the

4    brother didn't have like a girlfriend or

5    anything there, did he?

6        A.  I don't think so.

7        Q.  Okay.  All right.  We can mark this

8    as Exhibit --

9            MR. ROBINSON:  Where are we at?

10           THE COURT REPORTER:  Three --

11   well, four actually because of the flash

12   drive.  Do you want the flash drive as three?

13           MS. TULLY:  Yeah.  We will mark

14   -- do you want to do the other?  The flash

15   drive, we can mark as Exhibit 3.  It has two

16   videos on it.  We just haven't dealt with the

17   other video yet.  Do you have any objection

18   to that?

19           MR. BRYAN:  No.  Is it the Stump

20   video you're talking about?

21           MS. TULLY:  The bailiff video.

22           THE WITNESS:  McPeake.

23           MS. TULLY:  McPeake.  Whoever it

24   was.  We will explore that.

Page 121

1            MR. BRYAN:  The inside video?

2            MS. TULLY:  The inside video,

3    yes.

4            THE WITNESS:  That's McPeake's.

5            MR. ROBINSON:  We can mark it as

6    Exhibit 4.

7            (Exhibit 3 was marked.)

8            (Exhibit 4 was marked.)

9        Q.  Do you got something to say?  I

10   will mark it.

11       A.  This here was not their property.

12   But I had to ask them to get off of my

13   property.

14       Q.  All right.

15       A.  Go ahead.

16       Q.  All right.  This is marked as

17   Exhibit 4.  And this was a drawing that you

18   made to the best of your recollection,

19   correct?  It is a drawing you made to the

20   best of your recollection?

21       A.  Yes, sir.

22       Q.  Before I begin, you said you know

23   people from the sheriff's department.  What

24   deputies do you know from the Raleigh County

Page 122

1    Sheriff's Department?

2         A.  I know some that retired.

3         Q.  Like who?

4         A.  Jimmy Miller.  Sheww.  The one that

5    had the mustache.

6         Q.  They all got mustaches.

7         A.  Mark McCray.

8         Q.  McCray, yes.  He had a beard

9    though, I thought.

10        A.  Big monster.  But I know some that

11   currently work.  You know, Aaron Lilly.  I

12   know Bobby.

13        Q.  You know Stump, don't you?

14        A.  Yes, sir.

15            Jason Redden.

16        Q.  Yeah.  Which one?

17        A.  The lieutenant.  Not the -- not the

18   K-9, but the bigger one.

19        Q.  The one that does all the DUI

20   stops?

21        A.  That's probably him.

22        Q.  Yeah.  Okay.

23                (A discussion was held off the

24   record.)

1               THE WITNESS:  I know quite a few.

2    BY MR. ROBINSON:

3          Q.  Know any judges?

4          A.  No.

5          Q.  Okay.  Did you tell your girlfriend

6    to record the incident, or did she just do it

7    on her own?

8          A.  I told her to.  I told her to, sir.

9    Sorry.

10         Q.  Okay.  It looks like when the video

11   ended, you all are standing at -- did you

12   call that the gazebo?

13         A.  Yes.

14         Q.  What were you looking at over

15   there?

16         A.  You know, I had testified that that

17   was -- it was -- when I built that, it was

18   attached.  And I did that because we had that

19   derecho.  And everything I had got blowed

20   away.  So I learned to build things to

21   withstand as much wind as it can.  So they

22   were looking to see if it was actually bolted

23   down or not.

24         Q.  The whole gazebo?

Page 124

1          A.  The swing carrier.

2          Q.  Okay.  Why would they be looking at

3     that?

4          A.  She was awarded the swing.  And on

5     the property form that they prepared, she got

6     the swing.  I give her the swing.  Those are

7     two separate purchases.  You can buy a swing.

8     You can buy a swing carrier.  I bought two

9     different times.  I had to go get the swing

10    and the swing carrier.

11         Q.  Hold on.  What were they looking at

12    over there?

13         A.  The swing carrier.  It is going to

14    be on the back.

15         Q.  Okay.  Hold on.  What was she

16    awarded?

17              MS. TULLY:  I'm sorry.  I took

18    these exhibits from you.

19         A.  Let's see.  Joint Exhibit 1 --

20    let's go to the back page.

21         Q.  I am a little confused myself.

22         A.  You can look at Joint Exhibit 1.

23    It would make it just as easy.  Sorry.

24              MR. BRYAN:  Exhibit 2, right?

Page 125

1              THE WITNESS:  Sorry.  Exhibit 2.

2          Q.  Where it says swing, front yard?

3          A.  Yes, sir.

4          Q.  Okay.  And you are alleging that

5     she was not allowed to take that swing?

6          A.  No.  I give her the swing.

7          Q.  Okay.  And what were they looking

8     at when they went over there?

9          A.  They were seeing if the holder --

10    the swing holder was bolted down or not, that

11    I testified that it was.

12         Q.  And when did you testify that it

13    was bolted down?

14         A.  I think it was March 4, 2020.

15         Q.  Okay.  So you spoke -- so you all

16    did talk about some property?

17         A.  It was only yes or no, not -- not

18    here's your defense.  Not present your

19    evidence.  It was yes or no.  Is it yes or

20    no?

21         Q.  But you did talk about property

22    that had not been turned over, correct?

23         A.  No.  There was a question.  Did you

24    give her the pictures?  Yes or no?  Yes or

Page 126

1   no?

2       Q.  Okay.  You just said about the

3   pictures, yes.  But they also asked you about

4   the swing, didn't they?

5       A.  I believe so, yes.

6       Q.  Okay.  I don't -- I don't want to

7   do this, but I might go get the transcript

8   and go through it as well.

9       A.  Okay.  It is on record.

10      Q.  Is there anything else you talked

11  about there that -- any other property you

12  talked about at that March 4th hearing?

13      A.  Photos.

14      Q.  Photos?

15      A.  A swing.

16      Q.  When they asked you about the

17  photos, what did they ask you?

18      A.  They said, did you give her the

19  photos?  Yes or no?  And I said, no, because

20  I was ordered to copy.  What does the order

21  say?  I said to Judge Goldston -- she says --

22  you will get your chance was the words she

23  said.

24      Q.  And the order says copies?

1        A.  That's not what the order says.

2        Q.  What did you give her?

3        A.  The order says copies.  I give her

4   copies.  The property form that was never

5   corrected said that she got photos.  It

6   was --

7        Q.  Okay.  Are we talking about two

8   different --

9        A.  No, we are not.  There was --

10       Q.  You said the order form says what?

11       A.  The 2018 -- April 2018 order, Judge

12  Goldston verbally -- and it was generally put

13  by Mr. Lusk on the order that I was to copy

14  -- her words were Mr. Gibson will make copies

15  of the photos, as I did.  Okay?

16          So when we sat down with the

17  property exchange between Lusk and Johnson

18  and myself and the ex, they asked for the

19  photos.  And Mr. Johnson said that these

20  photos are off because I looked at the audio

21  and he is supposed to make copies.  And so

22  the photos were supposed to be taken off of

23  the property form.

24       Q.  Okay.  So you go down there and you

1    look at the swing I guess to see if it was

2    still bolted down?

3          A.  The swing carrier, not the swing.

4          Q.  Swing carrier.  Okay.  Why does it

5    matter if it was bolted down or not?

6          A.  Because she was arguing that the

7    swing and the swing carrier go together.

8          Q.  Do they go together?

9          A.  No.  They were two separate

10   purchases.

11         Q.  Who purchased them?

12         A.  We purchased them.

13         Q.  Okay.  Can the swing operate

14   without the swing carrier?

15         A.  It is two separate purchases.

16         Q.  Can it operate without the swing

17   carrier?

18         A.  Sure you can.  You can hang it from

19   a tree.

20         Q.  Would you want the kids swinging on

21   there without that on there?

22         A.  It is not a swing for that.  But

23   Judge Goldston backed me --

24         Q.  Is it safe for your kids to operate

1    that swing without the swing carrier?

2         A.  It's not that kind of swing, sir.

3    It's a relaxing swing you sit in the front

4    yard.

5         Q.  Why the carrier?

6         A.  I call it a carrier.  It is a swing

7    stand that the swing hangs from.

8         Q.  Okay.  All right.  So you look at

9    the swing carrier that you have there I guess

10   just because you just want it.  It is bolted

11   down.  What does the judge say at that time?

12        A.  The judge says she will have to

13   look at it because it is bolted down,

14   paraphrasing.

15        Q.  But you can remove it, can't you?

16        A.  No.

17        Q.  Why?

18        A.  I would have to tear down the

19   bottom of the gazebo, take boards off and --

20   because the bolts are put in from the bottom.

21        Q.  Okay.  At that -- okay.  When you

22   all added the gazebo -- how long were you

23   standing at the gazebo?

24        A.  A minute or two.

Page 130

1          Q.  Okay.  McPeake, does he search

2    anything at the gazebo?

3          A.  He is just standing there as far as

4    I know watching.

5          Q.  He is just standing there, correct?

6          A.  I believe so.

7          Q.  After you leave the gazebo, where

8    do you go?

9          A.  At the gazebo when Mr. McPeake

10   seizes my phone, we went to my garage.

11         Q.  Let's go back and talk about the

12   phone.  You said McPeake seized your phone?

13         A.  Yes, sir.

14         Q.  Why did he seize your phone?

15         A.  Because -- I don't know.  I mean, I

16   am assuming Judge Goldston told him -- asked

17   if I was recording.  And I said, yes, ma'am.

18   And she asked them to seize the phone.

19         Q.  And your phone at the time, it

20   still had the audio on it?

21         A.  Yes.

22         Q.  So it was still on after he seized

23   it, correct?

24         A.  Yes.

Page 131

1          Q.  Okay.

2          A.  It was still on until Mr. Lusk let

3     Judge Goldston know that the audio was still

4     on.

5          Q.  Okay.

6          A.  And then the ex-wife let Judge

7     Goldston know that my girlfriend was videoing

8     too.

9          Q.  Who turned off the phone?

10         A.  What phone?

11         Q.  The phone that you gave to Judge --

12    to --

13              MR. BRYAN:  Objection.

14         Q.  -- Deputy McPeake?

15              MR. BRYAN:  Objection to form.

16         Q.  You can answer.

17         A.  I turned it over under the order of

18    being arrested.

19         Q.  So there was no audio after that?

20         A.  No, sir.

21         Q.  You are at the gazebo.  It is you,

22    the judge, McPeake and Kyle Lusk?

23         A.  Yes, sir.

24         Q.  And is your ex-wife there?

Page 132

1       A.  Yes, sir.

2       Q.  Okay.  Are there any other -- did

3  anybody else come over to the gazebo?

4       A.  No, sir.  Not that I am aware of.

5       Q.  No other deputies came to the

6  gazebo?

7       A.  No, sir.

8       Q.  Okay.  And then after you are there

9  at the garage -- I mean, after you are at the

10  gazebo, then you go to the garage?

11      A.  Yes, sir.  We went to the garage.

12      Q.  Okay.  And where is the entrance to

13  the garage located?

14      A.  Where the cars are parked, they are

15  going to be right in front of the -- at the

16  neck of the driveway.

17      Q.  Okay.  So you have to walk across

18  the yard again to get down there?

19      A.  Yes, sir.

20      Q.  Okay.  Who all went down to your

21  garage?

22      A.  Judge Goldston, Bailiff McPeake, my

23  ex-wife, Kyle Lusk and myself.

24      Q.  And what was down there in the

Page 133

1    garage?  Well, I will rephrase that.  What do

2    you allege was taken from the garage?

3         A.  There was a chainsaw taken.

4         Q.  Okay.  Who does that chainsaw

5    belong to?

6         A.  She was -- she was ordered to get a

7    chainsaw.  We had two.  That's another part

8    of the property form that was not corrected.

9    And she got one chainsaw.  She didn't want

10   that one.  She wanted the other one.

11        Q.  Before that, did she ever tell you

12   she wanted the other chainsaw?

13        A.  No, sir.

14        Q.  Who said to go down to the garage?

15        A.  Judge Goldston.  She said, are you

16   going to let me in, or are you going to jail?

17        Q.  Why would -- who said to go to the

18   garage?  Why would you go to the garage

19   instead of going back to the house?  Do you

20   understand what I'm saying?  Why would you go

21   to the garage instead of to the front door?

22        A.  Because I don't want to go in my

23   front door because I try to keep as much dirt

24   and stuff out of my house as I can.  So there

Page 134

1  was a rug there that you can dry your feet

2  off.  I most all of the time go in my house

3  through the garage.

4       Q.  So you let them through the garage?

5       A.  Under duress, yes, sir.

6       Q.  And what happened to that chainsaw?

7  Did you get it back?

8       A.  No, sir.

9       Q.  You let her keep it?

10      A.  She -- I am assuming the court

11  still has one and she has one.

12      Q.  Okay.  Did McPeake -- Deputy

13  McPeake ever search for this chainsaw?

14      A.  He was with them.  So yes.

15      Q.  He was just with them.  Did he ever

16  pick up the chainsaw?

17      A.  I can't recall.

18      Q.  When you went down there to get the

19  chainsaw, did your ex-wife say, hey, that's

20  my chainsaw?

21      A.  No.

22      Q.  How did that all occur?

23      A.  I don't know what she said.

24      Q.  But Deputies White and Stump

Page 135

1  weren't out there when the chainsaw was

2  taken, were they?

3        A.  No, sir.

4        Q.  After you left the garage, where

5  did you go?

6        A.  We went into I guess what we would

7  call the family room/living room.

8        Q.  Who all went into the living room?

9        A.  Everybody -- the same people that

10  was in the garage - Mr. Lusk, Judge Goldston,

11  the ex-wife and myself.

12       Q.  White and Stump weren't out there

13  yet, correct?

14       A.  No, sir.

15       Q.  Do you recall what happened when he

16  -- when everybody went into the living room?

17       A.  I do remember the photos being

18  taken off the wall.  I tried to explain to

19  her once again.  She said, I am not going to

20  argue with you.  So I basically shut down

21  then.  If I can't speak in my own house --

22       Q.  Tried to explain to who?

23       A.  To Judge Goldston that the pictures

24  were ordered to be copied.

Page 136

```
 1          Q.  Let's go back for a minute.  You

 2    allege that Judge Goldston threatened your ex

 3    -- threatened your girlfriend with jail time

 4    if she didn't stop recording?

 5          A.  Yes.

 6          Q.  What did she do?  Did she yell

 7    across the yard or something?

 8          A.  Absolutely.

 9          Q.  Okay.

10          A.  Yes, sir.

11          Q.  And that's when your girlfriend

12    shut off the video?

13          A.  Yes, sir.

14          Q.  Stopped the recording?

15          A.  Yes.

16          Q.  Okay.  I'm still going to the time

17    you are outside the gazebo.  Sorry.  You

18    allege McPeake then called for backup at that

19    time?

20          A.  Yes, sir.

21          Q.  How did he call for backup?

22          A.  Via radio.

23          Q.  Did he have a radio on his --

24          A.  Yes, sir.
```

Page 137

1          Q.  -- shoulder or --

2          A.  Yeah.  He had a mike on his left

3     shoulder.

4          Q.  Do you remember how he called?  Do

5     you remember what he said when he called?

6          A.  I just knew when you call for

7     assistance, it ain't for fun.  So yeah.

8          Q.  You said all of the pictures were

9     taken off your wall.  Who took them off your

10    wall?

11         A.  My ex-wife.

12         Q.  Okay.  McPeake didn't take any

13    pictures off of the wall, did he?

14         A.  I can't recall.

15         Q.  You didn't see McPeake order

16    anybody to take any pictures off of the wall,

17    did he?

18         A.  I can't recall.

19         Q.  Judge Goldston didn't order anybody

20    to take pictures off of the wall, did she?

21         A.  Of course, yes.

22         Q.  She said to take the pictures off

23    of the wall?

24         A.  Yes.

Page 138

1          Q.  Judge Goldston said that?

2          A.  I do believe.

3          Q.  She said to take all of the

4    pictures off the wall?

5          A.  I believe so.

6          Q.  Did your ex-wife take all the

7    pictures off the wall?

8          A.  Yes, sir.

9          Q.  After you were in the family room

10   -- living room, did you then go to the family

11   room?

12         A.  Which is downstairs.

13         Q.  Okay.  Is that right next to the

14   living room?

15         A.  Yeah.  I don't know what you call

16   these rooms.  The first room, you walk in

17   where the pictures were at.  Our next stop, I

18   think we went downstairs to the living room

19   or whatever you want to call it.

20         Q.  What do you allege happened when

21   you proceed down to the family room?

22         A.  The downstairs living room, is that

23   the one we're talking about?

24         Q.  Well, I think we are in the living

Page 139

1    room.  We left the -- hold on.  I think we've

2    left the living room now.  Let's go back.

3              We came from the garage, correct?

4    You left -- the only thing that was seized

5    from the garage was --

6              A.  A chainsaw.

7              Q.  Chainsaw.  Then you go into the

8    living room, correct?

9              A.  I believe so.

10             Q.  Okay.  What do you believe was

11   seized out of the living room?

12             A.  The living room would be pictures

13   on the wall.

14             Q.  And that was it?

15             A.  As far as I can recall.

16             Q.  Then next you go into the family

17   room?

18             A.  Downstairs.

19             Q.  Okay.  What all do you allege was

20   seized from the family room?

21             A.  You know, my kids -- again, I have

22   full custody of one and half the other.  They

23   have their DVDs.  So there was 35, 40 movies

24   of theirs that I wasn't able -- anytime I

1   would say anything -- you'll get your chance.

2   You know, don't talk.  I am not arguing with

3   you.  Same kind of thing would go.  You know,

4   there was movies taken - Spiderman, Ice Age,

5   stuff like that.

6           Q.  And those all belonged to your

7   kids?

8           A.  Yes, sir.

9           Q.  Who purchased them?

10          A.  We purchased them.

11          Q.  You and your wife, correct?

12          A.  Uh-huh.

13          Q.  All right.

14          A.  But some of those were gifts from

15  Christmas.

16          Q.  From who?

17          A.  From us.

18          Q.  From you and your wife?

19          A.  Right.  I have full custody of my

20  oldest one.

21          Q.  You have full custody of one of

22  them?

23          A.  Of one of them.

24          Q.  She has full custody of the other

1    one, correct?

2          A.   No.   We have 50/50 of the other

3    one.

4          Q.   But she does have custody of the

5    other one?

6          A.   Yes.

7          Q.   And does Brooklyn ever go to her

8    mother's house?

9          A.   Some.

10         Q.   Some.   Like how often?

11         A.   I don't know.

12         Q.   Does she stay during the weekends

13   once a month?

14         A.   No.

15         Q.   How often does she stay over at

16   your ex-wife's house?

17         A.   She doesn't.

18         Q.   Not at all?

19         A.   No.

20         Q.   She doesn't like your ex-wife?

21         A.   No.   They get along fine.

22         Q.   Okay.   Any reason why she doesn't

23   stay over there?

24         A.   I don't know how -- I mean, it is

1  -- you've got a boyfriend involved, and

2  there's certain things that may be a family

3  court issue.  So I am not even going to bring

4  it up.

5      Q.  How old is she?

6      A.  She is 18.

7      Q.  Oh, okay.  In the family room, as

8  you allege, the movies were taken that

9  belonged to your children?

10     A.  Yes, sir.

11     Q.  And one was your girlfriend's?

12     A.  Yes, sir.

13     Q.  Which one was that?

14     A.  It was -- that was quick.  I Can

15 Only Imagine.

16     Q.  That's the name of the movie, I Can

17 Only Imagine?

18     A.  Yes, sir.

19     Q.  Then you made another allegation

20 that Deputy McPeake led you into another room

21 and forced you to open up your locked gun

22 safe?

23     A.  He followed me in there.

24     Q.  Okay.

Page 143

1          A.  Yeah.

2          Q.  Did he force you to open your gun

3     safe?

4          A.  No, sir.

5          Q.  Okay.

6          A.  Now, I will say, I was -- you know,

7     my voice said I am going to --

8          Q.  Your voice said you were going to?

9          A.  I said verbally, sorry, that I

10    would be looking for whatever we were looking

11    for in a safe.  And, you know, I just wanted

12    to kill two birds with one stone.  I wanted

13    everybody out of my house at that point.

14         Q.  During the course of discovery in

15    this case, I would have sent you

16    interrogatories which you would have answered

17    with your attorney?

18         A.  Sure.

19         Q.  Do you recall answering those?

20         A.  Yes, sir.

21         Q.  And I asked you in interrogatory

22    number three, Please provide a chronological

23    description of all events of March 4, 2020,

24    that relates to the occurrence that is the

Page 144

1   subject of this lawsuit.

2           And you gave a pretty lengthy

3   answer in the last few pages?

4       A.  Okay.

5       Q.  In that answer, you state, Bailiff

6   McPeake then led me into the next room where

7   I was forced to open my locked gun safe and

8   allowed him to search it.

9           You told me that statement is

10  incorrect, right?

11      A.  According to my recollection, when

12  we did this complaint -- because I didn't

13  have the video.  My recollection -- that's

14  what I thought.  Because anything that

15  happened inside that house, I was under

16  duress.  And I don't -- my memory didn't

17  serve me as well.

18      Q.  But when you answered this

19  discovery, you had that --

20      A.  I had my recollection.

21      Q.  When you answered discovery -- you

22  now have a copy of the tape?

23      A.  Yeah.  I didn't have a copy of the

24  tape.

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 145

1          Q.  When you answered discovery, you

2     didn't have a copy of the tape.  When did you

3     receive a copy of the tape from McPeake that

4     McPeake took?

5          A.  It was after that.

6          Q.  When?  Do you know when?

7               MR. BRYAN:  I think it was in a

8     discovery response.  I don't think it was

9     turned over with Rule 26.  So conveniently,

10    no.

11         A.  I definitely didn't have that when

12    I filled that out.

13         Q.  Is there anything else -- I may

14    need to come back.  I can go get you a copy

15    and have you read it through.  But is there

16    anything else in your answer to interrogatory

17    number three that you believe is now

18    incorrect?  Do you have a copy of it?

19         A.  I do.  Hold on a second.  Let me

20    get it.

21              MS. TULLY:  I was going to say, I

22    do.

23              MR. ROBINSON:  Oh, you do?

24         A.  Number three?

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 146

1          Q.  While you read that, let me talk to

2    you.

3                  MR. ROBINSON:  Let me take a

4    break real quick.

5                  (Break in proceedings.)

6    BY MR. ROBINSON:

7          Q.  Did you have a chance to finish

8    reading everything in there?

9          A.  Yeah, I didn't read it fully.

10         Q.  Well, you can go ahead and continue

11   reading it.

12                 (Witness reviews document.)

13         A.  I am familiar enough with it I

14   believe.

15         Q.  Is there anything in there that you

16   believe that is now incorrect?

17         A.  No.  I want to say, for the record,

18   you know, as far as the gun safe, if there

19   was no threat of arrest or I was under duress

20   -- or for that matter, one deputy with two

21   deputies en route, no way would I have

22   conceded to the search - I just want to say

23   that - and, you know, to let the search

24   happen, the Supreme Court said so.  So that's

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

1   kind of where I am at with that.

2        Q.  I am talking about the gun safe.

3        A.  And that was all part of the

4   search, sir.

5        Q.  But you led him to the gun safe,

6   correct?

7        A.  Uh-huh.

8        Q.  He didn't know you had a gun safe,

9   did he?

10       A.  Yes.

11       Q.  You told him you had one?

12       A.  Right.

13       Q.  And you let him in there, correct?

14       A.  Yes.

15       Q.  All right.  He didn't force you

16   there, did he?

17       A.  Every time --

18            MR. BRYAN:  Objection to form.

19   He was there under threat of arrest.

20       Q.  Bailiff McPeake then led me into

21   the next room where I was forced to open my

22   locked gun safe and allowed him to search it.

23   Is that statement accurate?  I think I asked

24   you that before.  That statement is not

Page 148

1    accurate, is it?

2         A.  The answer, it is not accurate

3    because it is due to my recollection.  I

4    hadn't received --

5         Q.  Let's bring up the video.  Go ahead

6    and answer.

7         A.  I just said it wasn't correct.  I

8    used my memory.  I didn't have the video yet.

9         Q.  What we are getting ready to play

10   here is a video that was taken by my client,

11   Deputy Stump, on his cell phone, is that

12   correct, to your knowledge?

13        A.  No.

14        Q.  It is not correct?

15        A.  Huh-uh.

16        Q.  Who took the video?

17        A.  McPeake.

18        Q.  I'm sorry.  You are correct.  It is

19   McPeake.  He took this video; is that

20   correct?

21        A.  As far as I know.

22        Q.  Okay.  And we are going to play it.

23   I believe it's around seven minutes long.

24   We'll start playing it now.

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 149

1          A.   Just for the record, I want to say

2    that the search was probably 20 to 30 minutes

3    long.  That shows seven minutes.

4          Q.   Okay.

5               (Video played.)

6          Q.   You are leaving your garage and now

7    entering your living room; is that correct?

8          A.   Yes, sir.

9          Q.   That was your ex-wife taking the

10   photographs off the wall, correct?

11         A.   Yes, sir.

12         Q.   And that's you carrying the

13   photograph, correct?

14         A.   Under threat of arrest.

15         Q.   And handing it to your wife?

16         A.   Under threat of duress.

17         Q.   Who threatened to arrest you?

18         A.   Judge Goldston.

19         Q.   She told you to get that photograph

20   and give it to her or she was going to arrest

21   you?

22         A.   Yes.

23         Q.   She said those exact -- sorry.  She

24   told you to grab that photograph and give it

Page 150

1    to her or she was going to arrest you?

2            MR. BRYAN:  Objection to form.

3    That's not what he said.

4        Q.  Well, you can still answer.

5        A.  The answer is no.

6        Q.  She didn't tell you that?

7        A.  No.  But there was multiple times

8    beforehand that she threatened me with

9    arrest.  So I'm not arguing with a lady who

10   has already had a bailiff and two deputies en

11   route.  I am not arguing with anybody inside

12   my house when I'm under duress, sir.

13       Q.  Where was that photograph located?

14       A.  What photograph?

15       Q.  That you were carrying in your

16   hands.

17       A.  What?  I don't understand your

18   question, sir.

19       Q.  That photograph right there --

20       A.  Where was it located?

21       Q.  Yeah.

22       A.  It was on the wall.

23       Q.  Where?  In the living room?

24       A.  Yeah.  Now, the other photos, the

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

Page 151

1   ex-wife took it off the wall with the power

2   of your client.

3           Q.  But you took --

4           A.  Gun and badge.

5           Q.  Repeat that.

6           A.  Your client.

7           Q.  He had a gun out is what you're

8   saying?

9           A.  No, no, no.  He is armed with a

10  badge and gun, the authority to arrest

11  people.  And she threatened me multiple

12  times, are you going to let me in, are you

13  going to let me in, you're going to let me

14  in.  At this point, I am not trying to go to

15  jail.  So I did whatever I had to do inside

16  that house.

17              (Video played.)

18          Q.  The judge also said she gave you

19  the lion's share.  She's not going to dispute

20  with you, she just was looking for items that

21  were not turned over to her, correct?

22          A.  Again, my understanding was, I'm

23  going to go to jail that day.  What did he

24  call for assistance for, to help with the

Page 152

1    search?

2              (Video played.)

3         Q.  We're walking downstairs.  What

4    room was that?

5         A.  I guess we are going to call it the

6    family room.  Take what you want.

7              (Break in proceedings.)

8    BY MR. ROBINSON:

9              (Video played.)

10        Q.  You were telling him to go check

11   the safe?

12        A.  Under duress, sir.

13        Q.  Under duress?

14        A.  Absolutely.

15        Q.  What did McPeake do there to make

16   you go check the safe?

17        A.  He didn't.  Well, what he did was

18   prior to that, which is called for

19   assistance, which tells me he was intending

20   to take me to jail.  You don't call for

21   assistance for anything.  I left them in

22   there so he could search.  Again, he called

23   for assistance.  I am not arguing with

24   nobody.

Page 153

1          Q.  Do you see McPeake search your gun

2    safe at any time in there?  Did he go through

3    and ruffle through?

4          A.  I left him at that point.

5          Q.  Look at the video.

6          A.  You can search visually.

7          Q.  Did he go in there and search and

8    moving anything around?

9          A.  He searched visually, yes, sir.

10         Q.  Was there a gun in there?

11         A.  What gun?

12         Q.  Was there a gun in there?  That's

13   what I am asking you.

14         A.  Inside my gun safe?

15         Q.  Yes.  Was there one in there?

16         A.  Absolutely.

17         Q.  Where is that?

18         A.  Well, you see it right there.

19   There's a whole lot of guns.

20         Q.  I can't see them.

21         A.  I can't either.  To the left,

22   there's guns all in there.

23         Q.  And that was you going in and

24   closing it, correct?

Page 154

1      A.  Yes, sir.

2      Q.  McPeake didn't close it, did he?

3      A.  No.  He was done with the search.

4          (Video played.)

5      Q.  I think that's it.

6          Deputy McPeake didn't seize any of

7  your movies, did he, personally?

8      A.  Did he carry them personally?

9      Q.  Yes.

10     A.  No.

11     Q.  What time do you recall Deputies

12 Stump and White arrive?

13     A.  Soon as the video -- soon as that

14 video ended, that's about what time they got

15 there.

16     Q.  And both of them arrived at the

17 same time?

18     A.  I believe so.

19     Q.  Did you speak to either one of

20 them?

21     A.  I did.

22     Q.  Which one did you speak to?

23     A.  I spoke to Bobby.  You know, he

24 came in and basically asked what is going on

Page 155

1    as far as I know.  And he -- I think he asked

2    -- he was going to have my witnesses and her

3    witnesses leave.

4            Q.  He didn't go outside, Stump?

5            A.  No.  He was out -- he was inside

6    and outside several times as far as I know.

7    At some point I left the whole search party.

8    I went upstairs.  Officer White followed me

9    around, and he detained me basically.

10            Q.  You said that Stump asked you what

11    was going on.  What did you tell him?

12            A.  I said, you know, you've got the

13    judge here.  As far as I can remember, that's

14    what I said, you know.  I really don't recall

15    what I said.  So you can strike that.

16    Because I don't recall what I said.

17            Q.  You just said that Deputy White

18    detained you.  How did Deputy White detain

19    you?

20            A.  Because I needed to go upstairs to

21    get away.

22            Q.  For what?

23            A.  I needed to go upstairs and get

24    away.  I was tired of the stress and, you

Page 156

1    know, the threat of jail.  I had to get up

2    and get away from them because they knew what

3    they were going to do -- because they were

4    going to -- anytime I objected to anything,

5    it was no, I am going to do -- we are going

6    to let her take this, take that.  There was

7    no sense of watching it.

8              So he went up there.  And he was

9    following me around the kitchen.  I said,

10   what are you doing, dude?  He said, I've got

11   to make sure that, you know, everybody is

12   safe.

13       Q.  But you were free to move around,

14   correct?

15       A.  With him by my side, yes.

16       Q.  All right.  He didn't place you in

17   handcuffs?

18       A.  No, sir.

19       Q.  Did he say you were being detained?

20       A.  I can't remember what he said.

21       Q.  I think after you left the living

22   room, you all then went to the kitchen?

23       A.  Yes, sir.

24       Q.  Was everyone -- was it White,

1    Stump, McPeake?

2          A.   I believe it was everybody.

3          Q.   Everybody?  White, Stump, McPeake,

4    Lusk, Goldston --

5          A.   Yes, sir.

6          Q.   -- you and your ex-wife?

7          A.   Yes, sir.

8          Q.   And there you allege some recipes

9    were taken?

10         A.   Yes, sir.

11              You know, for the record, I --

12              MR. BRYAN:  Just let him ask

13   questions, and then you can answer them.

14   Okay?

15              THE WITNESS:  Okay.

16         Q.   And after you left the kitchen --

17   you all went to the back deck after you

18   allege that an umbrella stand was taken?

19   Does that sound correct?

20         A.   That's correct.

21         Q.   And you allege that the umbrella

22   stand belongs to you?

23         A.   Again, if you -- when you buy a

24   patio set, you've got to buy the umbrella and

1  umbrella stand separately.  She got exactly

2  what she was awarded, which is the chairs,

3  the table and the umbrella.

4        Q.  During the time that Stump and

5  White were in your home, did you see either

6  Stump or White take any items out of your

7  home?

8        A.  I can't answer that.  I don't know.

9        Q.  I guess -- how did your ex-wife

10  move her items to -- move the items from the

11  house to her vehicle?

12        A.  There was a laundry basket

13  downstairs.  And I guess she decided to use

14  it.

15        Q.  Okay.  You never saw Deputy

16  McPeake, White or Stump remove any items?

17        A.  Again, I was away from them at some

18  point in time.  So the answer is, I can't

19  answer that.

20        Q.  What items do you allege were never

21  returned to you?

22        A.  Some of the movies.  My

23  girlfriend's DVD was taken.  I supplied text

24  messages.  And some of the movies belonged to

1    my kids.

2        Q.  So your kids never got a way to

3    watch those movies?

4        A.  I mean, unless we buy another DVD.

5    I mean, we can stream it I guess.

6        Q.  They couldn't watch them over at

7    your ex-wife's house?

8        A.  I mean, should my -- the answer is

9    she could watch them over there.  But my

10   daughter I have full custody of, she should

11   not have her Christmas gifts taken away.

12       Q.  You said the DVD that belonged to

13   your girlfriend was never returned?

14       A.  No.  No.  It was returned.

15       Q.  It was returned?

16       A.  It was.  Her movie was returned,

17   yes.

18       Q.  Okay.  All right.  Other than the

19   contempt hearing that was held in front of

20   Judge Goldston, have you ever been a part of

21   any other contempt hearing after that?

22       A.  You mean other than with Judge

23   Dorsey and Lisa Clark -- Judge Clark?

24       Q.  What was that contempt hearing in

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

1    front of Judge Clark -- what was that about?

2         A.   Same case.  It is a continuation of

3    the case.

4         Q.   It was about not returning items?

5         A.   It was -- never did we talk about

6    not returning.  We never talked about items.

7    She wouldn't let me testify on what was

8    taken, what was objected to.  She didn't hear

9    that testimony.

10        Q.   What was the contempt hearing

11   about?

12        A.   We talked about this earlier; was

13   whether I damaged items or not.

14        Q.   It was just about damaged items?

15        A.   Yes.

16        Q.   Not about items that were taken?

17        A.   Right.

18        Q.   Were you found in contempt?

19        A.   No.  As of last week, that

20   decision, she said she was going to let go

21   the contempt -- as of last Tuesday, February

22   15th.

23        Q.   I believe you also allege that you

24   sought counseling because of the incident,

Page 161

1    correct?

2         A.  Yes.

3         Q.  And you also admit that you had

4    sought counseling before that, correct?

5         A.  Yes.

6         Q.  And that counseling you sought

7    before was because of marital problems you

8    were having with your wife?

9         A.  Yes.

10        Q.  And it looks like you would have

11   started going to Life Strategies around

12   September of 2017?

13        A.  Sounds right.

14        Q.  Is that correct?

15        A.  Sounds right.

16        Q.  For anxiety stemming from issues

17   with your wife?

18        A.  Yes.

19        Q.  Do you have an anger problem?

20        A.  No way.  No, sir.

21        Q.  Do you recall being diagnosed with

22   unspecified anxiety and high expressed

23   emotion level within the family?  Do you

24   recall being diagnosed with that in 2017?

Page 162

1      A.  No, sir.  No, sir.

2      Q.  I have here a psychotherapy intake

3  note dated September 5, 2017.  It says,

4  Diagnosis, unspecified anxiety disorder was

5  high expressed emotional level within the

6  family.

7          Do you see that?

8      A.  Okay.

9      Q.  Does that diagnosis sound accurate?

10     A.  I mean, I was going through a

11 divorce then.

12     Q.  Does that diagnosis sound accurate?

13     A.  I am not a doctor, sir.  I don't

14 know.

15     Q.  So you disagree with that

16 diagnosis?

17     A.  I was going through a divorce.  I

18 was going through a rough time.

19          MR. ROBINSON:  We can mark this

20 as Exhibit 5.

21          (Exhibit 5 was marked.)

22     Q.  2017, you also had a bad

23 interaction with your aunt that caused you

24 some anxiety?

Page 163

```
 1          A.  Yeah.  Yes, sir.

 2          Q.  Okay.  So it was more than just

 3   with your wife then, correct?

 4          A.  No.  That was all connected.  When

 5   she filed for divorce, that's when she

 6   claimed abuse.  And my aunt, I don't really

 7   -- I wasn't raised with her.  She was raised

 8   in the Maryland/Virginia area.  I was raised

 9   in Oklahoma and West Virginia.  So when she

10   called and told her -- after my dad left --

11   there was a divorce happened 50 years ago.

12   So it was, you are just like your dad, he is

13   a piece of crap, all of that.  So there was a

14   lot of family issues.

15          Q.  How did your aunt find out about

16   it?

17          A.  My ex told her.

18          Q.  Okay.  You say it was just verbal

19   abuse?

20          A.  Yes, sir.

21          Q.  What's your aunt's name?

22          A.  Sandra Lerosa.

23          Q.  Where does she live?

24          A.  Alexandria, Virginia, the last I
```

1   heard.

2         Q.   What's her phone number?

3         A.   I don't know.  I ain't talked to

4   her in about five years.

5         Q.   Not since September of 2017?  Does

6   that sound right?

7         A.   Yes.  Once the harassment started,

8   I was done.  She texted my daughter.

9         Q.   Who texted your daughter?

10        A.   Ms. Lerosa.

11        Q.   This is your aunt, correct?

12        A.   You can call it that.

13        Q.   Is it your aunt?  Is she related to

14  you by blood?

15        A.   You can call it that, yes, sir.

16        Q.   What else would you call it?

17        A.   I don't know her.  I know you as

18  much as I know her.

19        Q.   Is she related -- is she your --

20        A.   She is a blood relative, yes, sir.

21        Q.   Okay.  I just wanted to make sure

22  she's not -- it is your aunt, right?  I mean,

23  you're saying you call it that.  I don't

24  understand what you mean by that.

1          A.  It is by relationship status.  We

2    were never raised together.  So I didn't

3    really look at her as an aunt.

4          Q.  Well, I wasn't raised with my aunts

5    and uncles, but they are still my aunts and

6    uncles.  Do you understand what I'm saying?

7          A.  No.  I understand what you're

8    getting at.  It's just I never carried her

9    like that because it was always drama.

10         Q.  Okay.  Yeah.

11              Okay.  Are you saying your wife

12   never accused you of any physical abuse?

13         A.  No, sir.

14         Q.  Then why would you tell your

15   therapist that?

16         A.  Maybe it was the best quote of what

17   I told him.  I mean, there was never an

18   accusation whatsoever.  It was just always

19   verbal or some kind of stuff like that.

20         Q.  You said something in the

21   description -- I am reading from a

22   psychotherapy report of October 9, 2017.  It

23   says Symptom Description and Subjective

24   Report.  It said his wife got paperwork

Page 166

1    moving for divorce.  He is feeling very

2    emotional about it.  Said his wife accused

3    him of physical abuse.

4         A.  Oh, yeah, yeah.  Hold on.  Yes.

5    Yeah.  When she came to my house and -- about

6    four or five days after, she had told my

7    daughter that I was an abusive man and

8    basically -- so I called my pastor.  You can

9    have his name too.  And --

10        Q.  What's his name?

11        A.  Pastor Gary Williams.

12        Q.  Where is he a pastor at?

13        A.  New Prospect Baptist.

14        Q.  Where is that located?

15        A.  That's in North Sand Branch --

16   Sweeneysburg.

17        Q.  Sweeneysburg.  Okay.

18        A.  Okay.  So he was -- he was doing

19   marriage counseling for us.  And after I seen

20   that they were going to accuse some kind of

21   abuse, I called them.  And he was doing

22   marriage counseling.  And I asked them, I

23   said, hey, did she ever accuse me of abuse?

24   He says no.  And I said, will you testify for

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

1    me?  He said yeah.

2         So after I hired Brandon Johnson, I

3    seen abuse wasn't going to be a dispute of

4    fact, I didn't call him for testimony.  But

5    after she told my daughter that I was

6    abusive, you know, that's when the trust on

7    our side stopped.  So yes, that happened.

8         Q.  All right.  And of course you

9    allege it never happened?

10        A.  Of course not.

11             MR. ROBINSON:  We can make the

12    psychotherapy note dated October 9, 2017 as

13    Exhibit 6.

14             (Exhibit 6 was marked.)

15        Q.  It looks like you went -- the first

16    time you went for therapy after the incident

17    that's the subject of this litigation was

18    March 17, 2017?

19        A.  Okay.

20        Q.  I'm sorry.  2018.

21        A.  Say that again.

22        Q.  I think it is March 17, 2018.  Does

23    that sound correct?

24        A.  That should be March 2020.

Page 168

1    Q.  2020?

2    A.  After.

3    Q.  Okay.  I'm sorry.

4         It looks like you went there -- it

5    says, Things are pretty crazy right now.  I

6    had a video go viral about some legal things

7    going on from him in his divorce.

8         Now, none of the defendants in this

9    case posted that video online, did they?

10   A.  No.

11   Q.  Okay.  That video was posted by

12   who?  Your attorney?

13   A.  Yes, sir.

14   Q.  Okay.  And you are saying your

15   anxiety came from the video going viral?

16   A.  Sure.  Because at this point,

17   everybody is looking at you whether you are

18   guilty or not guilty.  This went on for

19   two years.

20   Q.  People would not have done that had

21   your attorney not posted that video online,

22   correct?

23   A.  Well, if I didn't do that, then I

24   know that they would sweep the judge

Page 169

1   searching the house -- because she's been

2   doing it for 20 years -- under a rug.  And I

3   knew I would get no action.  So I had to put

4   my life's events out there to get some

5   action, to get the investigation going.

6          Q.  So you put it out there.  Okay.

7          A.  My attorney did, sir.

8          Q.  I think you also said Paul Payne,

9   Chris Payne, Jeff Presley came up to your

10  property and insisted on removing things from

11  your home.  They actually came into your home

12  and removed things?

13         A.  They didn't come inside, no.

14         Q.  They were all outside?

15         A.  Yes, sir.

16         Q.  Have you seen McPeake since the

17  incident?

18         A.  I can't recall.

19         Q.  Have you seen Stump since the

20  incident?

21         A.  No.  I can't recall that either.

22         Q.  Have you seen White since the

23  incident?

24         A.  No, sir.  Not that I can recall.

Page 170

1          Q.  So you can't recall them ever

2     threatening to arrest you after the incident,

3     correct?

4          A.  Say that again.

5          Q.  None of them have threatened you

6     with arrest after the incident, correct?

7          A.  After the incident, no.

8          Q.  Okay.  Did any deputy from the

9     Raleigh County Sheriff's Department threaten

10    you with arrest after the incident?

11         A.  No, sir.

12         Q.  You said deputies parked cruisers

13    in your yard?

14         A.  Yes, sir.

15         Q.  Which ones?

16         A.  I don't know who was driving what.

17         Q.  Do you have photographs of it?

18         A.  I did at one point.

19              MR. ROBINSON:  I don't have

20    anything else.

21              MR. BRYAN:  I just have a few

22    questions.

23              EXAMINATION

24    BY MR. BRYAN:

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA742

Page 171

1        Q.  Mr. Gibson, on page 23 of the West

2   Virginia Supreme Court's opinion regarding

3   the search that took place in this case, the

4   court wrote, and I quote, "Regardless of

5   whether the ex-husband had failed to provide

6   belongings he was previously directed to

7   provide, Judge Goldston failed to use the

8   appropriate tools available to her under the

9   law to address such failure because she felt

10  such procedures were ineffective.  Instead,

11  she, along with her bailiff, the ex-wife and

12  the ex-wife's attorney proceeded to enter the

13  ex-husband's home" --

14            MR. ROBINSON:  I'm going to lodge

15  an objection here.  Is this a question?

16            MS. TULLY:  Yeah.

17            MR. BRYAN:  Please let me finish.

18  I am almost done.

19       Q.  -- "the ex-husband's home over his

20  strenuous objections, directed that he stop

21  recording the incident and began searching

22  for items on the list of items he was to

23  produce.  Such an invasion of the

24  ex-husband's home was an egregious, abusive

1  process."

2        So that was page 23 of the West

3  Virginia Supreme Court's opinion regarding

4  the search that took place at your home.

5        My question is, were you in the

6  middle of this egregious, abusive process

7  when you made the decision to open your gun

8  safe?

9            MR. ROBINSON:  Objection to the

10  form.

11           MS. TULLY:  Object to form.

12     A.  Yes.

13     Q.  So that was the context in which

14  you opened your gun safe for Deputy McPeake

15  that we saw in the video?

16     A.  Yes, sir.

17     Q.  Would you have invited Deputy

18  McPeake into your house and opened up your

19  gun safe for him but for being in the middle

20  of this egregious, abusive process?

21     A.  I wouldn't have invited any one of

22  them in.  So the answer is no, sir.

23     Q.  Would you have invited Deputy

24  McPeake inside your house to film and observe

Page 173

1    the inside of your gun safe except for the

2    fact that you had been threatened with

3    arrest?

4         A.  I wouldn't have invited.  I didn't

5    authorize him to video inside my house.  So

6    no, sir.

7         Q.  Was this egregious, abusive process

8    which occurred in your home a traumatic

9    experience?

10              MR. ROBINSON:  Objection to the

11   form.

12              MS. TULLY:  Object to form.

13              MR. BRYAN:  What do you object

14   to?  That's the words of the Supreme Court.

15              MS. TULLY:  It's an objection

16   that I'm lodging.  I don't have to explain my

17   objection.  You can continue with your

18   question.

19              MR. ROBINSON:  I'm objecting to

20   your use of egregious and abusive process.

21              MS. TULLY:  Yeah.

22              MR. ROBINSON:  That's my

23   objection.

24              MR. BRYAN:  Page 23 of the West

Page 174

1   Virginia Supreme Court, that's what I'm

2   holding.  I mean, I --

3              MR. ROBINSON:  I stand by my

4   objection.  You can ask your question.

5              MR. BRYAN:  I mean, I want to ask

6   a good question.  Let me rephrase my question

7   then with your objection noted.

8        Q.  Was this egregious, abusive process

9   which occurred in your home a traumatic

10  experience for you?

11             MR. ROBINSON:  Object to form.

12             MS. TULLY:  Object to form.

13             MR. ROBINSON:  You can answer.

14       A.  Yes, sir.

15       Q.  Before watching the video that

16  Deputy McPeake took, did your recollection of

17  opening the gun safe vary some from what was

18  portrayed on the McPeake video?

19       A.  Yes.

20             MR. ROBINSON:  Object to the

21  form.

22             MR. BRYAN:  I'm sorry.  What's --

23             MR. ROBINSON:  I objected to the

24  form.  He can answer.

Page 175

1        Go ahead.  His recollection of what

2  is on the video, that's what you are asking

3  him?

4      Q.  Let me repeat my question.

5        You said that what occurred in your

6  home was a traumatic experience for you,

7  right?

8      A.  Yes, sir.

9      Q.  At the time that the complaint was

10  drafted and filed, you didn't have that video

11  in your possession, right?

12      A.  Correct.  I did not have that video

13  in my possession.

14      Q.  In fact, you had requested that

15  video?

16      A.  I did, sir.

17      Q.  You knew it existed?

18      A.  Yes, sir.

19      Q.  You saw Deputy McPeake taking a

20  video?

21      A.  I seen him fidgeting around with

22  his phone, yes, sir.

23      Q.  And you tried multiple times to

24  obtain a copy of that video?

Page 176

1          A.  I sent a FOIA request to the

2     sheriff's department, yes, sir.

3          Q.  But ultimately you had to assert

4     the allegations in the complaint without

5     having that video to review first?

6          A.  Yes, sir.

7          Q.  So as we sit here today and watch

8     the video, there was some factual variance

9     from the way that you recalled the event and

10    the way that the video shows the events?

11              MR. ROBINSON:  Object to the

12    form.

13         Q.  Is that right?

14         A.  Yes, sir.

15         Q.  But ultimately it is your testimony

16    that you otherwise wouldn't have invited

17    Deputy McPeake in your house to look in your

18    gun safe but for this search that was

19    occurring against your will?

20         A.  Absolutely.  I would not have

21    invited him in.  If I wasn't threatened with

22    arrest, I would have never let them in my

23    house.

24         Q.  Was it your understanding that you

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA748

1   had any choice but to comply with the search

2   that was taking place in your house once it

3   was under way?

4        A.  Once she threatened me with arrest

5   and he called for assistance, I had no -- no

6   way that I think that I -- I had to let her

7   in.  That's -- that's my thought process.

8        Q.  Were you threatened with arrest

9   multiple times?

10        A.  Yes, sir.

11        Q.  Do you recall how many times?

12        A.  I can't give an exact number.

13   Maybe seven -- six, seven.

14        Q.  And who would have arrested you, do

15   you know?

16        A.  Bailiff McPeake or the deputies

17   would have arrested me.

18        Q.  And were you afraid of getting

19   arrested?

20        A.  Absolutely, sir.

21        Q.  Why?

22        A.  Because I would lose custody of my

23   kids, what I had.

24        Q.  Any other reasons?

Page 178

```
 1          A.  I mean, lose my job.  I'd lose
 2    everything that I have built if I got
 3    arrested.
 4          Q.  So did you voluntarily consent to
 5    the search of your house that day?
 6          A.  No, sir.  Under duress and threats.
 7          Q.  In fact, did you demand a search
 8    warrant?
 9          A.  Yes, sir.
10          Q.  What was the response?
11          A.  I don't need a search warrant.
12          Q.  At some point, was your phone
13    seized?
14          A.  Yes, sir.
15          Q.  And who seized your phone?
16          A.  Bailiff McPeake.
17          Q.  Did you voluntarily give your phone
18    to Bailiff McPeake?
19          A.  No, sir.
20          Q.  Why did you do so?
21          A.  Under threat of arrest.
22          Q.  Did you voluntarily stop recording
23    on your phone that day?
24          A.  No, sir.
```

1        Q.  Why did you stop doing so?

2        A.  I was scared of going to jail under

3   threat of arrest.

4        Q.  Was Sharon Masual, your girlfriend,

5   threatened with arrest --

6        A.  Yes, sir.

7        Q.  -- that day?

8        A.  Yes, sir.

9        Q.  Was she told to stop recording

10  under the threat of arrest?

11       A.  Yes, sir.

12       Q.  And who made that threat?

13       A.  Judge Goldston.

14       Q.  Was Deputy McPeake present at the

15  -- when that threat was made?

16       A.  Yes, sir.

17       Q.  Was he in uniform?

18       A.  Yes, sir.

19       Q.  Was he there on the property in a

20  marked police cruiser?

21       A.  Yes, sir.

22       Q.  And you testified earlier that you

23  had parted ways with your prior attorney,

24  Brandon Johnson.  Did that occur after your

Page 180

1    divorce was finalized?

2         A.  Yes, sir.

3         Q.  So the case was over, right?

4         A.  Yes, sir.

5         Q.  After Judge Goldston was

6    disqualified from presiding over the contempt

7    action that was pending in family court, I

8    think you said Judge Lisa Clark eventually

9    began to preside over the action?

10        A.  Yes, sir.

11        Q.  So just to -- just to be clear, the

12   ultimate disposition or the ultimate

13   adjudication of this contempt petition that

14   we are -- we have talked about here today was

15   that it was dismissed without a finding that

16   you were in contempt; is that right?

17        A.  Yes, sir.  She said on the record

18   she is letting the case go.

19        Q.  And that was said when?

20        A.  Tuesday, February 15th, 2022.

21        Q.  Has a written order been entered to

22   your knowledge that memorializes that?

23        A.  No, sir.  She said she is going to

24   prepare it.  And I have got the court

Page 181

1    recorded audio.

2        Q.  But you do have a copy of the court

3    audio where she said -- Judge Clark says that

4    the contempt petition is being dismissed

5    without a finding of holding you in contempt?

6        A.  Yes.

7        Q.  Regarding the video being out

8    there, whether on the news or elsewhere, was

9    it important to you that other people know

10   about what happened to you?

11       A.  I think it was very important to

12   get my story out because it has been

13   happening to people for 20 years as Judge

14   Goldston admitted to.  So it is -- it is

15   important because the judge is supposed to

16   have the utmost integrity if anybody is

17   supposed to have it.  You guys are all

18   officers of the court.  You are supposed to

19   have integrity.  The judges must have the

20   utmost integrity.  It is important to know

21   what our deputies are doing with that search

22   warrant.  It's important to know what our

23   judges are doing behind the scenes.  When you

24   go to court for divorce, it should be just

Page 182

1    divorce.  All of these other games should not

2    be played.

3        Q.  If only you knew about it or only

4    you and your lawyer knew about it, do you

5    believe as we sit here today that that would

6    have caused you less anxiety or less

7    emotional trauma than you actually suffered?

8        A.  Can you say that question again?

9        Q.  Well, the insinuation is, is that

10    you say that you suffered emotional trauma

11    because everybody had seen the video.  And if

12    you yourself consented to putting the video

13    out there or put the video out there, then,

14    you know, the suggestion or the insinuation

15    is, is that you -- you know, you chose to

16    make that happen.

17            So my question is, is had you made

18    a different choice or had you not put the

19    video out there, do you believe that you

20    would have suffered any less?

21            MS. TULLY:  I am going to object

22    to the use of the word insinuation.  I mean,

23    he testified that it being out there causes

24    him stress and anxiety.

Page 183

1          MR. BRYAN:  I'm sorry.  I

2  completely butchered that question.  Let me

3  try to rephrase this.

4      Q.  Do you believe that you would have

5  suffered any less if the video hadn't been in

6  the news or on social media?

7      A.  I suffered regardless because my --

8  my lack of faith in the way a judge is

9  supposed to act and the police officer is

10  supposed to act happened.  You couldn't take

11  that from my memory.  Now, I do believe that

12  I suffered more when the video come out.  But

13  I -- you know, I had to to get justice.

14  There was only one way of getting justice,

15  was to put it out there.  I mean, again, for

16  20 years, people were scared to speak up.

17      Q.  So, in effect, did you feel that

18  that was an important step that you were

19  forced to take?

20      A.  Yes, sir.  It was -- it was either

21  that or swept under the rug as it has been

22  for 20 years.

23          MR. BRYAN:  All right.  Can I

24  have just a minute?  I think I'm probably

Page 184

1   done.  I'd just like to talk to Matt real

2   quick.

3              (Break in proceedings.)

4              MR. BRYAN:  I don't have any

5   other questions again.

6              MS. TULLY:  I just have a couple.

7              RE-EXAMINATION

8   BY MS. TULLY:

9       Q.  Judge Goldston never carried

10  anything out of your home; is that correct?

11      A.  Not that I know of.

12      Q.  Okay.  You say you contacted --

13  again, I don't want to know what you all

14  talked about.  But you think you contacted

15  Mr. Bryan sometime within a couple of weeks

16  of this happening?

17      A.  I am going to say within a week.

18      Q.  Okay.  So if this video was on the

19  news on March 5th of 2020 -- were you the one

20  that provided the video to the news?

21      A.  No.  I contacted him -- I probably

22  contacted him the same day.  Matter of fact,

23  I'm pretty sure I contacted him March 4th.

24      Q.  So you contacted him immediately?

Page 185

1          A.  Yes.

2          Q.  And you don't believe that without

3     putting that video out there, anything could

4     have happened?

5          A.  Yeah.

6          Q.  Like we wouldn't be sitting here

7     today had you not put that video out on --

8          A.  For 20 years, she had been

9     searching houses.  For 20 years, it has been

10    going on.  For 20 years, people didn't feel

11    like they had a voice.  For 20 years, they

12    haven't.

13         Q.  So you are being the savior of all

14    of these --

15         A.  There is no savior.  I hate it.  I

16    hate that it ever happened.

17         Q.  What's your ultimate goal with this

18    lawsuit?

19         A.  I want justice, ma'am.

20         Q.  So you want her to stop being able

21    to perform these searches, is that --

22         A.  Absolutely.

23         Q.  Okay.  Do you believe that has

24    happened through the hearing --

Page 186

1      A.  I have no faith in family court

2  now.

3      Q.  Let me finish my question.

4      A.  Sorry, ma'am.

5      Q.  Do you believe that that justice

6  has occurred with a result of the West

7  Virginia Supreme Court order?

8      A.  Do I believe them -- can you

9  rephrase it maybe so I understand?

10      Q.  Do you believe that the justice --

11  which you just told me that to you is that

12  she can no longer do these home visits, do

13  you believe that that justice has occurred?

14      A.  No.

15          MR. BRYAN:  Objection to the form

16  of the question, characterization of home

17  visits.  The Supreme Court said it was a

18  search.

19          MS. TULLY:  Okay.  Well,

20  regardless.

21      Q.  You don't believe that that justice

22  has occurred?

23      A.  No, ma'am.

24      Q.  Why not?

1        A.  I just don't think I do.  I mean,

2    it is -- she's still practicing.  She

3    violated many canons.  She violated laws.

4    There is no public trust.  When you hear --

5    family court now, it is a joke.  The average

6    man would say, oh, yeah, the one searching

7    houses, the one taking kids.  The integrity

8    of the system is gone in my opinion.

9        Q.  Okay.  How do you obtain justice

10   through this lawsuit?

11       A.  I think through this -- you know,

12   that's a good question.  I'd have to think

13   about it.  Because I don't have an answer for

14   you right now.

15       Q.  Well, you are the one who wants

16   justice.

17       A.  I do.

18       Q.  How do you obtain justice through

19   this lawsuit?  Because you agree with me that

20   this lawsuit can't take her off the bench,

21   correct?

22       A.  As far as I know.  I am not too

23   legally on that.  But okay.

24       Q.  Okay.  So what's your justice

1  through this?

2      A.  So if we go to trial and she is

3  found guilty, then it can take her off of the

4  bench because then she is convicted of a

5  civil penalty.  So I don't know.  You are

6  asking -- you're asking me the question.  I

7  am giving you an answer.  If she is found

8  guilty, then there will be some kind of

9  penalty for that.

10     Q.  Monetary?

11     A.  I guess.

12         MS. TULLY:  Okay.  I don't think

13 I have anything else.

14              RE-EXAMINATION

15 BY MR. ROBINSON:

16     Q.  On this timeline for picking up

17 property, you say March 2018, Mrs. Gibson

18 picked up her personal property from my home,

19 I have audio of her going through the home.

20 Including closets and drawers.

21         Do you still have that audio?

22     A.  I don't know.  I just switched

23 phones.  I may have it on my home drive.  I

24 may not.  I don't know.

Page 189

```
 1        Q.  Did she know that you were
 2   recording her?
 3        A.  Inside my house?
 4        Q.  Yes.
 5        A.  The answer is probably not.
 6        Q.  Okay.  Are there any other
 7   recordings of her that she doesn't know
 8   about?
 9        A.  No, sir.
10        Q.  Are you sure?
11        A.  Yes, sir.
12             MR. ROBINSON:  That's it.  I
13   don't have anything else.
14             MS. TULLY:  Actually, I have one
15   more.
16                RE-EXAMINATION
17   BY MS. TULLY:
18        Q.  You now remember that you called
19   Mr. Bryan on March 4th, 2020, correct?
20        A.  Yes, ma'am.
21        Q.  Do you remember if you called him
22   between the time you left the courthouse and
23   got to your home, or if you called him
24   sometime later in the day?
```

Page 190

1           A.   It is going to be later in the day.

2               MS. TULLY:  All right.  I think

3    that's all of the questions that I have.

4               MR. ROBINSON:  Okay.

5               MR. BRYAN:  He will read.

6               (Deposition concluded at 1:30

7    p.m.)

8               * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 191

1                    **CERTIFICATE**

2

3        I, Tara Arthur, Certified Stenotype

4    Reporter and Notary Public, do hereby

5    certify that the foregoing deposition of the

6    above-named witness, was duly taken by me in

7    machine shorthand, and that the same were

8    accurately written out in full and reduced

9    to computer transcription.

10        I further certify that I am neither

11   attorney or counsel for, nor related to or

12   employed by any of the parties to the action

13   in which this deposition is taken; and

14   furthermore, that I am not a relative or

15   employee of any attorney or counsel employed

16   by the parties hereto or financially

17   interested in the action.

18        My commission expires April 16, 2022.

19

20   _____

     Tara Arthur
21   Certified Court Reporter/Notary Public

22

23

24

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA763

USCA4 Appeal: 22-1757   Doc: 23-2   Filed: 10/21/2022   Pg: 258 of 402

1

## Exhibits

**Gibson02232
2Ex1** 3:10
15:24 16:1,6,
11 17:23
18:1,8,21,22,
24 19:4,5,8,
10,14,17
20:6,15 22:16
23:2,18 26:10
27:15,23 30:5
112:22
124:19,22

**Gibson02232
2Ex2** 3:10
19:5,9,18
20:6,12,13
23:2,18 27:10
28:7 29:21
30:6 124:24
125:1

**Gibson02232
2Ex4** 3:11
121:6,8,17

**Gibson02232
2Ex5** 3:12
162:20,21

**Gibson02232
2Ex6** 3:12
167:13,14

## $

**$100** 31:17

**$250** 30:16

**$3,000** 30:20,
22

**$5,000** 91:16,
18

## 1

**1** 15:24 16:1,
6,11 17:23
18:1,8,21,22,
24 19:4,5,8,
10,14,17
20:6,15 22:16
23:2,18 26:10
27:15,23 30:5
112:22
124:19,22

**10** 6:10 104:7
106:19

**10-minute**
107:6

**10:34** 103:19,
21

**11** 11:11

**113** 6:12 7:21
65:14 76:13
105:15

**12** 7:3 96:11

**13** 7:3 65:6
96:11

**14** 65:7

**15th** 160:22
180:20

**17** 167:18,22

**18** 7:1 14:16
29:17 68:18
96:12 142:6

**18th** 21:1

## 2

**19** 20:20
27:11 28:8
73:1

**1977** 6:10

**1995** 8:15
11:11 74:16

**1995-ish** 74:5

**1996** 41:12
69:10,13

**1997** 73:2

**1999** 73:18

**1:30** 190:6

## 2

**2** 19:5,9,18
20:6,13 23:2,
18 27:10 28:7
29:21 30:6
124:24 125:1

**20** 10:23
46:21 89:2
149:2 169:2
181:13
183:16,22
185:8,9,10,11

**2001** 69:14,
15,17

**2005** 8:2

**2015** 79:18

**2017** 11:18
12:2,4 76:1,
16 80:6
161:12,24
162:3,22
164:5 165:22
167:12,18

**2018** 10:1
14:16 20:20
24:3 28:8
29:3,8 32:10
33:4 34:9
35:16 49:21
52:1 77:9,14
78:9 80:9,16
86:23 94:13
127:11
167:20,22
188:17

**2019** 13:3
28:2 90:3
93:19,23

**2020** 4:16
27:11,16
37:18 40:4
41:6 42:8
43:9 49:1
50:10 51:2,14
52:9 57:15
62:19 91:4,14
93:19 94:3
96:14 98:1
103:6 125:14
143:23
167:24 168:1
184:19
189:19

**2022** 180:20

**20th** 88:24

**22** 10:8

**23** 171:1
172:2 173:24

**25813** 6:13

**26** 145:9

## 3

**3** 21:22
120:15 121:7

**30** 49:21
76:15 80:9
87:7,10 88:10
98:7,8,12,13,
22 149:2

**304-673-2986**
95:23

**30th** 11:18
80:6

**31st** 7:3

**35** 139:23

**3rd** 91:13

## 4

**4** 4:16 27:16
28:2 37:18
40:4 41:5
43:9 49:1
50:10 51:2,14
57:15 91:4
93:18,19,22
94:3 96:14
97:24 121:6,
8,17 125:14
143:23

**40** 139:23

**4th** 27:18
28:5 37:1
52:6,9 57:18
89:19 90:3,4,
6,11 92:4,12,
14,16,18,19,
21,23 93:5

Elite Court Reporting, LLC
MATTHEW GIBSON, 02/23/2022

JA764

96:17 102:13,
16 103:6
126:12
184:23
189:19

**5**

**5** 162:3,20,21

**50** 163:11

**50/50** 141:2

**5:00** 99:12

**5th** 184:19

**6**

**6** 167:13,14

**6:00** 99:12

**9**

**9** 165:22
167:12

**96** 73:1

**A**

**A-A-R-O-N**
4:10,11

**a.m.** 103:19,
21

**Aaron** 4:9,10
122:11

**abide** 41:15

**ability** 11:5

**absolutely**
16:24 17:18

18:15 25:13,
14,15 54:23
136:8 152:14
153:16
176:20
177:20
185:22

**abuse** 33:13
66:19,24
67:2,3 81:12,
18 82:8,10,
12,14,16
83:12 163:6,
19 165:12
166:3,21,23
167:3

**abusive**
82:23 166:7
167:6 171:24
172:6,20
173:7,20
174:8

**accurate**
147:23 148:1,
2 162:9,12

**accurately**
16:10,20 25:8
40:2

**accusation**
66:22 165:18

**accuse** 66:23
166:20,23

**accused**
165:12 166:2

**acre** 66:8

**act** 183:9,10

**action** 169:3,
5 180:7,9

**active** 72:12
73:2

**actual** 36:9
98:10

**added** 16:3
129:22

**additional**
16:3

**address** 6:11
7:24 171:9

**adjudication**
180:13

**admissions**
18:5

**admit** 161:3

**admitted**
19:17 20:17
23:2,3 102:8,
13 181:14

**adultery** 67:1

**affect** 11:4

**afraid** 177:18

**Age** 140:4

**agree** 15:2
187:19

**agreed** 30:2

**agreement**
13:17 15:18,
20 23:15 31:5

**ahead** 22:13
26:23 42:15
109:12,16
112:4,16
121:15
146:10 148:5
175:1

**Air** 69:18,19
72:8,14,18
74:3

**Alexandria**
163:24

**allegation**
142:19

**allegations**
33:12 83:12
176:4

**allege** 82:20
133:2 136:2,
18 138:20
139:19 142:8
157:8,18,21
158:20
160:23 167:9

**alleged** 82:13

**alleging**
89:24 125:4

**allowed** 44:6
78:7 125:5
144:8 147:22

**altered** 16:2
26:11 40:7

**altogether**
60:2

**ammo** 30:20

**amount** 63:21
84:10

**amounts** 32:3

**anger** 46:15
161:19

**annotations**
17:13

**answering**

143:19

**answers** 5:6

**anxiety** 43:15
47:21 54:21
161:16,22
162:4,24
168:15 182:6,
24

**anymore** 11:1
48:22 88:20

**anytime**
44:21,22
45:23 46:3
48:5 67:1,8
139:24 156:4

**appeared**
27:18

**appears** 13:6

**appointment**
45:14

**approached**
14:11

**approximatel
y** 10:1

**apps** 110:14

**April** 24:3
77:9 82:4
94:12 127:11

**AR-15's**
30:19

**area** 163:8

**argue** 85:20
135:20

**arguing**
128:6 140:2
150:9,11

152:23

argument 85:13

armed 151:9

Army 72:19

arrest 146:19 147:19 149:14,17,20 150:1,9 151:10 170:2, 6,10 173:3 176:22 177:4, 8 178:21 179:3,5,10

arrested 131:18 177:14,17,19 178:3

arrive 105:16 154:12

arrived 38:17 99:16,18 115:3,4 154:16

artistic 116:9

assert 176:3

assigned 32:5

assist 13:16

assistance 137:7 151:24 152:19,21,23 177:5

assistant 111:7

assume 8:6 71:23

assuming 26:8 54:9 56:23 74:10, 11 75:2 76:14 91:21 92:1 107:2 130:16 134:10

attached 16:23 18:3 123:18

attempt 60:17 114:19

attend 10:24 48:18

attending 9:5

attention 96:13

attorney 4:14,21 12:16 13:18 21:6 23:17 24:13 25:5 28:18 29:13 34:2 37:23 38:21 40:13 48:8 55:1 81:21,22 89:14 143:17 168:12,21 169:7 171:12 179:23

attorneys 30:2 101:11

audio 34:17 105:20 110:1, 4,7,8,20,24 111:1,13 127:20 130:20 131:3, 19 181:1,3

188:19,21

aunt 162:23 163:6,15 164:11,13,22 165:3

aunt's 163:21

aunts 165:4,5

authorities 60:23

authority 151:10

authorize 173:5

average 187:5

awarded 8:7 28:14,22 35:17 124:4, 16 158:2

aware 132:4

**B**

back 5:15 8:11 14:22 40:9 43:11 45:1,8 67:9 78:7 80:15,21 84:19,20 89:16 93:20 94:5 104:2 109:15 110:17 111:4 117:4 124:14, 20 130:11 133:19 134:7 136:1 139:2 145:14 157:17

backed 128:23

background 8:13

backup 136:18,21

bad 111:7 162:22

badge 151:4, 10

bag 79:23

bailiff 14:2 52:20 100:22, 23 120:21 132:22 144:5 147:20 150:10 171:11 177:16 178:16,18

ball 67:11

bank 66:4

Baptist 10:22 166:13

Base 72:14, 18

based 20:20 21:15

basically 9:18 59:13 71:3 91:19 105:19 135:20 154:24 155:9 166:8

basis 7:5 50:21

basket 158:12

basketball 45:9

bathroom 102:4

battles 13:14

beard 122:8

beast 114:1

Beaver 6:13 69:3

Beckley 8:18 9:1,14

bedroom 21:21 22:5 31:17

began 38:6 171:21 180:9

begin 11:15 42:3 121:22

beginning 12:22

belaboring 27:9

belief 15:14 36:18 59:6

believed 88:13 113:10, 12,13

believing 43:16

belong 10:18, 19 133:5

belonged 140:6 142:9 158:24

4

159:12

belongings 171:6

belongs 157:22

bench 187:20 188:4

bi-weekly 45:5

big 13:13 86:9,12 113:18,21 122:10

bigger 122:18

birds 143:12

birth 6:9 32:16 80:24

birthday 65:7

bit 46:15 56:15 70:21 111:5

black 49:3,5, 10 50:7 51:1, 7 52:12 62:7 86:15 97:8, 16,21 103:24 104:14 107:16 109:20,21 114:16 118:15

blocked 51:22

blood 164:14, 20

blowed 123:19

blower 16:8

blowers 16:5

blue 108:16 109:17

Bluefield 8:24 9:3,6

blur 115:15

boards 129:19

Bob 116:10

Bobby 122:12 154:23

bolted 123:22 125:10,13 128:2,5 129:10,13

bolts 129:20

book 76:7

bothered 44:8

bottom 49:13 51:19,20 62:1 80:8 81:6 84:9 87:23 95:5 96:6 99:6 129:19, 20

bought 8:8 65:17 124:8

box 117:7

boxes 35:12 49:23 88:18

boyfriend 67:24 119:18 142:1

boyfriend's 68:1

boys 65:4

Brad 57:6

Branch 166:15

Brandon 12:20 76:3 89:13 91:6 101:17,22 167:2 179:24

break 5:23 6:3,6 55:23 102:4,5 146:4,5 152:7 184:3

bring 81:2 85:15 97:4 119:24 142:3 148:5

Bringing 10:12

Brooklyn 6:23,24 7:1,8, 13,19 52:22 53:2 63:15 96:8,12 141:7

Brooklyn's 21:21

brother 67:23 84:15 118:16, 23 119:7,24 120:2,4

brother's 119:10

brought 78:6 81:3 102:18 120:2

Bryan 24:14, 17,20 25:6 34:5,10,17,20 39:8 53:13,15 54:2,9,12 102:3 116:23 120:19 121:1 124:24 131:13,15 145:7 147:18 150:2 157:12 170:21,24 171:17 173:13,24 174:5,22 183:1,23 184:4,15 186:15 189:19 190:5

buddy 74:16, 19

build 9:19 123:20

built 123:17 178:2

Bullis 72:19

bunch 78:3

Bureau 68:24 69:12,23 70:5 71:8

burner 96:1

butchered 183:2

button-down 108:16

buy 83:10 124:7,8 157:23,24

159:4

_____

C
_____

call 4:23 20:5 38:15 39:19 49:15,19 58:20 65:9 66:7,11,12 95:6 96:1 100:21 114:20 123:12 129:6 135:7 136:21 137:6 138:15, 19 151:24 152:5,20 164:12,15,16, 23 167:4

called 4:2 15:23 16:1 19:16 20:15 23:2 38:20 91:13 99:22 100:24 101:3 106:9 136:18 137:4,5 152:18,22 163:10 166:8, 21 177:5 189:18,21,23

camera 110:22

Camp 72:19

canons 187:3

car 74:23 79:15 105:12 118:20 119:22,23

5

card 32:16

cardboard
35:12 49:23

care 44:13
49:23 73:7

Carolina
72:16

Carrie 6:18
7:16 50:2

carried 62:6
78:24 86:13
90:4 98:21
165:8 184:9

carrier 95:12
124:1,8,10,13
128:3,4,7,14,
17 129:1,5,6,
9

carry 86:15
98:5 154:8

carrying
149:12
150:15

cars 97:6
132:14

Carter 51:9,
13 52:12 97:8
98:24 104:15
107:16
109:18,23

case 16:19
35:6 45:24
46:8 56:12,21
58:4 63:3,6
91:18 94:20
97:14 116:24
143:15 160:2,
3 168:9 171:3

180:3,18

cases 48:15
83:3

caught 16:3

caused 41:6,
10 43:11
54:21 162:23
182:6

cell 110:2,5,6
148:11

certificate 9:3
32:16 81:1

certificates
9:7,10

certifications
9:8

chainsaw
133:3,4,7,9,
12 134:6,13,
16,19,20
135:1 139:6,7

chair 9:19

chairs 158:2

chance 43:19
126:22 140:1
146:7

changed
95:10

characterizati
on 186:16

charge 89:23

charged
73:24

cheating
66:17

check
152:10,16

child 48:15
59:22 63:3,4,
7,8,12

children 6:20
7:12 64:12
65:1,3
102:10,15
142:9

choice 177:1
182:18

chose 182:15

Chris 169:9

Christmas
140:15
159:11

chronological
143:22

church 10:18,
22 11:2

circled 16:17
21:15 30:12,
13,16,20
31:22,23

circles 21:16

city 113:19

civil 188:5

claim 59:13
81:18 82:8
85:7

claimed 60:6
163:6

claiming
83:11

claims 81:12

Clarify 84:12

Clark 35:5,9
37:6 46:7
56:24 57:3
59:8,16,21
60:5,20 62:12
83:9 88:12,
22,23 159:23
160:1 180:8
181:3

Clark's 82:6

clear 180:11

clerk's 19:11
27:11,15

client 148:10
151:2,6

close 105:22
154:2

closely 29:22

closets 79:3
188:20

closing
153:24

clothes
32:12,13,19
78:24

clothing 79:2
80:20

clue 22:21

co-worker
49:4 51:10

co-workers
55:11,15

cold 86:24

collect 78:8

college 8:21

comments
55:3,7

communicati
ons 54:3

complaint
92:17 144:12
175:9 176:4

completely
183:2

Complies
117:11

comply 177:1

computer
77:18,20
78:24 79:2

conceded
146:22

concluded
40:21,23 41:2
190:6

condition
62:8

conference
13:23 57:8
58:11,14
59:17 99:23
100:3,7 101:7

confidential
54:3

confront
67:10,14

confused
84:21 124:21

confusing
19:2

6

connected 72:20 163:4

consent 178:4

consented 182:12

considered 70:5 118:19, 24

constitution 41:15

contact 114:19

contacted 184:12,14,21, 22,23,24

contempt 27:19 37:13 45:24 46:6 57:14,17,18 58:23 59:2,19 89:23 91:3 92:14,21 94:4 101:18 102:16 159:19,21,24 160:10,18,21 180:6,13,16 181:4,5

contentious 81:15

contesting 102:20

context 172:13

continuance 46:3 90:11

continuation 160:2

continue 12:24 27:8 47:23 146:10 173:17

continued 40:23 90:21

continuing 108:3

controlling 82:23

convenience 6:2

conveniently 145:9

conversational 5:10

conversations 13:5

convicted 73:8,14 188:4

coordinator 97:15

copied 23:23 37:6 103:14 135:24

copies 18:11, 14,21 26:23 36:1,10,19, 22,23 94:9, 10,18,22,23 126:24 127:3, 4,14,21

copy 16:11 20:21 24:6 27:1 30:1

37:9 43:24 95:8 126:20 127:13 144:22,23 145:2,3,14,18 175:24 181:2

copying 24:22

correct 8:19 9:21 12:14 20:7,8 21:8, 10,17 27:20 34:24 36:1,4, 15 37:15 38:7 40:19 42:11 49:1 52:23 53:18 55:1 57:11 58:5 59:3,5 66:6 67:22 68:21, 24 70:2 71:11 72:1,9 73:21 79:9 86:1 87:1,15 89:8, 15,23 90:1,21 92:15 94:1 98:12 100:3, 17 101:4,16 102:1,10 105:8 106:2 108:3 113:11, 16 114:13 119:5,18 121:19 125:22 130:5, 23 135:13 139:3,8 140:11 141:1 147:6,13 148:7,12,14, 18,20 149:7, 10,13 151:21

153:24 156:14 157:19,20 161:1,4,14 163:3 164:11 167:23 168:22 170:3, 6 175:12 184:10 187:21 189:19

corrected 15:22 20:11 23:15 30:3 127:5 133:8

correction 70:1

correctional 9:21

corrections 23:11 69:24 70:6 71:5

cost 94:20

couch 32:23 86:13,18 88:2,4

counsel 108:11 116:22

counseling 42:1,20 44:20 102:9,15 160:24 161:4, 6 166:19,22

counselor 42:4,7,11,14, 19 43:4,8 102:21

County 12:8 19:11 46:16 57:1,4,6 97:19 121:24 170:9

couple 4:15 55:20 68:7 85:14 184:6, 15

court 4:3 12:10 18:23 20:11,17 23:8 34:14 35:21 36:2 44:5,23 45:1,23 56:21 57:24 62:11 65:24 68:15 71:24 76:18 81:10,19 83:3 88:22 99:15 103:7,18,21 112:23 120:10 134:10 142:3 146:24 171:4 173:14 174:1 180:7,24 181:2,18,24 186:1,7,17 187:5

Court's 171:2 172:3

court- 102:14

court-ordered 94:7 102:9

courthouse 38:16 39:21 96:16 97:5 99:15,18 104:11

7

106:20 114:8, 18 189:22

**courtroom** 13:24 14:1 38:7 40:19 82:6 99:20 100:17,20 101:9

**courts** 91:17

**Crab** 74:17

**crap** 163:13

**crazy** 168:5

**crime** 46:22 73:9,15 74:1

**cruiser** 179:20

**cruisers** 170:12

**cuff** 55:17

**current** 6:11 45:14 68:11

**custody** 15:8 16:15,19 22:4 63:14,17 70:24 139:22 140:19,21,24 141:4 159:10 177:22

---

**D**

**da-da-da** 82:24

**dad** 32:20 33:17 69:19 70:19 73:6 80:16 84:15

111:23 116:4 119:3,5,7 120:2 163:10, 12

**dad's** 119:8

**daily** 45:18, 20 50:21,23

**damaged** 59:14 61:10, 16,17 160:13, 14

**dark** 99:12

**date** 6:9 12:2 20:23 40:24 57:18 58:1 75:3 76:14 78:9 92:17

**dated** 27:11, 15 28:7 162:3 167:12

**dating** 68:11, 12,16,20

**daughter** 16:14 22:4 52:23 159:10 164:8,9 166:7 167:5

**daughter's** 15:7 16:18

**daughters'** 45:9

**Dawson** 85:3

**day** 21:2 39:17 44:8 45:22 48:3,17 53:8 60:9 67:21 77:8 84:17 87:18,

19 90:5 96:14,16 99:9,15 151:23 178:5, 23 179:7 184:22 189:24 190:1

**days** 166:6

**dealt** 120:16

**debate** 94:14

**December** 11:11 28:2 90:3,6 91:10 92:4,16,18,19 93:5,18,22 96:12

**decide** 13:10

**decided** 76:17 94:17 111:24 158:13

**decision** 87:22 160:20 172:7

**deck** 157:17

**decompress** 48:20

**defend** 43:19, 20

**defendants** 168:8

**defense** 44:4 103:16 113:7 125:18

**demand** 178:7

**Denali** 79:18 109:4,5

**department** 46:16 121:23 122:1 170:9 176:2

**department's** 118:9

**deposition** 4:18,24 19:1, 14,19,22 23:19 44:22 190:6

**deputies** 4:15 121:24 132:5 134:24 146:21 150:10 154:11 170:12 177:16 181:21

**deputy** 52:21 56:11 101:14 111:16 112:8 131:14 134:12 142:20 146:20 148:11 154:6 155:17,18 158:15 170:8 172:14,17,23 174:16 175:19 176:17 179:14

**derecho** 123:19

**description** 143:23 165:21,23

**detain** 155:18

**detained** 155:9,18 156:19

**develop** 14:7, 9

**developed** 14:10 24:8

**dew** 35:11 88:13,15

**diagnosed** 161:21,24

**diagnosis** 162:4,9,12,16

**diagram** 116:24 117:3, 5

**difference** 44:1 70:23

**digital** 94:18, 22,23

**direct** 96:13

**directed** 171:6,20

**dirt** 133:23

**dis-** 36:13

**disability** 75:9

**disagree** 162:15

**disagreement** 35:23 36:5, 12,14 112:21

8

disbelief
46:14

discharge
10:5,11 71:22
72:22 73:6

discovery
41:4 58:20,22
90:9 94:1
143:14
144:19,21
145:1,8

discussed
50:9,12,17
53:1 54:7

discussing
106:7

discussion
17:11 18:17
27:5 85:21
115:6 117:1
122:23

discussions
91:9

dishonorable
72:22

dismiss 46:8

dismissed
180:15 181:4

disorder
162:4

disposition
180:12

dispute
151:19 167:3

disqualified
180:6

disqualify
106:10,15

dissension
81:11

distress 41:6,
10 54:22

distribution
13:19 20:7,24
23:7 28:11
29:12 37:15

disturbance
70:16

divide 14:13
21:8

divided 14:8
22:2 33:1
78:18

divorce 8:6
11:15,22
12:6,17 23:4
28:23 33:13
46:23 48:13
56:21 63:6
67:8 75:22
77:1 81:14
162:11,17
163:5,11
166:1 168:7
180:1 181:24
182:1

divorced
66:14 68:10,
12,21

docs 78:1

doctor
162:13

document
146:12

documents
25:21 90:15

dollar 32:3

dollars 16:14
30:9,24 31:2
85:14

door 133:21,
23

doors 79:3

Dorsey 57:6
58:7 159:23

Doug 49:3
62:7 86:15
97:8,11,16,21
100:9 103:24
104:14
107:16,19
109:20,21
114:15

Doug's 109:2
115:19

downstairs
138:12,18,22
139:18 152:3
158:13

drafted
175:10

drama 165:9

draw 116:8,
12

drawers
188:20

drawing
121:17,19

drawn 117:6

draws 117:3

drink 74:9

drive 37:7,10
94:17 105:7,
12,14 106:19
120:12,15
188:23

driveway
49:8,9,13
51:20 52:7,9,
16 62:1 80:8
81:6 83:14,17
84:10 95:6
96:6 105:19
115:16
118:12
132:16

driving 46:18
74:2,7,8,10,
11,15 104:21
105:8 106:24
114:7,17,24
170:16

dropped
74:5,6

drove 96:17
97:1,6 104:10

drunk 74:8

dry 35:13
49:23 88:18
134:1

dude 70:10
156:10

due 23:15
44:7 148:3

DUI 122:19

duly 4:2

duress 134:5
144:16

146:19
149:16
150:12
152:12,13
178:6

duty 72:12
73:2

DVD 158:23
159:4,12

DVDS 94:17
139:23

DVP 33:16

_____

E

e-mail 37:7,
11

earlier 61:20
66:21 69:9
160:12
179:22

easier 5:15
27:3

easily 43:20

easy 5:11
43:22 124:23

edge 33:21
34:8

educational
8:12

effect 183:17

egregious
171:24 172:6,
20 173:7,20
174:8

elaborated
82:21

9

elementary
8:11

else's 46:20

emotion
161:23

emotional
41:6 54:21
162:5 166:2
182:7,10

emotions
47:11,12

employed
9:12,23 68:23

en 146:21
150:10

end 12:3
61:22 67:12

ended 54:4
123:11
154:14

ends 86:19

enforcement
41:12,20
69:9,16

entail 10:11

enter 171:12

entered 15:21
17:2 20:10
27:23 28:4
180:21

entering
149:7

entire 25:1
52:19

entrance
132:12

equals 21:16

Evening
99:11

event 176:9

events
143:23 169:4
176:10

eventually
5:4 100:17
180:8

evidence
17:3 23:3
26:16,17
58:16,18
103:3,16
125:19

evidently
46:23

ex-husband
171:5

ex-husband's
171:13,19,24

ex-wife 6:15
8:4 11:14
13:17 16:17
22:6 26:8
28:10 31:11
42:22 50:1
57:13,23 61:3
84:3,13 94:16
100:12,19
101:4,9,11,13
116:2 118:18
131:6,24
132:23
134:19
135:11
137:11 138:6
141:20 149:9

151:1 157:6
158:9 171:11

ex-wife's
84:15 109:7
111:23
115:24
118:11,16
119:6 141:16
159:7 171:12

exact 88:14
149:23
177:12

EXAMINATIO
N 4:5 56:6
170:23

exchange
31:9 49:12
52:2 84:1
127:17

exchanged
49:21

exchanging
51:21

exhibit 15:24
16:1,6,11
17:23 18:1,8,
21,22,24
19:4,5,8,9,10,
14,17,18
20:6,12,15
22:16 23:2,18
26:10 27:10,
15,23 28:7
29:21 30:5,6
39:9 112:22
120:8,15
121:6,7,8,17
124:19,22,24
125:1 162:20,
21 167:13,14

exhibits
19:22 113:7
124:18

existed
175:17

exit 85:5

expect 4:22

experience
173:9 174:10
175:6

explain 13:21
41:9 43:21
47:4,9,13
103:13
135:18,22
173:16

explore
120:24

expressed
161:22 162:5

_____

F

face 10:15

facilities
70:10

fact 48:24
82:4 167:4
173:2 175:14
178:7 184:22

factual 176:8

failed 102:8,
14,24 171:5,7

failure 73:17
171:9

fair 15:19
41:7,8

fairly 113:18

faith 44:9
183:8 186:1

fall 87:2

familiar
146:13

family 12:10
34:14 44:23
56:20 78:20
81:10 83:3
99:15 135:7
138:9,10,21
139:16,20
142:2,7 152:6
161:23 162:6
163:14 180:7
186:1 187:5

fashion 41:13

fast 56:16
74:7,10,12

father 67:5,6
78:10 100:14
115:2 120:1

father's 67:17

February
160:21
180:20

federal 9:13,
24 68:24
69:12,23
70:5,20 71:8,
24

feel 81:16
183:17
185:10

feeling 46:14
166:1

10

feels 66:9 113:22

feet 134:1

felt 13:13 171:9

fidgeting 175:21

fight 70:17

figure 78:22

file 15:24 16:11 20:11, 17 25:1

filed 4:15 11:22 37:13 56:13 75:8 76:1 77:1 89:23 163:5 175:10

files 45:24

filled 145:12

film 172:24

final 16:24 23:9,12,13 68:17

finalized 180:1

find 47:3,8,9 163:15

finding 180:15 181:5

fine 12:5 24:18 63:1 141:21

finish 146:7 171:17 186:3

finished 40:17 55:21

fire 108:10

five-by-eight 86:10

fixed 43:20

flag 111:22

flash 120:11, 12,14

flip 21:20

floor 99:16

flow 5:11

FOIA 176:1

follow 102:8, 14,24

food 70:10 95:16

footage 111:1

force 69:18, 19 72:8,14,18 74:3 143:2 147:15

forced 142:21 144:7 147:21 183:19

foreman 9:16,24 69:6 70:9

forgot 32:14

forgotten 80:24

form 14:23 15:7,9,21 16:2 26:11 30:3,15 32:7

41:12 43:21 124:5 127:4, 10,23 131:15 133:8 147:18 150:2 172:10, 11 173:11,12 174:11,12,21, 24 176:12 186:15

forms 15:23 77:21

Forty-five 64:17

found 160:18 188:3,7

free 156:13

front 25:1 56:21,23,24 59:7,20 60:5 62:5 81:19 82:13 85:15 89:5 94:13 108:24 115:17,20 125:2 129:3 132:15 133:21,23 159:19 160:1

full 15:8, 16:15,19 22:4 139:22 140:19,21,24 159:10

full-time 7:5

fully 146:9

fun 137:7

functioning 47:24

furniture 16:18 22:5

furthest 67:12

G

Gabe 65:10

Gabriel 65:9

games 67:11 182:1

garage 83:24 84:7,9 88:8 118:7 130:10 132:9,10,11, 13,21 133:1, 2,14,18,21 134:3,4 135:4,10 139:3,5 149:6

Gary 166:11

gave 35:19 94:8 131:11 144:2 151:18

gazebo 111:22 115:3 123:12,24 129:19,22,23 130:2,7,9 131:21 132:3, 6,10 136:17

general 32:5

generally 127:12

get along 141:21

Gibson 4:1,9, 12 6:18,20,23

7:8,17 8:8 11:10 18:20 21:7 32:8 35:17 50:2 52:22 55:24 66:13 127:14 171:1 188:17

gifts 140:14 159:11

girlfriend 39:5,12 40:7 50:19 53:21 63:23 68:11 93:12 104:23, 24 106:23 107:1,13,14 111:19,20 120:4 123:5 131:7 136:3, 11 159:13 179:4

girlfriend's 49:16 142:11 158:23

girls 7:4

give 5:6 6:8 8:12 13:9 18:23 28:21 30:4,8 31:20, 24 32:15 35:20 53:22 55:19 71:10 84:5,20 90:10,23 93:19 94:5,6 104:7 116:18 124:6 125:6, 24 126:18 127:2,3 149:20,24

11

177:12
178:17

giving 188:7

glove 32:17
81:1

goal 33:20
185:17

God 64:13

Goldsboro
72:16

Goldston
4:13 12:12
16:7 23:23
26:9 29:24
35:7 36:3
37:4 44:24
48:22 53:24
57:3 81:20,23
82:13 85:16
89:16 90:10,
20 92:22
94:14 101:16
103:11
106:14
111:17
126:21
127:12
128:23
130:16 131:3,
7 132:22
133:15
135:10,23
136:2 137:19
138:1 149:18
157:4 159:20
171:7 179:13
180:5 181:14
184:9

Goldston's
40:18

good 47:6
56:1 66:15
69:21 110:1
116:24 174:6
187:12

grab 149:24

graduate
8:13

graduation
32:17

gray 112:2

grew 113:19

ground 4:24
88:1,3

guess 10:21
15:18 40:23
41:2 63:20
71:20 80:1,2
86:6 93:23
95:17 99:22
103:19
104:14 128:1
129:9 135:6
152:5 158:9,
13 159:5
188:11

guided 28:18

guilty 168:18
188:3,8

gun 30:16
142:21 143:2
144:7 146:18
147:2,5,8,22
151:4,7,10
153:1,10,11,
12,14 172:7,
14,19 173:1
174:17

176:18

guns 16:12,
13,14 17:22
30:4,8,9,19
153:19,22

guy 70:10
109:17,19

guy's 116:11

guys 41:19
46:17 49:9
52:15 70:4
181:17

gym 67:12

_____

H

_____

half 70:12
139:22

hand 18:21
41:14 58:13
108:21

handcuffs
156:17

handed 18:22

handful 79:24

handing
149:15

handled 38:1

hands 150:16

handwriting
22:19,23

hang 128:18

hanging 36:9

hangs 129:7

happen

17:19,21
41:18 146:24
182:16

happened
5:11 17:15,17
31:8 43:16
52:5 53:6
65:7 90:6,7
134:6 135:15
138:20
144:15
163:11 167:7,
9 181:10
183:10 185:4,
16,24

happening
181:13
184:16

happy 5:22

harassment
164:7

hard 46:24
47:10,13

hash 13:23

hate 185:15,
16

head 5:12
37:19 61:11
71:14

hear 73:12
160:8 187:4

heard 108:6
112:11 164:1

hearing 16:8
17:3 20:24
23:3,4,19,20
24:3 27:19
28:23 35:7

37:17 38:2,6,
10 39:19,20
40:22 45:24
46:6 48:6,13,
18 57:14,17,
18 58:10,23
59:3,18 60:4,
5 62:19 77:9
78:5 82:1
89:16 90:2,7,
21 91:2,3,10,
11 92:4,14,21
93:1,5,23
94:4,13 97:24
98:1 101:18
102:7,12,13
103:6 108:2
126:12
159:19,21,24
160:10
185:24

hearings 29:1
48:3,4,17
57:8 58:8,11,
15 59:20 92:3
93:10

Heart 11:2

heavy 35:11
88:15

held 18:17
27:5 85:21
115:6 117:1
122:23
159:19

helped 49:12
98:5 107:10

hey 80:21,24
91:22 92:6
103:7 104:1
134:19

12

166:23

high 8:14,17
32:16 161:22
162:5

highly 81:15

hill 83:16
86:7 114:1

hire 12:21

hired 76:3
167:2

hits 53:5

hold 38:24
93:15 110:17
124:11,15
139:1 145:19
166:4

holder 125:9,
10

holding 26:10
174:2 181:5

home 6:14
8:3 29:18
33:9 35:17
39:15,24
40:3,17 41:5
60:17 65:14
66:10 79:1
80:4,10,14
87:21 96:5
105:15
106:20
107:15,21
158:5,7
169:11
171:13,19,24
172:4 173:8
174:9 175:6
184:10

186:12,16
188:18,19,23
189:23

honorable
72:21,23 73:6

hope 83:10

hour 29:11
87:12,13
98:7,8,14,15,
20,23

house 26:10
29:9 38:11
46:20 59:10
66:3 77:4,10,
15 78:8 81:17
86:13 91:13
93:13 96:21
97:1 103:20
104:2,11,18,
22 105:11,12,
17 107:20,24
108:7 113:5
114:8,13,18
116:13 117:8,
10 133:19,24
134:2 135:21
141:8,16
143:13
144:15
150:12
151:16
158:11 159:7
166:5 169:1
172:18,24
173:5 176:17,
23 177:2
178:5 189:3

houses 99:3
185:9 187:7

huh-uh 5:9,

17 148:15

humanitarian
73:5

hundred
85:14

hunting
84:18,22,24
85:2,11 86:1

husband
21:16

---

**I**

Ice 140:4

idea 5:21
53:12

illegal 73:20

illegally
46:20

Imagine
142:15,17

immediately
184:24

impact 45:18
47:4

important
181:9,11,15,
20,22 183:18

incident 4:16
43:13 49:6
50:9 51:3
61:4 67:22
70:17 90:5
96:15 123:6
160:24
167:16
169:17,20,23

170:2,6,7,10
171:21

Including
188:20

incorrect
103:1 144:10
145:18
146:16

Independenc
e 8:17

indication
13:9

indirectly
63:20

ineffective
171:10

inflamed 46:4

inflames
44:22 45:1,19
46:11

information
51:18 52:5
106:5

initial 32:10

initially 39:20
42:18 51:5

initiated
75:22

inmates 9:18
10:12,13

inside 26:10
100:7 119:15
121:1,2
144:15
150:11
151:15
153:14 155:5

169:13
172:24 173:1,
5 189:3

insinuation
182:9,14,22

insisted
169:10

intake 71:21
162:2

integrity
181:16,19,20
187:7

intending
152:19

interact 48:21

interaction
162:23

interrogatorie
s 143:16

interrogatory
143:21
145:16

interrupting
60:13

interview
99:21 103:23
105:10

introduced
28:1

invasion
171:23

inventory
79:22

investigation
61:1 169:5

invited

13

172:17,21,23
173:4 176:16,
21

**involved** 44:6
142:1

**issue** 42:9
44:16,17
142:3

**issues** 43:21
84:11 161:16
163:14

**items** 15:9,
11,12,14 16:4
32:14 35:16
49:12 57:12,
21,24 59:4,9,
10,13 78:8,
11,12,17,18
80:20 86:12
89:7,11 90:24
91:23 92:7
93:20 94:5,7
96:6 113:10,
16 151:20
158:6,10,16,
20 160:4,6,
13,14,16
171:22

---

**J**

**jail** 133:16
136:3 151:15,
23 152:20
156:1 179:2

**January** 6:10
78:5 82:3

**Jason** 43:5
47:14 122:15

**Jeff** 68:2,5
169:9

**Jennifer** 4:12

**Jimmy** 122:4

**job** 69:5,17,
22 178:1

**jobs** 10:9

**John** 53:23

**Johnson**
12:20,21
13:6,16 17:7
31:10 72:14
76:3 84:2
89:13 91:6
101:17
127:17,19
167:2 179:24

**Joint** 15:23
16:10 17:23
18:1,22 19:4,
16 20:15
23:2,17 30:5
112:22
124:19,22

**joke** 187:5

**Jonas** 65:9

**judge** 4:13
12:12,13 14:2
16:7 23:23
26:9 29:24
35:5,7,9 36:2
37:4,5 38:10
40:18 43:18
44:24 46:7
48:22 54:1
56:22,24 57:3
58:5 59:7,16,
21 60:5,20

62:12 81:19,
22 82:5,13
83:8 85:16
88:12,22,23
89:16 90:10,
20 92:22
94:13 101:16
103:11
106:13 108:7
111:17 112:8
116:5 126:21
127:11
128:23
129:11,12
130:16 131:3,
6,11,22
132:22
133:15
135:10,23
136:2 137:19
138:1 149:18
151:18
155:13
159:20,22,23
160:1 168:24
171:7 179:13
180:5,8
181:3,13,15
183:8 184:9

**judges** 123:3
181:19,23

**judicial**
71:13,16

**jump** 56:14

**June** 68:17
73:1

**jury** 47:4

**justice** 44:9
183:13,14
185:19 186:5,

10,13,21
187:9,16,18,
24

---

**K**

**K-9** 122:18

**Kevin** 56:9
102:3 114:6

**key** 21:15
77:9

**khakis**
108:18

**kicks** 70:7,15

**kidding** 55:18
104:4

**kids** 96:5
128:20,24
139:21 140:7
159:1,2
177:23 187:7

**kids'** 15:14

**kill** 143:12

**kind** 4:22,23
9:2,8 11:3
17:9 41:10,24
44:6 47:15,
18,20 54:21
55:18 79:17
82:16 106:7
129:2 140:3
147:1 165:19
166:20 188:8

**kinds** 55:14

**kitchen**
156:9,22
157:16

**knew** 108:4,6
137:6 156:2
169:3 175:17
182:3,4

**knowledge**
40:8 148:12
180:22

**Kyle** 21:7
45:23 62:20
76:10 82:5,22
89:22 90:12,
23 91:10
93:24 101:13
110:16 112:2,
3 115:9 116:4
131:22
132:23

---

**L**

**lack** 112:12
183:8

**Lackland**
72:18,20

**lady** 106:7
150:9

**laid** 80:7

**land** 112:13

**large** 66:6

**larger** 66:9

**Laughter**
56:10 63:2
64:8

**laundry**
158:12

**law** 41:11,19
69:9,16 78:21
171:9

14

laws 187:3

lawsuit 4:14
25:22 56:13
144:1 185:18
187:10,19,20

lawyer 182:4

lawyers 5:19

laying 98:16

leaf 16:4,8

learn 106:11

learned 33:14
106:9,13,16,
18 123:20

lease 84:18,
24 85:11

leave 33:22
52:21 76:17,
18 130:7
155:3

leaving 149:6

led 142:20
144:6 147:5,
20

left 38:16
50:8 76:19
96:6 98:6,8,
18,21 108:21
135:4 137:2
139:1,2,4
152:21 153:4,
21 155:7
156:21
157:16
163:10
189:22

legal 168:6

legally
187:23

lengthy 144:2

Lerosa
163:22
164:10

letting 180:18

level 161:23
162:5

Lewisburg
85:5

lieutenant
122:17

life 43:7
45:18,20
161:11

life's 169:4

Lilly 122:11

Lion 95:16

lion's 151:19

Lisa 56:24
59:8 62:12
82:6 83:9
159:23 180:8

list 14:7,10,
12,15,18
15:15,17
17:4,10 21:5,
9,11,23 23:14
26:6 28:12
29:21 78:15
90:14,18
112:18,20
113:9 171:22

listed 15:3,6,
9 51:17

listen 40:10
111:6

lists 27:10

litigation
65:14 96:15
167:17

live 7:5 39:14
64:20 83:15
163:23

lived 7:23
76:21 93:13

lives 7:20
64:21,24 97:2
99:2

living 135:8,
16 138:10,14,
18,22,24
139:2,8,11,12
149:7 150:23
156:21

loading 99:4

located 72:15
85:2 116:14
132:13
150:13,20
166:14

locked
142:21 144:7
147:22

lodge 171:14

lodging
173:16

long 6:1 7:23
9:23 12:24
19:6 64:3
68:5,9 72:11
73:3 105:10,
15 129:22

148:23 149:3

longer 186:12

longwinded
5:20

looked 21:12
24:14 107:1
108:24
127:20

lose 177:22
178:1

lot 22:16
23:10,11
33:12 46:17
78:1,20 81:10
97:20 153:19
163:14

Louise 12:12
53:24

lowers 63:21

Lusk 13:18
14:10 16:6
17:12 20:12
21:7 23:21
31:10 32:7
62:20 76:10
82:5,22 84:2
89:22 90:8,
12,23 91:10
101:13
110:17 119:7
120:2 127:13,
17 131:2,22
132:23
135:10 157:4

———————

**M**

M-A-S-U-A-L
39:7

mad 67:16

made 17:22
18:11 23:11
52:21 66:21
87:22 121:18,
19 142:19
172:7 179:12,
15 182:17

main 90:17

major 70:17

make 5:1,5
17:13 18:14
19:1 26:23
36:21 57:10
81:18 86:6
110:21,24
114:8 124:23
127:14,21
152:15
156:11
164:21
167:11
182:16

makes 5:15

making 81:12

man 69:21
82:23 105:1
116:16 166:7
187:6

manager
97:14

March 4:16
7:3 13:3
27:16,18 28:5
29:3,8 32:10,
18 37:1,18
40:4 41:5
42:6,8 43:9
49:1 50:10

15

51:2,14 52:6,
9 54:14,15
57:15,18 73:1
77:14 78:9
80:16,23
89:19 90:4,11
91:4,11,13
92:12,14,21,
23 93:19 94:3
96:11,14,17
97:24 102:13,
16 103:6
125:14
126:12
143:23
167:18,22,24
184:19,23
188:17
189:19

**marital** 78:16
161:7

**mark** 18:24
19:3 39:8
116:14 120:7,
13,15 121:5,
10 122:7
162:19

**marked** 19:8,
9,18,23
118:18 121:7,
8,16 162:21
167:14
179:20

**marriage**
42:20 166:19,
22

**married** 7:15,
16 76:22

**marry** 11:10

**Maryland/
virginia** 163:8

**master** 31:16

**Masual** 39:7,
12 49:17,18
50:5,10 52:18
63:22 65:11
96:19 103:24
104:12 179:4

**match** 29:22
40:10

**Matt** 184:1

**matter** 47:2
61:7 70:4
82:4 128:5
146:20
184:22

**Matthew** 4:1,
9

**Mccray**
122:7,8

**Mcpeake**
26:17 100:23
101:13
120:22,23
130:1,9,12
131:14,22
132:22
134:12,13
136:18
137:12,15
142:20 144:6
145:3,4
147:20
148:17,19
152:15 153:1
154:2,6
157:1,3
158:16

169:16
172:14,18,24
174:16,18
175:19
176:17
177:16
178:16,18
179:14

**Mcpeake's**
26:17 121:4

**means** 9:17

**media** 183:6

**Medicaid**
75:14,16

**medical**
47:15

**Medicare**
75:19

**medication**
11:4,7 47:18,
21

**medications**
75:11

**member**
10:20

**memorializes**
180:22

**memory**
144:16 148:8
183:11

**Mercer** 57:1,3

**message**
80:24 91:14

**messages**
158:24

**microphone**

110:2

**middle** 42:6,8
54:14 99:5
172:6,19

**mike** 137:2

**Miller** 122:4

**mind** 18:13,
20 25:11,17
107:7

**mine** 49:4
51:10 74:17

**minute**
105:13,23
129:24 136:1
183:24

**minutes**
55:20 87:7,
10,13 88:10
98:7,12,13,22
104:7,17
106:19
148:23 149:2,
3

**misinterprete
d** 72:3

**misquoting**
60:23

**mist** 35:11
88:13,15

**mistake**
16:12

**mistakes**
16:4 23:10

**misunderstoo
d** 52:8 61:19

**Mobile** 95:18

**mom** 76:21

**Monetary**
188:10

**money** 31:24

**monster**
122:10

**month** 141:13

**months** 42:17
80:17

**Moore** 43:5
44:12 45:3
47:14

**morning** 87:3

**mother** 7:10

**mother's**
141:8

**motion** 37:13,
18 106:13,14,
15

**mountain**
48:7

**move** 76:12,
24 116:3,5
156:13
158:10

**moved** 77:4
79:11,13

**moves** 79:8
80:4

**movie** 142:16
159:16

**movies** 22:10
139:23 140:4
142:8 154:7
158:22,24
159:3

moving 153:8 166:1

mow 113:22, 24

mowing 66:9

multiple 150:7 151:11 175:23 177:9

mustache 122:5

mustaches 122:6

**N**

names 6:22 65:8

nasty 46:23

neck 132:16

needed 23:14 79:4 113:3 155:20,23

negative 55:10

neighbor 51:11,12

neighborhood 64:22,24

news 53:4,5, 9,18 54:4,10, 19 181:8 183:6 184:19, 20

Nicholas 57:6

night 49:20 51:24 74:16,

21 87:4 96:20

nods 37:19 61:11 71:14

non-custody 70:24 71:1

North 72:16 166:15

notated 23:14

notch 44:10

note 17:9 162:3 167:12

noted 174:7

notes 24:7,8, 15 25:2 26:5

notice 93:1,7

notices 93:9

November 29:17 33:4 34:9 35:15 49:21 52:1 80:9 86:22,23 99:12

number 20:13 60:1 95:19 143:22 145:17,24 164:2 177:12

**O**

Oak 6:12 7:21 38:14 65:14, 16 76:13 105:15

Oaks 64:24

oath 41:14

object 16:24 60:10,13,14 172:11 173:12,13 174:11,12,20 176:11 182:21

objected 60:15,16 156:4 160:8 174:23

objecting 173:19

objection 17:10 23:17 24:22 26:24 108:11 116:22,23 120:17 131:13,15 147:18 150:2 171:15 172:9 173:10,15,17, 23 174:4,7 186:15

objections 14:17 171:20

observe 172:24

obtain 9:2 53:20 175:24 187:9,18

obtained 9:7, 10

occur 134:22 179:24

occurred 12:7 13:22 40:3 41:5

173:8 174:9 175:5 186:6, 13,22

occurrence 143:24

occurring 176:19

October 165:22 167:12

odds 86:19

offered 91:15

officer 9:21 69:18,24 70:6 71:5 155:8 183:9

officer's 70:1

officers 181:18

official 77:13

officially 78:3

Oklahoma 163:9

oldest 140:20

online 168:9, 21

open 81:19 142:21 143:2 144:7 147:21 172:7

opened 172:14,18

opening 174:17

operate 128:13,16,24

opinion 81:10,14 171:2 172:3 187:8

opposed 5:9, 17

Orchard 74:18

order 16:24 23:10,12,13 24:3 29:24 71:24 72:5 90:23 103:12 126:20,24 127:1,3,10, 11,13 131:17 137:15,19 180:21 186:7

ordered 23:23 30:1 35:21 38:10 43:23 57:22 61:2 65:24 76:18 89:7,8, 17,20 90:8 94:12 102:15 103:14 112:24 126:20 133:6 135:24

orders 71:11, 13,16

organizations 10:18

original 26:14

out-take 71:21

outmanned 71:2

17

**P**

P-A-Y-N-E 67:20

p.m. 99:12,13 190:7

pages 26:4 144:3

paid 30:9,22, 24

paperwork 165:24

paraphrase 35:10 91:15

paraphrasing 91:19 129:14

parents 76:22

parked 99:7 107:18 114:15 118:5, 12,20,23 119:9 132:14 170:12

part 13:15 17:1 18:16 63:5 64:9 103:3 118:19, 24 133:7 147:3 159:20

parted 179:23

parties 100:24

parting 13:7

party 155:7

past 118:12

pastor 166:8, 11,12

patio 157:24

Paul 67:18 169:8

pay 16:13 31:19 63:7,8, 20

paying 32:4 63:4

Payne 67:18, 19 169:8,9

pays 63:12

peace 87:23

penalty 188:5,9

pending 6:4 180:7

penitentiary 9:24

people 66:12 70:12 112:13 121:23 135:9 151:11 168:20 181:9, 13 183:16 185:10

people's 41:15 81:13

perform 185:21

person 109:22

personal 29:2,7 32:10 77:8 78:13,18

79:9,12 80:20 188:18

personally 154:7,8

petition 77:1 180:13 181:4

Petitioner's 19:4,10

phone 76:6 95:12,19 96:2 106:2 107:3, 4,8,11 108:22,23 110:2,5,6,9 130:10,12,14, 18,19 131:9, 10,11 148:11 164:2 175:22 178:12,15,17, 23

phones 95:10 96:1 188:23

photocopies 94:11

photograph 149:13,19,24 150:13,14,19

photographs 149:10 170:17

photos 23:22 25:2 29:24 30:1 37:8 43:23,24 44:1 103:13 126:13,14,17, 19 127:5,15, 19,20,22 135:17

150:24

physical 66:19 67:2,3 82:8 165:12 166:3

physically 68:21

pick 15:12 29:18 33:5 50:2 81:8 89:6 95:4 96:23 134:16

picked 29:2,7 32:18,23 34:23 76:6 78:18 80:19 87:8,11 88:10 99:10 188:18

picking 26:6 29:5,6 188:16

picks 80:2

pickup 80:16 98:10 109:1 115:17 117:17,18

picture 26:3, 7,9,15 89:17 116:12

pictures 35:12,24 36:1,9,10,15, 19,22 37:10 94:9,14 125:24 126:3 135:23 137:8, 13,16,20,22 138:4,7,17 139:12

piece 163:13

piecemealing 27:4

pistols 30:19

place 10:5 49:12 79:6 156:16 171:3 172:4 177:2

plaintiff 108:15 117:6

plan 39:10

play 62:10 64:6 109:13 111:4 148:9, 22

played 39:2 109:14 110:15 111:11 112:5, 17 149:5 151:17 152:2, 9 154:4 182:2

playing 45:10 148:24

pleadings 25:22

point 12:13 13:7 23:1 27:9,24 28:24 29:16 37:12, 23 38:9 45:4 79:14 80:11 81:9,16 82:19 85:19 89:22 91:22 92:6 99:8 109:10 112:9 143:13 151:14 153:4

18

155:7 158:18
168:16
170:18
178:12

pointed 37:3

police 69:18
179:20 183:9

portrayed
174:18

position 9:15

positive
55:10

posse
112:10,11

possession
62:13 175:11,
13

posted 168:9,
11,21

power 151:1

practicing
187:2

prepaid 96:2

prepare
48:17 180:24

prepared
124:5

prepping
48:5

present 44:3
103:16
125:18
179:14

presented
14:15 16:7

preside 180:9

presiding
12:13 180:6

Presley 68:4,
5 169:9

press 109:12

pretty 144:2
168:5 184:23

previously
171:6

price 31:4

print 94:19

prior 6:5 7:15
10:2 42:7
78:19 98:7,8
152:18
179:23

prison 9:13
70:18

Prisons
68:24 69:13,
23 70:5 71:8

pro 38:2 48:7

problem 63:4
114:5 161:19

problems
161:7

procedures
171:10

proceed
138:21

proceeded
171:12

proceedings
11:15 12:7,
17,22 55:23

68:13,15
102:5 146:5
152:7 184:3

process 44:7
106:12 172:1,
6,20 173:7,20
174:8 177:7

produce
171:23

professionall
y 95:2

prom 74:16,
21 75:2

proper 59:24
60:23 108:4

property 8:7
13:19 14:5,8,
12,18,23
15:3,7,8,15,
17,23 16:2,15
17:3,4,10
20:7,24 21:8,
23 23:6 26:6,
7,11 27:9
28:11,22
29:2,5,6,7,12,
18,20,21
30:2,15 31:9
32:7,10,33:2,
6,22 34:8,9,
23 37:14
38:17 43:21
49:11,21 50:3
51:22 52:2,10
60:6,9,17
61:3,10,16,
18,21,23,24
62:23 65:13,
18 77:8
78:13,15

79:9,12 80:16
84:1,5,23
85:2 86:1,4
87:5 91:11
95:5 98:5
99:5 105:4,6
111:24 112:7
116:13
118:19 119:1
121:11,13
124:5 125:16,
21 126:11
127:4,17,23
133:8 169:10
179:19
188:17,18

Prospect
10:20 166:13

provide 28:10
35:24 36:9,
14,16,19,23
113:7 143:22
171:5,7

provided
34:1 113:9
184:20

psychotherap
y 162:2
165:22
167:12

public 4:3
187:4

pull 17:24
116:5

pulled 74:14
77:17,19
116:2

purchased
8:4 128:11,12

140:9,10

purchases
124:7 128:10,
15

put 32:8
33:15,16
35:15 41:22
43:17 46:13,
24 47:10 81:6
84:9 86:5
87:3,23 89:5
94:15 127:12
129:20 169:3,
6 182:13,18
183:15 185:7

putting 34:8
61:21 62:5
182:12 185:3

───────

Q

question 5:18
6:4,5 22:14
36:6 47:6
52:8 53:16
54:5 58:24
66:16 72:3
73:13 81:5
92:5,8 93:21
116:7 125:23
150:18
171:15 172:5
173:18 174:4,
6 175:4
182:8,17
183:2 186:3,
16 187:12
188:6

questioned
53:4

19

**questions**
4:17 5:20
25:9 56:2,5,
12,15 58:2
157:13
170:22 184:5
190:3

**quick** 142:14
146:4 184:2

**quickly** 54:11

**Quiet** 6:12
7:21 38:11,14
65:14,16
76:13 105:15

**quote** 99:11
165:16 171:4

---

**R**

**racing** 74:19

**radio** 136:22,
23

**rain** 62:23

**rained** 87:15,
19

**raining** 33:19
34:22 87:22

**raise** 41:14

**raised** 58:12
163:7,8
165:2,4

**Raleigh** 12:7
19:11 46:16
97:19 121:24
170:9

**ran** 79:2
103:23

**random**
105:4

**RE-
EXAMINATIO
N** 184:7
188:14
189:16

**reaching**
13:17

**read** 5:16
145:15 146:1,
9 190:5

**reading** 24:4
106:1 107:8
110:11 146:8,
11 165:21

**ready** 148:9

**real** 5:20
105:22 106:6
146:4 184:1

**reason** 83:12
86:5 141:22

**reasons**
177:24

**recall** 34:10,
11,13 38:18,
19 45:13 51:8
54:4,13 55:16
58:17 77:7,18
79:20 82:1
90:15 92:2
100:15 103:2
104:19,20
107:5 114:21
115:5 134:17
135:15
137:14,18
139:15
143:19

154:11
155:14,16
161:21,24
169:18,21,24
170:1 177:11

**recalled**
176:9

**receive** 72:21
145:3

**received**
25:24 40:12,
14 55:3,7
148:4

**receiving**
10:4,10 71:22

**recipes** 157:8

**reckless**
74:2,15

**recognized**
23:7

**recollection**
8:1 10:23
12:4 13:3,13
14:21 24:21
42:5 121:18,
20 144:11,13,
20 148:3
174:16 175:1

**record** 4:8
15:21 18:16,
18 25:14 27:6
35:5,8,9 36:2
85:22 88:22
103:19,21
108:14 115:7
117:2,5
122:24 123:6
126:9 146:17
149:1 157:11

180:17

**recorded**
33:23 181:1

**recording** 5:7
33:18 34:2,6,
7,12,17
130:17 136:4,
14 171:21
178:22 179:9
189:2

**recordings**
189:7

**rectify** 59:8

**recuse** 106:8,
15 108:5

**redact** 64:9,
14

**Redden**
122:15

**refer** 17:23

**reference**
66:21

**referred** 16:2
20:12 76:5,8

**reflect** 16:10
40:2 108:14

**reflected**
16:21

**refresh** 24:21

**regard** 37:14
51:14 55:4

**related**
164:13,19

**relates**
143:24

**relationship**
165:1

**relative**
164:20

**relaxing**
129:3

**release** 72:5,
6

**released**
102:22 103:4

**releasing**
10:13 71:24

**remained**
35:13,16

**remaining**
33:2,5

**remember**
15:1,5 92:19
95:19 100:11
116:15,17
135:17 137:4,
5 155:13
156:20
189:18,21

**remove** 65:24
80:11 129:15
158:16

**removed**
80:13 169:12

**removing**
169:10

**repeat** 93:21
151:5 175:4

**rephrase**
5:23 36:7
56:18 133:1
174:6 183:3

186:9

report 165:22,24

reporter 18:23 120:10

Reporter/ notary 4:3

represent 4:13 13:1 56:11

represented 17:6 37:22 91:6

representing 48:12

request 18:5 176:1

requested 93:24 175:14

required 90:12

rescheduled 92:22

rescinded 10:22

reside 64:18

residence 76:13 89:6

resistance 84:11

responds 70:7

response 46:5 145:8 178:10

responses 41:4

rest 25:18 80:19

result 4:16 42:1 47:16 186:6

retain 54:11

retained 54:8

retired 70:19 97:11,18 122:2

retrieve 85:12

retrieved 78:10

returned 40:18 158:21 159:13,14,15, 16

returning 160:4,6

review 90:18 176:5

reviews 146:12

ride 107:6

riding 96:18

rights 41:16

road 46:19 51:21,22 99:5,7

Robinson 18:12 24:12, 16 34:3 56:2, 4,7,8,9 83:1,5 85:23 102:6

108:9 111:4,9 114:3 115:8 116:21 117:4 120:9 121:5 123:2 145:23 146:3,6 152:8 162:19 167:11 170:19 171:14 172:9 173:10,19,22 174:3,11,13, 20,23 176:11 188:15 189:12 190:4

rode 115:13 119:20,22

roll 83:19,21 86:6

rolling 110:22

room 13:23 21:21 30:10 99:22,23 100:3,7 101:6,7 103:23 105:11 135:7, 8,16 138:9, 10,11,14,16, 18,21,22 139:1,2,8,11, 12,17,20 142:7,20 144:6 147:21 149:7 150:23 152:4,6 156:22

room/living 135:7

rooms 138:16

Ross 116:10

rough 162:18

route 146:21 150:11

royal 109:17

ruffle 153:3

rug 134:1 169:2 183:21

Rule 145:9

rules 4:24 58:16,18,21

run 24:13

running 110:6,7,8

___

S

Sad 46:15

safe 30:16 128:24 142:22 143:3, 11 144:7 146:18 147:2, 5,8,22 152:11,16 153:2,14 156:12 172:8, 14,19 173:1 174:17 176:18

sailed 83:9

Sand 166:15

Sandra 163:22

sat 13:24 14:4 32:22

61:24 62:9 127:16

savior 185:13,15

scale 116:24

scared 179:2 183:16

scenes 181:23

schedule 45:9

school 8:11, 14,17 32:17 48:11 53:5

schools 9:7

scratched 16:8

screen 79:1,2

sealed 83:4 89:3

search 46:19 113:1,2 130:1 134:13 144:8 146:22,23 147:4,22 149:2 152:1, 22 153:1,6,7 154:3 155:7 171:3 172:4 176:18 177:1 178:5,7,11 181:21 186:18

searched 153:9

searches 185:21

21

searching 108:7 169:1 171:21 185:9 187:6

secretary 70:9

Security 32:16 75:9

seeking 44:20

seize 130:14, 18 154:6

seized 23:22 59:10 60:9 130:12,22 139:4,11,20 178:13,15

seizes 130:10

send 72:4 93:9 114:22

sense 156:7

separate 104:15 124:7 128:9,15

separated 11:20 43:2

separately 158:1

separation 11:16 76:15

September 11:18 12:2 14:16 20:20 27:11 28:8 62:19 68:17 76:15 80:6 82:6 88:24

89:2 161:12 162:3 164:5

serve 114:6 144:17

served 72:8

set 33:19 45:15 78:8 88:2 157:24

set all 83:13

settlement 91:16

Seymour 72:14

share 8:8 24:17 151:19

shared 6:15

Sharon 39:7, 12 49:15 52:18 63:22 96:19 100:10 103:24 104:12 106:6 179:4

sheriff's 46:16 111:16 118:8 121:23 122:1 170:9 176:2

Sheww 73:23 122:4

ship 83:9

shirt 108:16

shoot 101:21

shoulder 137:1,3

shoulders

5:14

show 38:23 39:1 88:17

showed 33:19 50:2 53:17

shown 54:18

shows 117:19 149:3 176:10

shrugging 5:12

shut 135:20 136:12

sick 73:7

side 156:15 167:7

sir 58:1,6 60:19 61:5,8, 13 62:15,21, 24 63:7,10, 16,18,24 64:2,10,13, 17,19 65:2, 12,16,19,21 66:20 67:23 68:22 69:1,4, 7,11,14,24 71:6,9,12 72:2,10 73:16,19,22 74:13,20,22 75:1,4,7,10, 13,18,20,24 76:2,4,11,19, 23 77:2,5,17, 24 78:16 79:7,10,16 80:12,15 81:4

84:24 86:2,8, 17 87:16 88:11 89:9,12 90:22 91:1,8 93:2,14 94:2, 6,7 96:4,7,9, 17,22 97:3 98:13,14,17 99:21 100:1, 4,8,18 101:15,19 102:2 104:13, 16 105:9 108:22 109:11 110:3, 10 111:20 113:12,14 114:10 117:9 118:10 119:19 121:21 122:14 123:8 125:3 129:2 130:13 131:20,23 132:1,4,7,11, 19 133:13 134:5,8 135:3,14 136:10,13,20, 24 138:8 140:8 142:10, 12,18 143:4, 20 147:4 149:8,11 150:12,18 152:12 153:9 154:1 156:18, 23 157:5,7,10 161:20 162:1, 13 163:1,20 164:15,20 165:13

168:13 169:7, 15,24 170:11, 14 172:16,22 173:6 174:14 175:8,16,18, 22 176:2,6,14 177:10,20 178:6,9,14, 19,24 179:6, 8,11,16,18,21 180:2,4,10, 17,23 183:20 189:9,11

sit 13:22 67:12 81:7 83:16 129:3 176:7 182:5

sitting 87:10 101:2,4 102:1 185:6

situation 33:16

Sky 63:17

Sky's 21:21

Skyler 6:23 7:2,3,9,13,20 96:8,11

slight 57:5

slow 56:17

smart 81:17 106:7

social 10:17 32:16 75:9 183:6

softball 32:17 81:1

sought 41:24 47:15 160:24

161:4,6

sound 40:24 68:18 115:10 157:19 162:9, 12 164:6 167:23

sounded 110:23

Sounds 10:24 161:13, 15

speak 92:19 135:21 154:19,22 183:16

specific 71:18

specifically 113:3,4

speeding 73:20

spell 4:10 65:10

Spiderman 140:4

spinning 107:7

split 7:9 94:20

spoke 23:21 92:18 125:15 154:23

Sprint 95:15, 16,18

stand 84:4,8, 13,14 85:7,9 86:1 129:7

157:18,22 158:1 174:3

standing 49:9 52:15 70:12 108:14,15 123:11 129:23 130:3, 5

stands 71:1

stapled 25:20

Staples 37:6 95:1

start 42:18 56:20 68:10 81:12 108:13 148:24

started 43:1 68:16 90:3 161:11 164:7

state 4:7 8:24 9:3,6 70:21, 23 144:5

statement 144:9 147:23, 24

stating 57:11, 20

station 53:10 54:10

stationed 72:13

status 57:8 58:10,11,14 59:17 165:1

stay 52:19 67:11 141:12, 15,23

stayed 96:20

steep 83:20

stemming 161:16

step 183:18

steps 36:21

stone 143:12

stop 105:3,5 109:15 110:18 136:4 138:17 171:20 178:22 179:1, 9 185:20

stopped 136:14 167:7

stopping 57:5

stops 114:9 122:20

stored 88:7

stories 66:10

story 181:12

straight 99:19

Strategies 43:7 161:11

stream 159:5

street 6:12 7:21 10:13 38:11 65:15, 16 76:13 105:15

strenuous 171:20

stress 45:23 48:20 155:24 182:24

strike 80:3 99:17 105:7 155:15

study 48:10

stuff 25:8,23 45:21 55:18 58:17 77:14, 17,20 78:4, 21,22 79:24 80:7,22 81:6 83:13,22 89:5 93:16 98:11, 16,19 103:8 133:24 140:5 165:19

Stump 52:20, 21 120:19 122:13 134:24 135:12 148:11 154:12 155:4, 10 157:1,3 158:4,6,16 169:19

subject 61:6 65:13 96:15 144:1 167:17

Subjective 165:23

submit 58:19

submitted 23:13 35:6 37:1,5,11

sued 75:5

suffered 182:7,10,20 183:5,7,12

suggestion 182:14

suit 112:2

suitcases 79:14,23

summer 8:2

sunglasses 108:20

super 6:1

supplied 158:23

supply 94:16

support 48:15 59:22 63:3,4,7,9,13

supposed 17:12 21:10 29:17 30:3 35:24 37:9 57:12,21 63:8 70:8,11 127:21,22 181:15,17,18 183:9,10

Supreme 146:24 171:2 172:3 173:14 174:1 186:7, 17

SUV 111:16 117:21

swear 118:13

Sweeneysburg 166:16,17

sweep 168:24

swept 183:21

swing 124:1,
4,6,7,8,9,10,
13 125:2,5,6,
10 126:4,15
128:1,3,4,7,
13,14,16,22
129:1,2,3,6,7,
9

swinging
128:20

switched
188:22

sworn 4:2
57:7 58:12

Symptom
165:23

system 44:9
187:8

**T**

table 158:3

takes 21:2
79:9

taking 5:2 6:5
39:3 61:21
62:5 75:11
79:12 149:9
175:19 177:2
187:7

talk 28:6
43:23 50:23
56:16 91:16
125:16,21

talked 14:5
50:20 51:2
83:24 126:10,
12 160:6,12
164:3 180:14
184:14

talking 20:1
43:12 59:18
70:18 85:24
92:10,15
103:9 104:21
106:6 111:19
120:20 127:7
138:23 147:2

tape 144:22,
24 145:2,3

tape-recorded
64:5

Tara 5:2

taught 41:13

teach 9:18

tear 129:18

technical
111:7

telling 46:10
112:6 152:10

tells 152:19

ten 104:17

tenfold 48:10

terms 10:17
45:17

testified 4:4
98:1 123:16

125:11
179:22
182:23

testify 11:5
49:19,22 54:2
59:9 97:22
99:1,7 125:12
160:7 166:24

testimony
57:7,11 58:12
59:11,12
60:10,21
61:9,20 62:22
160:9 167:4
176:15

text 80:23
95:6,9
107:11,12
158:23

texted 32:15
95:7 164:8,9

texts 114:22

TG 95:18

therapist
165:15

therapy
167:16

thing 6:3,26:2
33:14 62:3
82:5 90:17
139:4 140:3

things 15:6
16:3,20
21:14,20 22:1
23:14 25:3,4
55:14 71:2
80:11 113:6
119:16

123:20 142:2
168:5,6
169:10,12

thinking 21:1
100:9 105:5

Thirty 87:12

thought
92:10 108:2
122:9 144:14
177:7

thoughts
105:4

thousand
16:13 30:9,24
31:2 43:24

thousands
37:8

threat 146:19
147:19
149:14,16
156:1 178:21
179:3,10,12,
15

threaten
170:9

threatened
136:2,3
149:17 150:8
151:11 170:5
173:2 176:21
177:4,8 179:5

threatening
33:17 170:2

threats 178:6

thumb 37:7,
10 94:17

ticket 83:10

till 38:16

time 7:10
13:15 14:14
29:6 34:23
38:15,16
45:11 52:19
54:8 59:7
73:2 74:24
78:2 79:19,21
80:2,11,22
86:21 87:1
89:14 90:9
91:7 93:18,22
95:13,14,20
98:18 99:8,9,
11 100:10,23
102:19,21
103:3,5 109:7
110:11,14
119:15
129:11
130:19 134:2
136:3,16,19
147:17 153:2
154:11,14,17
158:4,18
162:18
167:16 175:9
189:22

timeline 26:6
29:5 188:16

times 44:24
57:9 59:15
77:11,16 80:3
124:9 150:7
151:12 155:6
175:23 177:9,
11

timestamp
19:11 27:12,
15 28:7

24

timestamped 20:21

tint 73:21

tired 155:24

title 65:20,22 66:1,3

today 4:17 11:4 25:2 47:9 176:7 180:14 182:5 185:7

told 4:22 93:4 103:24 106:14 107:22,23 111:12 116:3,5 123:8 130:16 144:9 147:11 149:19,24 163:10,17 165:17 166:6 167:5 179:9 186:11

Tommy 51:9 97:8,11,13,14 98:24 100:9 103:24 104:14 107:16 109:2,18,23 114:16

Tommy's 115:19

tools 171:8

top 52:16 83:15,16 86:6

toys 22:8

trade 9:7

trailer 83:23 86:4,9,10,23 88:5,6,7

train 71:17

training 70:2 71:4,10,19 72:17

trampled 44:7

transcript 5:5,16 126:7

transcripts 83:2 102:23

transferred 57:2 58:4

trash 79:23

trauma 182:7,10

traumatic 173:8 174:9 175:6

traveled 39:23

travels 97:20

treadmill 86:14,18

treatment 47:15

tree 84:4,8,13,14 85:7,9 86:1 128:19

tri-level 66:12

trial 47:3 188:2

trouble 67:13

truck 52:14 109:1 114:14 115:17 116:2 117:12,13,14,17,18,20,22,23 118:1,4,6,15 119:10

trust 167:6 187:4

Tuesday 46:7 160:21 180:20

Tully 4:6,13 18:10,13,19 19:3 24:19 25:10 26:22 27:7 34:7 39:10 55:19,24 83:3,7 108:12 111:6 114:5 120:13,21,23 121:2 124:17 145:21 171:16 172:11 173:12,15,21 174:12 182:21 184:6,8 186:19 188:12 189:14,17 190:2

turn 57:12,22 60:7 61:2 89:8,11,17,20 90:8,12 92:8 93:24 110:19

turned 54:10 57:13,23,24

59:1,4 88:22 89:24 91:12,23 92:7,10 96:12 103:8 112:23 113:10,15 125:22 131:9,17 145:9 151:21

turning 111:12

turns 7:3 96:11

TV 31:17,19,21

Twelve 65:6

two-story 66:11

type 5:4 69:16 95:24 96:2

typed 25:19

typing 5:3

U

U-HAUL 99:6

uh-huh 5:9,11,17 21:9 30:7 46:2 82:11 106:3 140:12 147:7

ultimate 46:5 180:12 185:17

ultimately 176:3,15

umbrella 157:18,21,24 158:1,3

uncles 165:5,6

understand 5:18 29:15 35:22 56:16 133:20 150:17 164:24 165:6,7 186:9

understanding 6:19 11:12,14 23:8 35:14 41:4 46:12 112:24 151:22 176:24

uniform 179:17

unit 10:5

unspecified 161:22 162:4

upset 67:5,6

upstairs 155:8,20,23

utmost 181:16,20

V

variance 176:8

vary 174:17

vehicle 79:15,17 104:11

108:24 109:1,
6 111:16
115:18,20,24
116:1,14
117:15 118:9,
11 119:8,12
158:11

**vehicles**
104:15
119:14

**verbal** 24:3
66:24 82:9,
10,14,15,16
83:12 163:18
165:19

**verbally**
23:20 82:23
127:12 143:9

**verify** 51:23

**video** 26:19,
20 34:18,19
35:6 39:1,2,4,
11 40:2,6,12
49:8 50:11
52:13 53:18,
20 54:5,19
55:6 61:15,
17,21,24
62:2,3,4,6,10,
14 66:5
88:17,19
90:14,18
105:20,24
108:13,15
109:14,24
110:15
111:11 112:5,
17 115:2
117:17,19
118:1,14

120:17,20,21
121:1,2
123:10
136:12
144:13 148:5,
8,10,16,19
149:5 151:17
152:2,9 153:5
154:4,13,14
168:6,9,11,
15,21 172:15
173:5 174:15,
18 175:2,10,
12,15,20,24
176:5,8,10
181:7 182:11,
12,13,19
183:5,12
184:18,20
185:3,7

**videoed** 62:7

**videoing**
131:7

**videos**
120:16

**violated**
187:3

**viral** 168:6,15

**Virginia** 6:13
9:14 85:3
163:9,24
171:2 172:3
174:1 186:7

**visits** 186:12,
17

**visually**
153:6,9

**vocal** 5:6

**voice** 23:17
107:11,12
143:7,8
185:11

**voices** 5:6

**voluntarily**
178:4,17,22

---

**W**

**wait** 81:7

**waiting**
100:19 101:3,
6

**walk** 96:24
101:1 132:17
138:16

**walked**
100:10,24
115:3

**walking**
110:17
111:21 152:3

**wall** 44:2
135:18 137:9,
10,13,16,20,
23 138:4,7
139:13
149:10
150:22 151:1

**walls** 23:22
36:10 37:11

**wanted** 13:10
29:9 94:19
110:21
133:10,12
143:11,12
164:21

**warrant**
113:1,2
178:8,11
181:22

**watch** 159:3,
6,9 176:7

**watches** 71:1

**watching**
130:4 156:7
174:15

**ways** 13:7,15
179:23

**weather**
49:22 51:23
62:8 87:2
98:6 99:8

**week** 7:11,20
48:6 54:14
82:7 160:19
184:17

**weekends**
141:12

**weekly** 45:5

**weeks** 54:16
184:15

**West** 6:13
9:14 85:3
163:9 171:1
172:2 173:24
186:6

**wet** 87:24
88:1,2,6

**whatsoever**
165:18

**White** 134:24
135:12
154:12 155:8,

17,18 156:24
157:3 158:5,
6,16 169:22

**wife** 63:12
65:17 68:10
75:23,24 76:9
93:20 94:5,9
104:21
111:18
140:11,18
149:15 161:8,
17 163:3
165:11,24
166:2

**Williams**
166:11

**wind** 123:21

**window**
73:20 98:23

**wit** 4:4

**withstand**
123:21

**witnesses**
97:4 101:24
105:16 108:1
112:14 155:2,
3

**word** 182:22

**words** 6:13
35:10 40:10
41:22 43:17
46:13 47:1,4,
11,12 88:14
103:10
107:10
112:12
126:22
127:14
173:14

26

**work** 9:9,13
10:2 45:21
47:24 97:10
122:11

**worked** 10:4

**workout**
30:10

**works** 79:1
97:12 113:1

**worth** 85:13,
14

**write** 19:21
117:10

**writing** 22:17

**written**
180:21

**wrong** 41:21,
23 106:9

**wrote** 171:4

---

Y

**ya'll** 83:1

**yard** 66:6
113:18 125:2
129:4 132:18
136:7 170:13

**year** 8:22 9:6
42:17 46:1
71:6 72:12
86:21

**years** 10:8,23
44:19 46:1,21
64:10,11
68:8,19
163:11 164:4
168:19 169:2

181:13
183:16,22
185:8,9,10,11

**yell** 136:6

**yield** 73:18

**you-all** 43:2
50:17

**your-all's**
18:4

**Youtube**
54:19

**Yukon** 79:18
109:4,5



**FAMILY COURT JUDGE**
**TWENTY-THIRD FAMILY COURT CIRCUIT**



GLEN R. STOTLER
Family Court Judge
GINGER L. JOHNSON
Secretary/Clerk
JOY R. CAMPBELL
Family Case Coordinator

Hampshire-Mineral-Morgan
Morgan County Court House
77 Fairfax Street, Suite 201
Berkeley Springs, WV 25411
Telephone: (304) 258-7487
Fax: (304) 258-7486

March 25, 2021     COPY

The Honorable Evan H. Jenkins, Chief Justice
West Virginia Supreme Court of Appeals
Capitol Complex
Building 1, Room E-301
Charleston, WV 25305

RE:    Judicial Disciplinary Counsel

Dear Chief Justice Jenkins:

I am currently serving as the Family Court member of the Judicial Hearing Board, having been appointed to that position by the Supreme Court pursuant to the Order dated February 4, 2020. It is in my position as a member of the Board that I file this complaint and request an investigation by the Supreme Court into the conduct and practices of the Judicial Disciplinary Counsel.

During my tenure on the Board, there have only been a few cases that have made it to the JHB, most recently being the case of Family Court Judge Louise Goldston. My allegations stated hereinafter are based on what occurred in that case, as well as the admonishment of Family Court Judge Eric Shuck, whose case was referenced and cited as precedence in the Goldston case.

In order to verify and substantiate some of the following allegations, I highly recommend and request that you interview FCJ Goldston and FCJ Shuck in your investigation as to how they were treated by the JDC.

It is my observation that the conduct and practices of the JDC in both of these cases is questionable and concerning. It appears evident to me that the JDC is abusing its power and authority in the way that they deceive and intimidate judges into entering into agreements with the threat if they fail to do so, the judges will be subject to far more severe penalties and consequences.

The JDC requests judges to come to their office under the disguise of just being a friendly interview and, once there, the judges are sworn in and interrogated. Further, when the judges inquire as to whether or not they should have an attorney to represent them, they

are advised that they do not need an attorney. The judges have no idea of what they are being subjected to and therefore are given no opportunity to be prepared to address the issues and interrogation to which they are subjected. Additionally, it is evident during the interrogation that the JDC actually misrepresents the law in order to coerce judges to enter into agreements. For example, the JDC presented an excerpt taken out of context from *Westover Volunteer Fire Department v. Barker*, 142 W.Va. 404 (1956), in which they implied that a judge cannot do a view during a bench trial. In actuality, the case held that a judge could not do an *ex parte* view. This was not applicable to Judge Goldston's situation, and it was misleading in its presentation.

It is also evident that the JDC misstates the facts to achieve their goal. For example, in the Goldston case the JDC represented and stated that after Judge Goldston conducted a judicial view, which was the main issue in her case, she never took any further action. It became clear at Judge Goldston's hearing, which was conducted on January 15, 2021, that after she conducted the judicial view she returned to her courtroom and had a full hearing as to what occurred during the view. The JDC had full knowledge of this information and yet failed to acknowledge this fact. Furthermore, it became evident during the JHB hearing that not only did they know Judge Goldston had a subsequent hearing, they had a video copy of the hearing in their possession and only disclosed same when questioned during the hearing. The fact that Judge Goldston had conducted a subsequent hearing was an important part of her case.

I participated in the January 15, 2021, Goldston hearing presided over by Chairman of the Judicial Hearing Board, Judge Michael Lorensen. Prior to the hearing, I had reviewed all the documents provided to me, which included the complaint and agreement. I believed a Family Court Judge had the statutory authority and inherent authority to do what Judge Goldston had done. During the hearing, I attempted to question the JDC about the basis of their complaint and it became obvious that the JDC resented my asking questions about the complaint and agreement, and objected to me asking any questions. I find it disturbing that for some reason the JDC does not apparently believe anyone, and especially a member of the JHB, has the right to question their actions. It was apparent to me that the JDC was of the opinion that we should just "rubber stamp" what they had done. I find the conduct of the JDC during this hearing to be questionable and unacceptable.

The statements made in the previous two paragraphs can be verified and substantiated by reviewing the transcript of the January 15, 2021, Goldston hearing.

Also, based upon the fact that I had attempted to question the JDC regarding the basis of their complaint during the hearing, after the hearing the JDC proceeded to file a motion to have me disqualified from participating in the decision the JHB would render in the Goldston case. Once again, it appears to me the JDC believes they are above and beyond being questioned about their actions by anyone. The mere fact that the parties have entered into an agreement in this matter in no way compels the JHB to accept their recommendation without question. It is my understanding that the JHB has the authority to accept, reject and modify any agreement the JIC would recommend to the Judicial Hearing Board.

I believe it is evident that the JDC does not believe they are answerable to anyone for their actions, their conduct, or their practices. I truly hope the Supreme Court takes this matter seriously and directs that an immediate investigation be conducted. I believe the conduct of the JDC attorneys is of such nature to warrant their termination, or at the least a serious reprimand.

Very truly yours,

Glen R. Stotler, Family Court Judge
23rd Family Court Circuit
Judicial Hearing Board Member

cc:    The Honorable Elizabeth D. Walker, Justice of the WV Supreme Court of Appeals
The Honorable Tim P. Armstead, Justice of the WV Supreme Court of Appeals
The Honorable John A. Hutchison, Justice of the WV Supreme Court of Appeals
The Honorable William R. Wooton, Justice of the WV Supreme Court of Appeals
Charles S. Trump, IV, Esq., Chairman, Senate Judiciary Committee
Moore Capito, Esq., Chairman, House Judiciary Committee
Lisa A. Tackett, Director, Administrative Office
Joseph Armstrong, Administrative Director, Administrative Office
Keith Hoover, Deputy Administrative Director, Administrative Office
The Honorable Deanna R. Rock, Family Court Judge;
    President, Family Court Judicial Association

## LAWYER DISCIPLINARY BOARD
## INVESTIGATIVE PANEL CLOSING

**I.D. No.:** 21-03-139
21-03-140

**Date Complaint Received:** April 8, 2021

**COMPLAINANT:**    **Office of Disciplinary Counsel**
City Center East, Suite 1200 C
Charleston, West Virginia 25304

**RESPONDENTS:**    **Teresa A. Tarr, Esquire**          **Bar No.:** 5631
Chief Judicial Disciplinary Counsel
Judicial Investigation Commission
City Center East, Suite 1200 A
Charleston, West Virginia 25304

**Brian J. Lanham, Esquire**          **Bar. No.** 7736
Deputy Judicial Disciplinary Counsel
Judicial Investigation Commission
City Center East, Suite 1200 A
Charleston, West Virginia 25304

THE INVESTIGATION OF THESE MATTERS having been completed and a report

having been made to the Investigative Panel of the Lawyer Disciplinary Board, the Panel orders

that these complaints be closed for the following reasons:

### STATEMENT OF FACTS

On or about April 12, 2021, Judge Alan D. Moats, Chairperson of the Judicial

Investigation Commission, provided to the Office of Lawyer Disciplinary Counsel (hereinafter

"ODC") a March 25, 2021 letter addressed to the Chief Justice of the Supreme Court of Appeals[1]

---

[1] Supreme Court Justice Walker, Supreme Court Justice Armstead, Supreme Court Justice Hutchison, Supreme
Court Justice Wooton, Charles S. Trump, IV, Esquire, Chairman, Senate Judiciary Committee, Moore Capito,
Esquire, Chairman, House Judiciary Committee, Lisa A. Tackett, Director, Administrative Office, Joseph Armstrong,

and signed by the Honorable Family Court Judge (FCJ) Glen R. Stotler of the Twenty-Third

Family Court Circuit (hereinafter referred to as "Stotler letter")[2]. FCJ Stotler alleged that Chief

Judicial Disciplinary Counsel and Deputy Judicial Disciplinary Counsel engaged in serious

misconduct during the investigation and prosecution of two Family Court Judges. In his letter to

the Chief Justice, FCJ Stotler, in his capacity as a member of the Judicial Hearing Board stated

that it was his "observation" that the conduct and practices of JDC in both cases was

questionable and concerning and it was "evident to [him]" that JDC is abusing power and

authority in the way that they deceive and intimidate judges into entering into agreements with

the threat that if they fail to do so, the judges will be subject to far more severe penalties and

consequences. He further alleged that JDC requests judges to appear at their office under the

"disguise of just being a friendly interview and, once there, the judges are sworn in and

interrogated." He further alleged that when Judges inquire of JDC if they should have an attorney

to represent them, they are advised they do not need an attorney. Further, he alleged that the

judges have "no idea of what they are being subjected to and therefore are given no opportunity

to be prepared to address the issues and interrogation to which they are subjected." FCJ Stotler

further asserted that "[i]t is evident that during the interrogation that the JDC actually

misrepresents the law to coerce judges into agreements." He further alleged that "[i]t is evident

the JDC misstates the facts to achieve their goal." He stated "[i]t is evident the JDC does not

believe they are answerable to anyone for their actions, their conduct, or their practices." FCJ

---

Administrative Director, and FCJ Deanna Rock, President of the Family Court Judicial Association are all carbon
copied on FCJ Stotler's letter.
[2] Neither the Chair of the Judicial Hearing Board, nor the Chair of the Judicial Investigation Commission are copied
on the letter. By letter dated April 2, 2021, FCJ Stotler apologized to the Chair of the JIC for the oversight and
forwarded a copy of the March 25, 2021 letter.

Stotler requested that Chief Counsel and Deputy Counsel be investigated, seriously reprimanded and/or terminated from their respective positions.

As a result of Chairperson Moats providing the Stotler letter to ODC, it opened these complaints against Respondent Teresa A. Tarr, and Respondent Brian J. Lanham, both licensed members of the West Virginia State Bar.

**GOLDSTON MATTER**

FCJ Goldston's judicial disciplinary matter is presently pending before the Supreme Court. It originates from In re Gibson, Raleigh County Civil Case No. 17-D-655-G, which was filed on or about November 20, 2017, by wife Ms. Gibson in Raleigh County, West Virginia. FCJ Goldston was the presiding family court judge. The husband was initially represented by Brandon Johnson who made a notice of appearance on December 18, 2017. The wife's counsel Kyle Lusk made a notice of appearance on December 26, 2017.

On or about April 23, 2019, a Final Order was entered. On June 7, 2019, a Second Amended Corrected Final Order, Residential Schedule was entered by the Court. On or about June 19, 2019, a Qualified Domestic Relations Order was entered. The Order noted in relevant part:

> The parties divided their household furnishings by agreement which is represented by a four-page exhibit entered before the Court and attached hereto. Each page is initialed and dated by the parties. The circled items are Respondents [Matt Gibson]. The items not circled are the Petitioners [Carrie Gibson]. The parties shall cooperate to set a time and date for the Petitioner to pick up said items. The Petitioner may bring others to help her move the items.

On or about September 26, 2019, Ms. Gibson filed a Petition for Contempt against her husband. Ms. Gibson was still represented by Kyle Lusk. Mr. Gibson filed an Answer and Motion to Dismiss the contempt petition on October 17, 2019. Mr. Gibson's attorney moved to

withdraw as counsel on or about January 6, 2020. Ms. Gibson's attorney filed Petitioner's disclosure of witnesses for the contempt hearing on February 27, 2020.

On or about March 4, 2020, the parties appeared before FCJ Goldson. Ms. Gibson with counsel, Kyle Lusk, and Mr. Gibson, *pro se*. There was a discussion at the outset of the contempt about whether Mr. Gibson is entitled to apply for a court appointed attorney because "jail time" is at issue. FCJ Goldston stated "well, you're not going to get jail time." Mr. Gibson nonetheless indicated his desire to seek a court appointed attorney. FCJ Goldson advised that he could fill out the application for appointed counsel on recess. Mr. Gibson declined and proceeded with a motion to dismiss the petition based on the grounds that he didn't receive the disclosures by Lusk until February 27, 2020—4 days before the hearing. There is no dispute the disclosures were late, but FCJ Goldston declined to dismiss. However, she stated she would reschedule if he wanted additional time to prepare. Mr. Gibson stated his objection, but also said he was ready to proceed. FCJ Goldston noted his objection to her ruling denying the motion to dismiss, but also noted his waiver of the opportunity to request a continuance. Mr. Gibson was also asked to waive his right to seek the appointment of counsel. He stated he would obtain counsel should he wish to file an appeal, but that he would waive for purposes of "today."

With regard to the property, Mr. Gibson argued that the exchange took place November 30, 2018, but the Order was not entered until April 23, 2019. He argued that he did not have the final order on the date of the exchange and therefore could not be held in contempt. In response, on page 10 of the March 4, 2020 hearing transcript, FCJ Goldston says in response to Mr. Gibson's arguments to dismiss that "once I speak it, it's the order." On page 63 of the hearing

transcript[3] there were several exchanges between Mr. Gibson and FCJ Goldston wherein Mr. Gibson believed that he complied with what the court recorded audio of the distribution hearing said, to which FCJ Goldston replied "I don't care what the audio says. I want to know what the order said." Ultimately, FCJ Goldston asked where Mr. Gibson lived and said "All right. We're all going to meet there in ten minutes. Have you got anybody that's got a truck." Then, the transcript indicated OFF THE RECORD.

A cell phone recording by Mr. Gibson from the March 4, 2020 "home view" was reviewed. In that video, which took place outside of the Gibson home, at the 1:34 mark, Mr. Gibson asked FCJ Goldston to recuse herself because she was putting herself in a witness capacity. He noted there was no search warrant and there was not a list of what he was being ordered to produce. FCJ Goldston replied there was an Order entered, to which Mr. Gibson replied "not for today's search." FCJ Goldston denied his motion as not timely filed. Mr. Gibson said "you won't get in my house without a search warrant" to which FCJ Goldston responded "oh yeah I will." Thereafter, she and the deputy proceeded to inspect part of the subject property, specifically, the outside swing. At the 2:40 mark, after Mr. Gibson objected to a woman on his property,[4] FCJ Goldston said "now you are either going to let me in that house or he is going to arrest you for direct.... Are you recording this?" Mr. Gibson replied in the affirmative. FCJ Goldston ordered the deputy to take Mr. Gibson's phone. The video cuts out, but the audio continued and FCJ Goldston states at the 2:55 mark "turn off your phone. I will take you to jail if you don't turn it off. Do you understand that?" "put it up" "give him the phone or you're going

---

[3] A transcript of the March 4, 2020 contempt hearing was prepared and admitted into evidence by the Judicial Hearing Board in the Matter of The Honorable Louise E. Goldston, Judge of the 13th Family Court Circuit, Supreme Court No. 20-0742.

[4] Mr. Gibson noted in an April 10, 2020, To Whom It May Concern letter sent to the Judicial Disciplinary Counsel that the Judge noted that she was having a hearing at his house, but he noted that domestic hearings are private, and Ms. Gibson brought her father, her boyfriend, and her brother to Mr. Gibson's house.

5

A0063803 - rlfc

to be arrested." Mr. Gibson argued that he was permitted to record on this land to which FCJ Goldston replied at the 3:07 mark "I am the judge trying to effect equitable distribution. We are having a hearing. Now, you let me in that house or he is going to arrest you for being in direct contempt of court." The audio stopped at the 3:45 mark. FCJ Goldston, the parties, and law enforcement then entered Mr. Gibson's home.

In the course of this investigation, Chief Counsel reviewed FCJ Goldston's bailiff's cell phone recording of the "home view" that occurred inside of Mr. Gibson's home.

The contempt hearing transcript reflected ON THE RECORD at line 15 of page 63. FCJ Goldston stated "we did a home view of the marital property, the marital real estate that was awarded to Mr. Gibson in the divorce..." FCJ Goldston listed the items obtained that were awarded to Ms. Gibson in the final order. FCJ Goldston noted there were additional items that were not retrieved and ordered Mr. Gibson to bring the items to the court house by Friday. [Tr. P 65]. FCJ Goldston stated that Mr. Gibson made a motion to recuse her at the scene and she noted she disagreed because "I do this probably two or three times a year and we have jury views all the time." She further noted if he wanted to follow up on the motion he needed to do so at least 20 days before the next hearing. FCJ Goldston also explained she would then send his motion as well as her thoughts regarding why she did not believe she was prejudiced to the Supreme Court. Mr. Gibson advised FCJ Goldston he intended to file to have her recused and he intended to file a complaint with JIC. FCJ Goldston noted that a JIC complaint was not grounds to have her disqualified. The contempt hearing was ultimately continued to determine if FCJ Goldston could further hear the case. There was not an order entered by FCJ Goldston from this contempt hearing.

6

On or about March 16, 2020, Mr. Gibson filed a motion to disqualify FCJ Goldston. On or about April 3, 2020, the Gibson domestic matter was temporarily assigned to FCJ Dorsey. On or about July 28, 2020, the matter was assigned to FCJ Clark. As of today's date, the domestic matter remains pending before FCJ Clark.

Pursuant to its authority in Rule 2.2 of the Rules of Judicial Disciplinary Procedure, on March 11, 2020, JDC opened Complaint No. 30-2020 against FCJ Goldston. The official complaint form of the JIC was utilized by JDC, identifying the person making the complaint was JDC. The complaint form stated details of the incident in question; included a link to a video at Youtube; and specified specific rules of which FCJ's Goldston's conduct was possibly in violation. Also included was an Admonishment of another member of the judiciary referenced and attached. Additionally, there was a letter on JIC letterhead dated March 11, 2020, wherein Respondent Tarr advised FCJ Goldston that a complaint had been opened by JIC against her and again reiterated the March 4th incident details known to JIC. Respondent Tarr cited to the relevant judicial canons and finally advised FCJ Goldston that pursuant to Rule 2.3 of the Rules of Judicial Disciplinary Procedure, a written response was required within 10 days of receipt, but indicated she may seek an extension in writing for good cause.[5] She further reminded FCJ Goldston of the obligations to cooperate and not retaliate against any lawyer or litigant who files disciplinary complaints. Respondent Tarr's letter also indicates that the rules can be found in the State Code and provides a link to the rules and the Canons.

The complaint and letter were sent by email at 12:37p.m. on March 11, 2020, by Respondent Tarr to FCJ Goldston. The email was marked "high importance" and the email message indicated there was a complaint attached and a letter requesting a response. Respondent

---

[5] Respondent Tarr testified that in her nearly ten years as Chief Judicial Counsel it was the customary office policy to grant requests for extensions to answer judicial complaints.

7

Tarr advised FCJ Goldston she may call with any questions. Respondent Tarr also included a live link to the Youtube video referenced in the complaint. Respondent Tarr received a delivery confirmation email at 12:37 p.m, on the same date. The March 11, 2020 letter and complaint complied with written notice of the complaint to the Judge as required by the Rules of Judicial Disciplinary Procedure.

On March 18, 2020, Mr. Gibson filed Complaint No. 33-2020 against FCJ Goldston. His complaint raised the same allegations as Complaint No. 30-2020 opened by JIC. On the same date, the JIC Executive Assistant advised Mr. Gibson by letter that his complaint was received and indicated it would be reviewed by the commission and he would be notified of any action.

FCJ Goldston filed her written response to Complaint No. 30-2020 on or about March 18, 2020. As evidenced by an email from FCJ Goldston to Respondent Tarr on March 25, 2020, at 2:09 p.m., the response was not delivered to the JIC until a later date by mail, but Respondent Tarr received a PDF of Goldston's response. The email referenced that FCJ Goldston spoke to The Honorable John S. Hrko, former Judge of the Circuit Court of Wyoming County and current Senior Status Judge, about the subject ethics complaint and she was aware that Senior Status Judge Hrko spoke to Respondent Tarr about the same. FCJ Goldston also disclosed to Respondent Tarr that her bailiff made a recording inside of the Gibson home and she intended to provide the same in an effort to be transparent.

FCJ Goldston Complaints No. 30-2020 and 33-2020, along with the Responses were presented by JDC and reviewed at the April 24, 2020 JIC meeting. Respondent Tarr testified during her sworn statement to ODC that it was customary procedure to upload all of the

investigation documents to the JIC's secure server for the members review and confirmed that practice was followed at the April 24, 2020 meeting.

By letter dated April 27, 2020, Respondent Lanham advised FCJ Goldston that the two complaints were presented at the April 24th meeting. Pursuant to the JIC's directive, Respondent Lanham asked the following questions and requested any and all documentation and supporting evidence to support her answers:

1. How long have you been conducting "home visits" to litigant's homes?
2. How many total times have you conducted home visits to litigant's homes?
3. What are the case names and numbers of the cases of the home visits?
4. Please include any audio/video recordings of the home visits.
5. Please include any audio/video recordings of any hearings that took place surrounding any home visit.
6. At any time did you ask for advice on conducting home visits?
    A. If so, from whom did you ask?
    B. What was the advice?
    C. Please include any documentation of the advice or request.

An email reflects that Respondent Lanham had a telephone conversation with FCJ Goldston regarding the substance of the email, and he made clear that she did not need to file an additional written response to the Gibson complaint because the allegations mirrored the JIC complaint. He further indicated that she could call him on his cell phone (and he provided the number) or email him if she had any questions.

By email dated April 30, 2020, at 11:00 a.m., FCJ Goldston's office sent Respondent Lanham a PDF of a letter from FCJ Goldston that is responsive to the April 27, 2020 inquiry. The email reflects a hard copy of the letter and a disc with audio recordings would follow.

On July 8, 2020, at 4:46 p.m., FCJ Goldston wrote to Respondent Lanham and said "I had a crazy day. I apologize for the lateness of this email. We looked and there are three total recordings from that day. We mailed them out today because the files are too big to email. Please excuse my lateness in getting in touch. And I apologize for my unprofessional emotions

9

yesterday. This is just all very upsetting..." Respondent Lanham responded by email the following day at 8:41a.m and said "thank you for finding and sending the videos. you owe me no apology. I appreciate your kindness."

At some point in the investigation, it was determined that a sworn statement was necessary and Respondent Lanham contacted FCJ Goldston by telephone to arrange for the same.[6] Respondent Tarr testified that it was customary to permit judges to voluntarily submit to a sworn statement rather to issue a subpoena compelling attendance. Respondent Tarr testified that unless the allegations were as a result of extraordinary complaint filed by the Administrative Director[7] that this professional courtesy was extended to the judicial officers so as to not interfere with their dockets and to allow the judicial officers to demonstrate cooperation in the disciplinary proceedings. The evidence reflected that the sworn statement was arranged and scheduled directly with FCJ Goldston and that she was aware of the substance and significance[8] of the statement in advance.[9] The evidence reflected that FCJ Goldston had the opportunity to confer with counsel prior to filing a written response to the ethics complaint, and was aware[10] she could consult with counsel. The sworn statement was voluntary and arranged to accommodate FCJ's Goldston's schedule. As judges are required to respond to and cooperate in ethics inquiries, JDC could have easily compelled her appearance at the sworn statement by investigative subpoena, taking no regard for FCJ Goldston's docket or personal schedule. Moreover, allowing FCJ Goldston to voluntarily submit to the sworn statement afforded her the

---

[6] Respondent Lanham testified in his sworn statement to ODC that he customarily uses the term "sworn statement" when making arrangements with judicial officers to take a statement under oath.

[7] See Rule 2.14 of the Rules of Judicial Disciplinary Procedure. Extraordinary proceedings.

[8] Respondent Tarr and Respondent Lanham each recalled that FCJ Goldston was very emotional and audibly distressed during many, if not all, of the conversations/emails about the investigation.

[9] Emails reflect that Respondent Lanham and FCJ Goldston were continuously working cooperatively to address COVID concerns that had arisen in or around the Raleigh County Court House that resulted in the time of the sworn statement being changed to accommodate FCJ Goldston.

[10] In addition to being a jurist for twenty-seven years, FCJ Goldston has been a member of the West Virginia State Bar since May 15, 1984.

benefit evidence of cooperation which was jointly stipulated mitigation in her pending judicial disciplinary case.

FCJ Stotler's letter alleged that when judges inquire whether they should have an attorney to represent them, they are advised they do not need an attorney. Judicial disciplinary proceedings are not criminal in nature. JDC is under no obligation to assess and advise whether members of the judiciary should have counsel. As attorney fees can be awarded in formal cases when a judge prevails, it likely is not prudent for JDC to express any opinion regarding the same. *See* Rule 4.13 of the Rules of Judicial Disciplinary Procedure Attorney fees upon dismissal. In the Matter of Ferguson, the Supreme Court soundly rejected the argument from a magistrate— who did not possess law degree and a license to practice law—that it was a mitigating factor in the disciplinary proceedings because he did not consult with an attorney with respect to the preparation of the written response to the ethics complaint or have counsel present for his sworn statement before JDC. The Supreme Court reasoned "[m]oreover, with or without counsel, a magistrate should certainly know to be truthful when testifying under oath." Matter of Ferguson, 242 W.Va. 691 (2020). Regardless, Respondent Tarr testified that in her nearly ten (10) years as Chief Counsel she has never advised a judicial officer they did not need an attorney and when asked she advises that they may speak to counsel and/or bring counsel to a sworn statement if they so choose. Respondent Lanham's testimony was substantially similar to Respondent Tarr's statements.

The 2:53:16 audio file of FCJ Goldston's sworn statement and the transcript was conducted by Chief Counsel. The transcript of FCJ Goldston's sworn statement to JDC was admitted into evidence at her hearing as Joint Exhibit 6. The transcript reflected that FCJ Goldston's sworn statement occurred on July 22, 2020, regarding complaints No. 30-2020 and

11

A0063803 - rlfc

33-2020. Page 4 of the transcript stated "WHEREUPON, THE HONORABLE LOUISE E. GOLDSTON WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS FOLLOWS". The JIC Executive Assistant, a notary, administered the oath.[11] Line 14 on page 14 the parties made their appearances, Respondent Lanham stated "for the record" and "**sworn statement.**" (emphasis added). JDC were professional, courteous and respectful of the judicial officer at all times, and when FCJ Goldston became emotional during questioning, JDC went off the record to allow her to compose herself. JDC reminded FCJ Goldston when going back on the record that she was still under oath.

The transcript of July 22, 2020 reveals that JDC complied with the notice requirements as set forth in the Rules and advised FCJ Goldston of the existence of the ethics complaints. There is no credible evidence to support the Stotler allegation that FCJ Goldston had "no idea" and was given no opportunity to be prepared to address the issues. The scope of the sworn statement was consistent with the complaints that FCJ Goldston had been provided and given an opportunity to respond to in writing. The statutory authority that was discussed was consistent with the raised defenses to the alleged misconduct. Moreover, Judge Stotler alleged that JDC misled FCJ Goldston during her sworn statement by presenting an excerpt taken out of context from Westover Volunteer Fire Dept v. Barker, 142 W.Va. 404, 955 S.E2d 807 (1956) "in which they implied that a judge cannot do a view during a bench trial." This allegation from the Stotler letter is not supported by the evidence. FCJ Goldston stated in her sworn statement before JDC that she considered her home views akin to a jury view. As she raised this as her justification/defense to the home views, it was entirely relevant and permissible for JDC to discuss the statute and case annotations regarding jury views during her sworn statement. Regardless, there is no

---

[11] W.Va. Code 39-4-2(7) and (5) defines a notary public as an individual commission to perform a notarial act, such as administering an oath or affirmation.

12

characterization or implication of the <u>Westover</u> case by Respondent Lanham. In fact, the record reflects *only* that Respondent Lanham requested that she read the annotation to the jury view statute[12] and she did so on the record.

Pursuant to Rule 2.6 of the Rules of Judicial Disciplinary Procedure, Counsel's report along with multiple exhibits and FCJ Goldston's sworn statement was presented to the Commission at its August 21, 2020 Meeting. After a thorough review of all evidence, pursuant to Rule 2.7(a) and Rule 2(d) of the Rules of Judicial Disciplinary Procedure, the Commission found probable cause and voted to issue a one-count formal statement of charges against FCJ Goldston charging her with violating Rules 1.1, 1.2, 1.3, 2.2, 2.4(B), 2.5 and Rules 3.1(A), (B) and (D) of the Code of Judicial Conduct.

By email dated August 27, 2020, Respondent Lanham provided FCJ Goldston with a summary of the relevant facts of her complaints and a list of rules "that we discussed this morning." Lanham invited her to contact him further if he could be of any assistance. By email dated September 16, 2020, Respondent Lanham provided FCJ Goldston with a proposed draft of the Statement of Charges and stated "[a]s discussed, attached is copy of our final draft of the Statement of Charges. If you would like to make any suggestions we will consider them but as we have discussed, any decision will be up to us." By email dated September 16, 2020, at 3:04 p.m. FCJ Goldston replied "I have received and reviewed the draft. The only wording change I suggest is on page 4 on the first line after "contempt powers that" the word "specifically" be inserted. I rely on your discretion whether that could be added of course. I think the statement of charges is fair and accurate".

---

[12] Respondent Lanham testified that he asked her to review the statute at the sworn statement and asked her to read the <u>Westover</u> annotation in an effort to determine *if* she had actually read the referenced statute she was now using to justify going into Gibson's home.

A0063803 - rlfc

By email dated September 18, 2020, Respondent Lanham sent the proposed statement of charges to the Chair of the JIC for review and stated "[i]f it meets with your approval please sign and return at your convenience." On September 23, 2020, the 14-paragraph formal statement of charges signed by the Chairperson of the JIC on September 18, 2020, was filed by JDC against FCJ Goldston with the Clerk of Court. On the same day, in compliance with Rule 2.8 of the Rules of Judicial Disciplinary Procedure, FCJ Goldston was notified of the filing of the statement of charges and provided with a copy of the same. The statement of charges also notified FCJ Goldston of her right to file responsive pleadings pursuant to Rule 2.9 of the Rules of Judicial Disciplinary Procedure.

By email dated September 23, 2020, Respondent Lanham stated "[p]er our conversations, I have attached a copy of the agreement.[13] Please take your time and review it. If it meets with your approval please print it, sign it, scan it, email it and mail the original back to us by Friday, October 2, 2020. As always if you have any questions or concerns please do not hesitate to contact me. Also per your request, the code for Jury views is covered in WV Code 56-6-17. The case we discussed based on that statute was Westover Fire Dept. v. Barker, 142 wv 404, 95 SE2d 807. Also, I tracked down the list of people on the Hearing Board" and he provided her a list of the current Judicial Hearing Board members.[14]

After the September 23, 2020, email but before September 25, 2020, FCJ Goldston[15] retained counsel Andy Nason, Esquire.[16] It was Respondent Tarr's recollection during her sworn

---

[13] This draft agreement has admissions of violations of Judicial Canon 3.1.

[14] Rule 3.1 of the Rules of Judicial Disciplinary Procedure states in relevant part "[t]he [Judicial Hearing] Board shall consist of nine members: three circuit judges, one magistrate, one family court judge, one mental hygiene commissioner, juvenile referee, special commissioner, special master, or former judge or justice, state or federal, and three members of the public."

[15] FCJ Goldston testified in her sworn statement to Chief Counsel in the investigation of this matter that Respondent Tarr contacted her via telephone and said she was calling to "strongarm" her into reaching an

statement that Respondent Lanham advised her that Attorney Nason did not want FCJ Goldston to admit to any Rule 3.1 violations because of the possibility of a lawsuit. By email dated September 25, 2020, at 3:24 p.m., Respondent Lanham sent Attorney Nason an email entitled "modified agreement" and stated "attached is the modified draft agreement. Please let me know your thoughts. Thank you." Attorney Nason responded with his client FCJ Goldston cc'd on the September 30, 2020, 10:40 a.m. email and stated "Proposed agreement/ please advise." Within the hour, Respondent Lanham advised Respondent Tarr by email that he "Just talked to Mr. Nason and got this email. They proposed changing the language in paragraph 4.(f)." Respondent Lanham's email to Respondent Tarr indicated he found the proposal to be acceptable. By email dated September 30, 2020, at 12:19 p.m. Respondent Lanham advised Attorney Nason "We are ok with the changes. If you could print this agreement out, sign it, have Judge Goldston sign it, scan it, email it and mail the original to me, then I will get this to the Hearing Board and ask for an expedited hearing."

On or about September 30, 2020, FCJ Goldston and her counsel entered into a written agreement with the JDC whereby she would admit to (1) all of the facts contained in paragraphs 1 through 14 of the formal statement of charges; and (2) violating Rules 1.1, 1.2, 1.3, 2.2(A), 2.4(B) and 2.5 of the Code of Judicial Conduct for her behavior set forth therein. The parties set forth factors in mitigation. The parties further agreed to recommend sanctions of a censure, a $5,000.00 fine and the payment of costs. The agreement was signed by FCJ Golston and her Counsel Andy Nason on September 30, 2020, and by Respondent Tarr and Respondent Lanham on October 5, 2020. Despite being charged in the Statement of Charges, there are no violations

---

agreement. [Goldston Statement at 58] Respondent Tarr testified that she did not recall any such conversation with FCJ Goldston about the resolution of the disciplinary case. Respondent Tarr denied using the term "strongarm call" in her practice. Respondent Lanham also testified he did not ever recall Respondent Tarr using that term.
[16] The WVSB records indicate Andy Nason, Esquire has been a member of the Bar since April 29, 1980.

of Rule 3.1(a), (b) or (d) of the Code of Judicial Conduct included in the Agreement which appeared to support that the parties negotiated the terms of the agreement. There is no credible evidence to support the allegation that JDC used abusive tactics to intimidate FCJ Goldston into signing an agreement.

By email dated October 6, 2020, Respondent Lanham sent Ancil Ramey, Clerk for the Judicial Hearing Board, a copy of the Statement of Charges against FCJ Goldston and the signed agreement between the parties relating to the Statement of Charges. Respondent Lanham stated "if it meets with your approval, both parties would like to see if it is possible to get an early hearing date on the agreement. Mr. Nason is representing Judge Goldston." Attorney Nason is copied on the email. By email dated October 6, 2020 at 3:21 p.m., Ramey advised the parties the JHB had another hearing matter previously set for January 15, 2021, and inquired if that date was too far in the future. On October 7, 2020, Respondent Lanham replied "Mr. Nason, it was my understanding that your client was in a hurry to get this heard as soon as possible. We are willing to help in that endeavor. If she has changed her mind, January 15th works for us." A scheduling order was signed by Judge Lorensen on October 16, 2020, setting the relevant dates for the hearing.

On or about October 14, 2020, the JDC received three support letters from Family Court Judges. All of the letters were written on the FCJs' official court letterhead. The letters bear the address of City Center East and one is addressed to "Mr. Brian Lanham, Assistant Counsel"; one is addressed to "Judicial Investigation Commission" and one addressed to "Brian J. Lanham, Judicial Investigation Commission." At its October 16, 2020 meeting, the JIC found the letters to be inappropriate and ordered Respondent Lanham to advise the judges of the same. On the same date, Respondent Lanham telephoned the FCJs to advise of the JIC's determination. By emails

dated October 21 and 22, 2020, Respondent Lanham sent drafts of the letters to Judge Moats for his review and approval. Per the JIC's directive, after Judge Moats approved the same, on or about October 22, 2020, Respondent Lanham sent the warning letters to the three judges.[17] Specifically, the letter stated in relevant part "after reviewing your letter in its entirety the Commission was of the opinion that your letter violated several rules of the Code of Judicial Conduct." The letters set forth the code violations and ultimately the judges were warned, but not sanctioned and complaints were not initiated.

An Advisory Opinion 2020-25 was issued by the JIC on October 21, 2020, and concentrated on the question of whether a judge may voluntarily write letters of support on behalf of litigants in any civil or criminal matter. As per procedure, the Advisory Opinion was published to the Supreme Court's website and it was sent by PDF to all judges.[18]

As customary with the practices of the office, there was an update on the pending FCJ Goldston matter provided by Judicial Disciplinary Counsel at the December 11, 2020 JIC Meeting.

In October 2020, an order was entered scheduling FCJ Goldston's judicial disciplinary hearing for January 1, 2021. By email dated January 4, 2021, Respondent Lanham wrote to Attorney Ramey "Attached are digital copies of the evidence book that we will present at the hearing. Please let me know if you have any questions or I can help in any way." By email Wednesday, January 6, 2021 9:17a.m. Respondent Lanham wrote to Attorney Ramey "Here are

---

[17] Judge Moats, in his capacity as Chair of the JIC, advised Chief Counsel that there was no instance to his knowledge that either Respondent Tarr or Respondent Lanham has exceeded the scope of their authority as JDC. He further noted that he was not aware of any instance where either Respondent Tarr or Respondent Lanham have failed to follow the directives of JIC.

[18] This practice was adopted by JIC in early 2020 in an attempt to keep judicial officers informed as to Advisory Opinions.

17

A0063803 - rlfc

digital copies of the documents that will be introduced at the Goldston hearing. There will also be jump drives with 2 videos as listed. They appear to be too large to send over email. Please if you would like them before the hearing and I'll arrange to get them to you. Thanks." Ultimately, the emails reflect two jump drives overnighted to Attorney Ramey. Attorney Nason is copied on all emails.

By email dated January 5, 2021, Attorney Ramey provided the parties with a draft recommended decision based on the parties previously signed agreement. He noted this did not reflect any decision by the Judicial Hearing Board but was solely a quality control check on his interpretation of the parties' agreement. By email dated the same date, Attorney Nason advised the documents had been reviewed by FCJ Goldston and counsel and there were no objections.

FCJ Goldston's hearing[19] was held on January 15, 2021. The Judicial Hearing Board Chair, the Honorable Michael D. Lorensen, Judge of the 23rd Judicial Circuit, presided. In attendance were the following JHB members: (1) The Honorable Paul T. Farrell, Judge of the 6th Judicial Circuit; (2) The Honorable Richard G. Postalwait, Magistrate of Calhoun County; and (3) The Honorable Glen Stotler, Judge of the 23rd Family Court Circuit.

The hearing transcript reflected that FCJ Goldston, appeared in person and with Attorney Nason.[20] [Hearing Transcript at 5] Respondent Lanham examined FCJ Goldston and the agreement was discussed and FCJ Goldston testified that she signed the agreement and she did so knowingly, voluntarily, and intelligently. [Hearing Transcript at 7 lines 4-10] FCJ Goldston acknowledged and admitted to the facts as alleged in the Statement of Charges, paragraphs 1-14,

---

[19] Because of COVID 19 at Attorney Ramey's request and, with no party voicing an objection, the JHB members appeared via Microsoft Teams.

[20] FCJ Goldston and Attorney Nason were both over audio without video, but FCJ Goldston confirmed she was physically present with her counsel during the judicial hearing. [Hearing Transcript at 2]

A0063803 - rlfc

and stated she now understood her actions violated certain rules. [Hearing Transcript at 7-8] Respondent Lanham proffers her mitigation evidence and she acknowledged the recommended sanction made by the parties. [Hearing Transcript at 8 line 15 through 9 line 11]. FCJ Goldston's statements to the Judicial Hearing Board were all made under oath and in the presence of her counsel.

FCJ Stotler's letter also alleged that JDC misstated the facts to "achieve their goal" and he contended the JDC representations in the January hearing support this allegation. Specifically, he alleged that JDC represented that after FCJ Goldston conducted the home view that she never took any action, but FCJ Stotler contends in his letter that FCJ Goldston in fact did take action because she returned to the court room and went back on the record. The only statements relevant to this claim are during the January hearing wherein Respondent Tarr stated in relevant part:

> **Ms. Tarr:**     If, Your Honor, if I can just interject one thing. I think you have to look at the specific factors, which is why it was that we have asked to have it warranted, in that the – even if you were going to allow a view, she did not follow a procedure that was appropriate. And the procedure that was appropriate was to tell him ahead of time, before they went to the house, why they were going to the house, give him an opportunity to object, and then she never put anything on the record afterward. There is no order that set forth any of this.
>
> And so I think, if—if I understand what you were saying, I am in agreement that what you need to look at are the particular facts of this particular case, and whether she followed an appropriate procedure or not. And all parties agree did not follow an appropriate procedure, from beginning to end.

[Hearing Transcript at 22 line 15 through 23 line 7] Respondent Tarr's statements as a whole [*See Also* Hearing Transcript 17-20] reflect JDC's repeated position that even if a view were appropriate, FCJ Goldston still failed to follow procedure for a view and Respondent Tarr

19

concluded by making clear there was no order[21] regarding the issue of the view entered after the contempt hearing. Attorney Nason stated that although an order had not been entered by FCJ Golston after the view, she did come back on the record and made findings. [Hearing Transcript at 25] He stated she was recused shortly thereafter and had no further ability to do anything on the case, including entering any Order. JDC did not dispute this representation by Attorney Nason. FCJ Goldston took issue with the statement that she "did nothing else to preserve the record." [Hearing Transcript at 26] She stated the parties went back on the record, and she stated she set forth on the record everything that happened during the visit. She stated she gave the parties the right to object and advised Mr. Gibson of the procedure to seek her recusal. JDC did not dispute the representations by FCJ Goldston. FCJ Goldston concluded her testimony by again acknowledging "mistakes were made" and that she accepted responsibility for the errors. [Hearing Transcript at 26]

The evidence establishes that FCJ Goldston was provided with notice and opportunity to be respond to the complaint, both in writing and during her sworn statement, consistent with the Rules of Judicial Disciplinary Procedure. FCJ Goldston was able to participate in the drafting of the Statement of Charges filed by the JIC. FCJ Goldston secured counsel in September of 2020 who negotiated stipulations with JDC. FCJ Goldston's counsel and JDC submitted Joint Exhibits to the JHB. It is critical to note that there were no allegations that Respondent Tarr or Respondent Lanham had engaged in any misconduct made at or before the January 2021 hearing before the JHB.

---

[21] Respondent Tarr testified that courts speak through their orders and there was no Order arising from the contempt hearing.

20

The allegations lodged in FCJ Stotler's letter also claimed that JDC failed to disclose relevant evidence as to the existence of a recording of the subsequent hearing to the Judicial Hearing Board. This allegation is also not supported by the record. The parties had entered into an agreement and had agreed upon joint exhibits for the hearing. The Hearing Examiner asked if Respondent Lanham wished to move for the admission of the Joint Exhibits. [Hearing Transcript at 9 line 18] Respondent Lanham affirmed and the Hearing Examiner inquired if there were any objections. There were no objections and the Joint Exhibits were admitted. The Joint Exhibits were pre-marked and Joint Exhibit #5 was entitled "Courtroom video from the morning of March 4, 2020." Judge Lorensen noted that he did not receive a video of the second part of the hearing on March 4. [Hearing Transcript at 27] Respondent Lanham acknowledged a second video and expressed no issue with providing the same but indicated there may be some issue with sending the video electronically because of its size. [Hearing Transcript at 27]

It is noted there is no pleading or evidence wherein JDC represents to the JHB that there is not a second part of the Gibson March 4th contempt hearing, nor is there any evidence that JDC failed to disclose the video. Indeed, the only portion of the contempt hearing that was provided by the parties to the JHB was the morning portion prior to the view and the Joint Exhibit log specifically states it is the MORNING hearing. The post home view portion of the March 4th contempt hearing was in the possession of Attorney Nason as his client provided it to JDC. Attorney Nason agreed to the Joint Exhibit and made no objection to the Joint Exhibits when invited by the Hearing Examiner. When Judge Lorenson asked about it, Respondent Lanham agreed to provide it to the JHB.

21

A0063803 - rlfc

Respondent Lanham testified during his sworn statement that he did not include the post home view portion of the contempt hearing[22] as he did not believe it was relevant to his case in chief as the prosecution. This is supported by a review of the Statement of Charges as the enumerated 1-14 paragraphs only address the conduct leading up to and including the home view.[23] The disciplinary matter[24] was concluded after JDC rested and Attorney Nason expressed satisfaction that the record was complete. [Hearing Transcript at 28]

On January 20, 2020, JDC filed a Motion to Disqualify Judge Stotler from the judicial disciplinary matter. By Order entered January 22, 2020, Judge Stotler declined to disqualify himself. On the same day, JDC received an Order signed by Judge Lorensen, Chairperson of the Judicial Hearing Board, requiring post hearing briefs by the parties addressing legal issues delineated by questions a-l. The briefs were ordered by February 15, 2021, with any responsive brief filed by March 1, 2021.

Attorney Nason filed a Response to the Judicial Hearing Board Questions on or about February 12, 2021. On or about February 16, 2021, JDC filed its post-hearing brief. Along with the brief, Respondent Tarr sought the admission of two additional exhibits -- one was a copy of the transcript of the March 4, 2020 contempt hearing which was prepared by a Court reporter on January 28, 2021, at Respondent Tarr's request, and the second was the cell phone video taken

---

[22] Although the parties later jointly moved for its admission post hearing, the Statement of Charges did not specifically allege facts that required JDC to seek to admit the bailiff's video recording of inside of Gibson's home during their case in chief.

[23] The only factual reference made to conduct that occurred *after* the home view in the Statement of Charges is found in paragraph 11 which states in relevant part "she failed to enter any order subsequent to the visit reflecting what had happened at the residence, whether any items had been secured and/or whether or not a party was in contempt." *See* Goldston Statement of Charges, paragraph 11, pages 3-4.

[24] Judge Lorensen noted both JDC and FCJ Stotler's respective objections on the record. [Hearing Transcript at 23-24]

22

inside of Gibson's home by FCJ Goldston's bailiff. Attorney Nason had no objection to the additional exhibits.

On February 16, 2021, an amicus brief was filed by Mr. Gibson's attorney, John Bryan and the same was ordered filed by order entered by the JHB on February 19, 2021. An order was entered on February 19, 2021, by the JHB that reflected a JOINT request was made by the parties and was granted by the Board admitting additional exhibits. As customary, JDC provided JIC with an update on FCJ Goldson matter at its February 19, 2021 JIC Meeting. Attorney Nason filed a corrective brief on February 22, 2021.[25] Attorney Nason also filed a Response Brief with the JHB on or about March 1, 2021.

On or about March 16, 2021, JDC received the recommended decision of the JHB. The recommendation was an admonishment and a $1,000.00 fine. The decision reflected that two JHB members wanted a censure, with the reduced fine. FCJ Stotler dissented because in his opinion there was no clear and convincing evidence that FCJ Goldston violated any provision of the Code.[26] On or about March 23, 2021, Respondent Tarr filed her objections to the recommended decision which included a challenge to FCJ Stotler presiding over the case at the

---

[25] It is noted that Attorney Nason's original and subsequent corrective February 22, 2021 brief at page 2 third full paragraph is the first instance wherein it is claimed that "Respondent agreed to the admission of the violation of the Canons because the JIC took the position she had violated them; she respected that position. She believed from what she was told by discussion with the JIC that if she disputed the matter the JIC may seek her suspension from the bench."

Attorney Nason's March 1, 2021 Response Brief Page 4, paragraph 4 – "In this regard, the Respondent admits that she was ill prepared for the meeting with JIC counsel on July 22, 2020. The Respondent was told the meeting would be an interview. Respondent specifically asked if she needed an attorney and was told no. When the Respondent Judge Goldston arrived, she was put under oath, recorded, shown portions of various statutes, rules and cases for which she did not have time to research, and told she could be suspended from the bench. Proceeding with what she had believed was just an interview was a mistake. Other Courts of record should not suffer the ramifications of that mistake." Page 5, paragraph 1 – "Respondent Judge Goldston was shown a portion of the Westover case, which is cited in the respondent's initial brief. The portion suggested the view resulted in a reversal and was not permitted. In fact, a full reading of the Westover case leads to the conclusion that views are allowed.

[26] FCJ Stotler's dissenting opinion fails to address or reconcile FCJ Goldston's knowing, voluntary admission to violating thirteen separate rules of the Code of Judicial Conduct.

JHB level. Attorney Nason also filed an objection to the recommended decision. The matter is pending before the Supreme Court of Appeals and is set for Rule 19 oral argument on September 15, 2021.

FCJ Stotler's letter to the Chief Justice stated he found it disturbing the JDC does not apparently believe anyone, and especially a member of the JHB, has the right to question their actions. However, the record reflects that FCJ Stotler did question JDC as he begins his questions of Respondent Lanham by stating the "complaint in this matter disturbs me, and the applications of this case concern me about the precedence that's being established here." [Hearing Transcript at 16] He stated that "it appears that the JDC and the JIC have taken the position that Family Court and maybe Magistrate Court or Circuit Courts do not have the power to view." He questioned what authority JDC relied upon to determine that she didn't have the power to do what she did. Respondent Lanham replied by stating "that there is no statute, no rule, nothing that we could find that allows Judge Goldston to go and continue her court hearing at a participant's house." [Hearing Transcript 16 at line 16] FCJ Stotler questioned why that would not fall within the inherent authority of the Court. As FCJ Stotler's questions continued, Respondent Tarr replied "I am not sure why we're being questioned when all the parties agree to both the facts and the violations." [Hearing Transcript at 20]

FCJ Stotler stated in his letter to the Chief Justice of the Supreme Court that it was apparent to him that the JDC was of the opinion that they should "rubber stamp" what they had done. He further stated that "the mere fact that the parties have entered into an agreement in this matter in no way compels the JHB to accept their recommendation without question." He also stated that it was his understanding that the "JHB has the authority to accept, reject and modify any agreement the JIC would recommend to the Judicial Hearing Board."

24

It is noted that the applicable law regarding stipulations by parties states that "[s]tipulations or agreements made in open court by the parties in the trial of a case and acted upon are binding and a judgment founded thereon will not be reversed." Syl. Pt. 3, Matter of Starcher, 202 W.Va. 55, 501 S.E.2d 772(1998) *citing* Syllabus Point 1, Butler v. Smith's Transfer Corporation, 147 W.Va. 402, 128 S.E.2d 32 (1962). "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syl. Pt. 4, Matter of Starcher, 202 W. Va. 55, 501 S.E.2d 772 (1998). The Court has noted that the same rule would apply to pre-trial stipulations. Matter of Starcher, 202 W. Va. 55, 61, 501 S.E.2d 772, 778 (1998). The facts and violations of the Code of Judicial Conduct were stipulated both by a pre-trial agreement and in open court in this case. Additionally, the evidence submitted in the record supports the stipulations made by the parties. The agreement executed by the parties as well as the applicable law make clear that the stipulations would be binding, but the JHB is not bound by the party recommendations as to the sanctions. Moreover, the Rules of Judicial Disciplinary Procedure make clear that the Judicial Hearing Board's responsibility[27] is to make a record and a recommendation for the Supreme Court's review. *See* Rule 4.8 of the Rules of Judicial Disciplinary Procedure Recommended Disposition by Board. The JHB can (and most certainly has) accepted, rejected, and modified recommendations as to

---

[27] During the January 15, 2021 hearing FCJ Stotler, while addressing Judge Lorensen, notes JIC's objection to FCJ Stotler's questions and says "well, I guess my question Mr. ¬Judge Lorenson, is, if that is true, and there's questions that need to be answered in regards to the process, who are those questions posed to then?" [Hearing Transcript at 23] Judge Lorensen responded "The Supreme Court. I mean, we make a recommendation of what think it ought to be based upon the allegations in the context of this specific complaint, and the Supreme Court – you know they – they're – not going to just rubberstamp what we do. They're going to give it an independent evaluation..." [Hearing Transcript at 23-24]

25

sanctions that the parties have recommended in disciplinary matters.[28] It is well established law that the Supreme Court of Appeals of West Virginia will conduct an independent review of the record and is the final arbiter in all disciplinary matters. *See* In re Browning, 192 W.Va. 231, 452 S.E.2d 34 (1994) and Syl. Pt. 3, Committee on Legal Ethics v. Blair, 174 W.Va. 494, 327 S.E.2d 671 (1984).

During the course of these ODC investigations, Chief Counsel took the sworn statement of FCJ Goldston[29] who appeared pursuant to a confidential investigative subpoena,[30] with Attorney Nason, who represents her in the pending judicial disciplinary matter and Attorney Jennifer Tully, who represents FCJ Goldston in the federal action that was filed by Mr. Gibson.

FCJ Goldston testified that when the Youtube video outside of the Gibson home "hit the press" she contacted the press office for the Supreme Court to confirm that she could not comment and was advised she (Goldston) should self-report to Respondent Tarr. [Goldston Statement at 53] FCJ Goldston said she called Respondent Tarr who advised she was filing a complaint against her.[31] FCJ Goldston testified that Respondent Tarr[32] told her that "if you

---

[28] The parties' rights to consent or object to the recommended disposition of the JHB are delineated in Rules 4.10 and 4.11 of the Rules of Judicial Disciplinary Procedure.

[29] FCJ Stotler's letter stated in order to "verify and substantiate" the allegations, he "highly recommend[ed] and request[ed]" that FCJ Goldston be interviewed.

[30] Despite conferring with two attorneys about her judicial ethics case, FCJ Goldston claims she believed she was effectively muzzled by JDC during her investigation. However, it is noted that FCJ Goldston testified she spoke to the Director of the Division of Court Services about the sworn statement she was subpoenaed to give in the instant confidential ethics investigations. She stated the conversation took place prior to reviewing the language in the subpoena.

[31] Respondent Tarr confirmed speaking with FCJ Goldston and advised her that she could not provide her with ethical advice because a complaint had been opened, but she stated she recalled suggesting to FCJ Goldston not to engage in any additional home views until the issues had been resolved.

[32] Respondent Tarr testified that she often cautions judicial officers to be truthful in their statements. Although she had no specific recollection of this conversation, it is not improper for Respondent Tarr to remind judicial officers of potential pitfalls of being less than candid in sworn statements. The Massie Statement of Charges filed by the JIC in October of 2019, dealt with, amongst other allegations, statements to JDC that were lacking in candor. Magistrate Massie resigned from the bench in March of 2020. *See* Matter of The Honorable Stephen D. Massie, Supreme Court No. 19-0915.

26

cooperate, you'll probably get away with an admonishment but if you act like your cohort in Beckley[33] and try to cover things up, it'll get bad." [Goldston Statement at 54]. FCJ Goldston testified that she did not speak to an attorney prior to filing the written response to the disciplinary complaint because she was "told [she] didn't need to" by Respondent Tarr.[34] FCJ Goldston could not recall dates or times, but testified she asked her [Respondent Tarr] on several occasions "when do I need to get an attorney" and she stated Respondent Tarr replied she did not need an attorney unless an agreement could not be worked out. [Goldston Statement at 56-58 and 61-62]. FCJ Goldston testified that her overall conversations were "almost equal" between Respondent Tarr and Respondent Lanham, but prior to her statement they were primarily with Respondent Tarr.[35] [Goldston Statement at 60 and 66].

FCJ Goldston testified that when she came to her sworn statement with JDC she was unaware she would be sworn, and was not told she was coming to give a statement, but thought she was coming to be interviewed. [Goldston Statement at 66]. FCJ Goldston testified that prior to giving her sworn statement that she spoke to, but did not retain Attorney David Kersey. [Goldston Statement at 70] FCJ Goldston testified that she was told by Respondent Tarr and Respondent Lanham that she "couldn't talk to anybody else" that it was "confidential" until the

---

[33] FCJ Goldston explained she interpreted that to be in reference to former Magistrate Massie who was the subject of discipline and resigned. There is only one reference to Magistrate Massie during FCJ Goldston's July 22, 2020 sworn statement before JDC wherein Respondent Lanham asked if FCJ Goldston was familiar with the facts of the case. Specifically, he inquired if she thought if Magistrate Massie showed up at a crime scene that he could make himself a witness in the proceeding and if she thought the conduct was improper. FCJ Goldston stated she didn't know much about the case, but later stated that she thought it was a different situation. [Goldston JDC Statement 43-45]. *See* Matter of The Honorable Stephen D. Massie, Supreme Court No. 19-0915.

[34] It is noted that FCJ Goldston's March 25, 2020 email to Respondent Tarr referenced that she had spoken to Senior Status Judge Hrko about the matter, and that she was aware that Senior Status Hrko had spoken with Respondent Tarr.

[35] Respondent Tarr testified that she did not recall speaking with FCJ Goldston on more than three occasions and that Respondent Lanham was the person who primarily spoke with her. The emails between the parties also support that the majority of the communications were between FCJ Goldston and Respondent Lanham.

27

A0063803 - rlfc

statement of charges was filed and that "nobody could talk about it at all."[36] [Goldston Statement

at 70] FCJ Goldston testified that she was "surprised" [Goldston Statement at 73] that she sworn

in, but did not object, and agreed that the statement remained primarily focused on the Gibson

matter. [Goldston Statement at 75] FCJ Goldston characterized the demeanor of Respondent Tarr

and Respondent Lanham as "polite" "nice" but "misleading." [Goldston Statement at 77].

    Specifically, FCJ Goldston testified to ODC:

> [Respondent Lanham] showed me one statement highlighted in a case that said
> 'There is no statutory authority for judicial view." That's all he showed me of that
> case. And he said, "were you aware of that?" And, I said, "No, but I can tell you
> that as a lawyer, I have been on judicial views.
>
> That's not the holding of the case. The holding of that case, I learned later is that
> the Court found that the judicial view was improper because it was done ex parte,
> and they specifically found they were not speaking on whether or not judicial
> views were allowable.
>
> .....
>
> I find that to be misleading. Then Ms. Tarr handed me a statute regarding my
> contempt powers. I read it. And she said, "Do you see anything in this statute that
> allows you to do what you can do?" And it did not.
>
> But there are two other statutes that she did not show me, that she did not
> reference. One of which specifically allows—gives me the power to seize items.
> And I found that to be misleading.

[Goldston Statement at 77-78]

    As it was one of her raised defenses/justifications to permit the home view in Gibson,

there was a discussion and reference to the jury view statute during the July 22, 2020 sworn

statement. Additionally, there is only one reference to the Westover case during FCJ Goldston's

July 22, 2020 sworn statement with JDC.

---

[36] FCJ Goldston had already consulted with two attorneys about the matter, and she testified that JDC did not tell
her she couldn't speak with an attorney. [Goldston Statement at 71] FCJ Goldston testified to JDC at her July 22,
2020 sworn statement that she had spoken with her family about the investigation. [Goldston JDC Statement at
113]. Moreover, the restrictions set forth in Rule 2.4 of the Rules of Judicial Disciplinary Procedure Confidentiality
binds JDC and the judicial officer is the holder of the confidentiality privilege.

28

**BY MR. LANHAM:**

**Q.** I'm going to hand you a copy of the West Virginia Code Chapter 56, Article 6, Section 17, and ask if you could read that, please, out loud.

**A.** "The jury may in any case at the request of either party be taken to view the premises or place in question or any property, matter or thing relating to the controversy between the parties when it shall appear to the Court that such view is necessary to a just decision. And it such case, the judge presiding at the trial may go with the jury and control the proceedings. And in a felony case, the judge and the clerk shall go with the jury and the jury shall control the proceedings"—and the judge, sorry—"and the accused shall, likewise, be taken with the jury or under recognizance shall attend the view and his recognizance shall be construed to require such attendance. The party making the motion in the civil case shall advance a sum sufficient to defray the expenses of the jury and the officers who attend them in taking the view, which expenses shall be afterwards taxed like other legal costs."

**Q.** Is it your testimony that – hold onto that for one minute.

**A.** Okay. Sure. Sorry.

**Q.** That's okay. It is your testimony that that's the code section that you were following to give you the authority to go view the scene; is that accurate?

**A.** Yes, but I'll – I mean I'm not going—I'm not sure I ever read that to go by[37]. In my mind, that was the authority that I thought I had.

**Q.** In the case law—

**A.** And, again, as in my response, if I don't, I don't. I'm sorry. I won't do it again.

**Q.** In the case law underneath it, I put a Post-It note by it, there's a *Westover Volunteer Fire Department versus Barker* case.

**A.** Uh-huh.

**Q.** Can you read what that says?

**A.** "There is no statutory authority for a trial judge trying a case in lieu of a jury to take a view." I was not aware of that case, but I can tell you when I was practicing law, I was trying a horrible case over whether or not repairs to a roof were done correctly, and I asked the judge to go and look and he did. And he was mad.

[Goldston JDC Statement 33-35].

As it was a raised defense/justification in her March 18, 2020 written response to the

---

[37] Respondent Lanham testified that it was his intent to fully demonstrate that she had not previously read the statute that she was now arguing gave her the authority to do the home views. She acknowledged on the record that she had not reviewed the statute or the annotations.

29

judicial ethics complaint,[38] there was a discussion about contempt statutes at the July 22, 2020

sworn statement. The following excerpts are from FCJ Goldston's July 22, 2020 sworn statement

before JDC wherein there are references and discussions regarding statutory authority:

### BY MR. LANHAM

#### (WHEREUPON, EXHIBIT NUMBER 5

#### WAS MARKED FOR IDENTIFICATION)

**Q.** I'm going to hand you what's been marked as Exhibit Number 5. If you could take a moment and read that to yourself.

**A.** Sure. Okay.

**Q.** Exhibit Number 5 is a copy of the West Virginia Code Chapter 48, Article 1, Section 304, titled "Proceedings in Contempt." Have you read all of Exhibit 5?

**A.** Yeah. Yea. I've skimmed it, but yeah, I'm familiar with it.

**Q.** Is there anything in that section that would give you the power to go to a home visit, as you did in the Gibson matter."

**A.** I don't see anything that would.

[Goldston JDC Statement at 60]

### BY MR. LANHAM

#### (WHEREUPON, EXHIBIT NUMBER 6

#### WAS MARKED FOR IDENTIFICATION.)

**Q.** I'll hand you what's been marked Exhibit Number 6. If you could read that to yourself.

**A.** Okay.

**Q.** Have you read Exhibit Number 6?

**A.** I have.

---

[38] Specifically, her March 18, 2020 response says "Not having been aware of the Aboulhosn opinion, I believed that my conduct was allowed under the authority of my contempt power and requirement to ensure that orders are complied with. I believe I have the authority under my contempt powers to aid in effecting the safe and undamaged transfer of equitable distribution." This written response was admitted into evidence in the disciplinary hearing as Joint Exhibit 4.

30

**Q.**    Exhibit Number 6 is a copy of the West Virginia Code, Chapter 51, Article 2(a), Section 9, "Contempt Powers of a Family Court Judge". Do you see anything in that section that would give you the power to go to Mr. Gibson's house?

**A.**    I would say that sanction – in paragraph "B", the next-to-last sentence, "Sanctions may be but are not limited to seizure, impoundment of property to secure compliance with the prior order."

And I'm not—I don't say that that directly says that I can do it, but I –

**Q.**    Would you agree with me that earlier in that same paragraph, it says, "Sanctions must give the contemptor an opportunity to purge himself or herself"?

**A.**    Yes.

**Q.**    How is going to Mr. Gibson's house give him a chance to purge himself? Well first of all, did you even find him in contempt?

**A.**    No.

[Goldston JDC Statement 60-61]

**BY MR. LANHAM**

(WHEREUPON, EXHIBIT NUMBER 7

WAS MARKED FOR IDENTIFICATION.)

**Q.**    I'll show you what's been marked as Exhibit Number 7. If you could read that to yourself.

...

[Golston JDC Statement 62]

Respondent Tarr interrupts Respondent Lanham to inquire additionally about the prior

referenced statute, specifically whether FCJ Goldston gave Gibson the opportunity to purge

himself of the contempt. [Goldston JDC Statement 62-65].

**BY MR. LANHAM**

**Q.**    Exhibit Number 7 is the West Virginia Code, copy of the West Virginia Code, Chapter 61, Article 5, Section 25. Did you see – or the title of it is "Contempt of Court, what constitutes contempt, jury trial and presence of defendant". Did you see anything in that section that would give you the authority to go to the Gibson residence?

**A.**    Before I went, no.

31

A0063803 - rlfc

    **Q.**    I'm sorry, before?

    **A.**    Before I went, no. When I got there and there was the discussion that was had, yes.

    **Q.**    Okay. Can you explain that to me?

    ....

[Goldston JDC Statement 65-66].

Although FCJ Goldston testified that Respondent Lanham called her after the JIC meeting and told her that the JIC[39] wanted her suspended, Respondent Lanham denied this allegation and had no recollection of the JIC or JDC expressing any intent to seek her suspension. She agreed that she had an opportunity to review the charges before they were filed [Goldston Statement 89-90] and that Respondent Lanham was willing to allow her to have input the factual findings. [Goldston Statement 91]. FCJ Goldston also testified that Respondent Tarr later called her and tried to "strongarm" her into accepting an agreement[40] right before she retained counsel. [Goldston Statement at 94]. She stated she told Respondent Tarr that she could not agree to violations that could subject her to civil suit. [Goldston Statement 96]. She further alleged that Respondent Tarr said "it's hard for me to strongarm you, but if you don't agree to this, we're going to file charges and we're going to seek suspension[41]." [Goldston Statement 96] FCJ Goldston testified that near the end of the conversation she advised Respondent Tarr that she had spoken with Attorney Nason. She stated that Respondent Tarr was "terse" and stated "well,

---

[39] The Rules of Judicial Disciplinary Procedure provide that once probable cause is found and the Statement of Charges is filed with the Court, the JIC has no role before the Judicial Hearing Board. *See* Section II - Rules 3 - 4.13 of the Rules of Judicial Disciplinary Procedure.

[40] The facts alleged in the Statement of Charges were reviewed and agreed to by FCJ Goldston prior to the filing and were easily established by the record.

[41] Respondent Tarr denied this conversation. Even if this conversation did take place, advising a judicial officer of the possibility of seeking a harsher sanction is not a violation of the Rules of Professional Conduct. It is very common in plea and settlement negotiations to advise of the range of possible sanctions available and that to which the attorney is willing to accept and/or seek.

32

A0063803 - rlfe

you understand if you employ counsel,[42] I can't talk to you anymore?" [Goldston Statement at 103] FCJ Goldston then retained Attorney Nason [Goldston Statement at 104] and FJC Goldston testified that she entered the agreement voluntarily after having an opportunity to review it. [Goldston Statement at 106].

Chief Counsel further inquired of FCJ Goldston, and confirmed that she understood she did not have to admit to or agree to anything [Goldston Statement at 133]; that she understood that JDC bears the burden of proof in judicial disciplinary cases and they would have to prove everything that wasn't admitted; and that the burden was that of clear and convincing evidence before the Judicial Hearing Board. [Goldston Statement at 134] When pressed further, FCJ Goldston tried to explain that despite being aware of the above facts and having counsel, it was still intimidating because of the "culture..it's the way we're taught at our seminars."[43] To illustrate her point the "culture" of "unsurety," FCJ Goldston made reference to conflict with JIC advisory opinions and directives from the Supreme Court [Goldston Statement at 137].[44]

---

[42] *See* Rule 4.2 of the Rules of Professional Conduct.

[43] Based upon this allegation, Chief Counsel reviewed the power point presentations and watched videos of the presentations given to the Family Court Judges by Respondents Tarr and Lanham in 2017 and 2019. The presentations are discussions of hypotheticals, answers, and explanations of the answers by way of reference to Advisory Opinions and caselaw. JDC's rapport with the Family Court Judges is professional, but friendly as evidenced by laughter in the room and the freedom of the audience to inquire of JDC during the presentations. Chief Counsel confirmed with Judicial Education that because of COVID there were no known presentations given by JDC to the Family Court Judges in 2020. To date, there are no known presentations given by JDC to the Family Court Judges in 2021.

Chief Counsel inquired of the current Chair of the JIC who advised that he had observed both Respondent Tarr and Respondent Lanham during teaching sessions before the Circuit Court Judges and the Magistrates and the sessions were extremely informative, entertaining, interactive, and well received by members of the judiciary.

Chief Counsel also inquired of the former Chair of the JIC who served for fifteen years, 10 years as Chair of the JIC that he could speak volumes about Respondent Tarr and Respondent Lanham's ability and character from years of experience with the two attorneys. He did not recall ever receiving any complaints regarding Respondent Tarr or Respondent Lanham's behavior while teaching members of the judiciary. He stated at no time did either Respondent misrepresent the law or attempt to deceive members of the judiciary.

[44]Rule 2.16(d) of the Rules of Judicial Disciplinary Procedure states "An advisory opinion is not binding on the Judicial Hearing Board or the Court, but shall be admissible in any subsequent disciplinary proceeding involving the requesting judge."

FCJ Goldston testified that after the Statement of Charges was issued she recalled speaking with FCJ Rock and FCJ Greenberg about her case and she stated they aided her with research for the brief. [Goldston Statement at 123]. When questioned about the allegations made in the March 2021 letter from Judge Stotler, FCJ Goldston testified that she received a copy of Judge Stotler's letter, but testified that Judge Stotler did not contact her before sending the letter and that prior to Chief Counsel nobody had asked her questions about her interactions with Respondent Tarr or Respondent Lanham. [Goldston Statement at 131] When specifically asked by Chief Counsel that "...so no one else has had a discussion with you about your interactions with Mr. Lanham or Ms. Tarr." FCJ Goldston replied "no." [Goldston Statement at 132] When questioned by Chief Counsel the basis for which the allegations that he makes against Respondent Lanham and Respondent Tarr without speaking to her, FCJ Goldston testified that "they're in the brief that was filed," [45] [Goldston Statement at 131] and later testified that she had not spoken or communicated with FCJ Stotler since the last seminar they both attended. [Goldston Statement at 151].

---

[45] FCJ Stotler's letter is dated March 25, 2021. The pleadings filed by Attorney Nason on FCJ Goldston's behalf include: Response to the Judicial Hearing Board Questions filed February 12, 2021, Corrected Response to the Judicial Hearing Board Questions filed on February 22, 2021, which at page 2 third full paragraph claims that "Respondent agreed to the admission of the violation of the Canons because the JIC took the position she had violated them; she respected that position. She believed from what she was told by discussion with the JIC that if she disputed the matter the JIC may seek her suspension from the bench." Attorney Nason's March 1, 2021 Response Brief Page 4, paragraph 4 claimed "[i]n this regard, the Respondent admits that she was ill prepared for the meeting with JIC counsel on July 22, 2020. The Respondent was told the meeting would be an interview. Respondent specifically asked if she needed an attorney and was told no. When the Respondent Judge Goldston arrived, she was put under oath, recorded, shown portions of various statutes, rules and cases for which she did not have time to research, and told she could be suspended from the bench. Proceeding with what she had believed was just an interview was a mistake. Other Courts of record should not suffer the ramifications of that mistake." Page 5, paragraph 1 claimed "Respondent Judge Goldston was shown a portion of the Westover case, which is cited in the respondent's initial brief. The portion suggested the view resulted in a reversal and was not permitted. In fact, a full reading of the Westover case leads to the conclusion that views are allowed."

## SHUCK MATTER

The second referenced case in the Stotler letter is the case which involved Family Court Judge Eric B. Shuck, Complaint No. 56-2020. Pursuant to its authority in Rule 2.2 of the Rules of Judicial Disciplinary Procedure, on June 16, 2020, Judicial Disciplinary Counsel opened Complaint No. 56-2020 on FCJ Shuck. This complaint was opened by Judicial Disciplinary Counsel on or about June 16, 2020, after receiving information during the investigation of FCJ Goldston that FCJ Shuck was also conducting home views.

By email dated July 1, 2020, at 9:49 a.m., Respondent Lanham advised FCJ Shuck that a letter requesting a response to JIC Complaint 56-2020 was attached to the email. Respondent Lanham advised FCJ Shuck that pursuant to the Rules of Judicial Disciplinary Procedure, a response was required within 10 days of receipt. Respondent Lanham requested that FCJ Shuck contact him if he had any questions, needed any help or needed an extension on time. The email is addressed to "Judge Shuck" and is signed "—Brian Deputy Counsel, JIC" The July 1, 2020 email and attached July 1, 2020 complaint letter on JIC letterhead complied with written notice of the complaint to the Judge as required by the Rules of Judicial Disciplinary Procedure.

By email dated July 2, 2020, at 5:33 p.m., FCJ Shuck advised Respondent Lanham to confirm receipt of the email and attachment. He stated he intended to file a response within 10 days. The email is addressed to "Mr. Lanham" and is signed "Eric". By email dated July 8, 2020, FCJ Shuck advised Respondent Lanham that his response was placed in the mail today. The email is addressed to "Mr. Lanham" and is signed "Eric". By email dated July 9, 2020, Respondent Lanham responded "thank you for the heads up" and is signed "-brian. Sent from my iPhone" FCJ Shuck filed a timely response on July 8, 2020. His written response references Judicial Investigation Commission Complaint No. 56-2020 and stated "[p]lease allow this to

35

A0063803 - rlfc

serve as my written response to the Complaint filed on June 16, 2020, by the Judicial Disciplinary Counsel."

His answer stated that he conducted "home visits" to litigants' homes on two occasions, on September 18, 2019, and November 6, 2019. On or about September 18, 2019, a hearing was held in Case No. 19-D-191, wherein the attorney for the wife, Kyle Lusk, had previously filed Petition for Contempt and requested a visit to his client's home to determine if assets previously awarded to her were present at the home. FCJ Shuck asserted that the home and the assets were "under the jurisdiction of the Court" and there was no objection to the home visit by the husband's counsel, James Keenan. FCJ Shuck stated that those present at the home visit were himself, his bailiff, both parties, and their counsel. FCJ Shuck included an audio/video recording of the hearing.

In Case No. 15-D-452, a hearing was held on or about November 6, 2019. The wife's attorney, Todd Kirby, requested a visit to the marital home to determine that property previously awarded to his client was still present at the home. FCJ Shuck again asserted that the home and the assets were "still under the jurisdiction of the Court" and that there were no objections from the husband's counsel, Timothy Lafon. FCJ Shuck stated that those present at the home visit were himself, his bailiff, the husband, and counsel for both parties. FCJ Shuck stated the wife traveled to the home, but remained outside in her car during the view. FCJ Shuck provided an audio/video recording of the November 6, 2019 hearing and an audio recording of the home visit.

At some point in the investigation, it was determined that a sworn statement was necessary and Respondent Lanham contacted FCJ Shuck to arrange for the same. Respondent Tarr testified that it was customary to permit judges to voluntarily submit to a sworn statement

36

A0063803 - rlfc

rather to issue a subpoena compelling attendance. Respondent Tarr testified that unless the allegations were as a result of extraordinary complaint filed by the Administrative Director that this professional courtesy was extended to the judicial officers so as to not interfere with their dockets and to allow the judicial officers to demonstrate cooperation in the disciplinary proceedings.

The evidence reflects that the sworn statement was arranged and scheduled directly with FCJ Shuck by Respondent Lanham. By email dated July 20, 2020, at 11:24 a.m., Respondent Lanham stated "We would like for you to come up and give a statement concerning your complaint. Would you be available during the last week of July?" The email is addressed to "Judge Shuck" and signed "—brian" On the same date, by email at 3:55 p.m., FCJ Shuck advised of his upcoming hearing schedule and indicated that he had hearings scheduled every work day until August 7th, but was available on Friday, July 24, 2020. The email is addressed to "Mr. Lanham" and signed "Eric." On the same date at 4:05 p.m., Respondent Lanham advised they would make Friday the 24th work if it was still open and asked if he would be available at 9am. The email is addressed "Judge" and signed "—brian" FCJ Shuck advised by email at 4:25 p.m. that date and time were fine to which Respondent Lanham responded that it sounded good and would let everyone "here" know and thanked him.

On or about July 24, 2020, FCJ Shuck provided a sworn statement to Judicial Disciplinary Counsel. The sworn statement was voluntary and agreed to by FCJ Shuck and arranged around his schedule. As it was not lawfully compelled, but as judges are required to respond to and cooperate in ethics inquiries, JDC could have easily compelled his appearance at the sworn statement by investigative subpoena, taking no regard for FCJ Shuck's docket or personal schedule. Moreover, allowing FCJ Shuck to voluntarily submit to the sworn statement

A0063803 - rlfc

37

afforded him the benefit of evidence of cooperation in the judicial disciplinary case. Although the time between the filing of the complaint and the sworn statement is twenty-three days, FCJ Shuck had time to confer with counsel[46] if he so chose.

A review of the 1:48:43 audio file of FCJ Shuck's sworn statement and the transcript was conducted by Chief Counsel. The transcript reflected that FCJ Shuck's sworn statement occurred on July 24, 2020, regarding complaints No. 56-2020. Respondent Tarr, Respondent Lanham, the JIC Investigator and the JIC Executive Assistant were present for all or at least a portion of the sworn statement. FCJ Shuck was duly sworn on the record by the JIC Executive Assistant, a notary.[47] The transcript stated "WHEREUPON, THE HONORABLE ERIC SHUCK WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS FOLLOWS". [FCJ Shuck JDC Transcript at 4]

FCJ Shuck testified that he was elected as the Raleigh County Family Court Judge on or about May 10, 2016, and assumed office in January 2017[48] FCJ Shuck did not have prior family law experience [FCJ Shuck JDC Transcript at 6] as prior to becoming a family court judge, he worked in the Raleigh County Public Defender's office for nearly fifteen (15) years following his graduation from law school.[49] [FCJ Shuck JDC Transcript at 4-5]

---

[46] FCJ Stotler's letter alleged that when judges inquire whether they should have an attorney to represent them, they are advised they do not need an attorney. Judicial disciplinary proceedings are not criminal in nature. Judicial Disciplinary Counsel is under no obligation to assess whether members of the judiciary should have counsel. As attorney fees can be awarded in formal cases when a judge prevails, it likely is not prudent for counsel to express any opinion regarding the same. *See* Rule 4.13 of the Rules of Judicial Disciplinary Procedure Attorney Fees upon Dismissal. Additionally, FCJ Shuck's testimony did not indicate he inquired of JDC if he needed to retain an attorney or that he was discouraged by JDC in obtaining counsel.

[47] *See* footnote 12 infra.

[48] FCJ Shuck has never been disciplined by the JIC or the Supreme Court of Appeals as a judicial officer.

[49] FCJ Shuck became a member of the West Virginia State Bar on September 24, 2002. He has never been disciplined by the Lawyer Disciplinary Board or the Supreme Court of Appeals as a lawyer.

38

A0063803 - rlfc

FCJ Shuck asserted that in the two cases wherein he conducted the home visits there were difficult litigants and further asserted that he was enforcing previous orders in which the parties were accused of contempt of a court order. [FCJ Shuck JDC Transcript at 10 and 15] Respondent Lanham inquired as to what statute, rule or case law he was relying on that gave him the authority to go to the home. [FCJ Shuck JDC Transcript at 16] FCJ Shuck stated he felt that the home visits were akin to a "jury view." [FCJ Shuck JDC Transcript at 16] The record reflects that Respondent Lanham handed FCJ Shuck W.V. Code Chapter 56, Article 6, Section 17 the code section captioned "jury view." Respondent Lanham asked FCJ Shuck to read the jury view statute to himself and suggested that FCJ Shuck "take [his] time." [FCJ Shuck JDC Transcript at 17].

FCJ Shuck candidly replied to Respondent Lanham that he "didn't look up the code before [he] went, so [he] [was] not going to say that, you know, I looked it up and this was the code that I relied on." [FCJ Shuck JDC Transcript at 18]. FCJ Shuck reasserted that there were no objections to the home visits he conducted and that all parties were represented by counsel. He further stated that, had there been an objection, he would have explored the issue further. [FCJ Shuck JDC Transcript at 18] When asked by Respondent Lanham now that he "thought about it more" what was his "opinion legally," FCJ Shuck replied if "there's anything improper" that it would have been potentially having a hearing outside of the record, as there was no court reporter present at the home visits to make an official record. [FCJ Shuck JDC Transcript at 20] The record reflects that Respondent Tarr briefly inquired further of FCJ Shuck's prior statements [FCJ Shuck JDC Transcript 20 line 15 through 24 line 1], but at the 26:16 mark of the statement Respondent Lanham resumes his questions and returns his inquiry to the jury view statute and requests FCJ Shuck to review a case cited as an annotation to the statute, specifically, Westover

39

Volunteer Fire Dept v. Barker, 142 W.Va. 404, 955 S.E2d 807 (1956). FCJ Shuck reads the annotation "by trying the case in lieu of jury, there's no statutory authority for a trial judge trying a case in lieu of a jury to take a view." Again, FCJ Shuck candidly replied that he was not familiar with the case. Again, despite the allegations in Stotler's letter, Respondent Lanham does not characterize the Westover case, but instead asks him "based on that, do you think you had the authority to go out under that chapter, article and section of the Code." FCJ Shuck stated if he "only read that very small little annotation, then [he] would say no." [FCJ Shuck JDC Transcript 24-25] This is the only reference made by either party to the Westover case in FCJ Shuck's sworn statement.

FCJ Shuck acknowledged that the lack of a court recording of the home visit could potentially make him a witness in the matter. [FCJ Shuck JDC Transcript at 50] FCJ Shuck later noted that he had recorded one of the home visits with a hand-held recording he used for dictation. [FCJ Shuck JDC Transcript at 69] He explained he thought it was a good practice to take it, so that if there was a dispute, he had a recording of what took place." [FCJ Shuck JDC Transcript at 70]

Upon questioning by Respondent Lanham about the lawyer's response to opposing counsel's request for a home view in the second referenced case, FCJ Shuck testified "I'd have to look. I'm sorry. I'm obviously nervous during these things, so your memory- my memory is starting to get a little foggy." To which Respondent Lanham replied "Take your time. You're fine." FCJ Shuck further explained:

I don't want to misstate anything. I should've watched those last night. I didn't realize that I need- that I would need to be specific. I mean I guess because I provided the hearings—I can't recall. I mean I know when I watched it on that Sunday before I prepared my response, it, to me, confirmed what I thought that there was no opposition to it."

Respondent Lanham then attempts to refresh FCJ Shuck's memory as to the details with regard to Attorney LaFon's response to the motion for the home view to which FCJ Shuck replies "Yeah. I do recall that. I do recall that." [FCJ Shuck JDC Transcript at 56-57]

Again, despite the Stotler letter allegations, Judicial Disciplinary Counsel complied with the notice requirements as set forth in the Rules and advised FCJ Shuck of the existence of the ethics complaint. There is no credible evidence to support the allegation in the Stotler letter that FCJ Shuck had "no idea" and was given no opportunity to be prepared to address the issues. The scope of the sworn statement was consistent with the complaint that FCJ Shuck had been provided and was given an opportunity to and did respond to the complaint in writing. The authority, statutory or otherwise,[50] and relevant facts in the cases that were discussed in the sworn statement was consistent with the raised defenses to the alleged misconduct, e.g. jury view, contempt proceedings, and consent by the parties.

Pursuant to Rule 2.6 of the Rules of Judicial Disciplinary Procedure, Counsel presented Complaint No. 56-2020, FCJ Shuck's written response, and the transcript of FCJ Shuck's sworn statement at its August 21, 2020 meeting. Respondent Tarr testified during her sworn statement that it was customary procedure to upload all of the investigation documents to the JIC's secure server for the members review to and confirmed that practice was followed at this meeting. After a thorough review of all evidence, on or about August 25, 2020, the Judicial Investigation

---

[50] When questioned by Respondent Lanham if FCJ Shuck had ever inquired about the authority to conduct home visits from any other judicial officer or court personnel, FCJ Shuck stated that he had learned of the home visits from FCJ Goldston and other attorneys who had appeared in both of their family courts. However, FCJ Shuck stated FCJ Goldston did not specifically tell him to conduct home visits. [FCJ Shuck JDC Transcript at 72-73]. It is further noted that FCJ Shuck is the most junior, both in age and seniority, of the three family court judges in his family court circuit. [FCJ Shuck Statement at 6]

41

Commission found probable cause existed and pursuant to Rule 2.7(c) issued an Admonishment to FCJ Shuck regarding his conduct.

FCJ Shuck was admonished by the JIC for violations of Rules 1.1; 1.2; 1.3; and 2.5(a) of the Code of Judicial Conduct. The JIC noted that formal discipline was not essential as FCJ Shuck had no prior discipline, and he had been "led astray, in part, by another colleague's actions." [Admonishment at 3] The JIC stated that such home visits were not authorized by any statute, rule or case law and that they were "ill-advised and inappropriate." [Admonishment at 4] The JIC further stated:

> The burden of proof in a contempt proceeding rests with the moving party. In other words, it is the moving party's responsibility to provide evidence in support of their contention that the other side has failed to produce the items in question. When a judge goes to a scene to gather evidence, he/she places himself/herself in the stead of the moving party and ceases to serve as the factfinder. More importantly, when a judge goes to a home to help enforce a prior court order, he abrogates his responsibility as a judge in favor of some nonexistent role in the executive branch.

[Admonishment at 4]

By email dated August 26, 2020, Respondent Tarr sent FCJ Shuck the Admonishment from the JIC, and indicated her assistant would mail a copy on Friday. On the same date, FCJ Shuck acknowledged receipt and thanked her for advising him of the outcome in advance. While advised of the right to object within fourteen days after its receipt pursuant to Rule 2.7(c) of the Rules of Judicial Disciplinary Procedure, FCJ Shuck did not object to the Admonishment.

During the course of these ODC investigations, Chief Counsel took the sworn statement of FCJ Shuck[51] and he appeared pursuant to a confidential investigative subpoena. FCJ Shuck testified that he received an email dated July 1, 2020, from Respondent Lanham, requesting a

---

[51] FCJ Stotler's letter also stated in order to "verify and substantiate" the allegations, he "highly recommend[ed] and request[ed]" that FCJ Shuck be interviewed.

42

response to the attached letter within 10 days and Respondent Lanham indicated if he needed an extension or had questions, please contact him. [FCJ Shuck Statement at 43]. FCJ Shuck stated he contemplated sending JDC an email inquiring if there had been a "written complaint or who filed it... but I did look at their rules and I saw that it said they could open a complaint." [FCJ Shuck Statement at 48]. FCJ Shuck stated he filed a written response, and then "they wanted me to come down and give a **sworn statement**, so—" [FCJ Shuck Statement at 46] (emphasis added). He stated that he primarily dealt with Respondent Lanham who was "very personable" "very how you doing" "signs his name with Brian, so I felt comfortable that this was more of a just go down, say basically say in person **under oath** what I had ...said and that was going to be the end..." [FCJ Shuck Statement at 46-47] (emphasis added)[52]

FCJ Schuck testified that prior to filing a response to the complaint, he did not talk to an attorney because he did not feel he needed to as he did not think he had violated any rules.[53] [FCJ Shuck Statement at 48] FCJ Shuck testified that he called and spoke to Respondent Lanham prior to coming to the sworn statement and he was assured "it probably won't take an hour" and he stated that Respondent Lanham said "it really depends on how much you talk" [FCJ Shuck Statement at 51]. FCJ Shuck stated going into the sworn statement that he felt "comfortable" "a little nervous" but it did not "feel adversarial."

---

[52] Although Respondent Lanham's tone with FCJ Shuck was respectful, kind, and personable, FCJ Shuck's use of the terms "sworn statement" and "under oath" prior to going on the record do not support FCJ Stotler's allegations that JDC requests judges to appear at their office under the "disguise of just being a friendly interview and, once there, the judges are sworn in and interrogated."

[53] FCJ Shuck later testified that had he known JDC were going to interrogate him during the sworn statement, he would have brought counsel. [FCJ Shuck Statement at 59] When asked if he thought Respondent Tarr or Respondent Lanham violated the Rules of Professional Conduct, his response was "I can't say whether they actually violated the Rules of Professional Conduct. Do I think that what they did was appropriate with my case? No, I don't". [FCJ Shuck at 89] FCJ Shuck testified that had he been evasive, uncooperative, or alleged to have committed fraud then it would have been more appropriate to interrogate him that way. [FCJ Shuck at 90].

43

However, he testified that when he got there "and was placed under oath, it was a whole different ball game then." [FCJ Shuck Statement at 51]. FCJ Shuck stated it was like "an interrogation" that it was "intense" and "they were both asking questions." [FCJ Shuck Statement at 54] He further alleged that documents were being shown to him and despite his request, he was refused the chance to review anything and the documents were "jerked away." In fairness to FCJ Shuck, unlike FCJ Goldston he did not have a copy of his JDC statement before the sworn statement with ODC, and he is clear on the record that he did not "want to misstate something and then it be different there." [FCJ Shuck Statement at 56-57] However, the transcript of the July 24, 2020 statement does not support these allegations.

FCJ Shuck testified that "two and a half hours later, I left here feeling sick, head hurting."[54] FCJ Shuck testified that "I felt like it was intimidation" [FCJ Shuck Statement at 55].

FCJ Shuck testified that JDC mentioned Magistrate Massie before and during the sworn statement. Specifically, FCJ Shuck alleged that prior to going on the record that Respondent Tarr warned him "you don't want to be like Steve Massie. You need to cooperate with us, and you know you need to be honest." [FCJ Shuck Statement at 57] Respondent Tarr testified that she often cautions judicial officers to be truthful in their statements.[55] There is only one reference to Magistrate Massie during FCJ Shuck's July 24, 2020 sworn statement. Respondent Lanham asked if FCJ Shuck was familiar with the facts and prosecution of the case. Specifically, Respondent Lanham inquired if he was aware that Magistrate Massie was alleged to have shown

---

[54] The sworn statement by JDC was 1:48:43.

[55] This allegation is similar to FCJ Goldston's assertion that Respondent Tarr used the Massie case to threaten or intimidate her. It is not improper for Respondent Tarr to remind judicial officers of potential pitfalls of being less than candid in sworn statements. The Massie Statement of Charges filed by the JIC in October of 2019, dealt with, amongst other allegations, statements to JDC that were lacking in candor. Magistrate Massie resigned from the bench in March of 2020.

44

A0063803 - rlfc

up at crime scene that he could make himself a witness in the proceeding and if the conduct "put up a red flag." [FCJ Shuck JDC Statement 86-87][56]

In relation to FCJ Stotler's allegation about misrepresenting the Westover case, FCJ Shuck testified that JDC "misrepresented what the case said. They said it said I couldn't go out and view or something or go do that. That's not what this case says."[57] [FCJ Shuck Statement at 59-60] In fairness to FCJ Shuck, unlike FCJ Goldston he did not have a copy of his sworn statement given to JDC to review prior to the statement before giving his sworn statement before ODC, however, the transcript of the July 24, 2020 statement does not support these allegations. *See* Supra at 37-38. As was the case in FCJ Goldston's case, the transcript is clear that Respondent Lanham made no representations about the Westover case, but simply made inquiry of FCJ Shuck if after actually reviewing the statute and a single annotation if he saw any authority that allowed him to conduct the view.

When questioned about the allegations made in the March 2021 letter from Judge Stotler, FCJ Shuck testified that he "had not seen that" letter[58] and while he knew he was referenced in the letter that "he was not consulted" and he confirmed that FCJ Stotler did not contact him before sending the letter, instead, he testified that FCJ Rock contacted him. [FCJ Shuck Statement at 78] FCJ Shuck testified he was upset that he wasn't asked before the Stotler letter was sent. He testified that he didn't "play a role in [the letter]" didn't "suggest" it and he "was [not] consulted about it." [FCJ Shuck Statement at 79] When questioned how the allegations

---

[56] This line of questioning is substantially similar to Respondent Lanham's questions to FCJ Goldston about the Massie case.

[57] Similar to his line of questioning in FCJ Goldston's sworn statement, Respondent Lanham testified that it was his intent to demonstrate that he had not previously read the statute that he was now arguing gave him the authority and he acknowledged the same on the record.

[58] FCJ Shuck took a recess so he could read the Stotler letter. After returning to the record, he testified that was the first time he read the Stotler letter. [FCJ Shuck Statement at 79-80]. He stated he was aware of it because FCJ Goldston mentioned the Stotler letter to him. [FCJ Shuck Statement 80]

45

about him ended up in the Stotler letter, FCJ Shuck testified that he "spoke to [FCJ] Deanna Rock, who had contacted me... and had asked me about my experience and I shared some of my experience, which was similar to this." [FCJ Shuck Statement at 85] He testified that his conversation with FCJ Rock about his experience was before the Stotler letter, but he denied that she told him she was going to put his statements in the letter. [FCJ Shuck Statement at 86]. FCJ Schuck testified that FCJ Rock said "we don't think this is improper that you go—that judges go out like this, otherwise judges would be nailed to the bench, basically, and never be able to even walk outside and look at a vehicle to see if it was worth, say, seizing the child support." [FCJ Shuck Statement at 86].

### DISCUSSION AND REASONS CLOSED

Rule 1 of the Rules of Judicial Disciplinary Procedure states in relevant part that the ethical conduct of judges is of the highest importance to the people of the State of West Virginia and to the legal profession. Every judge shall observe the highest standards of judicial conduct. In furtherance of this goal, the Supreme Court of Appeals does hereby establish a Judicial Investigation Commission to determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct promulgated by the Supreme Court of Appeals to govern the ethical conduct of judges or that a judge. Rule 1.11 of the Rules of Judicial Disciplinary Procedure provides that the Commission shall have the authority to (1) determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct; inform the public about the existence and operation of the judicial disciplinary system, the filing of formal charges, and the discipline imposed or recommended on formal charges; delegate, in its discretion, to the Chairperson or Vice-Chairperson, the authority to act for the

Commission on administrative and procedural matters; and engage in such other activities related to judicial discipline as it deems appropriate.

Rule 5 of the Rules of Judicial Disciplinary Procedure states in relevant part that the Supreme Court of Appeals established an Office of Disciplinary Counsel to prosecute violations of the Code of Judicial Conduct. Judicial Disciplinary Counsel shall be primarily responsible for the investigation of complaints of ethical violations by judges. Rule 5.4 of the Rules of Judicial Disciplinary Procedure provides in relevant part that Disciplinary Counsel shall perform all prosecutorial functions and have the authority to receive complaints concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; review all complaints concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; investigate information concerning violations of the Code of Judicial Conduct and the Rules of Professional Conduct; prosecute violations of the Code of Judicial Conduct and Rules of Professional Conduct before the Lawyer Disciplinary Board, the Judicial Investigation Commission, the Judicial Hearing Board, and the Supreme Court of Appeals; and undertake, pursuant to information provided by the Lawyer Disciplinary Board, Judicial Investigation Commission or the Supreme Court of Appeals, whatever investigations are deemed appropriate.

The current Chair of the JIC advised that until receipt of FCJ Stotler's March 2021 letter, he had never heard complaints of any nature pertaining to Respondent Tarr or Repondent Lanham by any member of the judiciary. He further stated that both Respondent Tarr and Respondent Lanham are a credit to the legal profession. He affirmed that since his time as Chair of the JIC, that Respondent Tarr and Respondent Lanham have consulted him in his capacity as Chair as to every action, and every action taken has been done with his approval and with the consent and approval of the other members of the JIC.

47

The former Chair of the JIC stated he could speak to the abilities and character of Respondent Tarr and Respondent Lanham. He stated as attorneys representing the JIC they have exceedingly difficult jobs as they must not only know the judicial canons but act fearlessly in doing those things as required by their jobs as JDC. The former Chair of the JIC stated that FCJ Stotler's March 2021 letter demonstrates both an ignorance of the system and a willingness to respond to adverse decisions in an irresponsible manner. The former Chair further opined that the reckless letter required FCJ Stotler's removal from further service on the Judicial Hearing Board.

The operation of a fair and efficient court system depends on the quality and integrity of the Bench and the Bar. Systems of accountability, such as the judicial and lawyer disciplinary systems, are necessary to educate its member, to provide deterrence and consequences, and most importantly to protect the public and the rule of law. Lawyers owe one another and judges a duty of courtesy, candor, honesty, diligence, fairness and cooperation. Judges owe to all participants in a legal proceeding courtesy, attentiveness, respect, diligence, punctuality, protection against unjust and improper criticism or attack, and a dedication to the proper administration of the courts. [Preamble of the Standards of Professional Conduct.]

JDC has the unenviable job of prosecuting violations of the Code of Judicial Conduct. This is a position that is fraught with the possibility that some judicial officers are not pleased with the outcome. Respondent Tarr and Respondent Lanham must conduct thorough investigations and engage in diligent preparation for sworn statements in investigations wherein the integrity of a judicial officer is in question and the same is not a violation of the Rules of Professional Conduct. Indeed, the Rules of Professional Conduct provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal

48

A0063803 - rlfc

JA840

knowledge, skill, thoroughness and preparation reasonably necessary for the representation. *See* Rule 1.1 Competence.

Despite JDC's compliance with the Rules of Judicial Disciplinary Procedure, FCJ Stotler's letter essentially alleged "trial by ambush" tactics by JDC. However, a judicial officer should be expected to adequately prepare, be familiar with the applicable rights and controlling procedural rules, and competently assess the significance of a proceeding wherein their own judicial integrity is questioned. Rule 2.5(A) of the Code of Judicial Conduct provides that "a judge shall perform judicial and administrative duties, competently and diligently." Comment [1] Competence is the performance of judicial duties requires the legal knowledge, skill thoroughness, and preparation reasonably necessary to perform a judge's responsibilities of judicial office. Additionally, Rule 2.16 of the Code requires a judge to cooperate and be candid and honest with judicial and lawyer disciplinary agencies. Cooperation with investigations and proceedings of judicial and lawyer discipline agencies, as required in paragraph (A), instills confidence in judges' commitment to the integrity of the judicial system and the protection of the public.

The evidence clearly demonstrates that Respondent Tarr and Respondent Lanham treated the FCJs with respect and professionalism. The evidence clearly demonstrated that both FCJ Goldston and FCJ Shuck were provided notice of the complaints and given an opportunity to respond in writing, prior to their sworn statements. Then, after due consideration was given to their schedules by JDC, they voluntarily attended and provided statements to JDC. It is disingenuous for a member of the judiciary to assert that they did not appreciate the significance of providing a statement to JDC, sworn or not. It is presumed that members of the Bar and members of the judiciary, as they are officers of the court, would provide the same testimony

49

under oath or not. FCJ Goldston now alleges that it was unfair to discuss the statutory and legal authority that she raised as a defense to her actions at her sworn statement. It is not unfair to expect a member of the judiciary to be able to read and discuss the law that pertains to the issues within the scope of the judicial ethics investigation—particularly when the law in question was raised as a defense by the judicial officer.

While after giving their sworn statements, the full weight of the seriousness of the allegations may have been felt by the FCJs, but such belated recognition does not equate to improper, much less, unethical behavior by Respondent Tarr and Respondent Lanham. The most compelling evidence of the fairness and transparency is evidenced by the fact that, after retaining counsel, FCJ Goldston immediately into an agreed disposition of the facts and conclusions of law. Moreover, no allegations of misconduct by either Respondent Tarr or Respondent Lanham were raised by FCJ Goldston at her January hearing. Respondent Tarr and Lanham answer to and appear before the JIC, which in large part, is comprised of judicial officers. As such, it is reasonable to believe that Respondents are aware of the high level of scrutiny their actions will be subjected. JDC is equally aware that when prosecuting violations of the Code of Judicial Conduct and seeking sanctions against a judicial officer before the Judicial Hearing Board (and ultimately the Supreme Court) their actions as counsel will be reviewed with the same level of scrutiny.

It is shocking that a long-standing member of the judiciary bestowed with the honor of being part of the system designed to protect and preserve the integrity of the judicial system would make such baseless accusations designed solely to impugn the integrity of two members of the West Virginia State Bar. It does not appear that FCJ Stotler conducted any factual investigation into the allegations regarding JDC before regurgitating the untimely, unsupported

50

allegations made by FCJ Goldston and sending an *ex parte* communication, written on his official court letterhead, to the Supreme Court. Additionally, the Judicial branch of government has the exclusive authority to regulate the practice of law in the State of West Virginia, but FCJ Stotler's letter was also sent to members of the Legislature. The Investigative Panel of the Lawyer Disciplinary Board directs Chief Counsel to provide this disposition to both the Chairperson of the Judicial Investigation Commission and the Administrative Director of the Supreme Court of Appeals.

The law is not an arena wherein we vilify civility, curse thorough preparation, and denigrate skilled, zealous advocacy. The Investigative Panel of the Lawyer Disciplinary Board finds no merit to the allegations made against Respondent Tarr and Respondent Lanham and orders these matters be closed.

**CLOSING ORDERED** on the 13th day of May, 2021, and **ENTERED** this 13th day of May, 2021.

Amy C. Crossan, Chairperson
Investigative Panel
Lawyer Disciplinary Board

51

JA843

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.                           Civil Action No. 5:21-cv-00181
                                 Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

        Defendant.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANT LOUISE E. GOLDSTON**

    A.      JUDICIAL IMMUNITY

    1.      **Defendant Goldston is ineligible for judicial immunity as a matter of law.**

The WVSCA opinion in In the matter of Goldston, No. 20-0742 (2021) operates to prohibit Defendant Goldston from the application of judicial immunity in defense of the same underlying facts. Goldston is a final adjudication on identical issues facts and law, censuring Defendant for an "egregious abuse of process."[1] Despite Defendant's refusal to describe her conduct as a "search," the WVSCA held otherwise, specifically holding that she performed a search of the Plaintiff's residence:

---

[1] Goldston at 23.

1

> We begin with a threshold question: Did Judge Goldston view the ex-
> husband's home, or did she search it? We find that she searched it.... Accordingly, we
> find that Judge Goldston's actions at the residence were
> not a view.[2]

The Court rendered a final adjudication on Judge Goldston's argument that a West Virginia

family court judge possesses state-law authority to engage in her actions of March 4, 2020:

> Under our system of government, judges may not exercise executive powers . . . . In light
> of these clear prohibitions, we hold that the West Virginia Constitution forbids a judicial
> officer to participate in a search because a search is an exercise of executive power. W.
> Va. Const. art. 5 § 1. Because Judge Goldston plainly engaged in such a search, we find
> that the so- called "view" was improper.[3]

Defendant Goldston may not now assert judicial immunity, but rather is bound by the WVSCA's

final adjudication of the matter. Defendant cannot dispute that she performed a search, rather

than a view, and that performing a search of Plaintiff's home, as a matter of law, falls outside the

protections of judicial immunity.[4]

On November 18, 2021, the WVSCA issued their published opinion in the case of In the

matter of Goldston, No. 20-0742 (2021), censuring and fining Defendant Goldston. The central

issue in both Goldston and the § 1983 action currently *sub judice*, is the allegation that a family

court judge, under color of law, personally engaged in a search and seizure of the Plaintiff's

residence, forcing Plaintiff to stop documenting the incident, under threat of arrest, in violation

of state law and federal constitutional rights. The Court in Goldston established conclusively and

categorically that the Defendant's conduct was, as a matter of law, "*executive*" in nature, and

---

[2] Id. at 13-15.

[3] Id. at 17-18.

[4] Plaintiff has already briefed the issue of judicial immunity in his supplementary brief discussing the
effect of In the matter of Goldston, No. 20-0742 (2021) on Defendant Goldston's claim of judicial
immunity. In the interest of judicial economy, the Plaintiff hereby incorporates the supplementary brief by
reference as though fully restated herein.

expressly not "*judicial*." Syllabus Point 2 held that, "The West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power…." and, Syllabus Point 3 held that the underlying findings against Defendant were proven by clear and convincing evidence.

      Defendant admits that "searches" are executive in nature and that anyone who participates in one acts, not as a judicial officer, but rather as a law enforcement officer. However, she continues to deny that she was involved in a *search* of the Plaintiff's residence.[5] Rather than a *search*, Defendant instead characterizes her actions of March 4, 2020 as only a "seizure," illogically arguing that, although she cannot *search*, that she may instead engage in a *seizure*, as if there were a material difference between the two.[6] To the contrary, Defendant did perform a search. She attempts to justify her actions by re-defining the word *search*, though simultaneously admitting to the underlying activity held by the WVSCA to consist of a *search*, such as the fact that she entered Plaintiff's home to "locate" and "recover" items of personal property, including "photographs, yearbooks, DVDs, recipes, and a chainsaw."[7]

      Defendant claims that she didn't personally "look" for the items, but rather that she allowed Plaintiff's ex-wife to enter the home, along with her bailiff and the ex-wife's attorney, to look for the items:

    **A. . . . I did not go there to locate [items of personal property]. I went there to allow Mrs. Gibson to retrieve the items she had been awarded . . . .**

    Q. Okay. But you - you didn't know where they were inside his house, did you?

---

[5] Goldston Dep. at 22:2-18.

[6] Goldston Dep. at 22:19-24; 23:1-19.

[7] Goldston Dep. at 17:7-18.

**A. I did not, and I did not look.**

Q. So they - somebody had to locate the inside the house.

**A. That's correct.**

Q. … And nobody asked Mr. Gibson to go in his house and bring the items outside.

**A. No.**

Q. You went in, right?

**A. I did.**

Q. And the bailiff - your bailiff went in.

**A. He did.**

Q. Mrs. Gibson went in.

**A. She did.**

Q. To locate the items.

**A. Yes. I would say retrieve the items but –**

Q. In fact, the Supreme Court noted in their Opinion that when Mr. Gibson demanded a list of what you were seeking, you replied, "You have a list of everything attached to the order." And when he professed not to know where some of it's at, you replied, "Well, we're going to find it."

**A. I did.**

Q. … So as the Supreme Court noted, you told Mr. Gibson that you would be going inside his house to find items.

**A. Correct.**

Q. But you disagree with the categorization of that is a search.

**A. That that is a search by me, yes.[8]**

---

[8] Goldston Dep. at 11:3-24; 12:1-19.

4

Defendant's testimony demonstrates the absence of any factual dispute surrounding her conduct on March 4, 2020. The WVSCA correctly found her behavior to consist of personally directing a search and seizure inside Plaintiff's home. Whether Defendant agrees with the WVSCA's definition of the word *search* is irrelevant. She was provided the opportunity to litigate her position in the disciplinary matter, and the WVSCA declined to adopt her position, as had the Judicial Hearing Board and the Judicial Investigation Commission previously.

Ultimately, the WVSCA opinion in <u>Goldston</u> established, as a matter of law, that the Defendant "led a *search* of the [Plaintiff's] residence, not a 'judicial view,' and that, in so doing, she exercised executive powers forbidden to her under the West Virginia Constitution." <u>Id</u>. at 2 (emphasis original). The Court also took issue with the "manner in which [Judge Goldston] conducted the search," labeling her actions "serious misconduct," ordering that she be publicly censured and fined $1,000. <u>Id</u>. The Court expressly rejected Defendant's "attempt to reframe her conduct" as judicial in nature.[9] The WVSCA explicitly condemned Defendant Goldston for her actions in traveling to Plaintiff's home and searching it on March 4, 2020:

> As we have stated herein, Judge Goldston's conduct constituted a search, rather than a mere view, of the ex-husband's home. The parties appeared in court for a hearing before Judge Goldston. Undoubtedly, the ex-husband could not have anticipated that the hearing would proceed to an unannounced invasion of the sanctity and privacy of his home. Regardless of whether the ex-husband had failed to provide belongings he was previously directed to provide, Judge Goldston failed to use the appropriate tools available to her under the law to address such failure because she felt such procedures were ineffective. Instead, she, along with her bailiff, the ex-wife, and the ex-wife's attorney, proceeded to enter the ex-husband's home, over his strenuous objections, directed that he stop recording the incident, and began searching for items on the list of items he was to produce. Such an invasion of the ex-husband's home was an egregious abuse of process.

---

[9] <u>Id</u>. at 2 ("After considering the record and the parties' written and oral arguments, we reject the judge's attempt to reframe her conduct.").

Moreover, Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered the ex-husband's home to oversee the search....[10]

The fact that Defendant remains defiant of the censure she received from the WVSCA is alarming, as is the fact that she testified as to other family court judges having allegedly approached her and admitted to engaging in the same or similar misconduct. When asked under oath at her deposition if she recalled the names of those judges, she testified that she couldn't remember a single one. Defendant responded, "*I'll be honest with you, at our last conference[11] I had probably six or seven [family court judges] come and tell me they had done it.*"[12] When asked, "[a]nd you don't recall the name of even one of them," she replied that she didn't.[13] However, Defendant had previously testified in a sworn statement to investigators that two other family court judges, Family Court Judge Rock and Family Court Judge Greenberg, spoke to her about her case and "aided her with research for her brief."[14]

One family court judge in particular, who has expressed public and private support of Defendant's actions, is former Judicial Hearing Board member, Family Court Judge Glen R. Stotler of the Twenty-Third Family Court Circuit. Judge Stotler wrote a letter, dated March 25, 2021, to the Chief Justice of the WVSCA asserting various allegations of misconduct by the Judicial Disciplinary Counsel ("JDC") related to their alleged treatment of the Defendant, as well

---

[10] Goldston at 23.

[11] The Spring, 2021 conference of the Family Court Judicial Association; see Goldston at 38:1-6.

[12] Goldston Dep. at 37:21-24.

[13] Goldston Dep. at 38:18-20

[14] *See* ODC Report, discussed *supra*, at 34.

as her colleague, FCJ Shuck.[15] Following the submission and media publication[16] of the Stotler

letter, the Office of Disciplinary Counsel ("ODC") conducted an investigation into the

allegations, during which Defendant was compelled to provide yet another sworn statement.[17]

The Lawyer Disciplinary Board Investigative Panel Closing report released following the

ODC investigation revealed Stotler's allegations, including those pertaining to allegations of

misconduct towards the Defendant, to be false.[18] The Investigative Panel expressed shock at the

actions of Judges Stotler and Goldston:

> It is shocking that a long-standing member of the judiciary bestowed with the honor of
> being part of the system designed to protect and preserve the integrity of two members of
> the West Virginia State Bar. It does not appear that FCJ Stotler conducted any factual
> investigation into the allegations regarding JDC before regurgitating the untimely,
> unsupported allegations made by FCJ Goldston and sending *an ex parte* communication,
> written on his official court letterhead, to the Supreme Court.[19]

When asked if she saw the ODC report, the Defendant responded that she "*found it

insulting*" that the ODC "*took the word of two lawyers over the words of two sworn long-serving

judges.*"[20] However, Defendant failed to explain how the ODC could take the word of Judge

Stotler, given the fact that, according to her, Stotler had no personal knowledge of the

investigation into the Defendant, other than what he read in her pleadings submitted in the

disciplinary action, given the fact that Defendant claims she had no communication with Stotler

---

[15] *See* Stotler Letter, attached hereto as an exhibit.

[16] https://wvrecord.com/stories/585253911-family-court-judge-chastises-judicial-disciplinary-counsel-says-they-abuse-power

[17] Goldston Dep. at 49:14-24.

[18] *See* ODC Report, attached hereto as an exhibit.

[19] Id. at 50-51 (emphasis original).

[20] Goldston Dep. at 50:2-9.

7

about his allegations prior to the submission of his March, 2021 letter.[21] In her sworn statement to the ODC, Defendant Goldston testified that nobody had ever asked her about her interactions with JDC prior to the ODC interview, and "that she had not spoken or communicated with FCJ Stotler since the last seminar they both attended."[22] To the contrary however, during her subsequent deposition testimony, Defendant was asked if she has had any conversations with Judge Stotler about the March 4, 2020 incident. She responded, "*[n]ot before the judicial board hearing memo came out.*" When asked whether she had any communications with Judge Stotler about the Gibson incident *after* the JHB hearing, she responded, "*We talked generally about it at the conference* [in Spring of 2021]."[23] When asked about the content of their discussions, Defendant stated that Judge Stotler told her that he was "*glad it was over,*" and "*[h]e made it clear that he didn't think I had done anything wrong but we both discussed the fact that we didn't think there was anything wrong with us talking about it now because his role on the Judicial Hearing Board was complete.*"[24] Defendant thus testified to to ODC investigators that she had *never* discussed her interactions with JDC with Judge Stotler, and then subsequently testified at her deposition that she *had* discussed her interactions with JDC with Judge Stotler.[25]

---

[21] Goldston Dep. at 52:3-24; 53:1-3.

[22] ODC Report at 34.

[23] Goldston Dep. at 41:1-16.

[24] Goldston Dep. at 41:17-24; 42:1.

[25] Defendant admits that she was an acquaintance of Judge Stotler, even before her JHB hearing, stating that "*he knows me and knows my reputation and my character, and would have absolutely no reason to doubt what I had put in the pleadings.*" Goldston at 54:1-6; 55:3-6.

8

Despite tiptoeing around her connection to the Stotler letter, Defendant brazenly, and without explanation,[26] implied during her deposition that the entire disciplinary system, for both judges and lawyers, had conspired against her in the issuance of the report:

Q. So the allegations from you about alleged duress in the process, which mirrors the allegations made by Judge Stotler, were investigated by the ODC and found to be untrue. Is that fair?

**A. That is what they found and, again, I'd like to point out the ODC and the JDC share the same office suite.**

Q. And -

**A. And the same receptionist.**

Q. And why would you like to point that out?

**A. Because I think it stinks.**

Q. Why?

**A. I'm not going to say anything further than that. It's obvious. They share a suite.**[27]

But it wasn't just her, as FCJ Shuck was publicly admonished for engaging in the same behavior. The Shuck Admonishment notes that on a July 24, 2020 sworn statement, FCJ Shuck "opined that he believed it was proper to visit litigants' homes because a colleague had engaged in the same practice for several years."[28] When asked during her deposition whether the "colleague" referenced was her, Defendant Goldston adamantly refused knowing who the colleague was, despite knowing full-well that she was the colleague referenced, who was

_____

[26] When asked for specifics, Defendant Goldston replied only that, "I know that they took the words of Brian Lanham and Terri Tarr over the words of Judge Stotler and myself, and I find that to be offensive." Goldston Dep. at 51:15-24; 52:1-2.

[27] Goldston Dep. at 50:10-24.

[28] *See* Shuck Admonishment at page 2; *see also* Goldston Dep. at 24:4-17.

9

described as  being "also the subject of a judicial disciplinary proceeding" involving "a visit to a litigant ex-husband's home...."[29] As the ODC report made clear, Defendant was, not-surprisingly, indeed the colleague referenced in the Shuck Admonishment.[30] In fact, FCJ Shuck apparently testified to the ODC that he first found out about the Stotler Letter because Defendant Goldston told him about it.[31] Much like her association to the Stotler Letter, Defendant refuses to acknowledge the truth surrounding her actions. The Shuck Admonishment, like the disciplinary findings against the Defendant, expressly state that so-called "home visits" by a Family Court Judge are not authorized by any statute, rule or case law, and that when a judge goes to a scene to gather evidence, she places herself in the stead of the moving party and ceases to serve as a fact finder. More importantly, the Shuck Admonishment notes, when a judge goes to a home to help enforce a prior court order, she abrogates her responsibility as a judge in favor of some nonexistent role in the executive branch.[32]

Defendant Goldston's allegations of unfair treatment in the disciplinary process - however they made it into Judge Stotler's letter -  were examined in great detail in the ODC investigation report and exposed as complete falsehoods. The report demonstrates the extent to which Defendant Goldston has already been provided with every opportunity to vindicate herself, but yet failed at every level. The report noted that Defendant Goldston was provided notice of the complaint against her, given an opportunity to respond in writing, prior to giving a sworn statement, and then after due consideration, voluntarily attended and provided a sworn

---

[29] Goldston Dep. at 24:8-24; 25:1-24; 26:1-24; 27:1-24.

[30] ODC Report at 41, FN 50.

[31] ODC Report at 45, FN 58.

[32] Shuck Admonishment at 4.

statement to the JDC.[33] When asked whether she understood that she did not have to admit or

agree to anything, and that the JDC bears the burden of proof in judicial disciplinary cases,

Defendant blamed an alleged intimidating atmosphere at past continuing legal education

seminars, as the reason she felt coerced. This too, was exposed in the ODC report as completely

baseless.[34] After all, as the report pointed out, a member of the judiciary should have an

understanding of the law, in the first place:

> It is disingenuous for a member of the judiciary to assert that they did not appreciate the
> significance of providing a statement to the JDC, sworn or not. It is presumed that
> members of the Bar and members of the judiciary, as they are officers of the court, would
> provide the same testimony under oath or not. FCJ Goldston now alleges that it was
> unfair to discuss the law that pertains to the issues within the scope of the judicial ethics
> investigation - particularly when the law in question was raised as a defense by the
> judicial officer.
>
> While after giving [her] sworn statement, the full weight of the seriousness of the
> allegations may have been felt by [Defendant Goldston], but such belated recognition
> does not equate to improper, much less, unethical behavior by [the JDC]. The most
> compelling evidence of the fairness and transparency is evidenced by the fact that, after
> retaining counsel, FCJ Goldston immediately [entered] into an agreed disposition of the
> facts and conclusions of law.[35]

Yet again, Defendant Goldston, in her frivolous request for judicial immunity from civil

liability, seeks to attempt to reframe, and re-litigate, the issue of whether she performed a

"search," and whether her actions were authorized under State law. They unequivocally were not.

Defendant has demonstrated that she believes herself to be above-the-law and unrestrained by

either the U.S. Constitution, or even the West Virginia Supreme Court of Appeals. As the ODC

report points out, Defendant admitted under oath, with the advice and representation of counsel,

---

[33] ODC Report at 49-50.

[34] ODC Report at 33 and FN 43.

[35] Id. at 50.

that she violated numerous codes of judicial conduct,[36] and that prior to her punishment being adjudicated by the WVSCA, she concluded her testimony before the Judicial Hearing Board, by "again acknowledging 'mistakes were made' and that she accepted responsibility for the errors."[37] Only later did Defendant Goldston begin to argue otherwise, including at her deposition, in which she testified that the WVSCA was wrong about almost everything in the published opinion censuring her.[38]

Defendant Goldston's defiance of the law highlights the importance of holding her accountable under Section 1983. She's still serving as a government official and is willing to do it again. When asked at her deposition if she would ever "do it again," she responded, *"I don't know."*[39] *"Do I think I did anything wrong? No. Do it regret the consequences of it? Absolutely."* When asked during her deposition whether she regretted threatening Plaintiff with arrest on March 4, 2020, she replied that she did not.[40] Defendant also testified that, *even after the disciplinary proceedings*, she "sent a deputy" to go look for something at a litigant's home, and that since she didn't go personally, *"it was a fiasco and nothing was accomplished."*[41] When disciplinary sanctions were hanging over her head, Defendant admitted her mistakes, and was apologetic - even willing to testify numerous times under oath that she was wrong and deserved

---

[36] See FN 26 of IDC Report at page 23 ("FCJ Stotler's dissenting opinion fails to address or reconcile FCJ Goldston's knowing, voluntary admission to violating thirteen separate rules of the Code of Judicial Conduct.").

[37] ODC Report at 20.

[38] *See, e.g.*, Goldston Dep. at 8:6-24; 9:1-24; 10-24; 11:1-5; 12:13-21; 17:7-13; 23:11-19; 71:9-24; 72:1-24; 73:1-5.

[39] Goldston Dep. at 100:6-7.

[40] Goldston Dep. at 100:22-24.

[41] Goldston Dep. at 104:10-24; 104:1-2.

12

discipline. Now that discipline has already been meted out and she no longer faces possible

suspension, Defendant openly defies the law, already taking steps towards repeating the

misconduct. Defendant Goldston must be denied the application of judicial immunity.

B.    ESTOPPEL / PRECLUSION

1.    **Defendant Goldston is estopped and precluded from asserting immunity and
otherwise seeking to attack or contradict the State Supreme Court holdings**

Due to the fact that Defendant Goldston was already provided with a full and fair

opportunity to litigate the factual and legal issues arising from her actions of March 4, 2020 in

the underlying judicial disciplinary proceedings, she is now categorically barred from further

challenging those factual and legal findings litigated therein. The Complaint's allegations, as

well as the Defendant's ensuing assertion of judicial immunity in her motion to dismiss, consist

of substantially identical factual and legal issues as were decided in the Goldston opinion, and to

which the Defendant is now bound.[42] Any attempt by Defendant Goldston to subsequently claim

in this civil action, that she did not commit state and federal constitutional violations against the

Plaintiff, or that in so doing she was engaging in an alleged judicial act, is effectively an

inappropriate collateral attack on the State Supreme Court judgment.

C.    COUNT ONE - SEARCH AND SEIZURE

1.    **As a matter of law, Defendant Goldston violated the Fourth Amendment
by engaging in an unreasonable search and seizure under color of law**

Here, it's undisputed that Defendant Goldston entered Plaintiff's residence on March 4,

2020 accompanied by a uniformed sworn law enforcement officer, without a warrant, for

---

[42] Plaintiff has already briefed the issues of estoppel, preclusion, as well as the Rooker-Feldman Doctrine
in his supplementary brief discussing the effect of In the matter of Goldston, No. 20-0742 (2021) on
Defendant Goldston's claim of judicial immunity. In the interest of judicial economy, the Plaintiff hereby
incorporates the supplementary brief by reference as though fully restated herein.

13

purposes of performing a search and seizure therein. As portrayed in the video footage of the beginning of the encounter, the Plaintiff informed Defendant Goldston that she wasn't going inside his house without a search warrant, to which Defendant replied, "*oh, yes, I will*."[43] Defendant cannot justify her presumptively unconstitutional entry with an exception. In fact, Defendant doesn't dispute that her entry into Plaintiff's residence was made in the absence of Plaintiff's consent.[44] The WVSCA found that Defendant said to the Plaintiff, "*let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court*," and that Plaintiff felt he had no choice but to let her and others into his home.[45] Defendant admitted to threatening Plaintiff with arrest, should he refuse to allow her, and others, into his home.[46] Additionally, bailiff Jeff McPeake testified that he witnessed Defendant Goldston threaten Plaintiff with arrest, and that as a sworn on-duty police officer with arrest powers, he would have been the individual to effect the arrest, as threatened by the Defendant.[47]

Moreover, the WVSCA directly held that Judge Goldston's actions at the Plaintiff's residence "were not a view" as Defendant claimed in her disciplinary proceedings, but rather that she "searched" Plaintiff's home, admittedly with the intention to "locate and seize certain of its contents . . . ."[48] The WVSCA went so far as to expressly "reject the [Defendant's] attempt to reframe her conduct" and found that she "led a search of the homeowner's residence, not a

---

[43] Goldston Dep. at 75:16-19; Stump at 46:10-22; McPeake at 19:9-24; *see also* video footage at Exhibit 7 of Goldston Deposition.

[44] Goldston Dep. at 76:2-22; 77:1-5; McPeake at 26:7-24; 27:1-24; 28:1-22.

[45] Goldston at 4.

[46] Goldston Dep. at 16:8-13; 62:4-24; 63:1-5; 68:24; 69:1-14;

[47] McPeake at 26:24; 27:1-7; 45:16-18.

[48] Goldston at 13, 14, 15.

14

'judicial view,'" and that regarding the "threshold" question of whether the Defendant searched Plaintiff's residence or viewed it, "[w]e find that she searched it."[49] "The record is clear that Judge Goldston went to the property to locate things, not simply to observe them."[50] The Court further found that Defendant not only searched Plaintiff's residence, but that in so doing, items so located during the search were removed from the residence, at the Defendant's direction.[51] These items included photographs, yearbooks, DVDs, recipes and a chainsaw.[52]

Therefore, the WVSCA's adjudication of the Defendant's actions at the Plaintiff's home, which was labeled by the Court as displaying "a callous disregard for our system of justice," establish, as a matter of law, that: (1) Defendant Goldston entered and performed a search of Matthew Gibson's home on March 4, 2020 under color of state law; (2) In so doing, she acted intentionally and in an executive law enforcement capacity, thus rendering her ineligible for a grant of judicial immunity; and (3) Defendant failed to obtain a search warrant for the residence and did not have Plaintiff's consent.[53]

Defendant performed a "search" of Plaintiff's home in the absence of a warrant, and no applicable exception applies, thus the search was unlawful.[54] While acting under color of state law, Defendant Louise Goldston deprived Matthew Gibson of a federal constitutional right, which was his Fourth Amendment to be free from unreasonable search and seizure, as alleged in

---

[49] Goldston at 2, 13.

[50] Id. at 15.

[51] Id. at 15.

[52] Id. at 4.

[53] *See also* 9th Circuit Model Jury Instructions, 9.15 Particular Rights - Fourth Amendment - Unreasonable Search - Exception to Warrant Requirement - Emergency Circumstances.

[54] Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted).

15

Count One of the Complaint.[55] There are no genuine issues of material fact to be determined at trial. The only remaining issue for resolution of Count One is damages. Therefore, Plaintiff respectfully requests summary judgment on Count One and for the matter to be set for a jury trial on the issue of damages.

> D.   COUNT TWO - FIRST AMENDMENT

> 1.   **As a matter of law, Defendant Goldston violated the First Amendment by threatening to arrest Plaintiff and his guests for filming and recording her commission of an unlawful search and seizure on March 4, 2020**

The WVSCA made indisputable findings pertaining to Defendant Goldston's interference and retaliation with Plaintiff's First Amendment rights. In the matter of Goldston, No. 20-0742 (2021) conclusively establishes that Judge Goldston did in-fact prohibit recording, as well as the fact that so doing was an egregious act of misconduct. The Court wrote that, "Judge Goldston . . . indicated that if they did not turn off their phones and stop recording she would take the [Plaintiff], or perhaps both he and his girlfriend, to jail," and that "Judge Goldston, herself, made no arrangements to record what went on inside the home (or outside the home)." Id. at 4. The Court ultimately held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." Id. at 23.

During her deposition, Defendant Goldston repeatedly took issue with the WVSCA's findings and holdings. She was expressly defiant of the censure she received from the WVSCA, and irrationally maintained that, as a Family Court Judge, she possesses the ability to maintain a

---

[55] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

legal position contrary to the WVSCA's express holdings, including the very same incorrect mistakes of law that led to her censured in the first place.[56] Despite being placed under oath, Defendant Goldston initially denied threatening Plaintiff's girlfriend with arrest for attempting to record her actions on Plaintiff's property, only admitting the truth after being confronted with the audio recording of her doing so.[57]

Bailiff Jeff McPeake, testified that he was standing with Judge Goldston and the Plaintiff in Plaintiff's front yard near the gazebo when Judge Goldston ordered him to take possession of Plaintiff's cell phone, due to the fact that Plaintiff was attempting to record audio.[58] Even though Plaintiff was standing in his own front yard and attempting to record Defendant Goldston's actions, he was told by Defendant to stop recording, and then forced to give his cell phone to Bailiff McPeake.[59] At the time, McPeake was on-duty as a law enforcement officer and was in uniform.[60] Plaintiff did not consent to the seizure of his cell phone by Defendant Goldston and McPeake.[61] Ironically, Bailiff McPeake subsequently began filming the subsequent search of Plaintiff's residence using his personal cell phone, "for the protection of everyone involved," including at one point filming the interior of Plaintiff's gun safe.[62]

Lastly, even without eyewitness testimony or WVSCA opinion in Goldston, there could be no doubt that Defendant Goldston forced Plaintiff and his girlfriend to stop filming and

---

[56] See, e.g., Goldston Dep. at 8:6-24; 9:1-24; 10-24; 11:1-5; 12:13-21.

[57] Goldston Dep. at 63:21-24; 64:1-24; 65:1-15.

[58] McPeake at 32:6-24.

[59] McPeake at 33:1-24.

[60] McPeake at 34:9-17.

[61] McPeake at 35:11-15.

[62] McPeake at 36:4-24; 37:1; 44:3-5.

17

recording her actions at Plaintiff's residence on March 4, 2020, since it was captured on video and audio. The video footage filmed by Plaintiff's girlfriend shows the beginning of the encounter, to the point where Defendant Goldston forced the video to be turned off, under threat of arrest.[63] The audio recording from Plaintiff's cell phone captured the subsequent audio from the incident, to the point where Defendant Goldston ordered the seizure of Plaintiff's cell phone, thus ending the recording.[64]

The record thus demonstrates that there are no genuine issues of material fact for determination under Count Two. Plaintiff and his girlfriend, acting pursuant to his direction to record, were situated on Plaintiff's private property at the time the protected First Amendment actions of recording the defendants was taking place. They were subject to no applicable "time, place or manner" restrictions limiting their rights or ability to record the actions of the defendant government officials. Though Defendant Goldston defiantly "disagrees" with the WVSCA about the fact that she was engaging in an "egregious abuse of process," rather than a lawful or routine family court proceeding, the issue has already been adjudicated in Goldston. Whether Defendant chooses to admit it or not, the WVSCA held that, "over [Plaintiff's] strenuous objections, [Defendant Goldston] directed that he stop recording the incident, and began searching for items on the list of items he was to produce" and that, "[s]uch an invasion of the [Plaintiff's] home was an egregious abuse of process." Goldston. at 23.

_____

[63] See Goldston Deposition Exhibit 7.

[64] See Goldston Deposition Exhibit 6.

E.    COUNT FOUR - 14TH AMENDMENT DUE PROCESS[65]

1.    **As a matter of law, Defendant Goldston violated the Plaintiff's 14th Amendment Due Process rights on March 4, 2020**

As already noted multiple times above, the WVSCA held that Defendant Goldston's actions on March 4, 2020, were an "egregious abuse of process." Goldston at 23. The invasion of the privacy of Plaintiff's home, to which the WVSCA was referring, was performed by Defendant Goldston under the guise of family court contempt proceedings under West Virginia state law. However, Defendant Goldston did not provide the Plaintiff basic due process to which he was entitled under the state contempt laws in the contempt proceedings on March 4, 2020.[66] The deprivation of due process at issue pertain to actions taken by the Defendant during the performance of a "nonexistent" executive branch role, rather than in a judicial capacity.

While acting under color of state law, Defendant Goldston deprived Matthew Gibson of a federal constitutional right, which was his Fourteenth Amendment right to Due Process, as alleged in Count Four of the Complaint.[67] There are no genuine issues of material fact to be determined at trial. The only remaining issue for resolution of Count Four is damages. Therefore, Plaintiff respectfully requests summary judgment on Count Four and for the matter to be set for a jury trial on the issue of damages, along with Counts One and Two of the Complaint.

---

[65] Plaintiff declines to proceed on Count Five - 14th Amendment Equal Protection and has no objection to Count Five being dismissed.

[66] See W. Va. Code §51-2A-9 and W. Va. Code §48-1-304 for contempt provisions applicable to Family Court in West Virginia.

[67] Third Circuit Model Jury Instructions 4.3 - Section 1983 - Elements of Claim; Gomez v. Toledo, 446 U.S. 635, 640 (1980).

19

CONCLUSION

This case has the benefit of having already been adjudicated by the WVSCA on all

material issues, except for damages. Defendant Goldston searched Plaintiff's home and

interfered with his First Amendment right to record the serious misconduct of government

officials from the sanctity of his own private property. In so doing, the Defendant was acting in

an executive, non-judicial, capacity, for which judicial immunity may not be granted. Wherefore,

Plaintiff respectfully requests summary judgment against Defendant Goldston, and for such other

and further relief as this Court deems just and fit.


MATTHEW GIBSON,
By Counsel


/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

vs.

                                          Civil Action No. 5:21-cv-00181

                                          Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

        Defendant.

### CERTIFICATE OF SERVICE

      I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFFS' MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY

JUDGMENT AGAINST DEFENDANT LOUISE E. GOLDSTON has been served upon counsel

of record by using the CM/ECF System, this the 28th day of March, 2022 and addressed as

follows:

| | |
|---|---|
| Jennifer E. Tully, Esq. | J. Victor Flanagan, Esq. |
| Adam K. Strider, Esq. | Kevin J. Robinson, Esq. |
| Bailey & Wyant, PLLC | Pullin Fowler Flanagan, Brown & Poe, PLLC |
| 500 Virginia Street, East, Suite 600 | 252 George Street |
| PO Box 3710 | Beckley, WV 25801 |
| Charleston, WV 25337-3710 | *Counsel for Raleigh County Defendants* |
| *Counsel for Louise E. Goldston* | |

21

/s John H. Bryan_____
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

    **Plaintiff,**

v.

                                                    **Civil Action No. 5:21-cv-00181**
                                                    **Honorable Frank W. Volk**

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP, individually,
KYLE LUSK, individually,

    **Defendants.**

### DEFENDANT LOUISE E. GOLDSTON'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    **COMES NOW** this Defendant, Louise E. Goldston, by counsel Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby responds to Plaintiff Matthew Gibson's Motion for Summary Judgment, as follows:

### I.  STATEMENT OF FACTS

    In the interest of judicial economy, this Defendant herein incorporates and adopts the "Statement of Facts" section of her previously-filed Memorandum in Support of Defendant Louise E. Goldston's Motion for Summary Judgment.  See ECF Doc. No. 66 at Pgs. 1-6.

### II.  STANDARD OF REVIEW

Rule 56(a) of the *Federal Rules of Civil Procedure* provides that:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law. The court should state on the record the reasons for granting or denying the motion.

F.R.C.P., Rule 56(a).  In analyzing the application of Rule 56, this Court has held that:

> At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried; if not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly.

*Workman v. United Artists Theatre Circuit, Inc.*, 84 F.Supp.2d 790 (S.D. W.Va. 2000).

Furthermore, "[s]ummary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kitchen v. Summers Continuous Care Center, LLC*, 552 F.Supp.2d 589, 592 (S.D.W.Va. 2008) (*quoting* F.R.C.P, Rule 56(c)).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, a case involving solely a question of law is ripe to be resolved at the summary judgment stage.  *See Rogers v. City of Richmond*, 851 F. Supp. 2d 983, 985 (E.D. Va. 2012); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2006) ("[a] purely legal question . . . is always capable of decision at the summary judgment stage . . . .") (internal quotation and citation omitted).

It is important to note that genuine disputes of material facts are not demonstrated by the bald statements of a non-moving party in depositions. *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167 (4th. Cir. 1988).  A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Unsupported speculation by a non-moving party is insufficient to defeat a summary judgment motion. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987.) Mere unsupported

speculation is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. &*

*Educ. Radio, Inc.,* 53 F.3d 55, 62 (4ᵗʰ Cir. 1995).

### III. ARGUMENTS

**A.  The West Virginia Supreme Court of Appeals' holdings in *In Re Goldston* are not *res judicata* of this matter.**

The memorandum of law filed in support of Plaintiff's Motion for Summary Judgment in

majority part merely adopts the analysis by the West Virginia Supreme Court of Appeals in *In Re*

*Goldston*, previously briefed by the Parties in this matter, and argues much as he did in his prior

filing that this ruling is preclusive of an absolute judicial immunity defense.  However, this

cannot be the case, because absolute judicial immunity was not at issue in that matter.  *In Re*

*Goldston*

is inapplicable.

Res judicata takes two primary forms: claim preclusion, and issue preclusion.  First, claim

preclusion has no bearing on this Motion.  Under claim preclusion, a final judgment forecloses

"successive litigation of the very same claim, whether or not relitigation of the claim raises the same

issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S. Ct. 1808, 149 L. Ed.

2d 968 (2001).  In re Goldston did not concern the same claims that are at issue in this case.  It was a

judicial disciplinary proceeding, and this is a 42 U.S.C. § 1983 claim for alleged violations of the

First, Fourth, and Fourteenth Amendments, as well as a civil conspiracy claim.  None of those causes

of action were adjudicated by the Supreme Court in *In Re Goldston*, and therefore claim preclusion

would be entirely inappropriate.

Nor is issue preclusion applicable to this matter.  Issue preclusion, or collateral estoppel,

"operates to bar subsequent litigation of those legal and factual issues common to both actions that

were 'actually and necessarily determined by a court of competent jurisdiction' in the first

litigation.'" *In re Varat Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) (quoting *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210(1979)). Collateral estoppel applies only if: (1) the issue sought to be precluded is identical to the issue previously litigated; (2) the issue must have been actually litigated and determined in the prior proceeding; (3) the issue must have been necessary to the prior proceeding's decision; (4) the prior judgment must be final and valid; and (5) the party against whom preclusion is sought must have had a full and fair opportunity to litigate the issue in the previous suit. See *Ramsay v. INS*, 14 F.3d 206, 210 (4th Cir. 1994).

Courts are especially cautious about applying collateral estoppel where such estoppel is used offensively, as the Plaintiff is attempting to do here. In such cases, Courts are exhorted to use "'special care' to ensure that preclusion will not lead to unjust results." *Fate v. Dixon*, 649 F. Supp. 551, 559 (E. D. N. C. 1986). "Fairness to the defendant" is a critical finding necessary to the application of offensive collateral estoppel. *Jack Faucett Associates v. American Telephone and Telegraph Co.*, 240 U.S. App. D.C. 103, 744 F.2d 118, 125 (D.C. Cir. 1984), *cert. denied* 469 U.S. 1196, 105 S. Ct. 980, 83 L. Ed. 2d 982. "As so often is the case, no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity." *Blonder-Tongue Labs, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333-334, 28 L. Ed. 2d 788, 91 S. Ct. 1434 (1971).

Is discussed above, *In Re Goldston* was a judicial disciplinary proceeding, conducted under the West Virginia Code of Judicial Conduct ("CJC") and West Virginia Rules of Judicial Disciplinary Procedure ("RJDP"). In its ruling, the Supreme Court affirmed the Judicial Hearing Board's conclusion that Rules 1.1, 1.2, 1.3, 2.2, 2.4(A), 2.4(B), and 2.5 of the Code of Judicial Conduct had been violated by the conduct at issue in this case. In that determination, the Court

stated that the incident occurring at the Plaintiff's home was a "search," which is a power of the executive branch of government, rather than a judicial "view." It held that in doing so, this Defendant performed an act that was outside her authority as a judge. The Plaintiff argues that these conclusions collaterally estop this Defendant from claiming absolute judicial immunity. It should be apparent from a review of the applicable standard that this is not the case.

In this case, a minimum of four (4) elements of the collateral estoppel standard are unmet by the Plaintiff's argument. First, the issues sought to be precluded are not identical to any issue adjudicated in *In Re Goldston*. Elements 2, 3, and 5 are therefore also unmet, because the same issue we address in this matter was not addressed by the Court in *In Re Goldston*.

The mere commonality of an operative set of facts is not sufficient to invoke collateral estoppel. Many Courts, including those of this Circuit, have held that where the referenced prior proceeding applied identical facts to a different legal standard, collateral estoppel was not appropriate. In *Ridley v. Leavitt*, 631 F.2d 358 (4th Cir. 1980), the Fourth Circuit addressed a collateral estoppel defense asserted against a § 1983 excessive force claim by an inmate. The defendants therein asserted that because the plaintiff had been previously convicted of assaulting the prison guards in the same interaction, that it was already established that he was the aggressor in the interaction, and that the excessive force claim was therefore precluded. See *id*. at 359. The Court disagreed, holding that the fact that the plaintiff was the initial aggressor does not foreclose the possibility that the correctional officers responded with excessive force – a question which was not at issue in the criminal proceeding. See *id*. at 359-360. An identical conclusion was reached in *Packer v. Hayes*, 79 Fed. Appx. 573 (4th Cir. 2003) (holding that state court assault conviction against correctional officer did not preclude excessive force claim regarding the same interaction).

Likewise, in *Guiden v. Southeastern Public Service Authority*, 760 F. Supp. 1171 (E. D. Va.

5

JA870

1991), the Eastern District of Virginia engaged in a multi-state case law survey to conclude that a prior denial of unemployment compensation upon a finding that the plaintiff was terminated for "misconduct" was not preclusive in a subsequent wrongful termination suit. See *id.* at 1176-1177. In *Guiden*, the Court notably surveyed an age discrimination case wherein the plaintiff sought to apply collateral estoppel to the reason for her termination. See *Kendall v. C.F. Industries, Inc.*, 624 F. Supp. 1102 (N.D.Ill. 1986). This was based on the fact that the plaintiff had previously applied for unemployment benefits, and the responsible administrative agency held that she was not terminated for misconduct. See *id.* at 1106. The Court declined to apply collateral estoppel, as the standard for "misconduct" as a legitimate reason for termination and "misconduct" as a basis for denying unemployment compensation were not identical. See *id.* ("[W]hen different standards are applied to the same facts in reaching a legal conclusion, the issues are not identical for purposes of issue preclusion.").

The same principle applies here. The standard for penetrating judicial immunity was discussed at length in prior filings of this case:

> There are only two sets of circumstances in which judicial immunity is overcome. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's role as a judge. See *Forrester v. White*, 484 U.S. 219, 227-229, 108 S. Ct. 538, 98 L. Ed. 2d 555 (1988); *Stump v. Sparkman*, 435 U.S. 349, 360, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978). Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Stump* at 356-357. This does not mean, however, that judges are liable for actions which are merely beyond their authority. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." *Id.* at Syl. Pt. (a). "[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *Stump* at 362; see also *Forrester* at 227-229.

ECF Doc. No. 10 at Pg. 7. This principle was further expounded upon in *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991), as follows:

Of course, a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge." *Stump v. Sparkman*, 435 U.S. at 362. But if only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority." *Id.*, at 356. See also *Forrester v. White*, 484 U.S. at 227 (a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Accordingly, as the language in Stump indicates, the relevant inquiry is the "nature" and "function" of the act, not the "act itself." 435 U.S. at 362. In other words, we look to the particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court.

*Mireles* at 12-13.

These standards were not addressed in *In Re Goldston*, because judicial immunity was not in issue in that matter. Because judicial immunity is a defense only in civil suits for damages, a judicial disciplinary proceeding would have no use for that standard. Neither are any of the rules of the West Virginia Code of Judicial Conduct duplicative of these standards. See W. Va. CJC 1.1, 1.2, 1.3, 2.2. 2.4(A), 2.4(B), and 2.5. Thus, the issue sought to be precluded is not identical to any issue decided in the prior proceeding, and the first element of the collateral estoppel determination is unmet.

Likewise, the second element is unmet. Since the issue sought to be precluded was not addressed in the prior proceeding, it cannot have been "actually litigated and determined." *Ramsay* at 210. In the same manner, an unaddressed issue cannot have been "necessary to the prior proceeding's decision," leaving the third element unmet. *Id*. Finally, this Defendant cannot have had "a full and fair opportunity to litigate the issue in the previous suit" when the issue was not addressed in that suit. *Id*. The fifth element is therefore also unmet. Given that four of the five elements of collateral estoppel are unmet, its application is therefore inappropriate, and the Plaintiff's Motion for Summary Judgment should be denied in this respect.

**B. The *Rooker-Feldman* doctrine is inapplicable in the context in which the Plaintiff seeks**

7

to apply it.

The Plaintiff also incorporates by reference into his Memorandum a prior argument that this Defendant's judicial immunity defense is barred by the application of the *Rooker-Feldman* doctrine. This is not the case, and *Rooker-Feldman* has no application in the Plaintiff's contentions, as will be discussed herein.

The *Rooker-Feldman* Doctrine is "a jurisdictional rule providing that lower federal courts generally cannot review state court decisions." *Holliday Amusement v. State of South Carolina*, 401 F.3d 534, 537 (4th Cir. 2005). Under *Rooker-Feldman*, "federal district courts are barred from considering issues already presented by a party and decided by a state court and also are barred from hearing Constitutional claims that are 'inextricably intertwined with questions [so] ruled upon by a state court.'" *Id*. (quoting *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997)) (Emphasis added). Thus, "the controlling question . . . is whether a party seeks the federal district court to review a state court decision and thus pass upon the merits of that state court decision." *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003) (quoting *Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 202 (4th Cir. 1997)).

A federal claim is "inextricably intertwined" with a state court decision if "the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Id*. (quoting *Allstate Ins. Co. v. W. Va. State Bar*, 233 F.3d 813, 819 (4th Cir. 2000)). *Rooker-Feldman* deprives a federal District Court of jurisdiction "if in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render the judgment ineffectual." *Jordahl* at 202 (internal quotations omitted).

First, *Rooker-Feldman* is an odd fit for the Plaintiff's argument, because it is a jurisdictional doctrine, not a preclusion doctrine. Lower federal courts lack jurisdiction to hear the relitigation of

issues decided by a state court of competent jurisdiction. See *Lance v. Dennis*, 546 U.S. 459, 466, 126 S. Ct. 1198, 1202, 163 L.Ed.2d 1059 (2006). After a review of available case law, this Defendant was unable to locate any example of *Rooker-Feldman* being used offensively – to bar a court from hearing a defense to a claim it otherwise has jurisdiction to hear. This paucity of precedent for the maneuver Plaintiff is attempting fits logically too: it would be bizarre for a Court to have jurisdiction to hear a claim, but not the defenses thereto.

Jurisdictional considerations aside, the State Supreme Court's ruling in *In Re Goldston* could have no applicability to the immunity asserted by this Defendant, because the *In Re Goldston* ruling and the ruling which this Defendant asks the Court to make herein are not in conflict. While the State Supreme Court held that this Defendant exceeded her authority as a judge, and violated the Code of Judicial Conduct, it would not be inconsistent for this Court to hold that she is protected from civil suit by judicial immunity for the same actions which allegedly violated the CJC. Read together, those rulings would state that this Defendant allegedly exceeded her authority in ordering the proceeding at the Plaintiff's home, but continued to act as a judge – and to be approached and addressed as a judge by the parties – in doing so. This would be an entirely consistent body of law on this incident, because, as the Mireles Court laid out, exceeding one's authority or performing an act that is prohibited to judges is insufficient to remove the cloak of judicial immunity.

This Defendant is not asking this Court to overrule *In Re Goldston*. Neither is she seeking a ruling which would be in conflict with it. Thus, *Rooker-Feldman* does not bar her immunity defense, and Plaintiff's Motion is without merit in this regard.

**C. The Plaintiff's Motion for Summary Judgment should be denied due to the application of judicial immunity to this Defendant's actions.**

The Plaintiff's Motion for Summary Judgment should be denied on the basis that this Defendant is protected by absolute judicial immunity. As this argument is discussed at length in the

Memorandum of Law in Support of Defendant Louise E. Goldston's Motion for Summary

Judgment, those arguments are incorporated and adopted herein.  See ECF Doc. No. 66 at Pgs. 7-12.

### IV. CONCLUSIONS

**WHEREFORE**, based on the foregoing, this Defendant respectfully prays this Honorable

Court DENY the Plaintiff's Motion for Summary Judgment, and grant her such other relief as the

Court deems just and proper.


**LOUISE E. GOLDSTON,**

**By Counsel,**


 /s/  Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

    Plaintiff,

v.                                                                    Civil Action No. 5:21-cv-00181
                                                                      Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP,
individually, KYLE LUSK, individually,

    Defendants.

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of foregoing "**DEFENDANT LOUISE E. GOLDSTON'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**" was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, April 11, 2022:

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV  25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV 24983
*Attorney For: Matthew Gibson*

  /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
jtully@baileywyant.com
astrider@baileywyant.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

vs.                                                    Civil Action No. 5:21-cv-00181
                                                       Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

       Defendant.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## LOUISE E. GOLDSTON'S MOTION FOR SUMMARY JUDGMENT

For the same reasons cited in his Memorandum in Support of His Motion for Summary

Judgment Against Defendant Louise E. Goldston, Plaintiff opposes Defendant Goldston's motion

for summary judgment, and hereby incorporates by reference the arguments and exhibits asserted

therein in support of his response.

WHEREFORE, Plaintiff respectfully requests summary judgment be granted in his favor,

and that Defendant Goldston's motion for summary judgment be denied, and for such other and

further relief as this Court deems just and fit.

                              MATTHEW GIBSON,
                              By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

MATTHEW GIBSON,

       Plaintiff,

vs.                             Civil Action No. 5:21-cv-00181
                                 Honorable Frank W. Volk

LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision,
JEFF MCPEAKE, individually,
BRIAN WHITE, individually,
BOBBY STUMP, individually,

       Defendant.

### CERTIFICATE OF SERVICE

       I, John H. Bryan, do hereby certify that I have delivered a true copy of the foregoing

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT LOUISE E. GOLDSTON'S

MOTION FOR SUMMARY JUDGMENT has been served upon counsel of record by using the

CM/ECF System, this the 4th day of April, 2022 and addressed as follows:

Jennifer E. Tully, Esq.              J. Victor Flanagan, Esq.
Adam K. Strider, Esq.               Kevin J. Robinson, Esq.
Bailey & Wyant, PLLC              Pullin Fowler Flanagan, Brown & Poe, PLLC
500 Virginia Street, East, Suite 600     252 George Street
PO Box 3710                       Beckley, WV 25801
Charleston, WV 25337-3710        *Counsel for Raleigh County Defendants*
*Counsel for Louise E. Goldston*

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEYS AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

v.

                                               **Civil Action No. 5:21-cv-00181**
                                               **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP, individually,
KYLE LUSK, individually,**

    **Defendants.**

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S
MOTION FOR SUMMARY JUDGMENT**

    **COMES NOW** this Defendant, Louise E. Goldston, by counsel Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, and hereby offers the following Reply Memorandum in support of her previously-filed Motion for Summary Judgment.

    In response to the averments and arguments presented in this Defendant's Memorandum of Law in Support of Defendant Louise E. Goldston's Motion for Summary Judgment, the Plaintiff merely incorporated and reasserted the memorandum of law filed in support of his own Motion for Summary Judgment. As this Defendant has already addressed and rebutted those arguments in her Response to Plaintiff's Motion for Summary Judgment, ECF Doc. No. 72, it would be redundant to readdress them herein. Therefore, this Defendant herein incorporates and reasserts all averments and arguments made in her Response to Plaintiff's Motion for Summary Judgment.

**WHEREFORE,** based on the foregoing, as well as the averments and arguments presented in the Memorandum in Support of Defendant Louise E. Goldston's Motion for Summary Judgment, ECF Doc. No. 66, this Defendant respectfully prays this Honorable Court GRANT her Motion for Summary Judgment, and grant her such other relief as the Court deems just and proper.

**LOUISE E. GOLDSTON,**

**By Counsel,**

 /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
jtully@baileywyant.com
astrider@baileywyant.com

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

    **Plaintiff,**

**v.**
                                         **Civil Action No. 5:21-cv-00181**
                                         **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,**
**COUNTY COMMISSION OF RALEIGH**
**COUNTY, a political subdivision, JEFF**
**MCPEAKE, individually, BRIAN WHITE,**
**individually, BOBBY STUMP,**
**individually, KYLE LUSK, individually,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of foregoing "REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LOUISE E. GOLDSTON'S MOTION FOR SUMMARY JUDGMENT" was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, April 14, 2022:

Arie M. Spitz
Kevin A. Nelson
Jason L. Holliday
Dinsmore & Shohl, LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV  25339-1887
*Attorney For: Kyle Lusk*

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

 /s/ Adam K. Strider
**Jennifer E. Tully (WV Bar #9356)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia 25337-3710**
**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**astrider@baileywyant.com**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MATTHEW GIBSON,

        Plaintiff,

v.                                 CIVIL ACTION NO. 5:21-cv-00181

LOUISE E. GOLDSTON, *individually*;
COUNTY COMMISSION OF RALEIGH
COUNTY, *a political subdivision*; JEFF
MCPEAKE, *individually*; BRIAN WHITE,
*individually*; and BOBBY STUMP, *individually*;

        Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

        Pending are cross motions for summary judgment as to Defendant Louise Goldston

[Docs. 65, 67] and a motion for summary judgment filed by the Raleigh County Commission, Jeff

McPeake, Brian White, and Bobby Stump[1] (collectively, the "Raleigh County Defendants") [Doc.

63]. The matter is ready for adjudication.


**I.**

        On September 18, 2018, Mr. Gibson appeared before Family Court Judge Louise

Goldston in his divorce action. Judge Goldston granted the parties' divorce and adopted their

property settlement agreement. [Doc. 67-5 at 13:16–23:16 (hereinafter "Gibson at ____")].

        On September 26, 2019, Kyle Lusk, the attorney for Mr. Gibson's soon-to-be-ex-

wife, filed a Petition for Contempt, alleging defects in the property disbursement. [Gibson at

---

[1] Mr. Gibson does not oppose Deputy White's dismissal. [Doc. 73 at 1 n.1]. The Court
thus **GRANTS IN PART** the Motion for Summary Judgment [**Doc. 63**] as to Deputy White.

37:12–16]. On March 4, 2020, a hearing was held on this contempt petition. Judge Goldston *sua sponte* halted the hearing, requested Mr. Gibson's home address, and ordered the parties to reconvene at Mr. Gibson's home in ten minutes without explanation as to why the home visit was necessary. [Doc. 67-1 at 58:21–59:8 (hereinafter "Goldston at ____")].

On the approximately ten-minute drive from the courthouse to Mr. Gibson's home, Mr. Gibson and his girlfriend, Sharon Masual, researched how to move to disqualify Judge Goldston. [Gibson at 105:24–107:2]. Upon arrival at the home, Mr. Gibson and Ms. Masual began video recording. [Doc. 67-3 at 32:13–33:24 (hereinafter "McPeake at ____"); Gibson at 130:14–21; 178:12–179:13; Goldston at 64:1–11]. Mr. Gibson then immediately approached Judge Goldston and moved to disqualify her on the grounds she had become a potential witness. [Goldston at 60:13–61:16; *see also* Doc. 65-4 at 1:30–1:50 (hereinafter "Video Recording at ____")]. Judge Goldston denied the motion as untimely. [McPeake at 19:1–8].

Mr. Gibson informed Judge Goldston that she was not going inside his house without a search warrant; she replied, "oh, yes, I will." [Goldston at 75:16-19; McPeake at 19:9–24; Doc. 67-4 at 46:10–22 (hereinafter "Stump at ___")]. Judge Goldston continued, "let me in that house or [the bailiff] is going to arrest you for being in direct contempt of court." *In re Goldston*, 246 W. Va. 61, 866 S.E.2d 126, 130 (2021). Judge Goldston admitted to threatening Mr. Gibson with arrest if he refused to allow her and others into his home. [Goldston at 16:8–13; 62:4–24; 63:1–5; 68:24; 69:1–14]. Additionally, Bailiff McPeake testified that he witnessed Judge Goldston threaten Mr. Gibson with arrest, and that as a sworn, on-duty police officer with arrest powers, he would have been obliged to effect the arrest. [McPeake at 26:24; 27:1–7; 45:16–18].

Judge Goldston realized that Mr. Gibson was attempting to record the interaction; she ordered the recording ceased on the grounds that family court proceedings may not be

recorded. [*See* Video Recording at 2:50–3:45; Goldston at 67:23–68:1]. Bailiff McPeake testified that he was standing with Judge Goldston and Mr. Gibson in the front yard near the gazebo when Judge Goldston ordered him to take possession of Mr. Gibson's cell phone based upon her belief he was yet attempting to record audio. [McPeake at 32:6–24]. Judge Goldston told Mr. Gibson to stop recording and directed him to surrender his cell phone to Bailiff McPeake. [McPeake at 33:1–24]. Mr. Gibson did not consent to the seizure of his cell phone. [McPeake at 35:11–15]. Bailiff McPeake nevertheless filmed the search of Mr. Gibson's residence using his personal cell phone "for the protection of everyone involved," including at one point filming the interior of Mr. Gibson's gun safe. [McPeake at 36:4–24; 37:1; 44:3–5]. Judge Goldston was unaware until after this incident that Bailiff McPeake was recording. After he disclosed to Judge Goldston that he had recorded the incident, Judge Goldston told him that recording was improper, and he should not do it again. [Goldston at 19:8–20:19].

Before seizing Mr. Gibson's cell phone, Bailiff McPeake radioed for backup law enforcement assistance. [McPeake at 34:18–23; Stump at 53:7–10; Gibson at 136:16–137:7]. Before the backup arrived, Judge Goldston, Bailiff McPeake, Mr. Lusk, and Mr. Gibson's ex-wife entered Mr. Gibson's residence and began searching. [Goldston at 7:15–20; 12:22–13:1]. Deputy Bobby Stump also aided in the search and seizure of the disputed property at the direction of Judge Goldston once he arrived at Mr. Gibson's residence. [Stump at 45:17–24; Gibson at 156:24–157:7; McPeake at 56:15–59:9]. The search lasted approximately twenty (20) to thirty (30) minutes and involved various parts of the house. [Gibson at 149:1–3; McPeake 36:1–3]. Many different items of personal property were seized from Mr. Gibson's residence without his consent, only some of which were later returned. [Gibson at 158:20–159:1; 178:4–21]. Law enforcement created no contemporaneous inventory of the items taken or any police report. [Stump at 55:10–21].

When a small portion of video footage of the aforementioned events was publicized, the Judicial Disciplinary Counsel received two complaints against Judge Goldston. [Doc. 67-2 at 38 (hereinafter "Goldston Disciplinary Proceeding at _____")]. On September 18, 2020, the West Virginia Judicial Investigation Commission issued a Formal Statement of Charges, filed with the Supreme Court of Appeals of West Virginia, which revealed Judge Goldston admitted to conducting similar "home visits" in her capacity as Family Court Judge on at least eleven (11) separate occasions. [Goldston Disciplinary Proceeding at 11, 39]. She ultimately reached a settlement with the Judicial Disciplinary Counsel, "'admitted her wrongdoing,' and agreed to recommend to the Judicial Hearing Board and the Supreme Court of Appeals that she be censured and fined $5,000 as an appropriate sanction for her violations." [Goldston Disciplinary Proceeding at 36, 54:24–55:7].

On March 22, 2021, Mr. Gibson initiated this action against Judge Goldston, Bailiff McPeake, Deputies White and Stump, Mr. Lusk, and the Raleigh County Commission pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. He asserts that (1) the search and seizure of suspected marital property violated his Fourth Amendment right against unreasonable search and seizure [Doc. 1 ¶ 46–62]; (2) the restriction of Mr. Gibson and Ms. Masual's recordings and the seizure of Mr. Gibson's cell phone to prevent further recording violated his First Amendment right to free speech and access to information about officials' public activities [*Id.* ¶ 63–75]; (3) the assistance provided to Judge Goldston by the Raleigh County Sheriff's Office in the search and seizure constituted an official policy, custom, and practice of the Raleigh County Commission [*Id.* ¶ 76–78]; (4) the search and seizure of Mr. Gibson's property deprived him of his due process rights under the Fourteenth Amendment and West Virginia state law [*Id.* ¶ 79–88]; (5) Judge Goldston's home search policy

4

JA889

disadvantaged *pro se* litigants like Mr. Gibson in violation of the Equal Protection Clause of the Fourteenth Amendment and West Virginia state law [*Id.* ¶ 89–100]; and (6) the long-term practice, agreement, relationship, and understanding between Mr. Lusk and Judge Goldston related to searches and seizures of marital property in contempt proceedings constituted a conspiracy or concerted action under color of state law to deprive Mr. Gibson of his federally protected rights [*Id.* ¶ 101–109]. Mr. Gibson requests compensatory and punitive damages, as well as reasonable attorney fees and costs, injunctive and declaratory relief, and any other relief that this Court deems is just and fair. [*Id.* ¶ 37–38].

On April 19, 2021, all Defendants moved to dismiss. [Docs. 9, 11, 13]. Thereafter the Supreme Court of Appeals concluded Judge Goldston exceeded her judicial powers in searching Mr. Gibson's residence in violation of the *Code of Judicial Conduct*. *See In re Goldston*, 246 W. Va. 61, 866 S.E.2d 126. A censure and fine resulted. *Id.* The Undersigned ordered supplemental briefing by Judge Goldston and Mr. Gibson as to any effect the ruling might have on these proceedings [Doc. 39]. They each filed a supplemental memorandum on December 17, 2021. [Docs. 42, 43].

The parties thereafter moved for summary judgment. [Docs. 63, 64, 65, 66, 67, 68, 69]. The Court denied all motions to dismiss except that Defendant Kyle Lusk was dismissed by stipulation. [Docs. 62, 70, 71].

## II.

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the Court applies the above standard and must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate" Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

## III.

### A.    *Defendant Goldston's Motion for Summary Judgment*

Mr. Gibson pled five counts against Judge Goldston, all pursuant to 42 U.S.C. § 1983. Judge Goldston moved for summary judgment, claiming judicial immunity. Mr. Gibson contends her actions herein constitute a "nonjudicial act" for which no absolute immunity applies.[2]

---

[2] Mr. Gibson also asserts that the Supreme Court of Appeal's holdings in *In re Goldston* are res judicata. [Doc. 68]. The Court need not reach the contention.

Judicial immunity is a form of absolute immunity. *Stump v. Sparkman*, 435 U.S. 349, 359 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976); *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967); *Bradley v. Fisher*, 80 U.S. 335, 353–54 (1871); *Randall v. Brigham*, 74 U.S. 523, 535–36 (1869). "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see Randall*, 74 U.S. at 535; *Bradley*, 80 U.S. at 351; *Ayala v. United States*, 982 F.3d 209, 217 (4th Cir. 2020); *Mullins v. Oakley*, 437 F.2d 1217 (4th Cir. 1971). "Although unfairness and injustice to a litigant may result on occasion, it is 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Mireles*, 502 U.S. at 10 (quoting *Bradley*, 80 U.S. at 347); *see Pierson*, 386 U.S. at 554; *Imbler*, 424 U.S. at 435–36; *Stump*, 435 U.S. at 355; *King v. Myers*, 973 F.2d 354, 359 (4th Cir. 1992). "[J]udicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles*, 502 U.S. at 11 (citing *Pierson*, 386 U.S. at 554); *see Stump*, 435 U.S. at 356–57; *King*, 973 F.2d at 356.

Judicial "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988); *see Kalina v. Fletcher*, 522 U.S. 118, 127 (1997); *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Nero v. Mosby*, 890 F.3d 106, 118 (4th Cir. 2018); *King*, 973 F.2d at 357–58. A litany of Supreme Court cases establishes that "the immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the

complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12 (citations omitted); *see Forrester*, 484 U.S. at 227–29; *Stump*, 435 U.S. at 356–57; *Pierson*, 386 U.S. at 554; *Bradley*, 80 U.S. at 351; *King*, 973 F.2d at 356.

"[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362; *see King*, 973 F.2d at 356. As *Forrester* instructs, it is "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." 484 U.S. at 229.

Further, it is not "the particular act in question" that is scrutinized, otherwise "any mistake of a judge in excess of his authority would become a 'nonjudicial' act[] because an improper or erroneous act cannot be said to be normally performed by a judge." *Mireles*, 502 U.S. at 12–13; *see Stump*, 435 U.S. at 356–57. For instance, in *Stump*, the Supreme Court determined that a circuit court judge who approved a mother's petition to have a tubal ligation performed on her minor daughter without the daughter's knowledge or consent was entitled to judicial immunity. 435 U.S. at 352–53, 362. The High Court reasoned that judges "not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors," and Judge Stump was "acting as a county circuit court judge" when he approved the petition. *Id.* at 362.

Similarly, in *Mireles*, a California Superior Court judge was angered when a public defender failed to appear in court on time because he was delayed in a proceeding in another courtroom. 502 U.S. at 10. The judge directed police officers to use excessive force to remove the attorney from the other courtroom and bring the attorney before him. *Id.* In determining that the judge's actions were judicial -- and therefore covered under absolute immunity -- the Supreme Court reasoned that although the judge directing the officers to use excessive force was "in excess

8

JA893

of his authority," the act of directing an officer to bring counsel to court is judicial in nature. *Id.* at 12–13. Thus, in *Mireles*, the particular act in question was the "judge's direction to police officers to carry out a judicial order with excessive force." *Id.* The Supreme Court, however, did not analyze that particular act, but rather analyzed the "particular act's relation to a general function normally performed by a judge, in this case the function of directing police officers to bring counsel in a pending case before the court." *Id.* at 13. The High Court also emphasized that it was of no importance that the judge's "order was carried out by police officers" because it is "the nature of the function performed, not the identity of the actor who performed it, that informs our immunity analysis." *Id.* (internal quotations and citation omitted). The Court determined that the act -- ordering police officers to use excessive force to bring a lawyer before the court -- was a judicial one, and thus judicial immunity applied. *Id.*

The crux of Judge Goldston's argument is that her actions were taken during the course of adjudicating a Family Court dispute. She contends that, assuming she exceeded her authority, her actions were judicial in nature and hence subject to judicial immunity.

As noted, the Court examines the nature of the act and not the actor. The nature of the act was a warrantless search of Mr. Gibson's residence and a warrantless seizure of his property. The twofold inquiry is (1) whether a search of a residence was an act normally performed by a judge, and (2) the expectations of the parties, namely, whether Mr. Gibson was dealing with Judge Goldston in her judicial capacity. Respecting the first prong, does a judge normally execute a search warrant or personally search a residence? To quote Judge Posner, "[t]o ask the question is pretty much to answer it." *Nelson v. Streeter*, 16 F.3d 145, 148 (7th Cir. 1994). While "the issuance of a search warrant is unquestionably a judicial act," *see Burns v. Reed,* 500 U.S. 478, 492 (1991), the execution of a search and seizure is not. Indeed, searches are so quintessentially

executive in nature that a judge who participates in one acts "not . . . as a judicial officer, but as an adjunct law enforcement officer." *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979). While *Lo-Ji Sales* did not address judicial immunity, the Supreme Court expressed that a judicial officer presiding over a criminal case who personally "conducted a generalized search [of a store] under authority of an invalid [search] warrant . . . was not acting as a judicial officer but as an adjunct law enforcement officer." *Id*. at 327. Judge King observed likewise writing for the panel in *United States v. Servance*, stating "it is elementary that a judge can overstep his responsibilities and compromise his judicial neutrality if, by way of example, he serves as a leader of a search party." 394 F.3d 222, 231 (4th Cir.), *judgment vacated on other grounds*, 544 U.S. 1047 (2005). Judge Goldston was not engaged in an act normally performed by a judge.

Respecting the second prong, Mr. Gibson doubtless dealt with Judge Goldston in her judicial capacity at the outset of the March 4 contempt hearing. The situation changed markedly, however, once the field trip began. Once Judge Goldston invited herself to the residence, began her warrantless search, and then seized private property, the die was cast. Nevertheless, Judge Goldston notes (1) a bailiff was in attendance, (2) the search was recorded much like a judicial proceeding, and (3) Mr. Gibson and his ex-wife made motions during the process. She asserts all of this demonstrates the parties dealt with her as a judge.

The contentions do not withstand minimal scrutiny. Mr. Gibson's motion for disqualification arose out of Judge Goldston acting as a witness rather than a judge. Further, the recording of the search -- which Judge Goldston attempted to halt -- is in no way equivalent factually or legally to an electronically transcribed or recorded judicial proceeding. Judge Goldston recognized as much in her deposition. [Goldston 20:19–22].

Judge Goldston has thus failed to demonstrate either of the two required prongs.

10

JA895

Her protestation that this case is "in the same category as *Mireles*" [Doc. 66 at 10] also misses the mark. In *Mireles*, a judge ordered a bailiff to bring an attorney before him and ordered that excessive force be used in the process. 502 U.S. at 10. In *Mireles*, however, the underlying action of compelling counsel to appear was within the judicial orbit. And while Judge Goldston might similarly have had the authority to order a search of a litigant's home and a seizure of certain items, she could not conduct a search and seizure herself. If the judicial officer in *Mireles* used excessive force himself to bring the attorney before him, a different result might obtain.

A reductive analysis by the United States Court of Appeals for the Sixth Circuit is helpful: "the analytical key . . . between functions for which judicial immunity attaches and those for which it does not is the determination whether the questioned activities are 'truly judicial acts' or 'acts that simply happen to have been done by judges.'" *Archie v. Lanier*, 95 F.3d 438, 441 (6th Cir. 1996) (quoting *Sparks v. Character & Fitness Comm. of Ky.*, 869 F.2d 428, 432 (6th Cir. 1988)); *see Foster v. Walsh*, 864 F.2d 416, 417 (6th Cir. 1988). Judge Goldston's actions fall into the latter category. She performed a nonjudicial act, and she is not entitled to judicial immunity.[3]

---

[3] Moreover, it appears Judge Goldston acted in clear absence of all jurisdiction. As our Court of Appeals observed decades ago, the dividing line between unprotected *usurpations of power* on the one hand, and protected *mistaken exercises of limited power* on the other, is divined by answering a single question: "When a judge exceeds authority, was . . . she entirely devoid of power [and hence deprived of immunity] or was a power lawfully possessed wrongly exercised[, in which case immunity holds]?" *King v. Myers*, 973 F.2d 354, 357 (4th Cir. 1992). In arriving at the answer, the Supreme Court of Appeals' disciplinary ruling against Judge Goldston emphasizes how far she exceeded her warrant. And although the decision necessarily post-dated her actions herein, the Supreme Court of Appeals concluded the restrictive *and textual constitutional* markers were long in place prior to her unlawful actions:

To say that searches are an executive activity is to announce *no new principle of law*. The United States Supreme Court assumed as much in 1979 when it rejected a conviction resulting from a search led by a town justice. According to the Supreme Court, the town justice in question "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation."

JA896

Accordingly, the Court **DENIES** Judge Goldston's Motion for Summary Judgment.

**B.      *Plaintiff Matthew Gibson's Motion for Summary Judgment as to Judge Goldston***

Mr. Gibson filed his own Motion for Summary Judgment. [Doc. 67]. The Court concludes that genuine issues of material fact are extant. Consequently, Mr. Gibson's Motion for Summary Judgment is **DENIED**.

**C.      *The Raleigh County Defendants' Motion for Summary Judgment***

**1.      The Raleigh County Commission**

Mr. Gibson alleges that the Raleigh County Commission "instituted an official policy, custom, and practice of assisting Judge Goldston with searches and seizures of the homes of litigants appearing before her" pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). [Doc. 1 ¶ 76]. In its Motion for Summary Judgment, the Raleigh County Commission asserts that "the record is devoid of any evidence that the Raleigh County Commission has a policy or custom of violating the Plaintiff's rights." [Doc. 64 at 17]. Mr. Gibson responds that the evidence indicates that the Raleigh County Commission "had, and continues to have, a policy of enabling and supporting the unconstitutional misconduct of

---

Under our system of government, judges may not exercise executive powers. The West Virginia Constitution declares that "[t]he legislative, executive and judicial departments shall be separate and distinct." W. Va. Const. art. V, § 1. The Constitution further specifies, *in unmistakable terms*, that no department "shall exercise the powers properly belonging to either of the others" and forbids "any person [to] exercise the powers of more than one of them at the same time." In light of these *clear prohibitions*, we hold that the West Virginia Constitution forbids a judicial officer to participate in a search because a search is an exercise of executive power. W. Va. Const. art. 5, § 1.

*In re Goldston*, 246 W. Va. 61, 69–70, 866 S.E.2d 126, 135–36 (2021) (emphasis added).

12

JA897

Defendant Goldston." [Doc. 73 at 15].

"For the purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell*, 436 U.S. at 690). However, a municipality "cannot be held liable unless a municipal policy or custom caused the constitutional injury." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984); *see Connick v. Thompson*, 563 U.S. 51, 51 (2011); *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532–33 (4th Cir. 2022). A municipality may be liable under § 1983 for the violation of a plaintiff's constitutional rights "only where the constitutionally offensive actions of employees are taken in furtherance of some municipal 'policy or custom.'" *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987); *see Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 470 (4th Cir. 2013) (reasoning that the purpose of this "municipal policy or custom" requirement is to "ensure[] that the municipality is 'responsible' for the alleged violations"). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690–91, 694. Our Court of Appeals has observed how to prove a *Monell* claim:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)); *see Starbuck*, 28 F.4th at 533 (citing *L.A. Cnty. v. Humphries*, 562 U.S. 29, 36 (2010)).

Not every municipal official's action or inaction represents municipal policy.

Rather, the inquiry focuses on whether the municipal official possessed final policy making authority under state law concerning the action or inaction. *See, e.g.*, *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785–86 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000). "[T]he touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter*, 897 F.3d at 554–54 (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)); *see Davison v. Randall*, 912 F.3d 666, 689 (4th Cir. 2019). Furthermore, even if a § 1983 plaintiff can identify the requisite final policy making authority under state law, a municipality is not liable simply because a § 1983 plaintiff "is able to identify conduct attributable to the municipality." *Riddick*, 238 F.3d at 524. Instead, a § 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404; *see King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016).

Viewing the evidence in the light most favorable to the nonmoving party, there is a genuine issue of material fact respecting whether the Raleigh County Commission had a policy or custom that caused Mr. Gibson's injuries. For instance, according to the record, Bailiff McPeake sought out a Raleigh County supervisor prior to his first home search as a bailiff in Raleigh County Family Court, seeking assurance that he was within department policy prior to doing so. [McPeake at 13:10–13; 40:11–24; 64:2–23; 65:9–17]. Bailiff McPeake was told by Sergeant Aaron Lilly that he was authorized to participate and that they "do that from time to time." [McPeake at 64:2–15] Even after the March 4, 2020 event, Bailiff McPeake testified that there has been no policy change as to family court judges searching parties' homes. [McPeake at 64:16–20]. Bailiff McPeake, who continues to serve as bailiff for Judge Goldston, has not been instructed by his supervisor,

Lieutenant Dave Stafford, to refrain from similar conduct in the future. [McPeake at 13:10–13; 40:11–24; 64:2–23; 65:9–17].

Additionally, Deputy Stump, who established during his deposition that he was a supervisor for the Raleigh County Commission, testified that he had visited the homes of litigants with Judge Goldston "numerous times." [Stump at 6:12–14; 19–24; 7:1–4]. Deputy Stump explained that the sheriff's department policy for bailiffs is whatever policy a judge told him -- "no questions asked." [Stump at 31:3–18]. He noted that, even after the March 4, 2020 incident, there has been no policy change within the department about bailiffs going to the homes of litigants. Indeed, Deputy Stump asserts that, "if Judge Goldston told me today to go to the house, I'd be the first one there." [Stump at 56:1–6].

The record gives rise to a genuine issue of material fact respecting whether the Raleigh County Commission had the required municipal policy of allowing officers to participate in home searches with family court judges of the type here challenged. The Motion for Summary Judgment as it pertains to the Raleigh County Commission is **DENIED**.

### 2.  Defendants McPeake and Stump

Mr. Gibson has alleged a First Amendment claim against Bailiff McPeake and a Fourth Amendment claim against Bailiff McPeake and Deputy Stump. [Doc. 16]. Bailiff McPeake and Deputy Stump have moved for summary judgment, asserting qualified immunity. [Doc. 63].

### a.  First Amendment Claim

Qualified immunity "shields government officials from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Haze v. Harrison*, 961 F.3d 654, 660 (4th Cir. 2020); *see Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013). The doctrine "balances two important

15

JA900

interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Courts use a two-step test to ascertain whether qualified immunity applies: "(1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the defendant's conduct violated a constitutional right; and (2) was that right clearly established such that a reasonable person would have known that their conduct was unlawful." *Pearson*, 555 U.S. at 236; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017). The Supreme Court has since modified this approach "such that lower courts are no longer required to conduct the analysis in th[is] sequence. *Meyers*, 713 F.3d at 731.

Assuming an actionable deprivation of Mr. Gibson's First Amendment rights, the Court applies an objective test to determine whether a right is clearly established, asking whether "a reasonable person in the official's position could have failed to appreciate that his conduct would violate [the] right[]." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (citation omitted); *see Santos*, 725 F.3d at 468. The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

"To determine if the right in question was clearly established, we first look to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 99 (4th Cir. 2017) (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004)). Absent "directly on-point, binding authority,"

courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Booker*, 855 F.3d at 543; *Owens*, 372 F.3d at 279.

        The majority of circuits have found the First Amendment protects a citizen's right, in general, to record police. *See, e.g.*, *Fields v. City of Phila.*, 862 F.3d 353, 355–56 (3d Cir. 2017) ("[T]he First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689–90 (5th Cir. 2017) ("We agree with every circuit that has ruled on this question . . . the First Amendment protects the right to record police."); *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014) (recognizing a "First Amendment right to film police activity carried out in public"); *ACLU v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) ("The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights . . . ." (emphasis omitted)); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing plaintiffs had a First Amendment "right to videotape police activities"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a plaintiff who was attempting to videotape a demonstration had a "First Amendment right to film matters of public interest"); *cf. Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (recognizing the "right to watch police-citizen interactions" as a prerequisite to the right to "record[] police activity"). While the right to record in general may be clearly established, the right must be drawn more specifically.

        "In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right 'at a high level of particularity.'" *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013) (quotations omitted). In other words, the "clearly established"

inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation and internal quotation marks omitted). The subject right -- properly framed -- is whether a citizen suffers a First Amendment deprivation when a bailiff, acting on a direct judicial order, seizes that citizen's phone while the citizen is attempting to record what the bailiff perceived as an ongoing court proceeding. A reasonable law enforcement officer in Bailiff McPeake's position could not be expected to have known his conduct violated Mr. Gibson's First Amendment rights. Had Bailiff McPeake not complied with the order, he would doubtless have been held in contempt or dismissed. The qualified immunity doctrine does not require one in Bailiff McPeake's position to make a correct, and somewhat esoteric, on-the-spot legal analysis of whether a judge's order is legally correct. The Court consequently concludes that Bailiff McPeake is entitled to qualified immunity. The Court **GRANTS IN PART** the Raleigh County Defendants' Motion for Summary Judgment as to Mr. Gibson's First Amendment claim against Bailiff McPeake.

#### *b. Fourth Amendment Claim*

Again, assuming a deprivation of Mr. Gibson's Fourth Amendment rights, the Court analyzes the situation "in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (citation and internal quotation marks omitted). The authorities are legion that, absent a recognized exception, citizens have a clearly established right to be free from warrantless searches and seizures. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (holding that "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional"). The Court is unable, however, to find authority analogous to the present situation where officers participate in a warrantless search and seizure when a judge is

physically present and personally directing the effort.

The question again arises whether "a reasonable person in the official's position could have failed to appreciate that his conduct would violate [the] right[]." *Torchinsky*, 942 F.2d at 261 (citation omitted). Further, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The Court is unable to conclude that reasonable law enforcement officers positioned akin to Bailiff McPeake and Deputy Stump would have known that their conduct -- that is, following Judge Goldston's orders and participating in the search and seizure that she directed -- would violate Mr. Gibson's Fourth Amendment rights.

Bailiff McPeake and Deputy Stump are entitled to qualified immunity. The Court **GRANTS IN PART** the Raleigh County Defendants' Motion for Summary Judgment to that extent.

### IV.

Based on the foregoing discussion and the evidentiary record in its entirety, the Court **ORDERS** as follows:

1.   Judge Goldston's Motion for Summary Judgment [**Doc. 65**] is **DENIED**;

2.   Mr. Gibson's Motion for Summary Judgment [**Doc. 67**] is **DENIED**; and

3.   The Raleigh County Defendant's Motion for Summary Judgment [**Doc. 63**] is **GRANTED IN PART** as to Bailiff McPeake and Deputies Stump and White and **DENIED IN PART** as to the Raleigh County Commission.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER:   July 13, 2022

Frank W. Volk
United States District Judge

19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BECKLEY

**MATTHEW GIBSON,**

   **Plaintiff,**

**v.**

                                           **Civil Action No. 5:21-cv-00181**
                                           **Honorable Frank W. Volk**

**LOUISE E. GOLDSTON, individually,
COUNTY COMMISSION OF RALEIGH
COUNTY, a political subdivision, JEFF
MCPEAKE, individually, BRIAN WHITE,
individually, BOBBY STUMP,
individually,**

   **Defendants.**

### DEFENDANT LOUISE E. GOLDSTON'S NOTICE OF APPEAL

     **COMES NOW**, Louise E. Goldston, by counsel, Jennifer E. Tully, Adam K. Strider, and the law firm of Bailey & Wyant, PLLC, the Defendant in the above-captioned case, and hereby give notice that she is appealing the denial of judicial immunity to the United States Court of Appeals for the Fourth Circuit contained in the following Order:

     1.    ECF Document No. 130 Memorandum Opinion and Order, dated July 13, 2022, denying Louise E. Goldston's Motion for Summary Judgment asserting, *inter alia*, judicial immunity as to Plaintiff's claims for relief.

                                             **Louise E. Goldston,**
                                           **By Counsel,**

 **/s/ Jennifer E. Tully**
**Jennifer E. Tully (WV Bar #9356)**
**John P. Fuller (WV Bar #9116)**
**Adam K. Strider (WV Bar #12483)**
**BAILEY & WYANT, PLLC**
**500 Virginia Street, East, Suite 600**
**Post Office Box 3710**
**Charleston, West Virginia  25337-3710**

**T: 304.345.4222**
**F: 304.343.3133**
**jtully@baileywyant.com**
**jfuller@baileywyant.com**
**astrider@baileywyant.com**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

**MATTHEW GIBSON,**

   **Plaintiff,**

**v.**

**LOUISE E. GOLDSTON, individually, COUNTY COMMISSION OF RALEIGH COUNTY, a political subdivision, JEFF MCPEAKE, individually, BRIAN WHITE, individually, BOBBY STUMP, individually,**

   **Defendants.**

**Civil Action No. 5:21-cv-00181**
**Honorable Frank W. Volk**

## <u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that a true and correct copy of foregoing **"Defendant Louise E. Goldston's Notice of Appeal"** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, July 13, 2022:

J. Victor Flanagan
Kevin J. Robinson
Pullin Fowler Flanagan Brown & Poe, PLLC
252 George Street
Beckley, WV  25801
*Attorney For: Raleigh County Commission,*
*Bobby Stump, Brian White, Jeff McPeake*

John H. Bryan
Law Office of John H. Bryan
PO Box 366
Union, WV  24983
*Attorney For: Matthew Gibson*

JA907

/s/ Jennifer E. Tully
Jennifer E. Tully (WV Bar #9356)
John P. Fuller (WV Bar #9116)
Adam K. Strider (WV Bar #12483)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia  25337-3710
T: 304.345.4222
F: 304.343.3133
jtully@baileywyant.com
jfuller@baileywyant.com
astrider@baileywyant.com