RECORD NO. 22-1757

In The

# United States Court of Appeals
### for the Fourth Circuit

## MATTHEW GIBSON,

*Plaintiff-Appellee,*

*v.*

## LOUISE E. GOLDSTON, individually,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BRIEF OF APPELLEE

Victoria Clark
INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 960
Austin, Texas 78707
(512) 480-5936

Anya Bidwell
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 North Glebe Road,
Suite 900
Arlington, Virginia 22203
(703) 682-9320

John Bryan
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street, PO Box 366
Union, West Virginia 24983
(304) 772-4999

*Counsel for Plaintiff-Appellee*

## RULE 26.1 DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Plaintiff-Appellee Matthew Gibson makes these disclosures:

- Plaintiff-Appellee is a natural person.

- To Plaintiff-Appellee's knowledge, no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

- This case does not arise out of a bankruptcy proceeding.

- This is not a criminal case in which there was an organizational victim.

Date: November 14, 2022.

/s/ Victoria Clark
Victoria Clark
*Counsel for Plaintiff-Appellee*

i

# TABLE OF CONTENTS

**PAGE**

RULE 26.1 DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ...................................................... vi

JURISDICTIONAL STATEMENT ......................................... 1

STATEMENT OF THE ISSUES ............................................. 1

STANDARD OF REVIEW .................................................... 1

STATEMENT OF THE CASE ............................................... 2

    I.    West Virginia family court Judge Louise Goldston searches the plaintiff's home. ................................................ 2

    II.   The West Virginia high court fines and censures Judge Goldston, concluding that she acted without judicial authority when she conducted the unconstitutional search and seizure. ............................................................ 7

    III.  The district court denies Judge Goldston judicial immunity because, as the West Virginia high court confirmed, her actions were not judicial and were taken in the complete absence of jurisdiction. ........................................... 11

SUMMARY OF THE ARGUMENT ..................................... 12

ARGUMENT ...................................................................... 14

    I.    Judge Goldston is not entitled to judicial immunity because conducting a search of an individual's home is a quintessentially non-judicial act ........................................ 16

**PAGE**

A. Searching someone's home is not a function normally performed by a judge ...................................................... 16

    i. Goldston personally participated in a search of Gibson's home. .................................................... 17

    ii. Goldston is precluded from arguing she did not personally participate in the search. .................. 22

    iii. Personally participating in and leading a search is an executive act under longstanding Supreme Court precedent ...................................................... 24

    iv. Judicial immunity does not shield executive-branch actions, even when the actor is a judge. ........................................................... 27

        1. The Supreme Court has expressly held that judicial immunity does not apply to judges performing executive actions. .................... 28

        2. The Fifth, Seventh, and Ninth Circuits affirm that judges are not entitled to judicial immunity when behaving like law-enforcement officers. .......................... 29

        3. No one receives absolute immunity for behaving like a police officer. .................. 32

    v. It is a judicial act to order a search; it is not a judicial act to conduct a search .......................... 34

    vi. Conclusion .......................................................... 39

iii

**PAGE**

B.    Gibson was not interacting with Judge Goldston in her judicial capacity. .................................................... 40

    i.    Gibson stated on video—and surrounding circumstances confirmed—that he was not interacting with Goldston in her judicial capacity. ............................................................ 41

    ii.    Even if the parties appeared to interact with Goldston in her judicial capacity at times, she was not acting in her judicial capacity when performing the search. ........................................ 45

    iii.    Neither the bailiff's recording—of which Goldston disapproved—nor the nature of Goldston's disciplinary proceedings prove that the parties interacted with Goldston in a judicial capacity. ............................................................ 48

    iv.    Conclusion .......................................................... 49

II.    Judicial immunity is also inapplicable because, under the West Virginia Constitution, Judge Goldston acted in the complete absence of jurisdiction by performing executive-branch functions. .................................................. 50

    A.    Goldston lacked jurisdiction because she was entirely devoid of the power to search Gibson's home under the West Virginia Constitution. ........................................ 51

    B.    The West Virginia Supreme Court has specifically held that Goldston completely lacked the authority to search in this case. ..................................................... 53

III.    Granting judicial immunity here would not serve the doctrine's underlying purposes. ........................................... 55

iv

P<small>AGE</small>

    A.    Immunizing judges from suit for usurping executive power does not protect the judicial process. ................55

    B.    Appellate review of Goldston's actions was unavailable. ..................................................................57

CONCLUSION .........................................................................58

REQUEST FOR ORAL ARGUMENT .....................................59

CERTIFICATE OF COMPLIANCE ........................................61

CERTIFICATE OF SERVICE ..................................................62

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993) ................. 38, 55

*Barr v. Mateo*, 360 U.S. 564 (1959) ......................................................... 55

*Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1871) ........................... *passim*

*Brown v. Reinhart*, 760 F. App'x 175 (4th Cir. 2019) ............................. 1

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) .................................. 33, 57

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................... 40

*Burns v. Reed*, 500 U.S. 478 (1991) ................................................ *passim*

*Butz v. Economou*, 438 U.S. 478 (1978) ............................................ 12, 57

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) .......................... 18, 19

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) .................................. 38

*Dotzel v. Ashbridge*, 438 F.3d 320 (3d Cir. 2006) ................................. 1, 2

*Ex parte Virginia*, 100 U.S. 339 (1879) .................................................. 27

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017) .................. 44

*Figueroa v. Blackburn*, 208 F.3d 435 (3d Cir. 2000) ............................. 47

*Forrester v. White*, 484 U.S. 219 (1988) ......................................... *passim*

*Gibson v. Goldston*, No. 5:21-cv-00181, 2022 WL 2719725
   (S.D. W. Va. July 13, 2022) ....................................................... *passim*

**PAGE(S)**

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) .......................................... 44

*Goldstein v. Moatz*, 364 F.3d 205 (4th Cir. 2004) ................................... 33

*Gray-Hopkins v. Prince George's County*, 309 F.3d 224
  (4th Cir. 2002) ........................................................................................ 2

*Gregory v. Thompson*, 500 F.2d 59 (9th Cir. 1974) ........................ *passim*

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ............................................... 32

*In re McNallen*, 62 F.3d 619 (4th Cir. 1995) .......................................... 23

*Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999) .................................... 1

*King v. Myers*, 973 F.2d 354 (4th Cir. 1992) ................................. *passim*

*Kyllo v. United States*, 533 U.S. 27 (2001) .............................................. 19

*Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) ....................... *passim*

*Lopez v. Vanderwater*, 620 F.2d 1229 (7th Cir. 1980) .......... 31, 32, 52, 53

*Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306
  (10th Cir. 1999) ...................................................................................... 1

*Malina v. Gonzalez*, 994 F.2d 1121 (5th Cir. 1993) ................... 29, 30, 47

*Matter of Goldston*, 866 S.E.2d 126 (W. Va. 2021) ....................... *passim*

*Mireles v. Waco*, 502 U.S. 9 (1991) ................................................ *passim*

*Nero v. Mosby*, 890 F.3d 106 (4th Cir. 2018) ........................................... 1

*Pegg v. Herrnberger*, 845 F.3d 112 (4th Cir. 2017) ................................ 2

**PAGE(S)**

*Pierson v. Ray*, 386 U.S. 547 (1967) ............................................ 14, 56, 57

*Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001) ................................. 44

*State ex rel. Hensley v. Nowak*, 556 N.E.2d 171 (1990) .......................... 10

*State ex rel. McGraw v. Johnson & Johnson*, 704 S.E.2d 677
    (W. Va. 2010)................................................................................. 23

*Stump v. Sparkman*, 435 U.S. 349 (1978) ................................. 16, 26, 40

*Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478
    (5th Cir. 2000) ................................................................................ 1

*United States v. Brinkley*, 980 F.3d 377 (4th Cir. 2020) ........................ 44

*United States v. Jacobsen*, 466 U.S. 109 (1984)..................................... 18

*United States v. Leon*, 468 U.S. 897 (1984) ........................................... 26

*United States v. Servance*, 394 F.3d 222 (4th Cir. 2005), *vacated on
    other grounds*, 544 U.S. 1047 (2005) ............................................ 20, 27

*Weathers v. Ebert*, 505 F.2d 514 (4th Cir. 1974).................................... 34

**CONSTITUTIONAL PROVISIONS**

W. Va. Const. art. V, § 1.................................................................. 50, 52

**CODES AND STATUTES**

28 U.S.C. § 1331 .................................................................................. 1

42 U.S.C. § 1983 ................................................................................ 11

W. Va. Code § 62-10-9 ....................................................................... 38

P<small>AGE</small>(<small>S</small>)

W. Va. Code § 62-1A-3............................................................38

W. Va. Code § 62-1A-4............................................................38

**O<small>THER</small> A<small>UTHORITIES</small>**

Brad McElhinny, *Ethics hearing concludes in judge's case, with his peers to decide if he crossed the line*, MetroNews, June 16, 2022.......49

Debra Cassens Weiss, *Alleged Walmart walkouts lead to new ethics charge against 'distracted' judge*, ABAJournal, Mar. 2, 2022 ...........49

Noah Webster, An American Dictionary of the English Language 66 (1828) (reprt. 6th ed. 1989)....................................................19

The Federalist No. 47 (James Madison) (Benjamin F. Wright ed., 1961) ...........................................14, 52, 59

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. This Court also has appellate jurisdiction over interlocutory appeals of denials of absolute immunity. *See Nero v. Mosby*, 890 F.3d 106, 121–23 (4th Cir. 2018).

## STATEMENT OF THE ISSUES

This appeal poses a single issue: Is a judge entitled to *judicial* immunity for performing the *executive* function of searching someone's home and directing the seizure of his property?

## STANDARD OF REVIEW

Federal appellate courts typically review de novo the denial of summary-judgment motions based on absolute immunity. *See, e.g.*, *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 482 (5th Cir. 2000); *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1313 (10th Cir. 1999); *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999). However, as in qualified-immunity cases, this court has jurisdiction over interlocutory appeals of the denial of absolute immunity only to the extent the denial turns on an issue of law. *Brown v. Reinhart*, 760 F. App'x 175, 178 (4th Cir. 2019); *accord Dotzel v. Ashbridge*, 438

1

F.3d 320, 324 (3d Cir. 2006). Thus, on review, this Court "construe[s] all facts in the light most favorable to [the] non-moving party" and must "accept the facts as the district court articulated them when it determined whether summary judgment was appropriate." *Pegg v. Herrnberger*, 845 F.3d 112, 117 (4th Cir. 2017); *see also Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002). Only then does the Court determine, based on the district court's version of the facts, whether immunity is proper. *See Pegg*, 845 F.3d at 117.

## STATEMENT OF THE CASE

This case arises out of the illegal search of plaintiff Matthew Gibson's home.

## I.    West Virginia family court Judge Louise Goldston searches the plaintiff's home.

During their divorce proceedings, Gibson and his ex-wife reached an agreement on the division of certain items of personal property. *Gibson v. Goldston*, No. 5:21-cv-00181, 2022 WL 2719725, at *1 (S.D. W. Va. July 13, 2022); JA541–543 (Gibson Depo.) 14:7–23:15. Gibson's ex-wife later filed a petition for contempt, allegedly because Gibson retained some of her property after the divorce. *Gibson*, 2022 WL 2719725, at *1; JA546 (Gibson Depo.) 35:14–37:21. On March 4, 2020, the parties

2

appeared in West Virginia family court—before defendant Judge Louise Goldston—for a hearing on the petition. *Gibson*, 2022 WL 2719725, at *1; JA546–547 (Gibson Depo.) 37:12–41:2. During the hearing, Judge Goldston abruptly stopped the proceeding and ordered the parties to meet at Gibson's home immediately. *Gibson*, 2022 WL 2719725, at *1. Goldston did not explain the purpose of the visit and Gibson—a federal law-enforcement officer by trade—did not have legal representation. *Id.* at *2; JA260–261 (Goldston Depo.) 58:16–59:20; JA546–547 (Gibson Depo.) 37:17–38:3; JA554 (Gibson Depo.) 69:12–69:18.

After Goldston arrived at the house, Gibson moved to recuse Goldston on the ground that she had become a witness in the case. *Gibson*, 2022 WL 2719725, at *1; JA Digital Media Volume Ex. D (hereinafter "Gibson Video") at 1:00–1:25.[1] Goldston denied the motion as untimely. *Gibson*, 2022 WL 2719725, at *1; Gibson Video at 1:16–1:22. Gibson also stated that he did not consent to the search of his home without a warrant and told Goldston that she "[wouldn't] get in [his] house without a search warrant." Gibson Video 1:21–1:23; *Gibson*, 2022 WL 2719725, at *1. Goldston responded: "Oh yeah, I will." Gibson Video

---

[1] Available at https://youtu.be/DA67kzFO-oQ.

3

1:23–1:25; *Gibson*, 2022 WL 2719725, at *1. Shortly after, Goldston again ordered Gibson to let her into his house under threat of arrest. *Gibson*, 2022 WL 2719725, at *1; Gibson Video 2:12–2:17.

During these events, Gibson and his girlfriend were recording the encounter. *Gibson*, 2022 WL 2719725, at *1; Gibson Video at 2:12–2:17. When Goldston realized that she was being recorded, however, she ordered Gibson and his girlfriend to stop. *Gibson*, 2022 WL 2719725, at *1. Goldston then ordered the bailiff to seize Gibson's cell phone because she believed that Gibson was still recording. *Id.*

Goldston then directed and led a search of Gibson's home for about half an hour, accompanied by a search party that included the court bailiff, Gibson's ex-wife, and the ex-wife's attorney. *Gibson*, 2022 WL 2719725, at *2; JA211–215 (Goldston Depo.) 9:3–13:20; JA574 (Gibson Depo.) 149:1–149:3. At all times during the incident, everyone in the home was taking instructions from Goldston. *See generally* JA Digital Media Volume Ex. E (hereinafter "McPeake Video"[2]). Specifically, during the search, Goldston gave numerous orders to members of the search

---

[2] Available at https://youtu.be/HA1UuxUiCwk.

4

party about where, when, and how they could look for and seize disputed items. As shown in the McPeake Video:

- Goldston pointed to disputed photographs and demanded the search party "take 'em" (0:25–0:30);

- Goldston, upon seeing disputed yearbooks, ordered the search party to "get 'em" (1:00–1:08);

- Goldston instructed the ex-wife: "I can't let you search unless you have *some* idea of where they might be" (2:30–2:36);

- Goldston herself decided to go to the basement, with the search party following, upon learning that disputed property might be located there (2:50–3:00);

- Goldston ordered the ex-wife to "go in there and pick [the DVDs] you want" (3:17–3:22);

- Goldston controlled and supervised the ex-wife's search through Gibson's DVD collection: "Just go through 'em" (3:22–4:22);

- When Gibson requested to "kill two birds with one stone," Goldston responded that it "depends what it is" (4:24–4:28);

- Goldston granted Gibson permission to check a safe and ordered the bailiff, multiple times, to go with him (4:27–4:42);

- Goldston further instructed Gibson and his ex-wife on how to continue with the DVD search (6:00–6:22);

- Finally, Goldston demanded: "You look at those [DVDs] over there Mr., uh, Gibson. Mr. Gibson, listen to me! Look over there and see if you agree that you had all of those" (6:39–6:50).

During much of this time, Goldston sat in Gibson's rocking chair barefooted, without permission, while she demanded that those around her continue the search according to her precise instructions. McPeake Video at 3:22–4:47, 5:48–7:18.

Despite Goldston's order that the incident not be recorded, the court bailiff videoed about seven minutes of the search inside the house on his cell phone without Goldston's knowledge. *Gibson*, 2022 WL 2719725, at

*1; *see generally* McPeake Video. When he informed Goldston of the recording, she admonished that his actions were improper and that he should not do it again. *Gibson*, 2022 WL 2719725, at *1; JA221–222 (Goldston Depo.) 19:8–20:22. No known recording exists of the remainder of the search.

The search party ultimately removed several items from the home without Gibson's consent. *Gibson*, 2022 WL 2719725, at *1; JA576–577 (Gibson Depo.) 157:8–159:17. Some of the items belonged to Gibson's children or girlfriend, and some of the wrongfully seized items were never returned. JA576–577 (Gibson Depo.) 157:8–159:17; *Gibson*, 2022 WL 2719725, at *2. And law enforcement on the scene did not create an inventory of the items taken. *Gibson*, 2022 WL 2719725, at *2.

## II. The West Virginia high court fines and censures Judge Goldston, concluding that she acted without judicial authority when she conducted the unconstitutional search and seizure.

After video footage of the incident became public, Goldston faced multiple ethics complaints for her actions. *Matter of Goldston*, 866 S.E.2d 126, 130–31 (W. Va. 2021). The West Virginia Judicial Investigation Commission thereafter filed ethics-violations charges against Goldston under the state Code of Judicial Conduct. *Id.* at 131. She ultimately

7

settled the case via an agreement in which she admitted to both the violations and the underlying factual allegations. *Id.* at 132. She also agreed that censure and a $5,000 fine were appropriate sanctions. *Id.*

During the disciplinary process, Goldston admitted that she regularly conducted these so-called "home visits" in the midst of family-court proceedings. *Id.* at 131; *see also* JA479 (Stump Depo.) 6:22 (officer stating that he had gone to litigants' houses "[n]umerous times" with Goldston). However, Goldston could not identify any legal authority that supported her practice or any established procedures that governed it. *Matter of Goldston*, 866 S.E.2d at 131. She also admitted that she never created a record of the off-site proceedings—either via court reporter or otherwise—and did not subsequently enter orders reflecting what happened at the homes. *Id.* at 131–32. And she agreed that her personal presence at the residences made her a potential witness to future proceedings and improperly usurped the litigants' burden of producing evidence. *Id.* at 132. Moreover, Goldston admitted that she could have ordered law-enforcement officers to conduct searches, but she asserted that the officers would not have done a good enough job. *Id.* at 131 (quoting Goldston disciplinary-proceeding testimony: "I have been told by

8

every sheriff that I've worked with . . . that [looking for property in divorce disputes is] not something they do, that they're not going for more than 15 minutes . . . to do anything").

The West Virginia Supreme Court of Appeals ultimately imposed a censure and a $1,000 fine, *id.* at 139, publicly rebuking Goldston for "exercis[ing] executive powers forbidden to her under the West Virginia Constitution," *id.* at 129. Citing federal Fourth Amendment precedent, the Court held that Goldston conducted a search of Gibson's residence. *Id.* at 135. According to the Court, "the record [was] clear that Judge Goldston went to the property to *locate* things." *Id.* The Court observed that when Gibson stated that he did not know where certain items were located, Goldston replied: "Well, *we're gonna find it*." *Id.* "Looking for things," the Court reasoned, "is a 'search' by any sensible definition of the term." *Id.*

The Court went on to explain that "[s]earches are an activity of the executive department," which "is to announce no new principle of law." *Id.* "[S]earches are so quintessentially executive in nature," the Court reasoned, "that even a judge who participates in one acts not as a judicial officer, but as an adjunct law enforcement officer." *Id.* (cleaned up)

(quoting *State ex rel. Hensley v. Nowak*, 556 N.E.2d 171, 173 (Ohio 1990) (per curiam)). The inescapable conclusion, then, was that Goldston's behavior was unlawful: "Under our system of government, judges may not exercise executive powers." *Matter of Goldston*, 866 S.E.2d at 135. The Court thus held that Goldston unlawfully usurped the powers of the executive branch by searching Gibson's home and seizing his property. *Id.*

But the Court continued, noting that Goldston also "compounded her error by the manner in which she conducted the search." *Id.* at 129. The Court opined that "Judge Goldston went about the search in a highhanded and procedurally flawed manner," failing to afford the parties the opportunity to be heard and prohibiting the creation of a record despite "claim[ing]" to be holding a hearing. *Id.* at 137. "Without question," the Court observed, "Judge Goldston's conduct cast doubt in the minds of the citizens who viewed the recording of the incident as to whether the parties were being treated with justice and fairness." *Id.* The Court ultimately rejected the state hearing board's recommendation for a lower sanction and imposed a censure based on "the seriousness of

Judge Goldston's conduct and the impact such violations have on the public's confidence in the judiciary." *Id.* at 138.

## III.  The district court denies Judge Goldston judicial immunity because, as the West Virginia high court confirmed, her actions were not judicial and were taken in the complete absence of jurisdiction.

While the disciplinary proceedings were pending, Gibson sued Goldston and others involved in the search under 42 U.S.C. § 1983. *Gibson v. Goldston*, No. 5:21-cv-00181, 2022 WL 2719725 (S.D. W. Va. July 13, 2022). Gibson claimed that the search and seizure of his property violated his Fourth and Fourteenth Amendment rights and that the restrictions on recording the incident violated the First Amendment. *Id.* at *2. Goldston later sought summary judgment on the ground that she was entitled to judicial immunity. *Id.* at *3.

The district court denied the motion, holding that Goldston was not entitled to immunity because the search of Gibson's property was a *nonjudicial* act to which *judicial* immunity protections do not attach. *Id.* at *6. The court reasoned that Goldston's conduct was nonjudicial for two reasons: first, because conducting searches and seizures is an executive function that judges do not normally perform (tracking the West Virginia Supreme Court's holding); and second, because Gibson was not dealing

11

with Goldston in her judicial capacity, as evidenced by the fact that Gibson specifically moved for her to recuse herself for acting outside her judicial capacity. *Id.* at *5. Furthermore, the court concluded that even if Goldston's actions were judicial in nature, they were taken in the complete absence of jurisdiction because the West Virginia Constitution forbids judicial officers from performing executive functions (again tracking the West Virginia Supreme Court's decision). *Id.* at *6 n.3. And the absence of jurisdiction, the court recognized, was an independent basis for denying Goldston immunity. *Id.* at *4.

## SUMMARY OF THE ARGUMENT

Judges have difficult jobs. They must often preside over bitter disputes and make hard decisions with no clear right answer. That's why the Supreme Court has repeatedly recognized that judges need protection from lawsuits arising out of their judicial duties. *See, e.g.*, *Butz v. Economou*, 438 U.S. 478, 512 (1978).

Had Goldston simply erred while doing her job as a judge, immunity would likely protect her. But that's not what Goldston did, and nothing in her opening brief suggests otherwise. Despite Goldston's protests, this

12

case turns on the simple idea that a judge is not entitled to judicial protection for acting like a member of the executive branch.

As a matter of precedent, the Supreme Court has repeatedly observed that judicial immunity does not protect judges from suit if they are not engaged in judicial acts. *See, e.g.*, *Mireles v. Waco*, 502 U.S. 9, 11–13 (1991) (per curiam); *Forrester v. White*, 484 U.S. 219, 227 (1988). Goldston cannot carry her burden of showing that she is entitled to immunity for engaging in executive acts instead. *See Burns v. Reed*, 500 U.S. 478, 486 (1991) ("[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."). Further, judges don't get immunity, even for judicial acts, when those acts are performed in the complete absence of jurisdiction. *Mireles*, 502 U.S. at 12. And as already held by the highest authority on the subject, the West Virginia Constitution makes clear that judges completely lack authority to usurp the power of the executive branch. *Matter of Goldston*, 866 S.E.2d 126, 136 (W. Va. 2021).

Additionally, as a matter of common sense, Goldston should not be entitled to immunity. Judicial immunity exists to protect independent judicial decision making and limit redundant collateral attacks that

13

belong in the ordinary appellate process. *See Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871); *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Because neither purpose is served here, granting judicial immunity simply makes no sense.

As James Madison recognized at our country's founding, merging powers of multiple branches of government in the hands of one official "may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 336 (James Madison) (Benjamin F. Wright ed., 1961). Were a judge to usurp the power of the executive branch, "the judge might behave with all the violence of an oppressor." *Id.* at 338 (quoting Montesquieu). Thus judicial immunity does not, cannot, and should not, protect judges who blatantly ignore the separation of powers like Judge Goldston did here. The district court correctly concluded that judicial immunity does not shield Goldston for exercising the power of the executive branch and acting in the complete absence of all jurisdiction. This Court should affirm that decision.

## ARGUMENT

For decades, the Supreme Court has instructed that the judicial immunity analysis turns on whether the conduct in question is a "truly

14

judicial act[],'" or whether it is an "act[] that simply happen[s] to have been done by [a] judge[]." *Forrester v. White*, 484 U.S. 219, 227 (1988). Goldston's conduct here is a quintessential example of "acts that simply happen to have been done by [a] judge," *id.*, because conducting, directing, and supervising the search of private property is an executive, not judicial, act, *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979).

Under the modern formulation of the doctrine, judges are not entitled to immunity for actions that are (1) "nonjudicial," meaning "not taken in the judge's judicial capacity," or (2) "taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991). Either one is independently sufficient to deny Goldston immunity. As the district court correctly held, the actions at issue here—Goldston's search of Gibson's home and the resulting seizures of his property—fall into both categories. Moreover, granting judicial immunity here would not serve the doctrine's underlying purposes. Goldston therefore is not entitled to this special judicial protection.

## I. Judge Goldston is not entitled to judicial immunity because conducting a search of an individual's home is a quintessentially non-judicial act.

Whether a judge's action qualifies as a "judicial act" turns on "the nature of the act." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Courts ordinarily look to two factors in this analysis: (1) "whether [the act] is a function normally performed by a judge," and (2) "whether [the parties] dealt with the judge in his judicial capacity." *Id.* However, courts often focus on the first factor and give it great, if not dispositive, weight. *See, e.g.*, *Mireles*, 502 U.S. at 12–13 (noting the existence of the second factor but focusing on the first in the substantive analysis); *Forrester*, 484 U.S. at 227–30 (analyzing the first factor without even mentioning the second). Here, both factors conclusively demonstrate that Goldston's search of Gibson's home was a nonjudicial act and thus insufficient to invoke judicial immunity.

### A. Searching someone's home is not a function normally performed by a judge.

As to the first factor, the "relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" *Mireles*, 502 U.S. at 13 (quoting *Stump*, 435 U.S. at 362). This means that courts "look to the particular act's relation to a general function normally performed by a judge." *Id.*

16

Here, Goldston's act—searching a litigant's private residence—is not a function normally performed by a judge.

Specifically, according to both Fourth Amendment precedent and the West Virginia Supreme Court, Goldston personally participated in a search of Gibson's home. The Supreme Court has long held that the nature and function of a search is executive, not judicial—it is not a function normally performed by a judge. And the Court has made equally clear that judges are not entitled to judicial immunity for performing executive acts. While Goldston may be correct that she had the power to order the search, both this Court and the Supreme Court have observed that the power to order an executive function is separate from the power to perform that executive function. Thus the nature of Goldston's personal participation in the search of Gibson's home was non-judicial, and her conduct was not a judicial act to which immunity protections attach.

i.  Goldston personally participated in a search of Gibson's home.

In her brief, Goldston argues that she did not search Gibson's home. *See* Goldston's Br. at 18. She cannot dispute that she coerced Gibson to allow entry into his home under threat of arrest. *See Gibson*, 2022 WL

2719725, at *1. Nor can she dispute that she maintained control of the search at all times, deciding whether and when the search party could look in specific parts of the house and which items they could seize. *See supra* pp. 5–6 (citing McPeake Video). Instead, she contends—without citing any supporting legal authority—that she cannot be personally charged with engaging the search because she was merely supervising it and was not personally looking for items. Goldston's Br. at 18. However, Goldston attempts to muddy the waters where the Constitution itself is clear—any infringement of a reasonable expectation of privacy is a search, and Goldston ran roughshod over Gibson's privacy interest in his own home. Moreover, Goldston personally looked for Gibson's DVDs. And her role as the leader of the search party only makes her more responsible for the search, not less.

At the outset, Goldston's arguments ignore fundamental principles of constitutional law. A search under current Fourth Amendment doctrine "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) ("For much of our history, Fourth Amendment search doctrine was

18

tied to common-law trespass and focused on whether the Government obtains information by physically intruding on a constitutionally protected area." (internal quotation marks omitted)). And few things are more established in constitutional law than the proposition that individuals have a reasonable expectation of privacy in their homes. *See Kyllo v. United States*, 533 U.S. 27, 34 (2001) (describing the home as "the prototypical . . . area of protected privacy"). Goldston asserted government power to enter Gibson's home as the leader of a search party looking for specific items of personal property.[3] *See* JA422 (McPeake Depo.) 25:14–25:16 ("I remember us going there to retrieve items that were agreed that were going to be taken from him and given to her."). Had Goldston blindfolded herself and said nothing for the entire incident, her mere presence in Gibson's home would still have infringed on

---

[3] Goldston does not, and cannot, dispute that the individuals she was supervising engaged in a search by looking for disputed items. As the West Virginia Supreme Court observed in Goldston's disciplinary proceeding, "[l]ooking for things is a 'search' by any sensible definition of the term." *Matter of Goldston*, 866 S.E.2d at 135; *see also Kyllo*, 533 U.S. at 32 n.1 (noting that to search means "to look over or through for the purpose of finding something; to explore; . . . as to search the house for a book" (quoting Noah Webster, An American Dictionary of the English Language 66 (1828) (reprt. 6th ed. 1989)).

Gibson's reasonable expectation of privacy and therefore qualified as a search.

Yet she did far more than that. Goldston *did* look for things—at the very least, Gibson's DVDs. As shown at 2:50–3:21 of the McPeake Video, Goldston herself decided that she and the rest of the search party should go down to Gibson's basement upon learning that the disputed DVDs might be located there. She then arrived in the room with the DVDs and observed them before anyone moved them. Thus Goldston did not merely order others to look for things. She personally participated in looking for—and ultimately finding—allegedly disputed items during the search.

Further, even if this Court accepted Goldston's assertion that she did not personally look for items during the search, Goldston is still fully responsible as the leader of the search. As this Court has recognized, "it is elementary that a judge can overstep his responsibilities . . . if, by way of example, he serves as a *leader* of a search party." *United States v. Servance*, 394 F.3d 222, 231 (4th Cir. 2005), *vacated on other grounds*, 544 U.S. 1047 (2005) (mem.) (emphasis added). The Supreme Court has similarly held that a judge does not act as a judicial officer when leading a search party. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979)

20

(holding that the judge violated the Constitution by "allow[ing] himself to become a member, *if not the leader*, of the search party which was essentially a police operation" (emphasis added)).

Here, Goldston was unquestionably the leader of the group that searched Gibson's home. She forced Gibson to allow the group to enter his home and then personally entered the home herself. She maintained authority of the group by controlling the minutiae of the search while inside the home, including where and how the search was conducted. *See supra* pp. 5–6. She cannot now escape liability on the technicality that she was the leader, rather than a subordinate member, of the group.[4]

---

[4] Goldston's order to Gibson to stop recording the incident falls under this same umbrella. Neither the district court nor Goldston's opening brief here analyzes the order separately for immunity purposes, and for good reason: The order is indistinguishable from Goldston's other actions as the leader of the search party. *See Lo-Ji Sales, Inc.*, 442 U.S. at 328 (Court could not distinguish between when the judge was acting as a judge "and when he was one with the police and prosecutors in the executive seizure"). While Goldston makes much of the fact that litigants are not permitted to record family-court proceedings, Goldston's Br. at 9, 17, this was not a court proceeding, *see infra* at Part I.B. It was a search. *Matter of Goldston*, 866 S.E.2d at 138 (holding that Goldston was engaged in an executive search, rather than a judicial view, of Gibson's home). Goldston's order that Gibson stop recording was just one of the actions Goldston took in her attempt to supervise, conduct, control, and apparently cover up the search.

21

Simply put, any infringement on a reasonable expectation of privacy is a search, which means that Goldston was engaged in a search the moment she stepped foot in Gibson's home. Contrary to her assertions, she personally looked for disputed items. That she was otherwise the leader and instigator of the search, rather than a subordinate doing her bidding, only further evidences the egregiousness of her actions. As the West Virginia Supreme Court held, "Judge Goldston clearly left her role as an impartial judicial officer and participated in an executive function when she entered [Gibson's] home to oversee the search." *Id.* at 138. Goldston's hairsplitting is merely an attempt to introduce complexity where none exists.

ii. <u>Goldston is precluded from arguing she did not personally participate in the search.</u>

Moreover, Goldston is precluded from relitigating this issue. In Goldston's disciplinary proceeding, the West Virginia Supreme Court squarely held that "Judge Goldston [s]earched [Gibson's] [h]ome." *Matter of Goldston*, 866 S.E.2d at 134; *see also id.* at 134–36. Yet Goldston now argues that "she herself did not participate in the search." Goldston's Br. at 18. Goldston's arguments run headlong into the doctrine of issue preclusion.

22

A party cannot relitigate "an issue decided previously in judicial or administrative proceedings[,] provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995). When determining the preclusive effect of a state-court judgment, the forum state's law applies. *Id.* In West Virginia, a party cannot relitigate an issue if: (1) the previously decided issue is identical to the one currently presented; (2) there is a final adjudication of the merits of the prior action; (3) the party against whom the doctrine was invoked was a party or in privity with a party to the prior action; and (4) the party against whom the doctrine was invoked had a full and fair opportunity to litigate the issue in the prior action. *State ex rel. McGraw v. Johnson & Johnson*, 704 S.E.2d 677, 688 (W. Va. 2010).

Each of the four elements is met here. Satisfying element (1), the West Virginia Supreme Court held without qualification that Goldston engaged in a search of Gibson's home. *Matter of Goldston*, 866 S.E.2d at 134–36. The Court also rendered final judgment in Goldston' disciplinary proceeding, and Goldston herself was party to the action—meeting elements (2) and (3). *See id.* at 139. Finally, fulfilling element (4),

23

Goldston had a full and fair opportunity to litigate the issue. Indeed, she did so vigorously and even provided a sworn statement in support of her arguments. *See id.* at 131, 134. Goldston cannot now rehash the issue after she litigated it fully before the West Virginia Supreme Court just because she lost.

iii. <u>Personally participating in and leading a search is an executive act under longstanding Supreme Court precedent.</u>

Because Goldston participated in and ultimately led the search, her actions were executive in nature. In *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979), the Supreme Court straightforwardly instructed that personally participating in a search is an executive function, not a judicial one—even if the judge retains some appearance of judicial action. That principle applies with even more force here, where the conduct at issue had even less of a judicial veneer than that in *Lo-Ji Sales*.

In *Lo-Ji Sales*—which Goldston does not cite or discuss in her brief—the Court roundly condemned a judge who led a search party through an adult bookstore looking for obscene material. *Id.* at 321–23. The judge initially authorized the search via warrant based on two specific films, but police requested that he accompany them to the store to make probable-cause determinations on any additional items they

24

might find. *Id.* at 321. The judge, accompanied by several police officers and prosecutors, then proceeded to spend six hours rifling through the store's products to look for obscene materials. *Id.* at 322–23.

The Court held that the search and seizures were unconstitutional, despite the government's assertion that the judge's presence ensured that no items would be seized without probable cause. *Id.* at 326. The judge's presence did not obviate the violations, the Court reasoned, because the judge was no longer acting as a judge when he participated in the search. *Id.* at 327. According to the Court, the judge "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." *Id.* Because the judge "conducted a generalized search under authority of an invalid warrant[,] *he was not acting as a judicial officer but as an adjunct law enforcement officer*." *Id.* (emphasis added).

Goldston's actions here were even less judicial than the judge's in *Lo-Ji Sales*. Unlike in that case, Goldston never bothered to sign a warrant authorizing the search of Gibson's house. Thus, unlike the judge there, Goldston cannot even argue that her involvement in the search was an extension of her judicial act of signing the warrant being

25

executed. Goldston instead "conducted a generalized search" of Gibson's home without a warrant (even if such a warrant would have been invalid) that purported to provide authority to search or seize.[5] *See id.*

The cases' factual similarities further confirm that Goldston's actions were executive in nature. Just like the judge in *Lo-Ji Sales*, Goldston was "a member, if not the leader, of the search party which was essentially a police operation." *Id.* In both cases, the search parties looked for and seized specific items on private property while using threats of incarceration. *See id.* at 322 (store clerk placed under arrest and forced to assist the search party in viewing materials); *Gibson*, 2022 WL 2719725, at *1 (Gibson under threat of arrest unless he allowed Goldston into his home). Goldston, then, "was not acting as a judicial officer." *Lo-Ji Sales, Inc.*, 442 U.S. at 327; *see also United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Lo-Ji Sales* and affirming that a judge is no longer acting as a judge, even losing her legal power to authorize searches, when

---

[5] This is not to suggest that Goldston's actions were non-judicial because they were illegal. Judges may retain immunity even for actions that fall outside their legal authority. *Cf. Stump*, 435 U.S. at 356. Even if Goldston had conducted an otherwise legal search, however, her actions would still have been non-judicial and thus not entitled to judicial immunity.

she acts as a police officer); *Servance*, 394 F.3d at 231 ("[I]t is elementary that a judge can overstep his responsibilities . . . if, by way of example, he serves as a leader of a search party."). Instead, Goldston was acting "as an adjunct law enforcement officer" and usurping power reserved for the executive branch. *Lo-Ji Sales, Inc.*, 442 U.S. at 327.

> iv. Judicial immunity does not shield executive-branch actions, even when the actor is a judge.

Because Goldston exercised *executive* authority by engaging in a search, *judicial* immunity does not apply. "Whether the act done by [a judge] was judicial or not is to be determined by its character, and not by the character of the agent." *Ex parte Virginia*, 100 U.S. 339, 348 (1879); *see also Forrester*, 484 U.S. at 227. In other words, an act is either inherently judicial or it is not. Here, Goldston's actions would not have been even arguably judicial if they were performed by someone who was not a judge—they "might as well have been," and typically are, performed by executive-branch officers. *See Ex parte Virginia*, 100 U.S. at 348. The only foothold Goldston has for arguing that her actions were judicial is the fact that she was a judge.

As the Supreme Court has long affirmed, that is not enough. *See id.* Judicial immunity does not apply to executive functions. Further, the

27

Fifth, Seventh, and Ninth Circuits all affirm that judges are not entitled to judicial immunity when they act as law-enforcement officers. And the Supreme Court has rejected absolute immunity for government officials in other contexts when they engage in investigative functions. Absolute judicial immunity, then, does not apply here.

> 1. *The Supreme Court has expressly held that judicial immunity does not apply to judges performing executive actions.*

The Supreme Court itself has distinguished between judicial functions, which entitle the actor to judicial immunity, and executive functions, which do not.

In *Forrester v. White*, the Court held that a state judge was not immune from suit for demoting, and later firing, a court employee. 484 U.S. 219, 221 (1988). The Court observed that judicial-immunity precedent distinguishes "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.* at 227. The act of making employment decisions did not confer immunity, the Court reasoned, because the judge there could not "meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such

28

employment decisions." *Id.* at 229. The Court recognized that such decisions can "be essential to the very functioning of the courts." *Id.* at 228. Nevertheless, the Court held that immunity was not necessary to protect the judicial process because the act of making employment decisions was indistinguishable from one that might be performed by an executive-branch official in their executive capacity. *Id.* at 229–30.

> ## 2. *The Fifth, Seventh, and Ninth Circuits affirm that judges are not entitled to judicial immunity when behaving like law-enforcement officers.*

Consistent with *Forrester*, other federal courts have repeatedly recognized that judges who behave like executive-branch officers are not entitled to judicial immunity.

For instance, in *Malina v. Gonzalez*, a state judge effected a traffic stop of another driver who honked at him. 994 F.2d 1121, 1123 (5th Cir. 1993). The judge then sent a police officer to the driver's home to order him to appear in the judge's court the next day. *Id.* When the driver appeared in court, the judge accused him of various criminal violations and ordered him to return to another court at a later date. *Id.* When the driver attempted to explain his actions, the judge cited him with contempt and sentenced him to five hours in jail. *Id.*

29

The Fifth Circuit held that judicial immunity protected the judge for the contempt citation and sentencing, but nothing else. *Id.* at 1124. Specifically, the court concluded that conducting a traffic stop was not a judicial function because "[p]eace officers, not judges, stop motorists on the highway." *Id.* Similarly, the act of criminally charging the driver was not covered by judicial immunity because "[i]t is well settled that charging a defendant is a prosecutorial function, not a judicial function." *Id.* As the concurring opinion noted, immunity was not proper there because "the policy behind judicial immunity—encouragement of 'fearless decisionmaking' free from the intimidation of vexatious litigation—has no bearing on [the judge's] conduct." *Id.* at 1129 (Garza, J., concurring). "Conversely," the concurrence continued, "the dangers implicit in [the judge's] conduct—over-reaching from the joinder of executive and judicial powers—have been apparent since before the Constitution." *Id.*

Likewise, in *Gregory v. Thompson*, the Ninth Circuit held that a judge was not entitled to judicial immunity when he used physical force to remove an unwanted visitor from his courtroom. 500 F.2d 59, 61 (9th Cir. 1974). The visitor, a non-lawyer, refused to leave after the judge

30

informed him that he could not represent a litigant. *Id.* The judge then forced the visitor out of the courtroom, threw him on the floor, and beat him. *Id.* In the resulting lawsuit, the Ninth Circuit held that the judge's acts were non-judicial and thus undeserving of absolute immunity. *Id.* at 63–65. The court noted that the judge had the "judicial muscle," in the form of the contempt power, to remove the visitor if he wished. *Id.* at 64. But "[t]he decision to personally evict someone from a courtroom," the court observed, "is simply not an act of a judicial nature." *Id.* The court concluded that the judge's "choice to perform an act similar to that normally performed by a sheriff or bailiff should not result in his receiving absolute immunity for this act simply because he was a judge at the time." *Id.* at 65

Finally, in *Lopez v. Vanderwater*, a judge caused the arrest of a former tenant of a building owned by the judge's business partner when the tenant trespassed on the partner's property. 620 F.2d 1229, 1231–32 (7th Cir. 1980). The judge then allegedly drafted a criminal complaint against the tenant, signed the tenant's arrest warrant, forged the tenant's signature on a plea form, and arraigned, convicted, and sentenced the tenant while the tenant was not present. *Id.* at 1232–33.

The court held that the judge was entitled to judicial immunity for the judicial acts of arraigning, convicting, and sentencing the tenant. *Id.* at 1234–35. However, the court also held that the judge was not entitled to judicial immunity to the extent he acted like a prosecutor. *Id.* at 1235. Acts like preparing the criminal complaint and presenting it to himself, the court observed, "were not functions normally performed by a judge." *Id.* (internal quotation marks omitted). Instead, they were "prosecutorial acts" normally performed by the executive branch, and judicial immunity did not apply. *Id.*

### 3. No one receives absolute immunity for behaving like a police officer.

Even prosecutors—themselves executive-branch officials—do not receive absolute immunity for acting like police officers. Prosecutorial immunity, like judicial immunity, exists to safeguard the judicial process.[6] *Burns v. Reed*, 500 U.S. 478, 485 (1991). Thus if absolute immunity for law-enforcement actions was necessary to safeguard the judicial process, prosecutors would be entitled to that protection as well.

---

[6] Indeed, prosecutorial immunity flows from judicial immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 422–23 (1976).

Yet in *Buckley v. Fitzsimmons*, the Court held that engaging in investigative activities was not related enough to the judicial process to entitle a prosecutor to immunity. 509 U.S. 259, 272–76 (1993). In that case, the prosecutor allegedly attempted to fabricate evidence that a boot print found at the scene of the crime belonged to a particular suspect. *Id.* at 272. Absolute immunity was inappropriate, the Court reasoned, because the prosecutor was "perform[ing] the investigative functions normally performed by a detective or police officer." *Id.* at 273. The Court further observed that "if a prosecutor plans and executes a raid on a suspected weapons cache, he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." *Id.* at 274.

Put differently: Judicial immunity is unnecessary to protect the judicial process when *anyone* performs investigative functions. *See Burns*, 500 U.S. at 486–87 (noting "[t]he presumption" against granting officials absolute immunity). If prosecutors and police officers do not need absolute immunity in those circumstances, then judges don't either. *See Goldstein v. Moatz*, 364 F.3d 205, 215 (4th Cir. 2004) (no absolute immunity for investigative acts performed by agency prosecutors during

33

a disciplinary investigation); *Weathers v. Ebert*, 505 F.2d 514, 517 (4th Cir. 1974) ("Making an arrest is a police function, not a judicial one, and [the prosecutor] would lack immunity if he were involved.").

> v.    It is a judicial act to order a search; it is not a judicial act to conduct a search.

Cases in which the Supreme Court and this Court have granted judicial immunity further affirm that Goldston's actions fall on the non-judicial side of the dividing line. These cases illustrate that a judge's power to order something does not authorize her to participate in the execution of that order personally. *Cf.* Goldston's Br. at 11 ("As a family court judge, [Goldston] unquestionably possessed the authority to order the property to be searched for and seized."). That is why Goldston is not entitled to immunity here.

First, this Court has recognized that a judge's power to order something done is separate from her power to enforce that order. *King v. Myers*, 973 F.2d 354 (4th Cir. 1992), also involved a divorce proceeding in which a judge allegedly violated a litigant's civil rights. As here, the parties disagreed over the ownership of certain items of personal property. *Id.* at 355. The disagreement culminated in the judge sending an officer to arrest the ex-wife at her home, without a warrant and

34

without any explanation for the detention. *Id.* at 355–56. The ex-wife later sued the judge for the arrest. *Id.* at 356.

This Court held that the judge was entitled to judicial immunity, in part because ordering the arrest was a judicial act. *Id.* at 358. The ex-wife argued that the judge had "usurped the powers of a law enforcement officer" because only law enforcement officers were statutorily authorized to make warrantless arrests. *Id.* The Court rejected that argument, however, because "[t]he *magistrate* did not conduct the warrantless arrest." *Id.* (emphasis added). Instead, the judge had merely ordered the arrest, and "[i]ssuing process of arrest for one accused of a crime is a judicial function." *Id.* The Court thus concluded that judicial immunity was available because the judge, who did not personally arrest the plaintiff, "cannot be deemed to have usurped the powers of a law enforcement officer." *Id.*

The Supreme Court has made a similar observation. In *Mireles v. Waco*, a judge ordered police officers to seize an attorney with excessive force and bring him to the judge's courtroom. 502 U.S. at 10. The officers then violently seized the attorney, used offensive language, and slammed him into doors as they brought him before the judge. *Id.* Nonetheless, the

35

Supreme Court concluded that the judge's actions were judicial in nature. *Id.* at 12–13. Although it acknowledged that judges do not normally order police to carry out orders with excessive force, *id.* at 12, the Court emphasized that the correct inquiry was the "particular act's relation to a general function normally performed by a judge," *id.* at 13. There, the judge was engaged in "the function of directing police officers to bring counsel in a pending case before the court," which was a judicial act even though the judge performed it in an illegal way. *Id.*

In reaching that decision, however, the *Mireles* Court specifically concluded that the judge had not been performing executive functions. *Id.* "[T]he fact that [the judge's] order was carried out by police officers," the Court observed, did not "somehow transform his action from 'judicial' to 'executive' in character." *Id.* (citing *Forrester*, 484 U.S. at 229). The Court reasoned that the judge's order was "no more executive in character than a judge's issuance of a warrant for an executive officer to search a home." *Id.* Thus the fact that the judge's actions were not executive in nature was key to the Court's analysis.

On this point, Goldston's brief gets it exactly right. "It is apparent," Goldston argues, "that had Judge Goldston merely ordered from the

36

bench that [deputies] go to [Gibson's] home and secure the property at issue, while she awaited their return at the courthouse, there would be no controversy that she acted within her legal ambit." Goldston's Br. at 19. That's true. Under *Mireles*, Goldston might even have been entitled to immunity if she had ordered law-enforcement officers to conduct the search of Gibson's home in an unusual or illegal way—for instance, by breaking things as they went through the house. *See* 502 U.S. at 12–13. That's because ordering a search is a function normally performed by a judge. *See, e.g.*, *Burns*, 500 U.S. at 492 ([T]he issuance of a search warrant is unquestionably a judicial act.").

But Goldston did not merely order the search—she performed it. Goldston acknowledges in her brief that "[i]t is [Goldston's] personal presence at the home and interaction with the Parties while the property was located that allegedly causes the departure from her authorized sphere of action." Goldston's Br. at 19–20. Again, that's correct. Goldston was not only personally present in Gibson's home during the search, but she also instructed other members of the search party on where, when, and how to look for the disputed items. *See supra* pp. 5–6 (citing McPeake Video). Thus she was the leader of the search party—a police operation—

37

from her perch in Gibson's rocking chair. That is a far cry from ordering the execution of an enforcement operation from the courthouse bench. *Lo-Ji Sales, Inc.*, 442 U.S. at 327. That is why the judge in *Mireles* was entitled to judicial immunity but Goldston is not.[7]

This distinction between ordering and enforcing also makes sense in the context of the larger judicial-immunity analysis. Ultimately, the "touchstone" of the judicial-immunity inquiry is whether the judge was "resolving disputes between parties, or [] authoritatively adjudicating private rights." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36 (1993) (quoting *Burns*, 500 U.S. at 500 (Scalia, J., concurring in part and

---

[7] A breadth of additional legal authority, from Supreme Court precedent to West Virginia statutes, confirm that the enforcement of judicial orders to search or arrest falls solely to the executive branch. *See, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971) (holding that "government enforcement agent[s]" may not issue warrants because they "simply cannot be asked to maintain the requisite neutrality with regard to their own investigations"—"there could hardly be a more appropriate setting than this for a per se rule of disqualification"); W. Va. Code § 62-1A-3 (stating that judges may issue search warrants, but only police officers with jurisdiction or "other officer[s] authorized by law" may execute those warrants); W. Va. Code § 62-1A-4 (contemplating that the officer who executes a search warrant is different from the judge or magistrate who provides the property owner with documentation of the search after the fact); W. Va. Code § 62-10-9 (authorizing "sheriffs, deputy sheriffs[,] and correctional officers," but not judges, to make arrests).

dissenting in part)). Here, Goldston's personal participation in the search was completely unnecessary to resolve the dispute before her. Goldston could have, and should have, resolved the parties' disputes over certain items by entering orders from the bench based on the evidence the parties produced. Doubtless, some of those orders could have had an enforcement mechanism by which a law-enforcement officer would search Gibson's home—for example, if Gibson's ex-wife produced sufficient evidence that Gibson, was, in fact, retaining disputed property. But the act of entering the order legally adjudicates the parties' rights; the resulting enforcement action does not.

### vi. Conclusion

In sum, the Supreme Court has recognized for decades that personally leading a search party that results in seizures while threatening the property's custodian with arrest is not a function normally performed by a judge. *Lo-Ji Sales, Inc.*, 442 U.S. at 327. This Court has described that proposition as "elementary." *Servance*, 394 F.3d at 231. Judges are not even entitled to judicial immunity for executive functions that are critical to the operation of the judicial system. *Forrester*, 484 U.S. at 227–30. They certainly are not entitled to

39

immunity for blatantly usurping the power of the executive branch, and thus violating the separation-of-powers principle upon which our country is founded, for their own convenience. *See Buckley v. Valeo*, 424 U.S. 1, 124 (1976) (per curiam) ("The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787."). By definition, Goldston's exercise of executive power cannot be a judicial act—failing the first factor in the judicial-acts analysis.

### B. Gibson was not interacting with Judge Goldston in her judicial capacity.

The second factor in determining whether an act is judicial is "the expectations of the parties," that is, "whether [the parties] dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362. Again, courts often put less emphasis on this factor and sometimes do not even consider it. *See, e.g.*, *Mireles*, 502 U.S. at 12–13 (noting the existence of the second factor but focusing on the first in the substantive analysis); *Forrester*, 484 U.S. at 227–30 (analyzing the first factor without even mentioning the second); *see also King*, 973 F.2d at 358 n.2 (expressly not considering this factor because the Court concluded it was not relevant). But this factor,

40

like the first, further undermines Goldston's contention that the search was a judicial act.

Goldston primarily argues that some of her actions during the search *looked* judicial and thereby alchemized the entire incident into an act taken in her judicial capacity. But the record evidence of the parties' expectations belies that contention. Even if some of Goldston's actions appeared judicial, they did not magically transform the search into an act entirely performed in Goldston's judicial capacity. Moreover, Goldston's other arguments—which rely on a recording she actively opposed and her own disciplinary proceedings—are equally unpersuasive.

> i. Gibson stated on video—and surrounding circumstances confirmed—that he was not interacting with Goldston in her judicial capacity.

Goldston first argues that the parties were dealing with her in her judicial capacity because they were making motions for her to rule on during the search. Goldston's Br. at 18. However, the record demonstrates otherwise. As shown on video, shortly after everyone arrived on scene, Gibson moved for Goldston to recuse herself on the ground that she was becoming a witness in the case. Gibson Video at 1:00–1:25. Gibson's exact words to Goldston were: "I'm putting in a

41

motion to recuse yourself because you're putting yourself in a witness capacity *instead of a judiciary capacity*." *Id.* (emphasis added). Gibson thus stated, on video, that he did not believe Goldston was acting in her judicial capacity.[8]

Moreover, although Goldston asserts that the parties made at least two motions during the incident, the only motion captured on video was Gibson's motion to recuse. Goldston contends that the ex-wife also "made a motion to be permitted to search the home for items she did not know the location of." Goldston's Br. at 18. But the ex-wife's attorney—who appears to have made the request—did not call it a motion, and Goldston answered it without indicating whether it was granted or denied. McPeake Video at 2:22–2:50. The exchange had none of the hallmarks of a motion made in court and instead sounded much more like a conversation between a supervising police officer and her subordinate concerning the scope of an ongoing search. If anything, this request is further evidence that the parties—including the ex-wife's legal

---

[8] Even if Gibson believed that he was interacting with Goldston in her judicial capacity at the time he moved for her recusal, his motion—which occurred shortly after everyone arrived on scene—made clear that he believed Goldston was stepping out of her judicial capacity moving forward.

representative—did not expect that they were interacting with Goldston in her judicial capacity.

Moreover, nothing about the circumstances of the search resembled a hearing. Goldston was not presiding in a courtroom or wearing a robe during the search—for most of it, she was not even wearing shoes. *See, e.g.*, Gibson Video at 1:00–1:25; McPeake Video at 0:10–0:30. Nor was Goldston creating a record of the proceedings. Indeed, Goldston even chastised the bailiff for his unauthorized recording (which ultimately captured roughly a third, if not less, of the search inside the home). *Gibson*, 2022 WL 2719725, at *1. And when Gibson and his girlfriend attempted to record the incident, Goldston ordered them to stop. *See id*.

True, the parties "abided by [Goldston's] rulings," *see* Goldston's Br. at 18, including her ruling on the motion to recuse. But that does not mean Gibson was interacting with Goldston in her judicial capacity. Gibson complied with Goldston's orders under threat of arrest, *see Gibson*, 2022 WL 2719725, at *1; Gibson Video 2:12–2:17. Thus he didn't comply because he believed Goldston was a judge cloaked in judicial authority during a proceeding, *see* Gibson Video at 1:20–1:25 (Gibson stating that he would not allow Goldston in his home without a warrant);

43

he did it because he didn't want to be arrested for refusing to allow a search of his home. That is how someone typically interacts with a police officer, not a judge. *See, e.g.*, *Rogers v. Pendleton*, 249 F.3d 279, 295 (4th Cir. 2001) (noting the Court's "inference" that officers arrested a homeowner for his refusal to permit an illegal search of his property); *see also United States v. Brinkley*, 980 F.3d 377, 382 (4th Cir. 2020) (individual refusing entry into her home but later acquiescing on the officers' show of authority).

Gibson's other actions during the search further confirm that he was not interacting with Goldston in her judicial capacity. Again, Gibson attempted to record the incident—something litigants do not typically do when they believe they are dealing with a judge because the court staff, not the parties, creates the appropriate recording of the proceeding. Recording is common, however, during interactions with the police. *See, e.g.*, *Fields v. City of Philadelphia*, 862 F.3d 353, 355–56 (3d Cir. 2017) (collecting numerous cases addressing the First Amendment right to record police). And police who are being recorded sometimes demand that the recording stop, just as Goldston did. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 80 (1st Cir. 2011). Gibson had no expectation, then, that he was

dealing with Goldston in her judicial capacity as she personally conducted a largely unrecorded search of his home to look for disputed property.

> ii.   Even if the parties appeared to interact with Goldston in her judicial capacity at times, she was not acting in her judicial capacity when performing the search.

Even if the parties believed Goldston was acting in her judicial capacity by ruling on motions during the search, that fact does not transform all of her actions into judicial ones. Here, too, *Lo-Ji Sales, Inc.* is instructive. The judge in *Lo-Ji Sales* signed a warrant for the search and was actively engaged during the search in determining probable cause as to each item—all functions normally performed by a judge. *See* 442 U.S. at 321–23. Nonetheless, the Court held that the entirety of the judge's personal participation in the search, including conduct that otherwise *looked* judicial, was not judicial in nature. *Id.* at 327. The Court reasoned that it could not distinguish between when the judge was acting as a judge "and when he was one with the police and prosecutors in the executive seizure." *Id.* at 328. This was true, the Court held, even when the judge was purporting to perform constitutionally required post-seizure hearings on the seized items. *Id.*

45

Thus, the fact that a judge might happen to perform judicial acts while she is simultaneously performing non-judicial acts does not cloak the entire incident in judicial immunity. Goldston was personally directing the search and instructing members of the search party—including Gibson's ex-wife and the bailiff—on where, when, and how to search. *See supra* pp. 5–6. That means that the entirety of her personal involvement in the search was non-judicial, even if the parties sometimes interacted with her in judge-like ways.

True, the parties interacted with Goldston in her judicial capacity at the outset of the incident, but she moved out of that capacity by conducting the search. Judicial immunity "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester*, 484 U.S. at 227. Thus, when the same person performs a different or additional function, the immunity analysis changes too.

Other circuits have affirmed that a judge may move in and out of her judicial capacity in same case. For instance, in *Gregory*, the judge presided over the criminal case in which the unwelcome visitor was attempting to appear as counsel. 500 F.2d at 61. The visitor, along with the defendant in the criminal case, appeared before the court on a regular

46

court day to discuss the case. *Id.* Up to that point, the judge was unquestionably functioning as a judge by presiding over the criminal proceeding and ruling on requests related to that proceeding. However, the moment the judge began personally subjecting the visitor to physical force, the judge began functioning like a police officer instead. *Id.* at 65. That the parties had previously dealt with the judge in his judicial capacity was of no import, even though the incident began in the judge's courtroom and was arguably related to the judge's power to protect courtroom proceedings. *Id.* at 64; *see also Malina v. Gonzalez*, 994 F.2d 1121, 1124 (5th Cir. 1993) (judge began acting in executive capacity by initiating traffic stop but later acted in his judicial capacity by citing and sentencing the plaintiff).

So too here. The parties unquestionably dealt with Goldston in her judicial capacity when they appeared before her as litigants at a hearing in her courtroom before the search. *See, e.g.*, *Figueroa v. Blackburn*, 208 F.3d 435, 443 (3d Cir. 2000) (defendant who appeared before a judge in a criminal case was dealing with the judge in her judicial capacity). At that time, Goldston was performing a judicial act by holding a hearing. When she began to conduct the search of Gibson's home, however, she stepped

out of her role as judge—and Gibson no longer expected that he was interacting with Goldston in her judicial capacity, as evidenced by his motion to recuse on that exact ground.

> ### iii. Neither the bailiff's recording—of which Goldston disapproved—nor the nature of Goldston's disciplinary proceedings prove that the parties interacted with Goldston in a judicial capacity.

Goldston's remaining arguments fare no better. Goldston argues that the search was transformed into a court hearing because the bailiff recorded part of the incident. Goldston's Br. at 9, 17. But, as the district court found, Goldston did not authorize the bailiff's recording and chastised him when she found out it existed. *Gibson*, 2022 WL 2719725, at \*1. She cannot now rely on the existence of the recording—which documented only seven of the twenty to thirty minutes of the search—to shield herself from liability.

Goldston also argues that she was acting in her judicial capacity—in Goldston's words, her "public persona"—because she was disciplined for the incident under the West Virginia Code of Judicial Conduct. Goldston's Br. at 20. But the Code, unlike judicial immunity, applies to judges simply because they are judges—even if the conduct at issue is not judicial in nature. That is why judges are regularly charged with Code

48

violations for behavior that is completely unrelated to their judicial roles. *See, e.g.*, Brad McElhinny, *Ethics hearing concludes in judge's case, with his peers to decide if he crossed the line*, MetroNews, June 16, 2022[9] (West Virginia judge charged with Code violations for behavior during and after a traffic stop); Debra Cassens Weiss, *Alleged Walmart walkouts lead to new ethics charge against 'distracted' judge*, ABAJournal, Mar. 2, 2022[10] (same judge later charged with Code violations for stealing from Walmart). The fact that the Code governed Goldston's conduct, then, is irrelevant to the immunity analysis.

### iv.   Conclusion

As the district court below observed, Goldston's arguments on this point "do not withstand minimal scrutiny." *Gibson*, 2022 WL 2719725, at *5. Gibson made clear, before Goldston ever entered the house, that he did not believe he was dealing with Goldston in her judicial capacity. And the search did not resemble a court hearing in any other way. It is irrelevant that some of Goldston's actions during the search might have been properly done in a judicial capacity if performed in another setting

---

[9] Available at https://tinyurl.com/bddtpkbw.
[10] Available at https://tinyurl.com/8yxrktfc.

or that the parties previously interacted with Goldston as a judge. Goldston cannot now rely on a recording she disapproved of—and her own disciplinary proceeding—to transform the search, after the fact, into something it was not, especially since that issue has already been conclusively settled by the West Virginia Supreme Court. *See supra* Sec. I.A.ii.

## II. Judicial immunity is also inapplicable because, under the West Virginia Constitution, Judge Goldston acted in the complete absence of jurisdiction by performing executive-branch functions.

Further, as the district court correctly held, there is a second, independent basis for denying Goldston judicial immunity: She was acting in the complete absence of jurisdiction. *See Mireles*, 502 U.S. at 11–12; *Gibson*, 2022 WL 2719725, at *6 n.3. The West Virginia Constitution makes clear that judges categorically lack the ability—and therefore the jurisdiction—to exercise the power of the executive branch. W. Va. Const. art. V, § 1; *see also Matter of Goldston*, 866 S.E.2d at 136. Moreover, the West Virginia Supreme Court has specifically held, on these exact facts, that Goldston was entirely devoid of the power to search Gibson's home. Goldston therefore acted in the complete absence of

50

jurisdiction by personally conducting a search of Gibson's home, and judicial immunity does not apply.

> A. *Goldston lacked jurisdiction because she was entirely devoid of the power to search Gibson's home under the West Virginia Constitution.*

As the Supreme Court instructed in *Bradley*, there is a difference "between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter." 80 U.S. (13 Wall.) at 351. Courts must routinely determine the limits of their jurisdiction in the ordinary course of a case, and those decisions are protected by judicial immunity even if they are incorrect. *Id.* at 352. However, when a judge completely lacks jurisdiction over the subject matter at hand, "any authority exercised is a usurped authority." *Id.*

To illustrate this distinction, the *Bradley* Court turned to the differences between a probate court and a criminal court. The Court explained that "if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offences . . . his commission would afford no protection to him in the exercise of the usurped authority." *Bradley*, 80 U.S. (13 Wall.) at 352. However, if a criminal court erroneously concluded that

51

someone committed a crime, or imposed a greater sentence than the law allowed, the Court observed that those actions would merely "be in excess of [the criminal judge's] jurisdiction." *Id.* Immunity would thus attach in the latter scenario, but not the former.

Ultimately, this analysis boils down to a single inquiry: "When a judge exceeds authority, was he or she entirely devoid of power or was a power lawfully possessed wrongly exercised?" *King*, 973 F.2d at 357. Here, under the West Virginia Constitution, Goldston was entirely devoid of the power to personally conduct a search of Gibson's home. *See id.*

Article V, § 1 of the West Virginia Constitution instructs that "[t]he Legislative, Executive and Judicial Departments shall be separate and distinct." It also specifically states that no branch "shall exercise the powers properly belonging to either of the others," and no person shall "exercise the powers of more than one of them at the same time." *Id.*; *see also* The Federalist No. 47, at 338. Because conducting a search is an executive function, Goldston completely lacked the power to do so as a judicial official. *Matter of Goldston*, 866 S.E.2d at 136; *see also Lopez*, 620

F.2d at 1235 n.13 (concluding that "[a]cting as a prosecutor is not within an Illinois circuit judge's jurisdiction" under the state constitution).

Further, Goldston's usurpation of executive power is even more egregious than the hypothetical probate judge exercising criminal jurisdiction. The probate judge still acted within *some* court's jurisdiction by adjudicating criminal cases. *See Bradley*, 80 U.S (13 Wall.) at 352. But a judge never has jurisdiction to personally conduct a search of a private person's home. Goldston thus could not have been acting merely in excess of her jurisdiction because she was not exercising any judicial jurisdiction at all. She *did* behave like the probate judge, however, in the sense that she was exercising power that structurally did not belong to her. "[A]nd for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible." *Bradley*, 80 U.S. (13 Wall.) at 352.

### B. The West Virginia Supreme Court has specifically held that Goldston completely lacked the authority to search in this case.

Further, the West Virginia Supreme Court has already considered these exact facts and held that Goldston was completely devoid of authority to search Gibson's home. In Goldston's disciplinary proceeding, the Court declared that the Constitution's "unmistakable terms" prohibited judicial officers from "participat[ing] in a search because a

53

search is an exercise of executive power." *Matter of Goldston*, 866 S.E.2d at 136. And the Court held that Goldston was "plainly engaged in such a search" during the incident at issue here. *Id.* The Court therefore held that the Constitution's "clear prohibitions," as a structural matter, prohibited Goldston from behaving as she did. *Id.*

Thus, when Goldston searched Gibson's home, she was not simply making a legal mistake—she was exercising "a usurped authority." *Bradley*, 80 U.S. (13 Wall.) at 352; *see also Lo-Ji Sales, Inc.*, 442 U.S. at 327; *cf. King*, 973 F.2d at 358. Goldston did not wrongfully exercise a power she otherwise possessed because she did not, in any sense, lawfully possess the power to search Gibson's home or seize his property. *See King*, 973 F.2d at 357. She did not merely make a mistake about the boundaries of her power, *see Bradley*, 80 U.S. (13 Wall.) at 352, or choose to exercise her power in an illegal way, *see Mireles*, 502 U.S. at 13. She was "entirely devoid of [the] power" to conduct the search because that power belongs, full stop, to the executive branch. *King*, 973 F.2d at 357; *Matter of Goldston*, 866 S.E.2d at 136; *Lo-Ji Sales, Inc.*, 442 U.S. at 327. Goldston therefore acted in the complete absence of jurisdiction, which deprives her of immunity.

### III. Granting judicial immunity here would not serve the doctrine's underlying purposes.

Shielding Goldston from liability also would not serve any of judicial immunity's underlying purposes. Immunity for government officials "is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government." *Barr v. Mateo*, 360 U.S. 564, 572–73 (1959) (plurality opinion). Therefore, immunity generally—and judicial immunity in particular—should not extend any farther than its underlying purposes support. *See, e.g.*, *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432–37 (1993) (judicial immunity did not extend to court reporters, in part because the extension would not protect the doctrine's underlying policies). Neither of judicial immunity's primary justifications—protecting the judiciary's independence and avoiding unnecessary collateral attacks—would be served by granting Goldston immunity here.

### A. Immunizing judges from suit for usurping executive power does not protect the judicial process.

As the *Bradley* Court made clear, judicial immunity exists to protect a judge's "independence[,] without which no judiciary can be either respectable or useful." 80 U.S. (13 Wall.) at 347. "[I]t is a general principle of the highest importance," the Court explained, "that a judicial

officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* Judicial immunity thus exists "not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554. And protecting judicial independence, in turn, protects the integrity of the judicial process. *See Bradley*, 80 U.S. (13 Wall.) at 347.

The question here, then, is whether protection of the judicial process requires courts to shield judges who knowingly (and repeatedly) usurp the power of the executive branch for their own convenience. The answer, of course, is no. Again, Goldston's actions were executive, not judicial, in nature. Insulating judges from liability for *executive* actions does not protect the *judicial* process. That principle is particularly salient where, as here, the executive action at issue involves government intrusion into the security of an individual's person or property. *See Gregory*, 500 F.2d at 64 ("[W]e cannot believe that the purpose of the judicial immunity doctrine—to promote 'principled and fearless decision-

56

making'—will suffer in the slightest if it is held that judges who physically assault persons in their courtrooms have no automatic immunity."). If absolute immunity is unnecessary to serve the public interest when a search is conducted by a law-enforcement officer, there is no reason to extend absolute immunity to a judge for the exact same conduct. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 274 (1993).

*B. Appellate review of Goldston's actions was unavailable.*

Courts have also historically justified judicial immunity on the ground that it is necessary to protect judgments from repeated collateral attacks. *See, e.g.*, *Forrester*, 484 U.S. at 227. "A judicial act within the meaning of the doctrine [of judicial immunity] may normally be corrected on appeal." *Gregory*, 500 F.2d at 64. Thus, courts have reasoned, civil liability for judges is unnecessary because the appellate process exists for ordinary error correction. *See Pierson*, 386 U.S. at 554; *Butz v. Economou*, 438 U.S. 478, 512 (1978).

Here, however, appellate review would have been ineffective because Gibson's injury was already complete when Goldston entered his home. "[W]hen a judge exercises physical force," the *Gregory* court observed, "his decision is not amenable to appellate correction." 500 F.2d

at 64. True, unlike in this case, the judge in *Gregory* exercised physical force to assault the plaintiff. *Id.* at 61. But Goldston, too, exercised physical force in the sense that she herself insisted on physically entering Gibson's home—and she threatened Gibson with arrest if he tried to stop her. *See Gibson*, 2022 WL 2719725, at *1; Gibson Video 2:12–2:17. An appeal is not a sufficient tool for error correction here because an appellate court could not order Goldston to un-search Gibson's house, in the same way that an appellate judge could not order the judge in *Gregory* to un-assault the plaintiff. Likewise, the immediate and impromptu nature of Goldston's orders did not give Gibson any opportunity to contest those decisions on appeal beforehand. Thus this justification, too, does not warrant extension of immunity to Goldston here.

## CONCLUSION

Goldston did not merely make a mistake or an incorrect ruling when she lead a search party into Gibson's home. She stepped out of her role as an adjudicator and into the role of a law-enforcement officer. And that decision did not have merely theoretical effects. Without warning and without any legal basis, the judge, Gibson's ex-wife, the ex-wife's lawyer, and a crew of police officers invaded Gibson's home and rifled

through its most intimate parts—including a safe—in the midst of a deeply personal divorce. *See* JA441 (McPeake Depo.) 44:13–44:20. Moreover, when Gibson protested and insisted that the search party honor constitutional safeguards by obtaining a warrant, Goldston responded by threatening Gibson with arrest. Thus Goldston wielded the power of the executive branch and became, in James Madison's words, an "oppressor." The Federalist No. 47, at 338. This Court should therefore deny Goldston immunity and affirm the judgment of the district court.

## REQUEST FOR ORAL ARGUMENT

The issue here—whether a judge who conducts a search and seizure of an individual's property is entitled to judicial immunity—is one of first impression in this Court. Further, the issue is important because it controls whether this plaintiff, and future plaintiffs similarly situated, can vindicate their First, Fourth, and Fourteenth Amendment rights. Plaintiff-Appellee therefore respectfully requests oral argument.


Dated: November 14, 2022.

Respectfully submitted,

/s/ Victoria Clark
Victoria Clark

59

INSTITUTE FOR JUSTICE
816 Congress Avenue, Suite 960
Austin, Texas 78707
Tel: (512) 480-5936
Email: tclark@ij.org

Anya Bidwell
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Email: abidwell@ij.org
      pjaicomo@ij.org

John Bryan
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street, PO Box 366
Union, West Virginia 24983
Tel: (304) 772-4999
Email: jhb@johnbryanlaw.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of    citations,    statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains 12150 words.

[] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2022* in *14pt Century Schoolbook*; or

[] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 14, 2022

/s/ Victoria Clark
Victoria Clark
*Counsel for Plaintiff-Appellee*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14 day of November 2022, I caused

this Brief of Appellee to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

John P. Fuller
Adam Ketner Strider
Jennifer E. Tully
**BAILEY & WYANT, PLLC**
500 Virginia Street East, Suite 600
Charleston, WV 25301
Tel:        (304) 345-4222
Email:     jfuller@baileywyant.com
           astrider@baileywyant.com
           jtully@baileywyant.com

/s/ Victoria Clark
Victoria Clark
*Counsel for Plaintiff-*
*Appellee*

62